1  ROB BONTA
   Attorney General of California
2  TODD GRABARSKY
   R. MATTHEW WISE
3  Supervising Deputy Attorneys General
   KRISTI HUGHES
4  HARALD H. KIRN
   ZELDA VASSAR
5  CHRISTOPHER J. KISSEL
   Deputy Attorneys General
6  State Bar No. 333937
    300 South Spring Street, Suite 1702
7   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6388
8   E-mail:  Christopher.Kissel@doj.ca.gov

9  *Attorneys for Plaintiffs State of California and
   California Governor's Office of Business and Economic*
10 *Development*

11 *Additional Counsel Listed on Signature Page*

12
                 IN THE UNITED STATES DISTRICT COURT
13
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
14
                     SAN FRANCISCO DIVISION
15

16

17 | **STATE OF CALIFORNIA; STATE OF** | Case No. _____ |
18 | **COLORADO; STATE OF WASHINGTON;** | |
   | **STATE OF CONNECTICUT; STATE OF** | **COMPLAINT FOR DECLARATORY** |
19 | **ILLINOIS; STATE OF MARYLAND;** | **AND INJUNCTIVE RELIEF; VERIFIED** |
   | **COMMONWEALTH OF** | **DERIVATIVE COMPLAINT FOR** |
20 | **MASSACHUSETTS; STATE OF NEW** | **DECLARATORY AND INJUNCTIVE** |
   | **JERSEY; STATE OF NEW YORK; STATE** | **RELIEF** |
21 | **OF OREGON; STATE OF RHODE** | |
   | **ISLAND; STATE OF VERMONT; STATE** | Administrative Procedure Act Case |
22 | **OF WISCONSIN; CALIFORNIA** | |
   | **GOVERNOR'S OFFICE OF BUSINESS** | Date: |
23 | **AND ECONOMIC DEVELOPMENT**, | Time: |
   | derivatively on behalf of **ARCHES H2 LLC**; | Courtroom: |
24 | | Judge: |
   | Plaintiffs, | Trial Date: |
25 | | Action Filed: February 18, 2026 |

26                         **v.**

27

28

**CHRISTOPHER WRIGHT**, in his official capacity as Secretary of Energy; **U.S. DEPARTMENT OF ENERGY**; **RUSSELL T. VOUGHT**, in his official capacity as Director of the U.S. Office of Management and Budget; **U.S. OFFICE OF MANAGEMENT AND BUDGET,**

Defendants,

– and –

**ARCHES H2 LLC,**

Nominal Defendant.

**INTRODUCTION**

1.     Since the first day of President Donald J. Trump's second term, his Administration set out to reverse and undermine the historic energy and infrastructure funding measures enacted by Congress in the preceding years.

2.     On Inauguration Day, the President issued an executive order titled "Unleashing American Energy" that purported to "[t]erminat[e] the Green New Deal." Exec. Ord. 14154, 8357 (Jan. 20, 2025).[1] It also ordered agencies not to disburse any funding appropriated through the Inflation Reduction Act ("IRA") and the Infrastructure Investment and Jobs Act ("IIJA") (collectively "the Acts"), key energy and infrastructure laws enacted by Congress during the previous administration. *Id.* In the months that followed, the Trump Administration—including the Department of Energy ("DOE") and Office of Management and Budget ("OMB")—worked to eliminate entire programs created under those statutes. It also made decisions and took actions intended to create cover for its unilateral elimination of programs created by Congress.

3.     In March 2025, for example, DOE—following the Administration's direction in the Unleashing American Energy executive order—created a list of DOE-funded energy and infrastructure projects across the country to submit to the White House for cuts: the "kill list."[2] The list was intended to further the Administration's goal of eliminating renewable-energy programs created by Congress through the duly-enacted 2021 IIJA and the 2022 IRA—programs the Administration derisively calls the "Green New Scam." An expanded kill list was made public through reporting on October 7, 2025.[3]

4.     In May 2025, DOE issued a policy memorandum ("DOE Memo") announcing that DOE would subject previously funded projects to a nebulous and opaque "review" process.

---

[1] Available at https://www.govinfo.gov/content/pkg/DCPD-202500121/pdf/DCPD-202500121.pdf.

[2] James Bikales, *Lawmakers and industry groups blast away at DOE project kill list*, POLITICO (Mar. 29, 2025), https://www.politico.com/news/2025/03/29/energy-departments-project-hit-list-draws-bipartisan-pushback-from-lawmakers-00254729.

[3] Brian Dabbs, *DOE floats new cuts to hundreds of clean energy grants*, E&E NEWS (Oct. 7, 2025), https://subscriber.politicopro.com/article/eenews/2025/10/08/doe-floats-new-cuts-to-hundreds-of-clean-energy-grants-ew-00596523.

5.     The DOE Memo was a pretext. Its true purpose was to give the Administration thin bureaucratic cover to eliminate congressionally established energy and infrastructure programs and rescind their funding, for no other reason than a fundamental disagreement with the programs' policy underpinnings.

6.     As a federal government shutdown loomed, President Trump, on September 30, 2025, told reporters he could "do things during the shutdown that are irreversible" to strike back at Democrats, including "cutting programs that they like."[4]  The next day, Russell Vought, the Director of OMB, posted online that DOE would be terminating "[n]early $8 billion in Green New Scam funding to fuel the Left's climate agenda."[5]  The post listed sixteen States where projects would be defunded: California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, New York, Oregon, Vermont, and Washington State ("Blue States").

7.     DOE announced the cuts the next day, citing the DOE Memo and, in some instances, the Unleashing American Energy executive order.  The announcement was followed by a flurry of termination letters to public and private DOE awardees across the country.  Some of the letters referenced the decision of a "Peer Review Committee"; others offered no pretense that any deliberation had occurred at all.  All the formally terminated awards, excluding one in Canada, were to awardees in the Blue States mentioned in Director Vought's post.

8.     Throughout the first year of the Trump presidency, DOE has quietly abandoned projects, some of which were contained in various "kill lists."  But all were funded as elements of high-profile energy and infrastructure legislation passed during the previous presidential administration.

9.     Defendants' unlawful policy began with President Trump's "Unleashing American Energy" executive order; continued through the ongoing abandonment of energy and infrastructure awards; matured through DOE's creation of "kill lists" of existing awards; and

---

[4] Alex Gangitano, *Trump floats cutting benefits during shutdown, warns Democrats are taking a risk*, THE HILL (Sept. 30, 2025), https://thehill.com/homenews/administration/5529071-trump-floats-cutting-benefits-during-shutdown-warns-democrats-are-taking-a-risk/.
[5] Russell Vought (@russvought), X, https://x.com/russvought/status/1973450301236715838.

came to full fruition through the DOE Memo. In early October, as the Administration sought a cudgel to wield in budget negotiations, Defendants deployed this unlawful policy as an opportunistic way to hurt the Administration's political enemies and those associated with them. In addition to advancing this short term goal, Defendants' deployment of the DOE Memo advanced the core purpose articulated since Day 1 of the Trump Administration: the undermining and effective repeal of energy and infrastructure legislation.

10. Defendants' adoption of the DOE Memo and their efforts to eliminate energy and infrastructure programs have prevented those programs from benefiting the States and their citizens.

11. In our constitutional system, only Congress has the power to appropriate funding, and to define if and how federal programs are administered. It is the President's duty, after that legislation is signed by the Executive, to execute those laws. He has no power to undo them, whether piecemeal or in their entirety. Indeed, the President's authority is at its lowest ebb when he acts in direct contravention of express congressional authority. Here, Defendants set out to eliminate congressionally authorized programs and to unilaterally rescind appropriations associated with what the Administration derided as the "Green New Scam." The DOE Memo provided a convenient and opaque mechanism for executing that plan. The plan violated the Constitution and the Administrative Procedure Act in numerous respects. This lawless action should be declared unlawful, set aside, and enjoined to the fullest extent possible.

**JURISDICTION AND VENUE**

12. This action arises under the Constitution, the laws of the United States, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 701–706. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

13. An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

14. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because Plaintiff State of California is a resident of this district and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within this district.

15. This is a civil action in which Defendants are United States agencies or officers sued in their official capacities.

16. Assignment to the San Francisco Division of this District is proper pursuant to Northern District of California Local Rules 3-2(c) and (d), because Plaintiff State of California and Defendant United States both maintain offices in the District in San Francisco.

**PARTIES**

**Plaintiffs**

17. The State of California is a sovereign State of the United States of America. California is represented by and through its Attorney General, Rob Bonta, who is the chief legal officer for California and is authorized to institute this action. The California Governor's Office of Business and Economic Development ("GO-Biz") also alleges claims in this Complaint on behalf of nominal defendant ARCHES H2 LLC, as set forth below.

18. The State of Colorado is a sovereign State of the United States of America. Colorado is represented by and through its Attorney General, Philip J. Weiser, who is the chief legal officer for Colorado and is authorized to institute this action.

19. The State of Washington is a sovereign State of the United States of America. Washington is represented by and through Attorney General Nicholas W. Brown, who is the chief legal adviser to the State and is authorized to institute this action.

20. The State of Connecticut is a sovereign State of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

21. The State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America. Attorney General Raoul is the chief

legal officer for the State of Illinois and is authorized to pursue this action under Illinois law.  *See* 15 ILCS 205/4.

22.     The State of Maryland is a sovereign State of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief law enforcement officer of the State.

23.     The Commonwealth of Massachusetts is a sovereign State of the United States of America.  Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

24.     The State of Oregon is a sovereign State of the United States.  Oregon is represented by and through its Attorney General, Dan Rayfield, who is the chief legal officer for Oregon and is authorized to institute this action.

25.     The State of New Jersey is a sovereign State of the United States of America. New Jersey is represented by and through its chief legal officer, Acting Attorney General Jennifer L. Davenport.

26.     The State of New York is a sovereign State of the United States of America.  New York is represented by Attorney General Letitia James, the State's chief legal officer.

27.     The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

28.     The State of Vermont is a sovereign State of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is authorized to bring this action on behalf of the State.

29.     The State of Wisconsin is a sovereign State in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin.  Attorney General Kaul is authorized to sue on behalf of the State.

1

**Defendants**

2       30.    Defendant Christopher Wright is the Secretary of Energy of the United States and

3  DOE's highest ranking official.  He is charged with the supervision and management of all

4  decisions and actions of that agency.  42 U.S.C. § 7131.  He is sued in his official capacity.

5       31.    Defendant DOE is a cabinet agency within the executive branch of the United

6  States government.  *Id.*  DOE manages and coordinates federal energy functions and

7  responsibilities.  *Id.* § 7133.

8       32.    Defendant Russell Vought is the Director of OMB and that agency's highest

9  ranking official.  31 U.S.C. § 502(a).  He oversees OMB and provides direction to the executive

10  branch on financial and budgetary matters.  He is sued in his official capacity.

11       33.    Defendant OMB is an agency office within the Executive Office of the President

12  of the United States.  *Id.* § 501.  OMB is responsible for oversight of federal agencies'

13  performance and the administration of the federal budget as negotiated and passed by Congress.

14  *Id.* §§ 501–07.

15

**Parties to Derivative Claims**

16       34.    Plaintiff GO-Biz is a State agency created by statute and situated within the

17  executive branch of the State of California.  Cal. Gov. Code § 12096.2(a).  GO-Biz is empowered

18  to, among other things, "work[] in partnership with local, regional, federal, and other state public

19  and private institutions to encourage business development and investment in" California.  *Id.* §

20  12096.3(c).

21       35.    Nominal defendant ARCHES H2 LLC (Alliance for Renewable Clean Hydrogen

22  Energy Systems, or "ARCHES") is a California limited liability company that is the awardee of

23  cooperative agreement number DECD0000041.  GO-Biz is a member of ARCHES.

24       36.    GO-Biz brings its claims derivatively on ARCHES's behalf pursuant to Federal

25  Rule of Civil Procedure 23.1.

26

27

28

6

1  **ALLEGATIONS**

2  **I.    FACTUAL BACKGROUND**

3       **A.    Congress Passed Transformational Laws That Included Billions of Dollars**

4            **for Energy and Infrastructure Projects**

5            **1.    The Infrastructure Investment and Jobs Act**

6       37.    In November 2021, Congress passed, and President Biden signed into law, the

7  Infrastructure Investment and Jobs Act—a compromise born of bipartisan negotiation and made

8  possible through the joint efforts of the Legislative and Executive Branches, working in tandem to

9  deliver a permanent investment in American energy and infrastructure.

10      38.    The IIJA was the product of months of negotiation by the House, Senate, and

11 Biden Administration—an example of the American government functioning as the Framers of

12 the Constitution designed it—to advance a clean energy and infrastructure agenda for the

13 environmental and economic benefit of Americans nationwide.

14      39.    The process began on March 31, 2021, when President Biden announced a $2.3

15 trillion economic proposal to overhaul America's infrastructure.[6]  Republicans offered a $568

16 billion counterproposal.[7]

17      40.    The IIJA started as the House's answer to both proposals—a narrower $547 billion

18 transportation infrastructure bill called the INVEST in America Act, which the House passed on

19 July 1, 2021.  H.R. 3684, 117th Congress (June 4, 2021); 167 Cong. Rec. H3587 (Jul. 1, 2021).

20      41.    A bipartisan group in the Senate then developed a $1.2 trillion compromise.[8]  The

21 plan added energy, climate, industrial, and water programs to the INVEST Act, which was

---

22  [6] *The Build Back Better Framework*, The White House,

23 https://bidenwhitehouse.archives.gov/build-back-better/ (accessed on Oct. 31, 2025).

    [7] David Morgan, *Republicans unveil $568 bln infrastructure package to counter Biden*, REUTERS

24 (Apr. 2021), https://www.reuters.com/world/us/republicans-unveil-568-bln-infrastructure-

   package-counter-bidens-23-trillion-2021-04-22/.

25  [8] Jacob Prumak, *'We have a deal,' Biden says after meeting with Senate infrastructure group*,

   CNBC (June 24, 2025), https://www.cnbc.com/2021/06/24/infrastructure-deal-talks-biden-

26 invites-bipartisan-senators-to-white-house.html; Jacob Pramuk, *Bipartisan Senate Infrastructure*

   *deal would cost about $1 trillion*, CNBC (Jun. 11, 2025),

27 https://www.cnbc.com/2021/06/11/bipartisan-senate-infrastructure-deal-would-cost-about-1-

   trillion.html.

28

1   renamed the Infrastructure Investment and Jobs Act.  Senate Amendment to H.R. 3684, 117th

2   Congress (Aug. 10, 2021).  The Senate passed the IIJA on August 10, 2021, on a bipartisan vote

3   of 69–30, including the votes of the Senate Majority and Minority Leaders.  167 Cong. Rec.

4   S6203 (daily ed. Aug. 10, 2021).  The House adopted the Senate's changes on November 5, 2021,

5   and the IIJA was signed into law on November 15, 2021.  Pub. L. No. 117–58, 135 Stat. 429

6   (Nov. 15, 2021).

7       42.    In the IIJA, Congress appropriated a broad array of funding for energy,

8   technology, and infrastructure development.  The statute includes over $8 billion designated to

9   fund "Electricity" programs; nearly $7.5 billion to fund, in the statute's terms, "Fossil Energy and

10  Carbon Management," and over $16 billion for "Energy Efficiency and Renewable Energy."

11  Examples of the programs funded by these appropriations include the following:

12      a.    **The Grid Resilience and Innovation Partnerships Program's** ("GRIP")

13  **Smart Grid Program**, for which Congress appropriated $3 billion to support increasing the

14  capacity of the transmission system and integrating renewable energy.  Pub L. No. 117–58, 135

15  Stat. 940.  Congress directed that the Secretary of Energy "shall establish a Smart Grid Matching

16  Grant Program to provide awards of up to one-half (50 percent) of qualifying Smart Grid

17  Investments."  *Id.*; 42 U.S.C. § 17386(a).

18      b.    **The Resilient and Efficient Codes Implementation program** ("RECI"),

19  for which Congress appropriated $225 million to assist States and localities to update energy

20  codes for buildings.  Pub. L. No. 117–58, § 40511, 135 Stat. 1058.  Congress directed that the

21  Secretary of Energy "shall establish within the Building Technologies Office of the Department

22  of Energy a program under which the Secretary shall award grants on a competitive basis to

23  eligible entities to enable sustained cost-effective implementation of updated building energy

24  codes."  42 U.S.C. § 6838(b)(1).

25      c.    **The Carbon Storage Validation and Testing program**, for which

26  Congress appropriated $2.5 billion to develop large-scale carbon storage infrastructure to reduce

27  carbon dioxide emissions.  Pub. L. No. 117–58, 135 Stat. 1001-2.  Congress enacted a statute

28  within IIJA titled "Carbon storage validation and testing," directing that the Secretary of Energy

1   "shall establish a program of research, development, demonstration, and commercialization for

2   carbon storage."  42 U.S.C. § 16293.

3            **d.      The Wind Energy Technology Program**, for which Congress

4   appropriated $100 million to support wind energy research and development.  Pub. L. No. 117–

5   58, 135 Stat. 1129.  Congress directed that the Secretary of Energy "shall establish a program to

6   conduct research, development, demonstration, and commercialization of wind energy

7   technologies" and "carry out research, development, demonstration, and commercialization

8   activities, including . . . awarding grants and awards, on a competitive, merit-reviewed basis[.]"

9   42 U.S.C. §§ 16237(b)(1)(A), (b)(2)(A)(i).  DOE was required to "give special consideration to

10  projects that are located in a geographically diverse range of eligible entities[.]"  *Id.* §

11  16237(b)(2)(C)(i)(I).

12           **e.      The Solar Energy Technology Program**, for which Congress

13  appropriated $80 million to support solar energy research and development.  Pub. L. No. 117–58,

14  135 Stat. 1129.  Congress directed that the Secretary of Energy "shall establish a program to

15  conduct research, development, demonstration, and commercialization of solar energy

16  technologies" and "shall carry out research, development, demonstration, and commercialization

17  activities, including . . . awarding grants and awards, on a competitive, merit-reviewed basis[.]"

18  42 U.S.C. § 16238(b)(1)(A), (b)(2)(A)(i).  In doing so, the Secretary "shall, to the maximum

19  extent possible, give special consideration to projects that are located in a geographically diverse

20  range of eligible entities[.]"  *Id.* § 16237(b)(2)(C)(i)(I).

21           **f.      The Clean Hydrogen Electrolysis Program**, for which Congress

22  appropriated $1 billion to support projects that aim to reduce the cost of producing clean

23  hydrogen by using electrolysis, a process that uses electricity to split water into hydrogen and

24  oxygen.  Pub. L. No. 117–58, 135 Stat. 1369.  Congress enacted a statute within IIJA titled

25  "Clean hydrogen electrolysis program," directing that the Secretary of Energy "shall establish a

26  research, development, demonstration, commercialization, and deployment program for purposes

27  of commercialization to improve the efficiency, increase the durability, and reduce the cost of

28  producing clean hydrogen using electrolyzers."  42 U.S.C. § 16161d(b).  Additionally, the

Secretary "shall award grants, on a competitive basis, to eligible entities for projects that the Secretary determines would provide the greatest progress toward achieving the goal of the program[.]" *Id.* § 16161d(f)(1).

       **g.**      **The Carbon Utilization Program**, for which Congress appropriated over $300 million to support carbon utilization research and development. Pub. L. No. 117–58, 135 Stat. 1373. Congress enacted a statute within IIJA titled "Carbon utilization program," directing that the Secretary of Energy "shall establish a program of research, development, and demonstration for carbon utilization" and "shall establish a program to provide grants to eligible entities to . . . procure and use commercial or industrial products that: (i) use or are derived from anthropogenic carbon oxides; and (ii) demonstrate significant net reductions in lifecycle greenhouse gas emissions compared to incumbent technologies, processes, and products." 42 U.S.C. § 16298a(a), (b)(2).

43. The IIJA also funded initiatives such as the **Joint Office of Energy and Transportation**, for which Congress appropriated $300 million, including to, among other things, "support grants for community resilience and electric vehicle integration." Pub. L. No. 117–58, 135 Stat. 1425.

44. The IIJA also created the **Office of Clean Energy Demonstrations ("OCED")** within DOE and required the Secretary of Energy to appoint a head of OCED to administer "covered projects." Pub. L. No. 117–58, § 41201, 135 Stat. 1130. In total, the IIJA provided $21.5 billion to OCED. *Id.* Examples of OCED "covered programs," for which IIJA provided funding directly to OCED, include parts or all the following:

       **a.**      **The Regional Clean Hydrogen Hubs Program**, for which Congress appropriated $8 billion to support at least four "hydrogen hubs" in different regions of the United States with the goal of accelerating the domestic hydrogen industry and supporting decarbonization. Pub. L. No. 117–58, 135 Stat. 1378. Congress directed that the Secretary of Energy "shall establish a program to support the development of at least 4 regional clean hydrogen hubs" and that, "to the maximum extent practicable, each regional clean hydrogen hub shall be located in a different region of the United States; and shall use energy resources that are

abundant in that region." 42 U.S.C. § 16161a(b), (c)(3)(C).  At least one of hydrogen hubs chosen for the program "shall demonstrate the production of clean hydrogen from renewable energy."  *Id.* § 16161a(c)(3)(A)(ii).

45.    Finally, the IIJA directed DOE to create the **National Clean Hydrogen Strategy and Roadmap**, "a technologically and economically feasible national strategy and roadmap to facilitate widescale production, processing, delivery, storage, and use of clean hydrogen."  Pub. L. No. 117–58, § 40314, 135 Stat. 1010; 42 U.S.C. § 1616b.  Pursuant to this Roadmap, which DOE published in June 2023, DOE announced a number of funding opportunities that were funded under various statutes enacted during the Biden Administration, including the IIJA.

### 2.    Inflation Reduction Act

46.    In November 2021, Congress passed, and President Biden signed into law, the IRA, which created new programs and funding streams to support domestic energy production and emissions reduction, among other things.  The IRA was another product of the energy and infrastructure initiative carried out by Congress in the years between President Trump's first and second terms and was the result of extended legislative negotiations.

47.    Through the IRA, Congress appropriated approximately $783 billion for domestic-energy and climate-change projects.[9]  Programs created include the Greenhouse Gas Reduction Fund (which the Environmental Protection Agency has frozen); the Advanced Industrial Facilities Deployment Program, Pub. L. No. 117–169, 136 Stat. 2049; and others, such as **the Methane Emissions Reduction Program**, for which Congress appropriated $850 million to reduce greenhouse gas emissions from petroleum and natural gas systems and mitigate related health harms.  Pub. L. No. 117–169, 136 Stat. 2073.

---

[9] Congressional Budget Office, *Estimated Budgetary Effects of Public Law 117-169* (Sept. 7, 2022), https://www.cbo.gov/system/files/2022-09/PL117-169_9-7-22.pdf.

*California, et al. v. Wright, et. al.*

1         **3.**      **Additional Energy and Infrastructure Programs Created Between**

2                     **President Trump's First and Second Terms**

3         48.     In the years immediately preceding President Trump's second term, Congress also

4 dedicated billions of dollars to energy-efficiency and renewable-energy programs via yearly

5 appropriations bills.  Examples of these programs include the following:

6        **a.**      **The Technical Partnership Program**, for which Congress appropriated

7 $12 million to, in part, support the technical activities of DOE's Advanced Manufacturing Office.

8 Pub. L. No. 116–260, 134 Stat. 2450–51.  The program is intended "to encourage deployment of

9 combined heat and power, waste heat to power, and efficient district energy [] technologies" and

10 provide support to building and industrial professionals.  42 U.S.C. § 6345.  Congress directed

11 that the program "shall make funds available to institutions of higher education, research centers,

12 and other appropriate institutions[.]"  *Id.*

13        **b.**      **Industrial Efficiency and Decarbonization**, for which Congress directed

14 that DOE spend $240 million from FY 2022 energy efficiency and renewable energy

15 appropriations, Pub. L. No. 117–103, 136 Stat. 222, *Explanatory Statement* at 876 (FY 2022),[10]

16 and $420 million from FY 2023 appropriations, Pub. L. No. 117–328, 136 Stat. 4632,

17 *Explanatory Statement* at 898 (FY 2023).[11]  DOE created the Office of Industrial Efficiency and

18 Decarbonization and promulgated the Industrial Decarbonization Roadmap outlining DOE's

19 strategy to reduce emissions in the industrial sector.[12]

20        **c.**      **Building Energy Efficiency Frontiers & Innovation Technologies**

21 (**BENEFIT**), which DOE's Building Technologies Office funds yearly from Congress's annual

22 appropriation for energy efficiency and renewable energy activities.  *See, e.g.*, Pub. L. No. 117–

23 103, 136 Stat. 222, *Explanatory Statement* at 883 (FY 2022); Pub. L. No. 117–328, 136 Stat.

24 4632, *Explanatory Statement* at 913 (FY 2023).  The 2022 Consolidated Appropriations Act

25 directed that DOE "shall focus its efforts to address whole building energy performance and cost

26

27   [10] Available at https://www.congress.gov/117/cprt/HPRT47047/CPRT-117HPRT47047.pdf.

    [11] Available at https://www.congress.gov/117/cprt/HPRT50347/CPRT-117HPRT50347.pdf.

28   [12] Available at https://www.osti.gov/servlets/purl/1961393.

*California, et al. v. Wright, et. al.*

1    issues to inform efforts to advance beneficial electrification and greenhouse gas mitigation

2    without compromising building energy performance."  Pub. L. No. 117–103, 136 Stat. 222,

3    *Explanatory Statement* at 884 (FY 2022); *accord* Pub. L. No. 117–328, 136 Stat. 4632,

4    *Explanatory Statement* at 913 (FY 2023).

5          **d.**    **Renewable Energy Grid Integration,** for which Congress appropriated

6    $290 million for FY 2021 to support grid integration research and development.  Pub. L. No.

7    116–260, 135 Stat. 2592.  Congress directed that the Secretary of Energy "shall establish a

8    research, development, and demonstration program on technologies that enable integration of

9    renewable energy generation sources onto the electric grid[.]"  42 U.S.C. § 16236(a).

10          **e.**    **Vehicle Technologies**, which Congress funds via annual appropriations to

11    energy efficiency and renewable energy activities, including, for example, $250 million for

12    battery and electrification technologies.  *See, e.g.*, Pub. L. No. 117–103, 136 Stat. 222,

13    *Explanatory Statement* at 877 (FY 2022); Pub. L. No. 117–103, 136 Stat. 222, *Explanatory*

14    *Statement* at 902 (FY 2023).  In 2023, Congress indicated DOE should "prioritize projects in

15    states where the transportation sector is responsible for a higher percentage of the state's total

16    energy consumption and is the largest source of greenhouse gases." *Id.*

17          **f.**    **Hydrogen and Fuel Cell Technologies**, which Congress funds via annual

18    appropriations to energy efficiency and renewable energy activities, including, for example, $50

19    million for hydrogen technologies and $10 million for hydrogen delivery, storage, and release

20    technologies, for FY 2024.  Pub. L. No. 118–42, 138 Stat. 196, *Explanatory Statement* at S1574.[13]

21    Congress has also directed funding to specific hydrogen initiatives that advance the Hydrogen

22    Roadmap created by the IIJA, such as $100 million for the H2@Scale Initiative, which aims to

23    advance affordable hydrogen production, transport, storage, and utilization.  Pub. L. No. 117–

24    328, 136 Stat. 4632, *Explanatory Statement* at 905.  DOE's Hydrogen and Fuel Cell Technologies

25    Office also funds other research and development activities that advance the Hydrogen Roadmap,

26    such as Hydrogen Shot, which targets more efficient and affordable clean hydrogen production.

27

28          ——————————————

[13] Available at https://www.congress.gov/118/crec/2024/03/05/170/39/CREC-2024-03-05.pdf#page=522.

49.      As authorized and required by the foregoing statutes, including the IIJA and IRA, DOE awarded federal funds to numerous private and public entities, including Plaintiffs, for a broad array of energy projects.

**B.      The Trump Administration Sets Out to "Terminate the Green New Deal" and Freeze Funding Under the IIJA, IRA, and Other Legislation**

50.      President Trump signed the Unleashing American Energy executive order on January 20, 2025—day one of his administration.  90 Fed. Reg. 8353.[14]  The order purported to "[t]erminat[e] the Green New Deal."  *Id.* § 7(a).  It ordered "[a]ll agencies" to "immediately pause the disbursement of funds" under the IIJA and IRA and ordered agencies to assess whether funded programs conformed to the Administration's policy goals.  *Id.*  The executive order further prohibited, after the initial freeze and review, any future disbursement of IIJA or IRA funds without approval from Defendant Director of OMB Russell Vought.  *Id.* at 8354.

51.      Other executive orders issued around the same time and later instructed OMB and federal agencies to review existing awards and terminate those that the Trump Administration deemed unnecessary.  Exec. Ord. 14217, 90 Fed. Reg. 10577, 10577 (Feb. 19, 2025); Exec. Ord. 14158, 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025); Exec. Ord. 14222, 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025).

52.      A separate executive order titled "Declaring a National Energy Emergency," also issued on January 20, declared a "national energy emergency."  Exec. Ord. 14156 § 8(a), 90 Fed. Reg. 8433 (Jan. 20, 2025).[15]  Significantly, its definition of "energy" excluded energy derived from hydrogen, solar, and wind.  Exec. Ord. 14156 § 8(a), 90 Fed. Reg. 8433 (Jan. 20, 2025).[16] Together, the "Unleashing American Energy" and "Declaring a National Energy Emergency" executive orders set forth a policy to deprioritize funding for renewable-energy projects.

---

[14] Available at https://www.govinfo.gov/content/pkg/DCPD-202500121/pdf/DCPD-202500121.pdf.
[15] Available at https://www.govinfo.gov/content/pkg/DCPD-202500123/pdf/DCPD-202500123.pdf.
[16] Available at https://www.govinfo.gov/content/pkg/DCPD-202500123/pdf/DCPD-202500123.pdf.

53.    The Trump Administration's early efforts to enforce those orders were enjoined by several district courts. *See Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440, 479 (D.R.I. 2025) (enjoining, on April 15, 2025, Administration's freezing of awarded grants under the IIJA and IRA); *New York v. Trump*, 769 F. Supp. 3d 119, 146-47 (D.R.I. 2025) (enjoining, on March 6, 2025, Administration's freezing of various funds based on OMB's implementation of the "Unleashing American Energy" executive order); *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 130-31 (D.D.C. 2025) (same, on February 25, 2025).

54.    Even as those lawsuits proceeded, DOE persisted in furthering the Administration's goal of rolling back existing energy and infrastructure programs.  By late March, DOE had compiled a "kill list" of at least $22 billion in cuts to DOE-funded energy projects primarily supporting renewable energy development and decarbonization.[17]  A DOE spokesperson stated that DOE had decided to conduct a department-wide review of its funding "to ensure activities follow the law and align with the Trump administration's priorities."[18]

55.    In response, a group of Democratic congressmembers sent a letter to the Acting Inspector General of DOE.  "It appears," they wrote, "that some projects previously deemed worthy of funding are being terminated without adequate justification, and in some cases, with no clear rationale other than administrative convenience."[19]  The congressmembers noted that any "attempt to manipulate federal funding for partisan purposes" would "represent a serious abuse of power."  *Id.*

56.    The Administration tried, and failed, to convince Congress to pass legislation rescinding funds that had not yet been "obligated"—in other words, formally committed to an awardee—for programs it characterized as supporting the "Green New Scam."  The President's budget proposal, "Ending the Green New Scam," would have resulted in the rescission of roughly $15 billion in IIJA funding plus $4 billion more attributed to other projects.  FY26 Discretionary

---

[17] *Supra*, n. 3.
[18] *Id.*
[19] Appropriations Committee Democrats, *House Energy Leaders Call for Investigation into Department of Energy's Scheme to Cancel Awards and Contracts* (April 3, 2025), https://democrats-appropriations.house.gov/news/press-releases/house-energy-leaders-call-investigation-department-energys-scheme-cancel-awards.

Budget Proposal at 21, The White House (May 2, 2025).[20]  There was a significant overlap between programs targeted for rescission in the budget proposal and those identified on DOE's March "kill list," which similarly included *only* funds that DOE already committed to awardees. These actions make plain that the Administration intended to end all funding for those programs, whether DOE had awarded the funds yet or not.[21]

57.    The bill that Congress ultimately passed did not rescind any significant tranches of IIJA program funds; it only rescinded some unobligated funds supporting IRA programs.  Pub. L. No. 119–21, 139 Stat. 152 (July 4, 2025).  The bill also did not touch any of the IIJA and IRA funds that DOE previously obligated to award recipients.

58.    While the President's budget rescission proposal was under consideration by Congress, the Administration laid the foundations for a back-up plan, if Congress refused to rescind the funds: On May 15, 2025, Defendant Energy Secretary Wright announced DOE's new "Secretarial Policy on Ensuring Responsibility in Financial Assistance," which was memorialized in an accompanying one-page memorandum—the DOE Memo.  Dep't. of Energy, *Secretary Wright Announces New Policy for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025).[22]  Secretary Wright claimed DOE would "evaluat[e] financial assistance on a case-by-case basis to identify waste of taxpayer dollars, protect America's national security and advance President Trump's commitment to unleash affordable, reliable and secure energy for the American people." [23]  The statement parroted the President's "Unleashing American Energy" executive order.  *See* 90 Fed. Reg. 8353, 8353 ("It is thus in the national interest to unleash America's affordable and reliable energy and natural resources.").

59.    The DOE Memo outlined the purported process the agency would use to determine whether awards conformed to a set of new "Standards."  Wright, Chris, *Secretarial Policy on*

---

[20] Available at https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

[21] The final bill passed by Congress did not rescind any significant tranches of IIJA program funds; it only rescinded some unobligated funds supporting IRA programs.  Pub. L. No. 119–21, 139 Stat. 152.

[22] Available at https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful.

[23] *Id.*

*Ensuring Responsibility for Financial Assistance* (May 25, 2025).[24]  Those "Standards" included
open-ended and vague criteria such as whether DOE considered projects to be "aligned with
national interests" or "consistent with the Administration's policies and priorities."[25]  The DOE
Memo explained that DOE might utilize information about awardees that it already had on hand,
conduct its own investigation, or request information from awardees "to help inform DOE's
decisional process."  If DOE decided a program did not meet the "Standards," DOE "in its
discretion, may terminate the project . . . as allowed by law."

60.    The DOE Memo embodied DOE's unlawful review policy and half-heartedly
attempted to add a veneer of legitimacy to its elimination of congressionally authorized programs
by terminating awards added to the kill list months earlier. But DOE did not even purport to rely
on any legal authority to justify this "review," nor did it explain how it would apply the
"Standards."

61.    DOE began terminating awards using the DOE Memo fifteen days later.  On May
30, 2025, DOE terminated 24 carbon-capture projects, totaling $3.7 billion, all of which were
administered by the Office of Clean Energy Demonstrations (an office that Congress also created
in the IIJA).[26]  DOE claimed the terminations "generat[ed] an immediate $3.6 billion in savings
for the American people," implying that DOE was permanently withholding those funds in
violation of Congress's spending commands, consistent with the Administration's stated intent to
"terminate the Green New Scam."  *Secretary Wright Announces Termination of 24 Projects
Generating Over $3 Billion in Taxpayer Savings*, Dep't. of Energy (May 30, 2025).[27]

---

[24] Available at https://www.energy.gov/sites/default/files/2025-05/EXEC-2025-005990%20-%20Secretarial%20Policy%20-PRP%20-%205-14-25%%20%28FINAL%29%20%282%29.pdf.
[25] *Id.*
[26] Haley Smith, *California decarbonization projects are among two dozen eliminated by Trump's Department of Energy*, L.A. TIMES (June 18, 2025), https://www.latimes.com/environment/story/2025-06-18/california-decarbonization-projects-cancelled-trump-department-of-energy; Maeve Allsup, *What it means to cut the Office of Clean Energy Demonstrations*, LATITUDE MEDIA (April 4, 2025), https://www.latitudemedia.com/news/what-it-means-to-cut-the-office-of-clean-energy-demonstrations/.
[27] Available at https://www.energy.gov/articles/secretary-wright-announces-termination-24-projects-generating-over-3-billion-taxpayer.

62.     The Administration may be withholding other funds in furtherance of its goal of rolling back energy and infrastructure funding from the Biden years.  On September 24, 2025, DOE announced it was "returning . . . to the American taxpayer" more than $13 billion in unobligated funds "appropriated to advance the previous Administration's wasteful Green New Scam agenda."  *Energy Department Returns $13 billion in Unobligated Wasteful Spending to American Taxpayers*, Dep't of Energy (Sept. 24, 2025).[28]

63.     Since October 1, 2025, OMB has withheld funding intended for OCED, preventing DOE from spending any of the funds that Congress dedicated for OCED's use.  Specifically, OMB has refused to provide DOE the authority to obligate OCED funds.[29]  *See* 31 U.S.C. § 1512. This refusal to "apportion" OCED funds to DOE is a significant departure from past years, where the entire balance of the IIJA funds that support OCED's programs were available for OCED to spend at the beginning of each calendar year.

64.     In fact, OMB is required to apportion OCED funds 20 days before the beginning of each fiscal year or 30 days after the enactment of the appropriation. 31 U.S.C. § 1513.  OMB confirmed last year that it has been "carefully scrutinizing spending" that Congress set aside for various federal agencies to prevent spending toward the "Green New Scam" and other policies it disfavors.[30]

65.     In at least one instance, DOE has used IIJA funds for a purpose directly opposed to the purpose for which Congress provided those funds.  Just recently, DOE released a notice of funding opportunity titled "Restoring Reliability: Coal Recommissioning and Modernization" that referenced three sources of funding: the Carbon Capture Demonstration Projects Program, IIJA § 41004(b), 42 U.S.C. § 16292; the Carbon Capture Large-Scale Pilot Projects, IIJA § 41004(a) 42

---

[28] Available at https://www.energy.gov/articles/energy-department-returns-13-billion-unobligated-wasteful-spending-american-taxpayers.

[29] All agency spending data is available at https://portal.max.gov/portal/document/SF133/Budget/FACTS%20II%20-%20SF%20133%20Report%20on%20Budget%20Execution%20and%20Budgetary%20Resources.html#, and all OMB apportionment data is available at https://apportionment-public.max.gov/.

[30] Alicia Parlapiano, *In Budget Logs It Tried to Hide, White House Wrests More Control Over Spending*, N.Y. TIMES (Aug. 29, 2025), https://www.nytimes.com/2025/08/29/upshot/trump-congress-federal-budget.html (emphasis added).

U.S.C. § 16292; and the Energy Improvements in Rural or Remote Areas Program, IIJA § 40103(c).  There were awards from all three of those programs on DOE's kill list (though none to the plaintiffs in this case).  None of the IIJA provisions Congress used to create those programs authorized the use of funds to support coal-generated power.

66.     Also in the period since October 1, 2025, DOE only obligated $3.7 million in IIJA funds appropriated for "Energy Efficiency and Renewable Energy," despite having over $4.6 billion available; $12.6 million in IIJA funds for "Fossil Energy and Carbon Management," despite having over $6 billion available; and $5.2 million of IIJA funds appropriated for "Electricity," despite having over $2.7 billion available.  These expenditures are well below even the small amount authorized to cover DOE's administrative costs.  In contrast, DOE had obligated billions from these appropriations by this point last fiscal year.  This is effectively a complete shutdown of these funding streams and signals Defendants' intent to shutter these programs.

67.     DOE has claimed to have eliminated OCED, along with its Office of Energy Efficiency and Renewable Energy and Grid Deployment Office—the DOE offices tasked with administering much of the funding at issue here.[31]

68.     Those actions, taken together, evidence a decision by DOE and OMB to eliminate programs that the Administration associated with efforts by Congress and the previous presidential administration to advance clean energy and any other policies it associates with the "Green New Scam."

69.     The upshot is this: When the Administration's attempts to negotiate with Congress to rescind funding failed—such as when Congress rejected the Administration's "Ending the Green New Scam" rescission proposal—Defendants decided to achieve their goals by using the DOE Memo's purported case-by-case review process as a pretext to de-obligate swaths of

---

[31] DOE Organizational Chart (Nov. 20, 2025), https://www.energy.gov/sites/default/files/2025-11/Organization-Chart-11.20.2025-2.pdf; Hannah Northey and Christa Marshall, *Wright overhauls DOE, reflecting shift in US energy priorities*, E&E NEWS / POLITICO (Nov. 21, 2025), https://subscriber.politicopro.com/article/eenews/2025/11/21/wright-overhauls-doe-reflecting-shift-in-us-energy-priorities-ee-00662388.

funding for renewable-energy programs, energy-efficiency programs, or anything associated with the "Green New Scam," and by simply refusing to spend the unobligated balances of funding dedicated to those programs.

70.     The result is an effort to unilaterally eliminate programs created and funded by Congress based purely on policy disagreement.

**C.     The Administration Unlawfully Terminated Over Three Hundred Energy Projects and Abandoned Even More**

71.     As the federal government neared a shutdown in September 2025, the Administration threatened broad cuts to federal programs as a political cudgel against Democrats. President Trump claimed Democrats were "taking a risk by having a shutdown" and that the Administration could "do things during the shutdown that are irreversible" such as "cutting programs that [Democrats] like."[32]

72.     On October 1, Defendant OMB Director Vought announced that DOE was cutting "[n]early $8 billion in the Green New Scam funding to fuel the Left's climate agenda."[33]

73.     The next day, October 2, DOE announced the termination of 315 awards collectively worth $7.56 billion.  *Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion*, Dep't of Energy (Oct. 2, 2025).[34]  Nearly all the terminated funds had been appropriated in the IIJA to support energy and infrastructure programs.[35]  As OMB Director Vought had threatened, all but one—a single project in Canada—were situated in the Blue States.

---

[32] Nik Popli, *Trump Floats 'Irreversible' Cuts To Benefit Programs If Government Shuts Down*, TIME (Sept. 30, 2025), https://time.com/7322023/donald-trump-government-shutdown-benefit-cuts/.

[33] *Supra*, n. 5.

[34] Available at https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion.  As the District Court for the District of D.C. explained, "[t]he Secretary's announcement stated that there were 321 grant terminations . . . but the actual number was 315. DOE had terminated six awards months before." *City of Saint Paul v. Wright*, No. 25-CV-03899 (APM), 2026 WL 88193, at *2 & n.5 (D.D.C. Jan. 12, 2026).

[35] Matthew Daly, *Trump administration cuts nearly $8B in clean energy projects in states that backed Harris*, ASSOCIATED PRESS (Oct. 2, 2025), https://apnews.com/article/trump-clean-energy-hydrogen-hub-newsom-0223cb4469508bcea4f689c18c9ab65d; Fact Sheet: Energy Projects Terminated Under the Guise of the Republican Shutdown, Appropriations Committee

(continued…)

74.     DOE's announcement referenced the May DOE Memo: "On day one, the Energy Department began the critical task of reviewing billions of dollars in financial awards," Secretary Wright said.

75.     On October 7, 2025, news media reported the existence of a second list.[36]  This version of the "kill list" contained nearly all the projects on the October 2 list of program cuts, along with billions in additional cuts to projects across the country.  In all, it identified more than 600 awards valued at over $20 billion to be terminated.  A news article quoted an energy lobbyist: "I understand this is the full list that was sent to Office Management and Budget a few weeks ago," the lobbyist said.[37] "Last week, they basically just pulled out most, if not all, the blue state projects, and that's what they announced as cuts."

76.     Reporting suggests the Administration plucked the Blue State cuts from this second, larger list of intended cuts and announced them as retribution for the government shutdown after directing Defendant Secretary Wright to hold off on the larger list of cuts in late summer so the Administration could use them as leverage.[38]

77.     In other litigation, OMB and DOE "concede[d] that the political identity of a terminated grantee's state, including the fact that the state supported Vice President Kamala Harris in the 2024 election, played a preponderant role in the October 2025 grant termination decisions."[39]

78.     DOE has since terminated several programs represented by the awards identified on the October 7 "kill list."  And Secretary Wright has promised more cuts.[40]

---

Democrats, https://democrats-appropriations.house.gov/sites/evo-subsites/democrats-appropriations.house.gov/files/evo-media-document/doe-project-terminations-oct-2025.pdf (accessed on Dec. 16, 2025).

[36] *Supra*, n. 3.

[37] *Id.*

[38] Sophia Cai, *'The boys are fighting': Rising tensions beset Trump's Energy chief*, Politico (Oct. 9, 2025), https://www.politico.com/news/2025/10/09/white-house-energy-secretary-clash-over-30b-in-cuts-00600776.

[39] *City of Saint Paul*, 2026 WL 88193 at *2.

[40] Christa Marshall, DOE cancels more than $700M in battery, manufacturing projects, E&E News / Politico (Oct. 20, 2025), https://www.eenews.net/articles/doe-cancels-more-than-700m-in-battery-manufacturing-projects/.

79.     Around the same time DOE announced the 315 award terminations, it began issuing termination letters or notices to some awardees.

80.     A few letters made cursory attempts at individualized explanations for the terminations; others did not. Elsewhere, DOE merely sent amendments to the awards indicating that the project was terminated.

81.     When awardees did receive termination letters, the letters cited 2 C.F.R. § 200.340(a)(4), a federal regulation that permits the termination of awards that no longer serve "program goals" or "agency priorities," if the original award agreements permit termination on those grounds.

82.     Some awardees never received termination letters or amended awards but still cannot access their funds.  Those awardees are left in limbo, not officially terminated but unable to move forward. In effect, DOE has abandoned their awards.

83.     In every instance where a Plaintiff's award was listed on the October 7 list, but where the State did not receive a termination letter or notification, DOE has abandoned the award, *treating* the award as terminated.

84.     The results of Defendants' funding purge are spread across numerous States and across several of the programs and offices created in the Acts:

a.      **Regional Hydrogen Hubs:** DOE terminated cooperative agreements with the ARCHES and PNWH2 hydrogen hubs totaling over $2 billion.  The hubs received termination letters stating a review committee had determined that the hubs had not "passed" the "Standards" set forth in the DOE Memo. The letter invoked 2 C.F.R. § 200.340(a)(4).

b.      **GRIP – Smart Grid:** DOE terminated an award under this program, for which Oregon State University was a subrecipient, receiving $617,639 of the $115,225,626 award.  Oregon received a termination letter citing the DOE Memo and 2 C.F.R. § 200.340.

c.      **RECI:** DOE terminated cooperative agreements with California, Colorado, Massachusetts, New Jersey, New York, and Rhode Island, totaling almost $16 million.  California and Massachusetts received termination letters citing the DOE Memo, 2 C.F.R. § 200.340, and the "Declaring a National Energy Emergency" executive order.  New York and Colorado

22

1    received amendments to their existing award agreements stating only that "the award is

2    terminated," without any reasoning or basis for the termination.

3            **d.**     **Carbon Storage Validation and Testing:** DOE terminated cooperative

4    agreements under this program totaling over $41.5 million to Colorado.  The termination letters

5    cited the DOE Memo and 2 C.F.R. § 200.340.

6            **e.**     **Wind Energy Technology and Storage:** DOE terminated cooperative

7    agreements under this program totaling over $24 million in Massachusetts and Oregon.  Oregon

8    received termination letters citing the DOE Memo, 2 C.F.R. § 200.340, and the "Declaring a

9    National Energy Emergency" executive order.  Massachusetts received amendments to their

10   existing award agreements stating only that "the award is terminated."

11           **f.**     **Solar Energy Technology:** DOE terminated cooperative agreements with

12   Colorado, Connecticut, and Massachusetts.  The States received termination letters citing the

13   DOE Memo, 2 C.F.R. § 200.340, and the "Declaring a National Energy Emergency" executive

14   order.  Washington received a termination letter for another award under this program citing the

15   DOE Memo and 2 C.F.R. § 200.340.

16           **g.**     **Clean Hydrogen Electrolysis:** DOE terminated an award under this

17   program in Colorado for $3 million.  The termination letter cited the DOE Memo, 2 C.F.R.

18   § 200.340, and the "Declaring a National Energy Emergency" executive order.

19           **h.**     **Carbon Utilization Program:** DOE terminated a cooperative agreement

20   partially under this program in Colorado for almost $2 million. The termination letter cited the

21   DOE Memo and 2 C.F.R. § 200.340, and it stated that the "project does not align with agency

22   priorities. Termination will allow for funding to be directed towards projects designed to align

23   with DOE's goals and priorities."

24           **i.**     **Methane Emissions Reduction Program**: DOE terminated two

25   cooperative agreements under this program in Colorado totaling almost $23 million.  The

26   termination letters cited the DOE Memo and 2 C.F.R. § 200.340, and it stated "[t]his project does

27   not align with agency priorities.  Termination will allow for funding to be directed towards

28   projects designed to align with DOE's goals and priorities."  DOE also included on its kill list and

1    has abandoned three cooperative agreements under this program in Colorado totaling almost $325

2    million.

3            **j.**    **Industrial Efficiency and Decarbonization**: DOE terminated cooperative

4    agreements with Colorado, Maryland, and Washington under this program totaling over $8

5    million.  The states received termination letters citing the DOE Memo and 2 C.F.R. § 200.340.

6    The kill list also included a cooperative agreement with Wisconsin under this program for almost

7    $10 million, which DOE has abandoned.

8            **k.**    **Buildings Energy Efficiency Frontiers & Innovation Technologies**

9    (**BENEFIT**): DOE terminated cooperative agreements in Maryland under this program for $3

10   million.  The termination letters cited the DOE Memo and 2 C.F.R. § 200.340.

11           **l.**    **Renewable Energy Grid Integration:** DOE terminated a cooperative

12   agreement in Vermont under this program for $3.3 million.  The termination letter cited the DOE

13   Memo, 2 C.F.R. § 200.340, and the "Declaring a National Energy Emergency" executive order.

14           **m.**    **Vehicle Technologies**: DOE terminated a cooperative agreement in

15   Washington under this program for $1.6 million.  The termination letter cited the DOE Memo and

16   2 C.F.R. § 200.340.

17           **n.**    **Hydrogen and Fuel Cell Technologies:**  DOE terminated a cooperative

18   agreement in Colorado under this program for over $3.2 million funded as part of the Clean

19   Hydrogen Roadmap. The termination letter cited the DOE Memo, 2 C.F.R. § 200.340, and the

20   "Declaring a National Energy Emergency" executive order.

21           **o.**    **Technical Partnerships:** DOE terminated a cooperative agreement in

22   Colorado under this program for nearly $2.2 million.

23       85.    In summary, these actions illustrate a two-pronged effort to terminate programs

24   mandated by Congress.  First, DOE is terminating or abandoning existing awards, to deobligate

25   the funding for those programs and ensure awardees cannot move forward with their projects.

26   Second, Defendants are allowing unobligated funds to languish, perhaps until their appropriation

27   expires or to buy time for the Administration to try to convince Congress to rescind them.

28

1  **II.    DOE's "KILL LIST," THE DOE MEMO, AND THE TERMINATIONS AND**

2      **ABANDONMENTS OF PLAINTIFFS' AWARDS VIOLATE THE CONSTITUTION AND**

3      **VARIOUS STATUES**

4        86.    The "Unleashing American Energy" and "Declaring a National Energy

5  Emergency" executive orders, the implementing "kill list" and DOE Memo, and the October

6  award terminations and abandonments that flowed from them, are part of an ongoing effort by the

7  Administration to eliminate programs the Administration disfavors but has failed to convince

8  Congress to undo.

9        87.    The Administration's actions defy any authority given to the Executive Branch in

10  statute and in the Constitution and unlawfully encroach on powers reserved to Congress alone.

11        88.    The authority of the Executive Branch to act "must stem either from an act of

12  Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

13  579, 585 (1952).  Defendants have neither statutory nor constitutional authority here.

14        89.    The DOE Memo memorialized Defendants' effort to roll back programs the

15  Administration disfavors while allowing them to eliminate these programs under a pretextual veil

16  of procedural validity.

17        90.    Indeed, DOE's own October termination letters demonstrate that the

18  Administration's actions cannot be divorced from its antipathy for clean-energy and infrastructure

19  programs.  In every one of those letters, DOE cited 2 C.F.R. § 200.340(a)(4)—the grant-making

20  regulation which allows federal agencies to terminate funding agreements "if an award no longer

21  effectuates the program goals or agency priorities."  DOE's award terminations and

22  abandonments, and its efforts to eliminate entire federal programs, were not based on "case-by-

23  case" reviews or an amalgam of vague "Standards"—they were based on the Administration's

24  new "program goal" and "agency priority" of wholesale defunding "the Green New Scam."

25        91.    Defendants' goals and agency priorities cannot override the will of Congress.

26        92.    Congress has the ultimate authority over federal spending, called the "power of the

27  purse." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  The

28  Spending Clause empowers Congress to set spending policy to "provide for the . . . general

Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.  The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.  In short, the federal government cannot spend money without an appropriation from Congress, and Congress's spending priorities are paramount.  *U.S. Dep't of Navy v. Fed. Labor Rel. Authority*, 665 F.3d 1339, 1347 (D.C. Cir. 2012).

93.    Congress's appropriations are not suggestions.  Absent limiting language, appropriations are commands to obligate and spend the full amount of money appropriated.  *See, e.g., Train v. City of New York*, 420 U.S. 35, 41–48 (1975); *Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 610 (1838).

94.    The Constitution also vests all legislative powers in Congress and requires that laws be enacted only through the process of bicameralism and presentment.  U.S. Const. art. I, § 1; U.S. Const. art. I, § 7, cls. 2, 3.

95.    The President's formal legislative powers extend no further than the presentment process: He may sign a bill into law, veto it in whole, or take no action for ten days, after which the bill becomes law.  U.S. Const. art. I, § 7, cl. 2.  But he may not unilaterally *repeal* statutes. *Clinton v. City of New York*, 524 U.S. 417, 437 (1998).  Nor may he modify or ignore the statutory directives of Congress, including appropriations laws.  *Id.* at 446–49; *Kendall*, 37 U.S. (12 Pet.) at 608; *Train*, 420 U.S. at 44–47.

96.    Instead, the Constitution imposes on the Executive Branch a duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  The Executive Branch's authority under the Take Care Clause does not include authority to refuse to execute laws.  *Kendall*, 37 U.S. (12 Pet.) at 608.

97.    The DOE Memo sets forth a sham review process and the resulting terminations of hundreds of awards cut deeply into the "finely wrought and exhaustively considered" procedure imposed by our Constitution.  *INS v. Chadha*, 462 U.S. 919, 951 (1983).

98.    The "Unleashing American Energy" and "Declaring a National Energy Emergency" executive orders, DOE's kill list, the DOE Memo, and the actions taken to effectuate them leave unallocated billions of dollars in dedicated federal funding—for example, $2.2 billion

of the $8 billion Congress appropriated for the Regional Hydrogen Hub Program. "Because

Congress did not authorize withholding of [those] funds," and because doing so is not justified by

anything but the Administration's own policy objectives, that withholding "violate[s] the

constitutional principle of the Separation of Powers." *City & Cnty. of San Francisco*, 897 F.3d at

1235.

### III.    PLAINTIFFS ARE HARMED BY DEFENDANTS' ACTIONS

99.    DOE finalized the DOE Memo so that it could use the DOE Memo as the pretext

for terminating and abandoning Plaintiffs' awards, thus advancing President Trump's directives

to eliminate clean-energy and infrastructure programs and place coercive pressure on Blue States

during shutdown negotiations. Accordingly, the States of California, Colorado, Connecticut,

Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont,

Washington, and Wisconsin, and ARCHES, were harmed as a direct result of the DOE Memo and

the policy memorialized therein. These Plaintiff-specific harms are detailed in the paragraphs

that follow.

### A.    Harms to California and ARCHES

100.    Of the terminated DOE awards, nearly $2 billion were to Plaintiff State of

California or ARCHES, whose interests are represented here by Plaintiff GO-Biz. This includes

$1.2 billion under the ARCHES cooperative agreement, IIJA § 40314; 42 U.S.C. § 16161a;

$630,561,319 under the GRIP cooperative agreement with the California Energy Commission,

IIJA § 40103(b); and $4 million under the RECI cooperative agreement with the California

Energy Commission, IIJA § 40511; 42 U.S.C. § 6838.

101.    The ARCHES cooperative agreement, identified with the number DECD000004,

was created to coordinate and accelerate the buildout of a clean-hydrogen market and ecosystem

in the California region. Federal funding is necessary to pull together different interests to build

the ARCHES Hydrogen Hub, a network of clean-hydrogen production sites with the goal of

decarbonizing public transportation, heavy-duty trucking, and port operations by 2 million metric

tons per year—roughly the equivalent to annual emissions of 445,000 gasoline-powered cars.

The project aims to drive improvements in air quality along high-pollution interstate transportation corridors.

102.    ARCHES is a vital part of the active network of regional hydrogen hubs leading the nationwide effort to advance America's hydrogen economy.  The project also aims to connect and expand a clean west-coast freight network to other hydrogen hubs in the Pacific Northwest, Texas, and across the country.

103.    The up-to $1.2 billion in federal funding was slated to unlock $11.4 billion in cost share, including a mix of private funding ($9.3 billion) and State and local funding ($1.7 billion).  ARCHES picked the very best projects from an initial $56 billion project pool, many of which could move forward but for the terminations.  This system of projects, including those selected for the ARCHES application and others that were not specifically part of the application, were positioned to move forward as part of a larger system: the ARCHES hub. Each supply project could only function if it were paired with demand, and vice versa.  It was the federally funded ARCHES Hydrogen Hub that pulled these parties together into a system that would enable a self-sustaining and growing hydrogen market.

104.    The project's success hinges on being part of a larger ecosystem.  This scale of investment has the potential to be generation-changing, creating sustainable benefits and opportunities throughout the economy derived from renewable resources.  The approximately $12.6 billion total investment was slated to establish hundreds of thousands of careers, fueling local economies and delivering value while improving community health.

105.    As a result of the termination, ARCHES was forced to lay off its entire full-time staff, pausing the development of the ARCHES hub.  ARCHES, as an organization, subsists entirely on federal funding; without that funding, ARCHES is in a holding pattern, kept aloft only by the volunteer efforts of its Board of Directors and the employees of its LLC members.  The termination of ARCHES's cooperative agreement caused equipment manufacturers to cancel investments in hydrogen-fuel-cell programs, stationary-power providers to pivot away from hydrogen, and large-scale renewable energy projects to shift from hydrogen–which is needed to decarbonize multiple sectors.

106.     By unlawfully terminating the cooperative agreement, Defendants also deprived California and its citizens of a thriving hydrogen ecosystem that would foster economic prosperity, help the State achieve its climate goals, and create 200,000 jobs.  California will be deprived of nearly $3 billion in annual savings expected from improved health and air quality, the existence of a regionally connected market, and ARCHES's ability to be a key spoke in the IIJA-envisioned interconnected hydrogen hub network.

107.     Only restored federal investment will bring these parties back.  The uncertainty over the past year, culminating in the termination of ARCHES's federal award, wreaked havoc on an industry that would otherwise be well positioned to foster a thriving market for clean-hydrogen energy—the regionally connected national market Congress authorized and sought when it passed the IIJA.

108.     California's RECI cooperative agreement, identified with the number DEEE0011574 and awarded to the California Energy Commission, was created for the purpose of enabling sustained and cost-effective implementation of updated building energy codes.  Energy codes are increasingly complex and many communities lack the technical expertise and resources required to accurately implement them.  The RECI agreement was designed to support a program to educate and credential those who prepare energy code permit documentation, as well as examiners who verify compliance.  This will help ensure communities realize the intended benefits of the energy code.

109.     The termination of the RECI award deprived California and its citizens of the intended benefits of the State's updated energy code, as there will be limited individuals with the knowledge required to enforce them.  The lack of enforcement will result in greater electricity consumption and diminished uniformity in compliance, and impair safe, resilient, reliable, and effective State and local energy codes.  It will also result in lost opportunities to create high-paying jobs and lower greenhouse gas emissions; and will reduce indoor air quality and public health.  People throughout California will suffer these adverse effects, but California's most-vulnerable and economically disadvantaged populations will experience them the hardest.

1

**B.    Harms to Colorado**

2      110.    Defendants have terminated or abandoned funding worth over $600 million to

3    public and private projects in the State of Colorado.  This includes approximately $5 million

4    originally awarded to the Colorado Energy Office ("CEO") to improve building infrastructure and

5    over $405 million in original awards to Colorado institutions of higher education for significant

6    research in the sustainable energy space.

7      111.     Colorado Energy Office: CEO was awarded $5 million across two cooperative

8    agreements under the RECI Program, IIJA § 40511, 42 U.S.C. § 6838.

9      112.    The first agreement to CEO is titled "The Colorado Advanced Energy Code

10   Adoption and Enforcement Program," identified with the number DEEE0010939.  Consistent

11   with the RECI program's statutory objectives, this award is directed toward improving and

12   accelerating the adoption and enforcement of advanced energy codes and stretch codes by State

13   agencies and local governments; supplying expanded resources and technical assistance to local

14   governments; and addressing the needs required to grow Colorado's workforce in this area.  At

15   the time of the illegal termination, the cooperative agreement was partially obligated, with

16   approximately $535,000 of the $2,500,000 award having been spent.  CEO had made good use of

17   the funds to that point, providing technical assistance to 50 local jurisdictions.  At the time the

18   award was terminated, CEO's plans for these funds included the selection of two new sub-

19   recipients to provide energy code adoption and improved enforcement activities.

20     113.    The second CEO cooperative agreement is the "Advancing Building Performance

21   Standards in Colorado" program, identified with the number DEEE0010936.  It too was partially

22   obligated, with approximately $719,000 of the $2,500,000 award having been spent.  The award

23   was designed to educate Colorado's building owners about building performance standards;

24   ensure those owners have the proper resources to comply with those standards; and increase the

25   adoption of building performance standards in local jurisdictions.  The collaboration and

26   cooperation needed to educate and achieve compliance with these standards is part of the State's

27   effort to meet its statutory greenhouse gas emissions targets, and the termination of this award

28   hinders that goal for the State.

114.    Both of CEO's RECI cooperative agreements were abruptly terminated by the same illegal means.  On October 8, 2025, CEO received modifications to the governing agreements through the FedConnect portal that terminated the grants six days earlier, effective October 2.  Despite timely contesting the terminations through the informal dispute process, CEO has received no substantive response from DOE.

115.    Through their unilateral and abrupt termination of the RECI awards, Defendants interfered with a critical funding source relied upon by the State of Colorado to meet its goals for reducing greenhouse gas emissions.  Colorado is unable to replace the $5 million awarded across the two RECI projects, which will have a direct and appreciable impact on the State's ability to adopt and enforce energy efficiency building codes and meet its climate goals.

116.    <u>Colorado School of Mines</u>: Colorado boasts one of the country's premier applied science and engineering universities in the Colorado School of Mines ("Mines").  Mines and its graduates are broadly recognized as critically important to the nation's energy and mining industries, and to accomplishing the priorities of past and current Administrations with respect to energy abundance and critical minerals supply chains.  Because of this expertise, Mines was selected for four multi-year DOE awards—two under the Carbon Storage Validation and Testing Program and two under Biden-era clean-hydrogen programs.  All four awards were cooperative agreements and were partially obligated at the time of their illegal terminations.

117.    Mines received an award of $32,671,554 for a project titled "CarbonSAFE Eos: Developing Commercial Sequestration for Southern Colorado," identified with the number FE0032342, that is needed for the existing local steel, cement, and power plant industries and will create more jobs through advancing the development of a potential carbon-storage hub around Pueblo, Colorado.  Mines committed a cost share of over $8 million in additional funding.  When terminated, DOE was still committed to dispensing $17 million to Mines under the cooperative agreement.  The termination deprives the State of Colorado of the development of a carbon-storage hub in Pueblo, a project that would have provided significant economic benefits and employment opportunities to the region and was fully in line with congressional mandates for the

1    Carbon Storage Validation and Testing Program set forth in the IIJA.  IIJA § 40305; 42 U.S.C. §

2    16293.

3         118.    Mines also received an award of $8,999,989 to fund a project titled "CTV III CO2

4    Storage Project in Sacramento Basin, California," identified with the number DEFE0032450.

5    The project, which includes a collaborative cost share with industry partners of over $2 million, is

6    intended to conduct a feasibility study to advance a carbon-storage reservoir in the Sacramento

7    Delta region.  Defendants' illegal termination of this award directly undercuts the research,

8    development, demonstration, and deployment goals that Congress prioritized when it

9    appropriated funds for the Carbon Storage Validation and Testing Program set forth in the IIJA.

10   IIJA § 40305; 42 U.S.C. § 16293.

11        119.    Mines received an award of $3,011,242 for a project titled "BIL-Advanced

12   materials and operating conditions for intermediate-temperature protonic-ceramic steam

13   electrolysis," identified with the number DEEE0011337.  This award is part of the Clean

14   Hydrogen Electrolysis Program created by Congress under the IIJA and is aimed at improving

15   performance efficiency of cells for hydrogen electrolysis and to improve manufacturing processes

16   for large-area tubular-format cells, with broad applicability for proton-conducting solid-oxide

17   electrolyzers.  By terminating this award, Defendants have deprived the State of Colorado of

18   significant research that is aimed at increasing the efficiency and feasibility of hydrogen as an

19   energy source, something that is needed to meet the nation's energy abundance goals.  IIJA §

20   40314; 42 U.S.C. § 16161d(b).

21        120.    Finally, Mines received an award of $3,206,194 for a project titled "Solid State

22   Based Hydrogen Loss Recovery During LH2 Transfer," identified with the number

23   DEEE0011104.  This research award is part of DOE's National Clean Hydrogen Strategy

24   Roadmap, and in particular its H2@Scale Initiative and Hydrogen Shot, created under IIJA §

25   40314; 42 U.S.C. § 16161b.  The award funds research to find a solution for the capture of

26   hydrogen from boil-off loss events, which is vital to reducing the cost and environmental impact

27   of liquid hydrogen as a high-use and high-capacity energy storage reservoir.  Defendants'

28

1    termination of the award likewise deprives the State of Colorado of industry-leading research that

2    is critical to advancing hydrogen as a clean-energy solution, both within the State and beyond.

3        121.    Mines was informed of the terminations of these four awards on October 2, 2025,

4    by letters that were not printed on official DOE letterhead.  Each letter cited to the DOE Memo

5    for authority and stated the vague rationale that the projects no longer effectuate "agency

6    priorities."  In the case of the research projects, the letters also cited the "Declaring a National

7    Energy Emergency" executive order.

8        122.    Mines has received no substantive response to its efforts to utilize DOE's

9    administrative process to appeal the terminations.

10        123.    Colorado State University: Colorado State University's ("CSU") Energy Institute

11    is a recognized national and international industry leader.  Its interdisciplinary and collaborative

12    approach has produced groundbreaking work in clean-energy development.  CSU received seven

13    awards that were impacted by the DOE Memo.

14        124.    The Energy Institute is home to the Methane Emissions Technology Evaluation

15    Center ("METEC"), a one-of-a-kind large-scale emissions testing facility where researchers

16    collaborate with oil and gas industry partners to advance testing, education, and advanced

17    emissions modeling to evaluate and improve methane and other gas detection solutions.  CSU

18    received an award of $19,499,432 in March 2024 to provide foundational funding that allowed

19    CSU to stand up METEC, identified with the number DEEE0032276 and authorized under IRA,

20    § 60113; 42 U.S.C. § 7436; Pub. L. No. 117-169, 136 Stat. 2073.  Since its inception, METEC

21    has grown to 11 CSU employees, including a graduate student.  The cooperative agreement

22    includes an additional cost share of over $5,000,000 from other sources.  At the time it was

23    terminated, this award was partially obligated, with over $16 million remaining.  CSU invested

24    significant financial resources and industry connections to develop the plan for METEC, and that

25    cost-share will be stranded without the significant federal funding required for this ambitious

26    project.  The termination deprives the State and the oil and gas industry of a one-of-a-kind

27    research and testing facility, to the detriment of all interested economically and environmentally

28    in the reduction of methane leaks across a variety of sectors.  In separate litigation, DOE admitted

33

1    that this project's location in a "Blue State" was a "primary reason" for the termination, and its

2    termination was enjoined as an equal protection violation.  *City of Saint Paul v. Wright*, No. 25-

3    CV-03899 (APM), 2026 WL 88193, at *2 (D.D.C. Jan. 12, 2026).  DOE has since notified CSU

4    that the termination of the award has been rescinded, pursuant to court order.

5         125.    CSU was also awarded funding for a METEC project entitled "SABER, The Site-

6    Air-Basin Emissions Reconciliation DOE FOA 2616," identified with the number DEFE0032288

7    and authorized by IRA, § 60113; 42 U.S.C. § 7436; Pub. L. No. 117-169, 136 Stat. 2073.  The

8    award was in the amount of $2,999,988, with a cost share from other sources of $762,370 and

9    incorporates researchers from several additional institutions.  This project tests the use of high-

10   frequency sampling to create accurate emissions estimates within a basin and proposes replicating

11   this method in other basins.  CSU received a letter on October 2 that cited the DOE Memo.

12   Termination of this award deprives the State of research intended to accurately track methane

13   emissions in basins, both within Colorado and outside of it.

14        126.    CSU received an award in 2022 of $2,193,685, with a cost share of $713,256.  The

15   award was for a project entitled "Decarbonized District Energy System with Renewably Fueled

16   Combined Heat Power and Cooling," identified with the number DEEE0010280, authorized by

17   42 U.S.C. § 16191(a)(2)(C), and funded through appropriations set forth in the Consolidated

18   Appropriations Act of 2021, Pub. L. No. 116–260, 134 Stat. 2449.  The project captures engine-

19   produced heat waste and converts it into cooling via a turbo-compression cooling system.  The

20   project's technology has been selected to participate in Chevron's Studio program to scale up and

21   commercialize for the AI data center market, and it supports 2 CSU employees in the past fiscal

22   year, including 1 graduate student.  Despite the encouraging prospects of this technology and its

23   potential application to data centers—a known priority of the current administration—it, too, was

24   terminated in a similar manner to the other October 2 letters, and the termination has deprived the

25   State of the economic and environmental benefits involved with scaling up this technology.

26        127.    CSU received an award of $1,999,915 for a project titled "Algal Biorefinery

27   Conversion of Utility CO2 to High-Value Products," identified with the number DEFE0032229

28   and funded through appropriations set forth in the IIJA, 135 Stat. 1373.  The award funded

34

development of an algae-based biorefinery process to convert carbon dioxide from coal-fired power plants to high-value products such as ink and carbon nanofiber materials for electronics. CSU committed to a cost share of $547,999 for this award. In effect, the project's approach turns waste emissions into economic opportunities while advancing carbon-neutral technologies to the benefit of industry and the environment. This project supported six CSU employees, including one graduate student and one undergraduate student, and the termination has deprived CSU and the State of the economic and ecological benefits attendant to the development of this innovative technology.

128. In addition to the above awards, all of which were officially terminated, CSU also has three cooperative agreements that have been abandoned, leaving CSU without the ability to access any funds as a result of DOE's refusal to complete the process for finalizing the awards while subjecting the projects to review pursuant to the May DOE memo.

a. CSU received a conditional award of $299,999,930 for a project titled "Collaborative Approach to Reducing Emissions ("CARE") for Marginal Conventional Wells," identified with the number DEFE0032657 through funding from the Methane Emissions Reduction Project. IRA § 60113; 42 U.S.C. § 7436; Pub. L. No. 117–169, 136 Stat. 2073. Marginal conventional wells ("MCW"), also known as stripper wells, are low-producing wells that often have disproportionately high methane emissions. This project intends to develop, test, and tailor practical solutions for MCW site operators while building local training programs to ensure a skilled workforce to implement them. Although CSU has attempted to definitize this award, it has been unable to do so due to a lack of responsiveness from DOE. As a result, this project has not been started, and CSU has not been able to access any of the award funds. Despite this, DOE represented in other litigation that the award is not terminated and is capable of being definitized. Following the court order in *Saint Paul*, CSU attempted to contact DOE to definitize the award, but to date, has not received a response.

b. As with the previous conditional award, CSU has been unable to access the $20,000,000 in funding announced for a project titled "North-Central Methane Center (NCMC)," identified with the award number DEFE0032699 and awarded under IRA § 60113; 42 U.S.C.

7436; Pub. L. No. 117–169, 136 Stat. 2073. CSU's attempts to definitize this award so that the performance phase can begin have been unsuccessful. Nevertheless, DOE represented in other litigation that the award is not terminated and is capable of being definitized. Following the court order in *Saint Paul*, CSU attempted to contact DOE to definitize the award, but to date, has not received a response.

129.     CSU also received a conditional $4,669,746 award for a project titled "Full Scale Validation and Deployment of Comprehensive Methane Reduction Solution for NG Pipeline Engine-Compressor Sets," identified with award number DEFE0032660 and awarded under IRA § 60113; 42 U.S.C. 7436; Pub. L. No. 117–169, 136 Stat. 2073. This project is intended to develop and deploy an ultra-low emission retrofit system for natural gas pipeline compressor engines to drastically cut methane releases. On information and belief, DOE has abandoned this agreement. CSU has not been able to definitize this award or draw down on any of its funding since the award was announced. CSU's attempts to contact DOE to definitize the award and begin the project have gone unanswered.

130.     University of Colorado: The University of Colorado at Boulder (CU) is home to the Renewable and Sustainable Energy Institute, another academic leader of research and development in the green energy space. As part of a consortium of researchers working with the National Laboratory of the Rockies (formerly the National Renewable Energy Laboratory) and perovskite companies, the consortium received an award of approximately $9.2 million, with CU's share being $8.3 million, to fund "TEAMUP: Tandems for Efficient and Advanced Modules using Ultrastable Perovskites," identified with award number DEEE0010502. The TEAMUP grant was awarded under IIJA § 41007(c)(3), 135 Stat. 1129, and section 3004(b)(4) of the Energy Act of 2020, which was funded through the 2021 Consolidated Appropriations Act, Pub. L. No. 116–260, 134 Stat. 2504 (Dec. 27, 2020). At the time CU received a termination notice on October 10, approximately $5.6 million of the award remained (with approximately $4.8 million being CU's portion). The termination notice said that the project did not effectuate the administration's priorities and also cited to the national energy emergency executive order. This project aimed to fund and scale up perovskite tandem solar cells, an invention created by the

consortium's members, which is widely considered to be the future of the solar-cell industry. China's entry into this market has created a serious need to invest in higher power conversion efficiency cells that are also cheaper than those currently available. In short, this technology is critical to ensuring that America stays competitive in a technology that has economic and national security implications. CU's attempts to appeal this termination through the administrative process have gone unanswered.

### C.  Harms to Connecticut

131.    In 2023, Defendants awarded the University of Connecticut $2,250,000 in support of a project titled "Proactive: Predictive Community Outage Preparedness and Active Last Mile Visibility Feedback Autonomous Restoration," identified as award number DEEE0010422 and awarded under IIJA, § 41007, 42 U.S.C. § 16238(b)(2)-(4).

132.    The project was sought to develop and demonstrate a predictive community outage preparedness and active last mile visibility feedback autonomous restoration solution, namely PROACTIVE, to transform traditional manual and time-consuming grid restoration.

133.    On October 2, 2025, the University received a letter from DOE without official letterhead citing the DOE Memo and the "Declaring an Energy Emergency" executive order.

134.    By unlawfully terminating the award, Defendants have deprived Connecticut and its citizens of significant, tangible benefits for the power and energy industry, including improved grid reliability and resilience.

### D.  Harms to Illinois

135.    DOE terminated six grant awards with Plaintiff State of Illinois.  One grant award was made to the University of Illinois-Chicago ("UIC") and five grant awards were made to the University of Illinois Urbana-Champaign ("Urbana-Champaign") for projects managed by the Prairie Research Institute.  The Prairie Research Institute conducts transformative academic research on innovative, at-scale solutions for a society undergoing climate and energy transitions and comprises several state scientific surveys, including the Illinois State Geological Survey (IGIS) and the Illinois Sustainable Technology Center (ISTC).  The grants terminated by DOE were directed toward these state scientific surveys.

136.    DOE terminated a grant for the IGIS's Illinois Basin West CarbonSAFE III project, designated number DEFE0032340 and awarded under IIJA § 40305. The project was intended to research geologic formations underlying Springfield, Illinois to assess its suitability for permanent storage of carbon dioxide.  If suitable, then the project would submit permit applications to the U.S. Environmental Protection Agency for approval to construct injection wells and ultimately sequester carbon dioxide for the purpose of reducing emissions of carbon dioxide into the atmosphere.  In 2024, DOE obligated $20,541,757 for this project.  When DOE terminated the agreement on October 2, 2025, the remaining unspent balance on the award was $17,918,232.85. Urbana-Champaign originally received a termination notice from DOE via email on October 2, 2025, citing the DOE Memo.  On October 10, 2025, Urbana-Champaign received a corrected termination notice on official letterhead, also citing the DOE Memo.  On Nov. 3, 2025, Urbana-Champaign filed an administrative appeal of the termination with a DOE grants officer and sought informal dispute resolution. No response has been received.

137.    DOE terminated a grant for the ISTC to determine whether critical minerals and rare earth elements can be found in coal combustion residuals.  These minerals have important applications in many areas of technology and manufacturing in the United States, such as aerospace, batteries, or electric motors.  In 2024, DOE obligated $1,984,173 of grant funding for this project, called Advanced Characterization of Wastewaters with a Focus on the Environment & Economics, designated number DEFE0032457 and awarded under IIJA § 40305.  DOE terminated this grant on October 2, 2025, followed by an updated termination on October 10, 2025.  Both termination letters cited the DOE Memo and DOE's priorities.  As of the date of termination the remaining unspent balance on the award was $1,224,549.63.

138.    DOE terminated three grants to Urbana-Champaign for developing direct air capture of carbon dioxide, which gathers emissions from the ambient air and sequesters or utilizes them in industrial processes to divert carbon dioxide from the atmosphere.  The three grants were for separate ISTC projects in Illinois (a grant for $2,938,528 designated FE0032375), Colorado (a grant for $3,000,000 designated FE0032376), and Florida (a grant for $2,778,670 designated DEFE0032378) all awarded under 42 U.S.C. § 16298d and funded by the IIJA.  In these projects,

the expertise of Urbana-Champaign geology experts is being applied with local partners in several

different areas.  DOE terminated these grants in three separate termination letters on October 2,

2025, followed by an updated termination on October 10, 2025, citing the DOE Memo and DOE

policies and priorities.  The remaining unspent balance on the sum of all 3 awards was

$6,805,963.77.

139.    DOE terminated a grant to the University of Illinois-Chicago (UIC) to further

reliable and resilient operation of the nation's bulk power system while integrating large amounts

of renewable energy into the power grid.  The grant was for $2,584,681 and designated number

DEEE0010656.  DOE terminated these grants on October 2, 2025, and in a corrected termination

letter dated October 10, 2025, both citing the DOE Memo and DOE policies and priorities.  UIC

subsequently filed an informal dispute letter with their DOE contract officer on Nov. 3, 2025, and

a formal appeal on January 7, 2025.  UIC has received no response to its appeal.

**E.    Harms to Maryland**

140.    DOE terminated three cooperative agreements with Plaintiff State of Maryland.

These include a $2,743,850.00 award to the University of Maryland, College Park, for research

into highly efficient multi-effect drying systems driven by heat pumps; a $1,643,029.00 award to

the University of Maryland, College Park for research into smart cold climate rooftop heat pumps

with low global warming potential refrigerants; and a $1,420,490.00 award to the University of

Maryland, College Park for research into next generation liquid-to-refrigerant heat exchangers for

heat pumps, water heaters, and refrigeration systems.

141.    The Highly Efficient Multi-Effect Drying Systems Driven by Heat Pumps

cooperative agreement, identified with the number DEEE0010861 and authorized under 42

U.S.C. § 16191(a)(2)(C) and funded through annual appropriations for the Industrial Efficiency

and Decarbonization program., was created for the purpose of demonstrating highly efficient

industrial heat pump technologies to be used in drying systems with accompanying economic

analysis that would generate a tech-to-market strategy for commercializing the developed

technology.  Maryland contributed $240,671.61 in cost share for this award.

142.    The Cold Climate Rooftop Heat Pump cooperative agreement, identified with the number DEEE0010900 and authorized under 42 U.S.C. § 16191(a)(2)(B) and funded through annual appropriations for the Buildings Energy Efficiency Frontiers & Innovation Technologies (BENEFIT) program.  The award was created for the purpose of developing a system that utilizes low global warming potential refrigerant and an innovative saturation cycle to maintain high efficiency at temperatures as low as -15 degrees Fahrenheit.  Maryland contributed $168,835.46 in cost share for this award.

143.    The Next Generation Liquid-to-Refrigerant Heat Exchangers cooperative agreement, identified with the number DEEE0010904 and authorized under 42 U.S.C. § 16191(a)(2)(B) and funded through annual appropriations for the Buildings Energy Efficiency Frontiers & Innovation Technologies (BENEFIT) program.  The award was created to advance the development of novel and commercially viable liquid-to-refrigerant heat exchangers and related manufacturing methods to accelerate adoption of efficient cooling and heating systems. Heat exchangers are a cross-cutting technology with applications in a variety of settings including HVAC systems, electric vehicles, energy generation, industrial processes, and thermal energy storage.  Maryland contributed $335,123.00 in cost share for this award.

144.    By unlawfully terminating the award, Defendants deprived Maryland and its citizens of funding needed to continue these important projects, the commercial opportunities that accompanied the research and development tasks outlined in the cooperative agreements, access to the energy savings that would accompany their successful deployment, and the attendant environmental benefits from increasing efficiency of these products.

**F.    Harms to Massachusetts**

145.    DOE terminated three cooperative agreements with Plaintiff State of Massachusetts.  These include a $3,900,000 RECI award to the Department of Energy Resources ("DOER"), IIJA § 40511; 42 U.S.C. 6838; a $1,226,983 award to the University of Massachusetts, Amherst for research on solar energy infrastructure under Pub. L. No. 116–260 § 3004; 42 U.S.C. § 16238; and a $3,616,000 award to the University of Massachusetts, Amherst

1    Academic Center for Reliability and Resilience of Offshore Wind, awarded under Pub. L. No.

2    116–260 § 3003; 42 U.S.C. § 16237.

3    146.    Massachusetts's RECI award, the Massachusetts Integrated Deployment of a

4    Decarbonized Long-term Energy Code (MIDDLE-C) cooperative agreement, identified with the

5    number DEEE0010955, was created for the purpose of supporting Massachusetts in

6    implementing municipal building energy code updates that are more energy efficient and resilient.

7    Massachusetts had staffed two full-time positions with funding from this award. By unlawfully

8    terminating the RECI award to DOER, Defendants deprived Massachusetts and its citizens of

9    technical assistance to adopt and implement updated building energy codes, of expert support for

10   complying with updated codes and Passive House multi-family construction, and data collection

11   and analysis, thereby hindering the Commonwealth's ability to improve thermal performance in

12   new construction sectors, reduce building operation costs, and meet its goals for greenhouse gas

13   emissions reductions and electrification readiness.

14   147.    The unlawful termination of this award also resulted in the termination of the two

15   employees who had been funded by the RECI award.  These employees brought specialized

16   experience and skills to Massachusetts, which may not be replaceable in the future.  Defendants

17   not only deprived Massachusetts of these former employees' specialized experience and skills,

18   but Defendants' actions also directly increased unemployment in Massachusetts.

19   148.    The "Informing Wildlife Conservation Strategies and Best Practices for Solar

20   Facilities" cooperative agreement with the University of Massachusetts, identified with the

21   number DEEE0010382, was created under the Solar Energy Technology Program with the

22   purpose of researching how solar energy infrastructure interacts with wildlife to identify how to

23   improve the reliability and affordability of solar energy.  The Commonwealth contributed

24   $79,826 in cost sharing and other parties (including the New York State Energy Research and

25   Development Authority ("NYSERDA")) contributed an additional $59,286 in cost sharing.  By

26   unlawfully terminating the award, Defendants have jeopardized the totality of the cost-share

27   funding Massachusetts reasonably expected to receive and may deprive Massachusetts and its

28   citizens of research identifying how to minimize impacts to wildlife and maximize benefits of

41

1    solar energy infrastructure, thereby hindering the Commonwealth's ability to develop renewable

2    energy and meet its climate goals.

3        149.    The "Academic Center for Reliability and Resilience of Offshore Wind"

4    cooperative agreement with the University of Massachusetts, identified with the number

5    DEEE0011269, was created under the Wind Energy Technology Program with the purpose of

6    increasing expertise in offshore wind at U.S. universities and establishing partnerships to address

7    wind development challenges.  The Commonwealth contributed $4,750,000 in cost sharing

8    toward this grant and other parties (including the Maryland Energy Commission) contributed an

9    additional $2,625,116 in cost sharing toward this award.  By unlawfully terminating the award,

10   Defendants have jeopardized the totality of the cost-share funding Massachusetts reasonably

11   expected to receive, and may deprive Massachusetts and its citizens of the opportunity to develop

12   a new center of academic expertise at the state university and the opportunity to learn from

13   research about how to address wind development challenges, thereby hindering the

14   Commonwealth's ability to recruit students and effectively develop wind energy resources to

15   meet its climate goals.

16       **G.    Harms to New Jersey**

17       150.    DOE terminated two cooperative agreements with Rutgers, the State University of

18   New Jersey ("Rutgers"), a public institute of higher education located within Plaintiff State of

19   New Jersey.  These agreements include a $3.2 million award under the RECI program, IIJA §

20   40511; 42 U.S.C. 6838, issued jointly to Rutgers and the New Jersey Board of Public Utilities

21   ("NJBPU"), identified with the number DEEE0011553, and a $1.7 million award to Rutgers for

22   research on agrivoltaic systems for diversified agriculture, identified with the number

23   DEEE0010439, awarded under Pub. L. No. 116–206 § 3004; 42 U.S.C. § 16238.

24       151.    The BPS Ready: Preparing the Market for an Evidence-Based Building

25   Performance Standard cooperative agreement, identified with award number EE0011553, was

26   created to develop a more energy efficient and economic building performance standard.  Upon

27   completion, the BPS project would generate substantial energy and cost savings, as well as reduce

28   carbon dioxide emissions.  The research program included a Lead-by-Example pilot to implement

*California, et al. v. Wright, et. al.*

research-based approaches to building performance upgrades.  This work would benefit multi-family housing owners, operators, and occupants, while also serving as a potential model for other clean energy incentive-based programs.

152.    DOE awarded Rutgers $3.2 million in financial assistance to support this project through the RECI program, with $600,000.00 allocated by the New Jersey Board of Public Utilities in matching funds.

153.    By unlawfully terminating this award, Defendants deprived New Jersey and its citizens of potential savings for commercial property owners and tenants measuring between $3.8 billion and $15.4 billion over the course of five years. Specifically, Defendants deprived New Jersey consumers of the cost savings the BPS project would have generated in reducing peak loads through demand response and load shifting.  Likewise, Defendants' actions harm New Jersey by stemming the many employment and training opportunities that implementation of the BPS would create, and harm the nation by interfering with Congress' clean energy goals.

154.    The Agrivoltaic Systems for Diversified Agriculture project, identified with award number DEEE0010439, was developed to support research into the use of agrivoltaics, otherwise known as dual-use solar, in New Jersey.  Agrivoltaics is an emerging method of generating solar energy by co-locating solar arrays on operating farmland, rather than displacing the latter for the former.  This award supported research into: (1) crop trials at research farms to study crop performance under solar arrays; and (2) the development and implementation of a curriculum to train agrivoltaics-focused farmers and technical specialists.  These projects are critical to allowing widespread adoption of the emerging agrivoltaic technology.  Rutgers partnered with multiple stakeholders, including the American Farmland Trust (a premier farmland conservation nonprofit), Delaware State University, and the National Renewable Energy Laboratory to conduct the research in question.

155.    DOE awarded $1.7 million for this project to Rutgers through the Renewable Energy Research and Development program.  New Jersey contributed $178,782 in cost sharing.

156.    By unlawfully terminating the agrivoltaics award, Defendants undercut Congress's intent to prioritize research and development respecting new energy sources.  Defendants have

also forced Rutgers to vastly scale down its work with just one-third of the grant period remaining, harming not only New Jersey consumers, but consumers nationwide who would benefit from the abundant, reliable, and affordable energy agrivoltaics generates.

**H.    Harms to New York**

157.    DOE terminated a cooperative agreement with the New York State Energy Research and Development Authority ("NYSERDA"), an instrumentality of the Plaintiff State of New York, for a $9 million project under the RECI program, IIJA § 40511.

158.    The RECI cooperative agreement, identified as DEEE0011552, awarded $3 million in federal funds to NYSERDA, and NYSERDA committed to provide an additional $6 million in cost share.

159.    The RECI cooperative agreement was created for the purpose of enabling communities across New York State to benefit from advanced clean energy codes by improving access to existing, market ready, integrated online code compliance support.  Access to an integrated and comprehensive online building code compliance platform and third-party support resources is particularly crucial for Authorities Having Jurisdiction in New York where inequities and technical gaps are the greatest.  The realities of constrained local budgets and the prioritization of life-safety codes mean that local governments have limited resources for innovation.  The opportunity offered by the RECI program for innovative online use of qualified third-party support providers in communities most in need of these resources is extremely valuable and difficult to replace. By unlawfully terminating the RECI award, Defendants have undermined New York's ability to create the opportunity for its residents and industries to obtain access to advanced energy code compliance support.

**I.    Harms to Oregon**

160.    DOE terminated or abandoned three agreements that harmed Oregon State University.  These include a $2,499,876 award to Oregon State University, identified by the number DEEE0011078 and authorized under Pub. L. No. 116–260 § 3003; 42 U.S.C. § 16237; a $115,225,626 subaward, identified by the number DEGD0000901 and authorized under IIJA §

40107; 42 USC 17386; and a $8,000,000 subaward to Oregon State University, identified by the number DEEE0009424 and authorized under Pub. L. 116–260 § 3003; 42 U.S.C. § 16237.

161.    The "Community Benefits from Offshore Wind Development" cooperative agreement, identified as award number DEEE0011078, part of the Wind Energy Technology Program, sought to collect, analyze, and disseminate information about rural community perspectives on the benefits and impacts of offshore wind development.  Research tasks included an analysis of existing community benefits arrangements, surveys of six different rural coastal communities on the Pacific and Atlantic Coasts, and interviews with developers and communities.  The researchers' aim was to better understand rural perspectives on both the impacts and benefits of energy development, as well as local needs, expectations, and preferences around energy development.  These research efforts were aimed at understanding the community benefits process as it was implemented for offshore wind (including critique where warranted) and assessing its applicability in other locations where development was proposed.  Such work is relevant for all forms of energy and industrial development, including hydropower, geothermal, transmission/pipeline construction and data centers.

162.    The project includes research collaborators on both U.S. coasts in five states and at five universities, as well as research collaborations with three Sea Grant offices and several nonprofit organizations. Inside the state of Oregon, the impact to the research team at Oregon State University includes two faculty researchers, two post-doctoral fellows, two graduate students, and an administrative staff member.  Oregon research collaborators include Oregon Sea Grant, Renewable Northwest, and the Affiliated Tribes of Northwest Indians.

163.    By unlawfully terminating the award, Defendants deprived Oregon and its citizens in rural communities of having a voice in future energy development plans.  The termination also limits the research team's ability to complete the research and share findings with affected communities and also has very real impacts on the emerging scholars whose work was supported by this award.

164.    The "Bipartisan Infrastructure Law (BIL) - Accelerating and Deploying Grid Edge Computing" grant, identified as DEGD0000901, part of the GRID – Smart Grid program, is

aimed to install a scalable, distributed artificial intelligence ("AI") platform to accelerate grid edge computing capabilities and enhance distributed energy resource ("DER") integration. The project supported the goal of sourcing 25% of its peak load from its distribution system and reducing greenhouse gas emissions by 80% by 2030. The project aimed to deploy approximately 90,000 grid-edge computing ("GEC") devices, across approximately 10% of the customer base, as the first step towards deploying advanced grid edge computing. This deployment was intended to allow the awardee to target key locations within its service territory to demonstrate the value of edge computing prior to a full system deployment. The project was intended to focus approximately 40% of the GECs in disadvantaged communities (DACs) to support greater resiliency and clean energy parity within DACs.

165. The project included a subaward to Oregon State University to support a faculty member and multiple students to further the research aims of the project as well as develop an energy industry AI-specific course for deployment at OSU and community colleges.

166. By unlawfully terminating the award, Defendants deprived Oregon of advanced energy infrastructure and limited the research team's ability to complete its research. The termination also has very real impacts on the emerging scholars and students whose work was supported by this award and who will not have advanced classes available.

167. The "Improving High Resolution Offshore Wind Resource Assessments and Forecasting Using Observations in the MA/RI Lease Areas," identified as DEEE0009424, part of the Wind Energy Technology Program, included a subaward to Oregon State University. Oregon State University was responsible for field observations as part of buoy deployments, buoy recoveries, and data dissemination.

168. The project included a subaward to Oregon State University to support a faculty member and graduate student to further the research aims of the project.

169. By unlawfully terminating the award, Defendants deprived Oregon of participation in an important research project as well as a training opportunity for a graduate student.

**J.    Harms to Rhode Island**

170.    DOE terminated a $1,600,000 award to the Rhode Island Office of Energy Resources ("RIOER") under the RECI program.

171.    The RECI award, identified with the number DEEE0011572, was granted to assist in training and implementation of updated energy codes for residential buildings. Updated energy codes lower energy bills, improve energy efficiency, enhance building resilience, and reduce emissions. But these energy codes are often complex, and implementing them requires technical expertise and resources that many communities lack. The RECI award would have supported education and compliance programs to ensure that the updated energy codes are properly understood and effectively enforced.

172.    By unlawfully terminating the award, Defendants deprived Rhode Island and its residents of the benefits of adopting and enforcing updated building codes. Defendants' abrupt termination of this award impedes Rhode Island's efforts to promote energy efficiency, reduce its carbon emissions, and make progress toward its goal of achieving carbon neutrality by 2050, a goal codified in statute through the State's 2021 Act on Climate, 42 R.I. GEN. LAWS § 42-6.2-1 et seq., which set enforceable targets for reducing emissions.

173.    DOE also terminated funding for another project in Rhode Island, a five-year $2,468,434 award to the University of Rhode Island ("URI") for a project titled Measuring Community Effects of Offshore Wind Energy Development awarded under 42 U.S.C. § 16237 and funded by the IIJA, involving subawards to the University of Delaware and Boston University.

174.    URI, one of the top public universities in New England, is known for its research on climate models and sustainability. It leverages its expertise in ocean science and sustainability to develop advanced climate models and actionable resilience strategies, and it offers over a dozen undergraduate programs addressing sustainability.  Moreover, based in part on the State's early adoption of offshore wind energy—a crucial resource in meeting the growing energy demands in the Northeast—URI has become a leading American institution in the social dynamics of the technology.  Because of its specialization, URI was selected for the award to

47

fund its project analyzing the community effects of offshore wind development. And the duration of the grant was noteworthy: whereas most social-science studies are funded for no more than three years, URI received funding for a full five.

175.    The Measuring Community Effects of Offshore Wind Energy Development award, identified with the number DEEE0011077, was expected to support the study of three Eastern U.S. coastal communities over five years to assess the distribution of the benefits of offshore wind development. The project worked closely with a community-based organization in each study site.

176.    Defendants' sudden termination of the grant has severely disrupted URI's research, which was well underway when the termination was abruptly announced. A postdoctoral researcher had to be terminated, graduate and undergraduate students have lost work, and staff have had to be reassigned.  Moreover, the researchers are unable to fulfill commitments made to the communities.

177.    By unlawfully terminating the award, Defendants deprived Rhode Island and its residents of a valuable study that would have provided crucial insights into the distribution of the benefits of offshore wind development, particularly at a time when the State is investing heavily in wind energy to reduce its carbon emissions and achieve its Act on Climate goal of carbon neutrality by 2050.

### K.    Harms to Vermont

178.    DOE terminated a cooperative agreement with the University of Vermont ("UVM"), an instrumentality of the Plaintiff State of Vermont, awarded under Pub. L. No. 116–260 § 8004; 42 U.S.C. § 16236, by the Office of Energy Efficiency and Renewable Energy.  The Office of Energy Efficiency and Renewable Energy cooperative agreement, identified with the number DEEE0010407 and part of the Renewable Energy Grid Integration program, was created for the purpose of examining place-based renewable power generation and its impacts using the concept of an energyshed.  The amount of the award was $3,390,092 to UVM and its sub-awardees, plus $900,000 to three participating DOE national laboratories.

179.    The goal of the agreement was to develop the tools and processes to help community stakeholders evaluate the economic, environmental, social, and performance tradeoffs of various energy shed characteristics to enable a more data-informed transition to distributed renewable energy generation.

180.    By unlawfully terminating the award, Defendants deprived Vermont and its citizens of the tools and processes necessary to help community stakeholders evaluate the economic, environmental, social, and performance trade-offs required in adopting new energy sources and efficiency measures, which, among other things hinders the State's ability to meet its goals as described in its Comprehensive Energy Plan, 30 V.S.A. § 202b. Termination of the award also jeopardizes the reliability of the Vermont electric grid by ending research focused on development and testing of measures to ensure grid stability in the presence of renewable energy sources. It also deprives Vermont of the benefit of a productive collaboration between a major research university (UVM), three leading national laboratories (Sandia National Laboratory, Pacific Northwest National Laboratory, and the National Renewable Energy Laboratory (now known as the National Laboratory of the Rockies)), and four utility partners. UVM has, to date, contributed $742,371 in cost share toward the subject project, the benefits of which were lost when the grant was prematurely terminated.

**L.    Harms to the State of Washington**

181.    In July 2024, Defendants selected the Pacific Northwest Hydrogen Hub ("PNWH2") for a Financial Assistance Award, awarded under IIJA § 40314; 42 U.S.C. § 16161a. PNWH2 was awarded an initial $27.5 million out of a total project federal cost share of $1 billion.

182.    PNWH2 is led by the Pacific Northwest Hydrogen Association, a nonprofit entity that includes board members from the Washington State Department of Commerce and the Oregon Department of Energy. The Pacific Northwest Hydrogen Association was created by the Washington State Legislature to apply for IIJA funding, in recognition that Washington State was "strongly positioned to develop a regional clean energy hub," meeting the IIJA's criteria for

1    regional clean hydrogen hubs. S.S.B. 5910 § 102(1)(b), 67th Leg., Reg. Sess. (enacted, Wash.

2    2022).

3        183.    Specifically, the Washington State Legislature recognized that Washington was

4    well suited for designation as a regional clean energy hub because, among other things, it had

5    adopted a state energy strategy that recognizes hydrogen as an integral part of the State's

6    decarbonization pathway; had an abundance of low cost, low carbon, reliable electricity as the

7    primary energy resource for production of clean hydrogen; and already had under construction the

8    nation's first renewable hydrogen electrolyzer as well as several hydrogen fueling and production

9    facilities. *Id.* at § 201(1)(b)(iii).

10        184.    The Washington State Legislature ordered the Washington State Department of

11    Commerce to provide support—to potentially include department staff support and direct

12    funding—to what would eventually be deemed the Pacific Northwest Hydrogen

13    Association. *Id.* at § 201(2).  The Legislature further recognized its intent to "fully support a

14    regional clean energy hub in the state, including further direct financial assistance in developing

15    the hub[.]"  *Id.* at § 201(3).

16        185.    Washington's creation of the Pacific Northwest Hydrogen Association and its

17    commitment to development of a clean energy hydrogen hub reflects its broader recognition of

18    the importance of hydrogen energy to meeting its ambitious climate goals.

19        186.    The State of Washington has set ambitious goals to reduce greenhouse gas

20    ("GHG") emissions.  In 2020, the Washington State Legislature set new GHG emission limits

21    requiring the State to reduce emission levels by 45 percent by 2030; 70 percent by 2040; and

22    95 percent by 2050, achieving net zero emissions, as measured against 1990 levels.

23    *See* RCW 70A.45.020.  And in 2022, the Legislature recognized the critical role clean hydrogen

24    plays in the State's ability to meet these goals.  Specifically, the Legislature found that

25    "[h]ydrogen is an essential building block and energy carrier molecule that is necessary in the

26    production of conventional and renewable fuels and a valuable decarbonization tool . . . [T]he use

27    of renewable hydrogen and hydrogen produced from carbon-free feedstocks through electrolysis

28    is an essential tool to a clean energy ecosystem and emission reduction for challenging

infrastructure needs."  The Legislature therefore "establish[ed] policies and a framework for the state to become a national and global leader in the production and use of these hydrogen fuels," which included the establishment of the Pacific Northwest Hydrogen Association and the prioritization of IIJA federal funding.  Wash. Rev. Code § 43.330, Findings—Intent—2022 c. 292 (2022); S.S.B. 5910 § 1, 67th Leg., Reg. Sess. (enacted, Wash. 2022).

187.    DOE memorialized its selection of PNWH2 as a hydrogen hub awardee via a cooperative agreement, identified by number DECD0000040.  The cooperative agreement obligated $27.5 million and promised up to $1 billion in federal funding to develop the hub.  Washington State acted on its promise to provide direct funding to the hub, appropriating $20 million to PNWH2 "solely as state match" for IIJA hydrogen hub funding.  E.S.S.B. 5200 § 1029, 68th Leg., Reg. Sess. (enacted, Wash. 2023).  Oregon also contributed funds in the amount of $200,000, along with significant Oregon Department of Energy staff time.  These Oregon resources have already been spent and cannot be recouped."

188.    As memorialized by the cooperative agreement, DOE and PNWH2 maintained a shared vision for the hub: to create a clean hydrogen ecosystem across the Pacific Northwest in partnership with labor, tribal nations, and public and private sectors to improve the lives and futures of people throughout the region; to accelerate the deployment of hydrogen infrastructure to build out the clean hydrogen economy and promote quality jobs (PNWH2 envisioned creating 10,000 direct jobs); and to create a benchmark for successful, clean, and economically viable hydrogen production.  PNWH2 aimed to reduce carbon emissions by 1.7 million metric tons per year—roughly the equivalent to annual emissions of 400,000 gasoline powered cars.  In order to accomplish this vision, PNWH2 planned to incorporate multiple projects in eight distinct hub nodes (project groups) across the region and produce all of its hydrogen via electrolysis using clean, carbon-free energy, facilitating greater connectivity and expansion of a clean West Coast freight network that links to ARCHES, as well as hydrogen-based public transportation infrastructure along the I-5 corridor.

189.    PNWH2 was in the planning, analysis, and design phase—as contemplated by the award—when on October 1, 2025, DOE informed PNWH2 that its award had

51

1    been terminated.  As with other terminated awards, DOE failed to identify any specific facts or

2    reasoning to support the termination.

3         190.    Much like ARCHES, the success of PNWH2 depends on the federal funding

4    contemplated by the IIJA. Without this funding, PNWH2 will not be able to move forward.

5         191.    The loss of PNWH2 has a massive effect on Washington's ability to create a

6    successful hydrogen market and reduces the tools available to help Washington affordably meet

7    its climate goals.  Without PNWH2, Washington's ability to produce, store, transport,

8    and utilize hydrogen is significantly undermined.  Moreover, Washington has already spent

9    approximately $15 million of the $20 million invested as a state match, which cannot be

10   recouped.

11        192.    Washington State University: Washington State University ("WSU") is one of the

12   nation's prominent research universities, with five physical campuses and four Research and

13   Extension Centers located throughout the State of Washington.  The University's cutting-

14   edge work has established WSU as a leader at the forefront of clean energy innovation.

15        193.    Defendants awarded WSU $2,537,319 on August 1, 2023, in support of a project

16   entitled "Resilient Communities via Risk-driven Infrastructure Planning and Automated

17   Restoration (Recuperat)," identified as award number DEEE0010424.  As described in the

18   cooperative agreement, the project was sought to improve grid resilience for underserved

19   communities primarily affected by high-speed wind hazards through risk-based community

20   resilience planning and distributed energy resource assisted automated restoration.  The

21   cooperative agreement includes a cost share of $1,113,525.  On October 2, 2025, WSU received a

22   letter from DOE terminating the project.  On October 28, 2025, WSU received

23   an additional letter, dated October 10, 2025, via email providing formal notice of

24   the initial October 2, 2025, letter.  Prior to the award termination, the research team had delivered

25   substantial progress that directly advanced DOE's priorities around grid reliability, infrastructure

26   modernization, innovation, and technology deployment.  By unlawfully terminating the award,

27   Defendants have deprived Washington and its citizens of significant, tangible benefits for the

28   U.S. power and energy industry, including improved grid reliability and resilience.

194.    Defendants awarded WSU $1,690,731 on October 1, 2023, in support of a project entitled "Assuring Equitable Access and Building Technical Capacity for Transportation Decarbonization Among Native Nations in Washington, Oregon, Idaho, and Montana," identified as award number DEEE0010615, part of the Vehicle Technologies program referenced above.  As described in its cooperative agreement, the project was created for the purpose of promoting expanded vehicle and fuel choices for all Americans, including Native Nations.  The cooperative agreement includes a cost share of $54,000.  On October 2, 2025, WSU received a letter from DOE without an official letterhead citing the DOE Memo.  On October 24, WSU received an additional letter in the mail, dated October 10, 2025, that corrected and confirmed the October 2, 2025, notice.  Prior to the award termination, the project team was on track to exceed all measurable milestones outlined in the Statement of Project Objectives, having already reached all 55 federally recognized Tribes in the Northwest and having already begun providing technical assistance services to more than a dozen Native Tribes, in all four Northwest states.  The researchers aimed to eliminate barriers to tribal Zero Emission Vehicle ("ZEV") access, generate greater ZEV awareness, build ZEV technical capacity, and support long-term pollution reduction by ZEV market expansion.  By terminating the award, Defendants have deprived Washington and its citizens of more equitable, increased access to technical assistance services intended to assist with transportation decarbonization.

195.    Defendants awarded WSU $3,239,240 on October 1, 2023, in support of a project entitled "Towards Durable Carbon-Negative Concrete: Using Biochar to Replace Part of the Clinker and Fine Aggregate," identified as award number DEEE001085.  As described in its cooperative agreement, the project was created to develop the science and demonstrate the ability of biochar substitution for Ordinary Portland Cement ("OPC") and sand to decrease the carbon intensity of concrete by at least 50%, without also decreasing its strength and durability.  The cooperative agreement includes a cost share of $2,057,633.  On October 2, 2025, WSU received a letter from DOE without an official letterhead citing the DOE Memo.  On October 10, 2025, WSU received formal notice of the termination.  Prior to the award termination, the research team had achieved measurable progress in its effort to responsibly use

53

1    domestic natural resources to support forest management efforts that reduce wildfire risk.  The

2    team had also achieved technical improvements relative to traditional cement materials through

3    the development of biochar amended cement.  By unlawfully terminating the award, Defendants

4    have deprived Washington and its citizens of the benefit of additional rural jobs, advanced forest

5    stewardship, more developed local manufacturing processes, and reduced reliance on foreign

6    material imports in cement and concrete technology.

7        196.    Defendants awarded WSU $2,390,420 on August 1, 2024, in support of a project

8    entitled "Planning tools for managing uncertainties in future power grids," identified as award

9    number DEEE0011377.  As described in its cooperative agreement, the project was created

10   to develop new open-source planning tools for managing the modeling complexities and

11   uncertainties posed by inverter-based resources ("IBRs") and extreme weather events, in an effort

12   to meet the needs of future significant data center growth throughout the U.S.  The cooperative

13   agreement includes a cost share of $603,648.  On October 2, 2025, WSU received a letter from

14   DOE without an official letterhead citing the DOE Memo.  Where the letter was supposed to

15   provide a specific basis for the termination, the letter reads "[m]ore specifically, the Department

16   has determined:" followed by a blank space and no reasoning.  On October 8, 2025, WSU

17   received formal notice of the termination.  Prior to the award termination, the research team had

18   achieved significant progress in its effort to develop high-speed adaptive expansion planning

19   optimizers.  These optimizers identify transmission investment portfolios characterized by high

20   reliability, resilience, and robustness.  By unlawfully terminating the award, Defendants have

21   deprived Washington and its citizens of the benefit of more advanced transmission and generation

22   resources to meet growing energy needs.

23       **M.    Harms to Wisconsin**

24       197.    DOE abandoned a cooperative agreement with Plaintiff State of Wisconsin

25   identified with number DEEE0011231, awarded to the Board of Regents of the University of

26   Wisconsin System on behalf of the University of Wisconsin–Madison on October 1, 2024.

27   DOE's share of funding under the agreement is $9,995,543 and included a cost share obligation

28   of $7,552,318.

1    198.    The research funded under this award is titled "Demonstration of a SOEC

2    Hydrogen Direct Reduction (HDR) at the Toledo, Ohio Steel Plant."  The aim of this research is

3    to advance technical and market knowledge in the area of hydrogen direct reduction systems that

4    reduce CO2 emissions in ironmaking plants. The project is being conducted in collaboration with

5    Cleveland Cliffs Steel Corporation, FuelCell Energy, Inc., the Electric Power Research Institute,

6    and other U.S. and international research institutions.

7    199.    The award is in its first budget period that initially ran from October 1, 2024,

8    through September 30, 2025, because the principal investigator, on the recommendation of the

9    DOE program officer, sought a no-cost extension to allow work on the project to continue.  The

10    second budget period was scheduled to run from October 1, 2025, through September 30, 2026, to

11    be followed by a third budget period that would run from October 1, 2026, through September 30,

12    2027.  UW-Madison has not received any communication regarding the status of the no-cost

13    extension. Therefore, the principal investigator has had to stop work on the project.

14    200.    By including the cooperative agreement on the kill list, subjecting the award to the

15    arbitrary criteria in the DOE Memo, and abandoning the award as indicated by DOE's failure to

16    provide the no-cost extension or communicate with the principal investigator regarding the status

17    of either the no-cost extension or expected continuation funding, Defendants have left UW-

18    Madison with an uncertainty as to the status of the cooperative agreement that is tantamount to

19    termination.

20    201.    In so doing, Defendants deprived Wisconsin and the nation of the benefits of

21    critical cutting-edge research to reduce CO2 emissions in steel production.

**DERIVATIVE ALLEGATIONS**

23    202.    Plaintiff GO-Biz incorporates ¶¶ 1–207.

24    203.    Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, plaintiff GO-Biz

25    brings this action derivatively and for the benefit of ARCHES to redress injuries suffered as a

26    result of Defendants' unconstitutional and unlawful acts that are ultra vires and violate the

27    Constitution and the APA.

28

204.     ARCHES is named solely as a nominal defendant in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

205.     Plaintiff GO-Biz is, and has continuously been at all relevant times, a member of ARCHES, including at the time of the October 1, 2025, cooperative-agreement termination.

206.     Plaintiff GO-Biz will adequately and fairly represent the interests of ARCHES in enforcing and protecting its rights.

207.     On January 15, 2026, ARCHES held a board meeting at which the entire ARCHES Board of Directors was present.  At this meeting, GO-Biz, through its counsel, demanded that ARCHES pursue litigation to remedy any harms ARCHES suffered because of the October 1, 2025, termination of its cooperative agreement with DOE. GO-Biz's counsel advised the ARCHES Board of Directors of the constitutional and APA claims contained in this Complaint, as well as the ultimate facts of each cause of action.  GO-Biz demanded that ARCHES bring the claims contained in this Complaint against Defendants.

208.     The ARCHES Board did not make any inquiry in response to the litigation demand. Instead, at the meeting, the ARCHES Board informed GO-Biz that while the ARCHES Board believed pursuing the litigation was in ARCHES's best interests, it lacked the financial resources to investigate or litigate any claims because of Defendant DOE's actions. The ARCHES Board refused GO-Biz's litigation demand.

**CLAIMS**

**COUNT I**
**Violation of Separation of Powers**
**(Against All Defendants)**

209.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

210.     Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing equitable right to relief to challenge unconstitutional governmental

action, including under separation-of-powers principles); *Collins v. Yellen*, 594 U.S. 220, 263 n.1 (2021) (Thomas, J., concurring) (same).

211.    Congress possesses the exclusive power to legislate.  Article I, Section 1 of the U.S. Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."  U.S. Const. art. I, §1; *see Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").  The Constitution prescribes a "single, finely wrought and exhaustively considered[] procedure" for enacting legislation: passage of a bill by both houses of Congress and presentment to the President for signature.  *Clinton*, 524 U.S. at 439–40 (quoting *Chadha*, 462 U.S. at 951); *see* U.S. Const. art. I, § 7, cls. 2, 3.

212.    Similarly, the Constitution "grants the power of the purse to Congress, not the President."  *City & Cnty. of San Francisco*, 897 F.3d at 1231; *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); *id.* § 8, cl. 1 (Spending Clause).  "Among Congress's most important authorities is its control of the purse."  *Biden v. Nebraska*, 600 U.S. 477, 505 (2023).  The Appropriations Clause ensures Congress retains exclusive control over spending and is thus a bulwark of the Constitution's separation of powers among the three branches of the National Government."  *U.S. Dep't of Navy*, 665 F.3d at 1347 (Kavanaugh, J.).  Appropriations are laws that "authorize[] expenditures from a specified source of public money for designated purposes."  *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd*, 601 U.S. 416, 424 (2024).

213.    After presentment, the Executive Branch must "take Care that the laws be faithfully executed."  U.S. Const. Art. II, § 3; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them.").  The Executive Branch violates this clause when it declines to execute or otherwise impedes statutes enacted by Congress and signed into law, or by refusing to spend funds at the level set by Congress in appropriation.  *See In re Aiken Cnty*, 725 F.3d at 261 n.1 (Kavanaugh, J.) ("[E]ven the President does not have unilateral authority to refuse to spend . . . funds."); *see also In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive

order. . . ."); *Kendall*, 37 U.S. (12 Pet.) at 613 (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution"). Consistent with these principles, the President acts at the lowest ebb of his constitutional authority when he acts contrary to the will of Congress by attempting to nullify statutes in whole or in part or by refusing to spend appropriated funds. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

214. Congress exercised its legislative authority in creating these programs and holds the exclusive authority to alter or repeal them. By contrast, the Administration is duty bound to execute Congress's commands. The President's duty to enforce the law does not include the power to terminate or amend laws passed by Congress. The Administration's policy, memorialized in the DOE Memo, of rolling back or eliminating programs without regard for authorizing acts of Congress is fundamentally incompatible with Congress's legislative will. Thus, Defendants' attempts to terminate or roll back these programs violates the separation of powers because they are in direct contravention of Congress's legislative powers and ignore their constitutional responsibility to faithfully execute the laws.

215. Congress exercised its exclusive spending authority by appropriating funds at specific levels to support the programs it created and to fund the awards at issue here. Defendants' refusal to spend is an attempt to supersede Congress's spending authority and to defeat Congress's decision to direct spending to the programs it funded. This infringes upon Congress's exclusive spending power and is a violation of the Executive-Branch duty to faithfully execute the laws. Congress's commands to spend, as captured in the relevant appropriations, cannot be reconciled with Defendants' policy of refusing to spend those funds.

216. Where, as here, the President acts contrary to congressional authority, "the President's asserted power must be both 'exclusive' and 'conclusive' on the issue." *Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 637–38). But the President has no independent legislative authority, *Clinton*, 524 U.S. at 438, and has "none of 'his own constitutional powers' to 'rely' upon when it comes to spending." *City & Cnty. of San Francisco*, 897 F.3d at 1233–34 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J. concurring)).

217.    Thus, the DOE Memo and Defendants' efforts to eliminate the programs at issue violate the separation of powers because Defendants have overridden Congress's direction to create programs and spend appropriated funds, based on a policy disagreement with Congress as to the programs.  The Administration's policy of implementing the DOE Memo to punish Blue States also finds no grounding in either the authorizing statutes or appropriations laws.  This, too, violates the Separation of Powers and the Take Care Clause.

**COUNT II**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(C)**
**Contrary to Law**
**(Against Agency Defendants)**

218.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

219.    DOE and OMB are agencies as defined by the APA, 5 U.S.C. § 701(b)(1).

220.    Defendants' adoption of the DOE Memo and unilateral termination of statutorily required programs without authorization from Congress constitute final agency actions subject to judicial review because these actions reflect the "consummation of the agency's decisionmaking process," and "determine[] rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

221.    The APA requires courts to "hold unlawful and set aside" agency actions that are contrary to constitutional right or power; in excess of statutory authority or limitation; and not in accordance with law.  5 U.S.C. § 706(2)(A)–(C).  By adopting the DOE Memo and eliminating statutorily required programs without authorization from Congress, Defendants acted contrary to constitutional right and power.  5 U.S.C. § 706(2)(B).  The Executive Branch lacks constitutional authority to ignore Congress's express directives about spending.  DOE's actions subverted the plain language of the law by refusing to obligate or spend congressionally appropriated funds.

222.    By adopting the DOE Memo and unilaterally eliminating statutorily required programs without authorization from Congress, Defendants acted in excess of statutory authority or limitation.  5 U.S.C. § 706(2)(C).  The Executive Branch lacks statutory authority to unilaterally eliminate programs mandated by Congress.  DOE's actions also contravene the clear

requirements of the appropriation and authorization statutes.  Pub. L. No. 119–4, 139 Stat. 9; Pub. L. No. 118–42, 138 Stat. 25; Pub. L. No. 118–47, 138 Stat. 460.

**COUNT III**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)**
**Arbitrary and Capricious Agency Action and Agency Action in Violation of Procedure**
**(Against Agency Defendants)**

223.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

224.    DOE and OMB are agencies as defined by the APA, 5 U.S.C. § 701(b)(1).

225.    Defendants' adoption of the DOE Memo and termination of statutorily required programs without authorization from Congress constitute final agency actions subject to judicial review because these actions reflect the "consummation of the agency's decisionmaking process," and "determine[] rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

226.    The APA requires a court to "hold unlawful and set aside agency actions . . . found to be arbitrary, capricious or an abuse of discretion," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

227.    Agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024).  In reviewing agency action under that standard, courts look to the "grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015); *see also Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).  Courts consider "whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43). Agency action is also arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

228.    If an agency action reflects a changed position and the agency fails to "provide a reasoned explanation for the change, display awareness that [it is] changing position, and

60

consider serious reliance interests," its action is arbitrary and capricious.  *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025).  When changing positions, an agency "must show that there are good reasons for the new policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and consider any "serious reliance interests" engendered by the status quo, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation omitted).  Further, agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

229.    The adoption of Defendants' policy to review and terminate funding and eliminate clean-energy programs, including through the DOE Memo, is arbitrary and capricious for at least three independent reasons.

230.    First, the DOE Memo embraces a policy that is irreconcilable with the statutory directives in the relevant appropriations and authorization statutes. Those statutes created programs aimed at funding a wide variety of energy and infrastructure projects, many with a significant focus on renewable energy, decarbonization, and environmental sustainability.  The policy in the DOE Memo, however, explicitly aims to effectuate the presidential directives in the Unleashing American Energy executive order to "[t]erminat[e] the Green New Deal" and other executive orders that set forth the administration's anti-renewable-energy agenda.

231.    Specifically, the DOE Memo articulates a policy to review awards based on, among other under-determined factors, vague and unexplained references to alignment with "national and economic security interests," the current administration's "policies and priorities and program goals and priorities (Standards)," and "market conditions," none of which are factors found within the authorizing statutes or that were otherwise contemplated by Congress.

232.    Second, even if DOE and OMB were authorized to consider and rely on these factors in their decision-making, which they are not, the policy in the DOE Memo to review awards based on those "Standards" constitutes a change in policy for which DOE and OMB did not provide reasoned or reasonable explanations or any indication that it considered awardees' serious reliance interests.

233.     Third, the DOE Memo's vague and opaque criteria created the opportunity for the Administration's unjustifiably partisan plan to punish Blue States through DOE's rushed and chaotic termination of statutorily mandated programs.  This type of biased agency action is "precisely the type[] of agency action[] that would" result in a violation of the arbitrary and capricious standard.  *Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quotation omitted).

234.     Fourth, the DOE Memo purported to subject grants to a case-by-case review process.  That is not what happened.  Instead, swaths of funding were de-obligated and abandoned across the board, with the only discernable commonality being their association with renewable-energy programs, energy efficiency programs, or anything connected with the Administration's definition of the "Green New Scam."

235.     The wholesale elimination of these statutorily mandated programs is arbitrary and capricious for the same reasons.  Elimination of these programs is irreconcilable with the statutory directives in the relevant appropriations and authorization statutes; Defendants considered factors not contemplated by Congress and failed to consider Plaintiffs' serious reliance interests; Defendants moved to eliminate programs created by Congress as part of the Administration's unjustifiably partisan plan to punish Blue States; and Defendants deviated from the purported case-by-case review the DOE Memo said it would apply, instead deeply cutting into programs based solely on broad policy disagreement.

236.     Defendants' adoption of the DOE Memo also violates the APA because it deviated from procedures required by law.  5 U.S.C. § 706(2)(D).  The DOE Memo was neither subject to notice-and-comment rulemaking, nor any form of public comment and review, but it nonetheless kicked off a rash of actions by DOE and OMB that lack transparency and threaten to eviscerate a vast array of statutorily authorized programs and awards.  When agencies change the rules of the game, courts engage in a "functional analysis" of whether their actions constitute a promulgation subject to notice and comment.  *See Iowa League of Cities v. EPA*, 711 F.3d 844, 862 (8th Cir. 2013).  The DOE Memo established the equivalent of a new award-making rule, resulting in

termination or abandonment of awardees' funding.  The DOE Memo should have been subject to the required procedures for agency rulemaking.  5 U.S.C. § 706(2)(D).

**COUNT IV**
***Ultra Vires* Executive Action**
**(Against All Defendants)**

237.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

238.    Administrative agency can take any action that exceeds its statutory authority. *FCC v. Cruz*, 596 U.S. 289, 301 (2022).

239.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.  The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal law.  *Larson v. Domestic & Foreign Com Corp.*, 337 U.S. 682, 689 (1949); *Murphy Co. v. Biden*, 65 F.4th 112, 1128–29 (9th Cir. 2023) (finding jurisdiction to review "constitutional challenges to presidential acts" and "actions by subordinate Executive Branch officials that extend beyond the delegated statutory authority—i.e. *ultra vires* actions.").

240.    Defendants acted without lawful authority in adopting the DOE Memo and choking off congressionally appropriated funding.

**COUNT V**
**Violation of the First Amendment**
**(On Behalf of ARCHES Against All Defendants)**

241.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

242.    Defendants may not "discriminate against speech on the basis of viewpoint." *Rosenberger v. Rector & Visitors*, 515 U.S. 819, 829 (1995).  Neither may Defendants "subject[] individuals to retaliatory actions after the fact for having engaged in protected speech," *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022), nor infringe "the right 'to engage in association for the advancement of beliefs and ideas,'" *NAACP v. Button*, 371 U.S. 415, 431 (1963).  Similarly, the government is prohibited from "wielding [its] power selectively to punish

1  or suppress speech . . . through private intermediaries." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602

2  U.S. 175, 187 (2024).

3      243.    ARCHES deliberately associated with the government of the State of California.

4  ARCHES did so to advance its common interest with those States in the development of clean

5  hydrogen-energy infrastructure.

6      244.    ARCHES's cooperative agreements were terminated as part of a specific and

7  explicit campaign of political retribution against the State of California and its electorate.  In so

8  doing, Defendants unlawfully punished ARCHES for exercising its First Amendment right to

9  associate with the State of California.

10      245.    The State of California coordinated with ARCHES to ensure that ARCHES would

11  receive and utilize hydrogen-hub funds and California and its citizens would receive the benefits

12  of the hydrogen-hub program.

13      246.    Defendants targeted ARCHES as a proxy to retaliate against the speech and

14  viewpoint of Californians who did not vote for President Trump in the last election.  Defendants

15  would not have terminated ARCHES awards but for the protected speech and association of the

16  Californian electorate.  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (voting protected by the

17  First and Fourteenth Amendments).

18      **COUNT VI**
**Violation of the Fifth Amendment – Equal Protection**
19      **(On Behalf of ARCHES Against All Defendants)**

20      247.    Plaintiffs incorporate by reference the allegations contained in the preceding

21  paragraphs.

22      248.    Under the Fifth Amendment to the U.S. Constitution, the federal government may

23  not deny equal protection of the laws.  *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954); *Roy*

24  *v. Barr*, 960 F.3d 1175, 1181, n.3 (9th Cir. 2020).  When the government treats one group

25  differently from another, the classification must, at a minimum, "be relationally related to a

26  legitimate government purpose."  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

27      249.    Here, Defendants have singled out ARCHES's federal funding for termination

28  because it is located in the State of California, where a majority of voters cast their votes for the

64

1    nominee of the Democratic Party in the 2024 Presidential election.  Terminating ARCHES's

2    funding was an act of political retribution.  The statements made by President Trump and Director

3    Vought, along with DOE's explicit concession in *City of Saint Paul*, 2026 WL 88193, at *2, *8,

4    confirm this.

5         250.    Further, the political preference of the electorates of the State of California is

6    wholly irrelevant to whether the ARCHES cooperative agreement supports the Regional

7    Hydrogen Hubs program's goals or DOE's priorities, meaning it is not rationally related to the

8    purpose cited for the termination of the cooperative agreements.

9

10                                   **PRAYER FOR RELIEF**

11         WHEREFORE, Plaintiffs pray that this Court grant the following relief:

12         1.    Pursuant to Count I under the U.S. Constitution and Count IV alleging *ultra vires*

13    agency action:

14              a.    Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 holding that the

15                    DOE Memo is unconstitutional because it violates the Separation of

16                    Powers set forth in the U.S. Constitution and that it is *ultra vires*;

17              b.    Issue an injunction requiring DOE to cease any pending review pursuant to

18                    the DOE Memo;

19              c.    Issue an injunction undoing the termination or abandonment of any of the

20                    awards at issue here;

21              d.    Issue preliminary and permanent injunctive relief barring any future action

22                    based upon the DOE Memo, including the review, termination, or

23                    abandonment of any award;

24         2.    Pursuant to Counts II and III under the Administrative Procedure Act:

25              a.    Enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating

26                    the DOE Memo;

27              b.    Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 holding that the

28                    DOE Memo is unlawful because it violates the APA;

c.    Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 holding that

Defendants may not terminate or abandon awards based on the

Administration's policy preferences or the State in which the awardee is

located;

d.    Following vacatur of the DOE Memo under 5 U.S.C. § 706(2), and only if

no injunctive relief is awarded pursuant to Counts I and II that would result

in the reinstatement of Plaintiffs' awards, enter an order under 5 U.S.C.

§ 705 preserving the status of Plaintiffs' awards as of the date of this

Complaint, and remanding DOE's termination or abandonment of those

awards to DOE for reconsideration within a specified period in light of the

vacatur of the DOE Memo;

3.    Pursuant to Counts V and VI under the First and Fifth Amendments of the U.S.

Constitution, issue an injunction reinstating the ARCHES cooperative agreement;

4.    Declare that Plaintiff GO-Biz may maintain this action on behalf of ARCHES, and

that Plaintiff GO-Biz is an adequate representative of ARCHES.

5.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys'

fees, pursuant to 28 U.S.C. § 2412; and

6.    Grant any and all additional relief this Court may deem proper.

Dated:  February 18, 2026

Respectfully submitted,

**ROB BONTA**
Attorney General of California

TODD GRABARSKY
R. MATTHEW WISE
Supervising Deputy Attorneys General
KRISTI HUGHES
HARALD H. KIRN
ZELDA VASSAR

*/s/ Christopher J. Kissel*
CHRISTOPHER J. KISSEL
Deputy Attorneys General

*Attorneys for Plaintiffs State of California
and California Governor's Office of Business
and Economic Development*

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ Sarah H. Weiss*
SARAH A. KRAKOFF, CBA #27366*
Deputy Solicitor General
CARRIE NOTEBOOM, CBA #52910*
Assistant Deputy Attorney General
SARAH H. WEISS, CBA #61914*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
sarah.krakoff@coag.gov
carrie.noteboom@coag.gov
sarah.weiss@coag.gov

*Attorneys for Plaintiff State of Colorado*

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s/ Kaia Boonzaier*
KAIA BOONZAIER, CA SBN # 348123
CAITLIN M. SODEN, WSBA # 55457*
LEAH A. BROWN, WSBA # 45803*
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104
206-464-7744
kaia.boonzaier@atg.wa.gov
caitlin.soden@atg.wa.gov
leah.brown@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

67

*California, et al. v. Wright, et. al.*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Andrew M. Ammirati*
Andrew M. Ammirati*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5090
Andrew.Ammirati@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Paul Berks*
Paul Berks (pro hac vice admission forthcoming)
Joanna Brinkman
Complex Litigation Counsel
Jason E. James
Assistant Attorney General
Office of the Illinois Attorney General
115 S. Lasalle St.
Chicago, IL 60603
(773) 919-2923
Paul.Berks@ilag.gov

*Attorneys for Plaintiff State of Illinois*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Steven J. Goldstein*
Steven J. Goldstein*
Assistant Attorney General
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6414
sgoldstein@oag.maryland.gov

*Attorneys for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of the Commonwealth of Massachusetts

By: */s/ Vanessa A. Arslanian*
Vanessa A. Arslanian*
*State Trial Counsel*
Julia Jonas-Day*
*Assistant Attorney General*
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2107
vanessa.arslanian@mass.gov
julia.jonas-day@mass.gov

*Attorneys for Plaintiff the Commonwealth of Massachusetts*

**JENNIFER L. DAVENPORT**
Acting Attorney General of New Jersey

By: */s/ Jessica Palmer*
Jessica L. Palmer*
  *Assistant Attorney General*
Yael Fisher*
Elizabeth Van Winkle*
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
609-376-2984
Jessica.Palmer@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Matthew Eisenson*
MATTHEW EISENSON*
*Assistant Attorney General*
MICHAEL J. MYERS *
*Senior Counsel*
KELSEA SUAREZ*
*Special Assistant Attorney General*
Environmental Protection Bureau
Office of the Attorney General
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8481
matthew.eisenson@ag.ny.gov
michael.myers@ag.ny.gov
kelsea.suarez@ag.ny.gov

*Attorneys for Plaintiff State of New York*

**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Coby Howell*
COBY HOWELL*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Coby.Howell@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Eshan Dabak*
Eshan Dabak (R.I. Bar No. 11103)*
  Special Assistant Attorney General
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, ext. 2041
edabak@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

*California, et al. v. Wright, et. al.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose
Solicitor General
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 878-3171
jonathan.rose@vermont.gov

*Attorney for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Aaron J. Bibb*
Aaron J. Bibb, Wisconsin State Bar No.
1104662
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-0810
aaron.bibb@wisdoj.gov

*Attorney for the State of Wisconsin*

*Pro hac vice application forthcoming

70

1

## VERIFICATION

2

3    I, Van T. Nguyen, hereby declare as follows:

4    I am the Chief Legal Officer of the California Governor's Office of Business and

5    Economic Development (GO-Biz), which is a Plaintiff in the case captioned *California, et al. v.*

6    *Christopher Wright, et al.*, in the Northern District of California.  I have authorized the filing of

7    this complaint.  I have reviewed the allegations made in the complaint, and to those allegations of

8    which I have personal knowledge, I believe them to be true.  As to those allegations of which I do

9    not have personal knowledge, I rely on my counsel and counsel's investigation, published reports,

10   and published media reports regarding the actions at issue in this complaint, and I believe these

11   allegations to be true.

12    I declare under penalty of perjury that the foregoing is true and correct.

13

14   Executed on February 18, 2026, in Sacramento, California.

15

16   *Van T. Nguyen*
     VAN T. NGUYEN

17   Deputy Director of Legal Affairs
     California Governor's Office of

18   Business and Economic
     Development

19

20

21

22

23

24

25

26

27

28

71

*California, et al. v. Wright, et. al.*