University of Tennessee College of Law

## Legal Scholarship Repository: A Service of the Joel A. Katz Law Library

Chapter 11 Bankruptcy Case Studies                                    Student Work

2012

# Solyndra

Brandon Brewer

Matthew Kinsey

Anthony Mendenhall

Follow this and additional works at: https://ir.law.utk.edu/utk_studlawbankruptcy

 Part of the Bankruptcy Law Commons

Recommended Citation

Brewer, Brandon; Kinsey, Matthew; and Mendenhall, Anthony, "Solyndra" (2012). *Chapter 11 Bankruptcy Case Studies*. 34.
https://ir.law.utk.edu/utk_studlawbankruptcy/34

This Article is brought to you for free and open access by the Student Work at Legal Scholarship Repository: A Service of the Joel A. Katz Law Library. It has been accepted for inclusion in Chapter 11 Bankruptcy Case Studies by an authorized administrator of Legal Scholarship Repository: A Service of the Joel A. Katz Law Library. For more information, please contact eliza.boles@utk.edu.

DOE AR 000001

# SOLYNDRA'S CHAPTER 11 BANKRUPCY

*Brandon Brewer*

*Matthew Kinsey*

*Anthony Mendenhall*

I.    INTRODUCTION ......................................................................................5
      A. *Solyndra's New Technology* ...........................................................5
            1. Basic Energy Principles...............................................................6
            2. Photovoltaic Materials.................................................................6
      B. *Solyndra's Solar Cylinders* .............................................................7
      C. *Growing Pains* .................................................................................9

II.   THE DEPARTMENT OF ENERGY LOAN .................................................10

III.  THE PERFECT STORM: MARKET FORCES LEADING TO SOLYNDRA'S FAILURE ..24
      A. *Rise and Fall of Polysilicon Prices From 2008 to 2011*............................25
      B. *European Solar Subsidy Cuts* ........................................................27
      C. *Oversupply: The China Factor* .......................................................29

IV.   THE DECISION TO FILE FOR BANKRUPTCY .........................................32
      A. *Filing the Petition* ..........................................................................33
      B. *The Legal Effects of Solyndra's Filing* ...........................................34
      C. *First Day Motions* ..........................................................................35
            1. Postpetition Secured Financing .................................................36
            2. Motion for Joint Administration................................................39
            3. Motion to Establish Procedures for Interim Compensation ........39
            4. Motion to Maintain and Administer Warranty Programs and
               Honor Related Prepetition Obligations ......................................40
            5. Motion to Maintain Existing Bank Accounts and Continue Use of
               Existing Cash Management System ...........................................42
            6. Motion to Pay Prepetition Employee Wages and Benefits .........43
            7. Motion to Pay Prepetition Sales and Use and Similar Taxes ......44
            8. Motion Prohibiting Utilities from Discontinuing Service ...........44
            9. Motion to Reject Unexpired Lease.............................................45

V.    OUTCOMES FOR THE SECURED AND UNSECURED CREDITORS ...........................46

VI.   FIRST NON-PLAN SALE ATTEMPT ......................................................50
      A. *Landlord Contentions with the Preplan Sale*............................................51
      B. *Committee of Unsecured Creditors Contentions with the Preplan Sale*....53

       *C. Failure of the Non-Plan Sale* ....................................................................54

VII.    THE SUBCOMMITTEE HEARINGS ..........................................................................55

VIII.   THE WARN ACT CLASS ACTION LAWSUIT .........................................................58

IX.    THE END OF THE ROAD .....................................................................................60

DOE AR 000003

## Cast of Characters

| | |
|---|---|
| **Department of Energy** | Authorized Solyndra loan guarantee under Section 1705 of the American Recovery and Reinvestment Act of 2009.  Responsible for the analyzing of the solar panel market in addition to the general overseeing of the loan. |
| **Steven Chu** | Secretary of the Department of Energy and a driving force behind the acceleration and approval of Solyndra's loan guarantee.  Chu accepted full responsibility for the Solyndra guarantee and pledged there were no political motivations behind his decisions. |
| **Solyndra** | Manufacturer of solar panels based in Fremont, California.  Was the first recipient of a section 1705 loan guarantee under the American Recovery and Reinvestment Act.  After plummeting market prices, filed for Chapter 11 bankruptcy protection. |
| **Office of Management and Budget** | Responsible for assisting the President in overseeing the preparation of the federal budget.  Reviewed Solyndra's loan package and outlined numerous concerns while noting time constraints before ultimately giving final approval to the loan. |
| **PricewaterhouseCoopers** | One of the world's largest accounting firms and Solyndra's auditor.  Audit report included concerns over cash flow and doubts about continued production. |
| **Peter Orszag** | Director of the Office of Management and Budget |
| **Wilbur "Bill" Stover** | Chief Financial Officer and Member of Solyndra's Board of Directors.  One of two Solyndra representatives who refused to |

3

DOE AR 000004

testify at House hearings with the Subcommittee of Oversight and Investigations.

**Brian Harrison**            Chief Executive Officer and Member of Solyndra's Board of Directors. One of two Solyndra representatives who refused to testify at House hearings with the Subcommittee of Oversight and Investigations.

**Argonaut Private Equity**   Private equity firm founded by George Kaiser. Solyndra's largest private investor.

**George Kaiser**            Founder of Argonaut Private Equity and the George Kaiser Family Foundation, both heavy investors in Solyndra. Major Obama fundraiser.

**Judge Mary F. Walrath**    Judge for the United States Bankruptcy Court for the District of Delaware

**Peter Kohlstadt**          Claimant in a class action lawsuit against Solyndra under the U.S. Worker Adjustment and Retaining Notification Act and California Labor Code

**Roberta A. DeAngelis**     Appointed U.S. trustee. Filed motion to be appointed trustee of Solyndra's Ch. 11 filing. Also filed motion to have bankruptcy changed from a Chapter 11 to a Chapter 7 liquidation

4

DOE AR 000005

## I.  INTRODUCTION

Solyndra designed and manufactured solar photovoltaic systems designed for large, commercial building owners, government agencies, utilities, developers, roofing contractors, integrators, and energy service companies.[1] Solyndra was originally founded by Dr. Christian Gronet[2] in 2005 as Gronet Technologies, Inc.[3] Gronet Technologies, Inc. changed its name several months later to Solyndra, a play on the words "solar" and "cylinder."[4] Solyndra started out as green tech's poster child, showing how government and green entrepreneurs could team up to create clean energy, blue collared jobs, and a healthy new industry.[5]  Instead, Solyndra will likely be remembered as a cautionary tale of how taxpayer dollars were wasted when the government made financial investments based on political considerations.[6]

### A.  Solyndra's New Technology

---

[1] *Company Overview of Solyndra LLC*, BLOOMBERG BUSINESSWEEK (Apr. 21, 2012 1:04 PM ET), http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=33681528.

[2] Dr. Christian Gronet is an alumnus of Stanford University, where he earned a Ph.D. in semiconductor processing and a bachelor of science degree in Materials Science. *Christian Gronet: Executive Profile & Biography - Businessweek*, BLOOMBERG BUSINESSWEEK (Apr. 21, 2012 1:06 PM ET). http://investing.businessweek.com/research/stocks/private/person.asp?personId=54334387&privcapId=33681528&previousCapId=282225&previousTitle=KLA-TENCOR%20CORPORATION. Prior to Solyndra, Dr. Gronet had founded G-Squared Semiconductor Corp., which invented and developed technology for rapid thermal processing of silicon wafers for manufacturing integrated circuits. *Id*. G-Squared Semiconductors was later acquired by Applied Materials where he would serve 11 years as a Vice President and General Manager of the Transistor, Capacitor and Gate product group at Applied Materials. *Id*. Gronet left Applied Materials in 2002 and become a private investor prior to founding Solyndra in 2005. Chang Liu, *The Solyndra Saga*, MEMSCENTRAL.COM (2011), http://memscentral.com/Secondlayer/The_Solyndra_Saga.htm.

[3] *Company Overview of Solyndra LLC*, BLOOMBERG BUSINESSWEEK (Apr. 21, 2012 1:04 PM ET), http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=33681528.

[4] *Id.*

[5] Kent Bernhard, Jr., *Solyndra Goes From Solar Poster Child to Cautionary Tale*, PORTFOLIO.COM (Sept. 02, 2011 3:48pm EDT), http://www.portfolio.com/views/blogs/daily-brief/2011/09/02/solyndra-failure-causes-obama-venture-capitalists-and-solar-industry-headaches/.

[6] *Id*.

DOE AR 000006

To understand Solyndra's business and its products, an understanding of (1) the basic principles behind solar behind energy and (2) the different materials used in solar panel technology is needed.

### 1.  Basic Energy Principles

The sun gives off enough energy in one minute to supply the world's energy needs for an entire year.[7] Energy from the sun reaches the Earth in the form of electromagnetic radiation. Scientists use terms like electromagnetic radiation, infrared light, visible light, and ultraviolet light to describe energy from the sun. Ordinary people simply use the term "sunlight."

Like all forms of energy, sunlight can be changed from one form of energy into another. To illustrate this, one can picture a sunbather lying out on a breach in Rio de Janeiro. As sunlight hits the sunbather's body, the sunlight (electromagnetic energy) is absorbed by the sunbather's skin and converted into heat (thermal energy). Heat reacts with the different chemicals in the skin and, depending on the amount of certain chemicals in a person's skin, either gives the sunbather a nice tan or a nasty sunburn.

### 2.  Photovoltaic Materials

Most materials, like the sunbather's skin or the glass in a window, convert electromagnetic energy (sunlight) into thermal energy (heat). Some materials, however, convert electromagnetic energy into electrical energy. Materials that convert light into electricity are described as being "photovoltaic." Scientists have discovered several different types of photovoltaic materials. These include crystalline silicon, cadmium telluride, copper indium gallium selenide, and gallium arsenide.[8]

---

[7] *Solar Energy*, ALTERNATIVE ENERGY, http://www.altenergy.org/renewables/solar.html (last visited Apr. 14, 2012).

[8] Fundamentals of Photovoltaic Materials, National Solar Power Research Institute, Inc. (Dec. 21, 1998), *available at* http://userwww.sfsu.edu/~ciotola/solar/pv.pdf.

6

DOE AR 000007

While all of these materials can convert sunlight into electricity, each material has different physical properties. For example, crystalline silicon can be mined from sand, one of the most abundant materials on earth. This makes crystalline silicon a relatively cheap material to manufacture.[9] Crystalline silicon is also heavy and brittle compared to other photovoltaic materials such as copper indium gallium selenide.[10] Copper indium gallium selenide strongly absorbs sunlight and thus can be used to make flexible films.[11]

### B.  Solyndra's Solar Cylinders

Traditional solar panel technology suffers from a variety of problems that Solyndra hoped to capitalize on. First, solar panels, while producing "free" electricity, require significant upfront costs.[12] Second, solar panels are expensive and must be installed properly in order to operate safely and efficiently.[13] Third, traditional crystalline silicon panels—the kind one normally thinks of when picturing solar panels—require special structural support.[14] To keep high speed winds from ripping the angled panels off their structural mounts, additional structural support to the building that houses the panels may also be required. Also, traditional crystalline silicon

---

[9] Galen Barbose, Naïm Darghouth, Ryan Wiser & Joachim Seel, *Tracking the Sun IV: An Historical Summary of the Installed Cost of Photovoltaics in the United States from 1998 to 2010*, LAWRENCE BERKELEY NATIONAL LABORATORY (Sept. 2011), http://eetd.lbl.gov/EA/EMP/reports/lbnl-5047e-ppt.pdf.

[10] H.S. Ullal, *Polycrystalline Thin-Film Solar Cell Technologies*, NATIONAL RENEWABLE ENERGY LABORATORY (Dec. 2008), http://www.nrel.gov/docs/fy09osti/44622.pdf.

[11] *Fundamentals of Photovoltaic Materials*, National Solar Power Research Institute, Inc. (Dec. 21, 1998), http://userwww.sfsu.edu/~ciotola/solar/pv.pdf.

[12] *Calculate the cost of Photovoltaic Systems (Home Solar Electricity)*, NEW MEXICO SOLAR ENERGY ASSOCIATION, http://www.nmsea.org/Curriculum/7_12/Cost/calculate_solar_cost.htm#Calculation%20of%20upfront%20cost (last visited Apr. 14, 2012).

[13] *Id.*

[14] *Solar PV: Safety and The Building Regulations*, IN BALANCE ENERGY, http://www.inbalanceenergy.co.uk/articles/solar_pv_safety_and_the_building_regulations.html (last visited Apr. 14, 2012).

7

panels need to be angled in order to face the sun. Fourth, solar panels can sometimes be aesthetically unpleasant.[15]

Instead of a flat, crystalline silicon panel, Solyndra's products used rows of tubes. Each tube was, in reality, two tubes. The outer tube acted much like a lens, bending the sunlight towards an inner tube. The outside of the inner tubes were lined with the photovoltaic material copper indium gallium selenide (CIGS). Solyndra's designs were protected by several patents,[16] giving them a virtual monopoly on all cylindrical solar panel designs.

Solyndra's patented cylindrical design mitigated several problems associated with traditional crystalline silicon designs.[17] First, Solyndra's cylindrical design allowed panels to be placed in almost any orientation with minimal impact on energy generation because the outer tubes are able to capture a wide array of sunlight angles.[18] This allowed Solyndra panels to follow building contours instead of having to align in a true south or true north direction.[19]

---

[15] See, e.g., John Sullivan, *Some say Warwick solar panels are too ugly*, TIMES HERALD-RECORD (Oct. 1, 2012) http://www.recordonline.com/apps/pbcs.dll/article?AID=/20120110/NEWS/201100329/-1/SITEMAP.

[16] Real time process monitoring and control for semiconductor junctions, U.S. Patent No. 8,110,828 (filed June 9, 2011); Constant force mechanical scribers and methods for using same in semiconductor processing applications, U.S. Patent No. 8,109,004 (filed Jan. 26, 2011); Volume compensation within a photovoltaic device, U.S. Patent No. 8,106,292 (filed Nov. 30, 2007); Volume compensation within a photovoltaic device, U.S. Patent No. 8,093,493 (filed Nov. 30, 2007); Interconnects for solar cell devices, U.S. Patent No. 8,067,688 (filed Jan. 3, 2007), Real time process monitoring and control for semiconductor junction, U.S. Patent No. 7,964,418 (filed Aug. 16, 2007); Apparatus and methods for connecting multiple photovoltaic modules, U.S. Patent No. 7,963,813 (filed Nov. 2, 2007); System and method for creating electric isolation between layers comprising solar cells, U.S. Patent No. 7,879,685 (filed July 25, 2007); Constant force mechanical scribers and methods for using same in semiconductor processing applications, U.S. Patent No. 7,877,881 (filed Mar. 18, 2010); Method of and apparatus for inline deposition of materials on a non-planar surface, U.S. Patent No. 7,855,156 (filed May 9, 2007); Constant force mechanical scribers and methods for using same in semiconductor processing applications, U.S. Patent No. 7,707,732 (filed Oct. 15, 2008); Method of depositing materials on a non-planar surface, U.S. Patent No. 7,563,725 (filed May 9, 2007); Bifacial elongated solar cell devices with internal reflectors, U.S. Patent No. 7,394,016 (filed Oct. 11, 2005); Interconnects for solar cell devices, U.S. Patent No. 7,259,322 (filed Jan. 9, 2006); Monolithic integration of cylindrical solar cells, U.S. Patent No. 7,235,736 (filed Mar. 18, 2006); Bifacial elongated solar cell devices, U.S. Patent No. 7,196,262 (filed June 20, 2005).

[17] *Technology / Products*, SOLYNDRA, http://www.solyndra.com/technology-products (last visited Apr. 14, 2012).

[18] *Id.*

[19] *Id.*

8

DOE AR 000009

Second, Solyndra's cylindrical system was extremely lightweight compared to traditional crystalline silicon panels.[20] Solyndra's system did not require the oftentimes expensive mounting hardware and ballast and allowed for installation on older buildings not designed to carry heavy rooftop loads.[21] Third, because wind could blow between the series of tubes and because the system was relatively lightweight, high-speed wind concerns were minimized, and installation cost savings were realized.[22] Because Solyndra's panels were not mounted to the roof, Solyndra's panels would never transfer wind load to the roof or be blown off the roof.[23] Simple, non-penetrating mounting hardware was used in the Solyndra systems because no roof penetrations, attachments, or ballast were needed.[24] Fourth, because Solyndra panels did not need to be titled and spaced apart like traditional crystalline silicon panels,[25] Solyndra's panels could be placed closer together. This enabled greater rooftop coverage and easier access to irregular spaces or gaps caused by roof obstacles, while also providing easy visibility and access for rooftop maintenance.[26]

### C.  Growing Pains

Solyndra started shipping its first product line in July 2008.[27] Sales continued to grow from year to year; however, despite the growth in sales, Solyndra never had a profitable year.[28]

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Form S-1 Registration Statement of Solyndra, Inc., U.S. SECURITIES AND EXCHANGE COMMISSION (Dec. 18, 2009), http://www.sec.gov/Archives/edgar/data/1443115/000119312509255919/ds1.htm#toc15203_1.

[28] *Id.*

9

DOE AR 000010

This situation of continued losses despite growing sales is common for most starting businesses and is not necessarily the sign of a failing business. Selected analysts saw clean energy companies, including Solyndra, as sound businesses with great opportunity.[29] Solyndra describes itself as such in a December 2009 prospectus filing with the SEC:

> We commenced commercial shipments of our photovoltaic systems in July 2008 and have increased our sales volume and revenue every quarter since that date. We sold 17.2 megawatts, or MW, of panels . . . compared to 1.6 MW for the fiscal year ended January 3, 2009. For the nine months ended October 3, 2009, our revenue was $58.8 million, compared to $6.0 million for the fiscal year ended January 3, 2009. Our panels have been deployed in over 100 commercial installations internationally and across the United States. . . . As of the date of this prospectus, we have framework agreements with system integrators and roofing materials manufacturers outlining general terms for the delivery of up to 865 MW of our photovoltaic systems by the end 2013.[30]

With only one production plant in operation, Solyndra would need to expand its manufacturing capabilities in order to increase revenues.[31]Solyndra

## II.  THE DEPARTMENT OF ENERGY LOAN

On January 9, 2009, the Department of Energy Credit Committee convened to consider the loan guarantee of $535,000,000 for Solyndra Fab 2 LLC and a solar photovoltaic power

---

[29] *See* Claire Cain Miller, *Thin Film Solar Companies Raise Hundreds of Millions in Financing*, NEW YORK TIMES (Sept. 11, 2008, 2:28 PM), http://bits.blogs.nytimes.com/2008/09/11/another-thin-film-solar-company-rakes-in-venture-capital ("Thin film has the potential to be extremely disruptive. Because of its cost, it will steal market share."); *Powered by China, Clean Energy Investment Holds Steady in Q2*, BUSINESS WIRE (July 13, 2010 09:00 AM EDT), http://www.businesswire.com/news/home/20100713005435/en/Powered-China-Clean-Energy-Investment-Holds-Steady ("Venture capital and private equity financings remain a bright spot for clean energy in 2010 compared to last year.").

[30] Form S-1 Registration Statement of Solyndra, Inc., U.S. SECURITIES AND EXCHANGE COMMISSION (Dec. 18, 2009), http://www.sec.gov/Archives/edgar/data/1443115/000119312509255919/ds1.htm#toc15203_1.

[31] *Id.*

10

panel project.[32]  One of the driving forces behind the original loan guarantee was the Department of Energy's Secretary Chu.  When Chu met with the Department of Energy on January 9, 2009, he specifically asked what actions needed to be taken in order to accelerate the pace of review and issuance of loan guarantees.  On January 26, 2009, the American Recovery and Reinvestment Act of 2009 (ARRA) was introduced to the house by Representative Dave Obey.[33] Under the ARRA, a change was made to the current Department of Energy Loan Guarantee Program that allowed for certain projects to qualify as Section 1705 loan guarantees.  Under these Section 1705 loan guarantees, the borrower was no longer required to pay the credit subsidy cost, but in order to be eligible for this funding, the stimulus required that the projects begin no later than September 30, 2011.[34]

By not requiring the borrower to pay the credit subsidy, the government was substantially increasing the risks associated with any approved projects.  Before, when the borrower was responsible for the credit subsidy, there was great incentive on a corporation's part to thoroughly review projects and reduce any potential risks that could arise.  Once the government agreed to pay the subsidy on behalf of the borrowers, these corporations had far less concern for the minimizing of any risks.  While many of these companies were unable to afford the credit subsidy on their own and did indeed need the help of the government, it cannot be ignored that projects were implemented with far less concern for risk aversion.

---

[32] CJ Ciaramella, *White House political pressure alleged in Solyndra loan deal*, THE DAILY CALLER (Sept.14, 2011, 2:51 PM) http://dailycaller.com/2011/09/14/white-house-political-pressure-alleged-in-solyndra-loan-deal/ (last visited April 22, 2012).

[33] Govtrack.us, H.R. I (IIIth): American Recovery and Reinvestment Act of 2009, http://www.govtrack.us/congress/bills/111/hr1 (Last visited April 20, 2012).

[34] Wilson Sonsini Goodrich & Rosata Professional Corporation, Status Update – Department of Energy Title XVII Loan Guarantee Program (2011)

11

In March 2009, Solyndra was reported as the first commitment in the stimulus for credit subsidy costs.[35] The timing was curious and illustrated the Department of Energy's desire to reduce the cycle time for the decision-making process. At the time of the announcement, the Loans Program Office of the Department of Energy had still not received the Independent Market Report outlining the feasibility and soundness of Solyndra's model.[36] Furthermore, Solyndra and the Department of Energy were still negotiating over the debt to equity ratio of the deal. Solyndra was arguing for an 80–20 debt to equity split, with the Department of Energy asking for more equity.[37] In addition, there was still debate as to whether the deal would be structured as a corporate or project finance arrangement.[38]

On March 6, 2009, documents from the Department of Energy's Credit Committee and Credit Review Boards show that dates for the review and approval of the Solyndra application had been scheduled, even with no finalized term sheet having been negotiated.[39] There is also evidence that Solyndra was pushed through the process so as to be in time for a speech President Obama was giving in California on March 18th, as mentioned in email exchanges amongst the Loan Programs Office staff.[40] However, eventually negotiations did conclude and the term

---

[35] Solyndra, News and Information, *Solyndra Offered $535 Million Loan Guarantee By The U.S. Department of Energy Solyndra*, http://www.solyndra.com/2009/03/us-department/ (last visited April 20, 2012).

[36] Background Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 12, 2011)

[37] Background Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 12, 2011)

[38] *Id*.

[39] Lachlan Markay, *Solyndra Update: Friday Document Dump Raises More Questions,* THE FOUNDRY (Jan. 17, 2012, 1:26 PM) http://blog.heritage.org/2012/01/17/solyndra-update-friday-document-dump-raises-more-questions/ (last visited April 19, 2012).

[40] John of the SolarTribune, *Treasury: review of Solyndra loan was "rushed"*, THE SOLAR TRIBUNE (Apr. 5, 2012) http://solartribune.com/2012-04-05-treasury-review-of-solyndra-loan-was-rushed/#.T5oHcNWiOwE (last visited Apr. 19, 2012).

12

DOE AR 000013

sheet was finalized on March 20, 2009.[41]  While the Credit Committee did conditionally approve its commitment to Solyndra, it also listed its concerns and questions associated with the start-up. This list of concerns was considered particularly extensive and included everything from a proper analysis of Solyndra's competitors to greater details of the company's financials.

With the March 18th date approaching, the Credit Review Board met on March 17, 2009 to discuss the commitment to Solyndra.  During this meeting, it is unclear if the Credit Committee's follow-up questions were even discussed.  The conditional commitment was approved provided that Solyndra was able to raise its equity contribution.  On July 7, 2009, Secretary Chu even went as far to say that the "loan is theirs, as soon as they get the additional capital that's required by statute."[42]  Unfortunately, this was very much at odds with the consensus of the Department of Energy's Loan Program Office.  In an email from July 7, 2009, one staff member stated that he had no idea where the information on the equity raise had come from and that the claim saying that Solyndra had already secured the loan didn't help them move forward in the negotiation process.[43]

After the conditional commitment was approved, Solyndra's package was then submitted to the Office of Management and Budget for review.  In an act of apparent haste again, prior to the package's approval, the White House and Department of Energy scheduled an announcement for the closing of Solyndra's loan guarantee.[44]  Not surprisingly, a little over one week after the White House and Department of Energy began scheduling this announcement, a major

---

[41] R. Todd Neilson: Solyndra Report of R. Todd Neilson (2012)

[42] Jhoanna Frances S. Valdez, *D.O.E. asked Solyndra to delay announcement of company layoffs*, ECOSEED (Nov. 16, 2011) http://www.ecoseed.org/politics-article-list/article/3-politics/11850-d-o-e-asked-solyndra-to-delay-announcement-of-company-layoffs (last visited April 15, 2012)

[43] *Id.*

[44] Sarah Roman, Solyndra Timeline, AMERICAN FREEDOM (Nov. 12, 2011) http://usamericanfreedom.com/2011/11/12/solyndra-timeline/ (Last visited April 10, 2012)

13

DOE AR 000014

outstanding issue was identified that concerned the working capital and liquidity of the company.

Specifically, a Department of Energy staff member noted the working capital issue had long

been a concern and projected the company would run out of cash in September 2011.[45] The

Department of Energy tackled the issue for a period of four days before deciding on August 25,

2009 to push through the deal.[46] With still lingering concerns, the Department of Energy agreed

to refine the definition of project overrun costs to be paid for by the parent company and to alter

Solyndra's financial model.[47]

After briefing the Office of Management and Budget on August 25, 2009, it became

fairly evident that the Department of Energy had rushed the production of its documents in order

to meet a September 4, 2009 scheduled announcement event at Solyndra's facilities. There were

serious concerns over everything from the proposed credit subsidy estimates to the outlined cash

flow numbers.[48] The concerns were so grave that one staff member of the Office of

Management and Budget even contacted Vice President Joe Biden's office to voice his concerns

about the rushed nature associated with the approval.[49] When one staff member noticed that the

deal was based on a workout recovery scenario when it should have been developed under a

liquidation scenario, the employee was told that due to pressure to quickly approve Solyndra,

---

[45] *Solyndra Facts vs Fiction: Cash Flow Modeling*, ENERGY.GOV (Sept. 23, 2011, 5:25 PM) http://energy.gov/articles/solyndra-facts-vs-fiction-cash-flow-modeling (last visited March 15, 2012)

[46] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[47] Bill Vlasic and Matthew L. Wald, *Solyndra Is Blamed as Clea-Energy Loan Program Stalls*, THE NEW YORK TIMES (Mar. 12, 2012) http://www.nytimes.com/2012/03/13/business/energy-environment/stalled-clean-energy-loan-program-feels-solyndras-chill.html?pagewanted=all (last visited April 2, 2012)

[48] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[49] Doug Mataconis, *Emails Reveal White House Pressure To Appove Solyndra Loan,* OUTSIDE THE BELTWAY (Sep. 14, 2011) http://www.outsidethebeltway.com/emails-reveal-white-house-pressure-to-approve-solyndra-loan/ (last visited April 4, 2012)

14

there was no time to make the change.[50]  There appear to have been a number of red flags raised regarding not only Solyndra's guarantee, but also its business model as a whole.

On September 1, 2009, the Office of Management and Budget recommended that the Solyndra deal be slowed down in order to address serious concerns about the weakening world market prices for solar panels.[51]  In any case, the September 4, 2009 groundbreaking event went ahead as planned with Secretary Chu attending the event and Vice President Joe Biden making a guest appearance via satellite.[52]  In his commencement speech, Secretary Chu hailed Solyndra's advanced technology and room for future business growth.[21] He also noted that Solyndra's groundbreaking would be a shared success story with the Department of Energy and that they were being aggressive in ensuring Solyndra received the necessary funding.[53]

Once the Solyndra loan guarantee was closed, the Department of Energy began disbursing the funds in order to allow for the company to construct a brand new facility that was to be called "Fab 2."[54]  Within six months of the closing, Solyndra received over half of the loan

---

[50] Background Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 12, 2011)

[51] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[52] Press Release, House Energy and Commerce Committee, *Leaders Seek Financial Details for 14 Loan Guarantees DOE is Poised to Award in the Next 10 Days* (Sept. 20, 2011) http://energycommerce.house.gov/News/ PRArticle.aspx?NewsID=8931 (last visited April 10, 2012)

[53] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[54] Ucilia Wang, *Solyndra: Fab 2 Construction Begins*, GREENTECHSOLAR (Sep. 4, 2009) http:// www.greentechmedia.com/articles/read/solyndra-fab-2-construction-begins/ (last visited April 10, 2012)

15

guarantee amount for a total of $286 million.[55]  Furthermore, immediately after closing the $535 million loan guarantee, Solyndra filed yet another application for a second loan guarantee.[56]

On March 16, 2010, Solyndra's auditors, PricewaterhouseCoopers, released a report stating that the company had suffered negative cash flows since inception and recurring losses from its operations.[57]  PricewaterhouseCoopers also expressed doubt about Solyndra's ability to continue production.[58]  As a result, an addendum to Solyndra's S-1 Initial Public Offering registration was added.[59]  Upon hearing this, the Office of Management and Budget requested information from the Department of Energy concerning its monitoring of the Solyndra loan guarantee.[60]  The summary described the project as a continuing success and as on target with the initial business plan, despite the audit report.[61]

As a result of a Going Concern letter produced by PricewaterhouseCoopers, President Obama's staff began to voice their worry.[62] With an anticipated visit to the plant on May 26, 2010, Obama's staff wanted to ensure the solid status of the company and asked the Department

---

[55] Background Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 12, 2011)

[56] Matthew Boyle, *Documents show Solyndra sought second government loan guarantee for $469 million*, THE DAILY CALLER (Sep. 16, 2011, 3:49 PM) http://dailycaller.com/2011/09/16/documents-show-solyndra-sought-second-government-loan-guarantee-for-469-million/ (Last visited April 10, 2012)

[57] Jim Snyder and Christopher Martin, *Obama Team Backed $535 Million Solyndra Aid as Auditor Warned on Finances*, BLOOMBERG (Sep. 12, 2011, 12:59 PM) http://www.bloomberg.com/news/2011-09-12/obama-team-backed-535-million-solyndra-aid-as-auditor-warned-on-finances.html (Last visited April 11, 2012)

[58] *Id.*

[59] Lindsay Riddell, *Auditors raise doubt over Solyndra,* THE SAN FRANCISCO BUSINESS TIMES (Apr. 2, 2010, 10:07 AM) http://www.bizjournals.com/sanfrancisco/stories/2010/03/29/daily85.html?ed=2010-04-02&ana=e_du_pub (Last visited April 11, 2012)

[60] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[61] *Id.*

[62] Aamer Madhani, *E-mails show White House worried about Solyndra deal*, USA TODAY (Oct. 3, 2011, 9:15 PM) http://content.usatoday.com/communities/theoval/post/2011/10/e-mails-show-white-house-worried-about-solyndra-deal/1 (Last visited April 20, 2012)

16

of Energy's American Recovery and Reinvestment Act advisor for an update on the situation.[63] The advisor stated that the Going Concern letter was standard for pre-IPO companies and shouldn't be worried about.[64] He also stated that while Solyndra may face issues in the next 18-24 months, the company's long-term outlook was very good.[65] After this update, the staff decided to move forward with President Obama's appearance at the plant as scheduled.

Later, in June 2010, Solyndra stated that it would be cancelling its planned public offering and had decided to raise any needed capital from already existing investors.[66] This announcement raised serious concerns in the Office of Management and Budget with a call for the Department of Energy to increase its monitoring of Solyndra.[67] With the President and Vice-President both having made appearances at Solyndra events, there was potential for huge embarrassment if the project was to fail. In addressing the announcement, the Office of Management and Budget collaborated with the Treasury in producing a list of twelve follow-up items for the Department of Energy in relation to Solyndra's financial status. This list was sent on July 26, 2010, one day before a Loan Guarantee meeting between Secretary Chu, Office of Management and Budget Director Peter Orszag, and Treasury Assistant Secretary Mary Miller.[68]

---

[63] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[64] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[65] *Id.*

[66] Danny Bradburt, *Solyndra cancels planned solar IPO*, BUSINESS GREEN (June 21, 2010) http://www.businessgreen.com/bg/news/1806103/solyndra-cancels-planned-solar-ipo (Last visit April 10, 2012)

[67] Memorandum from Subcomm. on Oversight and Investigations Democratic Staff to Democratic Members of the Subcommittee on Oversight and Investigations (Oct. 3, 2011)

[68] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

17

One month later, the Department of Energy had still yet to provide the requested follow-up information.[69]

On July 9, 2010, the Department of Energy then provided the Office of Management and Budget with a project report outlining Solyndra's second loan guarantee for $468 million.[70] The Office of Management and Budget's staff worried whether the company's financial status could support a second guarantee. The Department of Energy opted to continue its review of the second loan guarantee and on September 14, 2010, alerted the Office of Management and Budget that Solyndra would be visiting them in order to discuss their current status and to discuss the second loan guarantee.[71]

On October 8, 2010, Solyndra executives informed the Department of Energy that they would not be able to raise the necessary capital by the end of the year.[72] Solyndra's original plan was said to no longer be viable due to the company's situation having changed in such a dramatic fashion.[73] Specifically, Solyndra's CFO, Bill Stover, stated that "without access to FFB loan funds in October, November, and December for work that has been completed, Solyndra would run out of cash in November."[74] Throughout October, Solyndra met with its investors and bankers in order to structure a deal for new capital while the Department of Energy

---

[69] *Id.*

[70] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[71] *Id.*

[72] Zeke Miller, *Energy Department Pushed Solyndra To Wait To Announce Layoffs Until After Midterm Elections*, THE FREE REPUBLIC (Nov. 15, 2011, 11:34 AM) http://www.freerepublic.com/focus/f-news/2807776/posts (Last visited March 20, 2012)

[73] *Id.*

[74] *Id.*

18

analyzed potential financial models for the deal.[75]  On October 25, 2010, Solyndra CEO, Brian

Harrison, emailed the Department of Energy stating that the company had received press

inquiries concerning Solyndra's ongoing problems and expressed worry that the state of

Solyndra was starting to leak outside the company.[76]  Harrison further stated that he would like

to move forward with an internal communication to employees regarding layoffs on Thursday,

October 28, 2010.[77]

On October 30, 2010, Argonaut Private Equity—Solyndra's largest investor—met with

the Department of Energy concerning the restructuring of the loan guarantee.[78]  During the

meeting the Department of Energy indicated that they could commit to Solyndra for November

but had not made a decision regarding December yet.[79]  Furthermore, Argonaut found it curious

that the Department of Energy was adamant that the announcement of consolidation not be made

until November 3rd.[80]  No reasoning was given for this date, but Argonaut indicated in numerous

emails that the layoff announcement was postponed because of the November 2 elections.[81]

---

[75] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[76] Ronnie Greene and Matthew Mosk, *Emails: Energy Dept. Asked Solyndra to Postpone Layoff Notice Until After Election*, ABC NEWS (Nov. 15, 2011) http://abcnews.go.com/Blotter/email-energy-dept-asked-solyndra-postpone-layoffs-till/story?id=14957973 (Last visited Mar. 15, 2012)

[77] *Id*.

[78] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[79] *Id*.

[80] Carol Leonnig and Joe Stephens, *Solyndra: Energy Dept. pushed firm to keep layoffs quiet until after midterms*, THE WASHINGTON POST (Nov. 15, 2011) http://www.washingtonpost.com/politics/solyndra-department-of-energy-pushed-hard-for-company-not-to-announce-layoffs-until-after-2010-mid-term-elections/2011/11/15/gIQA2AriON_story.html (Last visited April 2, 2012)

[81] *Id.*

19

The Department of Energy, Solyndra, and its investors all began negotiations in early December on restructuring an agreement that would allow new capital for the company.[82] While the Department of Energy had initially stated that it was not allowed to subordinate its interest, it reversed its position on December 7, 2010. [83] The Department of Energy agreed to allow the investors first recovery on the first $75 million in the event of Solyndra's liquidation.[84] On December 8, 2010, Chief Counsel of the Department of Energy's Loan Programs Office contacted the Department of Energy's Chief Counsel stating that she had concerns with the new proposal and that the proposal was in violation of the EP Act.[85] Under this statute, she believed there was a provision that prohibited subordination.[86] On December 10, 2010, the Department of Energy circulated a summary of the terms of the restructuring, which still included the subordination of the Department of Energy's interests to Solyndra's investors.[87]

While the terms for the restructuring were agreed to in December, the Department of Energy continued to fund Solyndra with disbursements in December and January.[88] During January and early February, the Office of Management and Budget determined the restructuring was a modification under Circular A-11 and that it would pose a cost to the government.[89]

---

[82] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[83] *Id.*

[84] Saqib Rahim, *Republicans Probed Whether DOE's Effort to Save Solyndra Violated 2005 EnergyAct*, THE NEW YORK TIMES (Oct. 11, 2011) http://www.nytimes.com/cwire/2011/10/11/11climatewire-republicans-probe-whether-does-effort-to-sav-11629.html?pagewanted=all (Last visited April 2, 2012)

[85] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

20

Meanwhile, the Department of Energy had labeled the restructuring as a working.[90]

Additionally, the Office of Management and Budget questioned the subordination of the

Department of Energy's interests, believing that they had stretched the definition and purpose of

the Energy Policy Act of 2005 beyond its limits. [91]

After calls between the Office of Management and Budget and the Department of

Energy, a legal opinion concerning the permissibility of the subordination was eventually

drafted.  This was not produced until January, long after the restructuring terms had been set and

Solyndra's funding had continued.[92]  By early February, the Office of Management and Budget

had determined the Solyndra restructuring was indeed a modification and would result in a cost

to the government.[93]  The Department of Energy then proceeded to submit a new set of cash

flows to the Office of Management and Budget.[94]  This led to the reversal of the Office of

Management and Budget's position and on February 11, 2011, they determined that the

restructuring did in fact constitute a workout.[95]  On February 22, 2011, Secretary Chu signed a

Department of Energy Action memo approving the agreement.[96]  The new agreement outlined

the terms and structure of the deal and included the subordination of the Department of Energy's

---

[90] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[91] The Associated Press, *Treasury Officials' Testimony Fuels GOP Concerns Over Solyndra Loan Restructuring,* FOX NEWS (Oct. 14, 2011) http://www.foxnews.com/politics/2011/10/14/house-panel-looks-at-solyndra-loan-restructuring/ (Last visited March 20, 2012)

[92] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

21

interest in the first $75 million.  The deal was completed on February 23, 2011, as Solyndra, its

investors, and the Department of Energy all signed the final restructuring contract.[97]

After the closing of the restructuring agreement, the Department of Energy continued to

fund the Solyndra loan guarantee with $468 million of the $535 million having already been

disbursed.[98] From March to August 2011, the Department of Energy authorized an additional

$40 million in disbursements to Solyndra while also increasing its monitoring of the company.[99]

As part of the restructuring agreement, Solyndra was to provide weekly cash flow reports and

allow the Department of Energy to observe board meetings.[100]  While these measures indicated

an upgrade in the overseeing and running of Solyndra, documents indicate that by May 2011, the

company was again having working capital issues.  Solyndra was in need of a second round of

financing by early June and, in a May 5, 2011, board meeting, it was stated that unless additional

capital was secured, the company would need to commence with bankruptcy proceedings.[101]

In order to address the need for more capital, Solyndra determined that Argonaut, its

largest investor, would purchase its Accounts Receivable at a reduced price.[102]  The idea behind

this agreement was that when any buyer paid off their bill, Argonaut would be paid back with

---

[97] Cliff Stearns,  *As DOE Doubled Down and Restructured Solyndra's Loan, White House Pulls Plug on Ex-GSA Chief's Planned Visit to Solyndra in February 2011*, CONGRESSMAN CLIFF STEARNS (Apr. 19, 2012) http://www.stearns.house.gov/index.cfm?sectionid=134&sectiontree=6,134&itemid=2016 (Last visited April 19, 2012)

[98] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[99] *Id.*

[100] Alex Ferreras, *Congressional Hearing to FocusRestructuring of Solyndra's Debt,* LOANSAFE (Oct. 14, 2011) http://www.loansafe.org/congressional-hearing-to-focus-restructuring-of-solyndras-debt (Last visited April 10, 2012)

[101] R. Todd Neilson: Solyndra Report of R. Todd Neilson (2012)

[102] Todd Woody, *Solyndra: Pay Some Investors Before Taxpayers In Solar Flame Out,* FORBES (Sept. 6, 2011, 7:15 PM) http://www.forbes.com/sites/toddwoody/2011/09/06/solyndra-pay-some-investors-before-taxpayers-in-solar-flame-out/ (Last visited April 2, 2012)

DOE AR 000023

Solyndra receiving the difference between Argonaut's purchase price and the customer's purchase price.  The purchase agreement was fitted with a $75 million cap but allowed for an increase up to $100 million if agreed upon by both Argonaut and Solyndra.[103]  Even with this agreement, Solyndra would still need an infusion of $46 million in additional working capital by August 2011 in order to maintain a workable minimum balance.[104]

On July 28, 2011, Solyndra's board convened and announced that it had revised its annual plan to reflect a 19 percent drop in shipments, a 23 percent drop in revenue, and a 10 percent decline in average sales price.[105]  After this board meeting, the Director of the Loan Program Office Portfolio Management group sent an email, which was later forwarded to Secretary Chu, to Executive Director Jonathan on August 4, 2011.[106]  He advised that Solyndra's cash position was very low and expressed doubts that investors would be willing to provide the necessary $20 million required within the next ten days.[107]

With a lack of commitment from investors, the Department of Energy retained investment bank Lazard Ltd., to analyze a potential second Solyndra restructuring.[108] On August 17, 2011, the Department of Energy, the Department of the Treasury, and the Office of Management and Budget convened in order to discuss the prepared analysis.[109]  As expected, the

---

[103] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[104] *Id.*

[105] *Id.*

[106] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

[107] *Id.*

[108] CJ Ciaramella, *Energy Department hired Wall Steet to Salvage $olyndra*, THE DAILY CALLER (Nov. 4, 2011, 5:52 PM) http://dailycaller.com/2011/11/04/big-money-still-flowed-to-politically-connected-donors-while-solyndra-sunk/ (Last visited April 2, 2012)

[109] Supplemental Memorandum from The Subcomm. on Oversight and Investigations to the Comm. of Energy and Commerce (Sept. 14, 2011)

23

report noted the unwillingness of investors to put more capital into the company without an additional restructuring agreement and advised that without this funding, the company would need to "begin an orderly wind-down of business."[110]  The report went on to further indicate that Lazard anticipated little, if anything, would be recovered by the Department of Energy.[111]

On August 26, 2011, the Department of Energy, Solyndra, and its investors reached a critical state in discussions as the Department of Energy did not want to advance an additional $5.4 million to the company. [112] The next day, Lazard gave a second presentation to the Office of Management and Budget, the Treasury, and the Department of Energy.[113]  On August 28, 2011, the Department of Energy informed Solyndra that it would not be providing the company with additional funding.[114]  The Solyndra board of directors met on August 30, 2011, and voted in favor of moving forward with bankruptcy proceedings.[115]  The company announced its decision to the public on August 31, 2011, and was eventually raided on September 8, 2011, by the Federal Bureau of Investigation and by the Department of Energy Office of Inspector General.[116]

III. THE PERFECT STORM: MARKET FORCES LEADING TO SOLYNDRA'S FAILURE

---

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] Todd Woody, *Solyndra: Pay Some Investors Before Taxpayers In Solar Flame Out*, FORBES (Sept. 6, 2011, 7:15 PM) http://www.forbes.com/sites/toddwoody/2011/09/06/solyndra-pay-some-investors-before-taxpayers-in-solar-flame-out/ (Last visited April 2, 2012)

[115] *Id.*

[116] Jim Snyder, *FBI Raid on Solyndra May Herald Escalation of Watchdog Probe*, BLOOMBERG (Sep. 9, 2011, 12:00 AM) http://www.bloomberg.com/news/2011-09-08/solyndra-s-california-headquarters-raided-by-fbi-agency-spokeswoman-says.html (Last visited April 15, 2012)

DOE AR 000025

From its founding in 2005 through the early parts of 2009, Solyndra looked like a "can't fail" green energy company.[117] Solyndra's products were considered innovative, and the company was shielded from the high prices plaguing the polysilicon market. With European countries heavily subsidizing the consumption of solar panels and other forms of green energy, international demand for Solyndra products, and solar products in general, increased.[118] The question then is: what happened in the intervening years of 2009 to 2011 that led a promising startup to file for bankruptcy?

The answer is threefold: (1) the steep decline in the price of silicon, (2) the cessation of several European subsidy programs, and (3) a colossal influx of low-cost Chinese panels.[119] Taken separately, Solyndra may have been able to survive each of these occurrences, but when hit with all three at once, Solyndra's business model had little hope of succeeding.

### A. *The Rise and Fall of Polysilicon Prices From 2008 to 2011*

In 2008, as Solyndra was coming of age, a shortage of polysilicon caused prices of the commodity to soar in the spot market.[120] At its highest point, the price of polysilicon reached $400 per kilogram on the market, allowing manufacturers to realize profit margins as high as 70%.[121] With such fat margins, production of polysilicon quickly increased. Existing players in

---

[117] Jesse Parent, *Solyndra's Lessons: Challenges of the Global Energy Market*, THEENERGYCOLLECTIVE.COM (Feb. 29, 2012), http://theenergycollective.com/jesse-parent/77851/solyndra-s-lessons-challenges-global-energy-market.

[118] *Id.*

[119] Declaration of W.G. Stover, Jr., Senior Vice President and Chief Financial Officer, In Support Of First Day Motions, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[120] *Polysilicon Prices Hit Record Low in 2011; Will Head Even Lower, Enabling $0.70/W PV in 2012*, GREENTECHMEDIA.COM (Feb. 10, 2012), http://www.greentechmedia.com/articles/read/polysilicon-prices-hit-record-lows-in-2011-will-head-even-lower-enabling-0.

[121] *Id.* At this point, it is important to gain a small understanding as to the production of polysilicon through the early parts of the 2000s. For much of the decade, the market had resembled a strong oligopoly, with a few major players supplying much of the market need. After 2008, this oligopoly would quickly be replaced with a more competitive marketplace. *Id.*

25

the market began expansion plans and construction of massive, new plants.[122] The large profit margins drew new players into the market, further increasing overall polysilicon supply.[123]

But 2008 also saw another phenomenon that added to the collapse of prices in the market: the worldwide economic recession.  When the recession struck, demand for solar energy—the largest consumer of polysilicon—dropped off dramatically. This in turn caused a dramatic drop off in demand for polysilicon products.[124]  As evidenced by the figure below, the financial crash of 2008 caused a dramatic decrease in the price of polysilicon. The decrease in demand in conjunction with the oversupply caused by the influx of new manufacturing brought about record low prices in 2011.[125]



Polysilicon Pricing Peaks and Supply Chain Immaturity and Inflexibility Induce Significar Supply/Demand Imbalances in 2009

- Solar polysilicon supply (GW)
- Crystalline cell production - planned capacities (GW)
- Solar polysilicon demand (GW)
- Spot market supply (GW)
- Spot market price ($)

---

[122] *Id.*

[123] *Id.*

[124] Laura Mandaro, *Polysilicon prices fall to earth*, NORTH COAST SOLAR STOCKS (Nov. 22, 2008, 1:21 p.m. EST), http://northcoastsolarstocks.wordpress.com/2008/11/22/polysilicon-prices-fall-to-earth/.

[125] *Id.*

26

For Solyndra, what had once been a competitive advantage was now a major cause for concern.  The technology that Solyndra heralded was unresponsive to the polysilicon market, which was good when prices were soaring around $400 per kilogram, but was bad when prices for polysilicon collapsed. The cost of production for traditional solar panel manufacturers decreased to a point where traditional products became cheaper than Solyndra's products. Considering the new state of the market, Solyndra's production costs were much higher than their competitors in the market.  Because Solyndra did not rely on the polysilicon market for their raw materials, they would have to find other ways to decrease costs.

While the collapsing polysilicon prices were the first sign of trouble for Solyndra, it is likely that with time Solyndra could have become profitable had it had enough time to weather the storm. However, other compounding conditions—notably the decrease of European subsidies and China flooding the market—would necessitate filing for bankruptcy.[126]

### B. European Solar Subsidy Cuts

The second factor that signaled the end of Solyndra was the termination of several key subsidies in Europe that promoted the consumption of solar energy.  As WG Stover, Solyndra's Chief Financial Officer, said in his declaration to the bankruptcy court, "the reduction or elimination of governmental subsidies and incentives for the purchase of solar energy, particularly in Europe, negatively impacted the availability of capital for PV system owners, further reducing demand for Solyndra's panels."[127]

---

[126] There are those who suggest that the collapse of the polysilicon market was perfectly foreseeable and should have been foreseen and considered by the Department of Energy in considering Solyndra for the stimulus loan.  In fact, it does seem that insiders of the current administration knew of the concerns before President Obama ever visited the Solyndra in 2010.  Various emails from Presidential staff were turned over during the house investigation warning the president that his visit to Solyndra could prove to be an embarrassment in the future.

[127] *Supra* note 119.

27

Governments across Europe were hit hard by the economic recession of 2008, and many were forced to pursue aggressive spending cuts. Up until 2008, the European Union had become known as a fertile market for solar companies because of the system of feed-in tariffs present in many of the European Union's most prominent countries. These subsidies made the installation of solar power a cost-effective option for European consumers when prices were high.[128] These tariffs allowed manufacturers to provide units at a competitive price to consumers, which drove up demand. In 2008, Germany, Italy, Spain, and the United Kingdom were all among the world's leaders in solar panel installations.[129]

However, as the price of polysilicon dropped, leading to a steep decline in the price of solar cells, the subsidies became overly generous to manufacturers. European governments were feeding in more money per unit than was feasible, sometimes even more than the unit was actually worth.[130]

As a response to this growing problem, as well as to the growing problem of budget deficits in the western world, many of these European countries announced cuts to governmental solar subsidies that had previously fueled demand for solar installations. The United Kingdom, for example, announced that they planned to cut solar subsidies in half by 2012.[131] Likewise, the German government claimed that they were going to slash solar subsidies by up to 30% in the

---

[128] Feed-in tariffs (also called minimum price policies, standard offer contracts, feed laws, etc.) are a subsidy system for renewable energy that offers a guarantee of payment to project owners for the total amount of electricity they produce, long-term contracts (typically 10-20 years), and access to the nation's power grid. For a full discussion of these subsidies *See*, Toby D. Couture, *Renewable Energy Feed-in Tariffs: An Analytical View*, CALIFORNIA ENERGY COMMISSION, May 28, 2009, http://www.energy.ca.gov/2009_energypolicy/documents/2009-05-28_workshop/presentations/01_Couture_Feed-in_Tariff_Wkshop_May_28_09.pdf.

[129] Ucilia Wang, *The Story Behind Solyndra's Rise and Fall*, GIGAOM, Aug. 31, 2011.

[130] Michael Birnbaum and Anthony Faiola, Solar Industry Faces Subsidy Cuts in Europe, WASH. POST, Mar. 18, 2012.

[131] *Id*.

28

DOE AR 000029

Summer of 2011 and could foresee abolishing them altogether by some time in 2012.[132] Spain and Italy followed suit and announced similar cutbacks to their solar programs.

It is unlikely that governments could have known the far-reaching effects of their actions. As an executive of one German solar company stated, "[Solar Power] is becoming cheap because of mass production. And this has happened only through creating demand. To stop it now makes no sense."[133] Subsidies dried up, and manufacturers were no longer able to rely on them to fuel demand in the European markets. As the demand in Europe decreased, the price of solar panels depressed even further. This decrease in demand, coupled with an increased supply of solar products, forced the price of solar cells below the cost of producing them.

These decreases in demand alone would not likely have spelled the end for Solyndra. But coupled with the other factors (the drop in the price of polysilicon and the dumping of solar products by China), it was simply not feasible for Solyndra to continue operations. The continued fall of competitor prices forced Solyndra to sell their product at a loss and increased the financial struggles of a now risky start-up that was struggling to stay competitive in a struggling market.

### C.  Oversupply: The China Factor

In March of 2012, the United States imposed a tariff on all solar panels manufactured in China.[134] American manufacturers of solar panels had been calling for such measures to be taken since the inception of two Chinese programs put in place to incentivize the manufacture of

---

[132] *Id.*

[133] *Id.*

[134] Don Lee and Adrian Chang, *U.S. to Impose Tariffs on Solar Panels from* China, L.A. TIMES, Mar. 20, 2012, http://www.latimes.com/business/la-fi-china-solar-20120320,0,2891514.story?track=rss&utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+lati mes%2Fbusiness+(L.A.+Times+-+Business)

29

solar panels in China.  Domestic manufacturers claimed that the Chinese government was enabling illegal dumping of product into solar markets against WTO regulations.[135]  This flooding of the market by Chinese manufacturers was the final piece of the perfect storm that prevented Solyndra from offering solar panels at a competitive price.

In 2008, as the world economy floundered in a recession, solar power companies across the globe struggled.[136]  Chinese companies, in the period of low demand, opted to build large factories, funded by massive loans from government-funded banks.[137]  By building larger factories, Chinese manufacturers were able to create economies of scale that allowed them to drastically decrease production costs and sell their solar products at a price greatly below the world market price.  In addition to the government-funded loans, the Chinese government would soon introduce two new programs to further depress the costs of production for Chinese manufactures and drive prices down even further.

In 2009, the Chinese government introduced two new solar subsidy programs: (1) the building-integrated photovoltaic (BIPV) subsidy program and (2) the Golden Sun program.[138]  The BIPV program was introduced in March of 2009 as the Chinese government's response to the sharp downturn in demand due to the 2008 increase in the price of polysilicon.  The program offered an upfront subsidy of 15–20 Yuan for every watt of solar power produced.[139]  The response to the program was overwhelming.  Every major player in the Chinese solar power

---

[135] *Id*.

[136] *Supra* note 129

[137] *Id.*

[138] *China's National Solar Subsidy Program*, https://sites.google.com/site/chinapolicyinfocus/china-s-solar-subsidy-programs/china-s-solar-industry/china-s-national-solar-subsidy-programs

[139] Melody Song, *Government Support Energizes China's PV Market*, PV GROUP, Feb. 2010, http://www.pvgroup.org/NewsArchive/ctr_034481

30

market participated in the program, including Suntech, which had 20 percent of its applications approved to receive government funds.[140]

With such an overwhelming response to the BIPV subsidy and the Chinese government's belief that solar power was an imperative business sector, both domestically and for export, they quickly rolled out another subsidy to boost production.[141]  In July of the same year, China's ministry of finance introduced the Golden Sun program, which was anticipated to subsidize up to 600 mega watts of solar installations with the Chinese government paying for 50–70% of installation costs.[142]  With these subsidies in full effect, the Chinese represented 40% of the world's production of solar panels by 2010.[143]

The problem for Solyndra was not the amount of production; the problem was that a vast majority of the Chinese manufacturing output was exported to other markets, including the United States.[144] From the perspective of American manufacturers, the Chinese government was funding the mass production of solar panels and dumping them in the American market, a practice forbidden by the World Trade Organization.[145]

Simply put, the oversupply of solar panels in the market was the final strike against Solyndra.  First, the steep decrease in the price of silicon drove the prices down for the vast majority of solar panel manufacturers.  Second, prices were further depressed by a sharp decrease in demand due to various European countries, including Italy and Germany, reducing or eliminating various solar subsidies, which had been artificially inflating demand for solar power.

---

[140] *Id.*

[141] *Supra* note 138.

[142] *Supra* note 139.

[143] *Id.*

[144] *Id.*

[145] *Supra* note 129.

31

Finally, prices were depressed even further by the ability of Chinese manufacturers, relying heavily on government funding and subsidies, to flood the market with solar cells at prices that American manufacturers could not match.  As Solyndra's CFO described it, the company simply could not lower the costs of production fast enough to allow them to be competitively priced in the market, ultimately causing Solyndra's failure.[146]

Soon after Solyndra's chapter 11 filing, American solar manufacturers once again opined for the government to investigate the subsidies provided by the Chinese government. In March of 2012, the United States levied a tariff against Chinese manufacturers as a result of this investigation.  The tariff came too late to save Solyndra, but Solyndra's all-too-public failure may have been the push that the United States government needed to step in and protect American manufacturers.

The three previous sections have shed some light on the various market forces that drove what appeared to be a promising solar start-up into Chapter 11. The three previous sections also illustrate the volatility that dominates the solar power market as a whole.

## IV. THE DECISION TO FILE FOR BANKRUPTCY

The Board of Managers convened a meeting on September 1, 2011, to discuss the inevitability of bankruptcy protection.[147] The Solyndra's operating agreement required the approval of at least two outside managers in order to file for bankruptcy protection.[148] Stephen Johnson and Richard Adkisson, both outside managers as defined by the operating agreement,

---

[146] *Supra* note 127.

[147] Voluntary Ch. 11 Petition of 360 Degree Solar Holdings Inc., *In re* Solyndra LLC, Case No. 11-12800 (MFW) (Bankr. D. Del Sept. 6, 2011).

[148] *Id.*

32

along with the rest of the board present, voted in favor of seeking bankruptcy.[149] The vote in favor for filing a petition was unanimous.[150] In the same meeting, the board authorized company officers to (1) execute, verify, and file all necessary petitions, schedules, lists, and other documents, (2) retain and employ all assistance attorneys, financial advisors, claims and noticing agents, accountants and other professionals needed for the bankruptcy, (3) obtain post-petition financing according to terms which may be negotiated by the management of the company, and (4) to retain the law firm of Pachulski Stang Ziehl & Jones LLP as general bankruptcy counsel.[151]

### A.  Filing the Petition

On September 6, 2011, Solyndra filed for chapter 11 bankruptcy protection.[152] Both 360 Degree Solar Holdings Inc. and Solyndra LLC filed voluntary petitions.[153] Solyndra, as a Delaware limited liability company,[154] filed in the District of Delaware.[155] The case was assigned to Judge Mary F. Walrath.

In an affidavit filed in support of first day motions, Solyndra's CFO, Bill Stover, blamed Solyndra's financial difficulties on a "combination of general business conditions and an

---

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] *Id.*

[153] Voluntary Ch. 11 Petition *of 360 Degree Solar Holdings Inc.*, *In re* Solyndra LLC, Case No. 11-12800 (MFW) (Bankr. D. Del Sept. 6, 2011); Voluntary Ch. 11 Petition of Solyndra LLC, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[154] *See* File No. 4568683, Registered Entity Search, Delaware Department of State: Division of Corporations (http:// sos.delaware.gov).

[155] Voluntary Ch. 11 Petition of 360 Degree Solar Holdings Inc., *In re* Solyndra LLC, Case No. 11-12800 (MFW) (Bankr. D. Del Sept. 6, 2011).

33

oversupply of solar panels dramatically reduced solar panel pricing world-wide."[156] According to Stover, subsidized foreign manufacturers provided a cheaper supply of solar panels, forcing Solyndra to lower prices in order to stay competitive.[157] At the same time, the reduction or elimination of governmental subsidies to purchasers of solar panels, especially in Europe, reduced demand for Solyndra's panels.[158] Lastly, Solyndra was unable to collect its accounts receivables in a timely manner. Foreign competitors offered extended payment terms and Solyndra's customers, now used to the extended terms of foreign competitors, refused to comply with less favorable, previously agreed upon terms.[159]

### B.   The Legal Effects of Solyndra's Filing

Solyndra's filing of a voluntary petition for relief under 11 U.S.C. § 301 automatically triggered several other sections of the Bankruptcy Code. First and foremost, by virtue of the Bankruptcy Code, an estate containing all of Solyndra's legal and equitable interests was created.[160] Conceptually, all of Solyndra's assets were plunked out of the Solyndra bucket and dropped into the newly created, heavily fortified bankruptcy estate bucket.

The Bankruptcy Code creates this new "bucket" to keep individuals from reaching in and grabbing the remaining assets of Solyndra. Everyone must wait their turn as the court reaches into the bucket and hands everyone their appointed share of the remaining assets. All the players in a bankruptcy proceeding have some kind of incentive to deplete the bucket of resources. Equity holders have the incentive to run up administrative expenses with the far flung hopes of

---

[156] Declaration of W.G. Stover, Jr., Senior Vice President and Chief Financial Officer at ¶ 23, In Support Of First Day Motions, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] *See* 11 U.S.C. § 541.

34

somehow realizing a small return on their investment. Unsecured creditors are trying to collect on their debts before administrative expenses eat up the remaining cash. Secured creditors are trying to collect on their collateral before their equity cushion runs out. Lawyers, accountants, and turnaround professionals deplete assets with their services fees.  Furthermore, while minimal in amount and fixed by statute, the bankruptcy trustees receive revenues from statutory fees.

The Bankruptcy Code protects the estate through two main statutory vehicles. First is the automatic stay of 11 U.S.C. § 362. The automatic stay is a creature of statute and is effective immediately upon the filing of petition.[161] The automatic stay (with narrow exceptions[162]) prohibits all collection efforts.[163]  The second group of statutes protects against the business's management, as debtor in possession, from depleting the assets of the company through continued operations during the bankruptcy. These statutes are loosely sprinkled through the Bankruptcy Code and usually take the form of barring the debtor in possession from using certain assets,[164] taking on additional debt,[165] or protecting the interest of secured parties.[166] For the most part, the Bankruptcy Code allows the debtor in possession to use or sell these protected assets, provided that the debtor in possession can prove that the use or sale of the assets is vital to maintaining the going concern value of the business.[167]

### C.  First Day Motions

---

[161] *Id.* at 362(a).

[162] *Id.* at 362(b).

[163] *Id.* at 362(a)(1-8).

[164] *Id.* at 363.

[165] *Id.* at 364.

[166] *Id.* at 361.

[167] *See, e.g.*, *Id.* at 363(b).

35

DOE AR 000036

Like most large companies that file for chapter 11, Solyndra had already prepared a number of first day motions in anticipation of filing a bankruptcy petition. While the individual motions vary depending on the debtor's individual circumstances, first day motions used by debtors keep business operations running, to the extent possible, without disruption.[168]

Like all businesses, Solyndra needed cash to run its day to day operations. Just as the automatic stay protects against creditors diminishing the bankruptcy estate,[169] various provisions of the Bankruptcy Code protect against the diminution of the estate by the debtor in possession. These provisions act as safeguards and set up the court as a gatekeeper for certain actions.[170] Solyndra needed the court's immediate authorization on a number of matters.

1.    Postpetition Secured Financing

Solyndra's first motion sought authorization from the court for Solyndra to (1) incur postpetition financing in the form of a $4 million priming senior secured superpriority debtor in possession term loan with $2.5 million of the $4 million authorized before the final order; (2) use cash collateral tied up by prepetition lenders' security interests; (3) provide adequate protection to prepetition secured lenders; and (4) grant needed technical procedures to accomplish the items (1)-(3).[171] The proposed loan agreement contained a carve-out provision for the expenses of Pachulski Stang Ziehl & Jones and other bankruptcy professionals.[172]

---

[168] JONATHAN P. FRIEDLAND, MICHAEL L. BERNSTEIN, GEORGE W. KUNEY & JOHN D. AYE, CHAPTER 11 - 101: THE NUTS AND BOLTS OF CHAPTER 11 PRACTICE: A PRIMER 18, (H. Slayton Dabney, Jr. & John W. Kibler eds., 2007). 169 See 11 U.S.C. § 541.

[170] See, e.g., Id. at 361, 362(d)(1), 363, 364.

[171] Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection (IV) Modifying the Automatic Stay, and (v) Scheduling a Final Hearing, In re Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[172] Id.

36

Prior to filing a petition, Solyndra had obtained the cooperation of its two largest secured lenders, Argonaut Ventures and Madrone Partners, for DIP financing.[173] Argonaut and Madrone would create a special purpose entity to loan Solyndra the needed capital to continue remaining business operations.[174] The priming loan would be secured by all present and after-acquired assets and property of Solyndra.[175] Solyndra wished the priming lien to include any property acquired by the estate through avoidance actions and preferential or fraudulent transfers.[176]

Again, Solyndra's inside investors would be getting a sweetheart deal. DIP financing allows the lender to take a security interest in unencumbered assets. A priming lien for new money has priority over administrative expenses and unsecured creditors.[177] Despite the additional collateral and priority protection granted to priming loans, DIP financing is able to command higher than normal interest rates simply due to the fact that the debtor is in bankruptcy.[178]

Judge Waltham signed the interim order the next day on September 7, 2011.[179] The signed interim order read almost word for word from the proposed order attached in the initial

---

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] *Id.*

[177] *See* 11 U.S.C. §§ 364(d), 507(a)(2).

[178] Marshall S. Huebner, *Debtor-In-Possession Financing*, THE RMA JOURNAL, April 2005 ("[B]ecause of the many lender protections enshrined in the U.S. Bankruptcy Code to induce [debtor in possession] lending, the safest loans in a troubled industry may well be those made to bankruptcy debtors."); David A. Skeel, Jr., *The Past, Present and Future of Debtor-in-Possession Financing*, 25 CARDOZO L. REV. 1905 (2004) ("[G]enerous terms offered to [DIP] financers have encouraged lenders to make loans to cash-starved debtors").

[179] Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing, *In re* Solyndra LLC, Case No. 11-12779(MFW) (Bankr. D. Del Sept. 6, 2011).

37

motion with two notable exceptions.[180] First, the interim order provided protection to Solyndra's landlords by prohibiting Solyndra from encumbering, pledging, or collateralizing any leasehold interest of Solyndra to the extent prohibited by the terms of the lease agreement.[181] The order specifically singled out Global Kato and stated that any letters of credit issued in connection with Solyndra's lease were property of Global Kato and not property of Solyndra's bankruptcy estate.[182] Second, the final order gave all parties the right at the Final Hearing to challenge whether the Inventory Accounts Receivable Trust Funds were property of Solyndra.[183] In the event that the Accounts Receivable Trust Funds[184] were to be found property of Solyndra, Judge Walrath specified that the amount of the Accounts Receivable proceeds would be deducted from the $2.5 million interim financing.[185]

The final order would be comparable in substance with the original proposed order and the interim order.[186] Argonaut Solar, LLC, the special purpose entity lending vehicle comprised

---

[180] *See* Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection (IV) Modifying the Automatic Stay, and (v) Scheduling a Final Hearing, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011); Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011). 181 Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[182] *Id.*

[183] *Id.*

[184] In an effort to raise capital and keep Solyndra afloat, Solyndra sold off large portion of its accounts receivables to specially created subsidiaries prior to filing for bankruptcy. *Id.* Solyndra would continue to collect the accounts receivable even though the subsidiaries owned the proceeds of the accounts. *Id.* These proceeds, held in Solyndra's accounts but owned by the subsidiaries, were a matter of dispute as to whether they should be included as property of the estate. *Id.*

[185] *Id.*

[186] Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection,

38

of Argonaut and Madrone, would provide the $4 million loan. Judge Walrath found the Accounts Receivable Trust Funds proceeds to not be property of the estate,[187] thus barring the use of the Accounts Receivable Trust Funds proceeds from being used toward the priming lien.  Judge Walrath also prohibited the use of any property acquired through any present and future avoidance actions from being used toward the priming lien.[188]

### 2.   Motion for Joint Administration

Solyndra then filed a motion to join its two cases together.[189] Bankruptcy Rule 1015(b) provides that the court may order the joint administration of the estates of a debtor and its affiliates if two or more petitions are pending in the same court by or against a debtor and an affiliate.[190] Because 360 Degree Solar Holdings, Inc. held a 100% ownership interest in Solyndra LLC,[191] the court quickly approved the attached order the next day and 360 Degree Solar Holdings, Inc. case was folded into Solyndra LLC's.[192]

### 3.   Motion to Establish Procedures for Interim Compensation

Next, Solyndra filed a motion to establish procedure for interim compensation of professionals to assist Solyndra during the bankruptcy proceedings, specifically singling out

---

and (IV) Modifying the Automatic Stay, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[187] *Id.*

[188] *Id.*

[189] Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[190] FED. R. BANKR. P. 1015(b).

[191] Voluntary Ch. 11 Petition of 360 Degree Solar Holdings Inc., *In re* Solyndra LLC, Case No. 11-12800 (MFW) (Bankr. D. Del Sept. 6, 2011); Voluntary Ch. 11 Petition *of Solyndra LLC*, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[192] Order Authorizing Joint Administration of Related Chapter 11 Cases, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

DOE AR 000040

Pachulski Stang Ziehl & Jones LLP.[193] Section 331 of the Bankruptcy Code allows professionals such as examiners, trustees, lawyers, and accountants to submit their fees to the court and, after notice and a hearing, the court may allow and disperse payment of the professional's fees from the bankruptcy estate.[194] Solyndra submitted a proposed plan which allowed for shorter payment periods for the first three months of the bankruptcy, followed by longer payment periods as the case progressed. A hearing regarding the proposed order was scheduled for September 27, 2011, with proposed objection due by September 20.[195] With no objections filed, Judge Walrath signed the original proposed order on September 23 2011.[196]

4.   Motion to Maintain and Administer Warranty Programs and Honor Related Prepetition

Obligations

Solyndra then filed a motion to maintain and administer Solyndra's warranty program and honor prepetition obligations related to the warranty program.[197] By continuing the warranty program, Solyndra hoped to keep customer confidence in the product and keep sales from deteriorating.[198]  In their motion,[199] Solyndra made several arguments based on 11 U.S.C.

---

[193] Motion of the Debtors for the Entry of an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[194] 11 U.S.C § 331.

[195] Notice of Hearing re: Notice of Motion of Debtors for Entry of an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[196] Administrative Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[197] Motion of the Debtors for Entry of an Order Authorizing the Debtors to Maintain and Administer Warranty Program and Honor Prepetition Obligations Related Thereto, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[198] *Id.*

[199] *Id.*

40

1107(a) and 11 U.S.C. 1108,[200] 11 U.S.C. 363(c),[201] and 11 U.S.C. 363(b)(1).[202] Solyndra

argued that the warranty program fell under the ordinary course of business.[203] Should the court

find that the warranty program did not fall under the ordinary course of business, Solyndra

argued that under section 363(b)(1), the court, after notice and hearing, should allow Solyndra to

use property of the estate. Solyndra further argued that continuing the warranty program was in

the best interest of the creditors because failure to do so "would risk encouraging certain

customer constituencies to initiate business relationships with the Debtors' competitors,"[204]

thereby depleting the going concern value of the business.[205] Even though some warranty claims

arose prepetition, Solyndra stated that the "necessity of payment" doctrine allows for payment of

a prepetition claim if the claim is essential to the continued operation of the business during

reorganization.[206] Judge Walrath entered an order the next day granting the motion.[207] The order

emphasized that "the requirements of Bankruptcy Rule 6003, which provide that a motion to pay

all or part of a claim that arose before the filing of the petition shall not be granted by the Court

---

[200] 11 U.S.C § 1108 permits debtors in possession to operate their businesses.

[201] 11 U.S.C § 363(c) authorizes the debtor in possession to use certain property of the estate in the ordinary course of business without notice or a hearing.

[202] 11 U.S.C § 363(b)(1) authorizes a debtors in possession to use certain property of the estate outside the course of ordinary business so long as the requirements of notice and a hearing are satisfied.

[203] Motion of the Debtors for Entry of an Order Authorizing the Debtors to Maintain and Administer Warranty Program and Honor Prepetition Obligations Related Thereto, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[204] *Id.* at ¶ 23.

[205] *Id.*

[206] *Id. See also* Ionosphere Clubs, Inc., 98 B.R. at 176; *In re* Lehigh & New England Rye Co., 657 F.2d 570, 581 (3d Cir. 1981) (stating the "necessity of payment" doctrine "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus."); In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987).

[207] Order Authorizing the Debtors to Maintain and Administer Warranty Program and Honor Prepetition Obligations Related Thereto, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

41

within 21 days after the filing of the Petition, are satisfied by the content of the Motion and the notice requirements of Rule 6004 shall be waived."[208]

5.   Motion to Maintain Existing Bank Accounts and Continue Use of Existing Cash Management System

Next, Solyndra sought an exemption from one of the United States Trustees for the District of Delaware's established operating guidelines for debtors in possession.[209] The United States Trustee Guidelines in the District of Delaware requires a chapter 11 debtor in possession to open new bank accounts and close all existing accounts.[210] The new bank accounts can only be opened in certain financial institutions designated as authorized depositories by the United States Trustee.[211] The requirement is designed to keep prepetition and postpetition claims and payments separate; thus preventing banks from honoring checks drawn before the Petition Date and helping to protect against the inadvertent payment of prepetition claims.[212] Changing accounts and account numbers would require Solyndra to notify all of its customers and set up entirely new electronic and wire transfer procedures with each customer.[213] Such measures would ultimately cause significant delays in collecting revenues from customers and disrupt Solyndra's ability to pay post petition obligations.[214] Such inconveniences could only hurt

---

[208] *Id.*

[209] Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 364, 503(B), 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, (IV) Continued Access to Corporate Credit Cards, (V) Limited Funding for Wind-Up of Foreign Subsidiaries, and (VI) Waiver of Section 345(B) Deposit and Investment Requirements, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[210] *Id.*

[211] *Id.*

[212] *Id.*

[213] *Id.*

[214] *Id.*

42

Solyndra's reputation with its remaining customers.[215] Solyndra also requested authorization to fund the wind-up for its foreign subsidiaries in a combined amount not to exceed $500,000.[216] Solyndra also requested continued access to corporate credit cards.[217] The next day, Judge Walrath granted the motion with a number of stipulations.[218] Most notable was the maximum amount allowed to wind up Solyndra's foreign subsidiaries.[219] Judge Walrath authorized $60,000 as opposed the requested $500,000.[220]

### 6.    Motion to Pay Prepetition Employee Wages and Benefits

Solyndra needed to the keep paying the remaining employees in order to keep what was left of the business running. Solyndra filed a typical motion asking the court to authorize the payment of certain prepetition wages and benefits to its employees.[221] Solyndra set several limits to each category of employee related expenses.[222] The combined total Solyndra asked for, and was subsequently given by the court, amounted to $1,242,103.[223] Judge Walrath's only addition

---

[215] *Id.*

[216] *Id.*

[217] *Id.*

[218] Order Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Cash Management System, (IV) Continued Access to Corporate Credit Cards, (V) Limited Funding for Wind-Up of Foreign Subsidiaries, and (VI) Waiver Of Section 345(B) Deposit and Investment Requirements, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[219] *Id.*

[220] *Id.*

[221] Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363, and 507(a) for an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[222] *Id.*

[223] Order Granting Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363, and 507(a) for an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process,

43

to Solyndra's attached sample order was the addition of express conditions of the statutory caps allowed to individual employees by the Bankruptcy Code.[224] (#35).

### 7.    Motion to Pay Prepetition Sales and Use and Similar Taxes

Solyndra sought to pay the government their taxes, and the court kindly obliged. Judge Walrath's order was identical to the sample order included in Solyndra's original motion. Solyndra could now pay its federal, state, and local taxes as they came due.

### 8.    Motion Prohibiting Utilities from Discontinuing Service

Under Section 366 of the Bankruptcy Code, utility companies may not discontinue services to a debtor simply because the debtor has entered bankruptcy.[225] Debtors are protected for the first 30 days; however, if debtors are unable to provide adequate assurance of payments after the 30 day period, utility providers are free to discontinue service.[226] Section 336 explicitly states that administrative expense priority does not constitute adequate assurance of utility payments.[227]

In order to keep the lights and the water running, Solyndra, in its motion, proposed creating a separate account to house 50% of the anticipated aggregated amount of utility claims

---

Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[224] *Id*.

[225] *See* 11 U.S.C. § 366(a) ("a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.").

[226] *See* 11 U.S.C. § 366(b) ("Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.").

[227] 11 U.S.C. § 366(c)(1)(B) ("For purposes of this subsection an administrative expense priority shall not constitute an assurance of payment.").

44

for one month.[228] Additionally, Solyndra proposed a set of procedures for utility companies to request additional adequate assurance. Solyndra's initial two week[229] estimate topped off at $172,250.[230] Judge Walrath entered a bridge order granting Solyndra's motion until the final hearing which was scheduled for September 27, 2011.[231] The final order was entered October 6, 2011, with no substantial differences between the bridge order and the final order.[232]

### 9.    Motion to Reject Unexpired Lease

Because Solyndra was shutting down almost all of its manufacturing operations by the date of the petition, Solyndra no longer required the use of the leased premises located at 400-472 Kato Terrace in Fremont, California.[233] Section 365(a) of the Bankruptcy Code authorizes debtors to reject unexpired leases of non-residential real property. The Third Circuit uses the business judgment rule to determine whether rejection of an unexpired lease of non-residential property is appropriate.[234] The business judgment rule, as its name implies, states an action is

---

[228] Motion of The Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance and (C) Establishing Procedures for Determining Adequate Assurance of Payment, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[229] Two weeks is approximately 50% of one month's worth of utility payments.

[230] Motion of The Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[231] Bridge Order Under Section 366 of The Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C)Establishing Procedures for Determining Adequate Assurance of Payment, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[232] Amended Final Order Under Section 366 of The Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures For Determining Adequate Assurance Of Payment, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[233] Debtors' Motion for Order Under Section 365(A) of the Bankruptcy Code Authorizing the Debtors (A) to Reject Unexpired Lease and (B) Abandon Any Personal Property Located a Such Premises and Fixing a Bar Date for Claims of Counterparty, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[234] *In re* Armstrong World Indus., Inc., 348 B.R. 136, 162 (D. Del. 2006) ("[A] debtor may assume an executory contract or unexpired lease if (i) outstanding defaults under the contract or lease have been cured under section

45

acceptable only if the effects of the action would increase the businesses proverbial "bottom line."[235]

Solyndra argued in its motion that, with the termination of their manufacturing operations, it had no further use for the leased facilities.[236] Not only did the leased facilities no longer provide any manufacturing benefit to Solyndra, but, Solyndra contended, the rent was above market, and no evidence suggested that the value of the Rejected Lease would increase in the immediate future.[237]

After receiving no objections,[238] the court entered an order granting Solyndra's motion on September 23, 2011.[239] With the rejection of the lease, Kato would now hold an unsecured claim and share *pro rata* with the rest of the Tranche E Lenders and other trade creditors.

## V. OUTCOMES FOR THE SECURED AND UNSECURED CREDITORS

Solyndra never gave any indication that it expected to re-emerge from bankruptcy as a viable business. In his affidavit in support of first day motions, Stover stated: "The Debtors are

---

365(b)(1) of the Bankruptcy Code, and (ii) the debtor's decision to assume such executory contract or unexpired lease is supported by valid business justifications."); *In re* Pinnacle Brands, Inc., 259 B.R. 46, 53 (Bankr. D. Del. 2001) ("The Debtor's decision to assume or reject an executory contract is based upon its business judgment."). *See also* National Labor Relations Board v. Bildisco & Bildisco (In re Bildisco ), 682 F.2d 72, 79 (3d Cir.1982) aff'd at 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, [under] the 'business judgment' test.").

[235] *See* Raymond T. Nimmer & Richard B.Feinberg, *Chapter 11 Business Governance: Fiduciary Duties, Business Judgment, Trustees and Exclusivity*, 6 BANKR. DEV. J. 1 (1989).

[236] Debtors' Motion for Order Under Section 365(A) of the Bankruptcy Code Authorizing the Debtors (A) to Reject Unexpired Lease and (B) Abandon Any Personal Property Located a Such Premises and Fixing a Bar Date for Claims of Counterparty, In re Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[237] *Id.*

[238] Certificate of No Objection Regarding Debtors' Motion for Order Under Section 365(A) of the Bankruptcy Code Authorizing the Debtors (A) to Reject Unexpired Lease and (B) Abandon Any Personal Property Located at Such Premises and Fixing a Bar Date for Claims of Counterparty, In re Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[239] Order Granting Debtors' Motion for Order Under Section 365(A) of the Bankruptcy Code Authorizing the Debtors (A) to Reject Unexpired Lease and (B) Abandon Any Personal Property Located at Such Premises and Fixing a Bar Date for Claims Of Counterparty, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

46

pursuing a two-pronged strategy to effectuate either a sale of their business to a 'turnkey' buyer who may acquire substantially all of Solyndra's assets or, if the Debtors are unable to identify any such potential buyers, an orderly liquidation of the Debtors' assets for the benefit of their creditors."[240]

While Solyndra's equity holders would be left with nothing from the pre-plan sale proceeds, the main investors would not go away empty handed. Argonaut Ventures and Madrone Partners, Solyndra's two largest private investors, would benefit as DIP financers through their lending vehicle, AE DIP 2011, LLC,[241] as well as holding the senior liens through the Tranche A Loan Facility Agreement.[242]

Two groups held most of Solyndra's unsecured debt: trade creditors and Tranche E Loan Facility Agreement Lenders.[243] At the time of filing, trade creditors held over $35 million in unsecured debt while Tranche E Loan Facility Agreement Lenders held over $38 million in unsecured debt.[244] The Office of the United States Trustee District of Delaware, pursuant to Section 1102(a)(1) of the Bankruptcy Code, appointed an official committee to represent the unsecured parties in the case.[245] The Trustee's Office appointed[246] the following six persons[247]:

---

[240] Declaration of W.G. Stover, Jr., Senior Vice President and Chief Financial Officer, In Support Of First Day Motions, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[241] Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Modifying the Automatic Stay, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[242] Declaration of W.G. Stover, Jr., Senior Vice President and Chief Financial Officer, In Support Of First Day Motions, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[243] Consolidated List of Creditors Holding 35 Largest Unsecured Claims, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[244] *Id.*

[245] Notice of Appointment of Committee of Unsecured Creditors, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[246] *Id.*

47

DOE AR 000048

(1) the two largest trade creditors,[248] each holding over $7.5 million in unsecured claims, (2) three smaller trade creditors,[249] and (3) Peter M. Kohlstadt, the named plaintiff in the WARN Act class action suit.[250] The committee would soon employ Blank Rome LLP to represent itself and the other unsecured creditors in the case.[251]

Chief Restructuring Officer

With the scheduled departure of Solyndra's CEO, Brian Harrison, Solyndra made a motion *nunc pro tunc* to employ Berkeley Research Group, LLC to perform restructuring services and to designate R. Todd Neilson as Chief Restructuring Officer ("CRO").[252] Section 363(c) of the Bankruptcy Code authorizes debtors to enter into certain transactions and use property of the estate in the ordinary course of business.[253] Solyndra maintained retention of interim corporate officers and other temporary employees is proper under section 363 of the Bankruptcy Code and cited a long list[254] of cases to justify its position.[255]

---

[247] The Bankruptcy Code gives a specific definition to word "person." *See* 11 U.S.C § 101(41).

[248] The two largest trade creditors at the time of the filing of the petition were Schott North America, Inc. and MGS Manufacturing Group, Inc. Consolidated List of Creditors Holding 35 Largest Unsecured Claims, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[249] The three smaller trade creditors were Certified Thermoplastics Co. Inc., West Valley Staffing Group, Plastikon Industries Inc., and VDL Enabling Technologies Group. *Id.*

[250] *See* Complaint, Kohlstadt v. Solnydra (*In re* Solyndra), Adv. Proc. No. 11-53 155 (MFW) (Bankr. D. Del Sept. 6, 2011).

[251] Application to Employ/Retain Blank Rome LLP as Counsel for the Official Committee of Unsecured Creditors of Solyndra LLC, et al., *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[252] Motion of the Debtors Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Employment of Berkeley Research Group, LLC and Designating R. Todd Neilson as Chief Restructuring Officer to the Debtors *Nunc Pro Tunc* to October 6, 2011, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[253] *See* 11 U.S.C. §363(c).

[254] The following cases were cited: In re Point Blank, Case No. 10-11255 (PJW) (Bankr. D. Del. May 13, 2010); In re Washington Mutual, Inc., Case No. 08-12229 (MFW) (Bankr. D. Del. November 7, 2008); In re Accredited Home Lenders Holding Co., Case No. 09-11516 (MFW) (Bankr. D. Del. July 2, 2009); In re CB Holdings Corp., Case No. 10-13683 (MFW) (Bankr. D. Del. January 10, 2011); In re DHP Holdings II Corp., Case No. 08-13422 (MFW)(Bankr. D. Del. April 28, 2009); In re Filene 's Basement, Case No. 09-11525 (MFW) (Bankr. D. Del. May 26, 2009); In re Fleming Companies, Inc., Case No. 03-10945 (MFW) (Bankr. D. Del. June 4, 2003); In re Flying J,

48

Because neither Berkeley Research Group, nor Todd Neilson as CRO, would be employed as professionals under section 327 of the Bankruptcy Code, neither would be subject to the compensation requirements of sections 330 and 331 of the Bankruptcy Code.[256] All fees[257] and expenses[258] would be payable monthly to BRG without the need for BRG to file fee applications with the Bankruptcy Court.[259] Berkeley Research Group, out of the kindness of their heart, would, however, file quarterly statements of its fees and expenses allowing parties in interest the information needed to object to fees.[260]

The United States Trustees Office objected to the engaging the services Berkeley Research Group and R. Todd Neilson because the United States Trustees Office, prior to the filing of Solyndra's motion, had filed a motion with the court directing the appointment of a chapter 11 trustee in the case.[261] Over the objections of the United States Trustee's Office, Judge

---

Case No. 08-13384 (MFW) (Bankr. D. Del. April 3, 2009); In re Harry & David, Case No. 11-10884 (MFW) (Bankr. D. Del. April 27, 2011); In re Universal Building Products, Inc., Case No. 10-12453 (MFW) (Bankr. D. Del. August 23,2010); In re Western Nonwovens, Case No. 08-11435 (PJW) (Bankr. D. Del. August 4,2008); In re Mortgage Lenders Network USA, Inc., Case No. 07 -10146 (PJW) (Bankr. D. Del. February 28, 2007); In re Global Home Products, LLC, Case No. 06 -10340 (KG) (Bankr. D. Del. May 4, 2006); In re Meridian Automotive Systems-Composite Operations, Inc., et at., Case No. 05-11168 (MFW) (Bankr. D. Del. July 19,2005); In re Cable & Wireless USA, Inc., Case No. 03-13711 (KJC) (Bankr. D. Del. Jan. 16,2004).

[255] Motion of the Debtors Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Employment of Berkeley Research Group, LLC and Designating R. Todd Neilson as Chief Restructuring Officer to the Debtors *Nunc Pro Tunc* to October 6, 2011, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[256] *See* 11 U.S.C § 330-31.

[257] Berkley Research Group charged the following hourly rates: Directors $595-770, Managing Consultant $345 – 455, Consultant $280-340, Associate $235-$275, and Para-Professionals $100-170.  Motion of the Debtors Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Employment of Berkeley Research Group, LLC and Designating R. Todd Neilson as Chief Restructuring Officer to the Debtors *Nunc Pro Tunc* to October 6, 2011, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[258] Total compensation through the confirmation date of a chapter 11 plan to Berkeley Research Group and the CRO was estimated to be approximately between $900,000 and $1,100,000. The CRO and Berkeley Research Group stated that they would be seeking the approval of the Board  to exceed $1,100,000. *Id*.

[259] *Id.*

[260] *Id.*

[261] *See* Objection of the United States Trustee to the Motion of the Debtors Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Employment of Berkeley Research Group, LLC and Designating R. Todd Neilson as Chief

49

Walrath approved the contract with Berkeley Research Group and the appointment of Todd Neilson as CRO.[262]

## VI. FIRST NON-PLAN SALE ATTEMPT

After the dust had settled from all the action created by the first day motions, the focus of the case would now turn toward the non-plan sale of the business. Court dockets and the media would refer to this and another subsequent attempt as a "turnkey sale" of the business.[263] Solyndra would need help in structuring and marketing the auction of Solyndra's business. Following the court's approval, Solyndra hired the investment banking firm Imperial Capital, LLC as their financial advisors and investment bankers for purposes of the turnkey sale.[264]

On September 16, 2011, Solyndra filed a motion with the court outlining their proposal for a non-plan sale of the business.[265] The proposed sale would be on an "'as is,' 'where is,' and 'with all faults' basis."[266] Potential bidders' offers were required to be (1) irrevocable, (2)

---

Restructuring Officer to the Debtors *Nunc Pro Tunc* to October 6, 2011, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[262] Order Authorizing The Employment Of Berkeley Research Group, LLC And Designating R. Todd Neilson As Chief Restructuring Officer To The Debtors *Nunc Pro Tunc* To October 6, 2011, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[263] *See* Motion of Solyndra LLC For an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011); *Solyndra Sale Will Wait Until January,* U.S. NEWS & WORLD REPORT (Nov. 17, 2011), http://www.usnews.com/news/articles/2011/11/17/solyndra-sale-will-wait-until-january.

[264] Amended Notice of Hearing re: Notice of Entry of Bridge Order and Final Hearing Regarding Debtors; Motion for Order Under Section 366 of the Bankruptcy Code, (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance and (C) Establishing Procedures for Determining Adequate Assurance of Payment, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[265] Motion of Solyndra LLC For an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[266] *Id.*

50

accompanied with a good faith deposit set at 5% of the bid price, and (3) ready, willing, and able to close by Dec. 1, 2011.[267] Offer letters were not to request a breakup-up fee or overbid fee; however, offers could include a willingness to become a stalking horse bidder.[268] Two groups objected to some of the specific provisions of the proposed sale: (1) landlords, comprised of iStar Ctl I, L.P., [269] Global Kato HG, LLC,[270] and Calaveras LLC[271] and (2) the official committee of unsecured creditors.[272]

### A. Landlord Contentions with the Preplan Sale

The landlords' main contentions focused around (1) the lack of notice to object to potential assignees and (2) waiver of pre-closing liabilities.[273] All parties were concerned that the

---

[267] *Id.*

[268] *Id.*

[269] iSTAR CTL I, L.P.'s Objection to Motion of Solyndra, LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[270] Limited Objection to Motion of Solyndra, LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[271] Joinder to iSTAR CTL I, L.P.'s Objection to Motion of Solyndra, LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[272] Objection of the Official Committee of Unsecured Creditors to Motion of Solyndra LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[273] *See* iSTAR CTL I, L.P.'s Objection to Motion of Solyndra, LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011); Limited Objection to Motion of Solyndra, LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011); Joinder to

51

proposed sale procedure lacked adequate time for the landlords to evaluate potential offers and prepare objections to the proposed assignment if needed.[274] Under Rule 6006 of the Federal Rules of Bankruptcy Procedure, a motion to assume, reject, or assign an unexpired lease is a contested matter under Rule 9014.[275] Under Rule 9014, "relief shall be requested by motion, and a reasonable notice and opportunity for hearing shall be afforded the party against whom the relief is sought."[276] Without reasonable notice and opportunity to prepare objections to the winning bid, the landlords argued that Solyndra was violating their rights under Rule 9014.

Solyndra's motion also stated that:

[The] assignee of the Assumed Executory Contracts shall not be subject to any liability to the assigned contract counterparty or lessor that *accrued or arose before the closing date of the sale* of the Assets and [the Debtor] shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.[277]

Global Kato and Calaveras had concerns about lease agreement provisions that required the lessee to return the premise to original conditions.[278] Concerns also arose around potential pre-

---

iSTAR CTL I, L.P.'s Objection to Motion of Solyndra, LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[274] *Id.*

[275] *See* FED. R. BANKR. P. 9014.

[276] *Id.* at 9014(a).

[277] Motion of Solyndra LLC For an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving forms of Notice; and (D) Granting Related Relief at ¶ 46, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011) (emphasis added).

[278] *See* Limited Objection to Motion of Solyndra, LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011); Joinder to iSTAR CTL I, L.P.'s Objection to Motion of Solyndra, LLC for an Order (A) Approving Procedures for Sale of

52

sale liabilities occurring, e.g., pre-closing obligations to "indemnity obligations, maintenance, and the obligation to keep the Premises lien free."[279]

In an effort to accommodate the three landlords, Solyndra agreed to revise their previous order to provide time for landlords to review the financial wherewithal of the bidder and the backup bidder.[280] Solyndra also agreed to have any issues of adequate assurance of future performance determined by the court.[281]

### B.  Committee of Unsecured Creditors Contentions with the Preplan Sale

The official committee of unsecured creditors filed an objection with the court regarding timing of the non-plan sale. The creditor's committee felt that Solyndra was rushing the non-plan sale by setting a bid deadline of October 25, 2011.[282] Bonnie Fatell of Blank Rome, an attorney for the creditor's committee, told Reuters:

> We are concerned there is a rushed sale here . . . . This is a new technology and a
>
> complex company with complex relations with vendors. To expect anyone to

---

Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[279] Limited Objection to Motion of Solyndra, LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief at ¶ 6, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[280] Omnibus Reply and Submission of Redlined Orders in Support of (I) Entry of Final Order Approving Postpetition Secured Financing and Use of Cash Collateral and (II) Approval of Procedures for Sale of Business Assets on Turnkey Basis, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[281] *Id.*

[282] Objection of the Official Committee of Unsecured Creditors to Motion of Solyndra LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing To Consider Approval Of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

53

really have an opportunity to complete due diligence on a company that was not marketed previously is stretching the process unduly.[283]

One might speculate that the unsecured creditors, knowing that they would likely receive nothing from the sale, had nothing to lose by extending the deadline. Perhaps the unsecured creditors were hoping for a revival of the restricting talks between the Tranche A Debt holders and the government that had occurred prior to the filing in early August. The unsecured creditors committee provided no evidence as to how delaying the bid and auction dates would benefit either themselves or any other party. Unsurprisingly, Judge Waltham, in her September 28, 2011 order, kept the original deadlines.[284]

### C. Failure of the Non-Plan Sale

On October 18, 2011, Solyndra sent notice that the bid and auction deadlines had been pushed back to November 16, 2011, and November 18, 2011.[285] During this time, Judge Walthram entered an order allowing Solyndra to start selling off non-core assets.[286] As the bid deadline approached with no bidders, Solyndra extended the bid deadline with the courts

---

[283] *Solyndra cleared for Oct. 27 bankruptcy auction*, REUTERS (Sep 27, 2011 1:16pm EDT), http://www.reuters.com/article/2011/09/27/solyndra-bankruptcy-hearing-idUSS1E78Q0FB20110927.

[284] Order (A) Approving Procedures for Sale of Solyndra LLC's Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[285] Notice of Continued Bid Deadline, Auction, and Sale Hearing for Sale of Solyndra LLC's Business Assets on Turnkey Basis and Assumption and Assignment of Related Contracts and Leases, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[286] Order Granting Motion of Solyndra LLC Pursuant to Sections 105(A) and 363 of the Bankruptcy Code and Authorizing Them to (A) Conduct Auction for Non-Core Assets, and (B) Sell Such Assets to the Successful Bidders at an Auction Free and Clear of All Encumbrances, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

DOE AR 000055

permission and sought approval for a piecemeal sale of Solyndra's assets in case no viable bidders materialized.[287]

Unfortunately for all involved, even after postponing the auction date twice,[288] only one bid was received.[289] The bid was a lowball offer designed to buy the real estate and equipment at a price significantly below market value.[290]

## VII.    THE SUBCOMMITTEE HEARINGS

The rapid decline of Solyndra raised serious questions about the Department of Energy's analysis of the company and the solar energy market.  As a result, a hearing with the House Subcommittee on Oversight and Investigations was scheduled in order to examine both Solyndra and the Department of Energy's overall loan guarantee program.[291]  Republicans were particularly adamant about the necessity of the hearing, sensing a great opportunity to attack the Obama administration.

As expected, the hearings were very politically charged.  Republicans questioned the dealings of George Kaiser and the role he played in securing Solyndra's loan guarantee.[292]  As both a major Obama fundraiser and as one of Solyndra's largest investors, significant concerns

---

[287] Notice of Continued Bid Deadline, Auction, and Sale Hearing for Sale of Solyndra LLC's Business Assets on Turnkey Basis and Assumption and Assignment of Related Contracts and Leases, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[288] *Id.*

[289] Michael Bathon, *Solyndra Wins Approval of Second Auction If Sale Fails*, BLOOMBERG BUSINESSWEEK (December 23, 2011, 5:09 AM EST), http://www.businessweek.com/news/2011-12-23/solyndra-wins-approval-of-second-auction-if-sale-fails.html; Randall Chase, *Only a 'lowball' bid received by bankrupt Solyndra*, THE WASHINGTON TIMES (Nov. 22, 2011), http://www.washingtontimes.com/news/2011/nov/22/only-a-lowball-bid-received-by-bankrupt-solyndra/; *UPDATE 1-Solyndra fails to garner bids for sale*, REUTERS (Wed Jan 18, 2012 12:02am EST), http://www.reuters.com/article/2012/01/18/solyndra-idUSL1E8CI0EF20120118;

[290] *Id.*

[291] Ronnie Greene, iWatch News, *From state, Energy officials pushed ahead with financial boost to now-failed solar startup,* Sep. 13, 2011 http://www.iwatchnews.org/node/6401/ (Last visited April 10,2012)

[292] Jim Puzzanghera, Los Angeles Times, *Solyndra investors are sought for questioning in House inquiry,* Sep. 20, 2011 http://articles.latimes.com/2011/sep/20/business/la-fi-solyndra-investors-20110920 (Last visited April 10, 2012)

55

over his financial ties were raised.[293]  Furthermore, after initially agreeing to waive the 5th

Amendment in order to accommodate a rescheduled hearing, Solyndra's representatives of Brian

Harrison and Bill Stover later recanted on their pledges.[294]  This led to considerable outrage from

the Subcommittee as question after question was turned away.  The continued questioning and

refusal to answer got so heated that it was eventually equated to a witch-hunt and suggested as

outright badgering by Representative Henry Waxman, D-Calif.[295]

The refusal of the Solyndra executives to testify led to the involvement of the U.S.

Trustee's Office.  U.S. Trustee Roberta A. DeAngelis was appointed to handle the Solyndra case

and filed a motion to be appointed trustee in Solyndra's Chapter 11 bankruptcy filing.[296]

DeAngelis argued that lack of testimony hindered the bankruptcy proceeding.[297]  DeAngelis

would also file a motion to have the Chapter 11 changed to a Chapter 7 liquidation, again

arguing that there was a lack of full disclosure and that the executives' lack of testimony allowed

for the avoiding of necessary reporting obligations.[298]  Judge Mary F. Walrath, who was

overseeing the United States Bankruptcy Court for the District of Delaware dismissed both

---

[293] Matea Gold and Stuart Pfeifer, The Lost Angeles Times, *Solar Firm's Obama Links Probed*, Sep. 17, 2011 http://articles.latimes.com/2011/sep/17/nation/la-na-SOLYNDRA-DONOR-20110917 (Last visited April 10, 2011)

[294] Amy Harder, National Journal, *Solyndra Executives Refuse to Testify Before House Panel,* Sep. 23, 2011 http://www.nationaljournal.com/energy/solyndra-executives-refuse-to-testify-before-house-panel-20110923 (Last visited April 10, 2012)

[295] Associated Press, Fox News, *Solyndra Execs Plead Fifth at Congressional Hearing More Than a Dozen Times,* Sep. 23, 2011 http://nation.foxnews.com/solyndra/2011/09/23/solyndra-execs-reduced-embarrassing-spectacle-hearing (Last visited April 10, 2012)

[296] Business Law Daily, *Justice Department Seeks Trustee In Solyndra Bankruptcy Case,* Sep. 30, 2011 http://businesslawdaily.net/2011/09/30/justice-department-seeks-trustee-solyndra-bankruptcy-case/ (Last visited April 10, 2012)

[297] Aviva Gat, The Deal Pipeline, *UST wants to install trustee to oversee Solyndra,* Oct. 3, 2011 http://www.thedeal.com/content/restructuring/ust-wants-to-install-trustee-to-oversee-solyndra.php (Last visited April 15, 2012)

[298] REUTERS, *Update 3-U.S. DOJ seeks trustee in Solyndra bankruptcy,* Sep. 30, 2011 http://www.reuters.com/article/2011/10/01/solyndra-bankruptcy-idUSS1E78T1TK20111001 (Last visited April 11, 2012)

56

DOE AR 000057

motions.[299]  Judge Walrath indicated that there was no evidence of any fraud or mismanagement within the company.[300]  DeAngelis had also noted Solyndra's unwillingness to discuss the status and answer questions concerning certain contracts that Solyndra had agreed to.[301]  Judge Walrath also addressed this as she stated that Solyndra's refusal to answer certain questions fell far short of the necessary standards for a trustee appointment.[302]

As the hearings continued, Energy Secretary Steven Chu was brought in to testify.[303]  Unlike Solyndra's executives, Energy Secretary Chu answered all questions and was very forthright with the committee.[304]  Energy Secretary Chu accepted full responsibility for the loan approval and restructuring of Solyndra while also admitting that he would not have approved the loan today.[305]  Furthermore, Energy Secretary Chu reaffirmed that there were no political motivations behind his decision to approve the loan.[306]  With the conclusion of the hearings, many in the media felt the Republicans had gone on the attack with the sole intentions of embarrassing President Obama.  The failure of Solyndra appears to be somewhat typical of any doomed business failure; the market simply bottomed out.  There was a real lack of

---

[299] Jim McElhatton, The Washington Times, *Judge denies government bid for Solyndra trustee,* Oct. 17, 2011 http://www.washingtontimes.com/news/2011/oct/17/judge-denies-bid-by-government-for-solyndra-truste/?page=all (Last visited April 10, 2012)

[300] *Id.*

[301] *Id.*

[302] *Id.*

[303] Reuters, CNBC, *Chu Takes Responsibility for Solyndra Loan,* Nov. 17, 2011 http://www.cnbc.com/id/45335012/Chu_Takes_Responsibility_for_Solyndra_Loan (Last visied, April 22, 2012)

[304] *Id.*

[305] Matthew Daly, The Huffington Post, *Steven Chu, Energy Secretary, Takes Responsibility for Solyndra Loan,* Nov. 17, 2011 http://www.huffingtonpost.com/2011/11/17/steven-chu-solyndra-responsibility_n_1099188.html (Last visited April 22, 2012)

[306] *Id.*

57

substance as to the necessity for the hearings and many viewed them as a waste of taxpayer money.

## VIII.    THE WARN ACT CLASS ACTION LAWSUIT

In anticipation of their impending Chapter 11 filing, Solyndra management engaged in a mass layoff and plant closing on August 31, 2011.  Six days later, Solyndra would file their voluntary petition for relief under Chapter 11 of the bankruptcy.  However, on September 2, Peter Kohlstadt filed a class action lawsuit in the U.S. District Court for the Northern District of California under both the United States Worker Adjustment and Retraining Notification (WARN) Act and the California Labor Code.[307]

As a general matter, the WARN Act requires employers to give employees, at minimum, 60 days advance notice of any intended plant closings or mass layoffs so as to provide laid off employees an economic cushion as they seek for new employment.[308]  Kohlstadt claimed that Solyndra officials had failed to provide the 60 day notice to the laid off employees affected by the plant closings just prior to the bankruptcy. Kohlstadt claimed Solyndra thus owed the laid off employees 60 days' worth of wages, benefits, commissions, 401(k) contributions, and other benefits of employment.[309] In addition to the federal WARN Act claim, the complaint also claimed relief under the California WARN Act.  The language of the California Act is similar to the federal act, and it was logical that the state claim would follow the federal claim.[310]

---

[307] Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.* (2000); Cal. Lab. Code § 1400 *et seq.* (West 2000). Also note that while the class action was filed in Northern California it was subsequently transferred to the bankruptcy court when Solyndra filed for bankruptcy protection.  Finally, this may be a good place to discuss that there was another WARN Act complaint filed, but it was merged into this lawsuit.

[308] *Id.* at 29 U.S.C. § 2102(a).

[309] Complaint,  Kohlstadt v. Solyndra, LLC, et al., *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[310] *See*, *Supra* note 276.

58

On top of the WARN act claims, the complaint alleged a claim for compensation for all accrued time off earned by the employees who had been laid off.[311] Sections 201 and 202 of the California Labor Code require employers to pay all wages due to the employee within a time specified by law. Kohlstadt and the other claimants argued that this included all accrued time off (vacation, sick leave, etc.), but Solyndra had only agreed to pay wages associated with time off accrued in the 90 days prior to their termination.

Finally, Kohlstadt and the claimant class were concerned about their placement in the bankruptcy priority pecking order.[312] Due to this fact, they categorized their claim as a first priority administrative expense under 11 U.S.C. 503(b)(1)(A).[313] The importance of this qualification can't be understated, as the priority of the claim would likely mean the difference between recovering the full value of the claims and recovering nothing at all.[314] As an unsecured claim, the WARN Act claimants would almost certainly recover nothing from Solyndra's bankruptcy proceedings.

After the initial filing of the complaint, very little action occurred for several months. An initial pretrial conference was scheduled for November 2, 2011, but the parties agreed to continue the proceeding until February 22, 2012.[315] On January 23, 2012, the court entered an amended stipulation that extended Solyndra's opportunity to respond to the claim.[316] This was

---

[311] *Supra* note 278.

[312] *Id.*

[313] *Id.*

[314] There has been no resolution to this issue documented in this docket, but the fact that both parties agreed to the indefinite extension of the matter until a more full picture of the estate can be known suggests that the plaintiffs expect their claims to be unsecured and have a very low priority in the dissolution of the estate.

[315] *See* Docket Report, Kohlstadt v. Solyndra, LLC, et al., *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[316] Order Approving Amended Stipulation Extending Time (Indefinitely) for Debtors to Respond to Complaint, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

59

an amendment to the initial agreement to extend Solyndra's opportunity to respond and continue the initial preconference hearing.[317]  In this amended stipulation, the parties both agreed that it was unclear at the time whether the debtor would have the requisite property to fund a recovery for unsecured creditors.  With that in mind, both parties determined that it was not worth the energy, time, or money expended to continue this adversarial proceeding at the time.[318]

On February 22, there was a hearing held in the matter, but little is publically available as of April 23, 2012.  The transcript for the hearing will not be available until May 26, 2012, and was not available for access at the time of this writing.[319]  Most recently, this matter was scheduled for another hearing on March 22, 2012 along with several other matters concerning the Solyndra bankruptcy.[320]  However, these hearings were once again continued and have been rescheduled for April 19, 2012.[321]  The future of this action depends totally on whether there are any funds available for unsecured creditors to recover.

## IX. THE END OF THE ROAD

Solyndra's chapter 11 bankruptcy is not an uncommon end for a promising start-up in an ultra-competitive, emerging marketplace.  When a market is emerging, such as the green energy market, there will be winners and losers.  Solyndra's bankruptcy received extra scrutiny because of the government-backed loan totaling $535 million and because of the government's subsequent voluntary subordination of the loan.  As far as the bankruptcy goes, there was very

---

[317] *Id.*

[318] *Id.*

[319] The docket report stated that the transcript would be available at the clerk's office, but would not be available until the date listed above.

[320] *Notice of Agenda of Matters Scheduled for Hearing*, Kohlstadt v. Solyndra, LLC et al, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[321] Notice of Change of Hearing Date & Time for April 19, 2012 Hearing, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

60

little value left in Solyndra at the time the petition was filed.[322]  As a result, the bankruptcy itself has not been very contentious, and it seems that Solyndra will likely fade gently into the night. Various matters still remain which need to be resolved.  These final matters have been continued several times, the most recent continuance has been rescheduled to an April 24, 2012 hearing.  These matters are largely perfunctory in nature and will not likely change the ultimate outcomes in the bankruptcy proceedings.

Aside from the hearing, only two items of note are happening recently in the bankruptcy. First, the committee for unsecured creditors[323] reserved their right to object to the rights of secured creditors in the remainder of the bankruptcy.  Second, the court is granting various motions to authorize the sale of *de minimis* and non-core assets.  Other than these actions, the bankruptcy seems to be winding down. Action will likely pick up once again when higher priced assets and intellectual property reach the auction block. As throughout Solyndra's bankruptcy, professionals will continue to collect fees as super priority administrative expense. Whether these fees are well earned or worth the money is up to each individual's personal interpretation.[324] With the November elections coming up, it is possible that Solyndra's bankruptcy will further gain attention as the GOP attempts to tie the failure of Solyndra to President Obama's record.

From a small, private start-up to a massive public failure, the rise and fall of Solyndra has been nothing short of a wild ride.  As the process draws ever so slowly to a close, several

---

[322] *See,* Schedules, *In re* Solyndra LLC, Case No. 11-12779 (MFW) (Bankr. D. Del Sept. 6, 2011).

[323] With two failed attempts at a sale under §363 of the bankruptcy code, it is unlikely that there will be anything left for the unsecured creditors to get after the debts to the secured creditors are satisfied.  With that in mind, it is likely that this is simply a carefully choreographed fight scene where the parties put on the appearance of contention while fully understanding the path of the bankruptcy

[324] *See* Supra note 203. While this is an admittedly cynical view, it seems that there really is nothing left to fight about. Small motions are being made regularly. With little value on the line for unsecured creditors, no one seems to want to fight over assets that creditors will never see.

61

questions have yet to be answered.  First, what does Solyndra's failure say about the United States government as an investor in the private sector—especially in regard to risky startup companies in emerging markets?  Second, to what extent will Solyndra's failure affect the 2012 presidential election?  Third, what does this bankruptcy signal, if anything, about the American solar market?  And finally, how will this and the failures of other green energy companies affect investment in green energy moving forward?  These questions can only fully be answered with time. However, one thing is for sure: the Solyndra bankruptcy will affect the answer to each of these questions.

62

DOE AR 000063



U.S. Department of Energy
Office of Inspector General
Office of Audits and Inspections

# Audit Report

## The Department's Management of the Smart Grid Investment Grant Program



OAS-RA-12-04

January 2012

DOE AR 000064



# Department of Energy
### Washington, DC 20585

January 20, 2012

MEMORANDUM FOR THE SECRETARY

FROM:              Gregory H. Friedman
                   Inspector General

SUBJECT:           INFORMATION:  Audit Report on "The Department's Management of
                   the Smart Grid Investment Grant Program"

INTRODUCTION AND OBJECTIVE

The Energy Independence and Security Act of 2007 charged the Department of Energy with
establishing the Smart Grid Investment Grant (SGIG) program.  More recently, the American
Recovery and Reinvestment Act of 2009 (Recovery Act) provided the Department's Office of
Electricity Delivery and Energy Reliability (OE) with $3.5 billion to fund the SGIG program and
to assist in modernizing the Nation's power grid.  The SGIG program was to facilitate the
installation of state-of-the-art information technologies and, ultimately, improve grid reliability
and enable consumers to reduce the amount of energy used.  The program required that the
portion of a recipient's project paid for with Federal funds not exceed 50 percent of the total
project cost.  The Department awarded all of its available grant funds to 99 recipients, with
awards ranging in value from $397,000 to $200 million.

Reliability of the grid, specifically, ensuring that the Nation's power grid is adequately protected
from malicious cyber attacks has been and continues to be an area of concern in both the public
and private sectors.  Our report on the *Federal Energy Regulatory Commission's Monitoring of
Power Grid Cyber Security* (DOE/IG-0846, January 2011) disclosed weaknesses related to the
Critical Infrastructure Protection cyber security standards.  In addition, the U.S. Government
Accountability Office's report on *Electricity Grid Modernization* (GAO-11-117, January 2011)
identified weaknesses regarding the implementation and enforcement of Smart Grid cyber
security guidelines.  Given the importance of developing an effective and secure Smart Grid, we
performed this audit to determine whether the Department adequately administered and
monitored the SGIG program.

RESULTS OF AUDIT

Although the Department had taken a number of positive actions, our audit revealed several
opportunities to enhance management of the SGIG program.  The problems that we discovered
could jeopardize achievement of Recovery Act goals.  In particular, we found that:

- Department officials approved Smart Grid projects that used Federally-sourced funds to
  meet cost-share requirements.  Although specifically prohibited by regulation, one
  grantee inappropriately used $1.8 million in Federal funds to meet grant cost-share
  obligations.  This practice is prohibited under the SGIG program because it effectively

DOE AR 000065

increased the Federal portion of the project to more than the maximum 50 percent cost-share.  In addition, one recipient was reimbursed twice for the same costs related to transportation.  The transportation costs were reimbursed as both direct cost and as part of the overhead cost calculation, and represented reimbursement of almost $300,000 more than appropriate through June 2011; and,

- Three of the five cyber security plans (required to be submitted by grantees) which we reviewed were incomplete, and did not always sufficiently describe security controls and how they were implemented.  Department officials noted that Federal involvement was limited when managing grants, but they had required grant recipients to develop cyber security plans that supported the strategy outlined in the grant application and described a minimum set of security elements, such as risk assessment and system security incident response.  However, a Department review revealed that 36 of 99 cyber security approaches submitted as part of the grant application lacked one or more required elements.  In our review of security plans, we noted that the plans did not always include sufficient information related to risk assessments and/or other important elements, and, that they did not fully address many of the weaknesses initially identified by the Department.

The issues we found were due, in part, to the accelerated planning, development, and deployment approach adopted by the Department for the SGIG program.  In particular, the Department had not always ensured that certain elements of the SGIG program were adequately monitored.  There was no assurance that the Department's grant monitoring methodology was completely effective.  Furthermore, officials approved cyber security plans for Smart Grid projects even though some of the plans contained shortcomings that could result in poorly implemented controls.  We also found that the Department was so focused on quickly disbursing Recovery Act funds that it had not ensured personnel received adequate grants management training.

Without improvements, there remains a risk that the goals and objectives of the Smart Grid program may not be fully realized.  From a business management perspective relating to taxpayer-provided funding, we questioned reimbursements totaling more than $2 million for activities related to the use of Federal funds to meet cost-share obligations and duplicate cost reimbursement.

Notably, the Department had taken actions to ensure that submitted SGIG proposals were reviewed and evaluated prior to providing financial assistance to projects that enabled improvements and modernization of the electric transmission and distribution system.  For instance, OE developed an extensive process for assessing the impacts and benefits of the various Smart Grid projects.  Reviews were performed on proposals by subject matter experts, technical topic managers, and a merit review committee.  In addition, program officials performed a number of monitoring functions over recipients' activities associated with the grants.  These are positive actions; however, in our view, additional effort is necessary to ensure that the grants are adequately managed over their lifecycle so that program objectives can be met.  As such, we have made several recommendations that, if fully implemented, should help improve the Department's ability to effectively administer and monitor the SGIG program.

2

MANAGEMENT REACTION

Management generally concurred with the report's recommendations and indicated that it will take steps to respond to the recommendations. Management, however, expressed concerns with a number of assertions made in our report. Management's comments, including its concerns and our response, are more thoroughly discussed in the body of the report and are included in their entirety in Appendix 3.

Attachment

cc: Deputy Secretary
  Associate Deputy Secretary
  Assistant Secretary, Office of Electricity Delivery and Energy Reliability
  Chief of Staff
  Acting Chief Financial Officer
  Chief Information Officer

3

DOE AR 000067

# REPORT ON THE DEPARTMENT'S MANAGEMENT OF THE SMART GRID INVESTMENT GRANT PROGRAM

## TABLE OF CONTENTS

**Management and Cyber Security Controls**

Details of Finding ...................................................................................................................1

Recommendations and Comments.........................................................................................6

**Appendices**

1. Objective, Scope and Methodology......................................................................................9

2. Related Reports...................................................................................................................10

3. Management Comments ......................................................................................................11

DOE AR 000068

## The Department's Management of the Smart Grid Investment Grant Program

**Management and Cyber Security Controls**

Our review revealed several opportunities to improve certain aspects of the Department of Energy's (Department) Smart Grid Investment Grant (SGIG) program. In particular, although the initial Funding Opportunity Announcement stated that Federally-sourced funds were not to be used for cost-share requirements, we determined that the Department had approved one Smart Grid project that utilized Federal funds to meet cost-share requirements. In addition, we identified one recipient that was reimbursed twice for the same costs related to transportation. Furthermore, cyber security plans developed by recipients were not always complete, and did not sufficiently describe security controls and how they were to be implemented.

### Approval of Smart Grid Projects

We found that the Department had approved one Smart Grid project even though the grant recipient's application noted its intent to use Federally-sourced reimbursements from work performed by its partner utilities on the same grant to meet a portion of its required cost-share. The SGIG program required that the recipient's cost-share be at least 50 percent of the total project cost and no funds from a Federal source be used to meet this requirement. We observed, however, that for one particular grant the recipient retained its partners' Federally-sourced reimbursement to meet the cost-share requirements for its portion of the project. As a result, we determined that the Department had funded 60 percent of the recipient's project – significantly more than the mandated 50 percent limit. As such, we questioned the Department's reimbursement of more than $1.8 million in American Recovery and Reinvestment Act of 2009 (Recovery Act) funds for that particular grant.

### Cost Reimbursement

The Department did not always follow effective business practices when reimbursing grant recipients. In particular, we identified one recipient that was reimbursed twice for the same costs related to transportation. While the recipient billed costs totaling almost $600,000 and was reimbursed one-half of that amount for direct transportation, it had also included transportation costs as part of its overhead rate calculation. As these costs should be properly classified as an element of the recipient's indirect costs, we questioned the reimbursement of almost $300,000 more than necessary through June 2011. Office of Electricity Delivery and Energy Reliability (OE) officials stated that all indirect rates would

be reviewed and reconciled prior to closing out individual grants and recipients would be responsible for reimbursing the Department for any overpayments. However, we believe this practice presents an unnecessary risk because the Department may have difficulty recovering funds from recipients if they become unable to meet the terms of their grant agreements.

Cyber Security

Cyber security plans submitted by recipients were not always complete or they did not describe intended controls in sufficient detail. As part of the grant application process, OE required each applicant to submit its approach to cyber security as part of its award application. Using a two-tier review conducted by subject matter experts, officials identified one or more required elements lacking in 36 of 99 (36 percent) cyber security approaches submitted in the grant applications. When the grants were awarded, the Department instructed recipients to develop a cyber security plan consistent with the approaches presented as part of the grant application process. In addition, cyber security plans were to, at a minimum, describe the recipients' approaches to detecting, preventing, and communicating with regard to, responding to, and recovering from system security incidents. Further, cyber security plans were required to contain detailed descriptions of the recipients' risk assessment processes, risk mitigation strategies, and other elements of their cyber security programs. However, although the Department approved these updated plans, our review found that the initial weaknesses had not always been fully addressed, and did not include a number of security practices commonly recommended for Federal government and industry systems. For instance:

- One recipient's cyber security plan provided only a summary description of its cyber security processes. While the plan addressed cyber security concerns related to the Smart Grid, it did not provide adequate details related to the risk assessment or mitigation processes. In addition, cyber security elements were discussed in general terms, and quality assurance and overall impact on grid security was not presented in detail. For instance, the recipient's approach to detecting, preventing, and communicating system security incidents was not adequately described. In particular, the plan stated that the recipient used monitoring, logging, and alerting technologies to detect incidents and exploits, but did not detail how these systems worked in its specific environment. Also, no detail was provided to explain how detected incidents were contained

and corrected to restore systems.  Without a thorough description of these processes, the Department, grantee, and other related parties cannot determine if those elements are being properly implemented.

- Another recipient submitted a cyber security plan that was based on guidance developed by the National Institute of Standards and Technology (NIST).  However, the plan contained only the minimal elements required by the Department in the Funding Opportunity Announcement and did not provide sufficient detail regarding how the elements would be implemented in the recipient's environment.  For example, the plan indicated that the recipient had a risk assessment and mitigation process in place.  However, the recipient commented that, while risks and mitigation strategies were included in the plan, a formal risk assessment had never been performed.  Without a formal risk assessment and associated mitigation strategy, threats and weaknesses may go unidentified and expose the recipient's systems to an unacceptable level of risk.

Despite the shortcomings in cyber security plans described above, we were informed that recipients were given the 3-year duration of the award to implement agreed-upon cyber security controls.  We acknowledge that the security plans will evolve as systems are developed and implemented.  However, this practice may be problematic in that any existing gaps in a recipient's security environment could allow system compromise before controls are implemented.  Likewise, approved elements that were not well-defined in the plan could leave the system susceptible to compromise even after the cyber security plan had been fully implemented.  For example, without a well-defined risk management process, potential risks may go unidentified and related mitigating controls may not be implemented.  Notably, Department officials told us that they are addressing risks by requiring that Technical Project Officers (TPO) and subject matter experts review the cyber security posture and recommend updates to cyber security policies when they perform their annual site visits to grant recipients.  Additionally, to the Department's credit, it created a website tailored to the cyber security needs of the SGIG projects, conducted webinars to provide technical assistance, and conducted a cyber security information exchange with all recipients to share the results of site visits and best practices.

In comments on our report, Department officials noted that, due to the nature of grants, Federal government involvement in the management of projects was limited, and indicated that including

the requirement to develop a cyber security plan in the grant terms and conditions was an extra measure taken to ensure that this area was addressed.  We commend the Department for its efforts to develop a cyber security strategy; however, we believe that continuing attention is needed to help strengthen grantee plans.  Department officials told us that they are committed to monitoring grantees throughout the 3-year implementation cycle to ensure that plans are updated as needed.

**Performance Monitoring and Training**

The issues identified were due, in part, to the accelerated planning, development, and deployment approach adopted by the Department for the SGIG program.  In particular, the Department had not ensured that the methodology used by the TPOs was completely effective for monitoring Smart Grid grants.  In addition, because the Department was focused on quickly disbursing Recovery Act funds, it had not ensured personnel had received adequate training to manage grants.

<u>Performance Monitoring and Oversight</u>

The Department had not ensured that the TPOs effectively monitored the SGIG program.  In particular, we found that the TPOs were not involved in the review and approval of indirect costs submitted by recipients during the grant application process.  Rather, the contracting officers were responsible for approving the components of indirect cost rates as part of the grant award.  Therefore, most TPOs compared the indirect rates claimed for reimbursement to the rate approved in the award agreement and did not perform any further checks as to the validity of the rate.  In addition, most of the TPOs did not have a complete understanding of how indirect costs were calculated and applied by recipients.  Had the TPOs coordinated with the contracting officers and completed effective reviews of indirect costs, certain cost-related issues discovered during our review may have been identified and remediated.  In preliminary comments on our report, officials noted that the contracting officer had provisionally approved recipients' indirect rates and would verify the costs at the end of the grants with final cost incurred audits.  However, the lack of coordination between the TPO and contracting officer led to the Department reimbursing one recipient twice for the same costs related to transportation.  While reimbursements are subject to final audit and recovery if deemed inappropriate, relying on the audit as a general control mechanism creates a higher than necessary risk that the Department will be unable to recover funds from recipients when grant funds have been completely expended.

We also found that the Department's approach to limit Federal involvement in grant implementation contributed to cyber security plans that lacked thorough descriptions by recipients as to how all minimum security controls would be implemented in their respective environments.  While officials were aware of the many weaknesses in the plans, they approved them even though they did not sufficiently detail the minimum standards specified in the award terms.  As a result, the approved cyber security plans did not adequately address security risks or planned cyber security controls.

Training

Department officials had not ensured that all personnel involved in the SGIG program received adequate training related to managing grants under their purview.  Specifically, in an accelerated effort to establish a new grants management office, OE hired many new employees and enlisted the help of employees within other areas of the Department to oversee the SGIG program.  However, we noted that only 2 of 10 TPOs were trained and certified in accordance with Department policies and procedures.  One of these two individuals had received certification that allowed him to oversee only grants and cooperative agreements under $10 million.  However, each of the TPOs was monitoring Smart Grid projects well above that threshold, including five individuals that were responsible for grants ranging from $100 million to $200 million.  In comments to our draft report, OE officials noted that they planned to ensure that the TPOs receive the necessary training for the certification that allows them to oversee grants and cooperative agreements above the $10 million threshold.

**Realization of Goals and Objectives**

Without improvements in monitoring and oversight of the SGIG program, there is a significant risk that certain goals and objectives of the Smart Grid may not be fully realized.  For example, reimbursement of costs that do not support Smart Grid goals do not enhance the overall reliability of the power grid and divert funds from other projects that could help the grid to function in a more efficient and cost-effective manner.  As noted in the report, we questioned reimbursements totaling more than $2 million for activities related to the use of Federal funds to meet cost-share obligations and duplicate cost reimbursement.  Had the Department only reimbursed costs that fully supported the modernization goals of the SGIG program, it could have applied the questioned amounts towards other projects or awarded additional grants.  In addition, as our review only evaluated 20 of

the 99 grants awarded, the amount of Recovery Act funds the Department paid to recipients for projects that do not support the program's goals may be higher.

Issues with grantee cyber security plans for Smart Grid projects could also result in poorly implemented controls, leaving the power grid susceptible to compromise by malicious individuals.

**RECOMMENDATIONS**

To help improve the Department's ability to effectively administer and monitor the SGIG program, we recommend that the Assistant Secretary, Office of Electricity Delivery and Energy Reliability ensure that:

1. The allowability of the costs questioned in this report is determined and program procedures are updated, as needed;

2. Grantees' cyber security plans are complete, including thorough descriptions of potential security risks and related mitigation through necessary cyber security controls;

3. An effective methodology for monitoring the SGIG program is developed and implemented; and,

4. Technical Project Officers are adequately trained and certified to manage the grants under their purview.

**MANAGEMENT REACTION AND AUDITOR COMMENTS**

Management generally concurred with the report's recommendations and indicated that action was planned, or had been initiated to respond to the four recommendations in the report.  Management's proposed or initiated corrective actions are responsive to our recommendations.  Management's comments indicated concerns with a number of assertions related to cost reimbursement and cyber security made in our report.  We have addressed management's comments below and made technical changes to the report, as appropriate.  Management's comments are included in their entirety in Appendix 3.

<u>Cost Reimbursement</u>

Management commented that it believed it had acted in full compliance with the law and Federal procurement regulations with regards to reimbursing costs related to recapturing the residual value of obsolete meters and the use of Federally-sourced reimbursements to meet a portion of recipients' cost share requirements.  In addition, management indicated that it believed

the language in the report incorrectly implied intentional and willful violation of these regulations when projects were chosen for award.  Specifically, management commented that it made the decision to reimburse the costs of the obsolete meters based on two considerations.  The cost principles in the Federal Acquisition Regulations (FAR) allowed the recipient to claim losses on the disposition of depreciable property.  Additionally, the reimbursed costs for outdated meters supported the goals of the SGIG program and the cost recovery treatment by local utility regulators allowed for recovery of these costs.  Management also believed it had not allowed one recipient to use Federally-sourced funds to meet its cost-share requirement.

After further evaluation, we agree that the FAR allows grant recipients to claim reimbursement for the residual value of obsolete meters and have made changes to remove this information from the report, as necessary.  However, we continue to disagree that Federally-sourced funds were not used to meet the cost-share requirements for one grant recipient.  In particular, the recipient's project budget documentation clearly shows it would contribute only a small amount of its own funds to the project, and planned to use Federally-sourced reimbursements from its partners to meet the remaining cost-share requirements.  As noted in the report, at the time our analysis was performed the Department had funded roughly 60 percent of the recipient's project even though the SGIG program required that no funds from a Federal source be used to meet cost-share requirements and that Federal contribution not exceed 50 percent of the total project cost.  While management observed that our report could lead one to the impression that the Department's actions were completed in a willful or intentionally negligent manner, we do not assert that such was the case.

<u>Cyber Security</u>

Management also commented that there are currently no Federal or state standards or regulations that mandate cyber security processes or practices for electric distribution systems.  Therefore, to ensure its recipients take cyber security seriously in the absence of such rules, the Department required each project to develop a cyber security plan that was signed by a corporate officer.  The plans were then reviewed by the Department's cyber security experts, and approved by individual recipient's TPOs.  Management further relayed its concern regarding the potential for confusion about the required contents for each SGIG project's cyber security plan, as stated in the report.  In particular, management noted that our statement regarding cyber security plan requirements, such as

detailed descriptions of the recipients' risk assessment processes, risk mitigation strategies, and cyber security controls, were never included in any Department guidance to the recipients. In fact, the cyber security plans were intended to be flexible enough to be tailored to specific project needs and, management felt, should focus on the recipient's cyber security methodologies and provide sufficient details on the approaches. Finally, management stated that the cyber security plans were reviewed by cyber security subject matter experts, the final version was approved by the Department, and a progress review of the recipient's cyber security implementation was an integral part of the annual site visit. As a result of the site visit review, many recipients are in the process of updating and strengthening their cyber security plans.

We agree with management's statements regarding the lack of cyber security standards or regulations for electric distribution systems, as noted in the report. However, awards were granted to recipients with control over all aspects of the Nation's electric grid, to include both transmission and distribution systems. Therefore, we believe that the SGIG program provided the Department a unique opportunity to promote strong cyber security programs among its recipients; an area which, based on the issues identified during our audit, could have been more thoroughly explored. We also believe that the Department should take steps to ensure the submitted cyber security plans are complete, being implemented, and are updated as situations warrant. While we agree that a cyber security plan should be flexible enough for tailoring to each project, the plan should contain sufficient information to assess the grant recipient's cyber security posture.

We agree with management's statement that Department guidance to recipients did not require detailed descriptions of cyber security controls. However, the SGIG Program Management Plan identified the requirement for recipients' cyber security plans, to include detailed descriptions of the recipient's risk assessment and mitigation processes and other standards to which the projects would adhere. This information was formally provided to the recipients as part of the project deliverables lists in the terms and conditions of the grant agreement.

## Appendix 1

**OBJECTIVE**          To determine whether the Department of Energy (Department) adequately administered and monitored the Smart Grid Investment Grant (SGIG) program.

**SCOPE**              The audit was performed between November 2010 and January 2012, at Department Headquarters in Washington, DC and various grant recipients in Texas and Arizona.  Reimbursement information for additional grant recipients was also reviewed.

**METHODOLOGY**        To accomplish our objective, we:

- Reviewed applicable laws and Department policies, including those pertaining to securing Smart Grid technologies;

- Reviewed applicable guidance issued by the National Institute of Standards and Technology and the Federal Energy Regulatory Commission;

- Reviewed prior reports issued by the Office of Inspector General and the U.S. Government Accountability Office;

- Obtained documentation from and held discussions with officials from the Department's Office of Electricity Delivery and Energy Reliability;

- Reviewed invoices submitted by grant recipients for appropriateness; and,

- Reviewed selected approved recipient cyber security plans for completeness.

We conducted this performance audit in accordance with generally accepted Government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our finding and conclusions based on our audit objectives.  Accordingly, we assessed significant internal controls and the Department's implementation of the *Government Performance and Results Act of 1993* and determined that it had established performance measures for management of its SGIG activities.  Because our review was limited, it would not have necessarily disclosed all internal control deficiencies that may have existed at the time of our audit.  We did not rely on computer-processed data to satisfy our audit objective.  An exit conference was held with Department officials on January 12, 2012.

## Appendix 2

### RELATED REPORTS

**Office of Inspector General Report**

- *Federal Energy Regulatory Commission's Monitoring of Power Grid Cyber Security* (DOE/IG-0846, January 2011).  Although the Federal Energy Regulatory Commission (Commission or FERC) had taken steps to ensure the Critical Infrastructure Protection (CIP) cyber security standards were developed and approved, such standards did not always include controls commonly recommended for protecting critical information systems.  In addition, the CIP standards implementation approach and schedule approved by the Commission were not adequate to ensure that systems-related risks to the Nation's power grid were mitigated or addressed in a timely manner.  Despite their importance to protecting the power grid, the CIP standards did not include a number of security controls commonly recommended for government and industry systems, including both administrative and mission-related systems.  These problems existed, in part, because the Commission had only limited authority to ensure adequate cyber security over the bulk electric system.  While the Energy Policy Act established the Commission's authority to approve, remand, or direct changes to proposed reliability standards, the Commission did not have the authority to implement its own reliability standards or mandatory alerts in response to emerging threats or vulnerabilities.

**U.S. Government Accountability Office Report**

- *Electricity Grid Modernization* (GAO-11-117, January 2011).  The National Institute of Standards and Technology (NIST) had developed and issued, in August 2010, a first version of its Smart Grid cyber security guidelines.  The agency developed the guidelines – for entities such as electric companies involved in implementing Smart Grid systems – to provide guidance on how to securely implement such systems.  However, NIST did not address the risk of attacks that use both cyber and physical means.  In addition, NIST identified other key elements that surfaced during its development of the guidelines that need to be addressed in future guideline updates.  Until the missing elements are addressed, there is an increased risk that Smart Grid implementation will not be secure as otherwise possible.  In addition, FERC began, in 2010, a process to consider an initial set of Smart Grid interoperability and cyber security standards for adoption, but had not developed a coordinated approach to monitor the extent to which industry is following these standards.  While the *Energy Independence and Security Act of 2007* gave FERC authority to adopt Smart Grid standards, it did not provide FERC with specific enforcement authority.  Additionally, although regulatory fragmentation complicated oversight of Smart Grid interoperability and cyber security, FERC had not developed an approach coordinated with other regulators to monitor whether industry was following the voluntary standards it adopted.

# Appendix 3

## MANAGEMENT COMMENTS



**Department of Energy**
Washington, DC 20585

November 14, 2011

MEMORANDUM FOR RICKEY R. HASS
DEPUTY INSPECTOR GENERAL
FOR AUDITS AND INSPECTIONS

FROM:                    PATRICIA A. HOFFMAN *OH*
ASSISTANT SECRETARY
ELECTRICITY DELIVERY AND ENERGY RELIABILITY

SUBJECT:                 Response to Office of Inspector General's (IG) Draft Audit
Report "The Department's Management of the Smart Grid
Investment Grant Program"

The Office of Electricity Delivery and Energy Reliability (OE) appreciates the
opportunity to respond to the Office of Inspector General's (IG) Draft Audit Report "The
Department's Management of the Smart Grid Investment Grant Program."

Under the Smart Grid Investment Grant (SGIG) program, OE manages $8 billion of
taxpayer and private funds. OE takes the responsibility of managing each of the 99 SGIG
projects very seriously to ensure that funds are being spent properly and that they are
accomplishing their intended purpose: "…to accelerate the modernization of the nation's
electric transmission and distribution systems and promote investments in smart grid
technologies, tools, and techniques which increase flexibility, functionality,
interoperability, cyber-security, situational awareness, and operational efficiency."

OE understands that such a large, important, and complex program requires a level of
monitoring and oversight that is much higher than normally applied in typical grant
programs. In fact, OE's management processes and procedures for the SGIG program go
well beyond standard grant management practices and include specific requirements to
help ensure that grant recipients deliver the intended results in a timely and cost-effective
manner and with reduced risks for U.S. taxpayers.

OE's responses to the four recommendations in the Audit Report are listed below. In
addition, OE is including Attachment 1, which contains supplementary information and
raises specific concerns with several of the Audit Report's findings and conclusions.

1

 Printed with soy ink on recycled paper

## Appendix 3 (continued)

**Recommendation 1:** Conduct a review to make a determination as to the allowability of the costs questioned in this report and update program procedures, as needed.

Response: In view of the prior consultations with DOE's Offices of Procurement and General Counsel, OE believes that the decisions to award questioned projects, and allow reimbursement of certain "stranded meter" costs, were based on proper interpretations of the applicable laws and regulations and that OE followed accepted practices for determining allowable costs. (See Attachment 1 for further information.)

**Action: OE will conduct a review of these decisions in consultation with DOE's Offices of Procurement and General Counsel. This review will be completed no later than March 30, 2012.**

**Recommendation 2:** Develop and implement an effective methodology for monitoring the SGIG program.

Response: OE believes it is implementing an effective methodology for monitoring the SGIG program. (See Attachment 1 for further information.) OE has taken a number of steps that are significantly more rigorous than those required under DOE regulations for grant management. Examples of these include: (1) submission of monthly versus quarterly progress reports to ensure problems can be identified early, (2) development of performance measurement baselines to track progress, (3) development of risk baselines and logs to ensure recipients are implementing effective risk mitigation strategies, (4) performance of onsite reviews to verify first hand that projects are performing work according to plans, (5) provision of federal funding on a cost reimbursement basis after the work has been performed and verified rather than providing the funding in advance, and (6) use of routine and on-going interactions with the recipients by the Technical Project Officers (TPO) to augment monthly reviews of reports and invoices. This approach was captured in the Program Management Plan (PMP) developed in 2010 from the onset of the Program.

**Action: OE will review its current methodology for monitoring the SGIG program and implement changes to further strengthen the existing SGIG Program Management Plan, as appropriate, by no later than March 30, 2012**

**Recommendation 3:** Ensure that grantees' cyber security plans are complete, including thorough descriptions of potential security risks and related mitigation through necessary cyber security controls.

2

## Appendix 3 (continued)

Response:  OE has developed a cyber security approach that is intended to improve cyber security practices and ensure that recipients do not place the power system at risk.  (See Attachment 1 for further information.) While there are mandatory cyber security standards for the bulk electric system, there are no federal or state cyber security standards or regulations that define cyber processes or practices for electric distribution systems.

To make sure the recipients take cyber security seriously even when formal rules do not exist, DOE requires each project to develop a cyber security plan (CSP), have it signed by corporate officers or similar officials, have it reviewed by OE cyber security experts, and then have it approved by the TPO. The intent of OE's requirement for recipients to develop CSPs is to document cyber security methodologies and approaches in sufficient detail to understand the overall approach but retain flexibility to meet the unique aspects of each project.  OE's management approach starts with the CSP but continues as an on-going process throughout the life cycle of each SGIG project.

**Action: OE will continue to ensure that the cyber security plans of the recipients are complete and are being implemented properly. OE is in the process of conducting a review of all of the reports from the on-site reviews and will require recipients to update their CSPs, as appropriate, no later than April 30, 2012.**

**Recommendation 4:** Ensure that Technical Project Officers (TPOS) are adequately trained and certified to manage the grants under their purview.

**Action: OE will have all of the TPOs trained and certified at the TPO II level by no later than September 30, 2012.**

Should you have any questions, please contact me at (202) 586-1411 or Stacy Byrd at (202) 586-5370.

Attachment

3

IG Report No.  OAS-RA-12-04

# CUSTOMER RESPONSE FORM

The Office of Inspector General has a continuing interest in improving the usefulness of its products.  We wish to make our reports as responsive as possible to our customers' requirements, and, therefore, ask that you consider sharing your thoughts with us.  On the back of this form, you may suggest improvements to enhance the effectiveness of future reports.  Please include answers to the following questions if they are applicable to you:

1.  What additional background information about the selection, scheduling, scope, or procedures of the inspection would have been helpful to the reader in understanding this report?

2.  What additional information related to findings and recommendations could have been included in the report to assist management in implementing corrective actions?

3.  What format, stylistic, or organizational changes might have made this report's overall message more clear to the reader?

4.  What additional actions could the Office of Inspector General have taken on the issues discussed in this report which would have been helpful?

5.  Please include your name and telephone number so that we may contact you should we have any questions about your comments.

Name _____     Date _____

Telephone _____     Organization _____

When you have completed this form, you may telefax it to the Office of Inspector General at (202) 586-0948, or you may mail it to:

Office of Inspector General (IG-1)<br>
Department of Energy<br>
Washington, DC 20585<br>
<br>
ATTN:  Customer Relations

If you wish to discuss this report or your comments with a staff member of the Office of Inspector General, please contact our office at (202) 253-2162.

DOE AR 000082

This page intentionally left blank.

DOE AR 000083

The Office of Inspector General wants to make the distribution of its reports as customer friendly and cost effective as possible.  Therefore, this report will be available electronically through the Internet at the following address:

U.S. Department of Energy Office of Inspector General Home Page
http://energy.gov/ig

Your comments would be appreciated and can be provided on the Customer Response Form.

DOE AR 000084

🇺🇸 An official website of the United States government    Here's how you know



**U.S. DEPARTMENT of ENERGY**

Policy & Priorities     Leadership & Organization     Topics     News & Events     About     **Funding Opportunities**

Office of Inspector General     Audit Report: OAS-RA-12-04

# Audit Report: OAS-RA-12-04

The Department's Management of the Smart Grid Investment Grant Program

[Office of Inspector General](#)

January 20, 2012

🕐 Estimated Read Time 2 min

January 20, 2012

**The Department's Management of the Smart Grid Investment Grant Program**

The Energy Independence and Security Act of 2007 charged the Department of Energy (Department) with establishing the Smart Grid Investment Grant (SGIG) program.  More recently, the American Recovery and Reinvestment Act of 2009 (Recovery Act) provided the Department's Office of Electricity Delivery and Energy Reliability with $3.5 billion to fund the SGIG program and to assist in modernizing the Nation's power grid.  The SGIG program was to facilitate the installation of state-of-the-art information technologies and, ultimately, improve grid reliability and enable consumers to reduce the amount of energy used.  The program required that the portion of a recipient's project paid for with Federal funds not exceed 50 percent of the total project cost.  The Department awarded all of its available grant funds to 99 recipients, with awards ranging in value from $397,000 to $200 million.

Although the Department had taken a number of positive actions, our audit revealed several opportunities to enhance management of the SGIG program.  The problems that we discovered could jeopardize achievement of Recovery Act goals.  In particular, we found that Department officials approved Smart Grid projects that used Federally-sourced funds to meet cost-share requirements.  In addition, one recipient was reimbursed twice for the same costs related to transportation.  Furthermore, three of the five cyber security plans (required to be submitted by grantees) which we reviewed were incomplete, and did not always sufficiently describe security controls and how they were implemented.  The issues we found were due, in part, to the accelerated planning, development, and deployment approach adopted by the Department for the SGIG program.  Without improvements, there remains a risk that the goals and objectives of the Smart Grid program may not be fully realized.  From a business management perspective relating to taxpayer-provided funding, we questioned reimbursements totaling more than $2 million for activities related to the use of Federal funds to meet cost-share obligations and duplicate cost reimbursement.

**Topic: Financial Assistance**

DOE AR 000085

## Audit Report: OAS-RA-12-04

**Committed to Restoring America's Energy Dominance.**

**Follow Us**

### Quick Links

Leadership & Offices

Newsroom

Contact Us

Careers

### Resources

Budget & Performance

Directives, Delegations, & Requirements

Freedom of Information Act (FOIA)

Inspector General

Privacy Program

### Federal Government

USA.gov

The White House

Open Gov    Accessibility    Privacy    Information Quality    No Fear Act    Web Policies    Vulnerability Disclosure Program

Whistleblower Protection    Equal Employment Opportunity    Notice of Court Orders

DOE AR 000086



U.S. Department of Energy
Office of Inspector General
Office of Audits and Inspections

# Audit Report

## The Department of Energy's Clean Cities Alternative Fuel Vehicle Grant Program Funded under the American Recovery and Reinvestment Act



OAS-RA-12-12

May 2012

DOE AR 000087



# Department of Energy
Washington, DC 20585

May 22, 2012

MEMORANDUM FOR THE SECRETARY

FROM:                    Gregory H. Friedman
                         Inspector General

SUBJECT:                 <u>INFORMATION</u>:  Audit Report on "The Department of Energy's Clean
                         Cities Alternative Fuel Vehicle Grant Program Funded under the
                         American Recovery and Reinvestment Act"

<u>INTRODUCTION AND OBJECTIVE</u>

Under the American Recovery and Reinvestment Act of 2009, the Department of Energy's Clean
Cities Alternative Fuel Vehicle Grant Program (Clean Cities Program) received nearly
$300 million, or 30 times its Fiscal Year 2009 funding of approximately $10 million.  From this
amount, the Department awarded grants ranging from $5 million to $15 million to 25 recipients,
including Clean Cities coalitions and other entities that partnered with coalitions.  Clean Cities
coalitions are volunteer groups that join with public and private sector organizations to promote
alternative and renewable fuels, fuel economy measures and new technologies.  Grant funding
may be used for the construction or upgrade of alternative-fueling sites and the purchase of
commercial vehicles capable of using alternative fuels, including garbage and transport trucks,
buses and taxis.  The Department required each grant recipient to comply with Federal
regulations governing financial assistance awards and to provide at least 50 percent of a project's
funding (cost-share).  As of March 2012, grantees had expended about $170 million of their
Recovery Act funding.

Because of the importance of the Recovery Act and the dramatic increase in funding, we initiated
this audit to determine whether the Department had effectively managed the Clean Cities
Program.

<u>RESULTS OF AUDIT</u>

Our review disclosed that the Department had followed established procedures for the
solicitation, merit review and selection of the Clean Cities projects.  However, the Department
had not always effectively managed the use of Recovery Act funding and other post-award
aspects of the Clean Cities Program.  In our review of seven recipients, we found that the
Department had inappropriately:

- Reimbursed a recipient about $1.5 million for costs incurred even though the costs were
  not substantiated.  Similarly, the Department approved $615,000 in unsubstantiated
  cost-share contributions.  The lack of substantiation raises transparency issues and

DOE AR 000088

2

increases the risk that the Department will pay more than its agreed upon share of project costs. Ultimately, based in part on the results of our review, the Department reduced total project costs by approximately $2 million;

- Paid one recipient $250,000 for a down payment on an alternative-fueling station that had been invoiced 3 months prior to the grant's authorized spending date of July 2009. After we pointed this issue out, the Department immediately recovered the $250,000;

- Approved a claim for $164,000 in cost-share contributions even though the recipient lacked documentation supporting the reasonableness of costs. Accordingly, we questioned the $164,000 in unsupported cost-share contributions; and,

- Allowed three recipients to award almost $20 million without documenting their decisions to award contracts and/or identifying potential conflicts of interest as required by Federal procurement regulations. Consequently, the Department lacked assurance that goods and services were procured from the most qualified sources at the best price available. Therefore, we questioned nearly $3.3 million spent on the projects to date and almost $1.4 million in cost-share commitments.

Inadequate policies and procedures, and ineffective oversight contributed to the grant administration issues we identified. The Department relied, in large measure, on Clean Cities grant recipients to disclose conflicts of interest and to ensure costs incurred were reasonable without adequately monitoring the grant recipients. For example, Department officials were unaware of a potential conflict of interest involving a coalition board member's company that had been awarded a contract. The recipient had claimed lease payments to a company owned by the board member's family. This was despite information in the award file that, in our view, should have led to questions about the relationship.

We acknowledge that significant responsibilities are placed on coalition recipients to identify and mitigate potential conflicts of interest and to form teaming partnerships prior to the award of a Clean Cities grant under Federal regulations. However, the operating environment of the coalitions requires robust Departmental oversight to ensure that procurement costs are reasonable and to provide the Federal program transparency expected by taxpayers. Specifically, it is important to note that coalitions are comprised of geographically-based networks of individuals and organizations often with mutual business interests. In such situations, heightened Departmental awareness of the potential for conflicts of interest is necessary.

The issues discussed in our report could, if unresolved, ultimately affect the credibility of the Clean Cities Program. In total, we questioned about $5 million in direct payments to recipients and nearly $2 million in cost-share contributions claimed by recipients (see Appendix 1). With about $130 million yet to be spent by the Clean Cities Program, the Department has an opportunity to proactively evaluate and address the significant risks inherent in overseeing a complex program involving numerous coalitions. As such, we made several recommendations to address the issues discussed in our report.

3

## MANAGEMENT REACTION

Management disagreed with many of our findings and recommendations.  Specifically, management did not agree with our conclusions regarding policies and procedures governing procurements and potential conflicts of interest, nor did it agree with all of the questioned costs identified.  In response to our report, management stated it had developed and implemented adequate policies and procedures for the selection and administration of financial assistance awards.  Regarding the procurement issues identified, management asserted that recipients had competed for services and teaming arrangements prior to the approval of the awards and, therefore, were not bound by Federal procurement regulations.  Further, management emphasized that teaming arrangements approved as part of the award process were properly reviewed and that they were integral to the success of the projects.  Regarding our finding on identifying and mitigating conflicts of interest, management noted that recipients are responsible for ensuring all transactions are free from such conflicts.

Management concurred with our recommendation regarding recipient reimbursement requests, but stated that contracting officers already reviewed requests for the allowability of costs incurred and cost-share amounts contributed.  Additionally, management stated that its contracting officers had reviewed, and worked expeditiously to resolve, cost and cost-share claims in the amount of about $640,000.  We noted that the Department had taken action on approximately $2.5 million in questioned costs and cost-share contributions.  However, management did not concur with other costs we questioned, totaling about $4.5 million relating to unsupported costs, conflicts of interest and procurement concerns (see Appendix 1).

We do not believe management's response fully and satisfactorily addresses our audit findings and recommendations.  Specifically, contrary to management's assertions that it had adequate policies and procedures, we noted the Clean Cities Program did not have formal procedures requiring officials to review available information submitted by recipients regarding potential conflicts of interest and to enforce requirements pertaining to the documentation of procurement decisions.

Further, management asserted that competition was not required.  However, we emphasize that, for the cases in question, recipients had procured services after their award had been granted and therefore, due to requirements in the award documents, should have complied with Federal procurement regulations.  In further support of our position, we note that recipients other than the ones cited in our report had solicited competitive bids with no reported harmful effects on teaming arrangements.  Regarding management's position on the identification and mitigation of conflicts of interest, we agree that recipients are responsible for ensuring all transactions are free of such conflicts.  However, it is our position that the Department also has significant responsibility in this arena, particularly in regard to overseeing awards in which potential conflicts of interest could jeopardize the integrity of the Clean Cities Program.  We remain concerned that recipients awarded contracts to businesses owned by or employing board members of the very same recipient coalitions and to employees or their families.  We further note that although one recipient in question had provided information to the Department that could have identified a potential conflict of interest, officials had not properly reviewed such information and taken action to resolve a potential conflict.

DOE AR 000090

4

Despite management's assertion that contracting officers reviewed reimbursement requests for allowability, the requests had been approved by project officers and contracting specialists without sufficient documentation to justify approval.  Therefore, we continue to believe that Clean Cities Program officials should review recipient reimbursement requests for the allowability of costs incurred and cost-share amounts contributed.

Overall, we recognize the risks inherent in the administration of complex, multi-million dollar grants, such as those awarded under the Clean Cities Program.  The importance of the Department's oversight activities in these circumstances, therefore, cannot be overstated.

We appreciate the actions taken by the Department to recover and resolve $640,000 in incurred costs and cost-share contributions, as well as the questionable costs resolved by management during the course of our review.  We are hopeful that management will reconsider its positions regarding our concerns about conflicts of interest and competitive procurement.  Accordingly, we reaffirm our recommendation that the contracting officers review about $4.5 million in questioned costs and cost-share claims as part of an official determination regarding cost allowability.

Management's comments are included in their entirety in Appendix 3.

Attachment

cc: Deputy Secretary
    Associate Deputy Secretary
    Acting Under Secretary of Energy
    Assistant Secretary for Energy Efficiency and Renewable Energy
    Chief of Staff

DOE AR 000091

# REPORT ON THE DEPARTMENT OF ENERGY'S CLEAN CITIES ALTERNATIVE FUEL VEHICLE GRANT PROGRAM FUNDED UNDER THE AMERICAN RECOVERY AND REINVESTMENT ACT

## TABLE OF CONTENTS

**Clean Cities Alternative Fuel Vehicle Grant Program**

Details of Finding ...................................................................................................... 1

Recommendations ...................................................................................................... 7

Comments ................................................................................................................ 8

**Appendices**

1.  Questioned Costs ............................................................................................ 11

2.  Objective, Scope and Methodology ................................................................. 12

3.  Management Comments ................................................................................... 14

DOE AR 000092

# THE DEPARTMENT OF ENERGY'S CLEAN CITIES ALTERNATIVE FUEL VEHICLE GRANT PROGRAM FUNDED UNDER THE AMERICAN RECOVERY AND REINVESTMENT ACT

**CLEAN CITIES ALTERNATIVE FUEL VEHICLE GRANT PROGRAM**

We found the Department of Energy (Department) had followed established procedures for the solicitation, merit review and selection of the Clean Cities projects. However, the Department had not always effectively managed the use of American Recovery and Reinvestment Act of 2009 (Recovery Act) funding and other post-award aspects of the Clean Cities Alternative Fuel Vehicle Grant Program (Clean Cities Program). In particular, we found issues pertaining to questionable reimbursements and cost-share contributions, costs incurred prior to award, and recipient procurement decisions that had not been documented as required by Federal regulations. As a result of the identified issues, we questioned about $5 million in incurred costs and about $2 million in cost-share contributions claimed by recipients (See Appendix 1).

Questionable Reimbursements and Cost-Share Contributions

The Department approved questionable reimbursement claims and cost-share contributions for three of the seven recipients we reviewed. In one case, we noted that the Department reimbursed a recipient for unsubstantiated costs claimed and approved unsupported cost-share contributions totaling approximately $2.1 million. The unsubstantiated costs and cost-share contributions were especially troubling and resulted from transactions involving a potential conflict of interest. Specifically, one recipient awarded funding to an individual who was also a Clean Cities coalition member to construct alternative fuel-dispensing pumps at seven fueling stations. We determined that the coalition member claimed and was reimbursed by the Department approximately $1.5 million for fuel station upgrades despite the fact that the upgrades included equipment not related to the purpose of the grant. Additionally, upgrades to the fueling stations represented a potential conflict of interest because the coalition member leased the fueling stations from a family member's company in which the individual served as the vice-president. We also questioned approximately $615,000 claimed as a cost-share contribution resulting from the same questionable, related-party lease transaction. Unsubstantiated cost-share contributions increased the risk that the Department could pay more than its agreed upon share of project costs (See Appendix 1, Example 1).

Department officials informed us they were pursuing questionable payments to, and cost-share contributions from, the recipient at the time of our audit. Based on documents provided by the Department to us, the contracting officer disallowed the entire

cost-share associated with the leases and reduced total project costs by approximately $2 million, in part, as a result of the potential conflict of interest we identified during our review.

The Department paid a second recipient $250,000 for costs that were incurred over 3 months prior to the authorized grant award spending date of July 2009. The recipient requested reimbursement for a down payment it had made in April 2009, on an alternative-fueling station. Recipient officials informed us that they had requested reimbursement because the station was not completed until months after the authorized spending date. Department officials told us that they had overlooked the date and erred in approving the amount submitted. As a result of our audit, the Department recovered the $250,000 (See Appendix 1, Example 2).

Finally, the Department approved nearly $164,000 in cost-share contributions that were unsupported, including credit for contributing $83,000 in coalition expenses and $81,000 in unsupported labor and materials costs. According to the budget documents, the cost-share contributions for the $83,000 in coalition expenses were not part of the approved budget. As a result of our audit, Department officials required the recipient to either exclude these costs from its next invoice or revise and justify its formerly approved budget. The same recipient claimed that it had contributed approximately $81,000 toward its cost-share commitment for other labor and materials costs. However, the available documentation lacked the information needed to adequately support the reasonableness of costs, such as actual labor hours and invoices for purchased equipment. Consequently, we questioned the cost-share contributions (See Appendix 1, Example 3). The Department stated the $81,000 in questioned cost-share represented a portion of a fixed-price contract between the prime and subcontractor attributable to the grant, and therefore, was not subject to delivery of additional supporting data such as hourly wages, labor hours completed and material costs. However, the available documentation submitted to the Department, as part of the reimbursement request, lacked evidence that the costs claimed corresponded to the items in the approved project budget and did not contain costs specifically unallowable such as Federally-sourced funds.

### Recipient Procurements

Of the seven grant recipients reviewed, we found three had procured goods and services totaling nearly $20 million without

documenting the results of award decisions and/or identifying potential conflicts of interest.  Specifically:

- Despite Federal regulations and the Department's detailed instructions, one recipient had awarded contracts totaling approximately $13 million for the construction of 10 alternative-fuel stations and purchases of alternative-fuel vehicles, without documenting the results of its award decisions, including its cost/price analyses.  Specifically, without publicly soliciting bids, the recipient awarded contracts for widely available services such as project management, consulting, software implementation, and outreach, in addition to construction of fueling infrastructures.  Coalition officials informed us that they "did not issue any bid requests" or "solicit bids" for any of the contracts awarded.  Instead they relied on proposals prepared by interested parties that had been made aware of funding through word of mouth and a coalition email to a network of associates.  Additionally, the coalition could not provide us with any documentation that it had analyzed the competing unsolicited proposals that it received nor could it provide us with a documented justification for its selection decisions.  In our view, the lack of a publicaly announced solicitation for bids, as was made by other coalition recipients, and the lack of any costs/price analyses of alternative proposals raises questions about the reasonableness of subcontract costs incurred by the recipient.  Accordingly, we questioned approximately $3 million paid to the recipient by the Department and nearly $1 million in cost-share commitments as of the date of our review (see Appendix 1, Example 4).

- Two recipients had awarded contracts, even though potential conflicts of interest existed.  Coalitions are comprised of geographically-based networks of individuals and organizations with mutual interests.  Their very structure makes coalitions vulnerable to doing business within an established network and may affect achievement of the Recovery Act's requirements to promote accountability and transparency.  Given the millions of dollars in awards received and distributed by coalitions, we are concerned about potential conflicts of interest we observed during our review.  For example:

➢ A recipient awarded nearly $6.5 million of its almost $15 million grant to companies either owned by or employing board members of its participating coalition. While the recipient had solicited bids, its awards were of particular concern, because entities associated with the coalition board members received over 40 percent of the available funding, and there was no documentation demonstrating that the recipient had taken action to mitigate the potential conflicts of interest. The recipient told us that the coalition board members who received subcontracts were not involved in the selection of subcontractors. The subcontractor selection was made by employees of the recipient; however, both selection officials were also members of the coalition board. There was no documentation supporting that coalition board members were excluded from the selection process. Additionally, the recipient did not have any documentation showing how it mitigated the appearance of a conflict of interest created by both selection officials also being on the coalition board with other members who were either employed by, or owners of, companies that submitted subcontract proposals and subsequently received awards. As of the date of our review, the Department had paid the recipient about $170,000 for costs incurred and allowed nearly an additional $375,000 in cost-share contributions (see Appendix 1, Example 5).

Department officials stated that because the recipient was solely responsible for subcontract selection, there did not appear to be a conflict of interest. However, as discussed above, in our view, the appearance of a conflict of interest existed because the selecting officials were also coalition board members, who served with other members awarded subcontracts.

➢ Another coalition recipient had used approximately $33,000 of its grant funds to pay for administrative services provided by a consulting company owned by the coalition president. Further, the coalition noncompetitively awarded a $360,000 subcontract

for grant administration to an investment company after the coalition president became the investment company's vice-president. Although there was no indication the individual personally approved the contract, the coalition president's continuing role, in our view, gives rise to a potential conflict of interest in monitoring and overseeing expenditures under the contract. During our review, we found no evidence of a mitigation plan for the potential conflicts of interest at the Department or the recipient level. As of our review, the Department had reimbursed the investment company over $72,000. We questioned approximately $105,000 of administrative costs incurred and paid to various subcontractors as of the date of our review (See Appendix 1, Example 6).

The Department disagreed that the above situation created an appearance of a potential conflict of interest. Specifically, the Department stated the coalition president prepared the initial application for the Clean Cities Program award and had substantial knowledge about the entire project and requirements that could not be quickly replaced. Further, the Department noted that the coalition initially did not have a mechanism to pay the president, so the coalition paid the individual through the president's own consulting company. Subsequently, the coalition decided to subcontract with the investment company when the individual changed employment because it wanted to retain the individual's services and to ensure continuity in administering the grant. According to the Department, the individual was recused from the decision to select the new company to administer the grant.

Despite the Department's assertions, we noted that as the coalition president and board member, the individual was ultimately responsible for payments to its consulting company. Additionally, while the Department stated that the coalition did not have a mechanism to pay the individual, we noted that the individual became a paid coalition employee for a short period of time before changing employment to the investment company. In addition, an

Page 5

Details of Finding

independent audit of the recipient specifically identified the relationship between the coalition president, the individual's consulting company, and the investment company as a related-party transaction.  Such disclosures are made to address potential conflicts of interest.

Federal regulations expressly prohibit individuals from entering into any contract if a real or perceived conflict of interest exists.  Specifically, 10 CFR 600.142 governing non-profit organizations states that:

> *"No employee, officer, or agent shall participate in the selection, award, or administration of a contract supported by Federal funds if a real or apparent conflict of interest would be involved.  Such a conflict would arise when the employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in the firm selected for an award. The officers, employees, and agents of the recipient shall neither solicit nor accept gratuities, favors, or anything of monetary value from contractors, or parties to sub-agreements."*

The importance of ensuring fair and open competition, free from any potential conflicts of interest, cannot be overstated.

**GRANT ADMINISTRATION**

Inadequate policies and procedures and ineffective oversight contributed to the grant administration issues we identified.  Specifically, we found the Department had not developed formal policies and procedures requiring officials to review funded projects for potential conflicts of interest and to ensure that recipients met Federal procurement requirements pertaining to the reasonableness of costs.  While the Department's guidance on Financial Assistance Awards required a "consideration" of the relationships among partnerships or consortiums during the award process, the guidance did not contain formal procedures that required Federal project managers to review relationships and transactions that may create conflicts of interest.  Our review of award files found no evidence that the Department had reviewed the grants for potential conflicts of interest.  In fact, prior to our audit, Department officials were unaware of the previously cited example in which a coalition board member's company had been awarded a contract and was claiming lease payments to a family-

DOE AR 000098

owned company despite information being in the award files that, in our view, should have led the Department to question the relationship.

Additionally, although Federal regulations and associated award cost principles require recipients to provide adequate support for their claims for reimbursement, the Department had not thoroughly reviewed recipient requests to ensure all costs were reasonable and well documented.  The Department's project officer and contracting specialist are responsible for reviewing requests for reimbursement and cost-share contributions for reasonableness and allowability.  However, our review showed the Department had approved cost-reimbursement requests and cost-share claims without sufficient documentation to justify approval.  Finally, while the Department generally performs site visits to recipients, we found that these visits focus on technical aspects of the projects and do not include reviews of compliance with Federal procurement requirements.

Management officials told us that grant recipients were primarily responsible for ensuring compliance with Federal procurement and conflict of interest rules.  Further, management stated that the Department relies on the recipients' vigilance to ensure that Federal funds are efficiently managed.  We are, however, concerned that the risk of fraud, waste and abuse is increased if the Department does not provide adequate oversight to ensure the reasonableness of costs and mitigation of potential conflicts of interest.

Given the questionable claims, lack of information justifying the reasonableness of contract costs, and potential conflicts of interest, we questioned about $5 million in incurred costs and about $2 million in cost-share contributions claimed by recipients (See Appendix 1).  To its credit, as previously discussed, the Department acted on several issues identified during our audit and had resolved nearly $2.5 million in questioned costs and cost-share contributions.

**RECOMMENDATIONS**    Given the significant amount of funding remaining to be spent, the Department has an opportunity to ensure a successful path forward. To help achieve the objectives of the Recovery Act, we recommend that the Assistant Secretary for Energy Efficiency and Renewable Energy direct Clean Cities Program officials to:

1.  Develop formal procedures to identify and mitigate potential conflicts of interest and to enforce requirements pertaining to documentation of procurement decisions; and,

DOE AR 000099

2. Review recipient reimbursement requests for the allowability of costs incurred and cost-share amounts contributed.

Additionally, we recommend that the contracting officers for the Clean Cities Program:

3. Resolve questioned costs remaining of about $3.2 million and questioned cost-share claims of about $1.3 million (See Appendix 1).

**MANAGEMENT REACTION AND AUDITOR RESPONSE**

Management did not fully concur with our report. Specifically, officials did not agree with our findings and recommendations regarding policies and procedures governing procurements and potential conflicts of interest, nor did they agree that all costs identified in our report were questionable. In addition, management provided technical comments that are addressed in the body of the report. Management's comments and our responses are discussed below. Management's comments are included in their entirety in Appendix 3.

Management Comments

In response to Recommendation 1, management stated that it had already developed and implemented adequate policies and procedures for the selection and administration of its financial assistance awards and disagreed with our finding regarding a recipient's procurement of services without free and open competition. Specifically, management noted that the recipient in question had competed subcontracts prior to their awards, and therefore, was not required to follow Federal procurement requirements. Management stated that requiring competition post-award might have altered the composition of the assembled teams, a major factor in the selection of the recipient. Regarding our concerns about the existence of potential conflicts of interest, management noted that under applicable regulations, recipients bear the primary responsibility for identifying and mitigating real or apparent conflicts. Management stated that when it receives allegations of potential conflicts of interest, it collaborates with the recipient to investigate and determine appropriate mitigation measures when required. After reviewing the circumstances surrounding the potential conflicts of interest identified in our audit, management concluded that recipients appropriately identified and mitigated the potential conflicts.

DOE AR 000100

Management concurred with Recommendation 2; however, it asserted that contracting officers currently review reimbursement requests for allowability of costs incurred and cost-share amounts contributed and would continue to do so.

Finally, in response to Recommendation 3, management stated that contracting officers had reviewed the costs and cost-share claims that we questioned and deemed $640,000 as unallowable.  As discussed, the Department had taken action on approximately $2.5 million in questioned costs and cost-share contributions. Management did not concur with other costs we questioned, totaling about $4.5 million relating to unsupported costs, conflicts of interest, and procurement concerns (See Appendix 1).

Auditor Response

We do not believe management's response fully and satisfactorily addresses our audit findings and recommendations.  Regarding management's position on procuring services, we noted that although one of the recipients discussed in our report had selected subcontractors before the award, it had not selected them through a competitive process, as asserted by management.  Ultimately, the recipient awarded $13 million in subcontracts without ensuring that these subcontracts were the most cost-effective means of achieving program goals and in the best interest of the taxpayers. Additionally, the subcontracts discussed in our report were actually awarded subsequent to the grant awards.  Under Federal regulations, the recipients, therefore, were required to either bid for services or prepare cost/price analyses justifying the reasonableness of costs, neither of which was done.  In further support of our position, we note that recipients other than the ones cited in our report had solicited bids with no reported harmful effects on teaming arrangements.

Regarding potential conflicts of interest, we underscore the importance of the Department's oversight in ensuring the integrity of the Clean Cities Program.  Applicable regulations set a high bar to prevent real or apparent conflicts of interest for Departmental programs.  The existence, or even the perception, of a conflict of interest undermines the public's confidence in the integrity of the Department's Clean Cities Program.  We remain concerned that significant contracts were ultimately awarded to businesses owned by or employing recipient board members and to employees or their families.  Neither the recipients nor the Department had taken

what we would consider to be appropriate action to protect taxpayer interests in ensuring that contracts are selected, awarded and administered free of potential conflicts of interest.

While we agree that the Department has numerous policies and procedures regarding the award and administration of financial assistance, we noted the Clean Cities Program did not have formal procedures requiring officials to review available information submitted by recipients regarding potential conflicts of interest and to enforce requirements pertaining to the documentation of procurement decisions.

Further, although contracting officers reportedly reviewed reimbursement requests for allowability of costs incurred and cost-share amounts contributed, our audit showed that cost-reimbursement requests and cost-share claims were approved by project officers and contracting specialists without sufficient documentation to justify approval. Therefore, we reaffirm our recommendation that program officials review recipient reimbursement requests for the allowability of costs incurred and cost-share amounts contributed.

We appreciate the actions taken by the Department to recover and resolve $640,000 in incurred costs and cost-share contributions, as well as the questionable costs resolved by the Department during the course of our review. We encourage management to reconsider its positions regarding our concerns with conflicts of interest and procurement, and accordingly, we reaffirm our recommendation that the contracting officers review about $4.5 million in questioned costs and cost-share claims as part of an official determination regarding cost allowability.

DOE AR 000102

**Appendix 1**

**QUESTIONED COSTS**

Table I

| Example | Incurred Costs | Cost-Share | Resolved by Department |
|---|---|---|---|
| 1. Transactions Involving a Potential Conflict of Interest | $1,500,000 | $615,000 | $2,115,000 |
| 2. Costs Incurred Prior to Award | $250,000 | $0 | $250,000 |
| 3. Excessive and Unsupported Cost-Share | $0 | $164,000 (Excluded in Cost-Share Total) | $83,000 |
| 4. Lack of Documented Award Decision (Includes $164,000 identified in Cost-Share Example 3) | $3,000,000 | $1,000,000 | $0 |
| 5. Potential Conflict of Interest with Board Members | $170,000 | $375,000 | $0 |
| 6. Charges Incurred by President of Coalition's Company and Contract Awarded to New Company | $105,000 | $0 | $0 |
| TOTAL | $5,025,000 | $1,990,000 | $2,448,000 |
| | | | |
| TOTAL REMAINING TO BE RESOLVED | $3,275,000 | $1,292,000 | |

Questioned Costs

DOE AR 000103

## Appendix 2

**OBJECTIVE**    To determine whether the Department of Energy (Department) had effectively managed the Clean Cities Alternative Fuel Vehicle Grant Program (Clean Cities Program) funded under the American Recovery and Reinvestment Act of 2009 (Recovery Act).

**SCOPE**    This audit was performed between June 2010 and April 2012, at the Department's Headquarters in Washington, DC, and the National Energy Technology Laboratory in Morgantown, WV and Pittsburgh, PA.  In addition, we conducted site visits with seven recipients and 34 sub-recipients.

**METHODOLOGY**    To accomplish the objective, we:

- Obtained and reviewed relevant laws and regulations related to implementation of the Recovery Act and financial assistance awards administration;

- Reviewed the Funding Opportunity Announcement, merit review information, and selection documentation;

- Conducted site visits to seven recipients and 34 sub-recipients to observe assets purchased and future sites of projects, interview officials, and analyze financial transactions and implementation of financial assistance requirements as prescribed by the terms and conditions of the awards;

- Reviewed all invoices submitted for reimbursements made through the date of our site visits with each recipient;

- Obtained access to the Department's Strategic Integrated Procurement Enterprise System and reviewed individual award files for the seven selected recipients;

- Interviewed project officers, contract specialists and the contracting officer for each of the seven recipient awards; and,

- Conducted interviews and meetings with Department officials and General Counsel.

Objective, Scope and Methodology

DOE AR 000104

## Appendix 2 (continued)

We conducted this performance audit in accordance with generally accepted Government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective. Accordingly, we assessed significant internal controls and compliance with laws and regulations to the extent necessary to satisfy the audit objective. In particular, we assessed the Department's implementation of the *GPRA Modernization Act of 2010* and determined that it had established performance measures for the management of the Clean Cities Program. Because our review was limited, it would not necessarily have disclosed all internal control deficiencies that may have existed at the time of our audit. Finally, we conducted an assessment of computer-processed data relevant to our audit objective and found it to be reliable.

Department officials waived an exit conference.

DOE AR 000105

## Appendix 3

## MANAGEMENT COMMENTS



**Department of Energy**
Washington, DC 20585

March 14, 2012

MEMORANDUM FOR:    GREGORY H. FRIEDMAN
                   INSPECTOR GENERAL
                   OFFICE OF INSPECTOR GENERAL

FROM:              KATHLEEN B. HOGAN
                   DEPUTY ASSISTANT SECRETARY FOR ENERGY EFFICIENCY
                   ENERGY EFFICIENCY AND RENEWABLE ENERGY

SUBJECT:           Response to Office of Inspector General Draft Audit Report on "The
                   Department of Energy's Clean Cities Alternative Fuel Vehicle Grant
                   Program Funded under the American Recovery and Reinvestment Act"

The Office of Energy Efficiency and Renewable Energy (EERE) appreciates the opportunity to review the Inspector General's (IG) Draft Audit Report entitled, "The Department of Energy's (DOE) Clean Cities Alternative Fuel Vehicle Program Funded under the American Recovery and Reinvestment Act." The DOE welcomes the opportunity to work with the IG to improve the Clean Cities program award administration. With this memorandum, we first provide some background on the Clean Cities grant program and then our response to the draft audit.

### BRIEF BACKGROUND

Section 721 of the Energy Policy Act of 2005 (EPACT 2005) authorizes the establishment of a competitive grant pilot program to be administered through the Clean Cities Program, to provide not more than 30 geographically dispersed project grants to State governments, local governments, and/or metropolitan transportation authorities, in partnership with an active designated Clean Cities Coalition(s). Through funding provided under the American Recovery and Reinvestment Act of 2009 (ARRA), the Clean Cities Program selected 25 projects postured to speed the transformation of the nation's vehicle fleet, putting more than 8,000 alternative fuel and energy efficient vehicles on the road, and establishing over 1,400 refueling stations across the country.

The ARRA funded projects have already deployed over 5,200 alternative fuel vehicles with an additional 1,800 in the pipeline for deployment in the near term. These vehicles are supported by over 732 operational fueling sites with another 160 in process for near term completion.

### Summary of DOE Position

EERE is committed to effective grants management and strives to implement sound grants management practices. The IG audit has identified a number of issues, some of which DOE concurs with. However, DOE does not concur with many of the IG findings contained in the draft IG report. In this response, DOE notes additional information that may not be reflected in the report, but is relevant to a number of the findings. The DOE Clean Cities Program was provided $300 million in funding to accelerate the progress of the program. To date, Clean Cities has judiciously reimbursed more than $155 million in


Printed with soy ink on recycled paper

## Appendix 3 (continued)

payments. It is important to note that while we take all audit findings seriously, the IG's findings in this case pertain to just 0.4% of the total payments executed by the DOE under this program thus far.

**RECOMMENDATION #1:** *"Develop formal procedures to identify and mitigate potential conflicts of interest and to enforce procurement requirements pertaining to documentation of procurement decisions."*

**MANAGEMENT RESPONSE:**

The Department has already developed, and currently utilizes, adequate policies and procedures that reflect government-wide standards for the award and administration of financial assistance. Financial assistance recipients are not required to comply with the Federal procurement requirements of the FAR. DOE has regulations which provide the administrative requirements and operational rules for carrying out financial assistance award and administration. The DOE Financial Assistance Rules, 10 CFR Part 600, implement the Federal Grant and Cooperative Agreement Act (FGCA) of 1977 (31 U.S.C. 6301-08) (which establishes criteria for determining whether a transaction is financial assistance) and establish uniform policies and procedures for the award and administration of DOE financial assistance. Codified into 10 CFR 600 are the Government-wide administrative requirements that apply to financial assistance agreements. These requirements stem from certain Office of Management and Budget (OMB) Circulars. To the extent the coverage of these OMB Circulars applies to recipients and subrecipients, they have been incorporated into 10 CFR Part 600 either in full text or by reference. The OMB Circulars incorporated into the regulations are:

> OMB Circular A-110, Uniform Administrative Requirements for Grants and Cooperative Agreements With Institutions of Higher Education, Hospitals and Other Non-Profit Organizations,

> OMB Circular A-102, Grants and Cooperative Agreements with State and Local Governments,

> OMB Circular A-133, Audits of States, Local Governments and Non-Profit Organizations (the Single Audit Act), and the circulars for cost principles,

> OMB Circular A-21, Cost Principles for Educational Institutions,

> OMB Circular A-87, Cost Principles for State, Local and Indian Tribal Governments, and

> OMB Circular A-122, Cost Principles for Non-Profits.

DOE also has established administrative requirements and operational rules for financial assistance awards to for-profit organizations in subpart D of 10 CFR 600 — Uniform Administrative Requirements for Grants and Cooperative Agreements With For-Profit Organizations.

In addition to the above statutes and regulations, DOE periodically issues guidance to Contracting Officers by way of the DOE Financial Assistance Guide, Financial Assistance Letters, and policy flashes.

The DOE awards and administers its financial assistance projects in accordance with 10 CFR600. With respect to conflicts of interest, 10 CFR § 600.142 and .143 places primary responsibility for identification and mitigation of real or apparent conflicts of interest on the recipient by requiring them to maintain organizationally written standards, plans or policies governing procurement transactions. Likewise, 10 CFR 600.236 places similar responsibilities on state and local government recipients. Further oversight

## Appendix 3 (continued)

of conflicts of interest is evident in 10 C.F.R. § 600.126 which requires recipients to undergo an audit subject to the requirements of the Single Audit Act and revised OMB Circular A-133, which includes a review of potential financial conflicts of interest.

10 CFR 600 contains requirements pertaining to the recipient's post-award procurements of supplies and other expendable property, equipment, real property, and other services with Federal funds. These procurements shall be conducted in a manner to provide open and free competition to the "maximum extent practical." DOE notes that: 1) The specific IG findings in the report involve financial assistance awards in which the subawards *were* competed prior to proposal submittal and financial assistance award; that *process* is not required to be documented, however, the resulting technical and budget proposal submitted (which included the subaward details) was reviewed by DOE according to the criteria set forth in the FOA and approved for award; 2) The government solicitation resulted in a second competition (competing project teams, work proposed and overall cost); and 3) Requiring recompetition of the established team members post award potentially would have altered the composition of the assembled team – with the team members typically being a major factor in the selection of the award.

**RECOMMENDATION #2:** *"Review recipient reimbursement requests for the allowability of costs incurred and cost share amounts contributed."*

**MANAGEMENT RESPONSE:** The DOE concurs with this IG recommendation. The Contracting Officers for the program reviewed the costs and cost share claims identified by the IG and worked expeditiously to resolve costs and cost share claims in the amount of $640K. The DOE Contracting Officers currently review reimbursement requests for the allowability of costs incurred and cost share amounts contributed and will continue to do so.

**RECOMMENDATION #3:** *"Resolve questioned costs remaining of about $3.3M and questionable cost share claims of $1.3M."*

**MANAGEMENT RESPONSE:** The IG audit identified approximately $640K of questioned costs that were later deemed unallowable costs by the Contracting Officer. These were incorrectly approved for reimbursement by the DOE and represent findings that would be expected of an audit. This further enforces the usefulness of independent audits, which are required by the regulations (See generally, 10 CFR § 600.126). The following table describes the types of unallowable costs noted by the audit team that the Contracting Officer determined to be actionable by the DOE. The remaining costs identified by the IG report as "questionable;" are addressed in the applicable sections of this response and are not concurred upon by the DOE Contracting Officer.

Table 1: Audit Team Unallowable Cost Findings

|  |  | DOE Action Taken |
|---|---|---|
| Unsubstantiated Lease Value | $307,000 | Disallow Cost |
| Costs Not Identified in Project Budget | $83,000 | Disallow Cost |
| Unallowable Pre-Award Cost (Down Payment) | $250,000 | Disallow Cost |
| Total | $640,000 | |

IG Report No.  <u>OAS-RA-12-12</u>

## CUSTOMER RESPONSE FORM

The Office of Inspector General has a continuing interest in improving the usefulness of its products.  We wish to make our reports as responsive as possible to our customers' requirements, and, therefore, ask that you consider sharing your thoughts with us.  On the back of this form, you may suggest improvements to enhance the effectiveness of future reports.  Please include answers to the following questions if they are applicable to you:

1.  What additional background information about the selection, scheduling, scope, or procedures of the audit or inspection would have been helpful to the reader in understanding this report?

2.  What additional information related to findings and recommendations could have been included in the report to assist management in implementing corrective actions?

3.  What format, stylistic, or organizational changes might have made this report's overall message more clear to the reader?

4.  What additional actions could the Office of Inspector General have taken on the issues discussed in this report which would have been helpful?

5.  Please include your name and telephone number so that we may contact you should we have any questions about your comments.

Name _____     Date _____

Telephone _____     Organization _____

When you have completed this form, you may telefax it to the Office of Inspector General at (202) 586-0948, or you may mail it to:

Office of Inspector General (IG-1)
Department of Energy
Washington, DC 20585

ATTN:  Customer Relations

If you wish to discuss this report or your comments with a staff member of the Office of Inspector General, please contact our office at (202) 253-2162.

DOE AR 000109

This page intentionally left blank.

DOE AR 000110

The Office of Inspector General wants to make the distribution of its reports as customer friendly and cost effective as possible.  Therefore, this report will be available electronically through the Internet at the following address:

U.S. Department of Energy Office of Inspector General Home Page
http://energy.gov/ig

Your comments would be appreciated and can be provided on the Customer Response Form.

DOE AR 000111



An official website of the United States government    Here's how you know

**U.S. DEPARTMENT** *of* **ENERGY**    Policy & Priorities    Leadership & Organization    Topics    News & Events    About    **Funding Opportunities**

Office of Inspector General    Audit Report: OAS-RA-12-12

# Audit Report: OAS-RA-12-12

The Department of Energy's Clean Cities Alternative Fuel Vehicle Grant Program Funded under the American Recovery and Reinvestment Act

[Office of Inspector General](#)

May 22, 2012

Estimated Read Time 2 min

May 22, 2012

**The Department of Energy's Clean Cities Alternative Fuel Vehicle Grant Program Funded under the American Recovery and Reinvestment Act**

Under the American Recovery and Reinvestment Act of 2009 (Recovery Act), the Department of Energy's (Department) Clean Cities Alternative Fuel Vehicle Grant Program (Clean Cities Program) received nearly $300 million, or 30 times its Fiscal Year 2009 funding of approximately $10 million. From this amount, the Department awarded grants ranging from $5 million to $15 million to 25 recipients, including Clean Cities coalitions and other entities that partnered with coalitions. Clean Cities coalitions are volunteer groups that join with public and private sector organizations to promote alternative and renewable fuels, fuel economy measures and new technologies.

Our review disclosed that the Department had followed established procedures for the solicitation, merit review and selection of the Clean Cities projects. However, the Department had not always effectively managed the use of Recovery Act funding and other post-award aspects of the Clean Cities Program. In our review of seven recipients, we found that the Department had inappropriately: 1) reimbursed a recipient about $1.5 million for costs incurred even though the costs were not substantiated, and approved $615,000 in unsubstantiated cost-share contributions; 2) paid one recipient $250,000 for a down payment on an alternative-fueling station that had been invoiced 3 months prior to the grant's authorized spending date of July 2009; 3) approved a claim for $164,000 in cost-share contributions even though the recipient lacked documentation supporting the reasonableness of costs; and, 4) allowed three recipients to award almost $20 million without documenting their decisions to award contracts and/or identifying potential conflicts of interest as required by Federal procurement regulations. In total, we questioned about $5 million in direct payments to recipients and nearly $2 million cost-share contributions claimed by recipients.

**Topic: Financial Assistance**

**Audit Report: OAS-RA-12-12**

DOE AR 000112

## Committed to Restoring America's Energy Dominance.

### Quick Links

Leadership & Offices

Newsroom

Contact Us

Careers

### Resources

Budget & Performance

Directives, Delegations, & Requirements

Freedom of Information Act (FOIA)

Inspector General

Privacy Program

### Federal Government

USA.gov

The White House

## Follow Us

Open Gov        Accessibility        Privacy        Information Quality        No Fear Act        Web Policies        Vulnerability Disclosure Program

Whistleblower Protection        Equal Employment Opportunity        Notice of Court Orders

DOE AR 000113

**U.S. Department of Labor**

Office of Inspector General—Office of Audit

**EMPLOYMENT AND TRAINING ADMINISTRATION**

 

# RECOVERY ACT: GREEN JOBS PROGRAM REPORTS LIMITED SUCCESS IN MEETING EMPLOYMENT AND RETENTION GOALS AS OF JUNE 30, 2012

| | |
|---|---|
| **Date Issued:** | October 25, 2012 |
| **Report Number:** | 18-13-001-03-390 |

DOE AR 000114

DOE AR 000115

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Audit**

# BRIEFLY…

Highlights of Report Number: 18-13-001-03-390 to the Assistant Secretary for Employment and Training.

## WHY READ THE REPORT

The Recovery Act provided $500 million for research, labor exchange, and job training projects to prepare workers for careers in energy efficiency and renewable energy. The main focus of the Green Jobs training program was to prepare individuals for jobs in Green industry sectors.

On September 30, 2011 we issued a report entitled, "Recovery Act: Slow Pace Placing Workers into Jobs Jeopardizes Employment Goals of the Green Jobs Program." We reported that grantees might not be able to meet their planned expenditures or goals for placing participants before grant periods expired.

This is a follow-up audit that was conducted as part of our oversight responsibilities and in response to a request for an update on our previous audit from the Honorable Darrell E. Issa, Chairman, House Oversight and Government Reform Committee.

## WHY OIG CONDUCTED THE AUDIT

Our overall audit objective was to assess the impact of the Green Jobs training program by answering the following questions:

1) Who was served and what training did participants receive?

2) What were the entered employment and retention outcomes for participants?

## READ THE FULL REPORT

To view the report, including the scope, methodology, and full agency response, go to:
http://www.oig.dol.gov/public/reports/oa/2013/18-13-001-03-390.pdf.

**October 2012**
## Recovery Act: Green Jobs Program Reports Limited Success in Meeting Employment and Retention Goals as of June 30, 2012

## WHAT OIG FOUND

As of June 30, 2012, with 88 percent of the extended grant periods having elapsed, the impact of the Recovery Act Green Jobs training program has been limited in terms of reported employment outcomes. Complicating the assessment of the program's overall impact was the inability of sampled grantees to document between 24 percent and 44 percent of their reported employment outcomes.

Out of a target of 81,254, grantees collectively reported 30,857 participants (38 percent) entered employment. While grantees reported that 49 percent of participants who obtained jobs retained employment for at least 6 months, the reported number retained of 11,613 represents only 16 percent of the planned retention goal of 71,017. Moreover, 42,322 participants (52 percent) who completed training were incumbent workers, meaning the participants were already employed when they entered the program. Grantees were authorized to train incumbent workers who needed training to secure full-time employment, advance their careers, or retain their current jobs. However, for the 81 incumbent workers we identified in our sample, we found no evidence that they needed green job training for any of these purposes.

Other issues that have a direct bearing on determining the success of the program include: value of credentials, duration of training, impact of grant period extensions, and limitations of available employment and retention data.

## WHAT OIG RECOMMENDED
We recommended that the Assistant Secretary for Employment and Training develop and utilize lessons learned from the Recovery Act Green Jobs training program, and improve the quality of grantee reported performance data.

In response to the draft report, the Assistant Secretary for Employment and Training indicated that the audit report did not fully capture the results of the program as of June 30, 2012, but agreed to consider the OIG's recommendations to improve grant programs performance.

U.S. Department of Labor – Office of Inspector General

**PAGE INTENTIONALLY LEFT BLANK**

DOE AR 000117

U.S. Department of Labor – Office of Inspector General

# Table of Contents

**Assistant Inspector General's Report** ................................................................ 1

**Who was served and what training did participants receive?** ................................... 6

**What were the employment and retention outcomes for participants?** ................. 15

**Exhibits**

Exhibit 1 Eight Sampled Grantees.................................................................... 35
Exhibit 2 Participant Characteristics .................................................................. 37
Exhibit 3 Extended Green Job Training Grants ................................................... 39
Exhibit 4 Disparate Goals Planned by Grantees ................................................ 41
Exhibit 5 Grant Awards, Expenditures, and Training Outcomes for All
                    Grants as of June 30, 2012 .................................................. 43

**Appendices**

Appendix A Background ................................................................................ 53
Appendix B Objective, Scope, Methodology, and Criteria .................................. 55
Appendix C Acronyms .................................................................................. 59
Appendix D Glossary..................................................................................... 61
Appendix E ETA Response to Draft Report....................................................... 63
Appendix F Acknowledgements ..................................................................... 67

DOE AR 000118

**PAGE INTENTIONALLY LEFT BLANK**

DOE AR 000119

**U.S. Department of Labor**

Office of Inspector General
Washington, D.C. 20210



### Assistant Inspector General's Report

October 25, 2012

Ms. Jane Oates
Assistant Secretary
  for Employment and Training
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C. 20210

The American Recovery and Reinvestment Act of 2009 (Recovery Act) was signed by President Obama on February 17, 2009. The purpose of the Recovery Act was to assist those most impacted by the recession by creating and preserving jobs. The Recovery Act provided $500 million for research, labor exchange, and job training projects to prepare workers for careers in energy efficiency and renewable energy as described in section 171(e)(1)(B) of the Workforce Investment Act (WIA) - also known as *The Green Jobs Act of 2007*. The main focus of the Green Jobs program was to prepare individuals for jobs in Green industry sectors through three separate training areas: State Energy Section Partnership (SESP), Pathways Out of Poverty (Pathways), and Energy Training Partnership (ETP).

**Background: Office of Inspector General's (OIG) Prior Audit Work**

On September 30, 2011 we issued a report entitled, "Recovery Act: Slow Pace Placing Workers into Jobs Jeopardizes Employment Goals of the Green Jobs Program," report number 18-11-004-03-390. This report was in response to a request from the Honorable Charles E. Grassley, then Ranking Member of the Senate Committee on Finance. Specifically, Senator Grassley requested an audit of Recovery Act funds spent on green jobs, the definition used by the Department of Labor for what constitutes a green job, and the number and duration of the jobs created pursuant to the funds expended.

We reported that grantees might not be able to meet their planned expenditures or goals for placing participants before grant periods expired. In response to our report, the Employment and Training Administration (ETA) stated it expected grantees' performance to increase significantly and all funds would be expended by September 30, 2013. Since our report was issued, ETA extended 46 of the 63 Pathways and ETP grant periods of performance set to expire in January 2012 from 2 months to 1 year to allow grantees additional time to expend funds and assist participants with training and employment. Furthermore, ETA extended 9 of the 34 SESP grants set to expire in

DOE AR 000120

January 2013 by 5 to 6 months. Currently, all grants are scheduled to end by July 31, 2013.

## Objective

We conducted this follow-up audit as part of our audit oversight responsibilities and in response to a request for an update on our previous audit from the Honorable Darrell E. Issa, Chairman, House Oversight and Government Reform Committee. Our overall audit objective was to assess the impact of the Green Jobs training program by answering the following questions: 1) Who was served and what training did participants receive and 2) What were the entered employment and retention outcomes for participants?

## Scope and Methodology

We analyzed reported performance outcomes and expenditures for the universe of 97 training grants totaling $435.4 million based on grantee data as of June 30, 2012.[1] For employment retention, we considered entered employment only for participants placed on or before December 31, 2011, since this measure requires a participant to be employed two quarters after the employment date. We also selected a statistical sample of 8 grants totaling $40.1 million and covering 9,510 participants served. Fieldwork for sampled grants was conducted prior to the release of June 2012 data. Therefore, for our sampled grants, we reviewed March 31, 2012, training programs, expenditures and performance outcomes. Onsite reviews were conducted for all sampled grants; and, within each grant, participants were randomly selected for testing. During onsite reviews, we reconciled costs and performance information reported to the general ledger and other records provided by the grantee. While statistically selected, the results of audit tests for the 463 participants selected at sampled grantees are only projectable to the sample of 8 grantees. (See Exhibit 1 for the 8 grantees.)

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. While grantee entered employment and retention data was limited in some cases, we believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

## Results In Brief

As of June 30, 2012, with 88 percent of the extended grant periods having elapsed, the impact of the Recovery Act Green Jobs training program has been limited in terms of reported employment outcomes. Complicating the assessment of the program's overall

---

[1] Since grantees continue to update and report participant training and employment activity, we used real-time data provided by ETA on August 21, 2012, representing performance outcomes as of June 30, 2012.

DOE AR 000121

impact was the inability of sampled grantees to document between 24 percent and 44 percent of their reported employment outcomes.

**Participants Served**. Grantees collectively reported serving 113,247 participants, or 90 percent of the targeted 126,493 participants. Of the participants served, 52,890 (47 percent) were incumbent workers, meaning the participants were already employed when they entered the program. Also, of those served, 84 percent were male, 45 percent were high school graduate or equivalent, and 44 percent had college or vocational school education. Grantees reported 49 percent of the participants were individuals in need of updated training related to the energy efficiency and renewable energy industries. Other individuals served included: the unemployed (42 percent); disadvantaged workers within areas of poverty, and seeking employment out of poverty and into self-sufficiency (22 percent); those impacted by the National Energy and Environmental Policy (10 percent); those with criminal records (9 percent); and veterans (7 percent).[2]

**Entered Employment and Retention**. Out of a target of 81,254, grantees collectively reported 30,857 participants (38 percent) entered employment. While grantees reported that 49 percent of participants who obtained jobs retained employment for at least 6 months, the reported number retained of 11,613 represents only 16 percent of the planned retention goal of 71,017. The low retention rate may be in part attributable to the timing of placement. For participants placed in the quarter ending June 30, 2012, retention information will not be available until the quarter ending December 31, 2012.

**Incumbent Workers**. Of the 81,354 participants who completed training, 42,322 (52 percent) were incumbent workers. Grantees were authorized to train incumbent workers who needed training to secure full-time employment, advance their careers, or retain their current jobs. However, for the 81 incumbent workers we identified in our sample, we found no evidence that they needed green job training for any of these purposes.

Based on ETA guidance, grantees reported incumbent workers as entered employment if they entered a new position of employment after program completion, even if the new position was with the same employer, as long as the individuals would utilize competencies acquired through training in their new position. Of the 30,857 participants grantees reported as having entered employment, 11,657 (or 38 percent) were incumbent workers, that is those who already held jobs when training began.

**Training-Related Employment**. Of the 30,857 participants grantees reported as having entered employment, grantees reported that 25,396 (or 82 percent) were employed in jobs that were either in the same occupation or industry as the training received, or the employer recognized the credential received by the participant.

---

[2] A participant may be included in multiple demographics. Therefore, the sum of these demographics exceeds 100 percent.

DOE AR 000122

**Availability and Reliability of Performance Data.** For the eight grantees in our sample, we attempted to verify grantee reported performance against available supporting documentation. The sampled grantees were unable to provide documentation for 24 percent of sampled participants reported as entered employment. Moreover, they could not provide documentation for 33 percent of sampled participants reported as entering training-related employment and 44 percent of sampled participants tested for retention. The inability to document reported program outcomes raises questions about what was achieved with the significant investment represented by this program.

In addition to the availability and reliability of performance data, we also identified other issues that have a direct bearing on determining the success of the program. Examples of these include the duration of training, value of credentials awarded, impact of grant period extensions, and the limitations of available employment and retention data that does not include specific information about jobs participants received.

ETA stated that once all grants have ended in September 2013, it will determine employment outcomes by using unemployment insurance and Federal employment records to obtain entered employment, employment retention and wages. ETA provided a summary of an analysis for participants that exited the program. The analysis showed that for 12,995 participants that exited by June 30, 2011, 57 percent entered employment, and for 6,701 participants that entered employment by December 31, 2010, 86 percent retained employment. The analysis also showed that annual wages averaged $25,926, and ranged from $10,065 for Pathway participants to $28,361 for ETP. However, this data is old because as of June 30, 2012, 113,247 participants were served and 81,354 completed training.

Also, ETA is conducting two comprehensive evaluations of these grants: *Green Jobs and Health Care Implementation Study,* an interim report was issued February 3, 2012, and the final is scheduled for release in January 2013; and *Green Jobs and Health Care Impact Study,* an interim report is expected in March 2014, and the final is scheduled for release in September 2017. However, because of the issues discussed throughout this report, ETA may face challenges in attempting to properly evaluate the program.

Finally, it is important to note that, while the results of this audit focused on the Recovery Act funded Green Jobs training program, the lessons learned and recommendations contained in this report apply to other discretionary grant programs and certainly to the existing Green Jobs training program funded through ETA's regular appropriation.

We recommend that the Assistant Secretary for Employment and Training develop and utilize lessons learned from the Recovery Act Green Jobs training program for future discretionary grant programs, and improve the quality of grantee reported performance data.

DOE AR 000123

**ETA's Response and OIG's Comments**

ETA acknowledged OIG's efforts to assess the results and costs to date of the Green Jobs training program. However, ETA indicated that the report did not reflect the progress of grantees from the beginning of the grants, and expressed concern that OIG did not utilize narrative performance information in assessing grantee outcomes. This notwithstanding, ETA agreed to consider OIG's recommendations to improve program performance.

The OIG audit was based on the latest data available for each participant served from the inception of the program through June 30, 2012, as reported to ETA by grantees. In its response, ETA includes performance data based on grantee quarterly summary reports. However, after grantees file the quarterly reports, they continue to update and report participant training and employment activity. The OIG used this updated, most current data for our audit. It is also important to note that the OIG stated in the report the problems with the accuracy and reliability of reported data, whether at the participant level or that contained in quarterly reports. This notwithstanding, the difference between the grantee performance data included in ETA's response versus the data used by the OIG is largely negligible. However, in the instance where there is a notable difference (the total entered employment as of December 31, 2011) we believe the number used by the OIG is appropriate. We have added clarification in the report. In summary, the OIG report contains data from the grant agreements approved by ETA at the inception of the program through the latest participant performance data available at the time of the audit, which we believe provides a complete picture of the progress of the grantees administering these grants to date.

ETA raised concerns that the OIG did not utilize narrative performance information, specifically information on participants placed in training-related employment prior to completion of training and the number of incumbent workers who retained their position as a result of grant-funded services. However, relevant ETA guidance states that the former should not be counted and, as noted in this report, we found no evidence that the incumbent workers in our sample required services or training to keep their job or obtain a new one.

Consistent with the recommendations in this report, we encourage ETA to apply the lessons gleaned from this program to improve all of its discretionary grant programs.

ETA's response is included in its entirety in Appendix E.

**RESULTS**

The purpose of the Recovery Act was to: (1) preserve and create jobs and promote economic recovery, and (2) assist those most impacted by the recession. The legislation did not define "most impacted," leaving ETA to provide guidance giving grantees discretion in determining which populations would be eligible for training.

DOE AR 000124

The Recovery Act further provided that the Green Jobs program target populations of eligible individuals to be given priority for training and other services, as follows:

1. Workers impacted by national energy and environmental policy;
2. Individuals in need of updated training related to the energy efficiency and renewable energy industries;
3. Veterans, or past and present members of the Armed Forces;
4. Unemployed individuals;
5. Individuals, including at-risk youth, seeking employment pathways out of poverty and into economic self-sufficiency; and
6. Formerly incarcerated, adjudicated, nonviolent offenders.

The main focus of the Green Jobs program was to prepare individuals for jobs in green industries through three separate training areas: SESP, Pathways, and ETP. Overall, the three areas received combined funding of $435.4 million and have reported expenditures of $328.5 as of June 30, 2012, as detailed in Table 1.

**Table 1: Awards and Expenditures for All Training Grants (as of June 30, 2012)**

| Grant Programs | No. of Grants Awarded | Amount Awarded (millions) | Reported Expenditures (millions) |
|---|---|---|---|
| SESP | 34 | $187.9 | $107.1 |
| Pathways | 38 | 147.7 | 130.1 |
| ETP | 25 | 99.8 | 91.3 |
| **Total** | **97** | **$435.4** | **$328.5** |

Source: Grantee reported expenditures

**Who was served and what training did participants receive?**

Participants Served

The Green Jobs program reported serving 113,247 participants, or 90 percent of the targeted 126,493, as of June 30, 2012. Of those served, 84 percent were male, 45 percent were high school graduate or equivalent, and 44 percent had college or vocational school education (see Exhibit 2 for participant characteristics). Most notably, however, incumbent workers comprised 47 percent of those served, 52 percent of those who completed training, and 38 percent of those reported as entered employment. These incumbent workers were individuals who already had jobs, but were enrolled in training in order to retain their jobs, obtain new work, or otherwise upgrade their skills.

Of the 113,247 participants served, grantees reported 49 percent as individuals in need of updated training related to the energy efficiency and renewable energy industries. The other individuals served were: the unemployed (42 percent); disadvantaged workers within areas of poverty and seeking employment out of poverty and into self-

DOE AR 000125

sufficiency (22 percent); impacted by the National Energy and Environmental Policy (10 percent); those with criminal records (9 percent); and veterans (7 percent).[3]

*Incumbent Workers: Employed participants served under these grants*

From the inception of the Green Jobs program, grantees enrolled incumbent workers. However, ETA did not provide guidance to grantees on how to report participants served including incumbent workers until March 3, 2010, approximately 2 months into the program. ETA's guidance defined incumbent workers as those who "need training to secure full-time employment, advance in their careers, or retain their current occupations, such as low-wage workers, workers who need to upgrade their skills to retain employment, and workers who are currently working part-time."[4] Furthermore, the guidance required that individuals in need of updated training related to the energy efficiency and renewable energy industries had to be:

- employed at time of participation; or
- terminated or laid-off or have received a notice of termination or lay-off from employment; or
- self-employed, but are now unemployed; and
- can benefit from training that will help them enter or advance in the energy efficiency and renewable energy industries to enter occupations within one or more of the "growth, enhanced, and emerging" green industries.

Three grantees in our sample of eight served a significant number of incumbent workers: Hawaii Department of Labor and Industrial Relations (Hawaii), Iowa Workforce Development (Iowa), and Washington State Workforce Training and Education Coordinating Board (Washington State). These grantees proposed serving incumbent workers in order to help upgrade their skills, retain employment or find new positions. However, our audit found no evidence that any of the 81 incumbent workers we identified in our sample needed green job training to secure a new job or retain their current jobs.

*Incumbent (Employed) Participant Eligibility Verification*

ETA required grantees to verify that all participants were eligible for the program. However, in its June 1, 2010 guidance, ETA left it up to the grantees to develop and apply objective guidelines to accomplish this. Our audit confirmed that self-attestation was the primary means of eligibility verification employed by grantees. However, ETA's guidance cautioned grantees about the risks of relying on self-attestation for

---

[3] A participant may be included in multiple demographics. Therefore, the sum of these demographics exceeds 100 percent.

[4] ETA stated this definition was only intended to apply to Health Care and Other High Growth and Emerging Industries grantees and does not apply to green job training grantees. However, ETA did not provide a valid explanation of why it would not apply, or an alternate definition. Moreover, the guidance clearly states that it applies to ETP, Pathways and SESP grants. Without a clear definition grantees run the risk of not serving those most in need as intended by the Recovery Act.

DOE AR 000126

documentation purposes, noting that self-attestation is more prone to error than many other forms of source documentation. Therefore, it should be the source documentation of last resort, and grantees should verify the information.

Training Completed

The Recovery Act provided seven energy efficiency and renewable energy industries eligible for training in the Green Jobs program. Grantees proposed 98,158 participants would complete training. As of June 30, 2012, 81,354 participants (83 percent) had completed training. Participants received training in the seven green job industries covered by the Recovery and Workforce Investment Acts, or in other green related industries. The training industry was not identified by grantees for the remaining 2,183 or 3 percent, of participants as shown in Table 2.

| Table 2: Completed Training by Industry Sectors for All Training Grants (as of June 30, 2012) | | | | | | |
|---|---|---|---|---|---|---|
| | | Incumbents | | Non-incumbents | | Combined | |
| Industry Trained | Trained | Rate | Trained | Rate | Trained | Rate |
| 1  Energy-Efficient Building, Construction, and Retrofit | 15,152 | 36% | 17,615 | 45% | 32,767 | 40% |
| 2  Renewable Electric Power | 4,988 | 12% | 6,309 | 16% | 11,297 | 14% |
| 3  Energy Efficiency Assessment | 4,452 | 11% | 1,855 | 5% | 6,307 | 8% |
| 4  Manufacturers that produce sustainable products | 2,745 | 6% | 1,392 | 4% | 4,137 | 5% |
| 5  Deconstruction and Materials Use | 360 | 1% | 1,087 | 3% | 1,447 | 2% |
| 6  Energy Efficient and Advanced Drive Train Vehicle | 753 | 2% | 404 | 1% | 1,157 | 1% |
| 7  Biofuels | 450 | 1% | 229 | 1% | 679 | 1% |
| Other Green Industries | 12,305 | 29% | 9,075 | 23% | 21,380 | 26% |
| Not Identified | 1,117 | 3% | 1,066 | 3% | 2,183 | 3% |
| Total | 42,322 | 100% | 39,032 | 100% | 81,354 | 100% |

Source: Grantee reported participant information

Grantees offered four different forums to train individuals: classroom, apprenticeship, on-the-job, and pre-apprenticeship. Based on the sites we visited, classroom training was primarily provided by training centers, technical schools, and community colleges. The goal was to provide workers with advanced skill sets to meet specific needs of employers. A registered apprenticeship program provides a combination of structured learning with on-the-job training from an employer assigned mentor. Apprentices start working from day one with incremental wage increases as they become more proficient on the job. Upon completion of a registered apprenticeship program, participants receive an industry-issued, nationally-recognized credential. On-the-job training is provided by an employer to a paid participant to obtain knowledge or skills essential to the job; it provides reimbursement of up to 50 percent of the wage rate; and is limited in duration. Pre-apprenticeship is designed to expand opportunities for disadvantaged, low-skilled and/or under-represented populations.

DOE AR 000127

U.S. Department of Labor – Office of Inspector General

| Table 3: Completed Training by Type for All Training Grants (as of June 30, 2012) | | | | | | |
|---|---|---|---|---|---|---|
| | Incumbents | | Non-incumbents | | Combined | |
| Type of Training | Trained | Rate | Trained | Rate | Trained | Rate |
| Classroom | 33,578 | 79% | 32,822 | 84% | 66,400 | 82% |
| Apprenticeship | 7,924 | 19% | 127 | 0% | 8,051 | 10% |
| On-The-Job | 702 | 2% | 3,556 | 9% | 4,258 | 5% |
| Pre-Apprenticeship | 118 | 0% | 2,527 | 6% | 2,645 | 3% |
| **Total** | **42,322** | **100%** | **39,032** | **100%** | **81,354** | **100%** |

Source: Grantee reported participant information

*Training Completed for Sampled Participants*

Training for the 382 sampled participants that completed training was in 4 of the 7 energy efficiency and renewable energy industry sectors, in other green industries, or was not identified by grantees. Training courses grantees reported in other green industries included some that could have been classified as 1of the 7 green job industry sectors, while others could not. Classes recorded as other green industries included: hazardous waste operations and emergency response (Hazwoper), commercial driver's license, green cleaning, 10-hour Occupational Safety and Health Administration (OSHA) certificate, English as a Second Language (ESL), General Educational Development (GED), career/work readiness, and computer training. Eight participants' training was not identified by the grantees as to what green industry was represented.

| Table 4: Completed Training by Green Job Sectors for Sampled Participants (as of March 31, 2012) | | | | | | |
|---|---|---|---|---|---|---|
| | Incumbents | | Non-Incumbents | | Combined | |
| SECTOR | Trained | Rate | Trained | Rate | Trained | Rate |
| 1 Energy-Efficient Building, Construction, & Retrofit | 48 | 66% | 140 | 45% | 188 | 49% |
| 2 Renewable Electric Power | 5 | 7% | 29 | 9% | 34 | 9% |
| 3 Deconstruction and Materials Use | 7 | 10% | 9 | 3% | 16 | 4% |
| 4 Energy Efficiency Assessment | 0 | 0% | 1 | 0% | 1 | 0% |
| 5 Energy Efficient and Advanced Drive Train Vehicle | 0 | 0% | 0 | 0% | 0 | 0% |
| 6 Biofuels | 0 | 0% | 0 | 0% | 0 | 0% |
| 7 Manufacturers produce/use sustainable processes | 0 | 0% | 0 | 0% | 0 | 0% |
| *Other Green Industries* | *12* | *16%* | *123* | *40%* | *135* | *35%* |
| *Not Identified* | *1* | *1%* | *7* | *2%* | *8* | *2%* |
| **Total** | **73** | **100%** | **309** | **100%** | **382** | **100%** |

Source: Grantee reported participant information

In terms of the type of training, sample grantees reported providing participants who completed training with types similar to all other Green Jobs program grantees.

DOE AR 000128

**Table 5: Completed Training by Type for Sampled Participants (as of March 31, 2012)**

| Type of Training | Incumbents | | Non-incumbents | | Combined | |
|---|---|---|---|---|---|---|
| | Trained | Rate | Trained | Rate | Trained | Rate |
| Classroom | 57 | 77% | 257 | 83% | 314 | 82% |
| Apprenticeship | 13 | 17% | 27 | 9% | 40 | 11% |
| On-The-Job | 4 | 5% | 20 | 7% | 24 | 6% |
| Pre-Apprenticeship | 0 | 0% | 4 | 1% | 4 | 1% |
| **Total** | **73** | **100%** | **309** | **100%** | **382** | **100%** |

Source: Grantee reported participant information

In the following sections, we discuss the specific type of training provided to participants we sampled as of March 31, 2012, at the eight grantees we visited.

Communication Workers of America National Education and Training Trust (CWA) (Located in Washington, DC, and serving participants in Ohio.) – CWA reported that of the 849 participants enrolled in classroom training, 837 completed training. In our sample of 85 participants, 68 completed training. Participants received training in the *Other Green Industries* (65 participants) and training for the remaining 3 participants was not identified to a green industry sector.

Twenty-two participants completed the one-week Green Manufacturing Production Module and could have been categorized under the green job industry sector *Manufacturing Using Environmentally Sustainable Processes and Materials*. The Module, which was developed with grant funding by the Manufacturing Skills Standard Council (MSSC), taught participants how to: conduct environmental incident and hazard investigations and preventive environmental inspections; and use advanced materials in production to reduce waste. Upon completion of the training, participants who passed a certification exam received an MSSC Green Production Credential. Additionally, sample participants completed one or more of MSSC's four manufacturing modules, including Safety module (56 participants), Quality (49 participants), Manufacturing Production Processes (46 participants), and Maintenance Awareness (42 participants). Each one-week module concluded with a certification exam. Additionally, participants who passed all four certification exams earned the Certified Production Technician credential. Basic skills and other related courses were offered and taken by participants, including Career Ready 101 (49 participants), Logistics (9 participants), Computer Upgrade and Repair (5 participants), and 10 other courses with 3 or fewer participants. As of March 31, 2012, CWA had fully expended its $3,969,056 grant. The average cost of tuition for the MSSC courses was $600 per module (1-week class).

Hawaii – Hawaii reported that of the 1,469 participants enrolled in training, 1,159 completed training. In our sample of 72 participants, grantee reported 46 completed training. Participants received training in the *Energy-Efficient Building, Construction & Retrofit* (18 participants), *Deconstruction and Materials Use* (2 participants), *Renewable Electric Power* (2 participants), and *Other Green Industries* (24 participants). Training in both the *Energy-Efficient Building, Construction & Retrofit* and *Renewable Electric Power* included 1-week classes on the following: basic principles of transforming energy from sunlight to electricity; hands-on training in the design and installation of solar

DOE AR 000129

thermal systems for hot water heating; and principles of the design, application, installation, and operation of grid-tied and stand-alone PV systems. Classes in *Deconstruction and Materials Use* consisted of over four months of training in waste handling and hazardous materials. Participants that had *Other Green Industries* training were involved in 1-day class in certified professional green cleaning and a 1 to 5 day class in photovoltaic, thermal, and solar installation. Upon completion of these classes, participants received a certificate of completion. As of March 31, 2012, Hawaii had expended $2,989,598 of its $6,000,000 grant. Tuition for the sampled participants for individual, specific courses ranged from $339 to $750 per course.

Iowa – Iowa reported that of the 1,392 participants enrolled in training, 1,252 completed training. In our sample of 56 participants, 50 completed training. Participants received training in the *Energy-Efficient Building, Construction, and Retrofit* (42 participants), *Renewable Electric Power* (6 participants), and *Deconstruction and Materials Use* (2 participants). In the *Energy-efficient Building* industry sector, participants learned system adjustment and verified efficiency for certification for HVAC ranging from 3 to 5 days, asbestos abatement ranging from 1 to 6 days, and lead safety renovation, repairs, and painting of 1 day. For the *Renewable Electric Power* sector, participants received training in industrial technology for 9 months. Training in *Deconstruction and Material Use* sector consisted of asbestos abatement ranging from 5 to 6 days. Iowa has expended $2,811,362 of the $5,997,000 award as of March 31, 2012. Tuition for these courses ranged from $162 to $6,496.

Lehigh Valley Workforce Investment Board, Inc. (Lehigh) (Located in Pennsylvania) – Lehigh reported that of the 323 participants enrolled in training, 206 completed training. In our sample of 40 participants, 27 completed training. Lehigh did not provide Green specific training, but planned on placing participants with employers engaged in Green-related industries. Training was provided at community colleges and technical schools. Participants received training in *Other Green Industry* sector (25 participants), and *Energy-Efficient Building, Construction, and Retrofit* (2 participants). The *Other Green Industry* consisted of 6 months of training in electromechanical, 42 to 69 days of training in IT/computer networking training, and 19 to 50 days of training in a commercial driver license course. For the *Energy-Efficient Building, Construction, and Retrofit* industry, participants received training in IT/computer networking for 69 days, commercial driver license ranging from 19 to 50 days, and Heating, Ventilation and Air Conditioning (HVAC) ranging from 30 to 46 days. As of March 31, 2012, Lehigh had expended $3,756,806 of its $4,000,000 grant. Tuition for the sampled participants for individual, specific courses ranged from $695 to $16,495 per course.

Mott Community College (Mott) (Located in Michigan) - Mott reported that of the 245 participants enrolled in training, 167 completed training. In our sample of 18 participants, 16 completed training. Participants received training in the *Energy-Efficient Building, Construction & Retrofit* (14 participants) and *Other Green Industries* (2 participants). Training in the *Energy Efficient Building, Construction & Retrofit* industry sector training included a 5 to 13 week green construction on-the-job training. Topics included: Red Cross first aid certificate, 10-hour OSHA certificate, construction

DOE AR 000130

fundamentals, green construction safety and principles, weatherization, deconstruction and retrofit. The class in *Other Green Industries* consisted of 45 days of training in the road construction apprenticeship readiness program. Most of the sampled participants received paid on-the-job work experience of up to $10,410. Completers of these courses earned a completion certificate issued by Mott. As of March 31, 2012, Mott had expended $2,463,535 of its $3,662,403 grant. Tuition for the sampled participants for individual, specific courses ranged from $1,111 to $3,500 per course.

National Association of Regional Councils (NARC) (Located in Washington, DC, and serving participants in Arizona, Ohio, and Texas.) – NARC reported that of the 966 participants enrolled in training, 881 completed training. In our sample of 93 participants served under this grant, grantee reported 83 completed training. Participants received training in *Energy-Efficient Building, Construction, and Retrofit* (27 participants); *Renewable Electric Power* (26 participants); *Deconstruction and Materials Use* (5 participants); *Energy Efficiency Assessment* (1 participant); *Other Green Industries* (19 participants), training for the remaining 5 participants was not identified to a green industry sector. The classes in the *Energy Efficient Building* industry sector included 20 days of employee readiness, 5 days of weatherization, and 2 to 20 days of green construction. The *Renewable Electric Power* industry sector included 12 to 72 days of training, where participants took a combination of courses such as Electrical Basics, Intro to Renewable Energy, and Solar Electric Fundamentals. The *Deconstruction and Materials Use* industry training included 2 days of the OSHA 10 training, 3 days of Hazwoper, and 3 days of Mine Safety and Health Administration (MSHA). The *Energy Efficiency Assessment* sector training was 80 days of training in HVAC. The *Other Green Industry* training was a combination of HAZWOPER, MSHA, heavy machine operation, and Cardiopulmonary Resuscitation (CPR)/First Aid, ranging from 8 to 24 days. As of March 31, 2012, NARC had expended $7,800,844 of the $7,994,999 award. Tuition for these courses ranged from $127 to $7,320.

Providence Economic Development Partnership (Providence) (Located in Rhode Island) – Providence reported that of the 250 participants enrolled in training, 194 completed training. In our sample of 17 participants, 15 completed training. Participants received training in *Energy-Efficient Building, Construction & Retrofit* (8 participants) and *Deconstruction and Materials Use* (7 participants). The training in *Energy-Efficient Building, Construction & Retrofit* sector included 12 weeks of classroom and on-the-job training in weatherization. Participants learned a variety of techniques to identify deficiencies, seal, and insulate buildings to enhance energy-efficiency. For the training in the *Deconstruction and Materials Use*, participants received 12 weeks of classroom and on-the-job training. Participants learned terms of construction and recycling, use of demolition equipment, and how to identify and safely extract materials with salvage value. Upon completion of training, all participants received four industry-recognized certifications (OSHA, Hazwoper, First Aid, and CPR). In addition, participants also received either a certificate of completion in weatherization or deconstruction. As of March 31, 2012, Providence had expended $2,117,042 of its $2,489,111 grant. The average tuition for the sampled participants was $6,952 per course.

DOE AR 000131

Washington State – Washington State reported that of the 1,625 participants enrolled in training, 1,486 completed training. In our sample of 82 participants, 77 completed training. All training was related to the *Energy-Efficient Building, Construction, and Retrofit* industry sector. The grantee offered more than 35 classes leading to various certifications. Participants took 1-day classes to learn about green construction and sustainability. The training also covered basic terminology related to "green" construction. Some participants received training in building automation or concrete polishing, which are part of an apprenticeship or journey level certification. A small number of participants enrolled in an 82-week building engineer program with a local technical college. As of March 31, 2012, Washington State had expended $3,012,021 of its $5,973,635 grant. Tuition for the sampled participants for individual, specific courses ranged from $51 to $5,534 per course.

*Duration of Training Received*

Of the 81,354 participants who completed training through the Green Jobs program, 47 percent (38,361 participants) received 5 days or less of training, of which 21 percent (17,374 participants) received only 1 day of training (see Figure 1).

**Figure 1**



Source: Grantee reported performance information as of June 30, 2012

Our analysis of grantee reported data found that 2 of the 97 grantees account for 83 percent (14,38... out of 17,374) of all participants that completed only 1 day of training. Of the total 30,857 reported as entered employment, 4,874 were for participants who received only 1 day of training. This included 3,213, or 66 percent of incumbent workers who were reported as entered employment after only 1day of training.

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390

DOE AR 000132

Specific information on the type of training for all participants was not readily available. However, for the sampled participants at the 8 grantees we visited we noted the following training for the 1 day, 2-5 days, 1-2 months, and 6-plus month categories.

One Day of Training – Four of our selected grantees (CWA, Hawaii, Iowa, and Washington State) provided in part, 1-day classes for sampled participants. These grantees reported 60 trainees completed a 1-day training course. For those who completed training, the majority of classes were for green construction, lead safety renovation, repairs, and painting, photovoltaic design and installation, and sustainability in the construction industry.

Two to Five Days of Training – Six of our selected grantees (CWA, Hawaii, Iowa, Mott, NARC, and Washington State) provided in part, trainings that covered between 2 and 5 days, for sampled participants. These grantees reported 82 trainees completed the training course. For those who completed training, the majority of the classes were for photovoltaic design and installation, weatherization, System Adjustment and Verified Efficiency for HVAC installation certification, and OSHA courses.

One to Two Months of Training – Six of our selected grantees (CWA, Hawaii, Lehigh, Mott, NARC, and Washington State) provided in part, training that ran between 1 and 2 months for sampled participants. These grantees reported 35 trainees completed the training course. For those who completed training, the courses primarily focused on green construction, certified cleaning, and commercial driver's license training. Additionally, the participants attended electrical basics, employer readiness, HVAC/Solar training, energy auditing, Hazwoper, Housing Industry Association *GreenSmart*, information technology, and computer networking.

Six Months or More of Training – Three of our selected grantees (Iowa, Lehigh and Washington State) provided in part, a 6-month or greater duration of training for sampled participants. These grantees reported 8 trainees completed the training course. For those who completed training, the classes covered electromechanical technology, industrial technology, and commercial building engineering.

*Value of Credentials Received*

Training and Employment Guidance Letter (TEGL) 15-10, issued in December 2010, emphasizes the importance of providing training that leads to credentials. The TEGL noted that credentials are an asset to those participants that face barriers to employment. Each solicitation for grant application (SGA) encouraged prospective grantees to ensure that skills training would lead to awarding of "industry-recognized" credentials.

Grantees reported "credentials" ranging from a certificate of completion for a 1-day training course to a bachelor's degree. Of the 81,354 participants who completed training, 70,130 (86 percent) received some type of credential. There was limited information regarding the value of most credentials received. The largest category,

DOE AR 000133

U.S. Department of Labor – Office of Inspector General

certificates, could include certificates of completion or industry recognized credentials. Information is not available for ETA to readily distinguish between the types of certificates or their value. Of the 17,374 completers that received only 1 day of training, 14,851 (85 percent) received either a certificate or other credential. As shown in Table 6, of the 70,130 participants receiving credentials, 64,784 (92 percent) were classified as a certificate; 4,660 (7 percent) were for "other" credentials such as 10-hour OSHA certificate, first aid/CPR, work readiness, energy assessment, weatherization; and 686 (less than 1 percent) were for associates, bachelor's, and other degrees.

| Table 6: Credentials Received by Green Job Sector for All Training Grants (as of June 30. 2012) | | | | | | |
|---|---|---|---|---|---|---|
| | Certificate | Associate's Degree | Bachelor's Degree | Other Degree | Other Credential | Total Credentials | %t of Total |
| Energy-Efficient Building, Construction, and Retrofit | 27,496 | 175 | 2 | 21 | 2,613 | 30,307 | 43% |
| Renewable Electric Power | 8,800 | 113 | 0 | 6 | 734 | 9,653 | 14% |
| Energy Efficiency Assessment | 5,078 | 55 | 3 | 5 | 200 | 5,341 | 8% |
| Manufacturers that produce sustainable products | 3,718 | 30 | 2 | 3 | 210 | 3,963 | 6% |
| Deconstruction and Materials Use | 1,271 | 0 | 0 | 0 | 20 | 1,291 | 2% |
| Energy Efficient and Advanced Drive Train Vehicle | 1,026 | 68 | 0 | 1 | 37 | 1,132 | 2% |
| Biofuels | 575 | 0 | 0 | 0 | 32 | 607 | 1% |
| *Other Green Industries* | *14,980* | *149* | *38* | *6* | *607* | *15,780* | *23%* |
| *Not Specified* | *1,840* | *4* | *0* | *5* | *207* | *2,056* | *3%* |
| Total | 64,784 | 594 | 45 | 47 | 4,660 | 70,130 | |
| Percent of Total | 92% | 1% | 0% | 0% | 7% | | |

Source: Grantee reported performance information

The range of credential type and their relationship to the participant securing employment will make it challenging for ETA to evaluate the value of these certifications in assessing the success of this or any job training program.

**What were the employment and retention outcomes for participants?**

Grantee reported entered employment and retention outcomes for participants were far less than originally proposed. As of June 30, 2012, with 88 percent of the extended grant period having elapsed and $328.5 million out of $435.4 million having been spent, grantees have fallen well short of their targets for employment and retention outcomes. Grantees reported 30,857 (38 percent) participants entered employment[5] out of a target of 81,254. Of these, 25,396 (82 percent) were training-related. Grantees also collectively projected that 71,017 participants would retain their jobs for two consecutive quarters. However, we found that grantees reported retention of only 11,613 (16 percent) of the planned goal of 71,017. (See Exhibit 5 for details of all training grants). There was a wide range of employment and retention goals among the 97 grants, as can be seen in Table 7 and Table 8.

---

[5] Per ETA guidance, a participant can only be counted as entered employment if they have completed training.

DOE AR 000134

U.S. Department of Labor – Office of Inspector General

**Table 7: Performance for All Training Grants (as of June 30, 2012)**

|  | Completed Training | Entered Employment | Training-Related Employment | Employment Retention |
|---|---|---|---|---|
| Proposed | 98,158 | 81,254 | 62,003 | 71,017 |
| Reported | 81,354 | 30,857 | 25,396 | 11,613 |
| Percent of Proposed | 83% | 38% | 41% | 16% |

Source: Grantee reported performance information. Employment retention is based on participants who entered employment on or before December 31, 2011.

**Table 8: Percentage of Goal Attainment for All Training Grants (as of June 30, 2012)**

|  | Proposed | Actual | Mean | Median | Range |
|---|---|---|---|---|---|
| Completed Training | 98,158 | 83% | 91% | 87% | 8% to 274% |
| Entered Employment | 81,254 | 38% | 55% | 47% | 0% to 259% |
| Training-Related Employment | 62,003 | 41% | 73% | 41% | 0% to 1,660% |
| Employment Retention | 71,017 | 16% | 26% | 16% | 0% to 136% |

Source: Grantee reported performance information

ETA stated that once all grants have ended in September 2013 it will determine employment outcomes by using unemployment insurance and Federal employment records to obtain entered employment, employment retention and wages. ETA provided a summary of an analysis for participants that exited the program. The analysis showed that for 12,995 participants that exited by June 30, 2011, 57 percent entered employment, and for 6,701 participants that entered employment by December 31, 2010, 86 percent retained employment. The analysis also showed that annual wages averaged $25,926, and ranged from $10,065 for Pathway participants to $28,361 for ETP participants. However, this data is old because as of June 30, 2012, 113,247 participants were served and 81,354 completed training.

Performance outcomes for our sample of 8 grantees were lower than the reported results for all 97 grants. As of June 30, 2012, with $32.1 million out of $40.1 million having been spent, sampled grantees have fallen well short of their targets for employment and retention outcomes. Grantees reported 2,325 participants entered employment out of a target of 8,131 (29 percent). Of these, 1,964 (84 percent) were training-related. Grantees also projected that 83 percent of those placed would retain their jobs for two consecutive quarters. While grantees reported that only 32 percent of participants who entered employment were retained, the reported number retained of 753 represents only 11 percent of the planned retention goal of 6,763.

**Table 9: Performance Goals for 8 Sampled Green Job Training Grants (as of June 30, 2012)**

|  | Completed Training | Entered Employment | Training Related Employment | Employment Retention |
|---|---|---|---|---|
| **Proposed** | 9,682 | 8,131 | 6,441 | 6,763 |
| **Reported** | 7,395 | 2,325 | 1,964 | 753 |
| **Percent** | **76%** | **29%** | **30%** | **11%** |

Source: Grantee reported performance information. Employment retention is based on participants who entered employment on or before December 31, 2011.

DOE AR 000135

During our audit we identified several possible reasons for low employment results. These included the nature of incumbent workers, inaccurate reporting and record keeping by grantees, and other challenges identified by the 8 grantees we visited.

Moreover, ETA officials cited a slow recovery in the construction industry and grantees serving many incumbent workers that retained jobs, but did not obtain new positions. Discussions with ETA also suggest that grantees' maintaining contact with participants proved to be a challenge, and therefore grantees did not always know what happened when participants completed the program. Another possible factor for low employment was the departure of employer partners originally involved with the grant because they might consider hiring participants. One ETA official said that employer partners left because their employment needs changed from the time the grantee submitted the proposal and the program started. In her Congressional testimony on June 6, 2012, the Assistant Secretary for Employment and Training made a similar reference. She testified that "in some communities employer needs have changed since grants started, and grantees have made adjustments to continue to ensure that their projects are aligned with employer needs, such as providing training for additional occupations that are in demand in their local areas."

In addition to key performance measures, ETA requires grantees to report their progress through quarterly narrative reports. These reports include; update on leveraged resources and strategic partnership activities, timeline for grant activities and deliverables, key issues and technical assistance needs, and best practices and success stories. Where applicable, the narrative includes status on incumbent workers services and if they retained employment. While the narrative provides additional information, it does not impact the reported performance measures as defined by ETA.

Entered Employment for Incumbent Workers

Of the 30,857 participants grantees reported as having entered employment, more than one-third, or 11,657, were workers who already held jobs when they entered the program. Based on ETA guidance, grantees reported incumbent workers as entered employment if they entered a new position of employment after program completion, even if the new position was with the same employer, as long as the individual would utilize competencies acquired through the training. Based on information reported by grantees, most incumbent workers entered the program to obtain necessary training to retain their current job as opposed to obtaining a new position, grantees that served a large number of incumbent workers were more likely to have a lower overall entered employment rate when compared to grantees serving fewer incumbent workers. In fact, we noted that non-incumbents had a higher entered employment rate (49 percent) in comparison to incumbents (28 percent).

*Employment in Green Job Sectors*

ETA required grantees to report the green industry sector where participants were placed. For the 97 training grants, grantees reported 41 percent of the 30,857

DOE AR 000136

participants who entered employment obtained jobs in two green industry sectors: *Energy-Efficient Building, Construction & Retrofit* (36 percent) and *Renewable Electric Power* (5 percent). Grantees reported 34 percent of employment was in an industry not specified as green.

**Table 10: Entered Employment by Green Job Industry Sector For All Training Grants (as of June 30, 2012)**

| SECTOR | INCUMBENTS Placed | Rate | NON-INCUMBENTS Placed | Rate | COMBINED Placed | Rate |
|---|---|---|---|---|---|---|
| 1 Energy-Efficient Building, Construction, and Retrofit | 4,605 | 40% | 6,417 | 33% | 11,022 | 36% |
| 2 Renewable Electric Power | 648 | 6% | 886 | 5% | 1,534 | 5% |
| 3 Manufacturers produce/use sustainable products | 645 | 6% | 656 | 3% | 1,301 | 4% |
| 4 Energy Efficiency Assessment | 459 | 4% | 515 | 3% | 974 | 3% |
| 5 Energy Efficient and Advanced Drive Train Vehicle | 553 | 5% | 243 | 1% | 796 | 3% |
| 6 Deconstruction and Materials Use | 110 | 1% | 382 | 2% | 492 | 2% |
| 7 Biofuels | 109 | 1% | 51 | 0% | 160 | 1% |
| *Other Green Industries* | 1,196 | 10% | 2,839 | 15% | 4,035 | 13% |
| *Not Specified* | 3,332 | 29% | 7,211 | 38% | 10,543 | 34% |
| **TOTAL** | **11,657** | **100%** | **19,200** | **100%** | **30,857** | **100%** |

Source: Grantee reported performance information

The combined entered employment statistics by green job industry sector for the sampled participants at the 8 grantees we visited were generally consistent with those for all 97 training grants, except for *Not Specified*, where 51 percent of sampled participants were reported versus 34 percent for participants overall.

**Table 11: Entered Employment by Industry Sector for Sampled Participants (as of March 31, 2012)**

| SECTOR | INCUMBENTS Placed | Rate | NON-INCUMBENTS Placed | Rate | COMBINED Placed | Rate |
|---|---|---|---|---|---|---|
| 1 Energy-Efficient Building, Construction, and Retrofit | 5 | 18% | 74 | 29% | 79 | 28% |
| 2 Renewable Electric Power | 1 | 4% | 10 | 4% | 11 | 4% |
| 3 Deconstruction and Materials Use | 3 | 11% | 6 | 2% | 9 | 3% |
| 4 Energy Efficient and Advanced Drive Train Vehicle | 0 | 0% | 0 | 0% | 0 | 0% |
| 5 Biofuels | 0 | 0% | 0 | 0% | 0 | 0% |
| 6 Energy Efficiency Assessment | 0 | 0% | 0 | 0% | 0 | 0% |
| 7 Manufacturers that produce sustainable products | 0 | 0% | 0 | 0% | 0 | 0% |
| *Other Green Industries* | 6 | 21% | 36 | 14% | 42 | 15% |
| *Not Specified* | 13 | 46% | 132 | 51% | 145 | 51% |
| **Total** | **28** | **100%** | **258** | **100%** | **286** | **100%** |

Source: Grantee reported performance information

Although ETA's system for performance data reporting included a field for job title, the majority of grantees did not report the specific job title within each industry sector. ETA officials stated that there was no requirement for grantees to report job titles. For our sample of 463 participants, grantees reported 286 participants that entered employment, and recorded specific job information for 88. The specific job information available for sampled participants is summarized as follows:

DOE AR 000137

CWA – Grantee reported 60 of the sampled 85 participants as entered employment. CWA reported North American Industry Classification System (NAICS) information for all 60 participants that entered employment, but did not report whether the entered employment was in a green industry for 59 of these participants. These industries included *Manufacturing (*49 participants*)*, *Retail Trade* (3 participants), *Health Care & Social Assistance* (3 participants)*, Information* (2 participants), *Arts, Entertainment, and Recreation* (2 participants), and *Professional Scientific* (1 participant). However, CWA could not support its entered employment information. The only support CWA maintained for job placements was a master listing of participants with a checkbox indicating whether the participant obtained employment. This listing provided no indication of employer name, job title, green industry sector, wages, or start date and was not supported by any other source documentation.

Hawaii – Grantee reported 32 of the sampled 72 participants as entered employment in *Energy-Efficient Building, Construction, and Retrofit* (10 participants), *Other Green Industries* (10 participants), *Renewable Electric Power* (1 participant), *Deconstruction and Materials Use* (1 participant), and *Not Specified* (10 participants). Reported job titles included *General/Kitchen Cleaner* (11 participants), *Photovoltaic/Solar Installer* (5 participants), *Hazardous Materials Specialist* (2 participants), *Maintenance Engineer* (2 participants), in addition to *Accountant, Cook, Electronic Technician, Warehouseman, Sales Representative, Software Tester, Laborer, Pool Attendant, Roofer, Driver, and Meat Cutter* (1 participant each). One participant was *Not Specified.*

Iowa - Grantee reported 21 of the 56 sampled participants as entered employment in *Energy-Efficient Building, Construction, and Retrofit* (12 participants), *Deconstruction and Materials Use* (3 participants), *Renewable Electric Power* (2 participants), and *Not Specified* (4 participants). Iowa's industries included *Construction* (15 participants), *Utilities,* (1 participant), *Manufacturing* (1 participant) and *Not Specified* (4 participants). Iowa did not report job titles.

Lehigh - Grantee reported 25 of the 40 sampled participants as entered employment in *Other Green Industries* (20 participants) and *Not Specified* (5 participants). Reported job titles included *Driver* (8 participants), *IT related* (4 participants), *Supervisor* (2 participants), *Flagger* (1 participant), *Welder* (1 participant), *Customer Service* (1 participant), *Assembler/Tester* (1 participant), *Maintenance Mechanic* (1 participant), *Shipping & Receiving* (1 participant), *Financial Analyst* (1 participant), *Forklift Operator* (1 participant), *Journeyman* (1 participant) and *Not Specified (2 participants).*

Mott - Grantee reported 13 of the 18 sampled participants as entered employment in *Energy-Efficient Building, Construction, and Retrofit* (1 participant) and *Not Specified* (12 participants). Reported job titles included *Census Crew Leader Assistant*, *General Labor*, and *Seasonal Athlete*. The grantee did not report job titles for the remaining 10 placements.

NARC - Grantee reported 75 of the sampled 93 participants as entered employment in Renewable *Electric Power* (8 participants), *Energy Efficient Building, Construction, and*

DOE AR 000138

*Retrofit* (7 participants), *Deconstruction and Material Use* (4 participants), *Other Green Industries* (9 participants), and *Not Specified* (47 participants). Reported job titles included *Maintenance/Janitorial* (5 participants), *Solar Installer/Electrician* (3 participants), *Technician* (2 participants), *Lead Roofer* (1 participant), *Driver* (1 participant), *Painter* (1 participant), *Security Guard* (1 participant), *General Laborer* (1 participant), *Auto Glass Replacement* (1 participant). Fifty-nine participants were *Not Specified*.

Providence – Grantee reported 11 of the sampled 17 participants as entered employment in *Energy Efficient Building, Construction, and Retrofit* (1 participant), *Deconstruction and Materials Use* (1 participant), *Other Green Industries* (2 participants), and *Not Specified* (7 participants). Reported job titles included *Environmental Technician* (1 participant), *Laborer* (1 participant), *Residential Monitor* (1 participant), and *Site Supervisor* (1 participant). Seven participants were *Not Specified*.

Washington State - Grantee reported 49 of the 82 sampled participants as entered employment. Green industries sectors of employment included *Energy Efficient Building, Construction, and Retrofit* (48 participants) and *Not Specified* (1 participant). Reported job titles, included *Engineers* (2 participants), *Benchmarking Hotline* (1 participant), *Building Energy Survey* (1 participant), *Building Maintenance* (1 participant), *Capacity Building Coordinator* (1 participant), *Contract Surveillance Representative* (1 participant), *Mover* (1 participant), *Architect* (1 participant), *Project Manager* (1 participant), and *Energy Auditor* (1 participant). Of the remaining 38 participants that entered employment, 37 had an employer name, which generally appeared to be construction or construction-related companies (e.g., electric, glass, stone, steel, welding, masonry, paving, etc.).

Training-Related Employment

Employment is considered training-related if the position is for the *same occupation* or *within the same industry* as the training provided or *if the employer recognizes the credential received by the participant* as a result of the grant.[6]

**Table 12: Comparison of Entered Employment and Training-Related Employment for All Training Grants (as of June 30, 2012)**

|  | Incumbents | | Non-incumbents | | Combined | |
|---|---|---|---|---|---|---|
|  | Participants | Rate | Participants | Rate | Participants | Rate |
| Completed Training | 42,322 | -- | 39,032 | -- | 81,354 | -- |
| Entered Employment | 11,657 | 28% | 19,200 | 49% | 30,857 | 38% |
| Training-Related Employment | 10,710 | 25% | 14,686 | 38% | 25,396 | 31% |

Source: Grantee reported performance information

From our sample of 463 participants, we confirmed that there were 185 that entered employment, but grantees identified only 79 job titles. Additionally, of the 185 that

---

[6] Performance Reporting Glossary and Guide for ARRA High Growth and Emerging Industries Grantees.

DOE AR 000139

entered employment, we confirmed that 96 participants entered training-related employment but grantees only provided job titles for 52 participants. Grantees were not required and most did not report job titles. While grantees reported training-related employment, there was not always evidence that the position was within the same occupation, within the same industry as the training provided, or if the employer recognized the credential received by the participant.

The eight grantees we visited gave various explanations as to how they determined if employment was training-related. Officials from one grantee stated that all employment was classified as training-related while officials from another grantee indicated that this determination was based on the names of the employers where participants were placed.

**Table 13: Training-Related Employment for Sampled Participants (as of March 31, 2012)**

| GRANTEE | PROGRAM | TRAINING RELATED EMPLOYMENT | % |
|---|---|---|---|
| Hawaii | SESP | 27 | 52% |
| Lehigh | Pathways | 12 | 23% |
| Washington State | SESP | 7 | 13% |
| Mott | Pathways | 2 | 4% |
| NARC | Pathways | 2 | 4% |
| Providence | Pathways | 2 | 4% |
| CWA | ETP | 0 | 0% |
| Iowa | SESP | 0 | 0% |
| **TOTAL** | | **52** | **100%** |

Source: Grantee reported performance information

Three of our 8 sampled grants – Hawaii, Lehigh, and Washington State – accounted for 88 percent of sampled participants identified as training-related employment. The job titles with the most training-related employment in our sample were: 1) Room/Kitchen Cleaner; 2) Driver; 3) Photovoltaic/Solar Installer; and 4) Construction/General Laborer. Additionally, we found participants placed in sales, customer service, and accounting that were classified as training-related.

- The 7 participants with training-related employment as a Room/Kitchen Cleaner were in Hawaii. Participants were trained in the Certified Cleaning Professional course which was industry recognized. Upon completion of the program they were hired at $8 per hour.

- The 7 participants with training-related employment as a Driver were in Lehigh. They all completed commercial driver training, and were employed by various employers earning between $11.25 and $18 per hour.

- Most Mott participants received training under the green construction certificate program. Participants learned construction fundamentals, green construction principles, building weatherization and maintenance, demolition and

DOE AR 000140

deconstruction, as well as Red Cross First Aid and OSHA safety training. At the conclusion of classroom training, completers could apply and be accepted into an on-the-job training program in green construction trades. Grant partners provided up to 6 months of on-the-job training. At the end of the training, some participants were offered unsubsidized employment with the same companies. On-the-job training wages were $10 per hour, and for those who entered employment as a Construction/General Laborer, starting wages were $10 per hour.

- There was one participant from Hawaii that completed the Photovoltaic Design and Installation course and was subsequently placed at a solar supply company in sales earning $15 per hour. There was another participant from Lehigh trained in Computerized Network Support Technology and was placed in customer service, earning $10 per hour.

*Unsubstantiated Entered Employment and Other Entered Employment Challenges*

Of the eight sampled grantees, the following six grantees could not support reported employment or did not meet their entered employment goals. They attributed not meeting their entered employment goals to the following reasons:

CWA – CWA reported 420 participants entered employment on its final performance report, thereby meeting its entered employment goal. However, CWA's method of documenting employment outcomes was not adequate. The only support CWA maintained for job placements was a listing of participants with a checkbox indicating whether the participant obtained employment. The grantee acknowledged that their systems for tracking placements could have been better and explained that management was relying on a partner to assist with the data collection and reporting, but the partnership did not materialize.

Hawaii – Grantee reported 205 participants (33 percent) entered employment as of March 31, 2012, out of the 625 participants proposed in the Statement of Work. The grantee attributes the low placement rate to the poor economy and to the number of incumbent workers served (nearly 62 percent). Based on ETA guidance, grantees could report incumbent workers as entered employment if they entered a new position of employment after program completion, even if the new position was with the same employer, as long as the individual would utilize competencies acquired through the training.

Iowa – Grantee reported that 102 participants (7 percent) entered employment as of March 31, 2012, out of the 1,400 participants proposed in the Statement of Work. The grantee attributes the low placement rate to an incorrect assumption that all incumbent workers who received training (nearly 70 percent) could be counted as entered employment which is not acceptable under ETA reporting guidelines, unless certain criteria are met. The grantee stated that its projected entered employment rate was significantly overstated since many of the participants served were incumbent workers.

DOE AR 000141

U.S. Department of Labor – Office of Inspector General

Mott – Grantee reported that 87 participants (54 percent) entered employment as of March 31, 2012, out of the 160 participants proposed in the Statement of Work. Mott's primary training program for participants was 12 weeks in length and could be followed by an additional 6 months of on-the-job. This lengthy training period resulted in its reported employment numbers to be lower than planned. Mott applied to modify the grant to permit training courses of shorter duration (4, 6, or 7 weeks) in length to bring more participants into the program and was given an extension of time until September 30, 2012, to achieve its goals.

Providence – Grantee reported 73 participants (41 percent) entered employment as of March 31, 2012, out of the 180 participants proposed in the Statement of Work. Providence served participants from a hard to serve population because approximately 80 percent were ex-offenders. The grantee attributes the low placement rate to the economy worsening between the time it applied for and received the award. At least 9 employer partners dropped out because there were fewer jobs available. The grantee also cited some union partners' reluctance to hire participants to work on deconstruction projects. Providence tried to recruit new employer partners to replace those who left the project. However, the grantee said it was difficult to find employers that were willing to take a chance on hiring ex-offenders even though they had successfully completed training.

Washington State – Grantee reported that 335 participants (7 percent) entered employment as of March 31, 2012, out of the 4,771 participants proposed in the Statement of Work. The grantee attributes the low placement rate in part to a misunderstanding of the treatment of incumbent workers, and some fundamental math and logic errors in the Statement of Work. The grantee was under the impression that multiple trainings provided to individuals would be counted multiple times. This is not the case as an individual who took two or more training courses is still only counted as one individual. Therefore, the projected number of participants, 4,814 to begin training would include the same participant multiple times. So when the expected placement rate (92 percent) used by the grantee was applied, it overstated the possible number of participants that would enter employment. Additionally, the grantee was under the incorrect assumption that all incumbent workers who receive training could be counted as entered employment which is not acceptable under ETA reporting guidelines, unless certain criteria are met.

*Entered Employment by Training Type and Length*

Within the population of all program participants there was a positive correlation between length of training and entered employment. Employment rates significantly grew as training length increased. Overall, the entered employment rate for was 38 percent. However, the reported placement rate for participants receiving one day of training was 28 percent, while the placement rate for those participants receiving 3 to 6 months of training was 52 percent (see Figure 2).

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390

DOE AR 000142

**Figure 2**



Source: Grantee reported performance information as of June 30, 2012

*Employment Retention*

While grantees reported that 49 percent[7] of participants who entered employment prior to December 31, 2011, retained employment for at least 6 months, the reported number retained of 11,613 represents only 16 percent of the planned retention goal of 71,017. The low retention rate may be in part attributable to the timing of placement. For participants placed in the quarter ending June 30, 2012, retention information will not be available until the quarter ending December 31, 2012.

The table below shows participants that retained employment for two quarters subsequent to entered employment after completing training and being employed from the date the grants were awarded through December 31, 2011. It is not known how many of the 7,069 participants that entered employment since January 1, 2012, were retained, because two consecutive quarters of continuous employment had not elapsed as of the end of our audit work.

| Table 14: Employment Retention for All Training Grants (as of June 30, 2012) | Completed Training | Entered Employment | Retained |
|---|---|---|---|
| Proposed | 98,158 | 81,254 | 71,017 |
| From grant start to Dec 31, 2011 | 59,205 | 23,788 | 11,613 |
| From Jan 1 to Jun 30, 2012 | 22,149 | 7,069 | * |
| Total | 81,354 | 30,857 | -- |

Source: Grantee reported performance information. Employment retention is based on participants who were employed on or before December 31, 2011. *Data will be available beginning November 15, 2012.

---

[7] The 49 percent was calculated by dividing the 11,613 participants that retained employment by the 23,788 that entered employment prior to December 31, 2011.

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390

DOE AR 000143

ETA cited the same issues affecting entered employment - discussed on page 16 - as also applying to employment retention success.

*Employment Retention Issues Cited by Grantees*

As with entered employment, our audit identified challenges grantees faced in tracking and reporting job retention for those participants that entered employment. Six of the grantees did not have an effective system in place to record and track job retention. Once a participant was employed, tracking retention became more difficult because contact between the grantee and participant frequently ended. Based on our audit, the only support we found for the reported retention numbers came from grantees' ancillary documents and their interviews with participants. Otherwise, the reported job retention numbers could not be supported.

| Table 15: Sample Grantees Without Retention Tracking Systems (as of March 31, 2012) | | | | | | |
|---|---|---|---|---|---|---|
| Grantee | Retention end of 1st Quarter* | Errors | % Errors | Retention end of 2nd Quarter* | Errors | % Errors |
| CWA | 0 | - | - | 0 | - | - |
| Hawaii | 3 | 1 | 33% | 1 | 0 | - |
| Lehigh | 5 | 3 | 60% | 4 | 4 | 100% |
| NARC | 43 | 22 | 51% | 38 | 28 | 74% |
| Providence | 7 | 1 | 14% | 5 | 3 | 60% |
| Washington State | 23 | 17 | 74% | 17 | 15 | 88% |

\* Grantee reported retention information

Two of the eight grantees - Iowa and Mott - had systems to track retention, but still had challenges. Retention data was not found to be reliable.

Iowa reported 14 participants retained their jobs at the end of the first quarter, and at the end of the second quarter 12 of the 14 were still employed. Iowa utilized a spreadsheet to record wage records for each participant. The wages were tracked for two quarters. We found 3 (21 percent) errors in the first quarter and 3 (25 percent) in the second quarter. One of the challenges to the system was obtaining wage information for those that were self-employed.

The system used by Mott to track entered employment, retention, and follow-up for participants provided reminders to job development staff every ninety days after a participant entered employment to follow-up on employment status. All contacts with participants were recorded in electronic case notes. However, the capabilities of the system were not effectively utilized to document and report grant participant retentions. As a result, even though the system was designed to track retentions, the quarterly reporting indicated zero retention as of March 31, 2012. The grant program manager stated that Mott had 68 first quarter retentions and 44 second quarter retentions as of June 30, 2012. Documentation was subsequently provided to support 44 retentions. Three of the eight grantees – Hawaii, Providence and Washington State - stated that many of the jobs participants found were "project-based" jobs, for example construction jobs, and it was therefore less likely that employment would continue for the long term.

DOE AR 000144

U.S. Department of Labor – Office of Inspector General

*Impact of Grant Period Extensions on Performance Outcomes*

Since our first report was issued in September 2011, 46 of the 63 (73 percent) Pathways and ETP grants set to expire in January 2012, were extended from 2 months to 1 year, or an additional 29 percent of the grant period, to allow grantees additional time to expend funds and assist participants with training and employment. While the additional time gave grantees the opportunity to allow 12 percent more participants to complete training, entered employment increased by 9 percent during the extended period. Even given the extension of time, there was no evidence that grantees have been able to deliver or will deliver their targeted entered employment and retention outcomes by the end of the grant periods (see Exhibit 3 for list of extended grants).

During the extended period of performance, the number of incumbent workers served significantly increased. The monthly averages of incumbent workers served and began training, increased by 11 and 14 percent, respectively. The monthly averages for non-incumbent workers served and began training, decreased by 75 and 70 percent, respectively.

**Table 16: Summary of Green Job Training Grants Extended**

| | | | EXTENSION | | | | MONTLY CHANGE IN PARTICPANTS DURING EXTENSION | | | |
| | | | | | | | SERVED | | BEGAN TRAINING | |
| Program | Number of Grants | Original End Date | Average | Minimum | Maximum | Time Extended | Non-Incumbents | Incumbents | Non-Incumbents | Incumbents |
|---|---|---|---|---|---|---|---|---|---|---|
| ETP | 19 of 25 | 1/14/2012 | 6.1 | 2.5 | 12 | 26% | -64% | 16% | -60% | 19% |
| Pathways | 27 of 38 | 1/28/2012 | 7.4 | 2.1 | 12.1 | 31% | -82% | -89% | -77% | -88% |
| *ETP & Pathways* | *46 of 63* | | *6.9* | *2.1* | *12.1* | *29%* | *-75%* | *11%* | *-70%* | *14%* |
| SESP | 9 of 34 | 1/28/2013 | 5.1 | 5 | 6 | 14% | -- | -- | -- | -- |
| All Grants | 55 of 97 | -- | -- | -- | -- | 25% | -- | -- | -- | -- |

Source: Grantee reported performance information as of June 30, 2012

*Reported Performance Outcomes Could Not Be Supported*

In verifying the reliability of performance outcomes reported by the eight sampled grantees, we determined that performance outcomes could not be supported. Most significantly, sampled grantees could not provide evidence for 24 percent of sampled participants reported as entered employment, 33 percent of sampled participants reported as entered training-related employment, and 44 percent of sampled participants tested for retention.

DOE AR 000145

U.S. Department of Labor – Office of Inspector General

**Table 17: Unsupported Performance Outcomes for Sampled Participants (as of March 31, 2012)**

| Outcome | Sample Size | Reported Participants In Outcome | Total Errors | Percentage Error |
|---|---|---|---|---|
| Served | 463 | 463 | 8 | 2% |
| Began Training | 463 | 425 | 26 | 6% |
| Completed Training | 463 | 382 | 94 | 20% |
| Received Credential | 463 | 329 | 97 | 21% |
| Entered Employment | 463 | 286 | 111 | 24% |
| Training-Related Employment | 463 | 237 | 151 | 33% |
| Employment Retention | 147 | 77 | 65 | 44% |

Source: Grantee reported performance information and audit results

The majority of the errors (86 percent) were from three of the sampled grantees: CWA (42 percent), Washington State (23 percent), and NARC (21 percent).

CWA –Employment data was not adequately tracked. CWA reported that 60 participants had entered employment, but could only provide employer names for 48 of the 60 participants. Additionally, CWA reported most of its participants that entered employment as training-related. However, CWA did not have a valid method for capturing this information. CWA used the employer's name and job title to determine if employment was training-related. However, for the 60 participants in the sample that CWA reported as having training-related employment, employer names were not documented for 12 (20 percent) participants and job titles that would help identify whether the placement was training-related, were not available for any of the 60 participants. The grantee stated that they were relying on a partner to assist with the data collection and reporting, but the partnership failed to materialize.

Washington State –Employment and training related employment information was not adequately tracked. Washington State reported 49 participants as having entered employment and the employment was reported as training-related. Of the 49, we found that 32 (65 percent) did not have adequate documentation maintained in the participant files to confirm that the trainee entered employment and that employment was training-related. The grantee stated that there was no formal direction from ETA on what outcome related information was required to be kept. Therefore, Washington State created guidance for sub-recipients that required outcome related information be available, but not that it be placed in the participant file. As a result, we were unable to verify the employment and training-related employment for sampled participants.

NARC – Employment and training related employment information was not adequately tracked. Grantee officials stated that participants had multiple options to assist with job searches in addition to development seminars held in conjunction with One-Stop Career Centers. However, most participants found employment on their own, and attempts to follow-up with were largely unsuccessful. As a result, NARC relied on unemployment insurance wage records to verify employment. The nature of the jobs secured through the program made unemployment insurance wage verification one of the few reliable methods of tracking employment because once a participant secured employment contact would often cease. For our sample of 93 participants, NARC reported that 75

DOE AR 000146

entered employment. NARC was not able to provide documentation supporting employment for 15 (16 percent) of the participants entering employment.

Additionally, NARC reported most of its employment as training-related, but admitted that they used a "common-sense" approach to identify training-related jobs. NARC reported individuals as receiving a training-related job if the participant's resume or job application listed the grant training and passed the "common-sense" test. For our sample of 75 reported as entered employment, 49 were reported as training-related, 41 of which (84 percent) we either could not determine from the information provided or did not find documentation supporting the assertion.

<u>Disparate Goals Among Grantees</u>

Grant agreements varied significantly in terms of employment and retention goals proposed by grantees and approved by ETA. For example, Jobs for the Future, Inc. a Pathways grant, proposed to serve 1,130 participants, place 81 percent of those served, and retain employment for at least 6 months 65 percent of those served at a per participant cost of $8,789 based on entered employment, or $10,926 based on retention. According to ETA, Pathways grantees target individuals who were unemployed, dropped out of high school, have criminal records, or live in areas of high poverty. Therefore, they generally have a higher cost per participant due to additional services necessary to successfully support the population served. However, the Institute for Career Development, Inc. an ETP grant, proposed to serve 2,000 participants, but place and retain only 12 percent of those served at a cost of over $19,000 per participant. These variances in grantee performance agreements, where one grantee's expected performance is so disproportionately lower to the expected performance of another grantee providing similar type training, will impact the different successes each grantee achieves. Exhibit 4 on page 41 contains detailed information on all 97 grants.

Table 18 provides a summary by grant type of planned entered employment and retained employment for each training grant as compared to the planned number of participants the grants would serve, as well as the total planned cost per participant based on entered employment and retained employment.

DOE AR 000147

U.S. Department of Labor – Office of Inspector General

**Table 18: Planned Performance Goals and Per Participant Costs for All Training Grants by Grant Type (as of June 30, 2012)**

| | | Planned to Serve | Percent Served to Entered Employment | Percent Served to Retained Employment | Cost Per Planned Served | Cost Per Planned Entered Employment | Cost Per Planned Retention |
|---|---|---|---|---|---|---|---|
| **ETP** | | | | | | | |
| | Mean | 1,464 | 65% | 58% | $2,727 | $4,171 | $4,689 |
| | Median | 1,400 | 68% | 55% | $3,330 | $6,009 | $5,468 |
| | Max | 3,640 | 95% | 95% | $16,283 | $22,389 | $29,852 |
| | Min | 120 | 12% | 12% | $1,317 | 1/ | 1/ |
| **PATHWAYS** | | | | | | | |
| | Mean | 670 | 52% | 41% | $5,804 | $11,261 | $14,150 |
| | Median | 438 | 57% | 47% | $7,901 | $13,289 | $16,443 |
| | Max | 3,639 | 90% | 90% | $16,949 | $102,894* | $102,894* |
| | Min | 150 | 13% | 13% | $1,299 | $4,597 | $5,744 |
| **SESP** | | | | | | | |
| | Mean | 1,937 | 67% | 60% | $2,853 | $4,250 | $4,782 |
| | Median | 1,457 | 68% | 64% | $3,776 | $5,685 | $6,369 |
| | Max | 7,125 | 88% | 81% | $7,646 | $19,020 | $19,020 |
| | Min | 400 | 22% | 22% | $842 | $1,080 | 1/ |
| **ALL PROGRAMS** | | | | | | | |
| | **Mean** | **1,319** | **64%** | **56%** | **$3,404** | **$5,359** | **$6,131** |
| | Median | 1,100 | 62% | 53% | $4,430 | $8,030 | $9,193 |
| | Max | 7,125 | 95% | 95% | $16,949 | $102,894* | $102,894* |
| | Min | 120 | 12% | 12% | $842 | 1/ | 1/ |

Source: Grant agreements

1/ Could not be determined because not all grantees provided complete data on planned performance in the grant agreements approved by ETA.

* The $102,894 comprises 1 grant, which is approximately 40 percent more in cost than the next highest grant. See Exhibit 4 for cost information for all grantees.

## CONCLUSION

As of June 30, 2012, with 88 percent of the extended grant periods having elapsed, the impact of the Recovery Act Green Jobs training program has been limited in terms of reported employment outcomes. Complicating the assessment of the program's overall impact was the inability of sampled grantees to document between 24 percent and 44 percent of their reported employment outcomes.

Although grantees have reported achieving 90 percent of serving a collective goal of 126,493 participants, entered employment and retention results are far lower than planned. Out of a target of 81,254 participants, grantees collectively reported placing 30,857 into jobs (38 percent). Moreover, while grantees collectively projected 71,017 participants would retain employment for at least 6 months, grantees reported that only 11,613 actually did, which amounts to 16 percent of the collective goal. The low retention rate may be in part attributable to the timing of placement. For participants

DOE AR 000148

placed in the quarter ending June 30, 2012, retention information will not be available until the quarter ending December 31, 2012.

Grantees were authorized to train incumbent workers who needed training to secure full-time employment, advance their careers, or retain their current jobs. Of the 81,354 participants who completed training, 42,322 (52 percent) were incumbent workers, meaning the participants were already employed when they entered the program. However, for the 81 incumbent workers we identified in our sample, we found no evidence that they needed green job training for any of these purposes.

Based on ETA guidance, grantees reported incumbent workers as entered employment if they entered a new position of employment after program completion, even if the new position was with the same employer, as long as the individuals would utilize competencies acquired through training in their new position. Of the 30,857 participants grantees reported as having entered employment, 11,657 (or 38 percent) were incumbent workers, that is those who already held jobs when training began.

For the eight grantees in our sample, we attempted to verify grantee reported performance against available supporting documentation. The sampled grantees were unable to provide documentation for 24 percent of those reported as entering employment. Moreover, they could not provide documentation for 33 percent of those reported as entering training-related employment. The inability to document reported program outcomes raises questions about what was achieved with the investment in this program.

In addition to the availability and reliability of performance data, we also identified other issues that have a direct bearing on determining the true success of the program. Examples of these include the impact of grant period extensions, meaningfulness of credentials, the duration of training, and the limitations of available employment and retention data that does not include specific information about jobs participants received.

ETA stated that once all grants have ended in September 2013, it will determine employment outcomes by using unemployment insurance and Federal employment records to obtain entered employment, employment retention, and quarterly wages. Also, ETA is conducting two comprehensive evaluations of these grants: *Green Jobs and Health Care Implementation Study* an interim report was issued February 3, 2012, and the final is expected in January 2013; and *Green Jobs and Health Care Impact Study* an interim report is expected March 2014, and the final is expected September 2017. However, because of the issues discussed throughout this report, ETA may face challenges in attempting to properly evaluate the program.

Finally, it is important to note that, while the results of this audit focused on the Recovery Act-funded Green Jobs training program, the lessons and recommendations contained in this report are applicable to other ETA discretionary grant programs and

DOE AR 000149

U.S. Department of Labor – Office of Inspector General

certainly to the existing Green Jobs training program funded through ETA's regular appropriation.

**RECOMMENDATIONS**

We recommend the Assistant Secretary for Employment and Training:

1.  Develop and utilize lessons learned from the Recovery Act - Green Jobs Training Program to improve future discretionary grant programs by:

    - Ensuring that training, placement and retention goals contained in grant agreements are sufficiently comparable among grantees to fully contribute to the overall success and cost efficiency of the program;
    - Developing a clear strategy for serving incumbent workers to ensure that grant funds are only expended on those most in need of services to obtain new employment or retain their current jobs;
    - Evaluating the benefits of short (1-5 days) and long-term (6+months) training toward improving the job prospects of incumbent and unemployed workers; and
    - Evaluating the criteria for ETA approved "credentials" to ensure that they add value to participants' career development and job prospects.

2.  Improve the quality of grantee reported performance data by:

    - Clarifying grantee data collection and reporting expectations; and
    - Improving monitoring and controls over grant performance and financial data.

Elliot P. Lewis
Assistant Inspector General
  for Audit

DOE AR 000150

**PAGE INTENTIONALLY LEFT BLANK**

DOE AR 000151

# Exhibits

DOE AR 000152

U.S. Department of Labor – Office of Inspector General

**PAGE INTENTIONALLY LEFT BLANK**

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390

DOE AR 000153

U.S. Department of Labor – Office of Inspector General

**Exhibit 1**

## Eight Sampled Grantees

**Reported Results for Eight Sampled Grantees as of June 30, 2012**

| Grantee | Award Amount | Award Period | Proposed Participants Served | Selected Measures (% of Proposed Goals) | | | |
|---|---|---|---|---|---|---|---|
| | | | | Served | Completed Training | Placed | Retained |
| CWA | $3,969,056 | 1/15/2010 to 1/14/2012 | 1,000 | 1,298 (130%) | 831 (83%) | 420 (42%) | 0 (0%) |
| Hawaii | $6,000,000 | 1/29/2010 to 1/28/2013 | 1,300 | 1,688 (130%) | 1,343 (103%) | 273 (21%) | 29 (2%) |
| Iowa | $5,997,000 | 1/29/2010 to 1/28/2013 | 1,600 | 2,000 (125%) | 1,812 (113%) | 156 (10%) | 55 (3%) |
| Lehigh | $4,000,000 | 1/29/2010 to 6/30/2012 | 400 | 660 (165%) | 274 (69%) | 194 (49%) | 82 (21%) |
| Mott | $3,662,403 | 1/29/2010 to 9/30/2012 | 300 | 318 (106%) | 207 (69%) | 111 (37%) | 0 (0%) |
| NARC | $7,994,999 | 1/29/2010 to 4/28/2012 | 1,000 | 1,284 (128%) | 880 (88%) | 525 (53%) | 246 (25%) |
| Providence | $2,489,111 | 1/29/2010 to 7/31/2012 | 300 | 287 (96%) | 194 (65%) | 73 (24%) | 19 (6%) |
| Washington | $5,973,635 | 1/29/2010 to 6/30/2013 | 5,446 | 1,975 (36%) | 1,854 (34%) | 573 (11%) | 322 (6%) |
| **Totals** | **$40,086,204** | | **11,346** | **9,510** (84%) | **7,395** (65%) | **2,325** (20%) | **753** (7%) |

Source: Grantee reported performance information as of June 30, 2012. Employment retention was based on participants employed on or before December 31, 2011.

DOE AR 000154

**PAGE INTENTIONALLY LEFT BLANK**

DOE AR 000155

U.S. Department of Labor – Office of Inspector General

**Exhibit 2**

## Participant Characteristics

### Profile of Participants Served for 97 Green Job Training Grants

| | ETP | | PATHWAYS | | SESP | | ALL PROGRAMS | |
|---|---|---|---|---|---|---|---|---|
| | Partic-ipants | % Served | Partic-ipants | % of Part. | Partic-ipants | % Served | Partic-ipants | % Served |
| **GENDER** | | | | | | | | |
| Male | 34,105 | 85% | 18,472 | 76% | 41,994 | 86% | 94,571 | 84% |
| Female | 5,719 | 14% | 5,664 | 23% | 6,722 | 14% | 18,105 | 16% |
| Not Specified | 385 | 1% | 12 | 0% | 174 | 0% | 571 | 1% |
| **TOTAL PARTICIPANTS** | **40,209** | **100%** | **24,148** | **100%** | **48,890** | **100%** | **113,247** | **100%** |
| | | | | | | | | |
| **DEMOGRAPHICS[1]** | | | | | | | | |
| Need of Updated Training in Energy Efficiency & Renewable Energy Ind. | 29,141 | 72% | 557 | 2% | 26,029 | 53% | 55,727 | 49% |
| Unemployed Individual | 12,236 | 30% | 19,779 | 82% | 15,642 | 32% | 47,657 | 42% |
| Disadvantaged Worker within Areas of Poverty | 99 | 0% | 16,901 | 70% | 577 | 1% | 17,577 | 16% |
| Impacted by National Energy and Environmental Policy | 9,507 | 24% | 10 | 0% | 1,825 | 4% | 11,342 | 10% |
| Individual with a Criminal Record | 102 | 0% | 8,344 | 35% | 1,745 | 4% | 10,191 | 9% |
| Eligible Veteran | 3,378 | 8% | 1,162 | 5% | 2,855 | 6% | 7,395 | 7% |
| Seeking Employment Path. Out of Poverty & Self-Suff. | 241 | 1% | 2,719 | 11% | 4,023 | 8% | 6,983 | 6% |
| High School Dropout | 829 | 2% | 4,545 | 19% | 1,270 | 3% | 6,644 | 6% |
| Impacted by Automotive-related Restructuring | 3,134 | 8% | 17 | 0% | 1,774 | 4% | 4,925 | 4% |
| Limited English Proficient | 649 | 2% | 1,400 | 6% | 409 | 1% | 2,458 | 2% |
| Individual with a Disability | 457 | 1% | 534 | 1% | 510 | 1% | 1,501 | 1% |
| | | | | | | | | |
| **RACE** | | | | | | | | |
| White | 24,604 | 61% | 6,806 | 28% | 34,386 | 70% | 65,796 | 58% |
| Black or African American | 6,452 | 16% | 12,855 | 53% | 4,810 | 10% | 24,117 | 21% |
| Not Specified | 6,306 | 16% | 2,632 | 11% | 4,964 | 10% | 13,902 | 12% |
| More Than One Race | 835 | 2% | 889 | 4% | 1,317 | 3% | 3,041 | 3% |
| Asian | 1,291 | 3% | 292 | 1% | 1,275 | 3% | 2,858 | 3% |
| American Indian or Alaska | 502 | 1% | 553 | 2% | 1,541 | 3% | 2,596 | 2% |
| Native Hawaiian or Other Pacific Islander | 219 | 1% | 121 | 1% | 597 | 1% | 937 | 1% |
| **TOTAL PARTICIPANTS** | **40,209** | **--** | **24,148** | **--** | **48,890** | **--** | **113,247** | **--** |
| | | | | | | | | |
| **EDUCATION** | | | | | | | | |
| High School graduate or equivalent | 17,390 | 43% | 12,883 | 53% | 20,579 | 42% | 50,852 | 45% |
| 1 - 4 yrs. or more of college, tech or vocational school | 15,077 | 37% | 4,496 | 19% | 14,519 | 30% | 34,092 | 30% |
| Associates Degree/Bachelor's Degree/4+ yrs. of college | 5,245 | 13% | 1,173 | 5% | 9,918 | 20% | 16,336 | 14% |
| 9th grade - 12th grade | 2,076 | 5% | 4,974 | 21% | 3,599 | 7% | 10,649 | 9% |
| 8th grade and under | 421 | 1% | 622 | 3% | 275 | 1% | 1,318 | 1% |
| | | | | | | | | |
| **TOTAL PARTICIPANTS** | **40,209** | **--** | **24,148** | **--** | **48,890** | **--** | **113,247** | **--** |

[1] Participants were included in multiple demographics. Therefore, the sum of these demographics exceeds more than 100 percent.

DOE AR 000156

**PAGE INTENTIONALLY LEFT BLANK**

DOE AR 000157

U.S. Department of Labor – Office of Inspector General

**Exhibit 3**

## Extended Green Job Training Grants

| GRANTEE | Start Date | End Date | Extended End Date | % Extended |
|---|---|---|---|---|
| **SESP -- Start, End, and Extension Dates** | | | | |
| Alabama Department Of Economic And Community Affairs | 1/29/2010 | 1/28/2013 | 6/30/2013 | 14% |
| Alaska Department Of Labor And Workforce Development | 1/29/2010 | 1/28/2013 | 6/30/2013 | 14% |
| Arkansas Workforce Investment Board/Department Of Workforce Services | 1/29/2010 | 1/28/2013 | 6/30/2013 | 14% |
| Idaho Department Of Labor | 1/29/2010 | 1/28/2013 | 7/31/2013 | 17% |
| Maryland Department Of Labor, Licensing And Regulation | 1/29/2010 | 1/28/2013 | 6/30/2013 | 14% |
| New Mexico Department Of Workforce Solutions | 1/29/2010 | 1/28/2013 | 6/30/2013 | 14% |
| Oregon State Of Education | 1/29/2010 | 1/28/2013 | 6/30/2013 | 14% |
| Utah Department Of Workforce Services | 1/29/2010 | 1/28/2013 | 6/30/2013 | 14% |
| Washington State Workforce Training And Education Coordinating Board | 1/29/2010 | 1/28/2013 | 6/30/2013 | 14% |
| **SESP SUMMARY** | **No. of Grants Extended:** | | **9** | **14%** |
| | | | | |
| **PATHWAYS -- Start, End, and Extension Dates** | | | | |
| Alternative Opportunities, Inc. | 1/29/2010 | 1/28/2012 | 7/31/2012 | 25% |
| City Of Minneapolis | 1/29/2010 | 1/28/2012 | 9/28/2012 | 33% |
| CNY Works, Inc. | 1/29/2010 | 1/28/2012 | 4/28/2012 | 12% |
| Consortium For Worker Education | 1/29/2010 | 1/28/2012 | 12/31/2012 | 46% |
| East Harlem Employment Services, Inc. | 1/29/2010 | 1/28/2012 | 6/30/2012 | 21% |
| Eastern Maine Development Corporation | 1/29/2010 | 1/28/2012 | 10/28/2012 | 38% |
| Goodwill Industries International | 1/29/2010 | 1/28/2012 | 12/31/2012 | 46% |
| Grand Rapids Community College | 1/29/2010 | 1/28/2012 | 7/31/2012 | 25% |
| It's My Community Initiative | 1/29/2010 | 1/28/2012 | 1/28/2013 | 50% |
| Jobs For The Future, Inc. | 1/29/2010 | 1/28/2012 | 9/30/2012 | 34% |
| Lehigh Valley Workforce Investment Board, Inc. | 1/29/2010 | 1/28/2012 | 6/30/2012 | 21% |
| Los Angeles Community College District | 1/29/2010 | 1/28/2012 | 7/28/2012 | 25% |
| MDC, Inc. | 1/29/2010 | 1/28/2012 | 1/31/2013 | 51% |
| Mott Community College | 1/29/2010 | 1/28/2012 | 9/30/2012 | 34% |
| Moultrie Technical College | 1/29/2010 | 1/28/2012 | 12/31/2012 | 46% |
| National Association Of Regional Councils | 1/29/2010 | 1/28/2012 | 4/28/2012 | 12% |
| National Council Of La Raza | 1/29/2010 | 1/28/2012 | 9/30/2012 | 34% |
| Opportunities Industrialization Centers Of America, Inc. | 1/29/2010 | 1/28/2012 | 10/28/2012 | 38% |
| Pathstone Corporation | 1/29/2010 | 1/28/2012 | 10/31/2012 | 38% |
| Providence Economic Development Partnership | 1/29/2010 | 1/28/2012 | 7/31/2012 | 25% |
| Roca, Inc. | 1/29/2010 | 1/28/2012 | 1/31/2013 | 51% |
| SER - Jobs For Progress Of The Texas Gulf Coast, Inc. | 1/29/2010 | 1/28/2012 | 11/30/2012 | 42% |
| Southwest Housing Solutions Corporation | 1/29/2010 | 1/28/2012 | 6/30/2012 | 21% |
| The Workplace, Inc. | 1/29/2010 | 1/28/2012 | 4/28/2012 | 12% |
| Western Iowa Tech Community College | 1/29/2010 | 1/28/2012 | 6/29/2012 | 21% |
| Workforce Development Council Of Seattle King County | 1/29/2010 | 1/28/2012 | 3/31/2012 | 9% |
| Worksystems, Inc. | 1/29/2010 | 1/28/2012 | 6/30/2012 | 21% |
| **PATHWAYS SUMMARY** | **No. of Grants Extended:** | | **27** | **31%** |
| | | | | |
| **ETP -- Start, End, and Extension Dates** | | | | |
| Austin Electrical J.A.T.C. | 1/15/2010 | 1/14/2012 | 7/14/2012 | 25% |
| Broward County Minority Builders Coalition | 1/15/2010 | 1/14/2012 | 9/14/2012 | 33% |
| Central Vermont Community Action Council, Inc. | 1/15/2010 | 1/14/2012 | 7/14/2012 | 25% |
| Community Housing Partners Corporation | 1/15/2010 | 1/14/2012 | 7/14/2012 | 25% |
| H-Cap, Inc. | 1/15/2010 | 1/14/2012 | 6/30/2012 | 23% |
| Heritage Community Initiatives | 1/15/2010 | 1/14/2012 | 4/13/2012 | 12% |
| International Transportation Learning Center | 1/15/2010 | 1/14/2012 | 8/31/2012 | 32% |
| Joint Labor Management Cooperation Committee | 1/15/2010 | 1/14/2012 | 7/14/2012 | 25% |
| Labor's Community Agency, Inc. | 1/15/2010 | 1/14/2012 | 3/31/2012 | 11% |
| Memphis Bioworks Foundation | 1/15/2010 | 1/14/2012 | 7/14/2012 | 25% |

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390

DOE AR 000158

U.S. Department of Labor – Office of Inspector General
Draft

## Exhibit 3 (continued)

| GRANTEE | Start Date | End Date | Extended End Date | % Extended |
|---|---|---|---|---|
| **ETP -- Start, End, and Extension Dates (continued)** | | | | |
| Montana Electrical Joint Apprenticeship And Training Committee | 1/15/2010 | 1/14/2012 | 7/15/2012 | 25% |
| Northwest Energy Efficiency Council | 1/15/2010 | 1/14/2012 | 3/31/2012 | 11% |
| Ohio Electrical Labor Management Cooperative Committee, Inc. | 1/15/2010 | 1/14/2012 | 3/31/2012 | 11% |
| Oregon Manufacturing Extension Partnership | 1/15/2010 | 1/14/2012 | 1/14/2013 | 50% |
| SER Metro Detroit Jobs For Progress, Inc. | 1/15/2010 | 1/14/2012 | 9/30/2012 | 36% |
| The Providence Plan | 1/15/2010 | 1/14/2012 | 9/30/2012 | 36% |
| Thomas Shortman Training Scholarship And Safety Fund | 1/15/2010 | 1/14/2012 | 6/30/2012 | 23% |
| UAW-Labor Employment And Training Corporation | 1/15/2010 | 1/14/2012 | 9/30/2012 | 36% |
| Utility Workers Union of America, AFL-CIO | 1/15/2010 | 1/14/2012 | 7/14/2012 | 25% |
| **ETP SUMMARY** | **No. of Grants Extended:** | | **19** | **26%** |
| | | | | |
| **ALL GREEN JOB TRAINING GRANTS** | **No. of Grants Extended:** | | **55** | **25%** |

DOE AR 000159

U.S. Department of Labor – Office of Inspector General

**Exhibit 4**

## Disparate Goals Planned by Grantees

| | Grantee Name | Program | Served | Entered Employment | Retained | Cost Per Served | Cost Per Entered Employment | Cost Per Retention |
|---|---|---|---|---|---|---|---|---|
| 1 | Nevada Department Of Employ, Training And Rehabilitation | SESP | 7,125 | 78% | 74% | $842 | $1,080 | $1,145 |
| 2 | Thomas Shortman Training Scholarship And Safety Fund | ETP | 2,000 | 95% | 95% | $1,401 | $1,475 | $1,475 |
| 3 | Washington State Workforce Training and Education | SESP | 5,446 | 88% | 74% | $1,097 | $1,252 | $1,485 |
| 4 | Healthcare Advancement Program, Inc. | ETP | 3,520 | 81% | 81% | $1,317 | $1,626 | $1,626 |
| 5 | International Transportation Learning Center | ETP | 3,640 | 85% | 80% | $1,374 | $1,616 | $1,717 |
| 6 | Montana Electrical Joint Apprenticeship And Training Committee | ETP | 2,475 | 90% | 81% | $2,020 | $2,242 | $2,491 |
| 7 | New Jersey Department Of Labor And Workforce Development | SESP | 3,412 | 68% | 68% | $1,758 | $2,596 | $2,596 |
| 8 | Wisconsin Department Of Workforce Development | SESP | 4,508 | 59% | 47% | $1,331 | $2,264 | $2,830 |
| 9 | Indiana Department Of Workforce Development | SESP | 2,500 | 86% | 78% | $2,400 | $2,804 | $3,093 |
| 10 | California Joint Labor Management Cooperation Committee | ETP | 2,192 | 73% | 73% | $2,281 | $3,141 | $3,141 |
| 11 | Arkansas Workforce Investment Board | SESP | 2,800 | 54% | 49% | $1,738 | $3,195 | $3,550 |
| 12 | Maryland Department Of Labor, Licensing And Regulation | SESP | 2,265 | 76% | 66% | $2,558 | $3,380 | $3,904 |
| 13 | Workforce West Virginia | SESP | 2,082 | 75% | 70% | $2,882 | $3,827 | $4,096 |
| 14 | Utah Department Of Workforce Services | SESP | 1,400 | 79% | 79% | $3,286 | $4,152 | $4,152 |
| 15 | New Mexico Department Of Workforce Solutions | SESP | 3,125 | 46% | 46% | $1,920 | $4,167 | $4,167 |
| 16 | Labor's Community Agency, Inc. | ETP | 1,913 | 56% | 45% | $1,884 | $3,365 | $4,210 |
| 17 | Ohio Electrical Labor Management Cooperative Committee, Inc. | ETP | 1,400 | 80% | 80% | $3,447 | $4,290 | $4,290 |
| 18 | Central Vermont Community Action Council, Inc. | ETP | 2,542 | 44% | 44% | $1,906 | $4,300 | $4,300 |
| 19 | Wyoming Department Of Workforce Services | SESP | 2,023 | 51% | 51% | $2,222 | $4,319 | $4,319 |
| 20 | Illinois Department Of Commerce And Economic Opportunity | SESP | 1,836 | 71% | 71% | $3,268 | $4,580 | $4,598 |
| 21 | Iowa Workforce Development | SESP | 1,600 | 88% | 81% | $3,748 | $4,284 | $4,613 |
| 22 | The Providence Plan | ETP | 2,075 | 77% | 39% | $1,793 | $2,325 | $4,650 |
| 23 | Blue Green Alliance Foundation | ETP | 2,063 | 60% | 48% | $2,424 | $4,039 | $5,000 |
| 24 | International Training Institute for Sheet Metal and A/C Industry | ETP | 1,500 | 62% | 62% | $3,330 | $5,371 | $5,371 |
| 25 | Broward County Minority Builders Coalition | ETP | 1,000 | 70% | 60% | $3,281 | $4,687 | $5,468 |
| 26 | Opportunities Industrialization Centers Of America, Inc. | Pathways | 1,600 | 67% | 53% | $3,063 | $4,597 | $5,744 |
| 27 | Citrus Levy Marion Regional Workforce Development Bd, Inc. | Pathways | 665 | 84% | 78% | $4,489 | $5,369 | $5,785 |
| 28 | Michigan Department Of Energy, Labor & Economic Growth | SESP | 1,282 | 82% | 77% | $4,540 | $5,532 | $5,903 |
| 29 | Better Family Life, Inc. | Pathways | 1,000 | 70% | 53% | $3,305 | $4,722 | $6,296 |
| 30 | State of Oklahoma | SESP | 1,200 | 88% | 79% | $5,000 | $5,714 | $6,316 |
| 31 | Oregon State Department Of Education | SESP | 1,247 | 72% | 68% | $4,317 | $5,995 | $6,349 |
| 32 | Arizona Department Of Economic Security | SESP | 1,648 | 68% | 57% | $3,641 | $5,367 | $6,369 |
| 33 | Alabama Department Of Economic And Community Affairs | SESP | 2,100 | 55% | 43% | $2,857 | $5,217 | $6,667 |
| 34 | Alaska Department Of Labor And Workforce Development | SESP | 700 | 86% | 77% | $5,143 | $6,010 | $6,679 |
| 35 | State Of California Employment Development Department | SESP | 1,200 | 80% | 70% | $5,000 | $6,250 | $7,143 |
| 36 | East Central Intergovernmental Association | ETP | 392 | 79% | 72% | $5,256 | $6,646 | $7,280 |
| 37 | Kansas Department Of Commerce | SESP | 1,580 | 52% | 52% | $3,797 | $7,281 | $7,281 |
| 38 | Los Angeles Community College District | Pathways | 925 | 72% | 57% | $4,324 | $5,997 | $7,590 |
| 38 | Connecticut Employment And Training Commission | SESP | 895 | 62% | 49% | $3,754 | $6,098 | $7,619 |
| 40 | UAW-Labor Employment And Training Corporation | ETP | 725 | 61% | 55% | $4,414 | $7,273 | $8,000 |
| 41 | North Carolina Department Of Commerce | SESP | 1,137 | 64% | 64% | $5,256 | $8,153 | $8,153 |
| 42 | Minnesota Department Of Employ. & Economic Development | SESP | 1,495 | 60% | 48% | $4,013 | $6,689 | $8,357 |
| 43 | Colorado Department Of Labor And Employment | SESP | 1,200 | 65% | 59% | $4,998 | $7,739 | $8,412 |
| 44 | Utility Workers Union of America, AFL-CIO | ETP | 719 | 91% | 82% | $6,946 | $7,659 | $8,436 |
| 45 | East Harlem Employment Services, Inc. | Pathways | 3,639 | 24% | 15% | $1,299 | $5,367 | $8,489 |
| 46 | Commonwealth of MA, Labor and Workforce Development | SESP | 1,379 | 56% | 48% | $4,332 | $7,738 | $9,065 |
| 47 | State Of Ohio | SESP | 1,800 | 36% | 36% | $3,333 | $9,160 | $9,160 |
| 48 | Oregon Manufacturing Extension Partnership | ETP | 1,734 | 37% | 31% | $2,884 | $7,837 | $9,225 |
| 49 | South Dakota Department Of Labor | SESP | 400 | 68% | 68% | $6,250 | $9,259 | $9,259 |
| 50 | Florida State College At Jacksonville | Pathways | 390 | 72% | 62% | $5,717 | $7,907 | $9,290 |
| 51 | Northwest Energy Efficiency Council | ETP | 875 | 54% | 46% | $4,430 | $8,195 | $9,571 |
| 52 | Austin Electrical JATC | ETP | 1,100 | 46% | 46% | $4,402 | $9,608 | $9,608 |
| 53 | Hawaii Department of Labor and Industrial Relations | SESP | 1,300 | 48% | 45% | $4,615 | $9,600 | $10,239 |

DOE AR 000160

U.S. Department of Labor – Office of Inspector General

Draft

## Exhibit 4 (continued)

| | Grantee Name | Program | Served | Entered Employ-ment | Retain-ed | Cost Per Served | Cost Per Entered Employ-ment | Cost Per Reten-tion |
|---|---|---|---|---|---|---|---|---|
| 54 | SER - Jobs For Progress Of The Texas Gulf Coast, Inc. | Pathways | 400 | 85% | 75% | $7,806 | $9,184 | $10,409 |
| 55 | Kentucky Education and Workforce Development Cabinet | SESP | 620 | 81% | 72% | $7,646 | $9,424 | $10,677 |
| 56 | Workforce Development Council Of Seattle King County | Pathways | 475 | 77% | 71% | $7,662 | $9,971 | $10,864 |
| 57 | Jobs For The Future, Inc. | Pathways | 1,130 | 81% | 65% | $7,078 | $8,789 | $10,926 |
| 58 | Northern Rural Training & Employment Consortium | Pathways | 615 | 70% | 56% | $6,504 | $9,281 | $11,594 |
| 59 | MDC, Inc. | Pathways | 734 | 53% | 44% | $5,151 | $9,670 | $11,742 |
| 60 | Missouri Division Of Workforce Development | SESP | 810 | 65% | 59% | $7,407 | $11,429 | $12,632 |
| 61 | Alternative Opportunities, Inc. | Pathways | 200 | 90% | 90% | $11,541 | $12,823 | $12,823 |
| 62 | Southwest Housing Solutions Corporation | Pathways | 1,200 | 30% | 26% | $3,333 | $11,111 | $12,903 |
| 63 | Pathstone Corporation | Pathways | 1,200 | 51% | 51% | $6,667 | $12,987 | $12,987 |
| 64 | The Workplace, Inc. | Pathways | 700 | 50% | 39% | $5,714 | $11,429 | $14,545 |
| 65 | Nebraska Department Of Labor | SESP | 950 | 37% | 33% | $5,094 | $13,788 | $15,364 |
| 66 | Providence Economic Development Partnership | Pathways | 300 | 60% | 53% | $8,297 | $13,828 | $15,557 |
| 67 | Goodwill Industries International | Pathways | 1,300 | 48% | 36% | $5,618 | $11,761 | $15,639 |
| 68 | National Association of Regional Councils | Pathways | 1,000 | 50% | 50% | $7,995 | $15,990 | $15,990 |
| 69 | Memphis Bioworks Foundation | ETP | 450 | 55% | 40% | $6,514 | $11,867 | $16,105 |
| 70 | Mi Casa Resource Center For Women, Inc. | Pathways | 500 | 54% | 45% | $7,266 | $13,456 | $16,220 |
| 71 | City Of Minneapolis | Pathways | 500 | 60% | 48% | $8,000 | $13,333 | $16,667 |
| 72 | Heritage Health Foundation | ETP | 120 | 75% | 70% | $11,738 | $15,651 | $16,769 |
| 73 | Grand Rapids Community College | Pathways | 1,250 | 24% | 18% | $3,200 | $13,245 | $17,621 |
| 74 | Moultrie Technical College | Pathways | 360 | 58% | 58% | $10,427 | $18,046 | $18,046 |
| 75 | Idaho Department Of Labor | SESP | 1,418 | 22% | 22% | $4,225 | $19,020 | $19,020 |
| 76 | Community Housing Partners Corporation | ETP | 380 | 66% | 53% | $10,172 | $15,462 | $19,327 |
| 77 | Institute For Career Development, Inc. | ETP | 2,000 | 12% | 12% | $2,329 | $19,412 | $19,412 |
| 78 | Community College Of Philadelphia | Pathways | 250 | 81% | 65% | $12,738 | $15,687 | $19,657 |
| 79 | Consortium For Worker Education | Pathways | 500 | 54% | 37% | $8,000 | $14,815 | $21,739 |
| 80 | Boley Centers, Inc. | Pathways | 225 | 56% | 44% | $10,225 | $18,405 | $23,007 |
| 81 | National Council Of La Raza | Pathways | 241 | 67% | 54% | $12,713 | $19,030 | $23,568 |
| 82 | Private Industry Council of Westmoreland/Fayette, Inc. | Pathways | 250 | 61% | 46% | $10,931 | $17,861 | $23,763 |
| 83 | Roca, Inc. | Pathways | 225 | 62% | 44% | $10,661 | $17,134 | $24,477 |
| 84 | Central New York Works, Inc. | Pathways | 1,000 | 37% | 15% | $3,716 | $10,153 | $25,452 |
| 85 | Southeast Community College Area | Pathways | 400 | 48% | 23% | $5,828 | $12,270 | $25,903 |
| 86 | West Hills Community College District | Pathways | 300 | 49% | 38% | $10,000 | $20,408 | $26,087 |
| 87 | Eastern Maine Development Corporation | Pathways | 150 | 60% | 50% | $14,061 | $23,434 | $28,121 |
| 88 | Western Iowa Tech Community College | Pathways | 300 | 55% | 47% | $13,332 | $24,239 | $28,165 |
| 89 | Mott Community College | Pathways | 300 | 53% | 43% | $12,208 | $22,890 | $28,172 |
| 90 | SER Metro Detroit Jobs For Progress, Inc. | ETP | 264 | 73% | 55% | $16,283 | $22,389 | $29,852 |
| 91 | Worksystems, Inc. | Pathways | 360 | 50% | 35% | $11,111 | $22,222 | $31,746 |
| 92 | It's My Community Initiative | Pathways | 236 | 81% | 32% | $16,949 | $21,053 | $53,333 |
| 93 | Lehigh Valley Workforce Investment Board, Inc. | Pathways | 400 | 19% | 16% | $10,000 | $53,333 | $61,538 |
| 94 | White Earth Band of Chippewa | Pathways | 240 | 13% | 13% | $12,862 | $102,894 | $102,894 |
| 95 | Communications Workers of America | ETP | 1,000 | 42% | 1/ | $3,969 | $9,450 | 1/ |
| 96 | Commonwealth Of Pennsylvania, Department Of Labor | SESP | 1,379 | 77% | 1/ | $4,351 | $5,655 | 1/ |
| 97 | National Ironworkers And Employers Apprenticeship | ETP | 510 | 1/ | 1/ | $3,812 | 1/ | 1/ |

| **Average By Green Job Training Grant Program** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **ETP** | 1,464 | **65%** | 58% | $2,727 | $4,171 | $4,689 |
| **PATHWAYS** | 670 | **52%** | 41% | $5,804 | $11,261 | $14,150 |
| **SESP** | 1,937 | **67%** | 60% | $2,853 | $4,250 | $4,782 |
| **All Programs** | **1,319** | **64%** | **56%** | **$3,404** | **$5,359** | **$6,131** |

1/ Data not available because grantee did not provide all goals in the grant agreement that was approved by ETA.

DOE AR 000161

U.S. Department of Labor – Office of Inspector General

**Exhibit 5**

## Grant Awards, Expenditures, and Training Outcomes for All Grants as of June 30, 2012

| No. | Grantee Name | | Awards & Expenditures | Proposed/ Reported | Served | Enrolled in Training | Completed Training | Entered Employment | Entered in Training-Related Employment | Employment Retention |
|---|---|---|---|---|---|---|---|---|---|---|
| **SESP Grants (34 grants in total)** | | | | | | | | | | |
| 1 | **Alabama Department of Economic and Community Affairs** | | | | | | | | | |
| | | Award: | $6,000,000 | Proposed: | 2,100 | 1,800 | 1,442 | 1,150 | 975 | 900 |
| | | Expenditures: | $3,514,396 | Reported: | 1,787 | 1,786 | 820 | 85 | 55 | 5 |
| 2 | **Alaska Department of Labor and Workforce Development** | | | | | | | | | |
| | | Award: | 3,600,000 | Proposed: | 700 | 700 | 665 | 599 | 539 | 539 |
| | | Expenditures: | 2,211,641 | Reported: | 756 | 756 | 733 | 368 | 359 | 95 |
| 3 | **Arizona Department of Economic Security** | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 1,648 | 1,648 | 1,502 | 1,118 | 1,083 | 942 |
| | | Expenditures: | 4,502,949 | Reported: | 2,088 | 2,079 | 1,495 | 832 | 785 | 166 |
| 4 | **Arkansas Workforce Investment Board** | | | | | | | | | |
| | | Award: | 4,866,479 | Proposed: | 2,800 | 2,240 | 1,792 | 1,523 | 1,344 | 1,371 |
| | | Expenditures: | 3,677,320 | Reported: | 2,796 | 2,795 | 2,376 | 1,533 | 1,394 | 466 |
| 5 | **Colorado Department of Labor and Employment** | | | | | | | | | |
| | | Award: | 5,998,050 | Proposed: | 1,200 | 1,200 | 830 | 775 | 760 | 713 |
| | | Expenditures: | 4,405,627 | Reported: | 1,842 | 1,833 | 1,331 | 300 | 299 | 149 |
| 6 | **Commonwealth of MA, Labor and Workforce Development** | | | | | | | | | |
| | | Award: | 5,973,657 | Proposed: | 1,379 | 1,379 | 1,164 | 772 | 681 | 659 |
| | | Expenditures: | 4,161,004 | Reported: | 1,576 | 1,568 | 1,223 | 518 | 482 | 250 |
| 7 | **Commonwealth of Pennsylvania, Department of Labor** | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 1,379 | 1,061 | 1,061 | 1,061 | 0 | 0 |
| | | Expenditures: | 4,602,787 | Reported: | 1,731 | 1,712 | 1,056 | 462 | 343 | 154 |
| 8 | **Connecticut Employment and Training Commission** | | | | | | | | | |
| | | Award: | 3,360,000 | Proposed: | 895 | 895 | 813 | 551 | 486 | 441 |
| | | Expenditures: | 2,066,033 | Reported: | 886 | 884 | 749 | 150 | 135 | 71 |
| 9 | **Kentucky Education and Workforce Development Cabinet** | | | | | | | | | |
| | | Award: | 4,740,457 | Proposed: | 620 | 620 | 560 | 503 | 469 | 444 |
| | | Expenditures: | 2,123,896 | Reported: | 648 | 648 | 441 | 84 | 77 | 17 |
| 10 | **Hawaii Department of Labor and Industrial Relations** | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 1,300 | 1,243 | 1,172 | 625 | 0 | 586 |
| | | Expenditures: | 3,844,291 | Reported: | 1,688 | 1,683 | 1,343 | 273 | 226 | 29 |
| 11 | **Idaho Department of Labor** | | | | | | | | | |
| | | Award: | 5,991,184 | Proposed: | 0 | 1,418 | 569 | 315* | 356 | 315 |
| | | Expenditures: | 4,055,149 | Reported: | 954 | 954 | 280 | 162 | 148 | 12 |
| 12 | **Illinois Department of Commerce and Economic Opportunity** | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 1,836 | 1,836 | 1,694 | 1,310 | 1,310 | 1,305 |
| | | Expenditures: | 3,245,341 | Reported: | 1,063 | 1,061 | 592 | 148 | 129 | 23 |
| 13 | **Indiana Department of Workforce Development** | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 2,500 | 2,500 | 2,190 | 2,140 | 2,075 | 1,940 |
| | | Expenditures: | 2,080,164 | Reported: | 838 | 827 | 531 | 137 | 133 | 20 |

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390
DOE AR 000162

U.S. Department of Labor – Office of Inspector General

**Exhibit 5 (continued)**

## Grant Awards, Expenditures, and Training Outcomes for all Grants as of June 30, 2012

| No. | Grantee Name | | Awards & Expenditures | Proposed/ Reported | Served | Enrolled in Training | Completed Training | Entered Employment | Entered in Training-Related Employment | Employment Retention |
|---|---|---|---|---|---|---|---|---|---|---|
| 14 | Iowa Workforce Development | | | | | | | | | |
| | | Award: | 5,997,000 | Proposed: | 1,600 | 1,600 | 1,500 | 1,400 | 1,000 | 1,300 |
| | | Expenditures: | 3,516,636 | Reported: | 2,000 | 1,994 | 1,812 | 156 | 108 | 55 |
| 15 | Kansas Department of Commerce | | | | | | | | | |
| | | Award: | 5,999,890 | Proposed: | 1,580 | 1,316 | 1,053 | 824* | 927 | 824 |
| | | Expenditures: | 3,338,415 | Reported: | 952 | 946 | 421 | 197 | 182 | 45 |
| 16 | Maryland Department of Labor, Licensing and Regulation | | | | | | | | | |
| | | Award: | 5,793,183 | Proposed: | 2,265 | 2,265 | 1,833 | 1,714 | 1,415 | 1,484 |
| | | Expenditures: | 3,906,329 | Reported: | 1,577 | 1,577 | 1,375 | 169 | 169 | 7 |
| 17 | Michigan Department of Energy, Labor and Economic Growth | | | | | | | | | |
| | | Award: | 5,819,999 | Proposed: | 1,282 | 1,137 | 0 | 1,052 | 0 | 986 |
| | | Expenditures: | 3,302,884 | Reported: | 951 | 951 | 609 | 298 | 255 | 121 |
| 18 | Minnesota Department of Employ. and Economic Development | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 1,495 | 1,495 | 1,196 | 897 | 628 | 718 |
| | | Expenditures: | 2,109,857 | Reported: | 1,462 | 1,458 | 983 | 319 | 274 | 178 |
| 19 | Missouri Division of Workforce Development | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 810 | 810 | 635 | 525 | 505 | 475 |
| | | Expenditures: | 2,735,437 | Reported: | 692 | 692 | 432 | 111 | 85 | 25 |
| 20 | Nebraska Department of Labor | | | | | | | | | |
| | | Award: | 4,839,511 | Proposed: | 950 | 867 | 737 | 351 | 329 | 315 |
| | | Expenditures: | 2,793,762 | Reported: | 1,315 | 1,309 | 473 | 136 | 94 | 13 |
| 21 | Nevada Department of Employ, Training and Rehabilitation | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 7,125 | 7,125 | 6,289 | 5,557 | 732 | 5,238 |
| | | Expenditures: | 3,555,499 | Reported: | 2,890 | 2,869 | 2,210 | 332 | 284 | 85 |
| 22 | New Jersey Department of Labor and Workforce Development | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 3,412 | 3,412 | 3,073 | 2,311** | 0 | 2,311 |
| | | Expenditures: | 1,088,759 | Reported: | 831 | 831 | 410 | 191 | 191 | 0 |
| 23 | New Mexico Department of Workforce Solutions | | | | | | | | | |
| | | Award: | 5,999,989 | Proposed: | 3,125 | 2,500 | 2,000 | 1,440* | 1,800 | 1,440 |
| | | Expenditures: | 2,656,293 | Reported: | 1,238 | 1,203 | 882 | 223 | 221 | 57 |
| 24 | North Carolina Department of Commerce | | | | | | | | | |
| | | Award: | 5,976,512 | Proposed: | 1,137 | 1,137 | 998 | 733** | 783 | 733 |
| | | Expenditures: | 3,346,308 | Reported: | 1,252 | 1,213 | 775 | 516 | 491 | 108 |
| 25 | Oregon State Department of Education | | | | | | | | | |
| | | Award: | 5,383,568 | Proposed: | 1,247 | 1,247 | 1,060 | 898 | 811 | 848 |
| | | Expenditures: | 3,698,261 | Reported: | 1,178 | 1,159 | 589 | 345 | 299 | 147 |
| 26 | South Dakota Department of Labor | | | | | | | | | |
| | | Award: | 2,500,000 | Proposed: | 400 | 300 | 285 | 270 | 257 | 270 |
| | | Expenditures: | 2,112,836 | Reported: | 393 | 267 | 126 | 112 | 91 | 28 |
| 27 | State of California Employment Development Department | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 1,200 | 1,200 | 960 | 960 | 900 | 840 |
| | | Expenditures: | 4,877,002 | Reported: | 1,076 | 1,016 | 521 | 293 | 273 | 12 |

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390

DOE AR 000163

U.S. Department of Labor – Office of Inspector General

**Exhibit 5 (continued)**

## Grant Awards, Expenditures, and Training Outcomes for all Grants as of June 30, 2012

| No. | Grantee Name | | Awards & Expenditures | Proposed/ Reported | Served | Enrolled in Training | Completed Training | Entered Employment | Entered in Training-Related Employment | Employment Retention |
|---|---|---|---|---|---|---|---|---|---|---|
| 28 | State of Ohio | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 1,800 | 1,600 | 1,500 | 655** | 200 | 655 |
| | | Expenditures: | 729,034 | Reported: | 1,373 | 1,373 | 1,364 | 0 | 0 | 0 |
| 29 | State of Oklahoma | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 1,200 | 1,200 | 1,100 | 1,050 | 1,000 | 950 |
| | | Expenditures: | 3,689,721 | Reported: | 3,133 | 3,126 | 2,558 | 1,351 | 1,294 | 605 |
| 30 | Utah Department of Workforce Services | | | | | | | | | |
| | | Award: | 4,600,000 | Proposed: | 1,400 | 1,400 | 0 | 1,108** | 955 | 1,108 |
| | | Expenditures: | 2,871,467 | Reported: | 1,076 | 1,068 | 219 | 80 | 73 | 0 |
| 31 | Washington State Workforce Training and Education | | | | | | | | | |
| | | Award: | 5,973,635 | Proposed: | 5,446 | 5,174 | 4,915 | 4,771 | 4,731 | 4,022 |
| | | Expenditures: | 3,598,231 | Reported: | 1,975 | 1,975 | 1,854 | 573 | 549 | 322 |
| 32 | Wisconsin Department of Workforce Development | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 4,508 | 4,206 | 2,944 | 2,650 | 2,503 | 2,120 |
| | | Expenditures: | 2,511,455 | Reported: | 2,800 | 2,800 | 320 | 302 | 302 | 0 |
| 33 | Workforce West Virginia | | | | | | | | | |
| | | Award: | 6,000,000 | Proposed: | 2,082 | 2,002 | 1,749 | 1,568 | 0 | 1,465 |
| | | Expenditures: | 3,782,230 | Reported: | 1,252 | 1,184 | 1,042 | 408 | 207 | 25 |
| 34 | Wyoming Department of Workforce Services | | | | | | | | | |
| | | Award: | 4,495,704 | Proposed: | 2,023 | 0 | 1,755 | 1,041 | 0 | 1,041 |
| | | Expenditures: | 2,415,733 | Reported: | 821 | 784 | 505 | 276 | 237 | 0 |
| **Subtotals for SESP grants:** | | | | | | | | | | |
| | | **Award:** | **$187,908,818** | **Proposed:** | 64,444 | 60,533 | 51,036 | 44,217 | 29,554 | 39,298 |
| | | **Expenditures:** | **$107,126,748** | **Reported:** | 48,890 | 48,381 | 32,450 | 11,440 | 10,244 | 3,290 |
| **Pathways Grants (38 grants in total)** | | | | | | | | | | |
| 35 | Alternative Opportunities, Inc. | | | | | | | | | |
| | | Award: | $2,308,200 | Proposed: | 200 | 200 | 200 | 180** | 160 | 180 |
| | | Expenditures: | $2,098,818 | Reported: | 166 | 166 | 105 | 70 | 39 | 56 |
| 36 | Better Family Life, Inc. | | | | | | | | | |
| | | Award: | 3,305,493 | Proposed: | 1,000 | 900 | 783 | 700 | 700 | 525 |
| | | Expenditures: | 3,218,272 | Reported: | 1,235 | 928 | 817 | 351 | 336 | 40 |
| 37 | Boley Centers, Inc. | | | | | | | | | |
| | | Award: | 2,300,678 | Proposed: | 225 | 150 | 127 | 125 | 80 | 100 |
| | | Expenditures: | 1,844,031 | Reported: | 247 | 180 | 111 | 59 | 35 | 24 |
| 38 | Citrus Levy Marion Regional Workforce Development Bd, Inc. | | | | | | | | | |
| | | Award: | 2,985,175 | Proposed: | 665 | 665 | 556 | 556 | 556 | 516 |
| | | Expenditures: | 1,708,204 | Reported: | 344 | 341 | 258 | 131 | 55 | 80 |
| 39 | City of Minneapolis | | | | | | | | | |
| | | Award: | 4,000,000 | Proposed: | 500 | 500 | 400 | 300 | 210 | 240 |
| | | Expenditures: | 3,951,374 | Reported: | 586 | 586 | 482 | 292 | 206 | 193 |

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390
DOE AR 000164

U.S. Department of Labor – Office of Inspector General

**Exhibit 5 (continued)**

## Grant Awards, Expenditures, and Training Outcomes for all Grants as of June 30, 2012

| No. | Grantee Name | | Awards & Expenditures | Proposed/ Reported | Served | Enrolled in Training | Completed Training | Entered Employment | Entered in Training-Related Employment | Employment Retention |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 | Central New York Works, Inc. | | | | | | | | | |
| | | Award: | 3,715,931 | Proposed: | 1,000 | 750 | 488 | 366 | 293 | 146 |
| | | Expenditures: | 2,281,251 | Reported: | 1,387 | 472 | 293 | 122 | 102 | 77 |
| 41 | Community College of Philadelphia | | | | | | | | | |
| | | Award: | 3,184,428 | Proposed: | 250 | 250 | 225 | 203 | 195 | 162 |
| | | Expenditures: | 1,990,681 | Reported: | 243 | 243 | 165 | 74 | 40 | 20 |
| 42 | Consortium for Worker Education | | | | | | | | | |
| | | Award: | 4,000,000 | Proposed: | 500 | 448 | 378 | 270 | 188 | 184 |
| | | Expenditures: | 3,637,430 | Reported: | 585 | 566 | 311 | 183 | 137 | 16 |
| 43 | East Harlem Employment Services, Inc. | | | | | | | | | |
| | | Award: | 4,728,419 | Proposed: | 3,639 | 1,819 | 1,258 | 881 | 818 | 557 |
| | | Expenditures: | 4,568,047 | Reported: | 1,998 | 1,905 | 1,174 | 504 | 283 | 118 |
| 44 | Eastern Maine Development Corporation | | | | | | | | | |
| | | Award: | 2,109,088 | Proposed: | 150 | 135 | 110 | 90 | 65 | 75 |
| | | Expenditures: | 1,648,905 | Reported: | 109 | 95 | 70 | 39 | 34 | 14 |
| 45 | Florida State College at Jacksonville | | | | | | | | | |
| | | Award: | 2,229,642 | Proposed: | 390 | 390 | 332 | 282 | 240 | 240 |
| | | Expenditures: | 1,511,806 | Reported: | 288 | 287 | 199 | 110 | 62 | 0 |
| 46 | Goodwill Industries International | | | | | | | | | |
| | | Award: | 7,303,634 | Proposed: | 1,300 | 997 | 764 | 621 | 571 | 467 |
| | | Expenditures: | 7,054,541 | Reported: | 1,668 | 1,349 | 997 | 657 | 266 | 441 |
| 47 | Grand Rapids Community College | | | | | | | | | |
| | | Award: | 4,000,000 | Proposed: | 1,250 | 1,080 | 464 | 302 | 151 | 227 |
| | | Expenditures: | 3,931,337 | Reported: | 665 | 499 | 300 | 165 | 109 | 72 |
| 48 | It's My Community Initiative | | | | | | | | | |
| | | Award: | 4,000,000 | Proposed: | 236 | 236 | 214 | 190 | 5 | 75 |
| | | Expenditures: | 2,844,414 | Reported: | 612 | 247 | 195 | 98 | 83 | 13 |
| 49 | Jobs for the Future, Inc. | | | | | | | | | |
| | | Award: | 7,997,936 | Proposed: | 1,130 | 1,100 | 997 | 910 | 848 | 732 |
| | | Expenditures: | 7,075,153 | Reported: | 1,283 | 1,282 | 888 | 532 | 419 | 261 |
| 50 | Lehigh Valley Workforce Investment Board, Inc. | | | | | | | | | |
| | | Award: | 4,000,000 | Proposed: | 400 | 225 | 100 | 75 | 70 | 65 |
| | | Expenditures: | 3,819,407 | Reported: | 660 | 324 | 274 | 194 | 169 | 82 |
| 51 | Los Angeles Community College District | | | | | | | | | |
| | | Award: | 4,000,000 | Proposed: | 925 | 925 | 878 | 667 | 600 | 527 |
| | | Expenditures: | 3,983,177 | Reported: | 1,028 | 904 | 605 | 246 | 190 | 0 |
| 52 | MDC, Inc. | | | | | | | | | |
| | | Award: | 3,780,816 | Proposed: | 734 | 711 | 580 | 391 | 318 | 322 |
| | | Expenditures: | 2,946,411 | Reported: | 679 | 679 | 359 | 182 | 89 | 69 |
| 53 | Mi Casa Resource Center for Women, Inc. | | | | | | | | | |
| | | Award: | 3,633,195 | Proposed: | 500 | 500 | 400 | 270 | 50 | 224 |
| | | Expenditures: | 3,604,279 | Reported: | 727 | 544 | 511 | 220 | 168 | 53 |

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390
DOE AR 000165

U.S. Department of Labor – Office of Inspector General

**Exhibit 5 (continued)**

## Grant Awards, Expenditures, and Training Outcomes for all Grants as of June 30, 2012

| No. | Grantee Name | | Awards & Expenditures | Proposed/ Reported | Served | Enrolled in Training | Completed Training | Entered Employment | Entered in Training-Related Employment | Employment Retention |
|---|---|---|---|---|---|---|---|---|---|---|
| 54 | Mott Community College | | | | | | | | | |
| | | Award: | 3,662,403 | Proposed: | 300 | 200 | 170 | 160 | 140 | 130 |
| | | Expenditures: | 3,279,607 | Reported: | 318 | 318 | 207 | 111 | 107 | 0 |
| 55 | Moultrie Technical College | | | | | | | | | |
| | | Award: | 3,753,579 | Proposed: | 360 | 324 | 260 | 208* | 208 | 208 |
| | | Expenditures: | 2,770,523 | Reported: | 143 | 123 | 20 | 4 | 2 | 0 |
| 56 | National Association of Regional Councils | | | | | | | | | |
| | | Award: | 7,994,999 | Proposed: | 1,000 | 800 | 600 | 500 | 500 | 500 |
| | | Expenditures: | 7,924,565 | Reported: | 1,284 | 966 | 880 | 525 | 346 | 246 |
| 57 | National Council of La Raza | | | | | | | | | |
| | | Award: | 3,063,839 | Proposed: | 241 | 241 | 216 | 161 | 139 | 130 |
| | | Expenditures: | 2,649,139 | Reported: | 333 | 322 | 182 | 105 | 70 | 66 |
| 58 | Northern Rural Training & Employment Consortium | | | | | | | | | |
| | | Award: | 4,000,000 | Proposed: | 615 | 554 | 443 | 431 | 420 | 345 |
| | | Expenditures: | 4,000,000 | Reported: | 586 | 581 | 436 | 188 | 144 | 33 |
| 59 | Opportunities Industrialization Centers of America, Inc. | | | | | | | | | |
| | | Award: | 4,900,000 | Proposed: | 1,600 | 1,350 | 0 | 1,066 | 1,066 | 853 |
| | | Expenditures: | 4,436,641 | Reported: | 1,020 | 903 | 804 | 392 | 170 | 163 |
| 60 | Pathstone Corporation | | | | | | | | | |
| | | Award: | 8,000,000 | Proposed: | 1,200 | 1,176 | 660 | 616** | 360 | 616 |
| | | Expenditures: | 5,689,966 | Reported: | 1,408 | 1,058 | 411 | 359 | 267 | 20 |
| 61 | Private Industry Council of Westmoreland/Fayette, Inc. | | | | | | | | | |
| | | Award: | 2,732,719 | Proposed: | 250 | 245 | 191 | 153 | 120 | 115 |
| | | Expenditures: | 2,699,127 | Reported: | 557 | 504 | 290 | 248 | 210 | 95 |
| 62 | Providence Economic Development Partnership | | | | | | | | | |
| | | Award: | 2,489,111 | Proposed: | 300 | 240 | 225 | 180 | 0 | 160 |
| | | Expenditures: | 2,136,431 | Reported: | 287 | 250 | 194 | 73 | 41 | 19 |
| 63 | Roca, Inc. | | | | | | | | | |
| | | Award: | 2,398,778 | Proposed: | 225 | 225 | 150 | 140 | 110 | 98 |
| | | Expenditures: | 1,987,517 | Reported: | 244 | 214 | 129 | 128 | 46 | 71 |
| 64 | SER - Jobs for Progress of the Texas Gulf Coast, Inc. | | | | | | | | | |
| | | Award: | 3,122,554 | Proposed: | 400 | 400 | 360 | 340 | 320 | 300 |
| | | Expenditures: | 2,866,614 | Reported: | 406 | 406 | 385 | 330 | 200 | 170 |
| 65 | Southeast Community College Area | | | | | | | | | |
| | | Award: | 2,331,278 | Proposed: | 400 | 400 | 220 | 190 | 110 | 90 |
| | | Expenditures: | 1,544,168 | Reported: | 249 | 246 | 110 | 65 | 30 | 0 |
| 66 | Southwest Housing Solutions Corporation | | | | | | | | | |
| | | Award: | 4,000,000 | Proposed: | 1,200 | 425 | 410 | 360 | 320 | 310 |
| | | Expenditures: | 4,000,000 | Reported: | 449 | 449 | 338 | 189 | 130 | 123 |
| 67 | The WorkPlace, Inc. | | | | | | | | | |
| | | Award: | 4,000,000 | Proposed: | 700 | 600 | 500 | 350 | 320 | 275 |
| | | Expenditures: | 3,868,575 | Reported: | 585 | 504 | 437 | 172 | 100 | 52 |

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390

DOE AR 000166

U.S. Department of Labor – Office of Inspector General

**Exhibit 5 (continued)**

## Grant Awards, Expenditures, and Training Outcomes for all Grants as of June 30, 2012

| No. | Grantee Name | | Awards & Expenditures | Proposed/ Reported | Served | Enrolled in Training | Completed Training | Entered Employment | Entered in Training-Related Employment | Employment Retention |
|---|---|---|---|---|---|---|---|---|---|---|
| 68 | West Hills Community College District | | | | | | | | | |
| | | Award: | 3,000,000 | Proposed: | 300 | 300 | 210 | 147 | 126 | 115 |
| | | Expenditures: | 3,000,000 | Reported: | 356 | 354 | 318 | 242 | 193 | 156 |
| 69 | Western Iowa Tech Community College | | | | | | | | | |
| | | Award: | 3,999,459 | Proposed: | 300 | 300 | 222 | 165 | 142 | 142 |
| | | Expenditures: | 3,568,671 | Reported: | 365 | 365 | 255 | 94 | 84 | 0 |
| 70 | White Earth Band of Chippewa | | | | | | | | | |
| | | Award: | 3,086,817 | Proposed: | 240 | 240 | 100 | 30** | 25 | 30 |
| | | Expenditures: | 2,482,921 | Reported: | 136 | 126 | 80 | 16 | 9 | 1 |
| 71 | Workforce Development Council of Seattle King County | | | | | | | | | |
| | | Award: | 3,639,530 | Proposed: | 475 | 450 | 406 | 365 | 275 | 335 |
| | | Expenditures: | 3,505,998 | Reported: | 491 | 489 | 442 | 256 | 144 | 59 |
| 72 | Worksystems, Inc. | | | | | | | | | |
| | | Award: | 4,000,000 | Proposed: | 360 | 300 | 225 | 180 | 160 | 126 |
| | | Expenditures: | 3,983,081 | Reported: | 421 | 351 | 252 | 193 | 164 | 112 |
| **Subtotals for Pathways grants:** | | | | | | | | | | |
| | | Award: | $147,757,701 | Proposed: | 25,460 | 20,751 | 14,822 | 13,121 | 10,979 | 10,442 |
| | | | $130,111,082 | Reported: | 24,148 | 20,126 | 14,284 | 7,919 | 5,279 | 3,015 |
| **ETP Grants (25 grants in total)** | | | | | | | | | | |
| 73 | Austin Electrical JATC | | | | | | | | | |
| | | Award: | $4,842,424 | Proposed: | 1,100 | 1,100 | 950 | 504** | 504 | 504 |
| | | Expenditures: | $4,719,965 | Reported: | 2,006 | 2,006 | 1,199 | 111 | 35 | 79 |
| 74 | Blue Green Alliance Foundation | | | | | | | | | |
| | | Award: | 5,000,000 | Proposed: | 2,063 | 2,063 | 1,650 | 1,238 | 1,000 | 1,000 |
| | | Expenditures: | 4,816,335 | Reported: | 1,663 | 1,663 | 1,660 | 472 | 367 | 160 |
| 75 | Broward County Minority Builders Coalition | | | | | | | | | |
| | | Award: | 3,280,656 | Proposed: | 1,000 | 900 | 700 | 700 | 600 | 600 |
| | | Expenditures: | 2,507,934 | Reported: | 550 | 547 | 481 | 281 | 101 | 99 |
| 76 | California Joint Labor Management Cooperation Committee | | | | | | | | | |
| | | Award: | 5,000,000 | Proposed: | 2,192 | 2,192 | 2,082 | 1,592** | 1,592 | 1,592 |
| | | Expenditures: | 4,857,393 | Reported: | 2,106 | 2,106 | 1,867 | 1,510 | 1,510 | 1,009 |
| 77 | Central Vermont Community Action Council, Inc. | | | | | | | | | |
| | | Award: | 4,846,195 | Proposed: | 2,542 | 2,542 | 2,397 | 1,127** | 1,127 | 1,127 |
| | | Expenditures: | 4,628,670 | Reported: | 2,431 | 2,369 | 2,330 | 1,933 | 1,805 | 845 |
| 78 | Community Housing Partners Corporation | | | | | | | | | |
| | | Award: | 3,865,480 | Proposed: | 380 | 350 | 320 | 250 | 200 | 200 |
| | | Expenditures: | 3,616,499 | Reported: | 568 | 523 | 443 | 340 | 287 | 200 |
| 79 | Communications Workers of America | | | | | | | | | |
| | | Award: | 3,969,056 | Proposed: | 1,000 | 1,000 | 1,000 | 420 | 0 | 0 |
| | | Expenditures: | 3,969,056 | Reported: | 1,298 | 849 | 831 | 420 | 418 | 0 |

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390
DOE AR 000167

**Exhibit 5 (continued)**

## Grant Awards, Expenditures, and Training Outcomes for all Grants as of June 30, 2012

| No. | Grantee Name | | Awards & Expenditures | Proposed/ Reported | Served | Enrolled in Training | Completed Training | Entered Employment | Entered in Training-Related Employment | Employment Retention |
|---|---|---|---|---|---|---|---|---|---|---|
| 80 | East Central Intergovernmental Association | | | | | | | | | |
| | | Award: | 2,060,250 | Proposed: | 392 | 392 | 344 | 310 | 283 | 283 |
| | | Expenditures: | 1,733,393 | Reported: | 367 | 367 | 335 | 149 | 71 | 64 |
| 81 | Healthcare Advancement Program, Inc. | | | | | | | | | |
| | | Award: | 4,637,551 | Proposed: | 3,520 | 3,472 | 3,420 | 2,852** | 2,852 | 2,852 |
| | | Expenditures: | 4,261,705 | Reported: | 2,774 | 2,590 | 2,250 | 162 | 157 | 37 |
| 82 | Heritage Health Foundation | | | | | | | | | |
| | | Award: | 1,408,601 | Proposed: | 120 | 120 | 102 | 90 | 84 | 84 |
| | | Expenditures: | 1,271,171 | Reported: | 431 | 148 | 113 | 75 | 42 | 42 |
| 83 | Institute for Career Development, Inc. | | | | | | | | | |
| | | Award: | 4,658,983 | Proposed: | 2,000 | 1,900 | 1,200 | 240** | 240 | 240 |
| | | Expenditures: | 4,658,983 | Reported: | 1,160 | 1,034 | 642 | 209 | 124 | 16 |
| 84 | International Training Institute for Sheet Metal and A/C Industry | | | | | | | | | |
| | | Award: | 4,995,188 | Proposed: | 1,500 | 1,500 | 1,482 | 930* | 930 | 930 |
| | | Expenditures: | 1,804,611 | Reported: | 380 | 380 | 361 | 30 | 30 | 7 |
| 85 | International Transportation Learning Center | | | | | | | | | |
| | | Award: | 5,000,000 | Proposed: | 3,640 | 3,640 | 3,276 | 3,095 | 3,095 | 2,912 |
| | | Expenditures: | 4,878,617 | Reported: | 5,655 | 5,655 | 5,576 | 0 | 0 | 0 |
| 86 | Labor's Community Agency, Inc. | | | | | | | | | |
| | | Award: | 3,604,162 | Proposed: | 1,913 | 1,817 | 1,530 | 1,071 | 856 | 856 |
| | | Expenditures: | 3,603,324 | Reported: | 2,482 | 2,432 | 2,395 | 1,124 | 972 | 906 |
| 87 | Memphis Bioworks Foundation | | | | | | | | | |
| | | Award: | 2,931,103 | Proposed: | 450 | 395 | 314 | 247 | 192 | 182 |
| | | Expenditures: | 2,891,340 | Reported: | 536 | 480 | 406 | 186 | 150 | 127 |
| 88 | Montana Electrical Joint Apprenticeship and Training Committee | | | | | | | | | |
| | | Award: | 5,000,000 | Proposed: | 2,475 | 2,475 | 2,450 | 2,230 | 2,007 | 2,007 |
| | | Expenditures: | 4,986,886 | Reported: | 3,491 | 3,491 | 3,478 | 330 | 330 | 0 |
| 89 | National Ironworkers and Employers Apprenticeship | | | | | | | | | |
| | | Award: | 1,943,931 | Proposed: | 510 | 510 | 510 | 0 | 0 | 0 |
| | | Expenditures: | 1,729,989 | Reported: | 631 | 631 | 622 | 461 | 42 | 152 |
| 90 | Northwest Energy Efficiency Council | | | | | | | | | |
| | | Award: | 3,876,171 | Proposed: | 875 | 750 | 675 | 473 | 405 | 405 |
| | | Expenditures: | 3,624,758 | Reported: | 780 | 769 | 577 | 288 | 225 | 113 |
| 91 | Ohio Electrical Labor Management Cooperative Committee, Inc. | | | | | | | | | |
| | | Award: | 4,826,073 | Proposed: | 1,400 | 1,400 | 1,288 | 1,125** | 1,125 | 1,125 |
| | | Expenditures: | 4,805,320 | Reported: | 2,434 | 2,434 | 2,371 | 1,182 | 1,143 | 388 |
| 92 | Oregon Manufacturing Extension Partnership | | | | | | | | | |
| | | Award: | 5,000,000 | Proposed: | 1,734 | 1,734 | 1,672 | 638 | 542 | 542 |
| | | Expenditures: | 4,089,778 | Reported: | 2,605 | 2,599 | 1,888 | 405 | 349 | 172 |
| 93 | SER Metro Detroit  Jobs for Progress, Inc. | | | | | | | | | |
| | | Award: | 4,298,673 | Proposed: | 264 | 240 | 216 | 192 | 144 | 144 |
| | | Expenditures: | 4,088,303 | Reported: | 328 | 328 | 256 | 184 | 142 | 82 |

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390

DOE AR 000168

U.S. Department of Labor – Office of Inspector General

**Exhibit 5 (continued)**

## Grant Awards, Expenditures, and Training Outcomes for all Grants as of June 30, 2012

| No. | Grantee Name | Awards & Expenditures | Proposed/ Reported | Served | Enrolled in Training | Completed Training | Entered Employment | Entered in Training-Related Employment | Employment Retention |
|---|---|---|---|---|---|---|---|---|---|
| 94 | The Providence Plan | | | | | | | | |
| | Award: | 3,720,000 | Proposed: | 2,075 | 1,775 | 1,600 | 1,600 | 800 | 800 |
| | Expenditures: | 3,402,279 | Reported: | 1,245 | 1,220 | 1,164 | 763 | 725 | 246 |
| 95 | Thomas Shortman Training Scholarship and Safety Fund | | | | | | | | |
| | Award: | 2,802,269 | Proposed: | 2,000 | 2,000 | 1,900 | 1,900** | 1,900 | 1,900 |
| | Expenditures: | 2,802,269 | Reported: | 2,507 | 2,507 | 2,150 | 21 | 21 | 13 |
| 96 | UAW-Labor Employment and Training Corporation | | | | | | | | |
| | Award: | 3,200,000 | Proposed: | 725 | 725 | 550 | 440 | 400 | 400 |
| | Expenditures: | 2,668,618 | Reported: | 1,030 | 983 | 692 | 337 | 302 | 116 |
| 97 | Utility Workers Union of America, AFL-CIO | | | | | | | | |
| | Award: | 4,993,922 | Proposed: | 719 | 719 | 672 | 652 | 592 | 592 |
| | Expenditures: | 4,899,699 | Reported: | 751 | 747 | 533 | 525 | 525 | 435 |
| **Subtotals for ETP grants:** | | | | | | | | | |
| | Award: | $99,760,688 | Proposed: | 36,589 | 35,711 | 32,300 | 23,916 | 21,470 | 21,277 |
| | Expenditures: | $91,316,895 | Reported: | 40,209 | 38,858 | 34,620 | 11,498 | 9,873 | 5,308 |
| **TOTALS FOR ALL 97 GREEN JOB TRAINING GRANTS** | | | | | | | | | |
| | Award: | $435,427,207 | Proposed: | 126,493 | 116,995 | 98,158 | 81,254 | 62,003 | 71,017 |
| | Expenditures: | $328,554,725 | Reported: | 113,247 | 107,365 | 81,354 | 30,857 | 25,396 | 11,613 |

* The number for "Entered Employment" was not provided by ETA. Therefore, the number proposed as "Employment Retention" was used for consistency.

** The number for "Entered Employment" provided by ETA was less than the proposed "Employment Retention". As a result, the number proposed as "Employment Retention" was used.

Recovery Act: Green Jobs Program
Report No. 18-13-001-03-390

DOE AR 000169

# Appendices

DOE AR 000170

U.S. Department of Labor – Office of Inspector General

**PAGE INTENTIONALLY LEFT BLANK**

DOE AR 000171

**Appendix A**

## Background

The American Recovery and Reinvestment Act of 2009 (Recovery Act) was signed by President Obama on February 17, 2009. The purpose of the Recovery Act was to assist those most impacted by the recession by creating and preserving jobs. The Recovery Act provided $500 million for research, labor exchange, and job training projects to prepare workers for careers in energy efficiency and renewable energy as described in section 171(e)(1)(B) of the Workforce Investment Act (WIA) - also known as *The Green Jobs Act of 2007*. The main focus of the Green Jobs program was to prepare individuals for jobs in Green industry sectors through three separate training areas: State Energy Section Partnership (SESP), Pathways Out of Poverty (Pathways), and Energy Training Partnership (ETP).

On September 30, 2011 we issued a report entitled, "Recovery Act: Slow Pace Placing Workers into Jobs Jeopardizes Employment Goals of the Green Jobs Program," report number 18-11-004-03-390, on the status of the Recovery Act-funded green job grants. This report was in response to a request from the Honorable Charles E. Grassley, then Ranking Member of the Senate Committee on Finance. Specifically, Senator Grassley requested an audit of Recovery Act funds spent on green jobs, the definition used by the Department of Labor for what constitutes a green job, and the number and duration of the jobs created pursuant to the funds expended.

We reported that grantees might not be able to meet their planned expenditures or goals for placing participants before grant periods expired. In response to our report, ETA stated it expected grantees' performance to increase significantly and all funds would be expended by September 30, 2013. Since our report was issued, ETA extended 46 of the 63 Pathways and ETP grant periods of performance set to expire in January 2012 from 2 months to 1 year to allow grantees additional time to expend funds and assist participants with training and employment. Furthermore, ETA extended 9 of the 34 SESP grants set to expire in January 2013 by 5 to 6 months.

A description of the three competitive grant programs follows:

1.  SESP is a training program designed to provide participants with technical and occupational skills training in the Green Job industry sector. On June 24, 2009, ETA issued the grant solicitation. Eligible SESP grant applicants included State Workforce Investment Boards (WIBs) located throughout all 50 States, the District of, Columbia, and U.S. territories as in Section VI.B.2.iv. WIBs were to deliver services to participants by working with regional Work Force Investment Boards, and One Stop Career Centers.

    On January 29, 2010, ETA awarded 34 SESP grants for approximately $190 million, with a grant execution period of 36 months that ended January 28, 2013. However, ETA has extended 9 of the 34 grants. The longest extension will end July 31, 2013.

DOE AR 000172

The target population for SESP grants included: workers impacted by changes in national energy and environmental policy, individuals in need of updated, training skills related to the energy efficiency, in renewable energy industries sectors; Veterans, and unemployed individuals.

2. Pathways is a training program designed to provide participants with technical and occupational skills training in the Green Job industry sector, as a pathway out of poverty and into employment. On June 24, 2009, ETA issued the grant solicitation. Eligible Pathways grant applicants included National entities; or local entities that had experience serving the targeted population.

   On January 29, 2010, ETA awarded 38 Pathway grants for approximately $150 million, with a grant execution period of 24 months that ended January 28, 2012. However, ETA has extended 27 of the 38 grants. The longest extension will end January 31, 2013.

   The targeted population for Pathway grants included: individuals 18 years old or older who were unemployed, high school dropouts, or had a criminal record, and disadvantaged individuals in areas of high poverty.

3. ETP is a training program designed to provide participants with technical and occupational skills training in the Green Job industry sector. On June 24, 2009, the grants were solicited. Eligible ETP grants applicants included private nonprofit organizations that were under one of two categories; National labor-management organizations with local networks; or Statewide/ local nonprofit partnerships that were expected to work with labor organizations, employers, and WIBs. The purpose of the program was to assist workers impacted by national energy and environmental policy changes.

   On January 15, 2010, ETA awarded 25 ETP grants for approximately $100 million, with a grant execution period of 24 months that ended January 14, 2012. However, ETA has extended 19 of the 25 grants. The longest extension will end January 14, 2013.

   The targeted population for ETP grants included: workers impacted by changes in national energy and environmental policy, individuals in need of updated training skills related to energy efficiency in renewable energy industry sectors, veterans, and unemployed individuals.

DOE AR 000173

**Appendix B**

**Objective, Scope, Methodology, and Criteria**

Objective

We conducted this follow-up audit as part of our audit oversight responsibilities and in response to a request for an update on our previous audit from the Honorable Darrell E. Issa, Chairman, House Oversight and Government Reform Committee. Our overall audit objective was to assess the impact of the Green Jobs training program by answering the following questions:

1) Who was served and what training did participants receive?

2) What were the entered employment and retention outcomes for participants?

Scope

The scope of the audit was reported performance outcomes and expenditures for the universe of 97 Green Job training grants totaling $435.4 million based on grantee data as of June 30, 2012. Since grantees continue to update and report participant training and employment activity, we used real-time data provided by ETA on August 21, 2012, representing performance outcomes as of June 30, 2012. For employment retention, we considered entered employment only for participants placed on or before December 31, 2011, since this measure requires a participant to be employed two quarters after the employment date.

Grants were awarded in December 2009 and January 2010 with various end dates. ETA extended 46 of the 63 Pathways and ETP grant periods of performance set to expire in January 2012 from 2 months to 1 year. Furthermore, ETA extended 9 of the 34 SESP grants set to expire in January 2013 by 5 to 6 months. Currently, all grants are scheduled to end by July 31, 2013.

We selected a statistical sample of 8 grants totaling $40.1 million and covering 9,510 participants served. The 8 sampled grantees included 3 SESP, 4 Pathways, and 1 ETP. Fieldwork for sampled grants was conducted prior to the release of June 2012 data. Therefore, for our sampled grants, we reviewed the March 31, 2012, training programs, expenditures and performance outcomes. Onsite reviews were conducted for all sampled grants.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. While grantee entered employment and retention data was limited in some cases, we believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

DOE AR 000174

Methodology

Grants were reviewed to determine the impact of the Green Jobs training programs on participants in preparing and placing them for jobs in the energy efficiency and renewable energy sectors. For sampled grants, we reviewed quarterly financial and performance reports to determine expenditures, types and lengths of training offered, and performance outcomes met. Fieldwork was conducted at ETA headquarters in Washington, DC and sampled grantee locations.

In performing the audit, ETA provided a detailed listing of all Green Job grant awards. We performed a data reliability assessment to ensure we had complete and accurate grant award data. To determine whether the data was reliable to select our sample, we compared the total of all grant awards on the grant award listing provided by ETA to the amount authorized by the Recovery Act. The difference in the amounts was for program administration. We also reconciled sampled grant agreements to the listing provided by ETA. We did not identify any differences. We concluded the data to be sufficiently reliable for our purposes.

To identify and assess internal controls relevant to our audit objectives, we interviewed relevant ETA National and regional personnel, grantee personnel and reviewed available policies and procedures. In planning and performing our audit, we considered internal controls of ETA's system of assessing and communicating grantee information by obtaining an understanding of the program's internal controls, to determine whether internal controls had been placed in operation, assessed control risk, and performed tests of internal controls in order to determine our auditing procedures for the purpose of achieving our objectives. Our consideration of ETA's internal control for communication of grantee information would not necessarily disclose all matters that might be significant deficiencies because of the inherent limitations in internal controls, misstatement, or losses, non-compliance may nevertheless occur and not be detected.

To gain a better understanding of the impact of the Green Jobs training programs on participants, from the universe of 97 training grants, we statistically selected a sample of 8 grants, totaling $40,086,204 million (9 percent). Grants were statistically selected using a risk assessment that factored performance, expenditures, and correlation of outcomes completed to expenditure rates to arrive at a final risk rating. The results of the risk analysis were used to stratify grants into four strata based on meeting proposed goals (3 strata), and the average cost per placement over $12,000 (1 stratum). Subsequently, 2 grants were randomly selected from each stratum. From the sampled grants, we randomly selected 463 participants to test from the sample universe using a 95 percent confidence level and +/- 10 percent sampling precision. While statistically selected, the results of audit tests for the 463 participants selected at the sampled grantees are only projectable to the sample of 8 grantees.

DOE AR 000175

**SAMPLED GRANTEES**

| Grantee | Grant Type | Award | Sample Size | Total Participants Served |
|---|---|---|---|---|
| NARC | Pathways | $ 7,994,999 | 93 | 1,284 |
| Hawaii | SESP | 6,000,000 | 72 | 1,688 |
| Iowa | SESP | 5,997,000 | 56 | 2,000 |
| Washington State | SESP | 5,973,635 | 82 | 1,975 |
| Lehigh | Pathways | 4,000,000 | 40 | 660 |
| CWA | ETP | 3,969,056 | 85 | 1,298 |
| Mott | Pathways | 3,662,403 | 18 | 318 |
| Providence | Pathways | 2,489,111 | 17 | 287 |
| **TOTALS** | | **$ 40,086,204** | **463** | **9,510** |

On-site reviews were conducted for all sampled grants. OIG staff conducted on-site reviews at 2 of the 8 grantee locations. The remaining 6 locations were conducted by a CPA firm under contract to the OIG. During onsite reviews, we reconciled costs and performance information reported to the general ledger and other records provided by the grantee. We validated performance information reported by each grantee to ETA for the 463 sampled participants. An audit of expenditures was not performed.

Criteria

We used the following criteria to accomplish our audit:

- American Recovery and Reinvestment Act of 2009, dated February 17, 2009
- Green Jobs Act of 2007, dated July 27, 2007
- ETA's Core Monitoring Guide
- Energy Policy Act of 2005, dated August 8, 2005
- Employment and Training Order No. 1-08
- Employment and Training Order No. 44-08
- SGAs for Energy Training partnerships (ETP)
- SGAs for State Energy Sector partnerships (SESP)
- SGAs for Pathways out of poverty (Pathways)

DOE AR 000176

**PAGE INTENTIONALLY LEFT BLANK**

DOE AR 000177

**Appendix C**

**Acronyms**

| | |
|---|---|
| ARRA | American Recovery and Reinvestment Act of 2009 |
| CPR | Cardiopulmonary Resuscitation |
| CWA | Communication Workers of America National Education and Training Trust |
| ETA | Employment and Training Administration |
| ESL | English as a Second Language |
| ETP | Energy Training Partnership |
| Hawaii | Hawaii Department of Labor and Industrial Relations |
| Hazwoper | Hazardous Waste Operations and Emergency Response |
| HVAC | Heating, Ventilation and Air Conditioning |
| Iowa | Iowa Workforce Development |
| Lehigh | Lehigh Valley Workforce Investment Board |
| LEED | Leadership in Energy and Environmental Design |
| MSHA | Mine Safety and Health Administration |
| MSSC | Manufacturing Skills Standards Council |
| Mott | Mott Community College |
| NARC | National Association of Regional Councils |
| OIG | Office of Inspector General |
| OSHA | Occupational Safety and Health Administration |
| Pathways | Pathways Out of Poverty |
| Providence | Providence Economic Development Partnership |
| RRP | Lead Safety Renovation, Repairs and Painting |
| Recovery Act | American Recovery and Reinvestment Act of 2009 |

DOE AR 000178

U.S. Department of Labor – Office of Inspector General

| | |
|---|---|
| SGA | Solicitation for Grant Application |
| SESP | State Energy Sector Partnership |
| TEGL | Training and Employment Guidance Letter |
| Washington State | Washington State Workforce Training and Education Coordinating Board |
| WIA | Workforce Investment Act |
| WIB | Workforce Investment Board |

DOE AR 000179

**Appendix D**

**Glossary**

**Terms Related to Performance Reporting for Green Job Training Grants**

**Completer** - Participants who successfully completed one or more industry and/or occupational skills education and job training activities during the reporting period. Participants can only be noted as completing an education/job training activity *once*.

**Credential** - An award that recognizes a person's attainment of measurable technical or occupational skills need to obtain employment or advance within an occupation. The term encompasses educational certificates or degrees, occupational licenses, registered apprenticeship, and industry-recognized certifications. Types of organizations and institutions that issue credentials include, but are not limited to: state education agency; accredited institution of higher education; professional, industry or employer organization; ETA or state apprenticeship agency; public regulatory agency that issues occupational licenses; Department of Veterans Affairs; Job Corps; and higher education institutions controlled or chartered by Native American tribe or tribes. Participants must successfully complete training to be counted as obtaining a credential.

**Enrolled in training activities** - Participant that begins receiving industry and/or occupational skills education and job training activities for the first time during the reporting period. This does not include those who receive only career awareness or career exploration activities.

**Entered employment** - Participants who complete education/job training activities and who obtain unsubsidized employment. Incumbent workers may be counted as "entered employment" only if they enter a new position after program completion, even if the new position is with the same employer.

**Green industry sector** - Energy efficiency and renewable energy industries identified in WIA section 171 (e)(1) (B) (ii) and other "green" industries defined by Green Job training grantee in their statement of work, and includes green occupations in other high growth and emerging industries.

**Incumbent worker** - Any participant that is a part-time or full-time worker at time of enrollment and who needs training to secure full-time employment, advance in their careers, or retain their current occupations.

**Participant** - Individual that grantee determines is eligible and who receives a service funded by the grant.

DOE AR 000180

**Retention** - Of those participants reported as entered employment, the total number of individuals employed in both the first and second quarters following initial placement.

**Served** - Eligible participants that receive a service during the quarterly reporting period. "Service" includes, but is not limited to: education and/or training activity, case management, and support services.

**Training-related employment** - Employment is considered training-related if the position is for the same occupation or within the same industry as the training provided or if the employer recognizes the credential received by the participant as a result of the grant.

## ETA's Common Measures

**Average earnings** - Of those who are employed in their first, second, and third quarters after exit, the average gross earnings from the second and third quarters after exit.

**Entered employment rate** - Of those individuals who were not employed at the time of program participation, the percentage who were employed in the first quarter after they exit (does not apply to incumbent workers).

**Employment retention** - Of those who were employed in their first quarter after exit, the percentage employed in both the second and third quarters after exit. Includes all participants employed in the first quarter after exit, regardless of their employment status at enrollment.

DOE AR 000181

U.S. Department of Labor – Office of Inspector General

**Appendix E**

## ETA Response to Draft Report

U.S. Department of Labor        Assistant Secretary for
Employment and Training
Washington, D.C. 20210



#700494

OCT 24 2012

MEMORANDUM FOR:     ELLIOT P. LEWIS
Assistant Inspector General for Audit
Office of the Inspector General

FROM:               JANE OATES
Assistant Secretary for Employment and Training
Employment and Training Administration

SUBJECT:            Response to Report No. 18-13-001-03-390

This is ETA's formal response to the Office of the Inspector General's report No. 18-13-001-03-390. We appreciate the opportunity to provide updated information on the status of the green jobs training grants. The grants are smart investments that are preparing Americans for the clean energy jobs driving our 21st Century economy. We anticipate that the information available for the quarter ending September 30, 2012, will show continued progress, and we appreciate that the OIG understands that the current report reflects a preliminary snapshot in time. While ETA has concerns with a number of the OIG's results and disagrees with aspects of the report, ETA appreciates the OIG's willingness to incorporate additional information in its report.

Grantee Results and Report Conclusions

The OIG report does not reflect the significant progress of the green jobs training grantees – Energy Training Partnership (ETP), Pathways out of Poverty (POP), and State Energy Sector Partnership (SESP) – since the beginning of the grants. The purpose of these grants is to train workers either to place them in jobs or give them increased security to retain their jobs. In a challenging economic climate, the grantees have trained and placed thousands of workers and provided others with enhanced job security. Based on the data available for the quarter ending June 30, 2012:
- 112,989 participants have been served through these grants;
- 107,110 participants have received training;
- 80,948 participants have completed training;

DOE AR 000182

- 69,816 participants have received industry-recognized credentials, including 37,919 incumbent workers;
- 30,610 participants have been placed in jobs with 82% of those placements in training-related employment; and
- 13,185 incumbent workers who completed training obtained new positions.

As noted by the OIG, nearly half of these grants are still active, so the performance numbers stated above will increase.   Many grants will continue through June 2013, and ETA will collect outcome data for months after that.

We appreciate that the OIG has taken into account grantees' service plans in calculating estimated costs.  These grants are designed to serve different populations as displayed in Table 18 entitled, "Planned Performance Goals and Per Participant Costs for All Training Grants by Grant Type as of June 30, 2012".  For example, the costs for the Pathways Out of Poverty (POP) grants are projected to be higher, reflecting multiple barriers to employment that the individuals in these programs face, and the intensive services they need to transition successfully into jobs and remain in those jobs.  We also are pleased to see that the OIG's calculation of average planned costs per participant served for all programs (identified in Table 18) are in line with ETA's expected costs for these grantees.

The OIG report states that data reported in the grantees' quarterly narrative reports do not impact the reported performance measures as defined by ETA.  ETA has explained that it uses both data reported on the 9153 form and outcome data reported in the narrative reports to compare to grantee targets and evaluate the performance and impact of the grants.  ETA appreciates the statement by the OIG explaining the different approaches for reviewing grantee performance and impacts. The OIG did not use the additional data in its analysis of individual grantee performance; therefore, the OIG report does not include information beyond the information on the 9153 form, such as the number of participants placed in training-related employment prior to completing a training program, and the number of incumbent workers who retained their position as the result of grant-funded services.  The data presented in the OIG report therefore provides an incomplete view of individual grantee performance and impact.

The OIG report does not reflect employment retention results as provided and certified by grantees through ETA's electronic reporting system, through which grantees are held accountable.  Grantee-certified data (data that grantees mark as certified and

2

DOE AR 000183

complete) show that of the 19,976 participants who entered employment by December 31, 2011, a total of 11,468 participants retained employment as of June 30, 2012, reflecting a 57 percent employment retention rate.   Rather than using only grantee-certified data, the OIG also used uncertified data to calculate retention results for grantees.  We appreciate the OIG's addition of a footnote explaining their use of real-time data as distinct from ETA's use of certified data.

<u>Audit Report Recommendations</u>

ETA will take into consideration the OIG's recommendations to improve grant programs performance while preserving regional and local flexibility to tailor programs to varying economic conditions, and industry, employer, and worker needs.  ETA will continue to track measures of employment, retention and earnings among other measures, while acknowledging variations in performance due to such factors as varying skill levels and the needs of populations served, types of services provided, the skills levels required for targeted occupations, and training strategies used.  ETA will continue to promote industry-recognized credentials – i.e., credentials that have labor market value as determined ultimately by employers.

ETA recognizes the importance of continuously improving monitoring and controls over grant performance and financial data, and it is dedicated to further improve these oversight and administrative functions.  In addition to our regular comprehensive monitoring and oversight, ETA provides extensive, specialized technical assistance on key program-related topics, such as effective placement strategies, working with hard-to-serve populations, and managing partnerships with employers.  These efforts involve a number of technical assistance strategies, including grantee coaching, facilitated peer-learning, webinars on key program topics, and case studies examining promising practices implemented by high-performing grantees.  ETA looks forward to continuing its dialogue with the OIG as this grant program matures.

3

DOE AR 000184

**PAGE INTENTIONALLY LEFT BLANK**

DOE AR 000185

U.S. Department of Labor – Office of Inspector General

**Appendix F**

## Acknowledgements

Key contributors to this report were Mark Schwartz, Cardelia Tsoi, Susan Rosenblum, Mary Lou Casazza, Eliacim Nieves-Perez, Grover Fowler, Mitchell Goldberg, Reza Noorani, Lawrence Alli, Andy Loomis, Lora Latterner, and Ajit Buttar.

DOE AR 000186

**PAGE INTENTIONALLY LEFT BLANK**

DOE AR 000187

DOE AR 000188

**TO REPORT FRAUD, WASTE OR ABUSE, PLEASE CONTACT:**

Online:    http://www.oig.dol.gov/hotlineform.htm
Email:     hotline@oig.dol.gov

Telephone:    1-800-347-3756
              202-693-6999

Fax:          202-693-7020

Address: Office of Inspector General
         U.S. Department of Labor
         200 Constitution Avenue, N.W.
         Room S-5506
         Washington, D.C. 20210

DOE AR 000189



U.S. Department of Energy
Office of Inspector General
Office of Audits and Inspections

# Audit Report

## The Department of Energy's $700 Million Smart Grid Demonstration Program Funded through the American Recovery and Reinvestment Act of 2009



OAS-RA-13-08                                     January 2013

DOE AR 000190



# Department of Energy
Washington, DC 20585

January 17, 2013

MEMORANDUM FOR THE SECRETARY

FROM:             Gregory H. Friedman
                  Inspector General

SUBJECT:          <u>INFORMATION</u>:  Audit Report on "The Department of Energy's $700
                  Million Smart Grid Demonstration Program Funded through the American
                  Recovery and Reinvestment Act of 2009"

<u>INTRODUCTION AND OBJECTIVE</u>

The Department of Energy's Office of Electricity Delivery and Energy Reliability received about $4.5 billion under the American Recovery and Reinvestment Act of 2009 to enhance the reliability and resilience of the Nation's power grid, or nearly 33 times the amount appropriated in Fiscal Year 2009.  Of the amount awarded, the Department allocated nearly $700 million to the Smart Grid Demonstration Program (Program) to fund 32 regional demonstrations and energy storage projects.  The Program also provided supplemental Recovery Act funding to 10 existing Department projects for renewable and distributed systems integration and high temperature superconductivity.  The projects were intended to demonstrate and further the advancement of the "smart grid," promoting innovative grid technologies.  The Department awarded Recovery Act funding through cooperative agreements to both for-profit and non-profit entities.

Because of the dramatic increase in funding and the national importance of modernizing the Nation's power grid, we initiated this audit to determine whether the Program had been properly managed.  This audit report is the second in a series of reports on the Department's Smart Grid efforts.  Our January 2012 report, *The Department's Management of the Smart Grid Investment Grant Program* (OAS-RA-12-04, January 2012), on a separate Smart Grid grant program, identified several opportunities to enhance the management of the Department's Smart Grid efforts.  Specifically, the audit identified weaknesses in financial management and incomplete and insufficient cyber security plans, potentially jeopardizing achievement of Recovery Act goals.

<u>RESULTS OF AUDIT</u>

We found the Department had not always managed the Program effectively and efficiently.  Our review of 11 projects, awarded $279 million in Recovery Act funding and $10 million in non-Recovery Act funding, identified weaknesses in reimbursement requests, cost-share contributions, and coordination efforts with another Department program.  These issues resulted in about $12.3 million in questioned costs.

DOE AR 000191

2

Specifically, the Department had:

- Approved reimbursements totaling about $12.3 million that lacked supporting documentation necessary to verify that costs were incurred and were reasonable. Contrary to award terms and conditions, the Department reimbursed two recipients for claims based on estimated rather than actual costs, resulting in overpayments of approximately $9.9 million.  A third recipient received nearly $2.4 million without providing adequate supporting documentation.  In fact, the recipient had not begun manufacturing the energy storage units called for by the award.

- Not always ensured recipients contributed their agreed-upon share of project costs. For example, the Department erroneously approved one recipient's plan to use about $28 million in expected proceeds from the sale of an energy storage unit manufactured in part with Federal funds and previous recipient contributions to meet its overall $32.7 million cost-share requirement.  Federal regulations specifically prohibit using Federal funds and previous recipient contributions toward meeting cost-share requirements.

- Awarded a recipient $14 million for a project even though the recipient had received $2 million under the Advanced Research Projects Agency – Energy (ARPA-E) Program for similar work.  In fact, the recipient, unknown to the Department until our audit, had reported the same accomplishments under both awards.

Although the Program had established procedures over financial reviews of projects, the problems we identified occurred, in part, because it had not adequately reviewed financial transactions and planned for or monitored recipient cost-share provisions.

After being presented with the results of our audit, the Department initiated actions to resolve the $12.3 million in questioned costs we discovered.  Specifically, Department officials reported that one recipient was making adjustments to address issues with reimbursements made based on estimated versus actual costs.  Additionally, the Department was taking action to resolve unsupported costs and the associated cost-share contributions, including requiring payment of corresponding interest owed.  The Department also stated one recipient had returned funds improperly claimed for incomplete energy storage units.  Furthermore, ARPA-E officials required the recipient with potentially overlapping projects to differentiate specific accomplishments and informed us they would take proactive measures to eliminate any potential overlap, or the appearance thereof, between the ARPA-E and Smart Grid Demonstration projects.

Given the infusion of Recovery Act funding, the Program has a unique opportunity to improve the Nation's power grid.  In total, we questioned about $12.3 million in costs claimed by recipients.  In the absence of significant improvements, the Program is at risk of not meeting its objectives and has an increased risk of fraud, waste and abuse.  Accordingly, we made recommendations to the Department to improve the management of the Program.

DOE AR 000192

3

MANAGEMENT REACTION

Management concurred with the report's recommendations and indicated that corrective actions
have been or would be initiated.  However, management expressed concerns with several
conclusions in our report.  Management's comments and our responses to its concerns are
summarized in the body of our report.  Management's comments are included in their entirety in
Appendix 3.

Attachment

cc: Deputy Secretary
    Associate Deputy Secretary
    Acting Under Secretary of Energy
    Assistant Secretary for Electricity Delivery and Energy Reliability
    Chief of Staff

DOE AR 000193

# REPORT ON THE DEPARTMENT OF ENERGY'S $700 MILLION SMART GRID DEMONSTRATION PROGRAM FUNDED THROUGH THE AMERICAN RECOVERY AND REINVESTMENT ACT OF 2009

## TABLE OF CONTENTS

**Smart Grid Demonstration Program**

Details of Finding ...................................................................................................................... 1

Recommendations and Comments............................................................................................ 6

**Appendices**

1.  Objective, Scope and Methodology ....................................................................... 8

2.  Prior Report ......................................................................................................... 10

3.  Management Comments........................................................................................ 11

DOE AR 000194

## THE DEPARTMENT OF ENERGY'S $700 MILLION SMART GRID DEMONSTRATION PROGRAM FUNDED THROUGH THE AMERICAN RECOVERY AND REINVESTMENT ACT OF 2009

**Smart Grid Demonstration Program**

The Smart Grid Demonstration Program (Program) was authorized by the *Energy Independence and Security Act of 2007* and amended by the American Recovery and Reinvestment Act of 2009 (Recovery Act). The Program's goal is to demonstrate and further the advancement of the "smart grid," which generally refers to a class of technologies designed to enhance power grid operations. Under the Recovery Act, the Department of Energy (Department) allocated about $700 million to fund 42 cooperative agreements with for-profit and non-profit entities to demonstrate such technologies as energy storage systems and advanced metering infrastructure. Of the 42 projects, 10 had been awarded partial funding prior to the Recovery Act.

Our audit examined the Department's management of 11 projects for which 9 recipients received Federal funds. The Department awarded these projects about $279 million, or about 40 percent of the Program's Recovery Act funding, and an additional $10 million in non-Recovery Act funding. We found the Department had not always managed the Program efficiently and effectively. Specifically, we identified reimbursements that were not adequately supported, problems with cost-share contributions, and funding made to potentially overlapping projects.

<u>Reimbursements</u>

Three of the nine recipients we reviewed had claimed, and the Department approved, requests for reimbursement that lacked supporting documentation that costs had been incurred by the recipients or were reasonable. Regulations require costs incurred to be reasonable and documented. Award terms and conditions also require recipients to claim only costs actually incurred. Notwithstanding these requirements, the Department had approved questionable reimbursements. For example:

- One recipient was reimbursed about $7.3 million more than allowed by the terms and conditions of the award. After reviewing the recipient's records, we identified an approximate $7.3 million difference between reimbursements requested and actual expenditures by the recipient. Contrary to the requirements, representatives of the recipient informed us they had based their monthly claims on both actual and estimated expenses and had not subsequently reconciled estimates to actual. Further, representatives told us that the discrepancy we identified included a combination of costs invoiced by subcontractors

---

Page 1

Details of Finding

DOE AR 000195

that had not yet been paid and costs reported as incurred by subcontractors that had not yet been invoiced to the recipient.  As a result of our audit, the Department stated the recipient was making the appropriate monthly adjustments to balance reimbursements with actual costs.  By the completion of our report, $4.9 million had been addressed and the remaining $2.4 million was to be addressed by June 2013.

- Another recipient was reimbursed about $2.6 million over the amount allowed for two projects.  The recipient had also based its reimbursement requests on estimated, rather than actual costs, and had consistently over-billed the Department for costs incurred.  As a result of our audit, the recipient provided the Department with a reconciliation dating back to the inception of its two projects funded by the Department, both awarded prior to the Recovery Act and supplemented with Recovery Act funding.  The reconciliation revealed about $2.6 million in erroneous reimbursement claims to the Department, as well as a misreporting of an additional $2.6 million in the recipient's cost-share.  In addition to taking action on the costs and cost-share erroneously claimed, the Department requested the recipient pay about $110,000 in interest owed on the overpaid amounts.

- A third recipient was reimbursed about $2.4 million for energy storage units not yet manufactured and the reimbursement requests lacked supporting documentation of incurred costs.  Despite project costs totaling about $4 million, including cost-share, the recipient had identified reliability and performance problems with the proposed technology, and stopped production at the facility before manufacturing the specific units for this project.  Because the entire project revolved around manufacturing and demonstrating the units, which had not begun, we were concerned that the Department reimbursed about $2.4 million in Federal funds and approved an additional $1.6 million in cost-share claims for this project.  Additionally, although the Department concluded the company's estimated costs were "reasonable" during negotiations, in our view, the Department had mistakenly agreed to reimburse the recipient based on the commercial price of units, rather than actual production costs, and had not tracked actual expenses.  Further, the recipient, despite the lack of production, continued to charge the Department for other project costs.  In response to our findings,

Details of Finding
DOE AR 000196

Department officials stated they were aware the manufacturing of the units had not begun. However, according to Department officials, the recipient had since paid back about $1.7 million for the energy storage units. For the remaining $700,000 we questioned, Department officials stated detailed documentation was provided and reviewed for invoiced costs. Based on that review, the Department concluded that the remaining costs were reasonable and allowable.

The reimbursement issues we identified occurred for a number of reasons. Based on our discussions with recipients, we concluded that they had misunderstood the terms and conditions of their agreements regarding requesting reimbursement. Although the Program had established procedures over financial oversight of projects, we also found the financial oversight insufficient to ensure the accuracy and integrity of amounts paid. Specifically, for two of the recipients, Department officials were unaware reimbursement requests were based on estimates because they had not always obtained and reviewed invoices.

After being presented with the results of our audit, the Department told us that it had initiated action to resolve all of the $12.3 million in questioned costs. As of the date of our report, the Department had recovered about $6.6 million and planned to recover an additional $5 million for payments made to recipients. For the remaining $700,000, as noted above, the Department determined the amounts to be reasonable and allowable.

Cost-Share Contributions

Recipients had not always contributed their cost-share as required by Federal laws, regulations and agreements with the Department. Cost-share contributions are important to ensure recipients are fully invested in the success of their projects and Federal funds are leveraged to the maximum extent practicable. Section 988 of the *Energy Policy Act of 2005* requires recipients participating in demonstration activities funded by the Department to contribute at least 50 percent of total project costs from non-Federal sources. However, we found the Department:

- Approved a recipient's plan to use about $28 million in expected proceeds from the sale of an energy storage unit manufactured in part with Federal funds and previous recipient contributions to meet its overall $32.7 million cost-share requirement. In its cost-share plan, the recipient

had included the sales proceeds of the unit and had not removed the Federal funds and previously claimed cost-share contributions from the calculation. Federal regulations specifically prohibit using Federal funds and previous recipient contributions toward meeting cost-share requirements. In response to our concerns, Department officials stated the recipient does not currently have a sales contract in place and the Department will closely monitor the transaction. However, because the expected proceeds account for such a large percentage of the total amount to be contributed, it is imperative the Department address the concerns before the end of the project. Department officials stated they would ensure the recipient understands that only the proceeds from the sale of the storage unit less the costs to fabricate/manufacture the unit can be recognized as cost-share and noted they are actively working with the recipient to address the cost-share concerns. However, this stipulation had yet to be defined in the agreement as of the completion of our review.

Near the end of our audit, the recipient requested that the Department accelerate Federal funding of the project due to financial difficulties and to avoid additional layoffs after a 33 percent staff reduction. In approving the accelerated funding, Department officials noted the action increased the likelihood that the project would be completed successfully. However, we noted that under the approved accelerated spending plan, Federal funds would, in fact, be exhausted before the technology is tested or demonstrated; thus, increasing the risk to the Department. According to Department officials, performance tests are scheduled for the first quarter of 2013, and the recipient was current in its cost-share contributions.

- Had not ensured that a recipient contributed the cost-share required by the terms and conditions of its cooperative agreement. The terms and conditions on the award included a specific schedule the recipient was to adhere to for the duration of the project for cost-share contributions. The agreement required the recipient to contribute 34 percent of costs incurred during the first phase of the project — ending May 2011; however, as of September 2011, the recipient had only contributed about $413,000 of the over $2.4 million in total project costs, or about 17 percent. Under the agreement, the recipient was expected to increase its cost-share in later phases of the project to

reach an overall cost-share of 52 percent. While the Department agreed to pay a higher percentage in the initial phase of the project, the recipient's failure to meet the existing lower cost-share expectations raised concern about its ability to meet the higher cost-share in later phases. Department officials also stated that because the project was significantly delayed, they had not expected the recipient to contribute at the level required in the award (58 percent for the period May 2011 – 2012 and 81 percent for May 2012 – 2013). However, officials had not modified the award to specify revised contribution expectations and to ensure that the recipient eventually contributes the total amount required. Department officials stated that the recipient, as of the issuance of our draft report, had subsequently exceeded the required contribution level at the current stage of the project. We did not verify this information.

Cost-share issues occurred because the Department had not adequately planned for, monitored or enforced cost-share provisions. For example, although Department officials were aware of the insufficient contributions of one recipient, they had neither modified the award to ensure the recipient ultimately contributed half of the funding, nor taken action to limit spending until the recipient could provide assurance of its ability to meet cost-share requirements.

<u>Potential Overlapping Efforts</u>

We found the Department had provided a recipient about $14 million under the Program and $2 million under the Advanced Research Projects Agency-Energy (ARPA-E) Grid-Scale Rampable Intermittent Dispatchable Storage Program for similar work. When initially awarded, Program funding supported the development of an energy storage unit that included the testing of materials for a carbon electrode component of the unit. Subsequently, the recipient changed its approach to develop a "metal electrode," a technology the recipient had received funding separately from ARPA-E to develop. After the change in approach, Department officials never revisited the level of funding being provided to the Smart Grid project in light of related funding provided to this recipient from ARPA-E. Further, although funding was awarded under the premise that the projects were different, we found numerous progress reports from the recipient that identified the same accomplishments for both projects.

Even though both Smart Grid and ARPA-E officials were aware the recipient had received funding for potentially overlapping projects, they had not coordinated their oversight activities. We did not identify in our limited test work any evidence the recipient had charged both projects for the same expenses. However, we remain concerned about the potential overlap between the projects. As a result of our audit, ARPA-E officials required the recipient to differentiate specific accomplishments and informed us they would take proactive measures to eliminate any potential overlap, or the appearance thereof, between the ARPA-E and Smart Grid Demonstration projects. Office of Electricity Delivery and Energy Reliability officials stated the technical project officer would schedule semi-annual discussions with the ARPA-E technical project officer, continue to monitor the project, and coordinate as needed with ARPA-E officials.

**RECOMMENDATIONS**

In total, we identified about $12.3 million in questioned costs. Without improvements in project management, the success of the efforts awarded under the Recovery Act is ultimately at risk. The lack of financial and project oversight increases the risk that fraud, waste, and abuse can occur without detection. Further, the failure of recipients to comply with their agreed-upon cost-share contributions increased the risks associated with these projects.

Given the significant amount of funding remaining to be spent and the issues found during our audit, the Department has an opportunity to modify its monitoring efforts, and thereby, increase the likelihood of successful outcomes for these projects. To help achieve the objectives of the Program and the Recovery Act, we recommend that the Assistant Secretary for Electricity Delivery and Energy Reliability direct Program officials to:

1. Ensure adequate review of payments made to recipients;

2. Provide training to recipients on proper submission of reimbursement packages;

3. Ensure that recipients contribute their required cost-share from allowable sources; and,

4. Ensure the elimination of any potential overlapping funding among awards authorized by various Department programs.

Additionally, we recommend that the contracting officers for the Program:

5. Resolve the questioned amounts in our report.

**MANAGEMENT REACTION AND AUDITOR COMMENTS**

Management concurred with the report's recommendations and indicated that corrective actions have been or would be initiated.  Management stated annual invoice training will be completed and the submission of invoices would be a specific agenda topic for project kick-off meetings.  Management also noted that a program-wide review of cost-share for the Program will be completed and the technical project officers for the Program and ARPA-E would increase coordination.  For the questioned costs, management concurred with the recommendation and as noted in our report, had initiated several actions to address the $12.3 million in questioned costs.

However, management expressed concern with several statements included in our finding about payments for energy storage units.  Specifically, management did not concur that it had mistakenly agreed to reimburse the recipient based on the commercial price of the energy storage units or that it was unaware the recipient had not begun manufacturing the units.  Management stated that it maintained frequent contact with the recipient and had been continually aware of the project's progress.

Management's comments and planned corrective actions are responsive to our recommendations.  Based on the actions taken by management, we made changes to the report in addition to Recommendation 5 to reflect the response and actions taken.  Further, in our finding on energy storage units, we clarified that the Department was aware that the recipient had not begun manufacturing.  However, we disagree that the Department had not mistakenly agreed to reimburse the recipient based on the commercial price of the units.  Under the terms and conditions of the award, the recipient was to be reimbursed for only costs actually incurred.  The Department paid the recipient based on the commercial price of the unit without verifying that actual costs had been incurred or that the recipient had provided supporting documentation to verify allowability and reasonableness of reimbursements.  The fact that the recipient had not manufactured the units and was reimbursed for almost 2 years before the Department received repayment of the $1.7 million, reaffirms our position that the Department mistakenly agreed to reimburse the recipient.

Management's comments are included in their entirety in Appendix 3.

Comments
DOE AR 000201

## Appendix 1

**OBJECTIVE**          The objective of this audit was to determine whether the Smart Grid Demonstration Program (Program) funded through the American Recovery and Reinvestment Act of 2009 (Recovery Act) had been properly managed.

**SCOPE**               This audit was performed between April 2011 and January 2013, at the Department of Energy's (Department) Headquarters in Washington, DC, and the National Energy Technology Laboratory (NETL) in Morgantown, West Virginia and Pittsburgh, Pennsylvania.  In addition, we conducted site visits on 11 projects with 9 recipients.

**METHODOLOGY**    To accomplish the objective, we:

- Obtained and reviewed relevant laws and regulations related to implementation of the Recovery Act and financial assistance awards administration;

- Reviewed the Funding Opportunity Announcement, merit review information and selection documentation;

- Conducted site visits to nine recipients to observe assets purchased and future sites of projects, interviewed officials and analyzed financial transactions and implementation of financial assistance requirements as prescribed by the terms and conditions of the awards;

- Reviewed invoices submitted for reimbursements and conducted onsite testing of books and records with each recipient;

- Obtained access to the Department's Strategic Integrated Procurement Enterprise System and reviewed individual award files for the 11 projects;

- Interviewed project officers and contracting personnel for each of the nine recipient's awards; and,

- Conducted interviews and meetings with Department Program officials.

We conducted this performance audit in accordance with generally accepted Government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe the evidence obtained provides a reasonable basis for our findings and

## Appendix 1 (continued)

conclusions based on our audit objectives.  Accordingly, we assessed significant internal controls and compliance with laws and regulations to the extent necessary to satisfy the audit objective.  In particular, we assessed the Department's implementation of the *GPRA Modernization Act of 2010* and determined that it had established performance measures for the management of the Program.  Because our review was limited, it would not necessarily have disclosed all internal control deficiencies that may have existed at the time of our audit.  Finally, we conducted an assessment of computer-processed data relevant to our audit objective and found it to be reliable.

An exit conference was held with the Department on January 16, 2013.

## Appendix 2

### PRIOR REPORT

- Audit Report on *The Department's Management of the Smart Grid Investment Grant Program* (OAS-RA-12-04, January 2012).  The audit revealed several opportunities to enhance management of the Smart Grid Investment Grant Program.  Specifically, although prohibited by Federal regulations, Department of Energy officials approved one grantee's use of $1.8 million in Federally-sourced funds to meet its cost-share obligation.  In addition, the audit revealed that one recipient was reimbursed twice, in the amount of $300,000, for transportation costs.  Further, three of the five recipient cyber security plans reviewed were incomplete, and did not always sufficiently describe security controls and how they were implemented.  Because the audit found that the cumulative effect of these issues could potentially jeopardize the goals of the Smart Grid Investment Grant Program, four recommendations were made.

DOE AR 000204

## Appendix 3

## <u>MANAGEMENT COMMENTS</u>



**Department of Energy**
Washington, DC 20585

December 20, 2012

MEMORANDUM FOR RICKEY R. HASS
                DEPUTY INSPECTOR GENERAL
                FOR AUDITS AND INSPECTIONS

FROM:           PATRICIA A. HOFFMAN
                ASSISTANT SECRETARY
                ELECTRICITY DELIVERY AND ENERGY RELIABILITY

SUBJECT:        Response to Office of Inspector General's (IG) Draft Audit
                Report "The Department of Energy's Smart Grid Demonstration
                Program Funded through the American Recovery and
                Reinvestment Act of 2009"

The Office of Electricity Delivery and Energy Reliability (OE) appreciates the
opportunity to respond to the Office of Inspector General's (IG) Draft Audit Report "The
Department of Energy's Smart Grid Demonstration Program Funded through the
American Recovery and Reinvestment Act of 2009."

Under the Smart Grid Demonstration Program (SGDP), OE manages $1.75 billion of
taxpayer and private funds. OE takes the responsibility of managing each of the 32
SGDP and 10 renewable and distributed systems integration and high temperature
superconductivity projects very seriously to ensure that funds are being spent properly
and that they are accomplishing their intended purpose and objectives.

OE understands that such a large, important, and complex program requires a level of
monitoring and oversight that is much higher than normally applied in typical programs.
In fact, OE's management processes and procedures for the SGDP program go well
beyond Federal, Department of Energy (DOE) and National Energy Technology
Laboratory (NETL) standard project management practices and include specific
requirements to help ensure that recipients deliver the intended results in a timely and
cost-effective manner and with reduced risks for U.S. taxpayers.

Examples of this increased oversight are:

- OE requested and received Office of Management and Budget (OMB) approval
  of monthly versus quarterly progress reports to ensure problems can be
  identified early.
- NETL developed a SGDP Project Monitoring Plan (Revision 2 dated March 26,
  2012) which includes the following

1

 Printed with soy ink on recycled paper

## Appendix 3

o   Technical Project Officer (TPO) Desktop Monitoring Checklist: to be completed on review of each monthly report
o   TPO On-site Monitoring Checklist: to be completed during site visits. The checklist contains 49 questions dealing with, among other things, Davis-Bacon Act requirements, payroll records, equipment/property, personnel and technical progress
o   Invoice Review Checklist, based on the annual training, to ensure TPOs are reviewing all aspects of the invoice.
- Initiated a program in which TPOs have been offered, at a minimum, 32 hours of on-site training and seminars in advanced electrical power systems. These have been provided by such organizations as Western Area Power Administration (WAPA), Schweitzer Engineering Laboratories (SEL) and the Power Systems Engineering Research Center (PSERC).

In addition, all SGDP TPOs are Contracting Officer Representative (COR) and TPO Level I certified and Contract Specialists (CS) are certified at Level II for acquisition and Level I for financial assistance.

OE's responses to the five recommendations in the Audit Report are listed below. In addition, OE is including Attachment 1, which contains supplementary information and raises specific concerns with some of the Audit Report's findings and conclusions.

**Recommendation 1:** Ensure adequate review of payments made to recipients

**Response:**
OE concurs that, at a minimum, adequate review of payments made to SGDP recipients is important. Additionally, OE believes the current review process for payments made to recipients is sound and is significantly more than "adequate" to manage SGDP projects. The first stage of the process is before the award is made and includes a thorough review of the budget by the TPO, the CS and typically a Cost Price Analyst. These reviews produce a list of budget questions that must be addressed by the recipient before the award is made to ensure that all negotiated costs are reasonable and allowable. Once the award is made, OE follows the standard processes and methods for invoice review as defined by:
- Federal Grant and Cooperative Agreement Act, P.L. 95-224, as amended by P.L. 97-258
- Part 600, Financial Assistance Rules
- OMB Circulars
- Terms and conditions of the award
- NETL Project Management Guidelines (Revision 3.0 dated March 22, 2012)
- NETL Federal Project Management Center, Frequently Asked Questions, "Invoice Review"

2

---

Management Comments

DOE AR 000206

## Appendix 3

Given the increased visibility, importance and value of the SGDP, OE initiated the following actions, over and above the standard processes and methods, to support a more informed and thorough review of invoices:

- Put all SGDP projects on cost reimbursement through the Automated Clearing House instead of reimbursement through the Automated Standard Application for Payment system
- Conducts annual training for TPOs and CSs on proper invoice review
- Created an invoice review checklist, based on the annual training, to ensure TPOs are reviewing all aspects of the invoice

Given the strict adherence to the standard processes and the additional processes developed, OE believes that the process for review of payments is significantly more than "adequate".

**Action:  NETL will continue to provide annual invoice review training to all SGDP TPOs and CSs and strictly follow all standard and additional processes for invoice review.  For FY13, the annual invoice review training will be completed by August 30, 2013.**

**Recommendation 2:** Provide training to recipients on proper submission of reimbursement packages

**Response:**
OE concurs that it is important that recipients submit accurate and thorough reimbursement packages and that additional training could benefit recipients. OE routinely conducts project Kickoff Meetings where project and administrative requirements are discussed.  NETL's standard operating procedure (Best Practice 2007-3: "Project Kickoff Meetings for Financial Assistance Agreements) for a new project is to host a "Project Kick-off Meeting" within 60 days of the award date.  Included in this SOP is, "The FPM should place the Contract Specialist and Contracting Officer at a convenient time in the agenda to offer comments and field any questions …"  Typically, the proper submission of reimbursement packages is discussed during this segment of the agenda to avoid any surprises or misunderstandings.

**Action:  NETL will include a specific agenda topic to the Best Practice 2007-3: "Project Kickoff Meetings for Financial Assistance Agreements SOP to address the submission of invoices.  This will be completed by March 29, 2013.  Also, the CS and TPO will continue to serve as day-to-day resources answering Recipients' questions on submission of reimbursement packages.**

3

Management Comments

DOE AR 000207

## Appendix 3

**Recommendation 3:** Ensure that recipients contribute their required cost-share from allowable sources.

**Response:**
OE concurs that recipients' required cost share must come from allowable sources. OE, as a standard practice, tracks Recipient cost share to ensure compliance with applicable laws and regulations. OE negotiates a cost share plan with each recipient that meets the project requirements. In all cases, the plan negotiated with a SGDP recipient is based on allowable sources, in accordance with applicable laws and regulations, to protect the government's investment. Recipient cost share to the SGDP significantly exceeds the initial programmatic requirement of 50%. Recipient cost share for all projects accounts for 62% of total project costs. This corresponds to $400 million more than was required by the funding opportunity announcement.

**Action: NETL will continue to ensure that the cost share plans negotiated with the recipients are reasonable and allowable, in accordance with 10 CFR 600 and OMB Circulars, and will ensure that all recipients contribute their required cost-share to protect the government's investment. In addition to on-going reviews of cost share requirements performed by the TPO and CS for each SGDP project, NETL will perform a program wide review of SGDP cost share by April 30, 2013.**

**Recommendation 4:**
Ensure the elimination of any potential duplicate funding among awards authorized by various Department programs.

**Response:**
OE concurs that duplicate funding among awards must be avoided. While the IG felt potential duplication may exist between these research/demonstration projects, the program was aware of the specific concern and had previously ensured duplication did not exist. The IG confirmed, in subsequent discussions, that no duplicate requests for reimbursement have occurred between the two projects. OE will continue to coordinate with other DOE Programs to ensure potential duplication among awards does not occur.

**Action: The TPO will continue to monitor the progress of the SGDP project and coordinate as needed with the ARPA-E TPO regarding the ARPA-E project. In addition to "as needed" meetings, the NETL TPO will schedule semi-annual discussions with the ARPA-E TPO. The first discussion will be completed by March 29, 2013.**

4

## Appendix 3

**Recommendation 5:**
Resolve the remaining questioned amounts in our report totaling about $9.7 million.

**Response:**
As stated in the audit report, the $9.7 million amount consists of two actions, for two separate awards under the SGDP, in amounts of $7.3 million and $2.4 million.

- OE concurs with the finding that one recipient was paid about $7.3 million over actual costs. Based on supporting documentation provided with the Recipient's reimbursement requests, there was no indication that the claimed expenses were based on both actual and estimated expenses. It was subsequently learned that the Recipient used both actual and estimated expenses for completed subcontractor/consultant work when submitting their reimbursement requests. The Department has reviewed invoice reconciliations (proposed by the Recipient as a result of this audit), and is making the appropriate monthly adjustments necessary to balance reimbursements with actual costs. Of the approximate $7.3 million in questioned cost, the Recipient has applied invoice reconciliations totaling $4.9 million to the project and it is anticipated that the remaining balance will be exhausted by June 2013.

- OE concurs that $1.7 million for the energy storage units was paid before the manufacturing was begun. Per the terms of this award this was reasonable and acceptable as the recipient intended to begin manufacturing the energy storage units. Shortly before the manufacturing process was begun, potential performance issues were identified; therefore, the manufacturing was delayed. The recipient notified the Department of the manufacturing delay and the $1.7 million has been repaid to the Department. The remaining $2.3 million identified in this finding ($0.7 million in federal funds and $1.6 million of recipient cost share) are reasonable and acceptable project costs related to project management; demonstration site planning and preparation; defining test parameters, data collection and analysis requirements; and initial baseline data collection. Also, OE does not concur that it "mistakenly agreed to reimburse the recipient" nor that it, "was unaware that the recipient had not begun manufacturing the units". OE maintains frequent contact with this recipient and has been continually aware of the progress of this project. OE will continue to monitor the progress of this project in order to support a successful demonstration.

**Actions:**
- **To address any potential invoice issues, NETL will send a letter to all SGDP recipients reminding the recipients that only actual costs should be included in invoice requests. This letter will also provide references and information on allowable actual costs and a reminder to contact the CS or TPO if the recipient has a question about the invoice process. This letter will be sent to all SGDP recipients by February 28, 2013.**
- **Regarding the $7.3 million finding, NETL will continue to review the recipient's invoices to: 1) ensure the entire reconciliation of $7.3 million is**

5

DOE AR 000209

## Appendix 3

applied to the award; and 2) ensure the recipient only receives payment for actual expenses for the remainder of the project.  OE expects to have all estimated expenses reconciled to actual costs by June 2013.

- **Regarding the $2.4 million finding, the action of the recipient repaying the $1.7 million has been completed.  Other than continuing to monitor the progress of this project, no further action on this finding is planned.**

Should you have any questions, please contact me at (202) 586-1411 or Kathy Bittner at (202) 287-5613.

6

Management Comments

DOE AR 000210

IG Report No.  <u>OAS-RA-13-08</u>

## CUSTOMER RESPONSE FORM

The Office of Inspector General has a continuing interest in improving the usefulness of its products.  We wish to make our reports as responsive as possible to our customers' requirements, and, therefore, ask that you consider sharing your thoughts with us.  On the back of this form, you may suggest improvements to enhance the effectiveness of future reports.  Please include answers to the following questions if applicable to you:

1. What additional background information about the selection, scheduling, scope, or procedures of the audit or inspection would have been helpful to the reader in understanding this report?

2. What additional information related to findings and recommendations could have been included in the report to assist management in implementing corrective actions?

3. What format, stylistic, or organizational changes might have made this report's overall message more clear to the reader?

4. What additional actions could the Office of Inspector General have taken on the issues discussed in this report that would have been helpful?

5. Please include your name and telephone number so that we may contact you should we have any questions about your comments.

Name _____    Date _____

Telephone _____    Organization _____

When you have completed this form, you may telefax it to the Office of Inspector General at (202) 586-0948, or you may mail it to:

Office of Inspector General (IG-1)
Department of Energy
Washington, DC 20585

ATTN:  Customer Relations

If you wish to discuss this report or your comments with a staff member of the Office of Inspector General, please contact our office at (202) 253-2162.

DOE AR 000211

This page intentionally left blank.

DOE AR 000212

The Office of Inspector General wants to make the distribution of its reports as customer friendly and cost effective as possible.  Therefore, this report will be available electronically through the Internet at the following address:

U.S. Department of Energy Office of Inspector General Home Page
http://energy.gov/ig

Your comments would be appreciated and can be provided on the Customer Response Form.

DOE AR 000213



An official website of the United States government    Here's how you know

**U.S. DEPARTMENT** *of* **ENERGY**

Policy & Priorities    Leadership & Organization    Topics    News & Events    About    **Funding Opportunities**

Office of Inspector General    Audit Report: OAS-RA-13-08

# Audit Report: OAS-RA-13-08

The Department of Energy's $700 Million Smart Grid Demonstration Program Funded through the American Recovery and Reinvestment Act of 2009



[Office of Inspector General](#)

January 17, 2013

Estimated Read Time 2 min

January 10, 2013

**The Department of Energy's $700 Million Smart Grid Demonstration Program Funded through the American Recovery and Reinvestment Act of 2009**

The Department of Energy's (Department) Office of Electricity Delivery and Energy Reliability received about $4.5 billion under the American Recovery and Reinvestment Act of 2009 (Recovery Act) to enhance the reliability and resilience of the Nation's power grid, or nearly 33 times the amount appropriated in Fiscal Year 2009. Of the amount awarded, the Department allocated nearly $700 million to the Smart Grid Demonstration Program (Program) to fund 32 regional demonstrations and energy storage projects. The Program also provided supplemental Recovery Act funding to 10 existing Department projects for renewable and distributed systems integration and high temperature superconductivity. The audit found that the Department had not always managed the Program effectively and efficiently. Review of 11 projects, awarded $279 million in Recovery Act funding and $10 million in non-Recovery Act funding, identified weaknesses in reimbursement requests, cost-share contributions, and coordination efforts with another Department program. These issues resulted in about $12.3 million in questioned costs. Although the Program had established procedures over financial reviews of projects, the problems identified occurred, in part, because it had not adequately reviewed financial transactions and planned for or monitored recipient cost-share provisions. In response to the finding, the Department concurred with the recommendations and indicated that corrective actions have been or would be initiated to improve the management of the Program and to resolve questioned costs.

**Tpoic: Financial Assistance**

**Audit Report: OAS-RA-13-08**

DOE AR 000214

## Quick Links

Leadership & Offices

Newsroom

Contact Us

Careers

## Resources

Budget & Performance

Directives, Delegations, & Requirements

Freedom of Information Act (FOIA)

Inspector General

Privacy Program

## Federal Government

USA.gov

The White House

**Committed to Restoring America's Energy Dominance.**

**Follow Us**

---

Open Gov   Accessibility   Privacy   Information Quality   No Fear Act   Web Policies   Vulnerability Disclosure Program

Whistleblower Protection   Equal Employment Opportunity   Notice of Court Orders

DOE AR 000215



U.S. Department of Energy
Office of Inspector General
Office of Audits and Inspections

# Special Report

## The Department of Energy's Management of the Award of a $150 Million Recovery Act Grant to LG Chem Michigan Inc.



OAS-RA-13-10

February 2013

DOE AR 000216



# Department of Energy
Washington, DC 20585

February 8, 2013

MEMORANDUM FOR THE UNDER SECRETARY OF ENERGY

FROM:           Gregory H. Friedman
                Inspector General

SUBJECT:        INFORMATION:  Special Report on "The Department of Energy's
                Management of the Award of a $150 Million Recovery Act Grant to
                LG Chem Michigan Inc."

## BACKGROUND

The Department of Energy's Vehicle Technologies Program was established to develop and deploy efficient and environmentally friendly highway transportation technologies to reduce the Nation's dependence on foreign oil and provide greater energy security.  The Vehicle Technologies Program received $2.4 billion under the American Recovery and Reinvestment Act of 2009 for these purposes.  The program is managed by the Office of Energy Efficiency and Renewable Energy and is being implemented and monitored primarily by the Department's National Energy Technology Laboratory (NETL).

In February 2010, LG Chem Michigan Inc. (LG Chem Michigan), formerly Compact Power Inc., was awarded more than $150 million in Recovery Act funding to help construct a $304 million battery cell manufacturing plant in Holland, Michigan.  As part of this process, LG Chem Michigan was also eligible to receive more than $175 million in tax relief from the State and local governments through 2025.  The objective of the project was to design, construct, start up and test a production facility for lithium-ion polymer batteries, create more than 440 jobs, and produce enough battery cells annually to equip 60,000 electric vehicles by the end of 2013, with assembly beginning in 2012.

On October 24, 2012, the Office of Inspector General received a complaint that LG Chem Michigan misused Recovery Act funds.  The complainant asserted that employees at the Michigan facility had little work to do and were spending time volunteering at local non-profit organizations, playing games and watching movies at the expense of the Federal government and taxpayers.  In a separate action, the Department's Chief of Staff and its General Counsel brought similar concerns to our attention.  We initiated this review to examine the allegations and to evaluate the Department's management of the Recovery Act grant awarded to LG Chem Michigan.

## RESULTS OF REVIEW

We confirmed the allegations.  We found that work performed under the grant to LG Chem Michigan had not been managed effectively.  Based on progress to date and despite the expenditures of $142 million in Recovery Act funds, LG Chem Michigan had not yet achieved the objectives outlined in its Department-approved project plan.

DOE AR 000217

2

The allegation that the Department reimbursed LG Chem Michigan for labor costs that did not support the goals and objectives of the grant was substantiated. Our review revealed that LG Chem Michigan inappropriately claimed and was reimbursed for labor charges incurred by a variety of supervisory and staff employees for activities that did not benefit the project. Through interviews with LG Chem Michigan management and other staff, we confirmed that employees spent time volunteering at local non-profit organizations, playing games and watching movies during regular working hours. As such, we determined that the Department reimbursed the company for questionable labor costs incurred in the third quarter of 2012. We were unable to calculate the exact loss to the Government because LG Chem Michigan did not track labor activities in detail. However, based on LG Chem Michigan employee revelations regarding work habits, we believe it is likely that the total amount of charges that included at least some non-productive work exceeded $1.6 million, about $842,000 of which was reimbursed by the Department in accordance with its cost-sharing arrangement for the project. The projected overpayment by the Department assumes that LG Chem Michigan complied with the terms of its grant to share costs on an equal basis, an aspect that we did not confirm.

We found that the overall goals related to production of battery cells and the projected number of jobs created had yet to be met. In particular:

- Even though the facility had produced a large number of test cells, the plant had yet to manufacture battery cells that could be used in electric vehicles sold to the public.

- Only about 60 percent of the production capacity set forth in the grant agreement was constructed even though nearly $142 of $151 million (94 percent) of the Department's share of project funds had been spent. LG Chem Michigan officials estimated that the Department's 50 percent share of the cost to complete the five production lines called for by the grant agreement would be $22 million, an amount that would significantly exceed the remaining funds available under the grant award. These same officials noted, however, that they had no plans to complete the remaining lines unless demand improved dramatically. We found that LG Chem Michigan had significantly underestimated labor costs and that this was a primary cause of its inability to complete planned construction.

- Project documentation prepared to support the grant award indicated that production of battery cells would transition from LG Chem's South Korean facility to the Michigan plant beginning in 2012, assuming that demand grew as expected. LG Chem Michigan officials indicated that they had not begun production at the facility because demand for the Chevrolet Volt, the U.S. manufactured vehicle for which the plant was to produce battery cells, had not developed as anticipated.

- Less than half of the expected number of jobs had been created to support the project. The period of performance for the grant runs through May 2013. Yet, based on progress and current plans of LG Chem Michigan officials at the time of our review, the expected benefits of the project are not likely to be realized within the originally anticipated timeframes.

The problems we identified occurred, in large part, due to grant monitoring issues with LG Chem Michigan and the Department.  Notably, LG Chem Michigan did not fully realize the grant's target goals, and the Department did not always take sufficient action to ensure adequate oversight of project progress and, in turn, protect the taxpayers $142 million investment in the project.  For instance, LG Chem Michigan officials told us that they made a decision to delay production of battery cells at the Michigan facility.  LG Chem Michigan officials made that decision even though demand for the Chevrolet Volt averaged 1,955 vehicles per month in 2012.  That volume could have readily been produced by using the then built-out capacity of the Michigan plant.  NETL officials commented that it was anticipated at the time the grant was awarded that the transition of production from non-U.S. sources to Michigan would occur; however, language requiring the shift in production had not been incorporated into the grant.  Thus, they asserted that the Department had no leverage to require the shift in production to the Michigan plant.  Yet, until the shift in production takes place or some alternative use for the plant is developed, U.S. taxpayers will receive little direct benefit from a plant for which they provided up to half of the funding.

Further, LG Chem Michigan officials told us that the vast majority of the increase in project costs was due to errors in estimating labor costs.  For example, LG Chem Michigan failed to account for the Recovery Act requirement to utilize Davis-Bacon Act wage rates for subcontractors.  We found this lapse hard to understand given the emphasis placed on strict compliance with Davis Bacon as one of the Recovery Act's basic principles, a fact that was well known to industry and to responsible Department officials.

In addition, LG Chem Michigan management had not adequately implemented the terms and conditions of the grant agreement as related to unallowable costs.  For instance, company officials we spoke with conceded that they submitted all labor costs for reimbursement because, as they asserted, they were unfamiliar with the types of costs that were allowable/unallowable.  We found, however, that grant documentation and related Federal regulations clearly established what types of costs were permissible.

We also noted a lack of effective monitoring of grant activities by NETL related to project progress and labor reimbursements.  For example, even though there were indications that the project was not progressing as planned early in 2012 – reflected by employee furloughs, construction delays and cost overages – NETL had not taken action to determine whether payments to LG Chem Michigan should be suspended until further review of the project.  Notably, the Office of Energy Efficiency and Renewable Energy had taken action to suspend reimbursements for labor charges when it became aware of potential improprieties in October 2012.  In preliminary comments on our report, officials also stated that documentation received from LG Chem Michigan did not indicate that the project would not ultimately meet its goals and objectives.  In addition, we determined that the Federal project monitoring process had not identified the questionable labor activities highlighted in our report.

<u>Production and Transition Issues</u>

LG Chem Michigan officials told us that they were faced with difficult decisions regarding the workforce at the Michigan facility.  Plant managers noted that they wanted to do their best to maintain the workforce in hopes that production would start soon.  They also indicated that they

4

resorted to furloughs and permitted employees to engage in non-productive activities to help ensure that their investment in training the employees was not lost. In addition, LG Chem Michigan officials indicated that their range of options was limited, claiming that shifting production to the Michigan plant at this point would actually result in financial losses on battery cells produced in the U.S.

We acknowledge that company officials were faced with difficult choices, with lack of demand for the product being at the core of LG Chem Michigan's problem. Yet, the basic question for Federal grant administrators, in our opinion, was whether grant funding should have continued or suspended once it became clear that: (i) all the promised production lines could not be completed within budget; and, (ii) LG Chem Michigan would continue to fill U.S. demand with battery cells made in South Korea. In light of those realities, we question whether Federal reimbursements for labor payments for any of the plant's employees and other project costs should have continued without a thorough re-evaluation of the project. At the time these facts became known, in our judgment, business risk for the endeavor should have shifted to LG Chem Michigan and should not have been borne, even in part, by the U.S. taxpayer. Ironically, program officials told us that they were considering a request from LG Chem Michigan to extend the grant period until 2016.

Impact and Path Forward

The LG Chem Michigan grant recipient faced a number of challenges. Most notably, the demand for battery cells to be produced at the Michigan plant was less than anticipated, frustrating efforts by the Department and its Recovery Act grant recipient to promote the use of electric vehicles and reduce the Nation's dependence on foreign oil. To its credit, NETL had initiated prompt actions related to resolving issues highlighted in the complaint initially referred to us by the Recovery Accountability and Transparency Board, including recovering presumptively unallowable labor reimbursements identified in our report and requiring LG Chem Michigan to submit an action plan to address concerns with the progress of the project.

While the efforts of the Department and LG Chem Michigan's immediate reaction to the allegations resulted in recovery of the non-productive labor charges, the results of our review indicated that more fundamental issues existed, limiting the possibility that the objectives of the project will be met. Without improvements, the Department may continue to reimburse LG Chem Michigan for costs that do not support the intent of the grant. As such, we have made a series of recommendations that should assist the Department in managing its Vehicle Technologies Program as it relates to LG Chem Michigan and similarly situated grantees.

MANAGEMENT REACTION

Management concurred with the report's recommendations and indicated that it had taken and/or initiated corrective action to address issues identified in our report.

In its comments on the report, officials confirmed that LG Chem Michigan had reimbursed the Department for the $842,000 in costs that we had found to be unreasonable and unallowable. However, management noted that this was only a very small percentage of the overall grant. We

5

think that this comment misses the point.  First, our review of costs incurred was limited to costs related to unproductive labor charges by LG Chem Michigan – that is, those charges identified in the initial allegation relating to idle workers playing board games and watching movies at Government expense.  Thus, we did not evaluate the reasonableness of the larger body of incurred costs.  Second, we leave it to each reader of the report to make their own judgment as to the significance of a $842,000 reimbursement.  Finally, the audit surfaced issues relating to the management of this grant which transcend the reimbursed amount in importance.

Management's comments and our response are summarized and more fully discussed in the body of the report.  Management's formal comments are included in their entirety in Appendix 3.

Attachment

cc:    Deputy Secretary
       Assistant Secretary for Energy Efficiency and Renewal Energy
       General Counsel
       Chief of Staff

DOE AR 000221

# SPECIAL REPORT ON THE DEPARTMENT OF ENERGY'S MANAGEMENT OF THE AWARD OF A $150 MILLION RECOVERY ACT GRANT TO LG CHEM MICHIGAN INC.

**TABLE OF CONTENTS**

**Project Performance and Cost**

Details of Finding ................................................................................................1

Recommendations and Comments...................................................................9

**Appendices**

1.   Objective, Scope and Methodology ..........................................................11

2.   Related Reports ........................................................................................12

3.   Management Comments.............................................................................13

DOE AR 000222

# THE DEPARTMENT OF ENERGY'S MANAGEMENT OF THE AWARD OF A $150 MILLION RECOVERY ACT GRANT TO LG CHEM MICHIGAN INC.

**PROJECT PERFORMANCE AND COST**

The Department of Energy (Department) and LG Chem Michigan Inc. (LG Chem Michigan) had not effectively managed grant activities related to the Electric Drive Vehicle Battery and Component Manufacturing Initiative (Manufacturing Initiative). In particular, based on progress at the time of the report and despite the expenditure of $142 million in American Recovery and Reinvestment Act of 2009 (Recovery Act) funds, we found that production and job creation goals and objectives outlined in the Department-approved project plan are unlikely to be achieved within anticipated timeframes. Furthermore, LG Chem Michigan inappropriately claimed and was reimbursed for labor costs that did not support the purpose/objective of the grant, including costs for workers to perform volunteer activities, play games and watch movies during regular work hours.

### Project Goals and Objectives

We found that the goals and objectives of the Manufacturing Initiative had not yet been met. The objective of the project was to design, construct, start up and test a production plant for lithium-ion batteries to support the manufacture of 60,000 electric vehicles by the end of 2013. Although assembly operations were to begin at the Michigan plant in 2012, we noted that goals related to production of battery cells and the number of jobs created had not been achieved. While the period of performance for the grant will continue until at least May 2013, and many variables affect whether goals are realized, our evaluation indicated that the expected benefits of the project are unlikely to be realized within the originally anticipated timeframes. In particular:

- Although LG Chem Michigan had made significant progress related to completion of design, construction and testing of the plant, it had not begun production of battery cells for commercial use. We noted that while a large number of test cells had been created as of June 2012, the plant had yet to have the entire production process tested and validated and, therefore, had not generated any cells that could be used in electric vehicles sold to the public.

- Grant award documentation indicated that production of battery cells was scheduled to transition to the Michigan plant from non-U.S. sources beginning in 2012, assuming that demand achieved expected levels. However, we found that this had not occurred. The project plan called for beginning production of battery cells in 2012, at the

Michigan plant, with production of all Chevrolet Volt battery cells occurring at the Michigan plant by the end of 2013.  LG Chem Michigan officials commented, however, that while they were prepared to begin production, they had not begun the transition to the Michigan plant due to lower than expected demand for electric vehicles.

- Production capacity set forth in the grant agreement had not been realized even though nearly all the Department's share of project funds had been spent.  Specifically, the project plan called for 5 production lines that would each produce enough battery cells annually to support at least 12,000 vehicles.  However, despite spending $142 million (94 percent) of funds available from the Department, only three of five production lines had been constructed.  LG Chem Michigan officials estimated that construction of the additional lines, if completed, would cost about $44 million.  Under the terms of the grant, the Department's share would be $22 million, which would significantly exceed the remaining grant funds.  Based on our review of available documentation, we determined that the vast majority of the increase in project costs was due to higher than expected labor costs.  Specifically, despite budgeting $15 million for the installation of all equipment, LG Chem Michigan had spent nearly $30 million by the time of our review on completing only three of the five production lines.  Furthermore, LG Chem Michigan officials indicated that the company had indefinitely delayed plans to construct the final two assembly lines.

- Although project planning documentation estimated that the project would create more than 440 jobs by the end of 2012, less than half of the expected number of jobs had actually been created.  We found that the plant reached a peak of 215 jobs in early 2012, but the number of employees had dropped to 200 by the time of our review.  To help compensate for the lack of production and reduce operating costs, plant management decided to furlough employees beginning in April 2012.  The furloughs continued at the time of our review and, according to plant officials, had saved the company nearly $580,000 to date, a portion of which was realized by the Department.  With no firm plans to begin production, it is unclear how and when the idle capacity will be addressed.

Details of Finding
DOE AR 000224

Labor Activities

We concluded that the Department paid LG Chem Michigan for labor costs that did not support the goals and objectives of the grant. Specifically, our review of worker activities at LG Chem Michigan, including supervisors, operators and engineers, indicated that employees used regular work hours to volunteer at local organizations, play board, card and video games and watch movies. As such, we determined that the Department may have reimbursed the company up to about $842,000 for questionable labor charges for just the third quarter of 2012. In particular, we found:

- 16 of 26 employees interviewed had participated in various volunteer activities during normal work hours in recent months. Based on our evaluation, we determined that the volunteer work began in or around August 2012, and continued until November 2012. This included volunteer work at Habitat for Humanity, animal shelters and outdoor nature centers, among others. While our interviews demonstrated that these activities had taken place, we were unable to quantify the number of days spent on volunteer work because the company did not track labor activities to this level of detail. Our test work indicated, however, that the amount of time spent volunteering ranged from one day for certain employees to 5 days per week for others. In total, the cost of labor for the third quarter was about $2.3 million, including $1.7 million for direct labor charges and $670,000 in related fringe benefits.

- 13 of 26 employees we spoke with had participated in various activities at work that were not appropriate for reimbursement by the Department, including watching movies and playing board, card and video games. We determined that these activities generally began prior to the volunteer work and continued until just before the time of our review. For instance, at least two individuals interviewed believed that such activities began prior to July 2012, but did not provide any documentation to support this assertion. Similar to the volunteer work, we were unable to quantify the amount of time spent on these activities because the company did not track labor to this level of detail.

National Energy Technology Laboratory (NETL) officials became aware of the questionable activities as a result of media reports and notified LG Chem Michigan on November 1, 2012, that it would

not be reimbursed for its share of more than $531,000, or approximately $265,500 (half of $531,000), in labor costs occurring in the third quarter of 2012. We determined, however, that the amount of questionable labor costs may be much higher. Specifically, NETL's estimate only included costs for production supervisors and operators, but did not include costs of more than $482,000 for several other categories of employees that also participated in volunteer activities, game playing and movie watching during work hours. The estimate developed by NETL was based on inaccurate information provided by LG Chem Michigan regarding which individuals had participated in volunteer activities. Based on our review, we are questioning costs of up to about $842,000, as summarized in the following table.

| Functional Group | Total Employees | Labor Costs by Functional Group | Questioned Labor Costs[1] |
|---|---|---|---|
| Construction | 5 | $49,798 | - |
| Production Engineers | 20 | $283,266 | $283,266 |
| Production Supervisors | 4 | $48,427 | $48,427* |
| Production Operators | 101 | $483,037 | $483,037* |
| Electrode Engineer | 5 | $55,885 | - |
| Electrode Operators | 12 | $56,049 | $56,049 |
| Administrative Personnel | 22 | $407,514 | - |
| Preventive Maintenance Technicians | 8 | $81,314 | - |
| Preventive Maintenance Engineers | 3 | $47,534 | - |
| Quality Assurance Engineers | 6 | $75,940 | $75,940 |
| Quality Assurance Operators | 14 | $67,400 | $67,400 |
| **Total Direct Labor** | **200** | **$1,656,164** | **$1,014,119** |
| Fringe Benefits | | $670,258 | $670,258 |
| **Total Labor** | | **$2,326,422** | **$1,684,377** |
| | | Department's Share of Cost | 50% |
| | | **Total Questioned Costs** | **$842,189** |

* These costs were initially questioned by NETL. The calculation of questioned costs assumes that LG Chem Michigan complied with the terms of its grant to share costs equally – an aspect that we did not confirm.

The decision of the company to permit employees to perform questionable activities using Department funds did not support the goals and objectives of the grant agreement, and therefore, was a questionable cost. LG Chem Michigan management told us that it was unaware that these costs may be considered unallowable and would work with the Department to address the situation. We found, however, that grant terms and readily available Federal regulations on the subject clearly established the types of costs that

[1] We did not question costs for certain labor categories because our sample of interviews did not identify individuals that participated in activities that did not support the goals and objectives of the project.

were appropriate.  Subsequent to our review, Department officials provided evidence that they had fully recovered the questioned costs identified in our report.

**Project Implementation and Monitoring**

The problems we identified occurred, in part, because LG Chem Michigan had not effectively implemented activities that supported the goals and objectives of the Manufacturing Initiative.  In addition, many of the issues identified were due to the lack of effective monitoring of grant activities by NETL related to project progress and labor reimbursements.  Furthermore, the goals and objectives of the project were not met within the estimated timeframes, in part, because electric vehicle sales were lower than anticipated.

Grant Activities

Senior LG Chem Michigan officials decided to retain production of battery cells outside of the U.S. rather than transition operations to the Michigan plant because the demand for electric vehicles was lower than anticipated.  LG Chem Michigan officials made that decision even though demand for the Chevrolet Volt, the U.S. manufactured vehicle for which the plant was to produce batteries, averaged 1,955 vehicles per month for 2012.  That volume could have readily been produced by using the then built-out capacity of the Michigan plant.  In addition, while the potential for production overcapacity was highlighted as a significant risk in the Project Management Plan when the grant was awarded, LG Chem Michigan's response indicated that demand for electric vehicles was strong enough to mitigate these concerns and that supply agreements with other major vendors would be obtained.  At the time of our review, however, no other agreements had been established.

LG Chem Michigan also had not appropriately implemented the terms and conditions of the grant as related to potentially unallowable labor costs.  In particular, company officials we spoke with explained that they were unfamiliar with all of the nuances of the agreement because they had never received grant funds from the Department prior to the Recovery Act.  However, we noted that the terms and conditions of the grant referred to Department Financial Assistance Regulations, 10 CFR 600, which demonstrated the types of activities that were permissible under the terms of the award.  For instance, Federal regulations state that costs could be considered reasonable, and therefore reimbursable, if ordinary and necessary for the conduct of business or contract performance.  LG Chem Michigan management also noted that it

made the decision to pay individuals to support local community activities rather than potentially terminating their employment due to a lack of production. They explained that this decision was made in response to the high cost to train workers and the fluidity in vehicle sales projections. However, we continue to question whether the cost for various activities should have been reimbursed by the Department as it did not appear reasonable to meet the intent of the grant. In our opinion, the cost of business decisions made by LG Chem Michigan should be absorbed by the company, not the U.S. taxpayer.

<u>Monitoring and Oversight</u>

The issues identified were also due to a lack of effective monitoring of grant activities by NETL related to project progress and labor reimbursements. For example, even though there were indications that the project was not progressing as planned – including employee furloughs, construction delays and cost overages – NETL had not taken action to determine whether payments to LG Chem Michigan should have been suspended pending further review of the project. In particular, although a technical review of the project's budget was completed during the grant award process, NETL did not require LG Chem Michigan to take corrective action when it became evident that the cost of the project would exceed the planned budget. For instance, our review of a site visit checklist completed by Federal officials in August 2012, did not include any discussion related to a comparison of cost versus capacity. In fact, documentation we reviewed indicated that the project was on track to meet program milestones and that there were no concerns with project progress. In addition, LG Chem Michigan officials told us that the vast majority of the increase in project costs was due to errors made by the company in estimating labor costs. While NETL completed a technical review of the budget, it did not ensure that LG Chem Michigan accounted for the requirement to utilize Davis-Bacon Act wage rates for subcontractors.

We also determined that NETL did not question LG Chem Michigan's decision to delay production at the Michigan plant. NETL officials commented that while they were aware of the planned transition to the Michigan plant as part of the grant documentation, they stated that the Department could not interfere with LG Chem Michigan's business decisions and noted that this did not impact the need to establish the award. In preliminary comments on our report, officials noted that the project plan included language related to transitioning production to Michigan,

Details of Finding
DOE AR 000228

but that factor had never been incorporated in the terms of the grant award. Federal officials also indicated that although the final two assembly lines were not installed, failure to complete the planned capacity would not impact the maximum amount of the Department's contribution. Senior LG Chem Michigan officials commented, however, that there were no plans to install the additional lines in the near future due to lower than expected demand for electric vehicles.

In addition, we determined that the Federal project monitoring process had not identified the questionable labor activities highlighted in our report. Although the Federal Project Manager visited the plant at the end of August 2012 – after many of the volunteer activities, games and movies had already begun – the issues were not identified. In light of the indications that the project was not progressing as planned and production had not begun, we believe it would have been prudent for Federal officials to inquire about employee activities given the large number of individuals employed at the plant. Had officials spoken to project engineers and/or operators about what they were doing during periods of inactivity, the questionable activities may have been identified. In fact, we do not believe that the monitoring process used by NETL would have ever identified the labor issues highlighted in our report. To its credit, NETL took immediate actions to respond to the allegations of labor improprieties, including suspending payments for labor, initiating cost recovery proceedings and directing LG Chem Michigan to develop corrective action plans.

Market Factors

NETL and LG Chem Michigan officials told us that lower than anticipated sales of electric vehicles also played a significant role in the progress of the Manufacturing Initiative. Specifically, although initial demand projections at the time of award were for 60,000 vehicles per year, 2012 sales totaled only 23,461. As a result, LG Chem Michigan officials decided to construct only three of the five planned production lines for the lithium-ion polymer batteries used to manufacture electric vehicles. LG Chem Michigan officials stated that they had placed an order for equipment to support assembly of a fourth production line, but suspended the order in December 2011, due to the lack of activity at the plant. While we recognize that the demand for electric vehicles was a significant factor impacting the success of the plant, the issues identified in our report demonstrate that there were also opportunities for enhanced project management practices

that should have been utilized to help implement the project in an effective manner.

Lack of demand and progress problems should have, in our opinion, prompted Federal officials to intensify/focus their review efforts on determining whether funding for the plant should have continued or should have been suspended pending further review. Notably, LG Chem Michigan officials told us that they have no specific plans to begin production in Michigan because of low demand. Even though NETL officials were aware of this fact, they told us that they could not interfere with business decisions of the company. Instead, they elected to continue to fund, in essence, business risks that, in our opinion, should have been assumed by LG Chem Michigan when it became apparent the goals of the grant would not be achieved within the originally anticipated timeframes. Unless and until production begins at the Michigan plant, in our opinion, the U.S. taxpayer will garner little benefit from its $143 million investment.

**Impact and Path Forward**

The Department faced a number of challenges in managing the LG Chem Michigan grant, particularly in light of the less than expected demand in the target market for battery cells to be produced at the Michigan plant. Without improvements, however, the Department may continue to reimburse LG Chem Michigan for costs that are questionable. For instance, as a result of the issues noted in this report, we identified up to about $842,000 in questionable costs related to reimbursements for labor charges that did not support the intent of the grant.

In addition, we are concerned that the goals and objectives of the grant may not be fully achieved due to lower than expected demand for electric vehicles. While the lack of electric vehicle demand for the project was a significant factor to the issues identified in our report, senior LG Chem Michigan officials countered that the plant remained critical to the long-term strategy of the company and believed that it would eventually succeed – whether through increased demand for vehicle batteries or expanding the scope of plant activities to produce other products such as energy storage solutions. However, until the company begins production at the Michigan plant or develops some alternative use for the plant, U.S. taxpayers will receive little direct benefit from a plant for which they provided at least half of the funding.

**RECOMMENDATIONS**

To improve management of the Manufacturing Initiative and help achieve the goals of the Recovery Act, we recommend that the Assistant Secretary for Energy Efficiency and Renewable Energy direct Vehicle Technologies Program officials to:

1. Enhance grant monitoring procedures to ensure that goals and objectives of the Manufacturing Initiative are achieved in the most effective manner;

2. Utilize the full range of remedial actions available to the government under the terms of the grant to hold LG Chem Michigan accountable for the outcome of the Michigan project; and,

3. Coordinate with LG Chem Michigan officials to facilitate either beginning battery cell production at the Michigan plant or implementation of some alternative, productive use for the plant.

We also recommend that the contracting officers for the Vehicle Technologies Program:

4. Evaluate questioned costs identified in our report and recover overpayments made to LG Chem Michigan.

**MANAGEMENT REACTION**

Department management agreed with the report's recommendations and stated that it had initiated actions to address the issues identified. For instance, management stated that it had taken action to disallow project costs identified in our report, although it noted that the unallowable labor costs represent less than 1 percent of EERE's contribution to the project. Management commented that while it was considering a request from LG Chem Michigan to extend the period of performance for the grant, the extension would not, in and of itself, increase the project's value or the Department's share of the project costs. In addition, management stated that it is committed to effective grants management and strives to implement sound grants management practices. Management also commented that, concurrent with our review, it provided guidance to LG Chem Michigan to assure a clear understanding of the reporting requirements as the project moves forward. Furthermore, management stated that it was in the process of establishing a uniform set of terms and conditions for funding opportunities and awards to facilitate active project management. Although management concurred with the need to enforce the terms and conditions of the grant award, it noted that under the terms of the grant it could not force LG Chem Michigan

to transition production to the Michigan plant.  Management also provided technical comments that are addressed in the body of the report, where appropriate.

**AUDITOR COMMENTS**     Management's comments and corrective actions are responsive to our recommendations.  However, in response to management's comments on the unallowable labor costs identified in the report, we note that while these costs comprised less than 1 percent of EERE's contribution to project costs, the scope of our audit was limited and would not necessarily have identified all unallowable costs, because we did not review all project invoices.  We modified Recommendation 3 in response to management's assertion that based on the terms of the grant, it could not force LG Chem Michigan to transition production to the Michigan plant.  Management's formal comments are included in Appendix 3.

## Appendix 1

**OBJECTIVE**   To determine whether work performed under the American Recovery and Reinvestment Act of 2009 (Recovery Act) grant awarded to LG Chem Michigan Inc. (LG Chem Michigan) was appropriately managed.

**SCOPE**   The review was performed between November 2012 and February 2013, at the National Energy Technology Laboratory in Morgantown, West Virginia, and the LG Chem Michigan plant in Holland, Michigan.

**METHODOLOGY**   To accomplish our objective, we:

- Reviewed applicable laws and regulations, including those pertaining to the Recovery Act;

- Interviewed Federal project officers, contract specialists and contracting officers regarding the grant awarded to LG Chem Michigan;

- Reviewed LG Chem Michigan grant documentation obtained from the Department of Energy's Strategic Integrated Procurement Enterprise System;

- Interviewed approximately 30 employees of LG Chem Michigan to obtain information related to activities performed at the plant, including the conduct of volunteer activities, game playing and video watching;

- Performed reviews of LG Chem Michigan's project plans, volunteer program, raw material balances and equipment tracking; and,

- Reviewed related reports issued by the Office of Inspector General and the U.S. Government Accountability Office.

An exit conference was held with officials on February 6, 2013.

## Appendix 2

### RELATED REPORTS

**Office of Inspector General Reports**

- Audit Report on *Follow-up on the Department of Energy's Implementation of the Advanced Batteries and Hybrid Components Program Funded under the American Recovery and Reinvestment Act* (OAS-RA-L-12-05, July 2012). The review identified opportunities for the Department of Energy (Department) to improve its administration of the Advanced Batteries and Hybrid Components Program. Specifically, the Department could better define regulations governing the retention of documentation supporting procurement decisions. In addition, the Department should ensure recipients adequately safeguard equipment purchased with Federal funds. Lastly, the Department should obtain and review required audit reports to ensure the sufficiency of internal controls and compliance with laws and regulations.

- Audit Report on *Progress in Implementing the Advanced Batteries and Hybrid Components Program under the American Recovery and Reinvestment Act* (OAS-RA-L-10-04, April 2010). The audit revealed that the Department had made significant progress in implementing the Advanced Batteries and Hybrid Components Program. Specifically, the Department had issued a Funding Opportunity Announcement that included defined selection criteria and established a grantee selection process that incorporated review of all aspects of applicant proposals. In addition, the Department awarded funding to 20 grantees, obligating 85 percent of the available American Recovery and Reinvestment Act of 2009 funding for projects such as construction of factories that will build lithium-ion batteries for hybrid and electric vehicles and facilities that will produce materials and components to supply battery manufacturers. Furthermore, the Department had established conditions on the use of funds awarded until such time as grantees can demonstrate, for example, that they have completed environmental reviews. Finally, the Department developed a comprehensive monitoring program plan that, if successfully implemented, should reduce the financial, technical and marketing risks associated with the projects.

**Government Accountability Office Report**

- *Batteries and Energy Storage Federal Initiatives Supported Similar Technologies and Goals by Had Key Differences* (GAO-12-842, August 2012).

## Appendix 3

<h2 style="text-align:center">MANAGEMENT COMMENTS</h2>

MEMORANDUM FOR:     RICKEY R. HASS
                    DEPUTY INSPECTOR GENERAL FOR AUDITS AND
                    INSPECTIONS
                    OFFICE OF INSPECTOR GENERAL

FROM:               KATHLEEN B. HOGAN
                    DEPUTY ASSISTANT SECRETARY FOR ENERGY EFFICIENCY
                    ENERGY EFFICIENCY AND RENEWABLE ENERGY

SUBJECT:            Response to Office of Inspector General Draft Special Report on
                    "Department of Energy's Management of the Award of a $150 Million
                    Recovery Act Award by the Department of Energy to LG Chem Michigan
                    Inc."

The Office of Energy Efficiency and Renewable Energy (EERE) appreciates the opportunity to respond to this audit report.

EERE's investment was to partially fund an advanced battery manufacturing facility, and it's simply unacceptable that any of those funds were used to pay for other work in the community, or for any other purpose. Immediately upon learning of these allegations, EERE took swift action to stop further payments, secured a refund for taxpayers on $842,189 in questionable costs, and report the matter to the Department's Inspector General. In addition, EERE is taking a series of steps to strengthen project management in the future, including a reorganization within EERE, an updated grants management process, increasing the number of site visits each year to large projects, and centralizing the review of project invoices. A more complete summary of these actions is below.

While the demand for electric vehicles hasn't grown quite as quickly as expected and there will likely be some more challenges in the next few years, electric drive vehicle sales tripled last year and are expected to continue growing rapidly. EERE's investment in this battery manufacturing facility – matched dollar for dollar by LG Chem Michigan Inc. – is helping to put Michigan and the United States in a prime position to capture a rapidly growing global market. This is part of an overall effort to make sure that America's auto manufacturing base continues to adapt to the most innovative technologies, deliver the gasoline-saving vehicles that consumers increasingly want, and to continue to grow the manufacturing sector in the United States.

While the Department has no tolerance for and moved swiftly to correct this case of inappropriate billing, it's also critical that the United States continue to compete aggressively for the clean energy jobs and industries of the future. Ultimately, the choice comes down to whether the United States should lead what will become an enormously valuable and growing market, or whether we will give up this industry because sales "only" grew 200 percent last year. Emerging technologies and industries often face struggles early on, but the race will be won by those who remain focused and committed to the end goal.

## Appendix 3 (continued)

### Electric Drive Vehicle Battery and Component Manufacturing Initiative

The objective of the Electric Drive Vehicle Battery and Component Manufacturing Initiative is to enable the United States to lead the development and manufacturing of batteries and components for electric drive vehicles (EDVs). EERE has invested, on a cost-shared basis with industry, in the establishment of a domestic battery and electric drive component industry capable of competing effectively in the global market. Specifically, EERE has provided financial assistance to raw materials suppliers, materials processors, electric drive component and systems manufacturers, cell manufacturers, and pack assemblers. This Initiative has successfully expanded domestic battery production capacity for EDVs – as of September 30, 2012, these projects had achieved a total manufacturing capacity exceeding 290,000 batteries/year.

### LG Chem Michigan Inc. Project

EERE is providing financial assistance to LG Chem Michigan Inc. to construct an 850,000 square foot manufacturing facility in Michigan and to procure, install, and validate manufacturing equipment. LG Chem Michigan Inc. is contributing over half ($151,403,339) of the total project cost ($302,790,339), and EERE is providing the remainder ($151,387,000). The unallowable labor costs identified in this report represent *less than 1 percent (specifically, 0.5 percent) of EERE's contribution to this project.*

This project will enable LG Chem to produce Lithium-Ion Polymer battery cells and batteries in the United States for automotive applications (including hybrid electric, plug-in hybrid electric, pure electric vehicles for commercial purposes, and military hybrid vehicles) and other applications, such as aviation, smart grid support, broadband backup power, and energy storage for renewable energy.

LG Chem Michigan Inc. has successfully completed the construction of the cell manufacturing facility and the installation of an electrode manufacturing line, four safety reinforcing separator lines, and three cell assembly lines. In addition, LG Chem Michigan Inc. has built hundreds of thousands of test cells to validate plant operation.

The project is scheduled to be completed on May 31, 2013; however, LG Chem Michigan Inc. has requested an extension in order to better align the remaining project tasks (representing about 6% of EERE's contribution to the total project cost) with market demand. If EERE grants this extension, it will not provide any additional funding beyond the amount specified in the original grant.

### EERE Request for Office of Inspector General Assistance and Response

The unallowable labor costs identified in this audit report are unacceptable and indefensible. *EERE will achieve full recovery of these labor costs* – EERE is requiring LG Chem Michigan Inc. to repay all $842,189, and LG Chem Michigan Inc. has agreed to do so.

DOE promptly referred the allegations of labor improprieties to the Office of Inspector General. In addition, EERE promptly took the following actions:
1. Suspended all reimbursements;
2. Initiated cost recovery proceedings;
3. Required LG Chem Michigan Inc. to develop a corrective action plan, including an updated project budget and project management plan in order to validate the project cost and schedule;
4. Increased scrutiny of quarterly project reports; and
5. Provided LG Chem Michigan Inc. with additional guidance on compliance with Federal reporting requirements.

## Appendix 3 (continued)

Based on information provided by LG Chem Michigan Inc. and the Office of Inspector General, EERE has determined that:

- The unallowable labor costs identified in this audit report were outside the scope of the award;
- LG Chem Michigan Inc. did not have a process in place to accurately track and account for labor hours associated with out-of-scope activities;
- LG Chem Michigan Inc. did not disclose the out-of-scope activities in any documentation submitted to EERE (e.g., invoices);
- EERE was not made aware, through invoicing or otherwise, that it was reimbursing LG Chem Michigan Inc. for out-of-scope activities; and
- After EERE opened its inquiry into the questioned labor costs, LG Chem Michigan Inc. failed to provide adequate evidence to allow the specific identification of the unallowable labor costs versus allowable labor costs. As a result, EERE, in consultation with the contracting officer, made the determination to disallow (and require reimbursement of) the entire $842,189, which includes a mix of allowable and unallowable costs.

EERE is committed to effective grants management. In April 2012, EERE began a comprehensive review of its grants management procedures. (This review predates the referral of LG Chem Michigan Inc.'s questioned labor costs to the Office of Inspector General in October 2012.)

- EERE benchmarked its grants management process against peer agencies (e.g., Advanced Research Projects Agency-Energy).
- EERE established an internal "community of practice" composed of subject matter experts in program and project management to develop new standard operating procedures and best practices, which will be applied to all EERE programs and projects.
- EERE created a new Project Management Coordination Office (PMCO) to ensure consistent and active project management across EERE's diverse portfolio of projects. PMCO is working with peer offices at other Federal agencies to develop training courses for Federal project managers and standards for a certification credential.
- EERE is in the process of consolidating multiple IT systems in order to establish a single Enterprise IT solution for core business functions, including grants management. This new system will provide EERE project managers with innovative tools for managing and evaluating projects, including their technical progress, budgets, and schedules.
- EERE is in the process of establishing a uniform set of terms and conditions for funding opportunities and awards, which will facilitate active project management. EERE will use cooperative agreements for most of its future projects, which will allow greater oversight of project activities. EERE will also establish annual go/no go milestones for every project, which will facilitate the modification or termination of underperforming projects.
- EERE is strengthening and centralizing its review of project invoices.
- EERE is increasing its engagement with recipients. Federal project managers will hold meetings (by telephone or webinar) at least once per quarter with every recipient and review the project's technical progress, budget, and schedule.
- EERE is increasing the frequency of site visits. Federal project managers will visit most projects at least once per year. Larger projects will be subject to greater scrutiny. Federal project managers will visit larger projects at least twice per year, and independent firms may be retained to conduct additional audits.

Specific responses to IG recommendations are provided below.

## Appendix 3 (continued)

**EERE Response to the Audit Report Recommendations**

***RECOMMENDATION #1:*** *"Enhance monitoring procedures, as appropriate, to help ensure that goals and objectives of the Manufacturing Initiative are achieved in the most effective manner."*

**MANAGEMENT RESPONSE: CONCUR.** As described above, EERE has increased its scrutiny of quarterly project reports, provided LG Chem Michigan Inc. with additional guidance on compliance with Federal reporting requirements, and required LG Chem Michigan Inc. to submit an updated project budget and project management plan in order to validate the project cost and schedule. Separately, EERE is developing and implementing a wide range of measures, including new processes and systems, to strengthen its grants management.

***RECOMMENDATION #2:*** *"Utilize the full range of remedial actions available to the government under the terms of the grant to hold LG Chem accountable for the outcome of the Holland, MI Project.*

**MANAGEMENT RESPONSE: CONCUR.** EERE will continue to enforce the terms and conditions of the grant and hold LG Chem Michigan Inc. accountable for any failures to comply therewith.

***RECOMMENDATION #3:*** *"Enforce the terms of the grant award, as appropriate, to ensure that LG Chem either transitions production of battery cells to the Michigan plant or implements some alternative use for the facility."*

**MANAGEMENT RESPONSE: PARTIAL CONCUR.** EERE will continue to enforce the terms and conditions of the grant and hold LG Chem Michigan Inc. accountable for any failures to comply therewith. For example, EERE will enforce compliance with 10 C.F.R. 600.321, which governs the disposition of project property and equipment. EERE's award requirements are based on the American Recovery and Reinvestment Act of 2009, OMB's "Initial Implementing Guidance for the American Reinvestment Act of 2009," and Federal financial assistance regulations.

DOE's investment in this battery manufacturing facility is helping to put Michigan and the United States in a prime position to capture a rapidly growing global market. This is part of an overall effort to make sure that America's auto manufacturing base continues to adapt to the most innovative technologies and deliver the gasoline saving vehicles that consumers increasingly want. Our grant is designed to provide this capacity to Michigan.

DOE does not concur that the grant terms for this grant can be used to force LG Chem Michigan Inc. to transition production of battery cells from South Korea to the Michigan plant. DOE does not have authority to dictate the production decisions of LG Chem Michigan Inc., which are based on the market.

***RECOMMENDATION #4:*** *"Conduct a review of questioned costs identified in our report and determine whether the costs were allowable and reasonable."*

**MANAGEMENT RESPONSE: CONCUR.** EERE, in conjunction with the contracting officer, conducted a review of the questioned labor costs. EERE concurs with the IG finding of unallowable costs in the amount of $1,684,377, of which the EERE share was $842,189. EERE, through the contracting officer, took action to disallow these project costs on December 18, 2012. *EERE will achieve full recovery of these labor costs* – EERE is requiring LG Chem Michigan Inc. to repay all $842,189, and LG Chem Michigan Inc. has agreed to do so.

IG Report No.  <u>OAS-RA-13-09</u>

# CUSTOMER RESPONSE FORM

The Office of Inspector General has a continuing interest in improving the usefulness of its products.  We wish to make our reports as responsive as possible to our customers' requirements, and, therefore, ask that you consider sharing your thoughts with us.  On the back of this form, you may suggest improvements to enhance the effectiveness of future reports.  Please include answers to the following questions if applicable to you:

1.   What additional background information about the selection, scheduling, scope, or procedures of the audit or inspection would have been helpful to the reader in understanding this report?

2.   What additional information related to findings and recommendations could have been included in the report to assist management in implementing corrective actions?

3.   What format, stylistic, or organizational changes might have made this report's overall message more clear to the reader?

4.   What additional actions could the Office of Inspector General have taken on the issues discussed in this report that would have been helpful?

5.   Please include your name and telephone number so that we may contact you should we have any questions about your comments.

Name _____     Date _____

Telephone _____     Organization _____

When you have completed this form, you may telefax it to the Office of Inspector General at (202) 586-0948, or you may mail it to:

Office of Inspector General (IG-1)
Department of Energy
Washington, DC 20585

ATTN:  Customer Relations

If you wish to discuss this report or your comments with a staff member of the Office of Inspector General, please contact our office at (202) 253-2162.

DOE AR 000239

This page intentionally left blank.

DOE AR 000240

The Office of Inspector General wants to make the distribution of its reports as customer friendly and cost effective as possible.  Therefore, this report will be available electronically through the Internet at the following address:

U.S. Department of Energy Office of Inspector General Home Page
http://energy.gov/ig

Your comments would be appreciated and can be provided on the Customer Response Form.

DOE AR 000241



An official website of the United States government    Here's how you know

**U.S. DEPARTMENT of ENERGY**

Policy & Priorities    Leadership & Organization    Topics    News & Events    About

Funding Opportunities

Office of Inspector General    Special Report: OAS-RA-13-10

# Special Report: OAS-RA-13-10

The Department of Energy's Management of the Award of a $150 Million Recovery Act Grant to LG Chem Michigan Inc



[Office of Inspector General](#)

February 8, 2013

🕐 Estimated Read Time 2 min

February 8, 2013

**The Department of Energy's Management of the Award of a $150 Million Recovery Act Grant to LG Chem Michigan Inc**

The Department of Energy's Vehicle Technologies Program was established to develop and deploy efficient and environmentally friendly highway transportation technologies to reduce the Nation's dependence on foreign oil and provide greater energy security. The Vehicle Technologies Program received $2.4 billion under the American Recovery and Reinvestment Act of 2009 (Recovery Act) for these purposes. In February 2010, LG Chem Michigan Inc. (LG Chem Michigan), formerly Compact Power, Inc., was awarded more than $150 million in Recovery Act funding to help construct a $304 million battery cell manufacturing plant in Holland, Michigan. On October 24, 2012, a complaint was received that LG Chem Michigan misused Recovery Act funds. The review confirmed the allegations. Specifically, LG Chem Michigan inappropriately claimed and was reimbursed for labor charges incurred by a variety of supervisory and staff employees for activities that did not benefit the project. As a result, up to about $842,000 in reimbursements for labor charges were questioned. Also, work performed under the grant to LG Chem Michigan had not been managed effectively. Based on progress to date and despite the expenditures of $142 million in Recovery Act funds, LG Chem Michigan had not yet achieved the objectives outlined in its Department-approved project plan. For instance, even though the facility had produced a large number of test cells, the plant had yet to manufacture battery cells that could be used in electric vehicles sold to the public. The problems identified occurred, in large part, due to grant monitoring issues with LG Chem Michigan and the Department. In response, the Department concurred with the recommendations and indicated that corrective action had been taken and/or has been initiated to address the issues identified.

**Topic: Financial Assistance**

DOE AR 000242

## Special Report: OAS-RA-13-10

**Committed to Restoring America's Energy Dominance.**

**Follow Us**

**Quick Links**

Leadership & Offices

Newsroom

Contact Us

Careers

**Resources**

Budget & Performance

Directives, Delegations, & Requirements

Freedom of Information Act (FOIA)

Inspector General

Privacy Program

**Federal Government**

USA.gov

The White House

Open Gov    Accessibility    Privacy    Information Quality    No Fear Act    Web Policies    Vulnerability Disclosure Program

Whistleblower Protection    Equal Employment Opportunity    Notice of Court Orders

DOE AR 000243



United States Government Accountability Office

# Report to Congressional Requesters

March 2013

# WIND ENERGY

# Additional Actions Could Help Ensure Effective Use of Federal Financial Support



**G A O**
Accountability ★ Integrity ★ Reliability

GAO-13-136

DOE AR 000244



## GAO
Accountability * Integrity * Reliability

# Highlights

Highlights of GAO-13-136, a report to congressional requesters

**March 2013**

# WIND ENERGY

## Additional Actions Could Help Ensure Effective Use of Federal Financial Support

## Why GAO Did This Study

Wind energy has been the fastest growing source of U.S. electric power generation in recent years. The increase in federal funding for wind technologies and involvement of multiple agencies has raised questions about fragmented, overlapping, or duplicative federal support.

In this report, GAO examines federal wind-related initiatives—programs or groups of agency activities that promoted wind energy through a specific emphasis or focus. GAO (1) identifies wind-related initiatives implemented by federal agencies in fiscal year 2011 and their key characteristics; (2) assesses the extent of fragmentation, overlap, and duplication, if any, among these initiatives, and the extent to which they were coordinated; and (3) examines how agencies allocate support to projects through their initiatives and the extent to which they assess applicant need for support. GAO sent a questionnaire to agencies to identify wind-related initiatives and to obtain data on their characteristics; potential for fragmentation, overlap, or duplication; and related coordination. GAO also reviewed studies of the initiatives and interviewed agency officials and financial professionals.

## What GAO Recommends

GAO recommends that to the extent possible within their statutory authority DOE and USDA formally assess and document whether the federal financial support of their initiatives is needed for applicants' wind projects to be built. DOE agreed with the recommendation and USDA generally concurred with the findings related to its initiatives.

View GAO-13-136. For more information, contact Frank Rusco at (202) 512-3841 or ruscof@gao.gov.

## What GAO Found

GAO identified 82 federal wind-related initiatives, with a variety of key characteristics, implemented by nine agencies in fiscal year 2011. Five agencies—the Departments of Energy (DOE), the Interior, Agriculture (USDA), Commerce, and the Treasury—collectively implemented 73 of the initiatives. The 82 initiatives incurred about $2.9 billion in wind-related obligations and provided estimated wind-related tax subsidies totaling at least $1.1 billion in fiscal year 2011, although complete data on wind-related tax subsidies were not available. Initiatives supporting deployment of wind facilities, such as those financing their construction or use, constituted the majority of initiatives and accounted for nearly all obligations and estimated tax subsidies related to wind in fiscal year 2011. In particular, a tax expenditure and a grant initiative, both administered by Treasury, accounted for nearly all federal financial support for wind energy.

The 82 wind-related initiatives GAO identified were fragmented across agencies, most had overlapping characteristics, and several that financed deployment of wind facilities provided some duplicative financial support. The 82 initiatives were fragmented because they were implemented across nine agencies, and 68 overlapped with at least one other initiative because of shared characteristics. About half of all initiatives reported formal coordination. Such coordination can, in principle, reduce the risk of unnecessary duplication and improve the effectiveness of federal efforts. However, GAO identified 7 initiatives that have provided duplicative support—financial support from multiple initiatives to the same recipient for deployment of a single project. Specifically, wind project developers have in many cases combined the support of more than 1 Treasury initiative and, in some cases, have received additional support from smaller grant or loan guarantee programs at DOE or USDA. GAO also identified 3 other initiatives that did not fund any wind projects in fiscal year 2011 but that could, based on their eligibility criteria, be combined with 1 or more initiatives to provide duplicative support. Of the 10 initiatives, those at Treasury accounted for over 95 percent of the federal financial support for wind in fiscal year 2011.

Agencies implementing the 10 initiatives allocate support to projects on the basis of the initiatives' goals or eligibility criteria, but the extent to which applicant financial need is considered is unclear. DOE and USDA—which have some discretion over the projects they support through their initiatives—allocate support based on projects' ability to meet initiative goals such as reducing emissions or benefitting rural communities, as well as other criteria. Both agencies also consider applicant need for the support of some initiatives, according to officials. However, GAO found that neither agency documents assessments of applicant need; therefore the extent to which they use such assessments to determine how much support to provide is unclear. Unlike DOE and USDA, Treasury generally supports projects based on the tax code's eligibility criteria and does not have discretion to allocate support to projects based on need. While the support of these initiatives may be necessary in many cases for wind projects to be built, because agencies do not document assessments of need, it is unclear, in some cases, if the entire amount of federal support provided was necessary. Federal support in excess of what is needed to induce projects to be built could instead be used to induce other projects to be built or simply withheld, thereby reducing federal expenditures.

_____ **United States Government Accountability Office**

DOE AR 000245

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 6 |
| | Multiple Federal Agencies Promoted Wind Energy in Fiscal Year 2011 through Numerous Initiatives Mainly Supporting Deployment | 10 |
| | Initiatives Were Fragmented and Had Overlapping Characteristics with Half Reporting Coordination, but Several Provided Some Duplicative Financial Support for Deployment | 20 |
| | Agencies Support Projects on the Basis of Initiatives' Goals or Eligibility Criteria, but the Extent to Which Agencies Assess Applicant Need Is Unclear | 36 |
| | Conclusions | 42 |
| | Recommendation for Executive Action | 43 |
| | Agency Comments and Our Evaluation | 44 |
| Appendix I | Objectives, Scope, and Methodology | 46 |
| Appendix II | Federal Wind-Related Initiatives | 53 |
| Appendix III | Estimated Revenue Losses for Treasury's Wind-Related Tax Expenditures | 80 |
| Appendix IV | GAO's Questionnaire for Federal Agencies with Wind-Related Initiatives | 81 |
| Appendix V | Comments from the Department of Energy | 92 |
| Appendix VI | GAO Contact and Staff Acknowledgments | 94 |

**GAO-13-136  Wind Energy**

DOE AR 000246

## Tables

Table 1: Actual and Estimated Obligations for Activities Specifically Related to Wind, by Agency, in Fiscal Year 2011                14

Table 2: Number and Percentage of Federal Wind-Related Initiatives Supporting Each Wind Issue in Fiscal Year 2011     15

Table 3: Number and Percentage of Federal Wind-Related Initiatives Supporting Each Technology Advancement Activity in Fiscal Year 2011                16

Table 4: Ten Initiatives That Have Provided or Could Provide Duplicative Financial Support for Deployment of Wind Facilities                29

Table 5: U.S. Department of Agriculture (USDA) Wind-Related Initiatives                53

Table 6: Department of Commerce Wind-Related Initiatives     58

Table 7: Department of Energy (DOE) Wind-Related Initiatives     61

Table 8: Department of the Interior Wind-Related Initiatives     67

Table 9: Department of the Treasury Wind-Related Initiatives     73

Table 10: Environmental Protection Agency (EPA) Wind-Related Initiatives                77

Table 11: Federal Energy Regulatory Commission Wind-Related Initiatives                78

Table 12: National Science Foundation (NSF) Wind-Related Initiatives                78

Table 13: Small Business Administration (SBA) Wind-Related Initiatives                79

Table 14: Estimated Revenue Losses for Treasury's Wind-Related Tax Expenditures in Fiscal Year 2011                80

## Figures

Figure 1: New Wind Energy Capacity Additions and Production Tax Credit Expirations, 1999 through 2012                8

Figure 2: Number of Federal Wind-Related Initiatives by Agency, in Fiscal Year 2011                11

Figure 3: Number of Federal Wind-Related Initiatives at Five Lead Agencies, by Agency and Technology Advancement Activity Supported                19

DOE AR 000247

Figure 4: Examples of Federal and State Initiatives Available in
Fiscal Year 2011 to Provide Financial Support for
Deployment of Utility-Scale Land-Based Wind Facilities by
Energy Companies                                                                 23

## Abbreviations

| | |
|---|---|
| accelerated depreciation | Accelerated Depreciation Recovery Periods for Specific Energy Property |
| BOEMRE | Bureau of Ocean Energy Management, Regulation and Enforcement |
| Commerce | Department of Commerce |
| DOE | Department of Energy |
| DSIRE | Database of State Incentives for Renewables and Efficiency |
| EERE | Office of Energy Efficiency and Renewable Energy |
| EIA | Energy Information Administration |
| EPA | Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| Interior | Department of the Interior |
| IRS | Internal Revenue Service |
| ITC | Energy Investment Credit, also known as |

DOE AR 000248

| | the Investment Tax Credit |
|---|---|
| LBNL | Lawrence Berkeley National Laboratory |
| NSF | National Science Foundation |
| PTC | Energy Production Credit, also known as the Production Tax Credit |
| REAP | Rural Energy for America Program |
| Recovery Act | American Recovery and Reinvestment Act of 2009 |
| RPS | Renewable Portfolio Standard |
| SBA | Small Business Administration |
| Section 1603 program | Payments for Specific Energy Property in Lieu of Tax Credits |
| Section 1703 program | Title XVII Section 1703 Loan Guarantee Program |
| Section 1705 program | Title XVII Section 1705 Loan Guarantee Program |
| Treasury | Department of the Treasury |
| USDA | U.S. Department of Agriculture |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

DOE AR 000249



**United States Government Accountability Office**
**Washington, DC 20548**

March 11, 2013

The Honorable Lamar Smith
Chairman
Committee on Science, Space, and Technology
House of Representatives

The Honorable Cynthia M. Lummis
Chairman
Subcommittee on Energy
Committee on Science, Space, and Technology
House of Representatives

The Honorable Paul Broun, M.D.
Chairman
Subcommittee on Oversight
Committee on Science, Space, and Technology
House of Representatives

Americans' daily lives, as well as the economic productivity of the United States, depend on the availability of energy, the majority of which comes from fossil fuels. However, concerns over the nation's reliance on imported oil, volatile energy costs, and fossil fuels' emissions of greenhouse gases linked to global climate change have increased the focus on developing renewable energy resources to help meet future energy needs. One of these resources—wind energy—has been the fastest growing source of U.S. electric power generation in recent years, increasing at about 33 percent per year since 2001, according to the Department of Energy's (DOE) Energy Information Administration (EIA), an independent statistical and analytical agency. In 2011, wind energy comprised 32 percent of all new additions to U.S. electric generating capacity and contributed 3.0 percent of our nation's total electricity generation, the largest share of any nonhydroelectric renewable source. While helping meet the nation's energy needs, wind energy may offer substantial environmental benefits as well, such as a reduction in greenhouse gas emissions, compared with traditional energy sources. However, wind energy as a source of electricity also faces numerous challenges related to its intermittent availability and historically higher costs compared with traditional energy sources.

In support of efforts to research, develop, and deploy wind energy technologies, the federal government provided nearly $5 billion in

subsidies in fiscal year 2010—more than 75 percent of federal subsidies for all renewable sources of electricity, according to EIA estimates.[1] Of this amount, about $4.9 billion was related to the American Recovery and Reinvestment Act of 2009 (Recovery Act).[2] By contrast, in fiscal year 2007—the previous year for which EIA analyzed these data—EIA estimated the federal government provided $476 million to support wind energy technologies.[3] This funding has helped spur development of wind energy in the United States, helping to meet goals (e.g., for energy security) established by federal agencies and policymakers. DOE has a leading role in committing federal resources and expertise to research, develop, and deploy wind energy technologies, as part of its mission to address the nation's energy and environmental challenges through science and technology. The Department of the Treasury (Treasury), meanwhile, provides large tax subsidies for wind energy technologies, through its administration of provisions in the federal Internal Revenue

---

[1]Although this report focuses on federal support for wind energy, the federal government has provided substantial support for other renewable and fossil energy sources as well as nuclear energy. We have recently examined support for some of these energy sources and have other ongoing work in the area that will address federal subsidies for energy. See GAO, *Solar Energy: Federal Initiatives Overlap but Take Measures to Avoid Duplication*, GAO-12-843 (Washington, D.C.: Aug. 30, 2012); GAO, *Batteries and Energy Storage: Federal Initiatives Supported Similar Technologies and Goals but Had Key Differences*, GAO-12-842 (Washington, D.C.: Aug. 30, 2012); GAO, *Research and Development: DOE Could Enhance the Project Selection Process for Government Oil and Natural Gas Research,* GAO-09-186 (Washington, D.C.: Dec. 29, 2008); GAO, *Oil and Gas Royalties: The Federal System for Collecting Oil and Gas Revenues Needs Comprehensive Reassessment*, GAO-08-691 (Washington, D.C.: Sept. 3, 2008).

[2]Pub. L. No. 111-5, 123 Stat. 115 (2009).

[3]The subsidies for wind energy reported in fiscal years 2007 and 2010 may not be directly comparable due to differences in available incentives during the 2 years. Specifically, beginning in 2009, Section 1603 of the Recovery Act, which created Treasury's Payments for Specific Energy Property in Lieu of Tax Credits initiative (Section 1603 program), allowed recipients to choose a direct grant in lieu of the Energy Production Credit (also known as the Production Tax Credit or PTC). The Section 1603 program, which was unavailable in 2007, and was popular with investors in fiscal year 2010, front-loads the government's support for projects in the year that the grant is awarded, as opposed to the PTC, which spreads out support over 10 years. Thus, while both incentives may provide the same overall level of support to recipients, the amount of support provided in a given year will differ based on which incentive is taken.

DOE AR 000251

Code.[4] Other agencies play a role in supporting wind energy technologies as well; in February 2012, we reported that 23 federal agencies had implemented nearly 700 renewable energy initiatives—programs or groups of agency activities that involved renewable energy through a specific emphasis or focus—in fiscal year 2010.[5] Many of these initiatives supported wind energy technologies. In addition, states also play an important role in encouraging development of wind and other renewable energy sources through policies and financial incentives. For example, many states have renewable portfolio standards (RPS) that require public utilities to generate or buy a percentage of energy from renewable sources.

In the current fiscally constrained environment, effective allocation of resources is especially important. The increase in funding for wind energy technologies and the involvement of multiple agencies have raised questions that federal efforts to support these technologies may be fragmented, overlapping, or duplicative. Fragmentation occurs when more than one federal agency, or more than one organization within an agency, is involved in furthering the development of wind energy. For purposes of this report, overlap occurs when multiple initiatives support similar wind issues,[6] similar technology advancement activities,[7] similar recipients, and have similar goals. As we have previously reported, fragmentation and overlap among government programs can potentially lead to unnecessary

[4]For purposes of this report, "tax subsidies" refer to the benefits provided to taxpayers who take advantage of tax expenditures, and thus pay lower taxes than they would otherwise have had to pay. Tax expenditures are provisions of federal tax laws that (1) allow a special exclusion, exemption, or deduction from gross income or (2) provide a special credit, preferential tax rate, or deferral of tax liability. Tax expenditures result in revenue losses for the federal government, which forgoes some of the tax revenues that it would have otherwise collected. See GAO, *Government Performance and Accountability: Tax Expenditures Represent a Substantial Federal Commitment and Need to Be Reexamined*, GAO-05-690 (Washington, D.C.: Sept. 23, 2005).

[5]GAO, *Renewable Energy: Federal Agencies Implement Hundreds of Initiatives*, GAO-12-260 (Washington, D.C.: Feb. 27, 2012).

[6]For the purposes of this report, wind issues covered by wind-related initiatives include utility-scale land-based wind, distributed land-based wind (also known as small wind), offshore wind, transmission, grid integration, and siting and permitting.

[7]For the purposes of this report, technology advancement activities include basic research, applied research, demonstration, commercialization, and deployment.

DOE AR 000252

duplication.[8] For purposes of this report, duplication occurs when multiple initiatives provide financial support to the same recipient for a single wind project. Duplication as we have defined it may be necessary, in some cases, for specific wind projects to be built. However, in other cases, duplication may result in ineffective use of federal financial support—that is, it may result in some amount of support being provided for specific wind projects that is not needed for them to be built.

In this report, we examine federal initiatives that promoted wind energy, which we termed "wind-related initiatives."[9] Our objectives for this report were to (1) identify wind-related initiatives implemented by federal agencies in fiscal year 2011 and their key characteristics; (2) assess the extent of fragmentation, overlap, and duplication, if any, among these initiatives, and the extent to which they were coordinated; and (3) examine how agencies allocate support to projects through their initiatives and the extent to which they assess applicant need for support.

To address these objectives, we collected and analyzed information from our previous work and conducted new work. Our review focused on those initiatives that promoted the research and development, commercialization, or deployment of wind energy technologies in fiscal year 2011, the most recent year for which data were available. To identify these initiatives, we relied, in part, on data from our February 2012 report on renewable energy initiatives, which identified and collected information from wind- and other renewable energy-related initiatives active in fiscal year 2010. Using these data, we focused our review on research and development, commercialization, or deployment initiatives for which wind energy was eligible for support. In addition, we excluded certain agencies—such as the Departments of Defense, Homeland Security, and State—which have initiatives generally focused on development of wind energy and other technologies for use in a military, border security, or

---

[8]GAO, *Managing for Results: Using the Results Act to Address Mission Fragmentation and Program Overlap*, GAO/AIMD-97-146 (Washington, D.C.: Aug. 29, 1997). For more information on fragmentation, overlap, and duplication in federal programs see GAO, *Opportunities to Reduce Potential Duplication in Government Programs, Save Tax Dollars, and Enhance Revenue*, GAO-11-318SP (Washington, D.C.: Mar. 1, 2011).

[9]For purposes of this report, we defined a wind-related initiative as a program or group of agency activities serving a similar purpose or function that promoted wind energy technologies through a specific emphasis or focus, even if wind energy was only one part of a broader effort.

DOE AR 000253

international aid setting, rather than for use in the domestic commercial energy market.

For the remaining agencies, we developed a questionnaire to collect information from their officials regarding whether their fiscal year 2010 initiatives were still active and whether wind energy still received or was eligible for support under the initiatives in fiscal year 2011. We also asked agency officials to identify any additional initiatives that were active and for which wind energy was eligible for support in fiscal year 2011. Using the responses from this questionnaire, we identified 82 wind-related initiatives at nine agencies. We then developed a second questionnaire and administered it to agency officials to collect additional data on the characteristics of these initiatives; potential fragmentation, overlap, or duplication among them; and efforts to coordinate the initiatives. Specifically, we asked questions regarding initiatives' obligations, or revenue losses from tax expenditures;[10] year in which the initiatives first supported wind energy; type of wind issues, technology advancement activities, and recipients supported; initiative goals; and efforts to coordinate with other wind-related initiatives. We received survey responses from all 82 initiatives and therefore had a response rate of 100 percent. (For further information on our objectives, scope, and methodology, including the use of our questionnaire, see app. I. For a copy of our questionnaire, see app. IV.) We then analyzed the data collected from the questionnaire to categorize initiatives' recipients and goals, and to determine the extent of potential fragmentation, overlap, and duplication of wind-related initiatives. For selected initiatives, we collected information from agency websites on financial support provided for projects, and we interviewed agency officials for information on their agencies' efforts to assess applicants' need for the support of their initiatives. We also reviewed studies of the initiatives by DOE's national laboratories, the Congressional Research Service, and other experts. We interviewed financial professionals from several of the major financial institutions and legal firms active in wind energy project financing in recent years. To obtain additional information about the types of support

---

[10]A revenue loss is the amount of revenue that the government forgoes as the result of each special provision in the tax code. Revenue loss is estimated for each tax expenditure separately by comparing the revenue raised under current law with the revenue that would have been raised if the provision did not exist (assuming that taxpayer behavior and all other tax and spending provisions remain constant). Revenue loss estimates do not incorporate any behavioral responses and thus do not necessarily represent the exact amount of revenue that would be gained if a specific tax expenditure were repealed.

DOE AR 000254

available to wind project developers, we collected and analyzed data from the Database of State Incentives for Renewables and Efficiency (DSIRE), a comprehensive source of information on state incentives and policies that promote renewable energy and energy efficiency, which is funded by DOE. We interviewed researchers who developed and maintain DSIRE and determined the data were sufficiently reliable for our purposes. We also interviewed agency officials and financial professionals for additional information on state initiatives.

We conducted this performance audit from February 2012 to March 2013 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

Wind energy is generated when wind turbines convert the kinetic energy in the wind into mechanical power, which can be used to generate electricity or for specific tasks such as grinding grain or pumping water. Electricity generated from wind can be used for other stand-alone purposes, such as charging a battery, or can flow to consumers from the facilities where it is generated through the networks that carry electricity, including wires, substations, and transformers (i.e., the grid). For utility-scale sources of wind energy, a large number of turbines are usually built close together to form a wind farm that provides grid power.[11] Stand-alone or distributed turbines are generally smaller scale turbines used for purposes such as powering communications equipment or generating electricity for local use by farmers. Areas with plentiful wind resources are often distant from consumer markets, and access to transmission is essential to bring electricity generated from wind to market. In addition, because of the intermittent availability of wind energy, integrating increasing amounts of wind energy into the electric grid while maintaining its reliable operation requires added efforts by federal agencies, electric

---

[11]In the United States, all utility-scale wind farms currently in place are built on land. Offshore wind turbines are utility-scale turbines that capture wind resources over bodies of water and convert this wind into electricity. Although there are currently no offshore wind turbines in United States, there are federal, regional, and state-level efforts intended to facilitate their development.

DOE AR 000255

grid operators, utilities, and regulators. Another important issue in the development of wind projects is the siting and permitting process, by which locations are chosen and permits are issued for wind turbines, while considering projects' potential effects on the environment and the competing uses for the land, airspace, or waterways the projects may require.

Innovation in wind energy technology takes place across a spectrum of activities, which we refer to as technology advancement activities, and which include basic research, applied research, demonstration, commercialization, and deployment.[12] For purposes of this report, basic research includes efforts to explore and define scientific or engineering concepts or to investigate the nature of a subject without targeting any specific technology; applied research includes efforts to develop new scientific or engineering knowledge to create new and improved technologies; demonstration includes efforts to operate new or improved technologies to collect information on their performance and assess readiness for widespread use; commercialization includes efforts to transition technologies to commercial applications by bridging the gap between research and demonstration activities and venture capital funding and marketing activities; and deployment includes efforts that facilitate or achieve widespread use of technologies in the commercial market.

Wind energy technology advancement activities are financed through both public and private investment. According to a Congressional Budget Office report,[13] without public investment, the private sector's investment in technology advancement activities is likely to be inefficiently low from

---

[12]We developed definitions that could be applied broadly to make comparisons across agencies and that covered the full spectrum of advancement activities. Federal agencies use various definitions and categories for describing the stages of technology advancement. For example, DOE uses technology readiness level categories and definitions to measure and communicate technology readiness for first-of-a-kind technology applications. In addition, the Office of Management and Budget provides federal definitions for the terms basic research, applied research, and development in Office of Management and Budget Circular A–11, Section 84—Character Classification (Schedule C) but does not provide definitions for demonstration activities, commercialization, or deployment. During pretests of our questionnaire, agency officials were able to fit their initiatives' activities within the categories that we defined.

[13]Congressional Budget Office, *Federal Financial Support for the Development and Production of Fuels and Energy Technologies* (Washington, D.C.: March 2012).

DOE AR 000256

society's perspective because firms cannot easily capture the "spillover benefits" that result, particularly at the early stages of developing a technology. In these stages, technology advancement activities can create fundamental knowledge leading to numerous benefits for society as a whole but not necessarily for the firms that invested in the activities. For example, basic research can create general scientific knowledge that is not itself subject to commercialization but that can lead to multiple applications that private companies can produce and sell. As activities get closer to the commercialization and deployment stages, the private sector may increase its support because its return on investment is likely to increase.

Federal investment and policies can have a significant impact on wind development. For example, a key tax incentive for the construction of wind projects—the Energy Production Credit (also known as the Production Tax Credit, or PTC)—has periodically expired and then been extended. In years following its expiration, new additions of wind energy capacity fell dramatically, as shown in figure 1 below.

**Figure 1: New Wind Energy Capacity Additions and Production Tax Credit Expirations, 1999 through 2012**

Source: GAO analysis of DOE data.

DOE AR 000257

[a]These data reflect net summer capacity—the maximum output that generating equipment can supply during the period of summer peak demand from June 1 through September 30.

[b]There was no expiration of the PTC immediately prior to 2010; however, the economic downturn and an uncertain regulatory environment (particularly relating to the renewal of production and investment tax credits) contributed to a lower level of wind capacity additions in 2010, according to EIA.

[c]Data for 2011 are preliminary. Final data were not available as of November 2012.

[d]Data for 2012 are projected. Actual data were not available as of November 2012. New wind energy capacity installations may be considerably larger in 2012 than this projection shows. For example, the American Wind Energy Association reports that 4,728 MW of wind energy were installed through the first three quarters of 2012, and there were an additional 8,430 MW under construction as of the third quarter of 2012. In addition, according to DOE, new capacity additions in 2012 were anticipated to exceed 2011 levels and perhaps even 2009 levels as developers rushed to commission projects before the scheduled expiration of several federal tax incentives for wind energy at the end of 2012.

[e]The PTC for wind projects was extended on January 2, 2013, by the American Taxpayer Relief Act of 2012 for facilities that begin construction by December 31, 2013.

Many states have also enacted policies affecting the development of wind energy, in part to attract investment within their borders. These policies include tax credits, grants, loans, and mandates such as RPSs requiring a portion of the electricity consumed or generated in a state to be from renewable sources.

Improvements in technology and external market factors also affect the development of wind energy. According to a report from DOE's Office of Energy Efficiency and Renewable Energy (EERE), recent improvements in the cost and performance of wind energy technologies contributed to the growth of wind energy in 2011.[14] For example, improvements such as taller towers and larger rotor diameters in wind turbines have improved their efficiency. However, according to the EERE report, continued low natural gas prices and modest growth in electricity demand, among other factors, may dramatically slow new installations of wind turbines in 2013. In addition, wind energy must compete in the market with other energy sources—renewable and nonrenewable—that are also receiving subsidies. For example, in a 2011 report, EIA estimated that the federal government provided nearly $6.7 billion in subsidies for coal, natural gas, petroleum liquids, and nuclear energy in fiscal year 2010.[15]

---

[14]DOE, *2011 Wind Technologies Market Report* (Washington, D.C.: 2012).

[15]DOE, Energy Information Administration, *Direct Federal Financial Interventions and Subsidies in Energy in Fiscal Year 2010* (Washington, D.C.: 2011).

DOE AR 000258

# Multiple Federal Agencies Promoted Wind Energy in Fiscal Year 2011 through Numerous Initiatives Mainly Supporting Deployment

We identified 82 federal wind-related initiatives, with a variety of key characteristics, implemented by nine agencies in fiscal year 2011.[16] Five agencies—DOE, the Department of the Interior (Interior), the Department of Agriculture (USDA), the Department of Commerce (Commerce), and Treasury—collectively implemented 73 of these initiatives. In fiscal year 2011, wind-related initiatives incurred about $2.9 billion in obligations for activities specifically related to wind. In addition to initiatives that obligated funds, Treasury's wind-related tax expenditure initiatives provided estimated tax subsidies of at least $1.1 billion for activities specifically related to wind, although complete data on wind-related tax subsidies were not available.[17] The initiatives supported a range of wind issues, including siting and permitting, offshore wind, and, most commonly, utility-scale and distributed land-based wind. They also supported a range of technology advancement activities, from basic and applied research to, most commonly, deployment. The majority of initiatives provided funding or other direct support for energy providers, developers, or manufacturers, and less than half of the initiatives supported other types of recipients such as public and private researchers or individuals. Initiatives supporting deployment accounted for all tax subsidies and nearly all obligations related to wind in fiscal year 2011. In particular, a tax expenditure and a grant initiative, both at Treasury, accounted for nearly all federal financial support related to wind.

---

[16]Our review focused on initiatives that promoted the research and development, commercialization, or deployment of wind energy technologies in fiscal year 2011. In addition, we excluded certain agencies—such as the Departments of Defense, Homeland Security, and State—which have initiatives generally focused on development of wind energy and other technologies for use in a military, border security, or international aid setting, rather than for use in the domestic commercial energy market. We also excluded the Departments of Transportation and Housing and Urban Development because their initiatives focused on commercialization and deployment of renewable energy projects on buildings, projects that typically use solar energy.

[17]The federal obligations and tax subsidies for fiscal year 2011 presented here cannot be compared to the Energy Information Administration's (EIA) estimate of $5 billion in total federal subsidies for wind in fiscal year 2010 because of differences in the time period and methods used in calculating these numbers. For instance, EIA measured subsidies on the basis of the cost of the programs to the federal budget as provided in budget documents from the Office of Management and Budget and the Joint Committee on Taxation. Our data and analysis of obligations and tax subsidies was based on agency questionnaire responses and interviews with officials.

DOE AR 000259

## Five Agencies Implemented Nearly All Initiatives and Were Responsible for Several Billion Dollars in Federal Support Related to Wind

Of the nine agencies that implemented the 82 federal wind-related initiatives we identified in fiscal year 2011, five lead agencies—DOE, Interior, USDA, Commerce, and Treasury—were collectively responsible for 73 (89 percent) of the initiatives. (See app. II for a full list of the initiatives.) The remaining four agencies—the Environmental Protection Agency (EPA), the Federal Energy Regulatory Commission (FERC), the National Science Foundation (NSF), and the Small Business Administration (SBA)—each had three or fewer initiatives. Figure 2 shows the number of initiatives by agency.

**Figure 2: Number of Federal Wind-Related Initiatives by Agency, in Fiscal Year 2011**



Source: GAO analysis of agency-provided data.

Around half of the initiatives—43 of 82—began supporting wind energy in fiscal year 2008 or before. For instance, the PTC, which provides an income tax credit based on the amount of energy produced at wind and other qualified facilities, was first enacted under the Energy Policy Act of 1992. However, several key initiatives began supporting wind energy more recently as part of the Recovery Act or other recent legislation. For instance, Section 1603 of the Recovery Act created Treasury's Payments for Specific Energy Property in Lieu of Tax Credits initiative (Section 1603 program), which provides cash payments of up to 30 percent of the total eligible costs of wind and certain other renewable energy facilities, in lieu of tax credits for energy investment or production. Key initiatives such as these and the PTC for wind facilities have recently expired or are

DOE AR 000260

scheduled to expire at the end of 2013. (See app. II for a full list of initiatives, including information on their expiration dates.)

The majority of the wind-related initiatives we identified supported a range of renewable energy sources in addition to wind, as well as other activities such as energy efficiency projects or rural development projects. Specifically, 16 initiatives (20 percent) supported wind energy either exclusively or primarily, and 51 initiatives (62 percent) supported other renewable energy sources or other activities either primarily or equally with wind energy.[18] For instance, initiatives that exclusively or primarily supported wind energy included several under EERE's Wind Energy Program that focused on research, development, and testing to improve the performance, lower the costs, and accelerate the deployment of wind technologies, and several at Interior's Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) that focused on facilitating the development of offshore wind through resource assessments, environmental impact studies, and granting of leases and rights-of-way for projects.[19] In contrast, wind-related tax expenditures such as the PTC, as well as several initiatives enacted or expanded under the Recovery Act such as Treasury's Section 1603 program, supported a range of renewable energy sources and, in some cases, other sources such as nuclear energy; energy efficiency projects related to buildings or vehicles; or carbon capture and storage projects involving coal or other fossil fuel sources.[20]

---

[18]In addition, agency officials for 18 percent of initiatives were not able to determine to what extent their initiatives supported wind energy relative to other sources of renewable energy or other activities. In some cases, officials were unable to make these determinations because of data limitations. For example, several initiatives did not track program data separately for each energy source.

[19]On October 1, 2011, BOEMRE reorganized into two independent entities: the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement. The Bureau of Ocean Energy Management is responsible for managing development of the nation's offshore resources in an environmentally and economically responsible way, and its activities include oversight of leasing, environmental studies, and economic analysis. The Bureau of Safety and Environmental Enforcement is responsible for enforcing safety and environmental regulations. However, given the time frame of our work, we refer to BOEMRE in this report.

[20]Carbon capture and storage is a process of separating carbon dioxide from other gases produced in fuel combustion and other industrial processes, transporting the carbon dioxide via pipeline to an underground storage location, and injecting and storing it long-term in underground geologic formations.

DOE AR 000261

In responding to our questionnaire, agency officials reported that they obligated around $2.9 billion through their initiatives in fiscal year 2011 for activities specifically related to wind.[21] These obligations data represent a mix of actual obligations and estimates.[22] Officials for 39 initiatives (about 48 percent) reported actual obligations, officials for 13 initiatives (about 16 percent) reported estimated obligations, and officials for 21 initiatives (about 26 percent) were not able to provide estimated or actual obligations.[23] Officials who provided estimates or were unable to provide obligations data noted that the accuracy or the availability of the obligations data was limited because, for example, isolating the obligations for activities specifically related to wind can be difficult. In addition, among the 21 initiatives for which no wind-specific obligations data were reported, agency officials for several of them reported, for example, that they recovered their costs from power customers, or they provided loan guarantees whose costs were offset by fees paid by lenders. As shown in table 1, Treasury was responsible for nearly 94 percent of the total reported obligations (about $2.7 billion of $2.9 billion), all of which were due to its Section 1603 program.

---

[21]Nearly all of these obligations were incurred by initiatives established under the Recovery Act. However, the Recovery Act initiatives with the most obligations for activities specifically related to wind—Treasury's Section 1603 program and DOE's Title XVII Section 1705 Loan Guarantee Program—were alternatives to initiatives that were established prior to the Recovery Act—the PTC and Energy Investment Credit (also known as the Investment Tax Credit, or ITC), as well as the Title XVII Section 1703 Loan Guarantee Program. Some projects the Recovery Act initiatives supported in fiscal year 2011 could have instead received support from the ongoing initiatives that existed prior to the act.

[22]As previously noted, most wind-related initiatives supported a range of energy sources in addition to wind. We asked agency officials to provide actual or estimated obligations data for their initiative's activities that were specifically related to wind. In addition, unlike spending data presented in the President's budget—which are estimated for fiscal years that are not completed at the time the budget is prepared—the estimated obligations data presented here are for completed fiscal years.

[23]In addition to the 21 initiatives for which no obligations data were reported, 9 of the initiatives (about 11 percent) for which officials did not provide obligations data were Treasury's wind-related tax expenditures, discussed below. Note that the percentages add to 101 due to rounding.

DOE AR 000262

**Table 1: Actual and Estimated Obligations for Activities Specifically Related to Wind, by Agency, in Fiscal Year 2011**

| Agency[a] | Number of wind-related initiatives for which data were provided | Actual obligations | Estimated obligations | Total obligations |
|---|---|---|---|---|
| Treasury | 1 | $2,716,933,281 | $0 | **$2,716,933,281** |
| DOE | 17 | 73,940,581 | 73,161,968 | **147,102,549[b]** |
| Interior | 15 | 10,206,170 | 15,778,339 | **25,984,509** |
| USDA | 9 | 4,850,539 | 56,000 | **4,906,539[c]** |
| Commerce | 4 | 2,332,038 | 415,462 | **2,747,500** |
| NSF | 2 | 2,104,544 | 0 | **2,104,544** |
| EPA | 2 | 30,000 | 210,000 | **240,000** |
| **Total** | **50** | **$2,810,397,153** | **$89,621,769** | **$2,900,018,922** |

Source: GAO analysis of agency-provided data.

Note: Because we summarize obligations data by agency, agency-level data typically reflect a mix of actual and estimated obligations. However, obligations reported for any specific initiative are either actual or estimated. For instance, EPA's data on its two initiatives above reflect one initiative for which actual obligations of $30,000 were reported, and one for which estimated obligations of $210,000 were reported.

[a]In addition to the 50 initiatives at the seven agencies listed here, FERC did not provide obligations data for its one wind-related initiative because it noted that all costs to the government associated with the initiative are recovered through charges to regulated entities. SBA did not provide obligations data for either of its two initiatives because, according to agency officials, one initiative provided loan guarantees whose costs were offset by fees, and the second initiative was in the early planning stages in fiscal year 2011.

[b]Of the $147 million obligated by DOE for activities specifically related to wind in 2011, about $51 million was obligated for credit subsidy costs—the government's estimated net long-term cost, in present value terms, of the loans it guarantees as part of the Title XVII Section 1705 Loan Guarantee Program. Credit subsidy costs exclude administrative costs and any incidental effects on governmental receipts or outlays. Present value is the worth of the future stream of returns or costs in terms of money paid immediately. In calculating present value, prevailing interest rates provide the basis for converting future amounts into their current equivalents.

[c]This amount does not reflect a guarantee for a $204 million loan provided for a wind project in fiscal year 2011 through USDA's Direct and Guaranteed Electric Loan Program. USDA officials said that based on the historical performance of the loans and the creditworthiness of applicants for the program, they estimate zero credit subsidy costs for the program.

In addition, Treasury's nine other wind-related initiatives were tax expenditures that provided estimated tax subsidies totaling at least $1.1 billion for activities specifically related to wind, according to available estimates. This amount is based almost solely on subsidies provided through the PTC, which was the only one of these nine initiatives for which complete estimates of wind-specific tax subsidies were available

DOE AR 000263

for 2011.[24] Both Treasury and the Joint Committee on Taxation develop estimates of tax subsidies provided through these tax expenditure initiatives; however, the initiatives support a range of renewable and other energy sources, and wind-specific estimates are not available for most of them. (See app. III for a list of these tax expenditures and the available estimates of revenue losses related to wind energy.)

## Initiatives Supported a Range of Wind Issues, Technology Advancement Activities, and Recipients

The 82 initiatives we identified supported a range of issues related to wind, and most initiatives supported more than one wind issue. The wind issues most commonly supported were utility-scale land-based wind (49 initiatives) and distributed land-based wind (45 initiatives). See table 2 below for the number and percentage of initiatives supporting each wind issue.

**Table 2: Number and Percentage of Federal Wind-Related Initiatives Supporting Each Wind Issue in Fiscal Year 2011**

| Wind issue | Number of initiatives | Percentage of initiatives |
|---|---|---|
| Utility-scale land-based wind | 49 | 60 |
| Distributed land-based wind | 45 | 55 |
| Offshore wind | 38 | 46 |
| Grid integration | 37 | 45 |
| Transmission | 33 | 40 |
| Siting and permitting | 28 | 34 |

Source: GAO analysis of agency-provided data.

Note: Because many wind-related initiatives supported multiple wind issues, the percentage of initiatives does not total 100, and the number of initiatives does not total 82, the number of initiatives identified in our review.

[24]In addition to the PTC, which provided an estimated $1.1 billion in wind-specific tax subsidies in 2011, the ITC provided less than $50 million in subsidies in 2011 for small wind properties—properties using wind turbines of 100 kilowatts or less—according to the Joint Committee on Taxation. However, this estimate does not include ITC support for larger wind properties. See Joint Committee on Taxation, *Estimates of Federal Tax Expenditures for Fiscal Years 2011-2015,* JCS-1-12 (Washington, D.C.: Jan. 17, 2012). Also, Treasury has developed wind-specific estimates of subsidies from the Credit for Residential Energy Efficient Property, but the most recent year for which data are available is 2009. Treasury officials said these estimates are typically reported 2 years after the subsidies are provided.

DOE AR 000264

Individual initiatives tended to support a range of wind issues. Specifically, 63 initiatives (77 percent) supported more than one wind issue, and 46 of these (56 percent of all initiatives) supported three or more wind issues.[25] For instance, USDA's High Energy Cost Grant Program provides grants for energy facilities and infrastructure serving rural communities with average home energy costs exceeding 275 percent of the national average. Officials responding to our questionnaire reported that these grants can support utility-scale and distributed land-based wind, transmission, and grid integration. Similarly, DOE's State Energy Program provides financial and technical assistance to state governments for a variety of renewable energy-related activities across all six wind issues, according to agency officials.

The 82 initiatives we identified also supported technology advancement activities ranging from basic and applied research through deployment, which was the most commonly supported technology advancement activity; 58 initiatives (71 percent) included support for deployment. See table 3 below for the number and percentage of initiatives supporting each technology advancement activity.

**Table 3: Number and Percentage of Federal Wind-Related Initiatives Supporting Each Technology Advancement Activity in Fiscal Year 2011**

| Technology advancement activity | Number of initiatives | Percentage of initiatives |
|---|---|---|
| Basic research | 13 | 16 |
| Applied research | 34 | 41 |
| Demonstration | 29 | 35 |
| Commercialization | 24 | 29 |
| Deployment | 58 | 71 |

Source: GAO analysis of agency-provided data.

Note: Because many wind-related initiatives supported multiple technology advancement activities, the percentage of initiatives does not total 100, and the number of initiatives does not total 82, the number of initiatives identified in our review.

[25]In addition to the 63 initiatives supporting more than one wind issue, responses to our questionnaires for 15 initiatives indicated support for only one wind issue, and responses for 4 other initiatives indicated only an "other" wind issue. The numbers of initiatives supporting one or more than one wind issue does not reflect whether officials responded that initiatives supported "other" wind issues in addition to one of the six main wind issues.

GAO-13-136 Wind Energy
DOE AR 000265

Our analysis showed that 39 (48 percent) of the 82 initiatives supported only one type of technology advancement activity. Another 39 initiatives (48 percent) supported more than one type of technology advancement activity, and of these, 5 initiatives supported all five.[26] For example, Commerce's Joint Wind Energy Program: Atmospheric Velocity Gradients initiative supports a single technology advancement activity—applied research—through studies focused on improving predictions of wind energy production from winds at various heights. In contrast, Commerce's Green Technology Pilot Program supported all types of technology advancement activities except basic research. The program supported investment in wind and other "green" technologies through expedited reviews of patent applications, allowing for earlier intellectual property protection.

The majority of initiatives supported recipients, generally in the private sector, that provide electricity generated from wind to consumers, develop wind energy generation projects, or manufacture wind-related equipment, according to agency officials responding to our questionnaire. Specifically, 57 initiatives (70 percent) provided funding or other direct support to energy providers, developers, or manufacturers. Fewer than half of the initiatives provided funding or other direct support to recipients such as public and private researchers (35 initiatives), states and other governmental organizations (34 initiatives), and individuals (12 initiatives). Around half of the initiatives—44 initiatives (54 percent)—supported one type of recipient, while the remaining 38 initiatives supported multiple types of recipients.

## Initiatives Supporting Deployment Accounted for Most Obligations and Tax Subsidies Related to Wind

In terms of federal financial support, deployment was the primary focus of federal efforts to promote wind energy. Of the reported $2.9 billion in actual and estimated obligations for wind-related activities in fiscal year 2011, $2.86 billion (99 percent) was obligated by the 58 initiatives that included support for deployment. As previously noted, approximately 94 percent of total wind-related obligations—just over $2.7 billion—was

---

[26]In addition to the 39 initiatives supporting one type of technology advancement activity and the 39 initiatives supporting more than one, responses to our questionnaires for 2 initiatives indicated only an "other" technology advancement activity, and responses for 2 others did not indicate any technology advancement activity. The numbers of initiatives supporting one or more than one technology advancement activity do not reflect whether officials responded that initiatives supported "other" technology advancement activities in addition to one of the five main types of activities.

DOE AR 000266

obligated by Treasury's Section 1603 program for the deployment of projects. Other initiatives that supported deployment activities obligated $147 million. In addition to obligations, all nine of Treasury's wind-related tax expenditures—with estimated tax subsidies of at least $1.1 billion for activities specifically related to wind—included support for deployment. These tax subsidies were primarily provided through the PTC, which, in 2011, provided an income tax credit of 2.2 cents per kilowatt hour for energy produced from wind and certain other renewable energy sources.[27] In addition, deployment was the most commonly supported technology advancement activity at the five lead agencies.[28] See figure 3 below for the number of initiatives supporting each technology advancement activity at these agencies.

---

[27]The amount of the credit varies by energy source. For example, the amount of the credit is currently 1.1 cents per kilowatt hour for energy produced from a subset of qualified energy sources, including hydropower, landfill gas, and others. In addition, the amount of the credit is adjusted annually for inflation. For example, when it was first created under the Energy Policy Act of 1992, the amount of the credit was 1.5 cents per kilowatt hour for energy produced by wind facilities.

[28]The number of DOE initiatives supporting deployment was equal to or greater than the number of its initiatives supporting any other technology advancement activity.

DOE AR 000267

**Figure 3: Number of Federal Wind-Related Initiatives at Five Lead Agencies, by Agency and Technology Advancement Activity Supported**



Source: GAO analysis of agency-provided data

Note: Agency initiatives often supported more than one technology advancement activity; therefore, the sum of initiatives shown in this figure for a given agency will not total the number of that agency's initiatives in our review.

In addition to initiatives that support deployment of wind energy technologies by directly funding or providing tax subsidies for the

DOE AR 000268

construction or operation of wind facilities, some initiatives that we identified supported the deployment of these technologies indirectly. This indirect support includes facilitating the buying and selling of wind technologies or wind energy, or encouraging deployment through policies and regulations. Examples include the following:

- Commerce's International Trade Administration implements an International Buyer Program, which supports U.S. companies at trade shows—including several major shows focused on renewable energy—by recruiting and escorting foreign buyer delegations to meet with U.S. companies.

- EPA's Green Power Partnership supports deployment of wind and other renewable energy technologies by encouraging organizations and individuals to purchase renewable energy through outreach, education, and technical support.

- DOE's Division of Permitting, Siting, and Analysis implements an initiative providing technical and financial assistance to state and regional entities, such as public utility commissions and state legislatures, to help develop renewable energy policies and portfolio standards, among other things.

## Initiatives Were Fragmented and Had Overlapping Characteristics with Half Reporting Coordination, but Several Provided Some Duplicative Financial Support for Deployment

The 82 wind-related initiatives we identified were fragmented across agencies, most had overlapping characteristics and, though half reported formally coordinating, several financing deployment of wind facilities have provided some duplicative financial support. The initiatives were fragmented because they were implemented across nine agencies and were involved in the same broad area of national need. Most initiatives overlapped to some degree with at least one other initiative because they had at least one wind issue, technology advancement activity, type of recipient, and type of goal in common, but such overlap did not necessarily lead to duplication of efforts because initiatives sometimes differed in meaningful ways. In addition, officials from about half of all initiatives reported formally coordinating with other wind-related initiatives. Such coordination can, in principle, reduce the risk of unnecessary duplication and improve the effectiveness of federal efforts. However, we identified seven initiatives that have provided duplicative support— financial support from multiple initiatives to the same recipient for deployment of a single project. Specifically, wind project developers have, in many cases, combined the support of more than one Treasury initiative and, in some cases, have received additional support from smaller grant

DOE AR 000269

or loan guarantee programs at DOE or USDA. We also identified three other initiatives that did not fund any wind projects in fiscal year 2011 but that could, on the basis of the initiatives' eligibility criteria, be combined with one or more initiatives to provide duplicative support. Of the 10 initiatives, those at Treasury accounted for over 95 percent of the federal financial support for wind in fiscal year 2011.

## Initiatives Were Fragmented and Most Had Broadly Overlapping Characteristics

The 82 wind-related initiatives we identified were fragmented because they were implemented across nine agencies and were involved in the same broad area of national need: promoting or enabling the development of wind energy. We found that initiatives supporting deployment in particular were spread about evenly across the five lead agencies—each had between 10 and 13 initiatives that supported deployment. In March 2011, we reported that fragmentation has the potential to result in duplication of resources.[29] However, such fragmentation is, by itself, not an indication that unnecessary duplication of efforts or activities exists. For example, in our March 2011 report, we stated that there can be advantages to having multiple federal agencies involved in a broad area of national need—agencies can tailor initiatives to suit their specific missions and needs, among other things.

Across all initiatives, we found that 68 (83 percent) overlapped to some degree with at least one other initiative because they supported similar wind issues, technology advancement activities, and recipients, and had similar goals. The following are several examples of overlapping initiatives:

- *Deployment of utility-scale land-based wind facilities by the energy industry.* Seventeen initiatives provided financial support for the construction or use of utility-scale land-based wind facilities to energy companies. For instance, USDA's Direct and Guaranteed Electric Loan Program provides loans and loan guarantees to establish and improve electric service in rural areas, including through utility-scale on-grid wind and other renewable energy systems. Similarly, the SBA's Certified Development Company/Section 504 Loans initiative guarantees SBA loans to businesses for, among other things, energy

---

[29]GAO-11-318SP.

DOE AR 000270

efficiency and renewable energy projects, including utility-scale land-based wind projects.

- *Applied research to facilitate the integration of wind energy into the electric power grid.* Five initiatives provided funding or support to public or private researchers to conduct applied research related to the integration of wind energy into the electric grid. For instance, DOE's Grid-Scale Rampable Intermittent Dispatchable Storage program funds efforts to develop new technologies that enable widespread use of cost-effective grid-scale energy storage, particularly technologies that mitigate variability in energy generated from renewable sources such as wind and solar. Similarly, the National Science Foundation's Emerging Frontiers in Research and Innovation initiative provides grants for interdisciplinary engineering research with the potential to create a significant impact in meeting national needs. Specifically, in fiscal year 2011, the initiative funded research on compressed air technology for storing excess energy from offshore wind turbines to alleviate power supply and demand imbalances on the electric grid during the day.[30]

- *Deployment of offshore wind technologies by state, local, and other governmental organizations.* Five initiatives helped address policy and regulatory barriers to deployment of offshore wind through support for state, local, and other governmental organizations. For instance, under Interior's Renewable Energy Program there is a Development and Implementation initiative through which BOEMRE worked to authorize orderly, safe, and environmentally responsible renewable energy development on the outer continental shelf, while complementing ongoing state and local renewable energy efforts. BOEMRE's efforts include assisting states in meeting goals established in RPSs through studies of potential development of particular states' offshore areas, as well as coordination and information exchange with states and regional organizations. Similarly, Commerce's MarineCadastre.gov initiative supports wind energy development and other uses of the outer continental shelf by providing mapping information for project planning and siting, which is intended to help developers identify and avoid potentially conflicting

---

[30]Compressed air energy storage involves injecting compressed air into a geological formation such as an underground cavern within a salt dome. To recover the power, the air is released and used to help drive a turbine generator. Compressed air energy storage provides bulk energy storage for stationary power systems.

DOE AR 000271

uses before creating development plans. Commerce's efforts under this initiative in fiscal year 2011 included developing maps for a federal-state task force to facilitate decisions on wind energy development in federal waters.

In addition, we identified several types of state initiatives that encourage development of wind and other renewable energy sources and share key characteristics with federal wind-related initiatives. Along with federal agencies, state governments implement initiatives that help energy companies finance deployment of utility-scale land-based wind facilities. These initiatives include state tax incentives such as production and investment tax credits. They also include state grant and loan programs, some of which were federally funded, according to DSIRE data. See figure 4 below for examples of these state and federal initiatives available in fiscal year 2011.

**Figure 4: Examples of Federal and State Initiatives Available in Fiscal Year 2011 to Provide Financial Support for Deployment of Utility-Scale Land-Based Wind Facilities by Energy Companies**





Sources: GAO analysis of DSIRE data and agency-provided data.

[a]Though most of these programs are implemented by state governments, several are implemented by one or more utilities or local governments within a state.

DOE AR 000272

States have also enacted a number of rules, regulations, or policies that encourage deployment of wind and other renewable energy sources, most notably RPSs. Such standards do not provide direct financial support to particular wind projects; however, by requiring or encouraging that a percentage of the electricity consumed in a state be generated from renewable sources, they are designed to create market demand for electricity from sources such as wind. Recent economic studies we reviewed suggest that certain RPSs have increased development of renewable energy.[31] Several financial professionals and agency officials with whom we spoke cited RPSs as strongly influencing wind energy development. They said that by creating demand for wind and other renewable energy, RPSs complement federal initiatives such as the PTC, which reduce the price of this energy. Currently, 37 states have RPSs that include wind.[32] For instance in California—which led the nation in new wind capacity added in 2011—state law requires electric utilities in the state to have 33 percent of their retail sales derived from eligible renewable energy resources, including wind, by 2020. In Texas—which led the nation in total installed wind capacity in 2011—state law requires 5,880 megawatts of total installed renewable energy capacity by 2015, including up to 5,380 megawatts of wind energy capacity.[33]

Overlap among initiatives does not necessarily lead to duplication because initiatives sometimes differ in meaningful ways. For instance, certain of Treasury's tax expenditures that support deployment of utility-scale land-based wind facilities by the energy industry differ in the type of organization eligible for their support. Treasury's Credit for Holding New

---

[31]Gilbert Metcalf, *Investment in Energy Infrastructure and the Tax Code*, From the Selected Works of Gilbert E. Metcalf (2009); Sanya Carley, *State Renewable Energy Electricity Policies: An Empirical Evaluation of Effectiveness*, Energy Policy (2009); Gireesh Shrimali and Joshua Kniefel, *Are Government Policies Effective In Promoting Deployment of Renewable Electricity Resources?* Energy Policy (2011); Haitao Yin and Nicholas Powers, *Do State Renewable Portfolio Standards Promote In-State Renewable Generation?* Energy Policy (2010).

[32]State RPS data are from DSIRE. Of the 37 states, 29 states have legally binding state standards, and 8 states have nonbinding RPS goals, according to DSIRE data. In addition to these states, Florida has a municipal utility that has signed a memorandum of understanding formalizing its commitment to generate at least 7.5 percent of its electric capacity from wind and other renewable energy sources by 2015.

[33]Texas law established a target of 500 megawatts of the total required 5,880 megawatts to come from sources other than wind energy. As of the end of 2011, 10,394 megawatts of wind energy capacity had been installed in Texas according to DOE.

DOE AR 000273

Clean Renewable Energy Bonds, for example, helps tax-exempt entities such as not-for-profit electric utilities or cooperative electric companies finance capital expenditures for wind and other renewable energy facilities by providing tax credits to holders of bonds issued by those entities. In contrast, the majority of Treasury's other wind-related tax expenditures that support the deployment of utility-scale land-based wind facilities do so by providing taxable organizations with tax credits or other tax incentives for such projects. In addition, certain overlapping initiatives may provide a cumulative benefit for the deployment of wind projects but do not meet our definition of duplication because they do not provide financial support to the same recipient for a single wind project. For instance, Treasury officials noted that the Qualifying Advanced Energy Project Credit and the Section 1603 program could provide support across multiple stages of wind energy deployment if, for example, a manufacturing plant that produces wind turbines receives the credit and a wind facility that uses those turbines receives a Section 1603 grant. However, for purposes of our report, these initiatives do not provide duplicative support because they have different direct recipients.

## About Half the Initiatives Reported Formally Coordinating, in Some Cases Employing Key Practices for Enhancing and Sustaining Agency Collaboration

Officials from 43 (52 percent) of the 82 initiatives reported coordinating formally with other federal wind-related initiatives.[34] Coordination was most prevalent among initiatives that reported having wind-specific goals—such as reducing the cost of wind technologies or facilitating the siting, leasing, and construction of new offshore wind projects. Specifically, of the 25 initiatives that reported having such goals, officials from 20 initiatives (80 percent) reported coordinating with other wind-related initiatives. In contrast, of the 57 initiatives that did not report having wind-specific goals, officials from 23 initiatives (40 percent) reported such coordination. Most of the initiatives for which officials reported coordinating—36 of 43—included coordination efforts with wind-related initiatives in other federal departments and independent agencies. For example, officials from several agencies reported coordinating through the Interagency Rapid Response Team for Transmission, which was based on a 2009 joint memorandum of understanding between nine

---

[34]We did not include informal coordination in the scope of this report. Our past work has shown that informal coordination mechanisms may be dependent on relationships among individual officials and that these informal relationships could end if personnel move to different assignments. See GAO, *National Security: Key Challenges and Solutions to Strengthen Interagency Collaboration,* GAO-10-822T (Washington, D.C.: June 9, 2010).

DOE AR 000274

federal agencies. This team aims to improve coordination of federal permitting and reviews of transmission infrastructure projects that will help integrate wind and other renewable energy sources into the electric grid. Officials from 22 initiatives also reported coordinating their wind-related initiatives with state governments.

As we have previously reported, coordination may reduce the risk of unnecessary duplication, and a lack of coordination can waste scarce funds and limit the overall effectiveness of the federal effort.[35] We have also previously reported that while agencies face a range of barriers when they attempt to collaborate with other agencies—such as differing missions and incompatible processes—certain key practices can help agencies enhance and sustain federal collaboration.[36] Several lead agencies implementing wind-related initiatives have formally coordinated overlapping initiatives, in some cases in a manner consistent with key practices, such as in the following examples:

- *Identifying and addressing needs by leveraging resources*: Agency officials reported leveraging resources such as the knowledge and expertise of other agencies in developing and implementing their own wind energy initiatives. For example, DOE has drawn on Treasury's expertise through required consultations regarding the terms and conditions of loan guarantees DOE provides to applicants.[37] In addition, USDA officials consulted with Treasury regarding the potential impact of tax laws on new provisions USDA was drafting for awarding certain grants. For some initiatives, agency officials reported leveraging the financial resources of other agencies to help ensure prudent use of funds, particularly in the case of loan guarantee programs. For example, according to an official for DOE's loan guarantee programs, if a project qualifies for a Treasury Section 1603

---

[35]GAO, *The Government Performance and Results Act: 1997 Governmentwide Implementation Will Be Uneven*, GAO/GGD-97-109 (Washington, D.C.: June 2, 1997); GAO, *2012 Annual Report: Opportunities to Reduce Duplication, Overlap and Fragmentation, Achieve Savings, and Enhance Revenue*, GAO-12-342SP (Washington, D.C.: Feb. 28, 2012).

[36]GAO, *Results-Oriented Government: Practices That Can Help Enhance and Sustain Collaboration among Federal Agencies,* GAO-06-15 (Washington, D.C.: Oct. 21, 2005).

[37]See 42 U.S.C. § 16512; 10 C.F.R. §609.9 (d); and Office of Management and Budget Circular A-129 Revised (Nov. 2000), *Policies for Federal Credit Programs and Non-Tax Receivables.*

DOE AR 000275

grant, it is typical for DOE to require that a portion of the grant proceeds be used to repay the DOE-guaranteed debt.[38] In addition, a USDA official for the Business and Industry Guaranteed Loan Program—which provides guaranteed loans to rural borrowers for projects that improve the economic and environmental climate in rural communities—said that the program provides information to applicants regarding other sources of funding available for wind projects, such as SBA loans or grants, or state-level sources of funding.

- *Developing mechanisms to monitor, evaluate, and report on results*: Agencies also engaged in collaborative efforts to create the means to monitor and evaluate their wind-related initiatives and report on their activities. For example, USDA reported coordinating programs that provide loans, grants, and loan guarantees for projects in rural communities both internally and with other agencies such as Commerce, DOE, and EPA through USDA's Energy Council Coordinating Committee. Agency officials participating in this council share general information on energy-related programs, which helps support common performance reporting and budgeting processes. In addition, USDA data on its grants, loans, and other awards are available to other agencies and the general public through a web-based mapping tool that shows agencies and potential recipients where USDA is supporting renewable energy projects.

---

[38]For instance, according to DOE officials, this type of arrangement can be made on a "pro rata" basis: that is, the percentage of the proceeds from the grant used to repay debt is the same as the percentage of a project's cost financed by debt. For example, if 70 percent of a project's capital costs are financed by debt, then 70 percent of Section 1603 grant proceeds will be used to pay down the debt. The percentage of debt financing varies from project to project.

DOE AR 000276

## Several Initiatives That Financed Deployment of Wind Facilities Have Provided Some Duplicative Financial Support

We identified examples of utility-scale land-based wind projects that received duplicative support—financial support from multiple initiatives to the same recipient for a single project—from initiatives supporting deployment of wind facilities. Specifically, we identified 10 initiatives that have provided or could provide duplicative support, as follows:[39]

- Seven initiatives provided some duplicative support for wind projects, including three tax expenditures and a grant program implemented by Treasury, a loan guarantee program implemented by DOE, and two programs that provide grants, loans, and loan guarantees implemented by USDA. Although all seven of these initiatives cannot be combined to support the same project, each of them has been combined with one or more of the others, with some limitations, to support a single project.

- Three other initiatives did not actually fund any wind projects in fiscal year 2011 but could provide duplicative support for wind projects going forward, based on the types of projects eligible for their support. These three initiatives were DOE's Section 1703 Loan Guarantee Program (Section 1703 program) and USDA's Business and Industry Guaranteed Loan Program and High Energy Cost Grant Program.

Some of these 10 initiatives have recently expired, such as Treasury's Section 1603 program and DOE's Section 1705 Loan Guarantee Program (Section 1705 program), and several others are scheduled to expire for wind projects at the end of 2013, such as Treasury's tax credits.[40] However, the types of mechanisms these initiatives employ—tax expenditures, grants, and loan guarantees—are employed by other of the initiatives that are not expiring and may be considered by policymakers as a means for supporting wind energy through future initiatives. In addition, duplication of financial support among these initiatives may not be limited to wind projects because all of these initiatives supported a range of

---

[39]We focused our analysis of duplication on initiatives at the five lead agencies (DOE, Interior, USDA, Commerce and Treasury) that provided financial support to energy industry recipients for the construction or operation of utility-scale land-based wind facilities. These initiatives represented the vast majority of actual and estimated wind-related obligations and tax subsidies in fiscal year 2011. For more detailed discussion of our methodology for identifying duplication, see app. I.

[40]Applications for Section 1603 grants must have been submitted before October 1, 2012, though Treasury officials noted that they anticipate significant awards to applicants will be made under the Section 1603 program over the next 4 years.

DOE AR 000277

renewable energy projects. Of the 10 initiatives, Treasury's 4 initiatives accounted for over 95 percent of the total federal financial support for wind in fiscal year 2011. See table 4 for brief descriptions of these initiatives. (For more detailed descriptions of these initiatives, including information on their expiration dates, see app. II.)

**Table 4: Ten Initiatives That Have Provided or Could Provide Duplicative Financial Support for Deployment of Wind Facilities**

| Agency | Initiative | Description |
|---|---|---|
| DOE | **Title XVII Section 1703 Loan Guarantee Program (Section 1703 program)**[a]  **Title XVII Section 1705 Loan Guarantee Program (Section 1705 program)** | According to DOE, the Section 1703 program provides loan guarantees to support innovative clean energy technologies that are typically unable to obtain conventional private financing due to high technology risks. The law requires that the technologies avoid, reduce, or sequester air pollutants or emissions of greenhouse gases. The Section 1705 program was a temporary program providing loan guarantees for both innovative and commercial technology energy projects that employ wind and other renewable energy systems, electric power transmission systems, or leading-edge biofuels that meet certain criteria. All Section 1705 projects were required to begin construction no later than September 30, 2011. Following the expiration of the Section 1705 program, Congress appropriated $170 million to pay the credit subsidy costs for Section 1703 projects that use renewable energy or efficient end-use energy technologies. The law provides that this funding is also available to such projects that applied under the Section 1705 program prior to February 24, 2011. |
| Treasury | **Energy Production Credit (PTC)**  **Energy Investment Credit (ITC)**  **Payments for Specific Energy Property in Lieu of Tax Credits (Section 1603 program)** | The PTC provides an income tax credit based on the amount of energy produced at qualified facilities, including wind facilities. *As an alternative to the PTC*, the ITC provides an income tax credit of 30 percent of either the cost or fair market value of new equipment that produces electricity from wind and other renewable energy sources. The payments under the Section 1603 program, *which can be taken in lieu of the PTC or ITC*, provide cash grants worth 30 percent of a wind project's cost or fair market value. |
|  | **Accelerated Depreciation Recovery Periods for Specific Energy Property (accelerated depreciation)**[b] | Allows wind energy technologies to be treated as 5-year property—that is, property whose costs are recovered through depreciation deductions from businesses' taxable income over 5 years. The Joint Committee on Taxation generally classifies as tax expenditures cost recovery allowances that are more favorable than those provided under the alternative depreciation system (Internal Revenue Code Section 168(g)), which provides for straight-line recovery over tax lives that are longer than those permitted under the accelerated system. Accelerated depreciation, in effect, reduces the cost of acquiring wind and other properties by allowing businesses to deduct larger amounts from their taxable income sooner than they would be able to do under straight-line depreciation. Reducing tax liability earlier provides a benefit to the taxpayer because of the time value of money—having a lower tax payment today is worth more to the taxpayer than having the lower payment in the future. |
| USDA | **Business and Industry Guaranteed Loan Program**[a] | Provides guaranteed loans to borrowers in rural areas for a range of eligible projects that improve the economic and environmental climate in rural communities. Eligible activities include the development and construction of renewable energy systems. |
|  | **Direct and Guaranteed Electric Loan Program** | Provides loans and loan guarantees for a range of eligible projects that establish and improve electric service in rural areas, including renewable energy systems. |

DOE AR 000278

| Agency | Initiative | Description |
|---|---|---|
| | High Energy Cost Grant Program[a] | Provides grants for energy generation, transmission, and distribution facilities serving rural communities with annual average home energy costs that exceed 275 percent of the national average. Eligible projects include on-grid and off-grid renewable energy systems. |
| | Rural Energy for America Program (REAP) | Provides funding for grants and guaranteed loans to farmers, ranchers, and small businesses in rural areas to assist with purchasing and installing renewable energy systems, such as wind projects. |

Source: GAO analysis of agency-provided data.

Note: Each of these 10 initiatives has been or could be used together with 1 or more other initiatives in this table; however, recipients can receive support from only 1 of the following 3 initiatives for a specific project: the PTC, ITC, or Section 1603 program.

[a]The Section 1703 program has not funded any wind or other projects to date, though it has provided conditional commitments to guarantee over $10 billion in loans for nuclear energy projects. However, recipients of Section 1703 loan guarantees are not restricted from receiving support from tax initiatives, such as Treasury's tax credits, and may receive support from such initiatives in the future. In addition, neither the Business and Industry Guaranteed Loan Program nor the High Energy Cost Grant Program funded any wind projects in fiscal year 2011. However, both initiatives specify wind projects as eligible for funding, and USDA officials said that neither initiative restricts their recipients from receiving support under the DOE or Treasury initiatives listed here.

[b]Depreciation—a normal business expense under an income tax system—is an annual deduction from income that allows taxpayers to recover the cost or other basis of certain property used in a business or other income-producing activity over the useful life of the property. In addition to the existing 5-year accelerated depreciation allowed for wind and other properties, 2008 legislation and subsequent laws have temporarily granted a 50 percent first-year bonus depreciation for properties placed in service before January 1, 2014. This allows businesses to deduct 50 percent of the depreciable basis of a broad set of tangible properties, including wind and other renewable energy facilities, from their taxable income in the first year after they are acquired. Furthermore, the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010 allowed businesses to deduct 100 percent of the depreciable basis of eligible wind and other facilities from their taxable income after September 8, 2010 and before January 1, 2012. The 50 percent bonus depreciation allowed under the 2008 act narrowed any tax differences between eligible assets, and the 100 percent bonus depreciation introduced in 2010 eliminated those differences altogether under the provision for allowing a full write-off of asset acquisition costs.

According to interviews with agency officials and financial professionals and information from agency websites, wind project developers have used various combinations of these initiatives to help finance specific wind projects. For instance, in many cases, developers combined the support of more than one Treasury initiative and, in some cases, they received additional support from smaller DOE or USDA grant or loan guarantee programs. Among Treasury initiatives, although the PTC, Energy Investment Credit (also known as the Energy Investment Tax Credit, or ITC), and Section 1603 program cannot be combined for a specific project, they all support wind projects for which developers also typically claim Accelerated Depreciation Recovery Periods for Specific Energy Property (accelerated depreciation), according to financial professionals and a Treasury official. In addition, DOE's Section 1705 program has provided loan guarantees for four utility-scale wind generation projects, all of which have received grants under Treasury's

Section 1603 program, and all of which are eligible to claim accelerated depreciation.[41] Similarly, USDA's grant and loan programs have supported projects that also received support under other initiatives. For example, USDA's Direct and Guaranteed Electric Loan Program provided a loan guarantee for a $204 million loan for a wind project that was also awarded an $88 million grant under the Section 1603 program. In addition, USDA's Rural Energy for America Program (REAP) provides grants and loan guarantees for renewable energy projects. A 2006 report by DOE's Lawrence Berkeley National Laboratory (LBNL) found that nearly all wind projects with a capacity of over 100 kilowatts that received REAP grants from 2003 through 2005 also intended to claim tax credits under the PTC.[42]

Although these initiatives have, in some cases, provided duplicative support, their support may address different needs of wind project developers or the communities they serve, according to agency officials and financial professionals with whom we spoke, and analyses by DOE's national laboratories.[43] For example, unlike the PTC and ITC, the Section 1603 program allows wind project developers to directly claim a cash grant regardless of their tax liability, thus avoiding the potential need to partner with financial institutions or other investors who provide tax

---

[41]Grant, loan, and tax expenditure initiatives provide capital for wind and other eligible projects—that is, the funds or tax subsidies provided by the government are used to cover the costs of developing and building a project. In contrast, loan guarantees provided through initiatives such as DOE's Section 1703 and Section 1705 programs lower the cost of capital for projects by helping companies obtain affordable financing because the federal government agrees to reimburse the lender for the guaranteed amount if a borrower defaults. Despite this difference between these forms of government support, both types of initiatives provide a financial benefit for developers of wind projects.

[42]Lawrence Berkeley National Laboratory, *Avoiding the Haircut: Potential Ways to Enhance the Value of the USDA's Section 9006 Program* (Berkeley, CA: July 2006).

[43]National Renewable Energy Laboratory and Lawrence Berkeley National Laboratory, *PTC, ITC, or Cash Grant? An Analysis of the Choice Facing Renewable Power Projects in the United States* (Golden, CO and Berkeley, CA: March 2009); Lawrence Berkeley National Laboratory, *Revealing the Hidden Value that the Federal Investment Tax Credit and Treasury Cash Grant Provide To Community Wind Projects* (Berkeley, CA: January 2010); Lawrence Berkeley National Laboratory, *Community Wind: Once Again Pushing the Envelope of Project Finance* (Berkeley, CA: January 2011).

DOE AR 000280

equity.[44] The Section 1603 program was created in part to address a perceived lack of tax equity following the recent financial crisis, according to Treasury guidance and financial professionals. Furthermore, by providing a cash grant, the program allows developers to receive the full amount of the government subsidy rather than sharing this subsidy with tax equity investors.[45] DOE's Section 1705 program, meanwhile, provided financing in many cases for innovative projects that were seen as too risky to obtain affordable financing from private lenders, according to DOE officials who administered the program. In addition, as with the Section 1703 program, Section 1705 loan guarantees can address projects' needs for construction and long-term debt financing, while grants under the Section 1603 program and support from Treasury's tax expenditures are available only when the related project has been constructed and is operational. Therefore, the loan guarantees helped support many projects that might not otherwise have reached the development stage—such as being placed in service or beginning to generate electricity—required to receive tax credits or Section 1603 grants. In addition, USDA's grant, loan, and loan guarantee initiatives are designed to encourage projects that serve the needs of rural communities, including by providing reliable, affordable electricity, and more generally stimulating rural economic development.

Moreover, although these initiatives can be used together in various combinations to help finance the same wind project, several include

---

[44]Developers of wind projects can cover the costs of their projects using several sources of capital, including debt and equity. Tax equity is a form of capital provided for projects by investors in exchange for tax benefits—primarily the PTC and accelerated depreciation—and a share of the revenues. Tax equity investors allow developers without sufficient tax liabilities to capture the benefit of tax credits and other tax subsidies. Using tax equity, a developer can convert its federal tax benefits into cash through an investor, at a discount, and use this cash to pay for a portion of project capital and installation costs.

[45]Project developers may not receive the full benefit of tax subsidies such as the PTC and accelerated depreciation, because the subsidies are often shared between the developers and financial or other institutions that invest tax equity in projects. Section 1603 grant payments go to whatever entity places the wind project into service, whether that is the developer or a tax equity investor. The Section 1603 program allows developers without sufficient tax liabilities to forgo the use of tax equity investors and directly receive the full amount of the government subsidy. However, developers may still partner with such investors who can take advantage of tax benefits such as depreciation, and who may also receive part of the subsidy provided through Section 1603 grants. According to financial professionals with whom we spoke, the rates of return on tax equity for such investors generally range from 7 to 9 percent for typical projects and can range up to twice that amount for riskier projects.

provisions—often referred to as antidouble-dipping provisions—that limit the amount of financial support provided to a wind project when combined with another initiative. For instance, the PTC includes a provision requiring that the amount of the credit be reduced for federal or state grants, tax-exempt bond financing, subsidized energy financing, or other federal tax credits received for use in connection with the project.[46] LBNL's financial modeling of wind projects for its 2006 report suggests that large wind projects receiving REAP grants and claiming the PTC would have seen the value of the PTC reduced by from 11 to 46 percent of the grant's face value, depending on the project's capital cost and capacity factor.[47] Similarly, antidouble-dipping provisions reduce the value of the ITC and Section 1603 grants—through reductions to the portion of project costs on which they are calculated—for projects that also receive government grants that are not taxed as income,[48] including, in some cases, REAP or other federal and state grants for wind projects.[49] Grants not taxed as income also reduce a project's depreciable basis, or the dollar amount that can be depreciated for tax purposes.[50] In addition to limitations on combining Treasury's tax expenditures with other sources of financial support, officials from USDA and DOE told us that their agencies consider some other sources of federal support a wind project

---

[46]26 U.S.C. § 45 (b)(3). This provision includes an exception for certain closed-loop biomass facilities. Loan guarantees provided under DOE's Section 1703 and Section 1705 programs are not treated as subsidized energy financing under this provision. The amount of the credit is not reduced by any state tax credits received in connection with a project. See Rev. Rul. 2006-9, 2006-9 I.R.B. 519.

[47]Capacity factors represent the electricity generated by a facility as a percentage of that facility's maximum capacity to generate electricity.

[48]According to officials, Treasury determines on a case-by-case basis whether grants under REAP or other federal grant programs must be taxed as income. For instance, officials said grants are generally not taxed if they meet the criteria of the "general welfare exclusion." This exclusion applies to payments made under social benefit programs for the promotion of general welfare based upon the recipient's need. Such payments include federally provided mortgage assistance payments to low-income homeowners, or certain government payments to victims of a natural disaster.

[49]The Recovery Act eliminated the provision reducing the value of the ITC and Section 1603 program grants for government-subsidized, low-interest loans, though such a provision remains for the PTC.

[50]The Recovery Act allows a partial exception to this provision for projects receiving Section 1603 grants along with accelerated depreciation. In this case, a project's depreciable basis is reduced by half of the grant's value—15 percent of project costs—rather than the full 30 percent of project costs that Section 1603 grants are worth.

DOE AR 000282

has received or will receive in determining whether or how much to award under their grant, loan, and loan guarantee programs. The officials for some of these programs said that they limit the value of support they provide, while officials from other programs, by law, must deny support altogether when applicants are receiving funding from other federal sources. For instance, the appropriations laws applicable to the Section 1703 program prohibit the issuance of loan guarantees for projects that are expected to receive certain other sources of federal support. Such sources of support include grants from certain USDA initiatives and federal "off-take arrangements," whereby federal agencies agree to purchase power from the projects.[51] Similarly, USDA officials said that, under REAP, the total amount of grants provided for projects from REAP and other federal sources generally cannot exceed 25 percent of project costs. However, this limit does not apply to grants provided under Treasury's Section 1603 program, according to USDA officials.

In addition to these 10 federal initiatives, the state tax credits, grant programs, and loan programs previously discussed can be used, in some cases, to provide financial support for deployment of a wind project in combination with one or more federal initiatives. For instance, it is possible for a single wind project to receive federal support from a Section 1603 grant, accelerated depreciation, and a DOE loan guarantee, along with state support from tax incentives and indirect subsidies due to a state RPS. Furthermore, DSIRE staff and a financial professional with whom we spoke said that states may often structure their initiatives so that recipients can fully leverage sources of federal support, such as by designing the initiatives to avoid triggering federal antidouble-dipping provisions. In addition, under Treasury's published guidance on the PTC provision reducing the amount of the credit for certain other sources of federal or state support, state or local tax credits do not trigger a reduction in the value of the PTC.[52]

---

[51]DOE officials told us that, under applicable provisions of the appropriations laws, the Office of Management and Budget is required to certify compliance with this restriction. The restriction appears in the fiscal year 2009 Omnibus Appropriations Act (Pub. L. No. 111-8), as well as the Department of Defense and Full-Year Continuing Appropriations Act, 2011, (Pub. L. No. 112-10) and provides that DOE may not provide loan guarantees based on its authority under that act to projects that benefit from other federal grants or support (other than tax benefits, federal leases, insurance, and transmission facilities).

[52]Rev. Rul. 2006-9, 2006-9 I.R.B. 519.

DOE AR 000283

Even with antidouble-dipping provisions and other limitations on combining financial support from multiple initiatives for the same project, federal initiatives have provided cumulative financial support worth about half of project costs for many wind projects according to financial professionals. For instance, financial professionals we spoke with estimated that the PTC and accelerated depreciation together provide nearly half of the capital costs required for a typical wind farm.[53] Of this amount, 30 percent or more of the total capital costs is due to the PTC, according to financial professionals' estimates.[54] For projects receiving support from other federal grant or loan initiatives in addition to the PTC and accelerated depreciation, the value of federal financial support would comprise a larger portion of project costs. Also, as noted earlier, wind projects may receive financial support from state initiatives. For instance, according to a briefing memorandum from White House staff, the total estimated federal and state financial support for a large wind project in Oregon—including a Section 1705 loan guarantee, a Section 1603 grant, accelerated depreciation at the federal and state level, state tax credits, and an estimated premium paid for power due to a state RPS—are worth 65 percent or more of the project's capital costs. In another example, estimates developed by management consultants for the energy industry

---

[53]As noted above, project developers may not receive the full benefit of tax subsidies such as the PTC and accelerated depreciation, because the subsidies are often shared between the developers and financial or other institutions that provide tax equity for projects. In addition, regardless of whether the tax subsidies are provided to developers or tax equity investors, the full benefit of these subsidies may not always be achieved because either (1) the taxpayer may have insufficient taxable income to fully use the credits or depreciation deductions over the period of years they are provided, or (2) the taxpayer may be required to pay the Alternative Minimum Tax due to the use of the credits and deductions.

[54]Financial professionals' estimates for accelerated depreciation ranged from 10 percent to 30 percent of projects' capital costs. Estimates in the low end of this range accounted for only the incremental value provided for wind properties by 5-year accelerated depreciation, above the value of straight-line depreciation. Under the straight-line method, annual depreciation expenses are calculated by dividing the purchase price of the asset (less its estimated salvage or residual value) by the estimated useful life of the asset. Estimates in the high end of the range included the full amount of deductions permitted under accelerated depreciation. Treasury officials noted that these estimates of accelerated depreciation reflect its tax value in absolute terms, but do not reflect whether depreciation allowances granted to wind projects provide a greater benefit than do depreciation allowances for other industries. As noted above, the 50 percent bonus depreciation allowed under current law narrows any tax differences between eligible assets, and the 100 percent bonus depreciation allowed under previous legislation eliminated those differences altogether by allowing a full write-off of asset acquisition costs.

DOE AR 000284

and other clients suggest that federal financial support for a New Hampshire wind farm—including a Section 1603 grant, a Section 1705 loan guarantee, and accelerated depreciation—in combination with financial support from state initiatives is worth over half of the project's capital costs.[55]

## Agencies Support Projects on the Basis of Initiatives' Goals or Eligibility Criteria, but the Extent to Which Agencies Assess Applicant Need Is Unclear

Agencies implementing the 10 initiatives that have provided or could provide duplicative support allocate support to projects on the basis of the initiatives' goals or eligibility criteria, but the extent to which agencies assess applicant need for the support is unclear because we found they do not document assessments.[56] DOE and USDA—which have discretion, to the extent allowed by their statutory authority, over the projects they support through 6 of the 10 initiatives—allocate support to projects based on the projects' ability to meet initiative goals such as reducing emissions or benefitting rural communities, as well as other criteria such as financial and technological feasibility. Treasury, meanwhile, provides support to projects through the remaining 4 initiatives based on the eligibility criteria in the tax code. DOE and USDA consider applicant need for the financial support of some initiatives, according to officials. However, we found that neither agency documents assessments of applicant need for any of their initiatives; therefore, the extent to which they use such assessments to determine how much support to provide is unclear. Treasury does not generally have discretion in allocating support to projects and, as such, does not assess need for the support of its initiatives. While the support of these initiatives may be necessary, in many cases, for wind projects to be built, because the agencies do not document assessments of need, it is unclear, in some cases, whether the entire amount of federal support provided was necessary to build wind projects. In the event that some wind projects receive more federal funding than is required to induce them to be built, this additional funding could potentially be used to induce additional

---

[55]Booz & Company Inc.—a global management consulting firm for businesses, governments, and other organizations—developed these estimates using a proprietary economic model that it uses to advise its clients in the energy industry. We did not independently verify the model's calculations.

[56]We focused our analysis of agencies' allocation of support to projects and assessment of applicant need on the 10 initiatives we identified that have provided or could provide duplicative support. As noted above, these initiatives provided almost all the federal financial support we identified related to wind in fiscal year 2011.

DOE AR 000285

projects to be built or simply withheld, thereby reducing federal expenditures.

## DOE and USDA Allocate Support to Projects Based on Initiative Goals and Other Criteria while Treasury Supports Projects Based on Eligibility under the Tax Code

Through their six initiatives, DOE and USDA allocate support to projects based on projects' ability to meet initiative goals, along with other criteria such as financial and technological feasibility. For instance, DOE's loan guarantee solicitation for its Section 1703 program set forth initial screening criteria for projects including that they employ new or significantly improved technology compared to commercially available technologies, and that they be ready to proceed through the loan approval process (i.e. equity has been committed to the project, construction and other contracts have been negotiated, and permits have been secured). For evaluating and scoring projects that meet the initial screening criteria, DOE's solicitation also set forth two equally weighted criteria related to the program's goals: a project's expected reduction or avoidance of greenhouse gas emissions relative to its cost, and a project's support for clean energy jobs and manufacturing. In line with program goals, USDA allocates the support of its four initiatives to projects based on their expected benefits for rural and other eligible communities, along with other factors such as technological feasibility and expected performance. For instance, under its High Energy Cost Grant Program, USDA evaluates which projects to support based on their abilities to address community needs such as those related to economic hardships, their technological design and feasibility, their expected performance measures including the amount of renewable energy they will produce, and other factors. Similarly, USDA evaluates applications for REAP grants or loan guarantees based on factors such as projects' support for small agricultural producers or businesses, expected energy production, and technical merit. As with DOE's Section 1703 program, USDA's loan guarantee programs also allocate support to projects based on their ability to repay their debt. Unlike DOE and USDA, Treasury generally does not have any discretion regarding which projects receive the support of its initiatives.[57] Taxpayers who are eligible for support under the Internal Revenue Code are generally entitled to that support.

---

[57]One exception to this, according to Treasury officials, is Treasury's Qualifying Advanced Energy Project Credit, under which there is a limit on the total amount of support available. According to officials, DOE evaluates and ranks projects based on several criteria including their potential to create domestic jobs and reduce air pollution.

DOE AR 000286

## It Is Unclear to What Extent Agencies Assess Applicant Need for the Financial Support of Their Initiatives Because We Found Such Assessments Are Not Documented

According to agency officials and program guidance, DOE and USDA consider applicant need for the financial support of some of their initiatives.[58] For instance, the solicitation for loan guarantee applications under DOE's Section 1703 program states that DOE will view unfavorably applications for projects that could be fully financed on a long-term basis by commercial banks or others without a federal loan guarantee. DOE officials told us they require applicants to provide a letter stating whether their projects can be financed without a federal loan guarantee, although this self-certification by applicants does not require they document any efforts to obtain private financing.[59] In addition to these letters, DOE officials said their conversations with wind project developers, along with their broader understanding of the lending community and project risks, allow them to determine whether projects would likely be able to obtain private financing without a loan guarantee. USDA also considers applicants' need for support from some of its initiatives according to agency officials. For example, application guidance for USDA's High Energy Cost Grant Program states that the program assesses project information including other sources of funding expected for the project to determine its financial viability, the level of community support for the project, and the community's need for funds. Similarly, officials from the Direct and Guaranteed Electric Loan Program said that prior to loan approval they assess projects' financial information to determine their financial feasibility and to avoid lending more than is necessary for project completion. However, unlike DOE's Section 1703 program, we did not identify program documents for USDA's initiatives—such as guidance for applicants or criteria for evaluating projects—stating that applicant need is a factor in allocating support. Treasury generally does not have any

---

[58]As we have previously reported, federal agencies conduct similar assessments to guard against the potential for duplication or excessive support provided through subsidies for other types of projects. In particular, developers of affordable housing awarded multiple sources of public funding often must undergo subsidy layering reviews, which are a statutory requirement to assure that federal resources are neither duplicative nor wasteful when applied to affordable rental housing. See GAO, *Housing Assistance: Opportunities Exist to Increase Collaboration and Consider Consolidation*, GAO-12-554 (Washington, D.C.: Aug. 16, 2012).

[59]We have previously reported in another context that relying exclusively on applicants' self-certification of eligibility does not prevent ineligible firms from receiving program support. See GAO, *Service-Disabled Veteran-Owned Small Business Program: Vulnerability to Fraud and Abuse Remains*, GAO-12-697 (Washington, D.C.: Aug. 1, 2012).

discretion in allocating support to projects and, as such, does not assess applicant need for the support of its initiatives.

Even with these DOE and USDA efforts, it is unclear to what extent DOE and USDA assess applicant need for the financial support of their initiatives because we found they do not document such assessments. The federal standards for internal control include control activities—such as documentation of significant transactions—which are essential for proper stewardship and accountability for government resources.[60] Because, as we found, the agencies do not document these assessments, it is unclear to outside parties how they considered the financial need of applicants when determining what amount of support to provide. Moreover, it is unclear if the incremental support some initiatives provided was always necessary to build projects. In the event that some wind projects receive more federal funding than is required to induce them to be built, this additional funding could potentially be used to induce additional projects to be built or simply withheld, thereby reducing federal expenditures. The following are examples where it was unclear whether initiatives' incremental support was needed for projects to be built[61]:

- According to the White House briefing memorandum noted above, because of the tax subsidies and other federal and state support for the Oregon wind project, the return on the private equity invested in the project was estimated to be relatively high—around 30 percent.[62]

---

[60]GAO, *Standards for Internal Control in the Federal Government,* GAO/AIMD-00-21.3.1 ("Green Book") (Washington, D.C.: November 1999).

[61]It was beyond the scope of our work to independently analyze the financing of specific wind projects in order to corroborate estimates of investors' returns or to determine whether or not federal support for such projects was necessary in order for the projects to be built. The estimates of returns and statements related to the projects' financial viability presented here do not necessarily indicate whether developers or investors would have committed their financial resources to these projects without the accompanying federal support. In commenting on a draft of this report, DOE noted that the Oregon wind project was of a significantly larger scale than other wind projects that had recently been financed, and that DOE's support mobilized a group of private investors to enter into a risk-sharing partnership with the federal government at a time when long-term capital for large-scale renewable energy projects was scarce.

[62]According to DOE officials, this estimate represents the internal rate of return for the private equity invested in the project and is based on several favorable assumptions. The officials said these assumptions—including high quality wind resources and no equipment malfunctions or construction delays—could have changed since the estimate was developed in September 2010, reducing the actual rate of return for the project.

DOE AR 000288

The memorandum further stated that this estimated return suggests the project would "likely move without the [Section 1705] loan guarantee," and "the alternative of private financing would not make the project non-viable." It is unclear from our review whether the loan guarantee was needed for the project to be built because we found DOE made no documented assessment of need. In addition, a separate analysis of the same wind project by DOE suggested that officials concluded, given the amount of the project's debt, it would have sufficient cash flow to repay its guaranteed loan without the incremental support of a Section 1603 grant, which it later received. Specifically, DOE approved a loan guarantee for the project in part based on its credit analysis, which was made under the assumption that the project would not need to make use of a Section 1603 grant to repay debt, and that neither DOE nor lenders for the project would have any claim on the grant. However, it is unclear whether the Section 1603 grant was needed for the project to be built because we found no documented assessment of need was made.[63] Though the analyses from the White House memorandum and DOE question the project's need for the combined support of the Section 1705 loan guarantee and Section 1603 grant, neither analysis questioned whether the project would have been built without either source of support.

- In another example, a developer of a wind project in Maine provided documentation in 2011 that it had sufficient funds to complete construction of the project without any additional source of capital, though it subsequently received a Section 1603 grant and a Section 1705 loan guarantee and was eligible for accelerated depreciation. Specifically, the developer provided this information to document its financial capacity in support of its permit application to the Maine Department of Environmental Protection, which later approved the permit for the project. However, because we found no documented assessments of need were made for the federal support this project received, it is unclear whether it could have been built with less support.

Nonetheless, the incremental support agencies' initiatives provide may be necessary for wind projects to be built, according to agency officials and

---

[63]Treasury does not have discretion in awarding these grants; taxpayers who are eligible for support under the Internal Revenue Code are entitled to that support.

DOE AR 000289

financial professionals. For instance, concerning DOE's initiatives, its loan guarantees allow developers to leverage federal resources to attract sources of equity and debt that would otherwise not be invested, according to DOE. Officials from the loan guarantee programs said that, without loan guarantees, wind project developers can have difficulty obtaining private loans due to the relatively long term of the fixed rate loans they use to finance their projects. Title XVII of the Energy Policy Act of 2005 allows DOE to provide guarantees for loans with terms of up to 30 years. According to DOE officials, there are constraints on the supply of private financing for large projects, and private lenders may consider such long-term loans to have greater risks and may be less likely to lend to such projects in the amounts required to fully finance the transactions. In addition, in commenting on a draft of this report, DOE officials said that long-term financing is necessary in order for debt payments to align with projects' proceeds from agreements to sell their power over the long term, and is also necessary to avoid risks associated with changing interest rates and other risks that can arise from using shorter-term financing. For instance, they said that the Maine wind project developer's filings with the state did not address any long-term financing needs for the project beyond its construction phase.

With respect to USDA's initiatives, USDA officials for some initiatives told us that their incremental support may be necessary for wind projects to be built, and for the projects to fully benefit rural communities. For instance, officials noted that, although well-qualified projects can generally find the financing they need in the private market, the cost of private financing would be higher than the cost of financing available through USDA's loan and loan guarantee programs, which would likely impact electric utility rates for rural ratepayers. They also said that projects receiving support from the High Energy Cost Grant Program may not be built without its support, as it tends to serve isolated communities where available funding for such projects may be limited.

Regarding the PTC and other Treasury initiatives, several financial professionals with whom we spoke said that the initiatives provide financial support for many projects that would likely not be built otherwise. For instance, they said that the PTC is necessary in order for many wind projects to be financially viable. Furthermore, although it was extended in 2013, prior to this extension, the financial professionals said the PTC's scheduled expiration at the end of 2012 had caused developers and

DOE AR 000290

investors to suspend plans for future construction of or investment in wind projects.[64] This expected slowdown in deployment of new wind projects is in line with historical evidence of prior PTC expirations being followed by decreases in new wind energy capacity additions. Treasury's Section 1603 program has also been shown to support wind projects that would otherwise likely not have been built. According to an LBNL analysis, the program supported projects that would likely not have been built using the PTC if the grant were not available—projects that added as much as 2,400 megawatts of wind energy capacity in 2009.[65]

More broadly, according to financial professionals, wind project developers and investors evaluate the returns they could make on a range of potential projects. If the expected returns for wind projects are lower due to a decrease in federal support, developers and investors are more likely to pursue other types of projects—including solar or other renewable energy projects, as well as nonenergy projects—that benefit from federal subsidies and could provide higher returns.[66]

## Conclusions

Faced with concerns about the nation's reliance on imported oil, as well as fossil fuels' contribution to global climate change, among other things, federal policymakers have increased the federal focus on and support for development of renewable energy sources, especially wind energy.

---

[64]The American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, 126 Stat. 2313 (2013), retroactively extended the deadline for wind facilities to claim the PTC by one year, from December 31, 2012 to December 31, 2013. In addition, it changed the definition of eligible facilities to those that begin construction prior to the deadline, rather than those that are placed in service prior to the deadline. Although the PTC was retroactively extended, according to financial professionals, a slowdown in wind deployment is expected in 2013 because wind project developers were uncertain about the future status of the PTC. As it can take 18 to 24 months to develop a new wind farm, investment decisions made in 2012 will impact future deployment levels.

[65]Lawrence Berkeley National Laboratory, *Preliminary Evaluation of the Impact of the Section 1603 Treasury Grant Program on Renewable Energy Deployment in 2009* (Berkeley, CA: April 2010).

[66]In addition, federal support for the construction of wind and other renewable energy projects is important because, according to studies by DOE's national laboratories, these projects are capital-intensive to build but have no ongoing fuel costs. In contrast, fossil fuel projects are less capital-intensive (per unit of production) but have higher fuel costs. Also, whereas federal tax incentives for fossil fuel projects are often distributed throughout the fuel cycle (e.g., from exploration and extraction to transportation and power production), tax incentives for wind projects are generally used to finance capital and generation costs.

At the same time, states have created demand for energy from renewable sources through initiatives such as RPSs, supplementing support provided by federal agencies.

In fiscal year 2011, wind-related initiatives implemented by federal agencies were fragmented and, in many cases, overlapping. Further, we identified 10 initiatives that have provided or could provide duplicative support to deploy wind facilities. Though some of the 10 initiatives have recently expired or are scheduled to expire, other initiatives employing similar mechanisms such as tax expenditures, grants, and loan guarantees remain in place, and similar initiatives may be considered in the future as a means for supporting wind and other renewable energy sources.

In the current fiscally constrained environment, it is especially important to allocate scarce resources where they can be most effective. In this context, it is important that agencies with discretion in implementing initiatives that have provided or could provide duplicative support—DOE and USDA—ensure that they allocate support through these initiatives to projects that would not be built otherwise. However, these agencies do not make documented assessments of whether or how much of their initiatives' financial support is needed for projects to be built and, as a result, it is unclear to what extent they assess need in order to determine what amount of support to provide. Moreover, it is unclear whether the incremental support some initiatives provided was always necessary for wind projects to be built.

## Recommendation for Executive Action

To support federal agencies' efforts to effectively allocate resources among wind projects, we recommend that the Secretaries of Energy and Agriculture, to the extent possible within their statutory authority, formally assess and document whether the incremental financial support of their initiatives is needed in order for applicants' projects to be built and take this information into account in determining whether, or how much, support to provide. Such assessments could include, for example, information on the investors' and developers' projected rates of return on these projects, or documentation of applicants' inability to secure private financing for projects. In addition, such assessments should consider the financial support available or provided to projects from other federal sources including tax expenditures and, to the extent practical, from state sources. In the event agencies lack discretion to consider this information in determining what financial support to provide, they may want to report this limitation to Congress.

DOE AR 000292

# Agency Comments and Our Evaluation

We provided a draft of this report to the Secretaries of Energy, Agriculture, and the Treasury for review and comment. DOE provided written comments, in which it agreed with our recommendation; these comments are summarized below and reprinted in appendix V. USDA's Rural Development provided comments by e-mail on February 11, 2013, stating that USDA generally concurred with the information in our report related to its initiatives. In addition, DOE, USDA, and Treasury provided technical and clarifying comments, which we incorporated as appropriate.

DOE stated in its written comments that it will now formally document its evaluation of applicants' assertions regarding their inability to finance their projects without a federal loan guarantee, and it will clarify how it considers the financial need of applicants when determining what amount of support to provide. With regard to financing wind projects, DOE noted that Section 1603 grants do not provide capital for developers to use to construct projects, but rather the proceeds from the grants are only available when the related project construction is complete and the project is operational. In contrast, DOE noted that its loan guarantees provide construction and long-term debt financing. As we note in the report, these initiatives may address different needs of wind project developers, including the need for project financing prior to reaching the development stage required to receive tax credits or grants under the Section 1603 program. To emphasize DOE's point, however, we added language to the report to make it clear that grants do not provide project sponsors with capital to construct their projects.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the Secretaries of Energy, Agriculture, and the Treasury; the appropriate congressional committees; and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff members have any questions about this report, please contact me at (202) 512-3841 or ruscof@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on

the last page of this report. GAO staff who made key contributions to this report are listed in appendix VI.

*Frank Rusco*

Frank Rusco
Director, Natural Resources and Environment

DOE AR 000294

# Appendix I: Objectives, Scope, and Methodology

Our objectives were to (1) identify wind-related initiatives implemented by federal agencies in fiscal year 2011 and their key characteristics; (2) assess the extent of fragmentation, overlap, and duplication, if any, among these initiatives, and the extent to which they were coordinated; and (3) examine how agencies allocate support to projects through their initiatives and the extent to which they assess applicant need for support.

To inform our objectives, we reviewed our February 2012 report that identified federal agencies' renewable energy initiatives and examined the federal roles the agencies' initiatives supported in fiscal year 2010.[1] That report identified nearly 700 initiatives that were implemented across the federal government, of which 296 initiatives supported wind energy.[2] For purposes of this report, we generally only included those wind-related initiatives categorized under the research and development or commercialization and deployment federal roles in our February 2012 report. However, we included some initiatives categorized under the regulation, permitting, and compliance federal role if they had a clear focus on deployment of wind energy, such as through streamlining regulatory processes or fast-tracking permitting or other processes for wind projects.[3] From this list of initiatives, we excluded those at certain

---

[1]GAO-12-260.

[2]For purposes of GAO-12-260 and, therefore, this report, we defined an initiative as a program or group of agency activities serving a similar purpose or function. For purposes of this report, we considered initiatives to be wind-related if they could or did promote or enable wind energy development, either exclusively or as part of a broader initiative. For instance, we considered initiatives with a focus on broader electricity issues—such as transmission or grid integration activities—to be wind-related if they encouraged or promoted wind energy, even if doing so was not an explicitly stated goal of the initiative. Similarly, for initiatives such as basic science research programs that did not directly promote development of wind-specific technologies, we considered them to be wind-related if they included research that could promote the future development of wind energy.

[3]For purposes of GAO-12-260, research and development includes efforts that further the knowledge of or the ability to create, develop, or improve technologies, including technology demonstrations; commercialization and deployment includes activities that provide incentives for the implementation or promote the competitiveness of renewable energy technologies in the commercial marketplace; and regulation, permitting, and compliance include activities that ensure compliance with federal laws and regulations regarding renewable energy production, use, technologies, or facilities. In addition, we included some initiatives categorized under the "other" federal role—which includes other types of efforts related to renewable energy that, for example, provide information, services, or other types of support—if the initiatives included some specific focus on promoting the development of wind energy.

DOE AR 000295

agencies—such as the Departments of Defense, Homeland Security, and State—whose initiatives generally focused on development of wind energy and other technologies for use in a military, border security, or international aid setting, rather than for use in the domestic commercial energy market.

For the remaining agencies and initiatives, we developed an initial questionnaire to collect information from officials regarding whether the fiscal year 2010 initiatives were still active and whether wind energy still received or was eligible for support under the initiatives in fiscal year 2011.[4] We also asked officials to identify any additional initiatives that were active and for which wind energy was eligible for support in fiscal year 2011. If officials wanted to remove an initiative from our list, we asked for additional information to support the removal. Using the responses from this questionnaire, we identified 82 wind-related initiatives at nine agencies.

To identify and describe the key characteristics of wind-related initiatives implemented by federal agencies, we developed a second questionnaire to collect information from officials responsible for the 82 initiatives. The questionnaire was prepopulated with information that was obtained from the agencies for GAO's report on fiscal year 2010 renewable energy initiatives, including the initiative name, description, recipient type, and expiration or sunset date. We asked officials to confirm or modify this information as appropriate for fiscal year 2011. We requested additional information on the initiatives including their obligations, or revenue losses from tax expenditures[5] for activities specifically related to wind;[6] year in

---

[4]For the purposes of this report, we considered an initiative "active" if it was authorized, planned, funded, or implemented in the fiscal year. For example, if funds for an initiative were obligated in a previous fiscal year, but its activities were still ongoing in fiscal year 2011, we considered it to be active in fiscal year 2011. Similarly, if funds for an initiative had not yet been obligated but the initiative was authorized or in the planning stages in fiscal year 2011, we considered it to be active in fiscal year 2011.

[5]Tax expenditures are reductions in federal tax liabilities that result from provisions of the federal tax laws that (1) allow a special exclusion, exemption, or deduction from gross income or (2) provide a special credit, preferential tax rate, or deferral of tax liability. Tax expenditures result in revenue losses for the federal government, which forgoes some of the tax revenues that it would have otherwise collected, while the taxpayers that take advantage of the tax expenditures pay lower taxes than they would otherwise have to pay. See also GAO-05-690.

DOE AR 000296

Appendix I: Objectives, Scope, and
Methodology

which they first supported wind energy; type of wind issues and technology advancement activities supported; initiative-wide and wind-specific goals; and efforts to coordinate with other wind-related initiatives. For a copy of our questionnaire, see appendix IV. We conducted pretests with officials from 12 initiatives across three agencies to ensure that respondents interpreted our questions in the way we intended (e.g., the questions were clear and unambiguous and terminology was used correctly), that the questionnaire was comprehensive and unbiased, and that respondents had the necessary information and ability to respond to the questions. An independent GAO reviewer also reviewed a draft of the questionnaire prior to its administration. On the basis of feedback from these pretests and independent review, we revised the questionnaire in order to improve its clarity. After completing the pretests, we sent the finalized questionnaires to the appropriate agency liaisons, who in turn sent the questionnaires to the appropriate officials. We received questionnaire responses for each of the 82 initiatives, resulting in a response rate of 100 percent. After reviewing the responses, we conducted follow-up e-mail exchanges or telephone discussions with agency officials when responses were unclear or conflicting. When necessary, we used the clarifying information provided by agency officials to update answers to questions to improve the accuracy and completeness of the data. To assess the reliability of obligations data, our questionnaire included questions on the data systems used to generate that data and any methodologies agencies used to develop estimates of obligations for their initiatives. In addition, to assess the reliability of data on tax subsidies provided by wind-related tax expenditures, we interviewed officials from the Department of the Treasury regarding the how the data were developed, and compared the data between the two publicly available sources from the Joint Committee on Taxation and the Office of Management and Budget. We determined that the obligations and tax subsidy data used in this report were of sufficient quality for our purposes. Because this effort was not a sample survey, it has no sampling errors. However, the practical difficulties of conducting any survey may introduce errors, commonly referred to as nonsampling errors. For example, difficulties in interpreting a particular question, sources of information available to respondents, or entering data into a database or analyzing them can introduce unwanted variability into the survey results. However, we took steps to minimize such nonsampling

---

[6]Most wind-related initiatives supported a range of energy sources in addition to wind. We asked agency officials to provide actual or estimated obligations data for their initiative's activities that were specifically related to wind.

DOE AR 000297

**Appendix I: Objectives, Scope, and Methodology**

errors in developing the questionnaire—including using a social science survey specialist to help design and pretest the questionnaire. We also minimized the nonsampling errors when analyzing the data, including using a computer program for analysis, and using an independent analyst to review the computer program. Finally, we verified the accuracy of a small sample of keypunched records by comparing them with their corresponding questionnaires, and we corrected the errors we found. Less than 0.5 percent of the data items we checked had random keypunch errors that would not have been corrected during data processing.

To assess the extent of fragmentation, overlap, and duplication of wind-related initiatives, we first defined these terms based on definitions established in our prior reports. Specifically, for purposes of this report, fragmentation, overlap, and duplication, were defined as follows:

- Fragmentation occurs when more than one federal agency, or more than one organization within an agency, is involved in the same broad area of national need.

- Overlap occurs when multiple initiatives support similar wind issues, similar technology advancement activities, and similar recipients, as well as having similar goals.

- Duplication occurs when multiple initiatives provide financial support to the same recipient for a single wind project.[7] Duplication as we have defined it may be necessary in some cases for specific wind projects to be built. However, in other cases, duplication may result in ineffective use of federal financial support—that is, it may result in some amount of support being provided for specific wind projects that is not needed for them to be built.

To determine the extent of fragmentation, we used agencies' questionnaire responses to confirm the number of federal agencies that supported wind-related initiatives. To determine the extent of overlap, we

---

[7]When multiple initiatives provide financial support to the same recipient for a single project, we consider that financial support to be duplicative. However, for the purposes of this report, we do not consider the initiatives themselves to be duplicative if they also support other recipients aside from those who have received duplicative financial support.

DOE AR 000298

first analyzed the questionnaire responses to categorize initiatives'
recipient types into four categories, as follows[8]:

- *Energy providers, developers, and manufacturers.* This category
  includes organizations in the energy industry that provide electricity
  produced by wind energy, develop wind energy generation projects,
  or manufacture equipment associated with wind turbines or other
  wind-related technologies.

- *Public and private researchers.* This category includes researchers
  employed by or associated with federal, state, or other governmental
  entities (such as national laboratories), academic institutions,
  nonprofit organizations, or private companies.

- *State, local, tribal, and other governmental organizations.* This
  category includes nonfederal governmental organizations, such as
  state and local governments and quasi-governmental entities, and
  federally recognized American Indian tribes.

- *Individuals.* This category includes members of the general public who
  produce, develop, or use wind energy, and who receive support
  independently of their affiliation with a private, governmental or other
  organization.

We then analyzed information on the initiatives' descriptions and goals
provided in the questionnaire responses and categorized initiatives into all
applicable categories that we developed for types of goals. These
categories included initiatives that facilitated the assessment of wind
resources; initiatives that fostered technological improvements or cost-
reduction in wind technologies; initiatives that financed the construction or
use of wind facilities; and initiatives that addressed policy and regulatory
barriers to wind energy development. Once these categories were
defined, two staff independently read through each initiative's description
and goals and identified all categories that likely applied to the initiative.
They then discussed the categorizations about which they disagreed and
came to agreement about whether or not the category applied to the
initiative. Using agency-provided data on wind issues and technology

---

[8]In addition, we categorized certain recipients as "other" if they did not fit under any of the
four main categories. Such recipients included federal agencies that develop or regulate
wind resources, or private entities that did not fit under the energy industry or researcher
categories.

DOE AR 000299

advancement activities supported, and our categorizations of the initiatives' recipients and types of goals, we identified overlapping initiatives as those sharing at least one common wind issue, technology advancement activity, recipient type, and type of goal.

To identify duplication of federal support, we focused our review on those initiatives with the largest estimated obligations or revenue losses in 2011 for activities specifically related to wind. Specifically, we first focused our analysis on the five lead agencies, which implemented 89 percent of initiatives comprising 99.9 percent of estimated obligations and all estimated revenue losses in 2011—the Departments of Energy (DOE), the Interior, Agriculture (USDA), Commerce, and the Treasury. Second, we focused our analysis on initiatives that included support for deployment, which were responsible for 99 percent of obligations and all estimated revenue losses in 2011. Third, because of the relatively large number of and variety in the initiatives that supported deployment, we further focused our analysis on those deployment initiatives that provided financial support for construction or operation of wind facilities. Fourth, we narrowed our focus to initiatives that included a focus on utility-scale land-based wind—the most commonly supported wind issue—and fifth, we narrowed our focus to initiatives with recipients that included energy providers, developers, or manufacturers—the most commonly support recipient type. Applying all of these criteria resulted in a list of 15 initiatives, which represented 96 percent of estimated obligations and all revenue losses, according to best available estimates. From this list of 15 initiatives, we reviewed agencies' questionnaire responses, agency documents, and laws and regulations related to the initiatives, and spoke with agency officials and outside experts about them. Based on this review, we determined that there was only a small potential that duplicative support was provided by the four Treasury initiatives because eligibility for their support was explicitly limited to tax-exempt entities, which were generally not supported by other initiatives such as Treasury's other tax expenditures. In addition, on the basis of our review of documents and discussions with agency officials and others, we determined that there was only a small potential for duplication of another initiative on our list—Treasury's Qualifying Advanced Energy Project Credit—because its eligibility criteria limit its support to manufacturing facilities, rather than the energy generation facilities that are generally supported by the other initiatives we identified that have provided or could provide duplicative support. In addition, all available credits under the initiative were allocated by the end of 2010.

DOE AR 000300

**Appendix I: Objectives, Scope, and Methodology**

For initiatives we identified that have provided or could provide duplicative support, we collected information from agency websites on financial support provided for projects, and we interviewed agency officials and reviewed program guidance and regulations for information on how agencies allocate support to projects through the initiatives, and efforts by the agencies to assess applicant need for the support of their initiatives. We also reviewed studies of the initiatives by DOE's national laboratories, the Congressional Research Service, and other experts. In addition, we interviewed six financial professionals from several of the major financial institutions and legal firms active in wind energy project financing in recent years regarding the support for wind projects provided by the initiatives. We identified these individuals based on their presentations at the annual national wind industry conference held by the American Wind Energy Association and through reviews of industry reports, newsletters, and other publications. To obtain additional information about the types of support available to wind project developers from state governments, we collected and analyzed data from the Database of State Incentives for Renewables and Efficiency (DSIRE), a comprehensive source of information on state incentives and policies that promote renewable energy and energy efficiency, which is funded by DOE. We interviewed researchers who developed and maintain DSIRE regarding their methodology for collecting and summarizing information on state incentives and policies and their processes for ensuring the data are accurate and up-to-date, and we determined the data were sufficiently reliable for our purposes. We also interviewed agency officials and financial professionals for additional information on state initiatives.

We conducted this performance audit from February 2012 to March 2013 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

DOE AR 000301

# Appendix II: Federal Wind-Related Initiatives

Tables 5 through 13 below provide descriptions, by agency, of the 82 federal wind-related initiatives we identified. The tables also provide information reported by agencies on initiatives that will or have expired, in full or in part, due to an expiration of legislative authority, depletion of available appropriations, or some other expiration under the law as of fall of 2012.

**Table 5: U.S. Department of Agriculture (USDA) Wind-Related Initiatives**

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Agricultural Research Service** | | |
| Bioenergy National Program | The mission of this Agricultural Research Service research program is to develop technologies for the sustainable commercial production of biofuels by the agricultural sector in ways that enhance natural resources without disrupting existing food, feed, and fiber markets. Agricultural Research Service efforts under this initiative include a research project involving wind energy. | Wind component will be phased out completely by fall of 2014. |
| **U.S. Forest Service** | | |
| Landownership Management Program | Under this program, the U.S. Forest Service manages over 193 million acres of forests and grasslands and provides approximately 70,000 land use authorizations annually for a wide variety of purposes, including rights-of-way for roads, pipelines, communication and navigation sites, and electric transmission and distribution facilities. To help meet USDA's strategic goals of assisting rural communities and federal energy goals, the U.S. Forest Service is working to diversify the energy projects for which it issues land use authorizations to include projects that produce energy from renewable sources such as wind, solar, and hydroelectric power. | None |
| **National Institute of Food and Agriculture** | | |
| Small Business Innovation Research Program: Rural Development Topic Area | As part of USDA's Small Business Innovation Research Program, grants awarded under this topic area develop new technologies or apply existing technologies to address concerns facing rural America. Efforts focus on environmental enhancement, disaster resilience, service delivery, and entrepreneurial and workforce skills. Topics may include technologies and services that promote rural tourism, protect the ecosystem, conserve energy, and develop alternative energy sources such as wind and solar energy (excluding biofuels). | The Small Business Innovation Research program has been reauthorized through September 30, 2017. |

DOE AR 000302

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Small Business Innovation Research Program: Small and Mid-Size Farms Topic Area | As part of USDA's Small Business Innovation Research Program, grants awarded under this topic area develop new technologies and information that will help improve the viability and profitability of small and mid-sized farms and ranches. Efforts include developing enterprises focused on specialty farm products, enhancing the efficiency and profitability of small farms, developing farming methods for small farms that use natural resources more efficiently, and developing new educational tools to ensure that small farmers have the information they need to operate their farms on a sustainable and profitable basis. Particular emphasis is placed on research to utilize renewable energy sources, such as wind, solar, and geothermal energy, and to promote improved energy efficiency and conservation in farming operations. | The Small Business Innovation Research program has been reauthorized through September 30, 2017. |
| **Natural Resources Conservation Service** | | |
| Conservation Innovation Grant Program | This program, authorized under the Food, Conservation and Energy Act of 2008, provides grants to tribes, state or local governments, nongovernmental organizations, or individuals to develop, evaluate, implement, and monitor conservation approaches, incentive systems, or technologies. The purpose of these grants is to stimulate the development and adoption of innovative conservation approaches and technologies. The Natural Resources Conservation Service expects these projects to lead to the transfer of conservation technologies, systems, and approaches into agency policy, technical manuals, and guidance, or to the private sector. Among other areas of focus, the Natural Resources Conservation Service awards grants for projects that focus on innovative tools to estimate the energy and fossil fuel implications of cropland and conservation practices; innovative on-farm applications of renewable energy production technologies; and sustainable biomass production, harvesting, and handling technologies. | Authorization for this program expires with the end of the Food, Conservation, and Energy Act of 2008. However, the Department of Agriculture reported that, should funding remain available after the expiration of the act, it has the authority to continue program operations based upon existing regulations. |
| Conservation Security Program | This program was not reauthorized in the 2008 Farm Bill and is no longer available; however, contracts written while the program was still authorized can span up to 10 years and some contracts were still being implemented in fiscal year 2011. This provided financial and technical assistance to promote the conservation and improvement of soil, water, air, energy, plant, and animal life, and other conservation purposes on tribal and private lands. The Natural Resources Conservation Service established contracts for two types of renewable energy-related efforts: (1) payments for the bio-based portion of eligible blended fuel; and (2) payments for electricity generated from renewable sources, including wind energy. | This program no longer exists. |

DOE AR 000303

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Conservation Stewardship Program | This program, authorized under the Food, Conservation and Energy Act of 2008, provides financial and technical assistance to help agricultural and forestry producers conserve and enhance soil, water, air, and related natural resources on their land by (1) undertaking additional conservation activities and (2) improving and maintaining existing conservation systems. One such conservation activity that is eligible for assistance under the program is for pumping plants powered by renewable energy—wind or solar—to supply water for irrigation, drainage, livestock watering, or wildlife. | None |
| Environmental Quality Incentives Program | This program, authorized under the Food, Conservation and Energy Act of 2008, provides financial and technical assistance through contracts with agricultural producers to implement conservation practices to address environmental natural resource problems. The Natural Resources Conservation Service reported that, while the program does not fund projects for the sole purpose of energy production, in cases of remote livestock where no source of electricity is available, eligible producers may pursue wind or solar power to support the pumping of water for livestock in remote regions of rangeland and where multiple resource concerns are addressed. | Authorization for this program expires with the end of the Food, Conservation, and Energy Act of 2008. However, the Department of Agriculture reported that, should funding remain available after the expiration of the act, it has the authority to continue program operations based upon existing regulations. |
| **Office of the Chief Economist** | | |
| Energy and Bioenergy Research | The Office of the Chief Economist advises the Secretary of Agriculture on economic issues related to agriculture, such as commodity trends and issues, as well as specific topics like renewable energy. The Office of the Chief Economist's Office of Energy Policy and New Uses assists the Secretary of Agriculture in developing and coordinating USDA energy policy, programs, and strategies. The mission of this research program is to conduct economic analyses and evaluate policies and strategies concerning biomass feedstocks for renewable energy production. Efforts under this program have largely focused on liquid transportation fuels and energy sources used to produce heat and power, including wind. | None |

DOE AR 000304

Appendix II: Federal Wind-Related Initiatives

**Office of the Secretary**

| USDA / Navy Memorandum of Understanding Project | Through this effort, USDA is working with the Navy to reduce energy consumption derived from fossil fuels, increase clean energy production from renewable energy sources to meet transportation needs, help meet the Secretary of the Navy's goal of sailing the "Great Green Fleet," and to support the President's "Blueprint for a Secure Energy Future." To accomplish this, USDA is engaging other departmental programs. USDA has established a memorandum of understanding with the Navy in support of this effort under which the departments agreed to share technical, program management, and financial expertise, and to cooperate in developing strategies and plans to implement renewable energy projects and initiatives. USDA and the Navy also agreed to collaborate on the funding of projects, and to support development of advanced biofuels and renewable energy processes that are sustainable from an economic, social, and environmental perspective. Wind energy would have been eligible for support through this initiative in fiscal year 2011, in that the initiative complements other USDA efforts that support wind energy, such as the Rural Energy for America Program, as well as the Navy and Marine Corps' existing renewable energy programs. However, the initiative did not fund any wind projects in 2011, and no future funding is planned for wind projects. | This initiative is implemented through other programs that were set to expire at the end of the Food, Conservation, and Energy Act of 2008. Many programs under that act were extended by the American Taxpayer Relief Act of 2012, including biofuel and other renewable energy provisions. |
|---|---|---|

**Rural Business-Cooperative Service**

| Business and Industry Guaranteed Loan Program | The purpose of this program is to improve, develop, or finance business, industry, and employment, and the economic and environmental climate in rural communities by providing guaranteed loans to borrowers in rural areas. Eligible project proposals include those that will provide employment; improve the economic or environmental climate; promote the conservation, development, and use of water for aquaculture; or reduce reliance on nonrenewable energy resources by encouraging the development and construction of renewable energy systems, including wind energy systems. Loan amounts are generally limited to $10 million per borrower except under certain circumstances, and the percentage amount of the loan guarantee varies depending upon the value of the loan. | None |
|---|---|---|

DOE AR 000305

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Rural Energy for America Program (formerly the Renewable Energy Systems and Energy Efficiency Improvements Program) | This program, authorized under the Food, Conservation and Energy Act of 2008, provides funding for guaranteed loans and grants to farmers, ranchers, and small businesses in rural areas to assist with purchasing and installing renewable energy systems, such as wind energy projects, and energy efficiency improvements. Guaranteed loans under the program encourage the commercial financing of renewable energy and energy efficiency projects by guaranteeing between 60 and 85 percent of the loan (depending upon the amount of the loan). Loans may be guaranteed up to 75 percent of a project's cost or $25 million. Grants under the program are awarded on a competitive basis and can be up to 25 percent of total eligible project costs or $500,000 for renewable energy systems and $50,000 for renewable energy feasibility studies. At least 20 percent of the renewable energy system grant funds awarded must be for grants of $20,000 or less. In addition, the program provides grants for energy audits. | Authorization for this program was set to expire with the end of the Food, Conservation, and Energy Act of 2008. On January 2, 2013, the American Taxpayer Relief Act of 2012 authorized discretionary funding for the program for fiscal year 2013. The Department of Agriculture reported that, should funding remain available after the expiration of the act, it has the authority to continue program operations based upon existing regulations. |
| **Rural Utilities Service** | | |
| Direct and Guaranteed Electric Loan Program | This program, authorized under the Rural Electrification Act of 1936, provides loans and loan guarantees to establish and improve electric service in rural areas and to assist electric borrowers to implement demand side management, energy efficiency and conservation programs, and on-grid and off-grid renewable energy systems including wind energy systems. These loans and loan guarantees provide financing to eligible nonprofit utility organizations, such as electric co-ops and public utility districts, as well as for-profit entities. The Rural Utilities Service reported that providing loans for renewable energy is one of the primary purposes of the Rural Electrification Act and, to advance this purpose, the agency gives priority to completed renewable energy project loan applications in its annual processing queue. In addition, Rural Utilities Service reported that it is reviewing its policies and regulations to initiate, as appropriate, additional accommodations to support renewable energy project lending to a wider range of applicants consistent with the underlying statutory requirements for prudent lending and adequate loan security. | None |

DOE AR 000306

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| High Energy Cost Grant Program | This program, authorized under the Rural Electrification Act of 1936, provides grants for energy generation, transmission, and distribution facilities serving rural communities with annual average home energy costs that exceed 275 percent of the national average. Applicants may receive grants for on-grid and off-grid renewable energy systems, such as wind energy systems, as well as energy conservation and efficiency projects. In addition, the Rural Utilities Service reported that the Rural Electrification Act also includes loan authority, but that no funds have been appropriated for loans under this program. | None |

Source: GAO analysis of agency-provided data.

**Table 6: Department of Commerce Wind-Related Initiatives**

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Economic Development Administration** | | |
| Environmentally-Sustainable Development Investment Priority | Economic Development Administration awards grants that are intended to advance the administration's key investment priorities, one of which is environmentally sustainable development. This priority focuses the Economic Development Administration's existing place-based grant programs (planning, technical assistance, and infrastructure construction) in support of promoting economic development projects that, among other things, enhance environmental quality. Eligible projects include wind and other renewable energy economic development projects. | None |
| Global Climate Change Mitigation Incentive Fund | The Global Climate Change Mitigation Incentive Fund was established to strengthen the linkages between economic development and environmental quality. It finances economic development projects that create jobs and increase private capital investment in efforts to limit the nation's dependence on fossil fuels, enhance energy efficiency, curb greenhouse gas emissions, and protect natural systems. Eligible projects include economic development projects that support wind and other sources of renewable energy. | The Global Climate Change Mitigation Incentive Fund is not a standing program, but rather a congressionally directed funding stream, which requires annual submission of a report/spending plan to Congress summarizing how the funds will be used. |

DOE AR 000307

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **International Trade Association** | | |
| International Buyer Program | The International Buyer Program is an initiative that supports U.S. companies at U.S. trade shows by recruiting and escorting foreign buyer delegations to the shows to meet with U.S. companies to participate in business-to-business matchmaking activities. These shows often include one-on-one meetings between U.S. companies and the international buyers. The initiative supported several major shows focused on renewable energy, including the WINDPOWER 2012 Conference & Exhibition featuring 51 foreign buyer delegates. | None |
| Market Development Cooperator Program | Under this initiative, industry groups—such as trade associations and chambers of commerce—compete for International Trade Association-awarded grants that fund projects to enhance their industry's competitive position in innovative ways. The selected groups establish partnerships with the International Trade Association, which provides financial and technical assistance to enhance global competitiveness of U.S. industries. Partnerships have included several related to renewable energy, such as the Green Export Enabler program and the Colorado Export of Innovative and Sustainable Technologies program. | None |
| Renewable Energy and Energy Efficiency Export Initiative | This initiative represents the first-ever national effort to coordinate export promotion of renewable energy and energy efficiency technologies, including wind energy technologies. It is led by the Department of Commerce, and includes commitments from eight U.S. government agencies—including the Departments of Agriculture, Energy, and State—to help tailor financing products to the needs of U.S. renewable energy and energy efficiency companies, enhance market access and trade promotion for their products, and improve the delivery of U.S. government services to these companies. An example of projects supported by the initiative includes the commitment to lead several trade policy missions to key potential markets for U.S. companies. | None |
| **National Institute of Standards and Technology** | | |
| National Institute of Standards and Technology Smart Grid Program | The National Institute of Standards and Technology's efforts in this area involve coordinating the development of interoperability standards needed to accelerate implementation of a smart grid system. The smart grid is a planned nationwide electric transmission and distribution network that uses information technology to deliver electricity efficiently, reliably, and securely. Conceptually, a smart grid system will enable integration of wind and other renewable and alternate energy sources into the electric grid. | None |

DOE AR 000308

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **National Oceanic and Atmospheric Administration** | | |
| Joint Wind Energy Program: Atmospheric Velocity Gradients | Through a cooperative agreement, the National Oceanic and Atmospheric Administration's Air Research Laboratory is working with the private sector to conduct wind energy research to demonstrate the potential for significantly improving the prediction of winds at various heights. These efforts will help improve short-term predictions of wind farm energy production. | None |
| Program Development | This initiative explores ways to leverage the National Oceanic and Atmospheric Administration Earth Systems Research Laboratory's ongoing research for renewable energy purposes. For example, while another National Oceanic and Atmospheric Administration program collects wind data for atmospheric research, this initiative explores how that same data could be used for renewable energy purposes. | None |
| Renewable Energy Research | The purpose of this initiative is to conduct research in four areas: (1) wind power observations and forecasting, (2) solar power observations and forecasting, (3) climate analyses to assess wind and solar resources, and (4) climate change impacts on wind and solar resources. For instance, a study has been under way to determine wind and solar resource availability over the continental United States, and a comparison of the estimated wind and solar power that could be produced against energy load during the years 2006 through 2008. Researchers will present their results to academia, industry, and others. | None |
| MarineCadastre.gov | The purpose of this program is to support wind energy development and other uses of the outer continental shelf by providing mapping information on locations for project planning and siting. This information is intended to help renewable energy developers in initial planning stages to identify multiple uses and avoid conflicts before producing plans for development. This initiative is managed jointly by the National Oceanic and Atmospheric Administration and the Department of the Interior's Bureau of Ocean Energy Management, Regulation and Enforcement. | None |
| **U.S. Patent and Trademark Organization** | | |
| Green Technology Pilot Program | This initiative supports investment in renewable energy, including wind energy, by spurring inventive activity with the prospect of early intellectual property protection. Such protection is often critical in the ability to raise the venture capital for development and commercialization of the technology. The U.S. Patent and Trademark Organization's Patent Office reviews applications pertaining to green technologies—such as development of renewable energy resources—on an expedited basis, which allows for earlier acquisition of patent protection. | The Green Technology Pilot Program expired in February 2012. |

Source: GAO analysis of agency-provided data.

DOE AR 000309

Appendix II: Federal Wind-Related Initiatives

**Table 7: Department of Energy (DOE) Wind-Related Initiatives**

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Advanced Research Projects Agency – Energy** | | |
| Agile Delivery of Electrical Power Technology | This initiative supports Advanced Research Projects Agency-Energy's efforts to invest in materials—such those used in power converters—that facilitate key advances in electrical power technology, including those that enable solar photovoltaics and wind turbine generators. | The Advanced Research Projects Agency-Energy's authorizing legislation, the America Creating Opportunities to Meaningfully Promote Excellence in Technology, Education, and Science Act of 2010, was recently reauthorized until 2013. |
| Advanced Research Projects Agency-Energy Funding Opportunity Announcement 1 | Under this initiative, Advanced Research Projects Agency-Energy provides funding to support research on a variety of energy ideas and technologies. This research funding is focused on applicants with well-formed research and development plans for potentially high-impact concepts or new technologies, including wind and other renewable technologies. | The Advanced Research Projects Agency-Energy's authorizing legislation, the America Creating Opportunities to Meaningfully Promote Excellence in Technology, Education, and Science Act of 2010, was recently reauthorized until 2013. |
| Grid-Scale Rampable Intermittent Dispatchable Storage | This initiative supports Advanced Research Projects Agency-Energy's efforts to develop new technologies that enable widespread use of cost-effective grid-scale energy storage. Specifically, it focuses on developing technologies that can be widely implemented across the power grid to mitigate variability in energy generated from renewable sources such as wind. | The Advanced Research Projects Agency-Energy's authorizing legislation, the America Creating Opportunities to Meaningfully Promote Excellence in Technology, Education, and Science Act of 2010, was recently reauthorized until 2013. |
| **Office of Energy Efficiency and Renewable Energy (EERE)** | | |
| Energy Efficiency and Conservation Block Grants | The Energy Efficiency and Conservation Block Grant Program provides assistance to cities, counties, states, territories, and tribes to develop and implement projects and programs that reduce fossil fuel emissions; reduce the total energy use of the eligible entities; improve energy efficiency in various economic sectors; and create and retain jobs. Most of the funding provided under this program supports formula grants, although some funding supports competitively awarded grants or is used to develop technical assistance tools. Program funds may be used for a variety of energy efficiency and conservation programs and projects, as well as for renewable energy projects including wind projects. Renewable energy projects that generate electricity and are installed on or in a government building are expressly eligible under the statute. Other renewable energy activities may be eligible as part of a comprehensive energy efficiency program. DOE reported that a significant number of grantees have used program funding to implement projects that include renewable energy elements. | This program was funded through American Recovery and Reinvestment Act of 2009 funding, and no additional appropriations were granted. The Recovery Act funds were required to be obligated by September 30, 2010, and expended by September 30, 2013. |

DOE AR 000310

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Hydrogen and Fuel Cell Technologies Crosscutting Activities | This initiative focuses on crosscutting functions for hydrogen and fuel cell technologies such as manufacturing, technology validation, safety codes and standards, and education. It also analyzes technologies to identify gaps and help direct future research and development. Hydrogen and fuel cell technologies include those produced from renewable resources such as biomass, solar, wind, etc. | The Energy Policy Act of 2005 and the Energy Independence and Security Act of 2007 provide authorization for these activities through fiscal year 2015 or 2020, depending upon the activity. |
| Hydrogen Fuel R&D | This initiative focuses on research and development to develop hydrogen production, delivery, and storage technologies, including those from hydrogen produced using renewable energy sources such as biomass, solar, wind, etc. | The Energy Policy Act of 2005 and the Energy Independence and Security Act of 2007 provide authorization for these activities through fiscal year 2015 or 2020, depending upon the activity. |
| State Energy Program | The State Energy Program provides financial and technical assistance to grantees through formula and competitive grants for the deployment of energy efficiency and renewable energy technologies, including wind energy technologies. States use their formula grants, plus a 20 percent match that they provide, to develop state strategies and goals to address their energy priorities. In designing their programs, grantees choose a list of eligible activities to fund with their grant, including a variety of renewable energy-related activities. DOE reported that a significant number of grantees have incorporated renewable energy activities into their state energy programs. Competitive grants awarded under the State Energy Program assist grantees with the adoption of energy efficiency/renewable energy products and technologies. | None |
| Tribal Energy Program | This program promotes energy self-sufficiency, economic development, and employment on Tribal lands through the use of renewable energy and energy efficiency technologies, including wind energy technologies. Under this program, DOE provides competitively-awarded funding and technical assistance to Tribes to evaluate and develop their renewable energy resources and reduce their energy consumption through efficiency and weatherization. In addition, DOE provides training and outreach to Tribal governments, including student internships; regional workshops and Webinars to learn about renewable energy and energy efficiency and how to develop those resources; and renewable energy short courses covering renewable energy and efficiency options, business development, and project financing. | None |

DOE AR 000311

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Wind Energy - Offshore Wind | Through this initiative, EERE seeks to promote and accelerate the deployment of offshore wind power technologies in U.S. waters. Under this initiative, DOE plans to develop innovative technologies to reduce the cost of offshore wind energy. DOE will work with Interior and other agencies to shorten the timeline for deploying these technologies, and will partner with industry to demonstrate commercially and technically viable offshore wind technology. Efforts include research, development, demonstration, education, outreach, and interagency coordination. | None |
| Wind Energy - Technology Application | Under this initiative, EERE helps prepare and accelerate the market adoption of wind technologies. It includes two components: (1) systems integration and (2) technology acceptance. The systems integration component focuses on planning and operating wind energy projects, and anticipating and overcoming technical issues associated with interconnecting large amounts of wind and other renewable energy to the electricity grid. The technology acceptance component addresses opportunities for and barriers to the use of wind energy systems such as mitigating wind-radar interference; providing state and regional energy sector education and outreach; and investigating and mitigating social, environmental, and wildlife issues associated with wind energy development. | None |
| Wind Energy - Technology Viability | This initiative's activities focus on research, development, and testing to improve the performance, cost-effectiveness, manufacturing, and reliability of large and distributed wind energy systems. It has three components: (1) low wind speed technology, (2) distributed wind technology, and (3) supporting research and testing. Distributed wind technology, which leverages transmission availability off the main grid, enables community ownership and builds support for wind in general. | None |

DOE AR 000312

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Loan Programs Office** | | |
| Title XVII Section 1703 Loan Guarantee Program | Under Section 1703 of Title XVII of the Energy Policy Act of 2005, DOE provides loans to support innovative energy technologies that are typically unable to obtain conventional private financing due to high technology risks. In addition, the technologies must avoid, reduce, or sequester air pollutants or emissions of greenhouse gases. Eligible technologies under this initiative included biomass, solar, wind, hydropower, and alternative fuel vehicles, among others. Under Section 1703, borrowers were to pay DOE for the credit subsidy costs. However, DOE noted that once the Section 1705 Loan Guarantee Program (under which the credit subsidy cost is paid with appropriated funds) was established under the Recovery Act specifically to support renewable energy and certain other projects, renewable energy projects were supported under the Section 1705 Loan Guarantee Program rather than the Section 1703 Loan Guarantee Program. DOE now has $170 million in appropriated funds to pay the credit subsidy cost for renewable energy and energy efficiency projects under Section 1703. | None |
| Title XVII Section 1705 Loan Guarantee Program | The Recovery Act added Section 1705 to the Energy Policy Act of 2005. Section 1705 authorized a temporary program to provide loan guarantees for certain renewable energy systems, electric power transmission systems and innovative biofuel projects that began construction no later than September 30, 2011. To help implement this authority, DOE established the Financial Institution Partnership Program, a risk-sharing partnership between DOE and qualified finance organizations. Through this program, DOE pays the credit subsidy costs of loan guarantees using funds appropriated for this purpose, and guarantees up to 80 percent of a loan provided for a renewable energy generation project by qualified financial institutions. In addition, under the 1705 authority, DOE funded eligible innovative wind and other renewable energy projects through the Federal Financing Bank. | The American Recovery and Reinvestment Act of 2009 added Section 1705 to the Energy Policy Act of 2005. The initiative expired on September 30, 2011. |
| **Multiple** | | |
| Small Business Innovation Research/Small Business Technology Transfer - Wind Energy Technology Development Topic Area | Under this initiative, DOE provides grant funding to stimulate technological innovation in small businesses to meet federal agency research and development needs. The solicitation contains technical topics in a number of research areas of interest to DOE. Grants awarded under this topic area promote the development of wind energy technologies. Efforts focus on manufacturing and assembly, component reliability, and monitoring. | Continuation of the Small Business Innovation Research/Small Business Technology Transfer programs is contingent upon their reauthorization. |

DOE AR 000313

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Office of Electricity Delivery & Energy Reliability** | | |
| Clean Energy Transmission and Reliability | This initiative focuses on developing tools and techniques to address system reliability issues, including challenges that renewable energy sources such as wind and solar power pose to electricity grid operators, who need to incorporate these variable generation sources without compromising reliability. The Office of Electricity Delivery & Energy Reliability's efforts under this initiative also include communications, education, and outreach. | None |
| Funding of five interconnection-wide transmission planning & associated projects | Through this initiative, the Office of Electricity Delivery & Energy Reliability aims to facilitate the development or strengthening of capabilities in each of the three interconnections (Western, Eastern, Texas) serving the lower 48 states of the United States by preparing analyses of transmission requirements under a broad range of alternative futures and developing long-term interconnection-wide transmission expansion plans. This includes efforts to identify renewable resources such as wind that are suitable for near-term development to supply electricity to meet state renewable portfolio standards. | None |
| Office of Electricity Delivery & Energy Reliability Energy Storage | The goal of this initiative is to develop advanced energy storage technologies and systems that will increase the reliability, performance, and competitiveness of electricity generation and transmission in the electric grid and in stand-alone systems. These efforts also facilitate integration of renewable energy sources such as wind into the electricity grid. Through the initiative, DOE works to build a community around this goal in collaboration with industry, academia, and government institutions to ensure that technology development meets all stakeholder needs and interests. The initiative also provides grants to private companies to encourage commercialization and deployment. | None |
| Office of Electricity Delivery & Energy Reliability Permitting, Siting, and Analysis – various projects | This initiative provides technical and financial assistance to states and regional entities to help develop infrastructure required to utilize renewable energy, among other resources. For example, the initiative assists state public utility commissions, state legislatures, regional state associations, and governors' offices on renewable energy policies and portfolio standards, among other topics. Among other things, DOE issued its second electric transmission congestion study, which includes consideration of remote renewable resources including wind to comply with provisions of the Recovery Act. | None |

DOE AR 000314

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Office of Indian Energy Policy and Programs** | | |
| Strategic Technical Assistance Response Team Program | The Strategic Technical Assistance Response Team initiative is a project of the DOE Office of Indian Energy Policy and Programs aimed at advancing next-generation energy development in Indian Country. Through the Strategic Technical Assistance Response Team Program, early-stage project development technical assistance is provided to 10 selected projects—5 in Alaska and 5 in the 48 contiguous states. | None |
| **Power Marketing Administrations** | | |
| Bonneville Power Administration Wind Integration | The Bonneville Power Administration is a federal entity that is also one of the largest transmission providers in the West. The Bonneville Power Administration has played an active role in facilitating the development of wind energy in the Pacific Northwest, and its area of operation has become a test bed for management of large and growing amounts of intermittent wind energy to peak electricity load. The Bonneville Power Administration is piloting and implementing operational practices to manage the intermittent wind resource in a variety of key areas. The Bonneville Power Administration works to help the region meet its energy and environmental goals while simultaneously providing reliable load service and satisfying multiple nonpower constraints, such as protection of endangered fish. | None |
| Western Area Power Administration—Operations | Western Area Power is participating in the Western Interconnection Joint Initiatives projects intended to facilitate the integration of variable energy resources, including wind energy. These initiatives include tools or processes such as Intra-hour Scheduling, Dynamic Scheduling System, and Intra-hour Transaction Accelerator Platform. | None |

DOE AR 000315

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Western Area Power Administration—Transmission Services | The Western Area Power Administration began its Transmission Infrastructure Program in 2009 under section 402 of the Recovery Act, for the purpose of constructing, financing, facilitating, planning, operating, maintaining, or studying construction of new or upgraded electric power transmission lines and related facilities with at least one terminus within the area served by Western, and for delivering or facilitating the delivery of power generated by renewable energy resources constructed or reasonably expected to be constructed after the date section 402 was enacted. The program uses authority granted under this section to borrow up to $3.25 billion from the U.S. Department of the Treasury to accomplish these purposes. Pursuant to the Recovery Act, projects under the program must (1) be in the public interest; (2) not adversely impact system reliability or operations, or other statutory obligations; (3) offer reasonable expectation that proceeds will be adequate to meet Western's repayment obligations; (4) use a public process to set transmission rates; (5) have the necessary capability to obtain and deliver generation-related ancillary services; and (6) provide proceeds to repay principal and interest of the loan from the Treasury. | None |

Source: GAO analysis of agency-provided data.

**Table 8: Department of the Interior Wind-Related Initiatives**

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Bureau of Land Management** | | |
| Recovery Act Renewable Energy Efforts | These efforts are intended to support the Bureau of Land Management's portfolio of renewable energy work, through studies related to wind and solar energy right-of-way authorizations on the bureau's lands. Projects funded under the Recovery Act included resource assessments and studies on environmental impacts of wind and solar development. | These are one-time activities authorized under the American Recovery and Reinvestment Act of 2009. |

DOE AR 000316

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Renewable Energy Coordination Offices Implementation | To facilitate the development of wind and solar energy projects on Bureau of Land Management lands, the bureau has increased dedicated teams of staff to streamline the review and approval of applications and conduct analysis required by the National Environmental Policy Act. In particular, this initiative facilitated further development of the Renewable Energy Coordination Offices through staffing of the Renewable Energy Support personnel in Colorado, Idaho, Montana, New Mexico, Oregon/Washington, and Utah. Support personnel provide additional capacity and resources in those states with lower volume workload but significant renewable energy workloads. | None |
| Wind Energy Authorizations and Operations on Bureau of Land Management Public Lands | The purpose of this initiative is to regulate wind energy development on Bureau of Land Management lands. The bureau processes and approves developers' applications, and collects land rents and other fees as projects are built and operated. | None |
| **Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE)[a]** | | |
| Environmental Studies Program | Through this program, BOEMRE provides information needed for prediction, assessment, and management of impacts on the human, marine, and coastal environments of the outer continental shelf and nearshore areas that may be affected by oil and gas, wind and other renewable energy, or other development. Specific research activities focus on establishing baseline information for assessing environmental impacts, constructing models to predict impacts, and environmental monitoring to provide trend data on significant changes in the environment. | None |
| Renewable Energy Program Development and Implementation | Through these efforts, BOEMRE implements and manages its program to authorize orderly, safe, and environmentally responsible renewable energy development on the outer continental shelf, as established in 2009 by the department's renewable energy regulatory framework document. The bureau also coordinates these efforts with ongoing state and local renewable energy efforts, as required by the Energy Policy Act of 2005. Specific efforts include renewable energy resource assessment and transmission studies; environmental studies; public stakeholder meetings; and support for intergovernmental and interagency meetings and information exchange. These efforts support the bureau's efforts to grant leases, easements, and rights-of-way for wind and other renewable energy development activities on the outer continental shelf. | None |

DOE AR 000317

**Appendix II: Federal Wind-Related Initiatives**

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Renewable Energy Program: Ensure Fair Return for Renewable Energy Resources | By statute, renewable energy leases must be issued competitively unless the Secretary determines, after public notice of a proposal, that there is no competitive interest. BOEMRE is responsible for ensuring the public will receive a fair return for the competitive and noncompetitive award of renewable energy leases. The regulations authorize a range of auction formats that have not been used previously by BOEMRE. These formats may be implemented under appropriate circumstances to encourage competitive auctions. BOEMRE's ability to set reasonable commercial lease terms and auction parameters necessary to earn a fair return is directly related to its ability to conduct accurate wind resource assessments and economic modeling of projects within a given wind energy area. The initiative supports BOEMRE on these issues. | None |
| Renewable Energy Program: Environmental Compliance | Through this program, BOEMRE works to ensure that the bureau's renewable energy activities comply with all applicable laws and regulations, including the National Environmental Policy Act. To facilitate siting, leasing, and construction of new projects, the bureau prepares environmental assessments and environmental impact statements to inform decisions on lease and grant issuance, and plan approval. The bureau has focused these efforts on supporting the Secretary of the Interior's "Smart form the Start" initiative to facilitate the development of wind energy on the Atlantic Outer Continental Shelf. | None |
| Renewable Energy Program: Multipurpose Marine Cadastre | This program supports wind energy development, and coastal and marine spatial planning on the outer continental shelf in general, by providing mapping information on locations for project planning and siting. The bureau provides data, data services, and a geospatial viewer with information on state and federal areas of jurisdiction over marine and coastal property, as well as other nonjurisdictional data sets. This information is intended to help renewable energy developers in initial planning stages to identify multiple uses and avoid conflicts before producing plans for development. The National Oceanic and Atmospheric Administration provides in-kind support as the technical lead agency for this program. | Authority for this initiative will expire at the end of fiscal year 2014. |

DOE AR 000318

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Renewable Energy Program: Safety Program and Inspections | The current focus of this program is to identify the critical components of an offshore wind turbine, how it might fail, and what inspection techniques should be followed. The bureau has conducted studies to identify this information and used it to develop detailed guidance for agency inspectors for the inspection of offshore wind energy installations. The office has also commissioned a study by the National Academy of Science to determine best practices for the design, fabrication, and installation of offshore wind turbines, and is collaborating with the American Wind Energy Association to develop a consensus industry guideline on appropriate standards for these turbines. | None |
| Resource Evaluation Program: Economic Analysis | BOEMRE has a responsibility to conduct economic analyses for the evaluation of resources on tracts offered for development, to ensure the public receives a fair return. BOEMRE conducts financial analysis of the fees to be included in commercial leases, provides semiannual renewable energy revenue and activity projections to the Office of Management and Budget, and conducts benefit-cost analysis of proposed legislative and regulatory policies, which will also address regional economic assessments as the program evolves. | None |
| Resource Evaluation Program: Resource Evaluation | Resource evaluation is necessary to ensure a fair return and to assess the offshore renewable energy resource potential in areas that are being considered for leasing. Presently, this initiative is primarily focused on the collection and quantification of wind resource data developed by the DOE, as well as the development of in-house capabilities with respect to the collection and quantification of wind, current, and wave resources. Other objectives of this initiative include use of the information by BOEMRE to determine minimum bid amounts for competitive lease sales, providing review of potentially dangerous conditions related to the placement of facilities on the seabed, and generating other information necessary to support lease sales. | None |
| Technology Assessment and Research Program | Under this program, the bureau seeks to ensure that industry operations on the outer continental shelf incorporate the use of the best available and safest technologies, as required by federal laws including the Outer Continental Shelf Lands Act Amendments of 1978 and the Energy Policy Act of 2005. There are two components to the Technology Assessment and Research Studies Program: operational safety and engineering research, and renewable energy research. Within the renewable energy research component, the office has funded industry researchers to study offshore wind technologies. | None |

DOE AR 000319

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Bureau of Reclamation** | | |
| Desalination and Water Purification Research and Development Program | This program is intended to address the needs for water desalination and purification in locations that do not have adequate traditional sources of water by lowering the costs of desalination and purification technologies and understanding and minimizing associated environmental impacts. Through the program, the Bureau of Reclamation provides financial assistance to water utilities, state and local governments, industry, and other parties, and emphasizes the application of renewable energy technologies such as wind, particularly for minimizing environmental impacts of desalination and purification. | This initiative ended at the end of fiscal year 2011. |
| Science and Technology Program | This program provides funding on a competitive basis to Bureau of Reclamation researchers to improve the operations, efficiency, and maintenance of the bureau's hydropower resources. The bureau also provides funding to support research on other renewable energy generation systems, such as wind systems, to understand how they can improve the bureau's ability to carry out its mission. This office also funds an interagency agreement with the National Renewable Energy Laboratory to assist Reclamation in developing both facility- and utility-scale renewable installations. | None |
| **Bureau of Indian Affairs** | | |
| Minerals & Mining Program: Renewable Energy Projects | This program funds a broad range of renewable energy projects on tribal lands, with the goal of enabling tribes to take over the federal government's role of oversight and development of resources on tribal lands. Indian Affairs funds projects through an annual competitive grant award process, and projects have included economic analyses, feasibility studies, resource assessments, marketing of resources, and construction of facilities. These projects have involved a wide range of renewable resources, including woody biomass, waste conversion, geothermal, hydroelectric, solar, and wind. | None |

DOE AR 000320

Appendix II: Federal Wind-Related Initiatives

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Office of Insular Affairs** | | |
| Insular Plan for Alternative and Renewable Energy | As part of a broader strategic planning effort for the islands required by the Assistant Secretary of Insular Affairs, the Governors of the Pacific territories of American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands each established energy steering committees to guide the development of energy on their islands. In addition, the Office of Insular Affairs funds DOE's National Renewable Energy Laboratory to conduct renewable energy assessments and develop draft strategic energy plans for each territory. Among other things, these plans have identified opportunities for the territories to develop wind, solar, geothermal, biomass, power system upgrades, improvements to existing diesel generators, and the implementation of island-wide energy efficiency and conservation programs. The Office of Insular Affairs recently expanded the laboratory's scope of work to include addressing the needs of the U.S. freely associated states, which include the Republic of the Marshall Islands, the Republic of Palau, and the Federated States of Micronesia. Working with the island leadership, local utilities, and other stake holders, the laboratory is examining realistic, cost-effective ways of employing renewable energy to solve the biggest economic challenge facing the islands, i.e., their 100 percent dependence on imported fossil fuels. | None |

Source: GAO analysis of agency-provided data.

[a]On October 1, 2011, BOEMRE reorganized into two independent entities: the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement. The Bureau of Ocean Energy Management is responsible for managing development of the nation's offshore resources in an environmentally and economically responsible way, and its activities include oversight of leasing, environmental studies, and economic analysis. The Bureau of Safety and Environmental Enforcement is responsible for enforcing safety and environmental regulations. However, given the time frame of our work, we refer to BOEMRE in this report.

DOE AR 000321

**Table 9: Department of the Treasury Wind-Related Initiatives**

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Internal Revenue Service (IRS)** | | |
| Accelerated Depreciation Recovery Periods for Specific Energy Property | Under the federal Modified Accelerated Cost-Recovery System, businesses may recover the costs of investments in certain property through depreciation deductions from a taxpayer's taxable income. The system sets the period of time over which various types of property may be depreciated from 3 to 50 years, and classifies a number of renewable energy technologies as 5-year property, including wind. The Joint Committee on Taxation generally classifies as tax expenditures cost recovery allowances that are more favorable than those provided under the alternative depreciation system (Internal Revenue Code Section 168(g)), which provides for straight-line recovery over tax lives that are longer than those permitted under the accelerated system. However, the Economic Stimulus Act of 2008 included a 50 percent first-year bonus depreciation provision for a wide range of eligible properties including renewable energy systems. This provision was extended by the American Recovery and Reinvestment Act of 2009, and by the Creating Small Business Jobs Act of 2010. Bonus depreciation was further extended through 2012 by the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, with a 100 percent deduction allowed for property acquired after September 8, 2010, and before January 1, 2012. The American Taxpayer Relief Act of 2012 extended 50 percent expensing for qualifying property purchased and placed in service before January 1, 2014. The 50 percent bonus depreciation narrowed any tax differences between eligible assets based on cost recovery provisions, and the 100 percent bonus depreciation eliminated those differences altogether under the provision for allowing a full write-off of asset acquisition costs. | Bonus depreciation was extended by the American Taxpayer Relief Act of 2012 through 2013 for qualifying property placed in service before January 1, 2014 (or January 1, 2015 for certain other assets). |

DOE AR 000322

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Credit for Holding New Clean Renewable Energy Bonds | New Clean Renewable Energy Bonds help tax-exempt entities finance capital expenditures for new facilities that produce electricity from renewable sources, including wind energy. Bond holders receive tax credits at 70% of the tax credit interest rate, in lieu of interest payments. New Clean Renewable Energy Bonds may be issued by a public power provider, a cooperative electric company, a governmental body, a clean renewable energy bond lender or a not-for-profit electric utility which has received a loan or loan guarantee under the Rural Electrification Act. The Department of the Treasury publicly solicited applications for an initial volume cap, set by Congress at $800 million, and awarded allocations based on criteria and applications received. An additional $1.6 billion in New Clean Renewable Energy Bond authorization was provided under the Recovery Act. | None |
| Credit for Holding Qualified Energy Conservation Bonds | Qualified Energy Conservation Bonds provide an opportunity for tax-exempt entities to issue bonds for which bondholders can receive an income tax credit in lieu of interest payments from the issuers of the bonds. Qualified Energy Conservation Bonds can be issued to help finance projects that produce or conserve electricity, including capital expenditures incurred for rural development involving the production of electricity from renewable energy resources, as well as qualified facilities, including wind facilities, under Internal Revenue Code Section 45(d). Qualified Energy Conservation Bonds can be used for a broad array of purposes, including expenditures for certain research facilities, grants, and demonstration projects. Similar to the New Clean Renewable Energy Bonds, the tax credit rate for Qualified Energy Conservation Bonds is 70 percent of the tax credit interest rate. Congress established an initial volume cap of $800 million in Qualified Energy Conservation Bonds that could be issued. The cap was raised to $3.2 billion under the Recovery Act. IRS allocated the authority to issue the bonds to U.S. states and territories according to a population-based formula, and the states and territories further allocated the bond issuance authority for individual projects. | None |
| Credit for Residential Energy Efficient Property | The Internal Revenue Code provides an income tax credit to homeowners of up to 30 percent of the costs of eligible energy efficiency equipment, which creates an incentive for homeowners to make such improvements. To be eligible for the credit, the energy efficiency equipment installed by the homeowner must meet certain standards; small wind turbines, solar electric and hot water systems, and geothermal heat pumps are included among the eligible types of equipment. Also, the equipment must be placed in service by December 31, 2016. | Property must be placed in service by December 31, 2016. |

DOE AR 000323

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Direct Payment in Lieu of a Credit for Holding New Clean Renewable Energy Bonds | Through the Hiring Incentives to Restore Employment Act of 2010, Congress permitted issuers of New Clean Renewable Energy Bonds the option to receive a direct payment equivalent to and in lieu of the amount of the tax credit that would otherwise go to the bondholder. This option applied to New Clean Renewable Energy Bonds issued after March 18, 2010. In cases where bond issuers elect to receive a direct payment, this option helps tax-exempt entities finance projects that produce electricity from renewable sources, including wind energy, because it provides an incentive for investors to purchase the bonds since the investors' returns would not depend upon having sufficient tax liability to utilize a tax credit. | None |
| Direct Payment in Lieu of a Credit for Holding Qualified Energy Conservation Bonds | Through the Hiring Incentives to Restore Employment Act of 2010, Congress permitted issuers of Qualified Energy Conservation Bonds the option to receive a direct payment equivalent to and in lieu of the amount of the tax credit that would otherwise go to the bondholder. This option applied to Qualified Energy Conservation Bonds issued after March 18, 2010. In cases where bond issuers elect to receive a direct payment, this option helps tax-exempt entities finance projects that produce or conserve electricity, including electricity produced from renewable sources such as wind energy, because it provides an incentive for investors to purchase the bonds since the investors' returns would not depend upon having sufficient tax liability to utilize a tax credit. | None |
| Energy Investment Credit | The Internal Revenue Code provides an income tax credit based on a percentage of either the cost or fair market value in new equipment that produces electricity and/or heat from renewable energy sources, including wind energy. This credit provides an incentive for businesses to make such investments. Wind, solar, geothermal, and certain other investments qualify for a credit of 30 percent of the investment. Also, the credit is limited based on the date the equipment is placed in service, the production capacity of the equipment, or other factors. Facilities qualifying for the investment tax credit could instead claim a cash grant under Section 1603 of the Recovery Act for facilities placed in service in 2009, 2010, or 2011. For wind facilities placed in service after 2011, taxpayers could claim the investment credit or Section 1603 cash grant if construction of the facility began in 2009, 2010, or 2011, and the property is placed in service before 2013. | Wind projects must begin construction before January 1, 2014, in order to claim the credit. |

DOE AR 000324

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Energy Production Credit | The Internal Revenue Code provides an income tax credit to businesses and agricultural cooperatives based on the amount of energy they produce at qualified facilities. The credit provides an incentive for electricity production from a variety of renewable energy sources; although, in calendar year 2011, it was primarily taken by wind energy producers. The amount of the credit varies somewhat depending upon the source and is adjusted annually for inflation. Among other limitations, a taxpayer may generally claim the credit only during the 10-year period commencing with the date the production facility is placed in service, and the credit phases out as the market price of electricity exceeds certain levels. For example, for calendar year 2011, the credit amount was 2.2 cents per kilowatt hour for certain resources (e.g., wind, geothermal, and certain biomass electricity production). For wind facilities placed in service after 2011, taxpayers could claim the cash grant in lieu of the production credit if construction of the facility began in 2009, 2010, or 2011, and the property is placed in service before 2013, or taxpayers could claim the investment credit for facilities placed in service in 2012. | Wind projects must begin construction before January 1, 2014, to be eligible. |
| Qualifying Advanced Energy Project Credit | The Internal Revenue Code provided an income tax credit of up to 30 percent of the costs to establish, reequip, or expand U.S. domestic manufacturing facilities, which created an incentive to invest in advanced energy equipment manufacturing facilities. Qualified facilities included those that produce equipment designed to produce energy from wind, the sun, geothermal, other renewable resources, as well as other types of energy production and conservation equipment. This credit was established under the Recovery Act, with an initial cap of $2.3 billion in credit allocations. All available amounts were allocated in 2010 but, if some of those credits were forfeited, it may be possible to reallocate them through 2013. A taxpayer claiming this credit was not allowed to also claim the energy investment tax credit. | The application period for the first round of credit certification ended on December 31, 2010. All available amounts were allocated in 2010. Property certified in the first round must be placed in service within 3 years of certification (generally in 2014). If some credits which were allocated are forfeited, it may be possible to reallocate them through 2013. |

DOE AR 000325

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Office of Domestic Finance** | | |
| Payments for Specific Energy Property in Lieu of Tax Credits | Section 1603 of the Recovery Act established a cash grant program to provide payments to eligible applicants who place specified energy property in service for use in a trade or business. Applicants could take the payment in lieu of either an energy production or investment credit. These payments provide an incentive for investment in property for electricity and heat production, particularly for applicants without sufficient tax liability to utilize a tax credit. Initially, the program provided cash grants for renewable energy projects and production placed in service as of December 31, 2010, or which began construction in 2009 or 2010. However, the program was extended for 1 year as part of the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010. For projects placed in service as of the end of 2011, wind energy projects received the majority of funding, while solar energy project applicants submitted the largest number of funding requests. | Applications must have been submitted before October 1, 2012. |

Source: GAO analysis of agency-provided data.

**Table 10: Environmental Protection Agency (EPA) Wind-Related Initiatives**

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Office of Air and Radiation** | | |
| Green Power Partnership | Through this initiative, EPA supports renewable energy development by increasing community and organizational demand for renewable electricity. EPA educates prospective partners about green power and offers expert advice, technical support, tools, and resources to encourage organizations to use green power. The program encourages its over 1,000 partnering organizations to use renewable electricity from any and all eligible sources, including wind. | None |
| **Office of Research and Development** | | |
| People, Prosperity, and the Planet Award Program | Under this initiative, EPA provides competitive grant funding for college student research on sustainable design. Selected teams are awarded $15,000 to develop an idea and demonstrate it at the annual National Sustainable Design Expo in Washington, D.C., where they compete for a $90,000 grant to take their design to market. Research proposals have included projects related to several renewable energy sources, including wind energy. | None |

DOE AR 000326

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Office of Solid Waste and Emergency Response** | | |
| RE-Powering America's Land | Under this initiative, EPA encourages renewable energy development on current and formerly contaminated land and mine sites. EPA has screened over 11,000 sites to determine their potential for renewable energy resources, including wind energy, and provides this information in a Google Earth tool. EPA also provides technical assistance and information on environmental issues related to land contamination and liability for communities, developers, industry, state and local governments, and others interested in reusing these sites for renewable energy development. | None |

Source: GAO analysis of agency-provided data.

**Table 11: Federal Energy Regulatory Commission Wind-Related Initiatives**

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Integration of Variable Energy Resources - Market and Regulatory Reforms to Remove Unduly Discriminatory Practices and Ensure Just and Reasonable Rates | This program implements market reforms that allow all resources, including wind energy, to compete on a level playing field in jurisdictional markets. These efforts include amendments to market rules and the implementation of operational tools that support the reliable integration of renewable resources. | None |

Source: GAO analysis of agency-provided data.

**Table 12: National Science Foundation (NSF) Wind-Related Initiatives**

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Directorate for Engineering** | | |
| Energy for Sustainability Program | The program funds fundamental academic research and education activities through grants to enable innovative processes for the sustainable production of electricity and transportation fuels. While the program emphasizes two primary fuel sources—biofuels/bioenergy and photovoltaic solar energy—it also supports research in wind and wave energy, sustainable energy technology assessment, and fuel cells. | None |

DOE AR 000327

Appendix II: Federal Wind-Related Initiatives

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| Energy, Power, and Adaptive Systems | The program provides grants for academic researchers to design and study intelligent and adaptive engineering networks with an emphasis on electric power electronics, networks, and grids. This focus includes generation, distribution, transmission and integration of renewable energy systems and alternative energy technologies, including wind, solar cells, ocean waves, and hydropower. The program also supports laboratory and curriculum development to integrate research and education. | None |
| **Directorate for Engineering - Directorate for Mathematical and Physical Sciences** | | |
| Emerging Frontiers in Research and Innovation | The initiative funds grants for interdisciplinary engineering research with the potential to create a significant impact or meet national needs. Under the program, NSF has coordinated with DOE to call for proposals that help address the need for wind and solar energy storage. | None |

Source: GAO analysis of agency-provided data.

**Table 13: Small Business Administration (SBA) Wind-Related Initiatives**

| Initiative name and implementing subagency | Description | Expiration information |
|---|---|---|
| **Office of Capital Access** | | |
| Certified Development Company / Section 504 Loans | These loan guarantees supplement SBA loans to businesses investing in energy efficient equipment, renewable energy sources—such as wind energy—or equipment, or green buildings. SBA allows green building and energy efficient activities to qualify as broader public policy goals, allowing for larger loans and lower job creation goals for eligible companies. | None |
| **Office of Investment** | | |
| Energy Saving Debenture | This initiative provides a financing tool for Small Business Investment Companies licensed after 2008 to invest in small businesses with products or services that are directed toward energy saving activities, including renewable energy. Energy Saving Debentures provide a financing option for Small Business Investment Companies to make energy saving qualified investments in these small businesses. | None |

Source: GAO analysis of agency-provided data.

DOE AR 000328

# Appendix III: Estimated Revenue Losses for Treasury's Wind-Related Tax Expenditures

Table 14 below reflects the fiscal year 2011 revenue loss estimates for Treasury's wind-related tax expenditures—both their total estimated revenue losses and their estimated revenue losses for activities specifically related to wind.[1]

**Table 14: Estimated Revenue Losses for Treasury's Wind-Related Tax Expenditures in Fiscal Year 2011**

| Initiative name | Estimated revenue losses | Estimated revenue losses for activities specifically related to wind[a] |
|---|---|---|
| Accelerated Depreciation Recovery Periods for Specific Energy Property | Up to $350 million[b] | Estimates are not available |
| Credit for Holding New Clean Renewable Energy Bonds | $70 million | Estimates are not available |
| Credit for Holding Qualified Energy Conservation Bonds | $10 million | Estimates are not available |
| Credit for Residential Energy Efficient Property | $840 million | Estimates are not available |
| Direct Payment in Lieu of a Credit for Holding New Clean Renewable Energy Bonds | $20 million | Estimates are not available |
| Direct Payment in Lieu of a Credit for Holding Qualified Energy Conservation Bonds | $30 million | Estimates are not available |
| Energy Investment Credit (ITC)[c] | $700 million | Less than $50 million for small wind properties—properties using wind turbines of 100 kilowatts or less[b] |
| Energy Production Credit (PTC)[d] | $1,560 million | $1,100 million[b] |
| Qualifying Advanced Energy Project Credit | $430 million | Estimates are not available |

Sources: GAO analysis of Office of Management and Budget and Joint Committee on Taxation documentation.

Note: Revenue losses and outlay effects reflect Treasury estimates from the President's Fiscal Year 2013 budget unless otherwise specified. Revenue loss estimates do not incorporate any behavioral responses and thus do not reflect the exact amount of revenue that would be gained if a specific tax expenditure were repealed. In addition, while sufficiently reliable as a gauge of general magnitude, summing individual tax expenditures' revenue loss estimates does not take into account interactions between individual provisions.

[a]The Office of Management and Budget—which uses revenue loss estimates developed by Treasury—does not publish energy source-specific revenue loss estimates.

[b]The revenue loss estimate is reported by the Joint Committee on Taxation only.

[c]Firms can take a cash grant under Treasury's Payments for Specific Energy Property in Lieu of Tax Credits initiative (Section 1603 program) instead of the ITC for facilities placed in service in 2009, 2010, and 2011, or if their construction began in 2009, 2010, or 2011.

[d]Firms can take a cash grant under Treasury's Section 1603 program instead of the PTC for facilities placed in service in 2009, 2010, or 2011, or if their construction began in 2009, 2010, or 2011.

[1]The majority of wind-related initiatives, including all tax expenditures listed here, supported a range of energy sources in addition to wind.

DOE AR 000329

# Appendix IV: GAO's Questionnaire for Federal Agencies with Wind-Related Initiatives

QUESTIONS ABOUT FEDERAL WIND INITIATIVES – *[PRE-POPULATED INFORMATION]*



## United States Government Accountability Office

QUESTIONS ABOUT FEDERAL WIND-RELATED INITIATIVE:
*[PRE-POPULATED INFORMATION]*

### Introduction

The United States Government Accountability Office (GAO), an independent, legislative-branch agency, is examining how the federal government promotes research and development, commercialization, and deployment of wind energy through wind-related initiatives (GAO job code 361379). We define an initiative as a group of programmatic or mission-area activities serving similar purposes or functions. We are not considering individual projects within an initiative—such as a specific grant award—to be initiatives in themselves. Wind-related initiatives are those that could or do promote wind energy, either exclusively or as part of a broader initiative. GAO is beginning this work in response to a congressional mandate in the Statutory Pay-As-You-Go Act of 2010, Public Law No. 111-139, Section 21. The objectives for this study are to examine: (1) the key characteristics of wind energy initiatives supported by the federal government; (2) the extent to which, if any, there is fragmentation, overlap, and duplication of federal wind energy initiatives; and (3) the extent to which agencies review their portfolios of wind energy initiatives and coordinate similar efforts internally and with other agencies.

In 2011, we asked your agency to provide us with information and data on the renewable energy initiatives that were ongoing at your agency in fiscal year 2010 (GAO job code 361185). Using that information, and information provided to us in the prior questionnaire distributed for this engagement on wind-related initiatives, we have identified initiatives that your agency indicated promoted wind energy through research and development, commercialization, or deployment, and were active in fiscal year 2011. Through this supplemental questionnaire, we are asking you to provide additional information about the *[PRE-POPULATED INFORMATION]* initiative. After we receive your response, we may follow up to discuss and clarify any outstanding questions about the initiative relative to the objectives stated above.

Please complete all four sections and return it to one of the individuals mentioned below by **May 1, 2012**. When returning the questionnaire, please attach any relevant supporting documentation to your e-mail.

If you have any questions or comments about this questionnaire, please call or e-mail Miles Ingram at (617) 788-0549 (ingramm@gao.gov) or Keya Chateauneuf at (617) 788-0583 (chateauneufk@gao.gov). Thank you very much for your assistance.

Page 1 of 11

DOE AR 000330

Appendix IV: GAO's Questionnaire for Federal
Agencies with Wind-Related Initiatives

QUESTIONS ABOUT FEDERAL WIND INITIATIVES – *[PRE-POPULATED INFORMATION]*

**Instructions**

This questionnaire can be completed using MS-Word and returned via e-mail to
ingramm@gao.gov or chateauneufk@gao.gov. Please complete this questionnaire and return it
by **May 1, 2012**.

1) Use your mouse to navigate by clicking on the check box ☐ or answer box ▢ you
   wish to answer.

2) To select a check box, click on the center of the box, and an 'X' will appear.

3) To deselect a check box response, click on the center of the box, and the 'X' will
   disappear.

4) To answer a question that requires a comment, click on the answer box ▢ and begin
   typing. The box will expand to accommodate your answer.

DOE AR 000331

QUESTIONS ABOUT FEDERAL WIND INITIATIVES – *[PRE-POPULATED INFORMATION]*

## SECTION I: GENERAL INFORMATION ABOUT INITIATIVE

We define wind-related initiatives as those that could or do promote or enable wind energy development—either exclusively or as part of a broader initiative. The initiative itself may support solely, or in part, wind energy *research and development*—including efforts ranging from basic research defining scientific concepts to efforts to apply and demonstrate new and improved technologies. The initiative may also support solely, or in part, wind energy *commercialization*—such as, efforts to bridge the gap between research and development activities and the marketplace through transitioning technologies to commercial applications. In addition, the initiative may support wind energy *deployment*—efforts to facilitate or achieve widespread use of technologies, such as through their construction or operation. Under our definition of deployment, we are also including regulatory initiatives that focus on streamlining regulatory processes, providing regulatory access to resources, or fast-tracking permitting of certain projects.

**Your agency provided the following information about the initiative to a previous GAO job (job code 361185).**

**Initiative Name:**            *[PRE-POPULATED INFORMATION]*

**Implementing Sub-Agency:**    *[PRE-POPULATED INFORMATION]*

**Implementing Office:**        *[PRE-POPULATED INFORMATION]*

**Initiative Description:**     *[PRE-POPULATED INFORMATION]*

**Recipient Type:**            *[PRE-POPULATED INFORMATION]*

**Expiration/sunset date:**     *[PRE-POPULATED INFORMATION]*

1. Is the information provided above about the initiative correct and complete for fiscal year 2011?
   Yes .............................☐
   No...............................☐

   If you answered No, what information is incorrect or incomplete, and what is the correct or complete information? Please use the space below.

Page 3 of 11

DOE AR 000332

QUESTIONS ABOUT FEDERAL WIND INITIATIVES – *[PRE-POPULATED INFORMATION]*

**2. When did wind energy first receive or become eligible for support under this initiative?**

*Please check one box in each row.*

| | Fiscal year 2011 ▼ | Fiscal year 2010 ▼ | Fiscal year 2009 ▼ | Fiscal year 2008 or before ▼ | Don't know/Not able to determine ▼ |
|---|---|---|---|---|---|
| a) Wind energy first received support.......... | ☐ | ☐ | ☐ | ☐ | ☐ |
| b) Wind energy was first eligible for support.. | ☐ | ☐ | ☐ | ☐ | ☐ |

**3. On which of the following areas does your initiative focus?**

*Please check Yes or No for each category.*

| | Yes ▼ | No ▼ |
|---|---|---|
| Utility-scale onshore wind ............................................................... | ☐ | ☐ |
| Distributed (small-scale) onshore wind ......................................... | ☐ | ☐ |
| Offshore wind ................................................................................ | ☐ | ☐ |
| Transmission ................................................................................. | ☐ | ☐ |
| Grid integration ............................................................................. | ☐ | ☐ |
| Siting and permitting ..................................................................... | ☐ | ☐ |
| Other? *Please specify in the space below.* ................................... | ☐ | ☐ |

DOE AR 000333

**Appendix IV: GAO's Questionnaire for Federal Agencies with Wind-Related Initiatives**

QUESTIONS ABOUT FEDERAL WIND INITIATIVES – *[PRE-POPULATED INFORMATION]*

4. We understand that each agency defines technology-related activities in a unique manner; however, in order to compare activities across agencies, we have developed categories that can be applied broadly and have listed them below. Please determine which categories best fit the wind-related activities under your initiative.

**Which of the following technology-related categories apply to this initiative's wind-related activities?** *Please check Yes or No for each category.*

| | | Yes ▼ | No ▼ |
|---|---|---|---|
| a. | **Basic research?** ....................................................<br>*Basic research includes efforts that explore and define scientific or engineering concepts, or is conducted to investigate the nature of a subject without targeting any specific technology.* | ☐ | ☐ |
| b. | **Applied research?** ..................................................<br>*Applied research includes efforts that develop new scientific or engineering knowledge to create new and improved technologies.* | ☐ | ☐ |
| c. | **Demonstration activities?** ......................................<br>*Demonstration activities include efforts that operate new or improved technologies to collect information on their performance and assess their readiness for widespread use.* | ☐ | ☐ |
| d. | **Commercialization?** ...............................................<br>*Commercialization includes efforts that bridge the gap between research and demonstration activities, and venture capital funding and marketing activities, through transitioning technologies to commercial applications.* | ☐ | ☐ |
| e. | **Deployment?** .........................................................<br>*Deployment includes efforts that facilitate or achieve widespread use of technologies in the commercial market through their construction, operation or use.* <u>*We are also including initiatives that focus on streamlining regulatory processes, providing regulatory access to resources, or fast-tracking permitting of certain projects.*</u> | ☐ | ☐ |
| f. | **Other?** *Please specify in the space below* ................. | ☐ | ☐ |

Page 5 of 11

DOE AR 000334

QUESTIONS ABOUT FEDERAL WIND INITIATIVES – *[PRE-POPULATED INFORMATION]*

5. Please describe the overall goals of your initiative in the space below. Briefly describe the source from which the goals come, such as program-level documents, agency-wide documents, or government-wide directives from the Office of Management and Budget or Congress.

6. If the above goals are not specific to wind energy, does your initiative have goals that <u>are specific to wind energy</u>?

N/A - wind-specific goals provided in Question 5... ☐

Yes................................................................. ☐

No..................................................................... ☐

If you answered Yes, please briefly describe the goals for wind energy in the space below. Please provide a link(s) to the applicable website(s) in the space below or some other reference for documents such as strategic plans, annual reports, program plans, grant solicitations, or requests for proposals. Please cite the relevant portion of the document (e.g. document name and page number) if applicable.

7. Has your initiative created performance measures to track progress toward the <u>wind energy</u> goals?

Yes............................................................. ☐

No.............................................................. ☐

N/A............................................................ ☐

If you answered Yes, please describe the performance measures in the space below.

8. Has anyone at <u>your agency</u> (including any sub-agencies or offices) or any third party assessed this initiative to determine the extent to which it has met any of its goals or targets?

Yes .............................☐

No...............................☐

Don't know ...............☐

If yes, please describe the assessment(s), including whether or not a report was generated, in the space below. If you have a report or other documentation, please provide a weblink or attach a copy.

Page 6 of 11

DOE AR 000335



DOE AR 000336

**Appendix IV: GAO's Questionnaire for Federal
Agencies with Wind-Related Initiatives**

QUESTIONS ABOUT FEDERAL WIND INITIATIVES – *[PRE-POPULATED INFORMATION]*

10. Government auditing standards require that we assess the reliability of data used in our products. Therefore, **for the data you reported in the previous question,** we would like to obtain answers to the following questions about the data and/or the information system that produces them (e.g. databases or other electronic records).

    a. **If the data provided in question 9 are an estimate, please explain how the estimate was determined and identify what limitations, if any, are associated with this estimate.**

    b. **What is the source of the data provided in question 9** (e.g. name of database or other electronic records system)?

    c. **Please describe any data system controls, edit checks, or internal auditing procedures in place that ensure the accuracy and completeness of the data. What procedures, if any, are in place to review and certify the reliability of this data? Have there been any reviews of the quality of the data** (e.g. inspector general or internal audit reports, internal reviews and studies, or contractor or consultant studies)? If so, please provide copies or web links.

    d. If you needed to consult with someone more involved with relevant data system(s) to answer this question, **please identify that individual and provide contact information so that we may ask follow-up questions, if necessary.**

11. As part of our review, we'd like to provide a few examples of projects or program activities that have been funded under this initiative. **Please briefly describe two examples of specific wind-related projects or program activities that were active under this initiative in fiscal year 2011 in the space below. (Please limit your response to 800 characters.)**

    a. Example #1

    b. Example #2

12. **Considering the range of projects or activities supported and the resources committed to these projects or activities in fiscal year 2011, which of the following best describes this initiative?**

Solely supported wind-related activities................................ ☐
Primarily supported wind-related activities...................................... ☐
Supported wind-related and non wind-related activities equally...... ☐
Primarily supported activities that are not wind-related................ ☐
└─ Don't know/Not able to determine........................................ ☐

If you don't know or are not able to determine, please explain: 

Page 8 of 11

**Appendix IV: GAO's Questionnaire for Federal
Agencies with Wind-Related Initiatives**

QUESTIONS ABOUT FEDERAL WIND INITIATIVES – *[PRE-POPULATED INFORMATION]*

**SECTION III: COORDINATION**

13. **Do you or staff involved with the [PRE-POPULATED INFORMATION] initiative** *formally* **coordinate with other wind-related initiatives <u>within your agency</u> or <u>with other federal agencies</u>?** An example of formal coordination might be participation in a working group or having a memorandum of understanding or interagency agreement.

Yes ............................ ☐
No ............................. ☐

If you answered Yes to the above question, please provide up to five examples in the table below of how you coordinate within your agency or with other federal agencies.

| Name/Title of coordination activities | Description of coordination activities | Does this coordination activity involve agencies outside of your agency? | |
|---|---|---|---|
| | | Yes ▼ | No ▼ |
| 1. | | ☐ | ☐ |
| 2. | | ☐ | ☐ |
| 3. | | ☐ | ☐ |
| 4. | | ☐ | ☐ |
| 5. | | ☐ | ☐ |

If you have additional information you would like to provide about your coordination activities, please describe in the space below:

Page 9 of 11

GAO-13-136  Wind Energy

DOE AR 000338

QUESTIONS ABOUT FEDERAL WIND INITIATIVES – *[PRE-POPULATED INFORMATION]*

14. **Do you or staff involved with this initiative *formally* coordinate your initiative's activities with <u>state governments</u>?** An example of formal coordination might be participation in a working group or having a memorandum of understanding or interagency agreement.

Yes ............................. ☐
No................................ ☐

If you answered Yes to the above question, please provide up to five examples in the table below of how you coordinate with state governments.

| Name/Title of coordination activities | Description of coordination activities |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |

If you have additional information you would like to provide about your coordination activities, please describe in the space below:

15. **What steps, if any, does <u>your agency</u> (or your sub-agency or office) take to assess potential overlap or duplication of its initiatives' activities with other federal efforts?**

16. **When reviewing requests for funding, such as grant applications or bids for contracts, do you take steps to determine whether or not the requesters have received other sources of federal funding for the project?**

Yes ............................. ☐
No................................ ☐

If you answered Yes, please describe in the space below what information you review and how you determine whether or not they have received other sources of federal funding for the project.

Page 10 of 11

DOE AR 000339

QUESTIONS ABOUT FEDERAL WIND INITIATIVES – *[PRE-POPULATED INFORMATION]*

## SECTION IV: OTHER INFORMATION

17. **Are there any additional data, nuances, further sources of information, or comments not covered previously that would help us further understand and report on how this initiative is being implemented? If so, please describe and/or provide link(s) to the relevant website(s) in the space below.** *If you do not have additional information to provide, it is appropriate to leave this question blank.* If applicable, please provide electronic copies of the relevant documents (e.g., strategic planning documents, performance metrics, requests for proposals, regulatory provisions, etc.) when returning this questionnaire. Alternatively, you can suggest that further discussion about this initiative be conducted through follow-up conversations with GAO.

18. **Please provide the contact information for a representative from your agency for any follow-up questions we may have about this questionnaire.**

Name:
Title:
Agency:
Office/Division:
Email:
Phone:

Please remember to attach any relevant supporting documentation when returning this questionnaire to either or ingramm@gao.gov or chateauneufk@gao.gov.



### Thank you for your time!

Page 11 of 11

DOE AR 000340

# Appendix V: Comments from the Department of Energy



**Department of Energy**
Washington, DC 20585

FEB 2 0 2013

Mr. Frank Rusco
Director
Natural Resources and Environment
U.S. Government Accountability Office
441 G Street NW
Washington, DC 20548

Dear Mr. Rusco:

Thank you for the opportunity to comment on the Government Accountability Office's (GAO) draft report, *Wind Energy: Additional Actions Could Help Ensure Effective Use of Federal Financial Support*. The Loan Programs Office (LPO) is responding on behalf of the Department of Energy (DOE or Department).

GAO Recommendation for Executive Action: To support federal agencies' efforts to effectively allocate resources among wind projects, GAO recommends that the Secretaries of Energy and Agriculture, to the extent possible within their statutory authority, formally assess and document whether the incremental financial support of their initiatives is needed in order for applicants' projects to be built, and take this information into account in determining whether, or how much, support to provide. Such assessments could include, for example, information on the investors' and developers' projected rates of return on these projects, or documentation of applicants' inability to secure private financing for projects. In addition, such assessments should consider the financial support available or provided to projects from other federal sources including tax expenditures, and to the extent practical, from state sources. In the event agencies lack discretion to consider this information in determining what financial support to provide, they may want to report this limitation to Congress.

*DOE Response:* The LPO agrees with GAO's recommendation that the agency formally assess and document whether the incremental financial support of our initiatives is needed in order for an applicant's project to be built, and take this information into account in determining whether, or how much, support to provide. As your draft report noted, the LPO does consider the ability of a project to obtain private financing and referenced our May 30, 2012, solicitation supplement that indicates that DOE will view unfavorably applications for projects that could be fully financed on a long-term basis by commercial banks or others without a federal loan guarantee. Going forward, the LPO will formally document our evaluation of applicants' assertions regarding their inability to finance their projects without a federal loan guarantee. The Department will provide clarity about how the financial need of applicants was considered when determining what amount of support to provide.

 Printed with soy ink on recycled paper

DOE AR 000341

As your report also noted, appropriations laws applicable to the Section 1703 program generally prohibit the issuance of loan guarantees for projects that are expected to receive certain other sources of federal support. These would include grants, loan guarantees from other federal agencies, contracts with federal off-takers, leases and other arrangements that support a project. DOE will continue to enforce these double-dipping provisions.

Your report also notes, however, that Section 1603 Cash Grants are authorized to be used, and have been used frequently, to provide assistance to projects that also benefit from a loan guarantee. Please note that the proceeds of Section 1603 Cash Grants are available only when the related project construction is complete, and the allocable portion of the project is operational. Section 1603 Cash Grants do not provide project sponsors needed capital upfront in order to construct their projects. This capital is only available after the project has been constructed and is operational. The Section 1703 and 1705 programs provide the construction and long-term debt financing that is needed to complete and sustain these projects. Even in cases in which construction capital is available, long-term, fixed rate financing may not be available. For a project with a long-term fixed rate Power Purchase Agreement ("PPA") to be viable during the operational period long-term financing is necessary (1) to match payment of debt service on the long-term loan with the proceeds of such long-term PPA (default risk), (2) to avoid the risk (a) of large changes in interest rates on floating rate loans, and (b) of derivative financial instruments required to manage interest rate changes (basis risk), and (3) to control refinancing risks that result when short-term debt comes due in a high interest rate market (timing risk).

In summary, the DOE appreciates the spirit of the GAO's recommendation that DOE formally assess and document whether the incremental financial support of their initiatives is needed in order for applicants' projects to be built, and take this information into account in determining whether, or how much, support to provide. We look forward to working with your team on future engagements.

Sincerely,

Susan S. Richardson,
David G. Frantz    Acting for
Acting Executive Director
Loan Programs Office

# Appendix VI: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Frank Rusco (202) 512-3841 or ruscof@gao.gov |
| **Staff Acknowledgments** | In addition to the individual named above, Dan Haas, Assistant Director; Krista Anderson; Keya Chateauneuf; Cindy Gilbert; Miles Ingram; Cynthia Norris; Jerome Sandau; MaryLynn Sergent; Maria Stattel; Anne Stevens; Barbara Timmerman; and Jack Wang made key contributions to this report. |

DOE AR 000343

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (http://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to http://www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Website: http://www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |





U.S. Department of Energy
Office of Inspector General
Office of Audits and Inspections

# Audit Report

## The Department of Energy's Industrial Carbon Capture and Storage Program Funded by the American Recovery and Reinvestment Act



OAS-RA-13-15

March 2013

DOE AR 000345



# Department of Energy
Washington, DC 20585

March 21, 2013

MEMORANDUM FOR THE SECRETARY

FROM:          Gregory H. Friedman
               Inspector General

SUBJECT:          INFORMATION:  Audit Report on "The Department of Energy's Industrial
                  Carbon Capture and Storage Program Funded by the American Recovery
                  and Reinvestment Act"

## INTRODUCTION AND OBJECTIVE

The Department of Energy received nearly $1.5 billion through the American Recovery and
Reinvestment Act of 2009 (Recovery Act) to invest in clean industrial technologies and
sequestration projects through the Industrial Carbon Capture and Storage Program (Carbon
Program).  The National Energy Technology Laboratory awarded 46 cooperative agreements to a
variety of demonstration and research and development projects.  The agreements required
substantial involvement by Federal project managers and relied on recipients, such as private
industry and universities, to share in the investments needed to complete the projects.  As of
February 2013, more than 2 years after the Carbon Program had fully obligated its Recovery Act
funding, only about $623 million, or less than 42 percent, of the funds had been spent.

Previous Office of Inspector General reviews identified weaknesses in the Department's
management of financial assistance awards.  For instance, our audit report on *Management of
Fossil Energy Cooperative Agreements* (DOE/IG-0692, July 2005) found that the Department
had not always provided adequate monitoring and oversight of cooperative agreements, and
Federal project officials had not always taken sufficient action to address project management or
financial shortcomings.  In response to the report, the Department committed to address the
weaknesses highlighted in our report.  In light of previous concerns and the significant amount of
Recovery Act funding, we initiated this audit to determine whether the Department had
effectively and efficiently managed the Carbon Program.

## RESULTS OF AUDIT

We found that the Department had not always effectively managed the Carbon Program and the
use of Recovery Act funds.  In particular, our review of the Carbon Program, including 15
recipients awarded a total of approximately $1.1 billion, revealed that the Department:

- Had not adequately documented the approval and rationale to use $575 million of the
  $1.1 billion that we reviewed to accelerate existing projects rather than proceeding with
  new awards as required by Federal and Department policies.  Even when program
  officials provided explanations regarding the selection process, our review of available
  documentation revealed evidence that was either inconsistent with or did not otherwise
  support their assertions.

DOE AR 000346

2

- Reimbursed recipients approximately $16.8 million without obtaining and/or reviewing adequate supporting documentation.  Yet, we were able to identify, for one recipient, over $2.4 million in costs charged to the project that were questionable and/or unallowable.  Despite a Department prohibition against reimbursing requests for pre-award costs, the Department reimbursed more than $1 million in such costs.  In addition, the Department reimbursed approximately $14.4 million for costs incurred by three other recipients even though the costs were not substantiated by supporting documentation such as invoices.

- Awarded three recipients over $90 million in Recovery Act funding even though the merit review process identified significant financial and/or technical issues.  For example, the Department awarded more than $48 million to one recipient whose financial condition precluded it from obtaining a satisfactory merit review score.  Rather than addressing the underlying issues, the Department accepted increased risk and lowered the recipient's required cost share.  At the time of our review, the recipient had been unable to raise even the reduced required cost share contribution, increasing the risk that the project's goals may not be realized.  We noted that 2 years after award, the three recipients had only spent about $7 million and experienced delays finalizing agreements due to problems meeting financial commitments and overcoming technical issues impacting the scope of work for the projects.  The challenges precisely paralleled the initial concerns raised during the merit review process.

- Had not ensured that recipient subcontractor or vendor selections for goods and services represented the best value to the Government.  Specifically, for three recipients we reviewed, the Department had not reviewed contracting actions totaling over $4.1 million to ensure that the selections were arm's-length transactions and did not comprise conflicts of interest.  To cite the relevant concerns with the Department's inaction, we identified transactions totaling over $1.4 million in which one recipient contracted with an affiliated company that had representatives on its own Board of Directors.

The issues we identified occurred, in part, because program officials had not always provided effective monitoring and oversight of recipient activities.  Specifically, the Department had not implemented certain performance monitoring controls that would have allowed for more thorough reviews of costs prior to reimbursement.  For example, despite indications to the contrary, the Department allowed some recipients to remain on a "draw down" method of reimbursement, a practice in which no supporting documentation was reviewed prior to payment.

In addition, we found that policies and procedures related to managing the Carbon Program were either not developed or not fully implemented.  For instance, the Department had not developed formal policies and procedures requiring officials to evaluate or seek resolution of apparent related party transactions or potential conflicts of interest apparent in awarder-substituted materials.  An underlying cause of ineffective oversight was the approach Department officials took in monitoring these agreements.  The responsible Federal officials indicated that their involvement under cooperative agreement financing instruments was limited to technical monitoring rather than financial oversight of projects.  However, cooperative agreements, by definition, require the substantial involvement of the Department, including enhanced oversight and stewardship responsibilities, specifically including reviews of financial performance.  Thorough reviews of procurement practices and costs may have identified certain weaknesses

3

noted in our report, including potential conflicts of interest and inadequate competition. Finally, despite Federal and Department policies requiring that significant decisions be documented, program officials had not maintained records related to decisions to allocate funds to accelerate existing projects.

Notably, the Department expeditiously obligated all of its Carbon Program funds to comply with the time constraints of the Recovery Act. These projects represented an investment in the development of clean coal technologies which was unprecedented in terms of cost and scope. Yet, despite the magnitude of the effort, the issues discussed in our report could, if unresolved, impact the ability of the Carbon Program to meet its objectives and the goals of the Recovery Act. As noted in our report, we identified up to $18.3 million in questionable reimbursement claims that were approved by the Department for just the limited sample of awards reviewed. With approximately $860 million in Recovery Act Carbon Program funds yet to be spent, we believe the Department still has an opportunity to implement needed program enhancements and internal controls designed to increase the likelihood of a successful outcome. As such, we have made recommendations designed to improve the Department's implementation of the Carbon Program.

MANAGEMENT REACTION

Management concurred with three of the four recommendations in our report and indicated that it had initiated and/or taken corrective actions to address our findings. Management did not agree that procedures should exist related to identifying and documenting potential conflicts of interest. In particular, management indicated that it was the recipients' responsibility to identify and mitigate conflicts of interest using plans or policies specific to the organization. While we agree with management's position that recipients have a duty to identify and mitigate conflicts of interest, program managers also have responsibilities in this case. Specifically, Federal and Department regulations require the Department to review costs for related party transactions, including potential conflicts of interest and arm's-length transactions. Management's comments and our responses are summarized and more fully discussed in the body of the report. Management's comments are included in their entirety in Appendix 4.

Attachment

cc:   Deputy Secretary
      Acting Under Secretary of Energy
      Assistant Secretary for Fossil Energy
      Chief of Staff

# REPORT ON THE DEPARTMENT OF ENERGY'S INDUSTRIAL CARBON CAPTURE AND STORAGE PROGRAM FUNDED BY THE AMERICAN RECOVERY AND REINVESTMENT ACT

## TABLE OF CONTENTS

### Carbon Capture and Storage Program

Details of Findings ...........................................................................................................1

Recommendations ...........................................................................................................15

Comments .......................................................................................................................16

### Appendices

1.  Questioned Costs .....................................................................................................19

2.  Objective, Scope and Methodology ........................................................................20

3.  Prior Reports ...........................................................................................................22

4.  Management Comments ..........................................................................................23

DOE AR 000349

# THE DEPARTMENT OF ENERGY'S INDUSTRIAL CARBON CAPTURE AND STORAGE PROGRAM FUNDED BY THE AMERICAN RECOVERY AND REINVESTMENT ACT

**CARBON CAPTURE AND STORAGE PROGRAM**

Our review found that the Department of Energy (Department) had not always effectively managed the Industrial Carbon Capture and Storage Program (Carbon Program) and the related use of the American Recovery and Reinvestment Act of 2009 (Recovery Act) funds.  Specifically, the Department had not documented significant program decisions when awarding Recovery Act funds to accelerate existing projects.  In addition, recipients claimed costs that were questionable and/or unsubstantiated and the Department reimbursed such costs.  The Department also awarded Recovery Act funds to recipients that had technical and/or financial issues identified during a merit review process – issues that resulted in schedule and/or scope changes that may impact the ability of the Carbon Program to meet intended goals.  Furthermore, procurement practices supporting the program were not always adequate to ensure that recipients' subcontract or vendor selections were appropriate and in accordance with relevant policies and procedures.

## Acceleration of Existing Projects

Our review identified several issues related to the Department's use of Recovery Act funds to accelerate existing projects.  Recovery Act guidance stipulated that funds be awarded to competitively selected projects within the Carbon Program.  We found, however, that management awarded about $575 million non-competitively by accelerating existing projects.  Although the Department documented its rationale in some instances, we determined that the documentation either negated or did not fully support a number of management's assertions.

Program officials did not provide detailed documentation to support decisions to provide significant Recovery Act funds to existing projects despite our numerous requests.  Instead, officials told us that the Department had not received the number of applications anticipated under the competitive solicitation and determined that issuing another solicitation was not feasible due to time constraints to obligate Recovery Act funding by September 30, 2010.  Therefore, a decision was made to use approximately $575 million of Recovery Act funding to advance existing, previously competitively selected projects that could contribute to carbon capture and storage research and development.  Program officials stated that they worked with the Office of Management and Budget and Congressional staff to obtain approval for the decision to allocate the funds to existing

projects.  In addition, individuals we spoke with asserted that funding decisions were made by senior level officials at Headquarters and were outside of their control.  Department officials, however, did not develop or failed to maintain documentation supporting these decisions.  Failure to develop and/or maintain such documentation contradicted Federal[1] and Department[2] policies that require documentation demonstrating steps taken to finalize a decision be maintained, including research conducted and input from other organizations participating in the decision process.

Lacking documented rationale for selecting projects, we were not able to validate the basis for funding the projects.  For example, program officials told us that they considered all projects in the Office of Fossil Energy's portfolio to develop a listing of projects to accelerate that would most benefit the Carbon Program's goals.  Through an iterative process that included daily teleconferences, the program identified 30 projects to receive additional funding.  We noted, however, that the results of discussions were not recorded, and we could not obtain detailed documentation demonstrating the analysis used to justify the selections.  For one of the awards we evaluated, $71 million was provided to an existing project based on the Department's belief that expanding the project would reduce capital costs, improve the efficiency of the technology and accelerate the development schedule by 3 years.  Because the Department had not developed or did not retain detailed analyses or documentation to support the assertions related to this and other similar projects, we were unable to objectively determine whether the projects selected were the most beneficial or in the best interest of the Government.

While program officials described the rationale for the reallocation of funds or subsequent project selections, our review of available documentation contradicted a number of those assertions.  For example, officials indicated that a key consideration for selecting projects to accelerate was whether the projects were previously awarded through a competitive solicitation process.  However, we noted instances in which this had not occurred.  In particular, we found that the Department awarded additional funding for one recipient even though the project had not been competitively selected and had a history of poor performance.  The Department indicated that the project was not subject to competition; however, the predecessor award had gone through such a process in 1999.  While true, the prior award had a different scope of work and a

---

[1] 36 Code of Federal Regulations Subchapter B 1222.22 (e) and 1222.10 (b)(4)
[2] Department of Energy Records Management Handbook, Chapter IV (12)(h) and (12)(h)(4)

Details of Finding
DOE AR 000351

significantly smaller project cost. In addition, the company's management structure had changed during the intervening time. In another case, we noted that the Department asserted that it had accelerated a recipient's project by providing an additional $20 million, citing similar reasons as in the previous example. However, the project began to fall behind after receiving the additional funding, and was 1 year behind schedule at the time of our review. In summary, despite Recovery Act guidance that stated projects should be competitively selected, we found that the Department had awarded over $500 million to eight existing projects that had not been subjected to contemporaneous competition. Based on the inconsistencies we identified, we were unable to fully assess the competitiveness of the awards.

### Questioned Costs

The Department approved questionable and/or unallowable reimbursement claims and cost share contributions for 4 of the 15 recipients we reviewed. In particular, for one recipient, our examination of records identified over $2.4 million in costs charged to the project that were questionable or unallowable. For the other three recipients, we noted that the Department approved approximately $14.4 million in cost reimbursements without obtaining and reviewing adequate documentation to substantiate the costs. Specifically:

- For one recipient, our evaluation identified more than $2.4 million in questionable and/or unallowable costs charged to the project. Contrary to a Department memorandum prohibiting the recipient from being reimbursed for pre-award costs, we found that the recipient was reimbursed for more than $1 million in such costs. In addition, we identified over $770,000 in bonuses that were paid to employees over 3 years, including more than $340,000 in the first quarter of 2012. Although required by Federal regulations[3], we noted that justification supporting the basis for the bonuses had not been documented. Finally, we questioned an additional $600,000 related to various activities, including reimbursements for interest and penalties on underpaid taxes, legal fees associated with valuation of company stock, and other costs related to travel and employee meals that were specifically unallowable under Federal regulations.[4] In response to our

---

[3] 48 Federal Acquisition Regulations System Part 31 Section 205-6 (f)(1)(ii)
[4] 48 Federal Acquisition Regulations System Part 31

Details of Finding
DOE AR 000352

review, the Department indicated that it had initiated actions to recover unallowable costs identified for this recipient.

- For another recipient, the Department had not obtained detailed documentation substantiating approximately $10.1 million in funding reimbursed to the recipient.  To enhance controls, the recipient was placed on a "request for reimbursement" method of payment in 2010, which required invoice backup to be submitted to the Department prior to approval and disbursement of funds.  We found, however, that the documentation submitted as part of the reimbursement requests lacked supporting evidence such as vendor invoices or receipts for equipment purchases.  In addition, we reviewed documentation for a limited sample of transactions and determined that almost one-third of the items contained questionable or unallowable costs.  Without adequate supporting documentation, we were unable to determine the allowability and reasonableness of all costs charged to the project.  As such, we questioned approximately $10.1 million in costs claimed under the award.

  In response to our review, Department officials requested backup documentation from the recipient to support the questioned costs.  While we recognize the Department's efforts to resolve the questioned costs identified, we do not believe the documentation provided was sufficient to determine the allowability of costs charged to the Department.  For example, we noted that the Department did not obtain documentation for all cost categories such as labor and travel, among other things.  In addition, we identified instances in which the recipient charged estimated costs to the project instead of actual costs incurred, resulting in overcharges of about $1 million.  Further, the recipient had not passed along discounts to the Department as required by Federal regulations.[5]  Given that over $60 million in Recovery Act funding remained to be spent by the recipient, we believe it is imperative for the Department to obtain and review sufficient documentation to determine whether costs charged to the project are allowable, reasonable and in accordance with Federal regulations.

---

[5] 48 Federal Acquisition Regulations System Part 31 Section 201-5

Details of Finding
DOE AR 000353

- The Department reimbursed a third recipient about $3.7 million, or 74 percent of the award, even though documentation submitted to the Department lacked evidence that the costs claimed corresponded to the items in the approved project budget.  Although the recipient had not responded to a prior request by the Department for detailed documentation concerning the project's progress, additional funding through the Carbon Program was provided in September 2010 to expand work under an existing award.  After receiving the additional funds, the recipient did not respond to numerous requests from program officials for documentation or questions related to the scope of work.  Notably, officials suspended the award in January 2012 because the project was behind schedule, and the recipient failed to meet key deliverables.  Department officials indicated that they were working with the recipient to recover unallowable costs.  Until such time that all of the questionable costs have been repaid, we continue to question approximately $3.7 million in costs reimbursed by the Department.

- For a fourth recipient, the Department reimbursed the full Government share, approximately $573,000, even though the recipient had not met the terms of its award.  Specifically, we found that the recipient had not provided its portion of the agreed-upon cost share or submitted a final report describing the results of its efforts.  While Department officials were aware of these issues for over 2 years and stated that they had made attempts to obtain the report, they had not taken action to cancel the award or recover any of the reimbursed funds.  Until the recipient completes the requirements of the award and provides its full amount of cost share contributions, the Department remains at risk of paying more than its agreed-upon share of project costs.  Furthermore, similar to the recipients previously mentioned, we were unable to verify that costs claimed corresponded to budgeted amounts because documentation submitted to the Department as part of the reimbursement request did not contain supporting evidence.  Therefore, we questioned the $573,000 in total costs claimed under the award.

In summary, we questioned reimbursements of up to $16.8 million at four of the recipients reviewed (see Appendix 1).  Management commented, in response to our report, that it had taken action to begin recovering the questioned costs identified in our report, as

appropriate.  Until all questionable costs are resolved, however, the Department remains at risk of paying more than necessary for activities supporting the Carbon Program.

In addition to the previous examples, we also identified concerns related to another recipient's ability to meet agreed-upon cost share contributions.  Specifically, the scope of the recipient's work under its award covered tasks for two projects – one of which was for a carbon dioxide compressor used to support carbon storage that was to be completed by November 2012.  The other was for an engine power-wheel to be completed by December 2013.  Although the Department considered the award to be one project, our analysis separated the projects because of differing cost share percentages and scopes of work.  As of April 2012, the recipient had drawn down the full $20 million of the Department's cost share for tasks related to its compressor project, leaving approximately $10.4 million to be contributed by the recipient to complete the work.

Based on our analysis of existing financial documentation and future commitments for financial support at the time of our review, we estimated that the recipient may encounter a funding shortfall of at least $4.3 million (41 percent) of the total contribution for the compressor work.  Under the current method of reimbursement in which the recipient was not required to submit documentation for review and approval, the Department lacked controls to ensure that Recovery Act funds drawn down by the recipient for the engine work will not be used to cover the shortfall.  In fact, our review identified an instance in which the recipient drew down over $777,000 more than the amount authorized by the Department at that time.  Management confirmed that the recipient had drawn down more than the amount authorized at the time, but noted that corrective actions had been taken to address the issue.  Without additional monitoring, however, there is an increased risk that the Department may pay more than its agreed-upon share of the project's costs.

Subsequent to our field work, the recipient requested and the Department approved an extension to the compressor project's period of performance and reallocated funds that would allow the recipient additional time to meet its cost share.  In response to our review, management indicated that it did not share our concern regarding the recipient's ability to meet its cost share commitment based on these actions.  Management also stated that recipients are required to notify the Department if they are unable to meet the cost share and if not, recipients must reimburse the Department the proportionate share of project costs.  Given that the recipient

already exhausted the compressor project's Government's cost share and the project was a year behind schedule, we continue to believe that the recipient may be unable to meet its cost share commitment, increasing the risk that the scope of work may not be completed.

<u>Project Risks and Recovery Act Goals and Objectives</u>

We found that three recipients received funding even though the merit review process performed prior to award identified significant financial and/or technical issues.  The projects, which were awarded over $90 million in total, experienced delays related to finalizing awards due to problems meeting financial commitments or overcoming technical issues.  At the time of our review, the recipients had only spent about $7 million of the projects' funds.  Specifically:

- The Department awarded one recipient more than $48 million even though merit reviewers identified significant financial issues.  As noted during the merit review, the low score was assigned based on uncertainty surrounding the recipient's ability to raise its cost share, combined with the fact that the organization and its parent company had experienced annual operating losses since their inception in 2007 and 2004, respectively.  Rather than addressing the underlying issues related to the risks, the Department elected to accept the merit review's recommendation to lower the recipient's required cost share from 60 percent to 20 percent, or a reduction of over $24 million.

  Despite lowering the required cost share, the recipient was ultimately only able to raise $4.6 million of the $12.1 million needed for its cost share, further increasing the risk that the project's goals may not be realized.  As a result of financial problems, the recipient experienced schedule delays that increased the risk that intended goals and objectives would not be met.  Specifically, even though the period of performance for the award was October 2010 through September 2014, work on the project's second phase had not commenced as of July 2012 and was nearly 2 years behind schedule.  In fact, we noted that negotiations on budget and scope had yet to be finalized between the Department and the recipient.

  Based on the original period of performance of 48 months, we determined that the delays to the project would likely

extend the completion date beyond the expiration of Recovery Act funds. All Recovery Act funds may not be spent because the project's scope and budget had not been finalized, and because the second phase, which included construction and a majority of the funding, could not begin. At the time of our review, the recipient had only expended $2.5 million (5 percent) of its award.

- For another recipient, we noted that the project was awarded and had fully obligated $25 million by August 2010 even though it had been given a low technical score during a merit review. Although the merit review identified major technical issues, the recipient was still recommended for selection because reviewers believed that it had the ability to promote and enhance the objectives of the Recovery Act in an expeditious manner, especially job creation, preservation and economic recovery in spite of its technical shortcomings.

  We found, however, consistent with the identified technical issues, the project suffered a number of problems during execution. For instance, the scope of the project had been significantly reduced, and the proposed creation of 272 jobs may not be realized. In fact, only 68 jobs had been created as of July 2012. In addition, the Department reduced the recipient's cost share from $92.6 million to $11.6 million (87 percent decrease) even though the high cost share was a significant factor in project selection because it had not met the technical criteria specified in the funding opportunity announcement.

  Similar to other recipients, we determined that this project's goals and objectives were also at risk of not being met. In particular, we found that the terms and conditions of the project had not been fully defined almost 2 years after award. At the time of our review, the recipient still had not raised its required cost share and, therefore, could not proceed into project construction. As of July 2012, the project was already 7 months behind schedule, and the Department's project manager indicated that the recipient's Engineering, Procurement and Construction firm may withdraw from the project if construction did not start soon, thereby putting the project even further behind schedule and increasing the risk that it would not be completed before the expiration of Recovery Act funds. As of July 2012, the recipient had expended only about $4.4 million, or less than 18 percent of the award.

Details of Finding
DOE AR 000357

- We found that a third recipient's project was at risk of not meeting its intended goals and objectives. The recipient, as with the other project previously mentioned, was recommended for selection even though it had earned a low technical score. While major weaknesses related to technical aspects were identified, the project was selected to receive about $20 million based on its ability to expeditiously promote Recovery Act objectives and create a large number of jobs, as well as its proposed cost share contribution of 50 percent.

  Nearly 2 years after the award and obligation of funds, the project still had not been definitized because the Department had not yet resolved technical issues with the recipient, including proposed revisions to the project partner and location of work. While the Department had extended the period of performance, we found that the recipient had only spent about $125,000 at the time of our review, and the project may not be completed by the end of the Recovery Act if delays continue.

To its credit, the Department divided these projects into sub-phases as a control measure to mitigate the risks associated with each recipient, and to prohibit recipients from spending funds until technical milestones were achieved. The Department also delayed definitization of each award until recipients could raise cost share and/or negotiations regarding the scope of work were completed. Further, the Department considered alternatives, such as segmenting projects into modules, to allow additional time to raise cost share or to finalize preliminary design efforts and allow some work to begin while negotiations continued.

Procurement Practices

Recipient procurement practices supporting the Carbon Program did not always adequately ensure that subcontractor or vendor selections made by recipients represented the best value to the Government and were in accordance with relevant policies and procedures. Specifically, three recipients that we reviewed had not always documented their selections or sole source justifications, especially for instances in which the selections did not represent arm's-length transactions. In total, we identified over $4.1 million in recipient procurements that involved potential conflicts of interest. In each case, the recipients had provided information about the relationships to the Department that went undetected. In particular:

- Contrary to Federal regulations[6] and its own procurement policies designed to promote competition and cost efficiencies, one recipient had not documented results of vendor selections or sole source justifications.  The recipient's procurement manager stated that he had relied on engineers to justify selections.  This concerned us because we identified transactions totaling over $1.4 million in which the recipient contracted with an affiliated company that had representatives on its Board of Directors.  While we noted that evidence of the relationship was contained in the recipient's award documentation, it was not questioned by the Department.  Consequently, we could not determine, and the Department lacked assurance, that goods and services were procured from the most qualified sources at the best price available.  Until such time that the costs have been reviewed, we are questioning over $1.4 million in related party transaction costs.

- For a second recipient, documentation did not exist to support procurement transactions that involved a potential conflict of interest.  In particular, we found that the recipient's owner was also a co-owner, along with other members of his family, of a company that was performing work on the project and had received approximately $60,000 as of the time of our review.  Given the close relationship of the parties, these transactions raised concerns because neither we nor the Department could determine if the services were procured at the best price available.  In our view, evidence of the related party transactions included in the request for reimbursement packages sent to the Department, including lists containing employee last names common to both companies, should have led to questions about the relationship and the reasonableness of the costs.  While we question the $60,000, these costs were previously included in our analysis of questionable costs.

- The owner of a third recipient also owned the project's primary vendor that had received about $2.7 million, or more than 50 percent of the available Carbon Program funding.  Similar to the examples previously mentioned, documentation demonstrating the justification for selecting this vendor was not available; therefore, we could not determine if the services were procured at the lowest

---

[6] 10 Code of Federal Regulations Part 600 Sections 600.311 and 600.331 (a) and 48 Federal Acquisition Regulations System Part 31 Sections 31.201-2(d) and  31.201-3

available cost. Had a thorough review of documentation included in requests for reimbursement been conducted, evidence of the possible conflict of interest may have been identified and resulted in questions about the relationship and reasonableness of costs. For instance, we found that invoices submitted to the Department contained the same address for both the prime recipient and the recipient's vendor. While we are questioning the $2.7 million, these costs were previously included in our analysis of questionable costs.

In response to our review, the Department indicated that it had reviewed the transactions associated with the $60,000 in costs noted in our report and concluded that the amounts paid were reasonable for the services provided. The Department stated that it would review the other two projects discussed above for cost reasonableness. While this is a positive step, we remain concerned that similar transactions may occur because the Department failed to identify and/or question costs even though evidence of potential conflicts of interest was provided in the reimbursement requests.

Other recent Office of Inspector General efforts identified similar issues related to recipient procurement practices and the identification of conflicts of interest. For instance, our audit report on *The Department of Energy's Clean Cities Alternative Fuel Vehicle Grant Program Funded under the American Recovery and Reinvestment Act* (OAS-RA-12-12, May 2012) found that the Department had allowed recipients to award funding without documenting decisions to award contracts and/or identifying potential conflicts of interest as required by Federal procurement regulations.

**Performance Monitoring and Policies and Procedures**

The issues we identified occurred, in part, because program officials had not always provided effective monitoring and oversight of recipient activities. Specifically, the Department had not implemented certain performance monitoring controls that could have allowed for more thorough reviews of costs prior to reimbursement. In addition, we found that policies and procedures related to managing the Carbon Program were either not developed or not fully implemented.

<u>Monitoring of Recipients</u>

The Department had not implemented certain performance monitoring and oversight controls that could have allowed for more thorough reviews of costs prior to reimbursement and been used to identify questionable and/or unallowable costs. For

instance, the Department allowed two projects in our sample to remain on a method of reimbursement that permitted recipients to draw down funds from the Department without submitting supporting documentation for approval.  While the Department had the authority to request invoice backup at any time for one of the recipients, we found that it had neither requested nor reviewed any invoice backup to support claimed costs.  In addition, although terms and conditions of the awards required recipients to provide support for reimbursement claims, the Department's review of requests for reimbursement from three of the recipients previously mentioned was not sufficient to ensure that all costs were reasonable and appropriately documented.  Although the Department's Project Manager and Contract Specialist were responsible for reviewing requests for reimbursement and cost share contributions for reasonableness and allowability, our review identified that the Department had approved cost reimbursement requests without sufficient documentation to justify approval.  While the Department asserted that it had reconciled the amounts billed under each award to ensure they aligned with approved budgets and technical progress, documentation we reviewed provided no evidence to demonstrate that reconciliations were performed.  Furthermore, the Department had not exercised its authority under the terms of two of the awards to obtain additional backup documentation.  A Department official indicated that certain types of information, such as timecards, were not requested due to perceived liability concerns related to protecting personally identifiable information.

In addition, the Department had not ensured that reviews of recipients' controls over accounting practices designed to identify irregularities were conducted in a timely manner.  In particular, program officials relied on the results of a Defense Contract Audit Agency (DCAA) audit of incurred costs claimed from Fiscal Years 2004 – 2005 for one recipient to determine whether indirect rates were reasonable and the accounting system was adequate.  At the time of our review, however, the Department had not requested a follow-up audit of the recipient's accounting system despite an increase in the scope and size of the award as well as changes in company's structure.  A follow-up review may have identified many of the same issues noted in our report.  For another recipient, a 2010 DCAA review identified significant weaknesses related to the ability to accumulate and bill costs to Government contracts.  The Department, however, had not ensured that compliance reviews of internal controls required by 10 Code of Federal Regulations Part 600 were conducted to ensure that weaknesses were corrected.

Furthermore, we noted that the Department waived cost/price analyses required by the Department's Federal Project Management Center for several recipients despite uncertainties related to their financial positions.  Cost/price reviews are designed to determine the reasonableness of proposed budgets and details of cost share contributions.  Under the Federal Project Management Center's guidelines, a comprehensive cost/price analysis must be performed to assess specific items of costs for any negotiated award anticipated to be in excess of $15 million.  However, Department officials indicated that based on the pressure to obligate Recovery Act funds in a timely manner, a number of projects had not received a cost/price review prior to award.  Additionally, officials indicated that while in the past they had relied on the DCAA to conduct reviews of recipients, there had been a significant backlog of DCAA reviews since 2008, and the Department was unable to obtain the reviews prior to making awards.  However, we noted that the Department had a contract with an independent public accounting firm that was available to programs for obtaining, among other things, cost/price reviews under the Recovery Act.  Had such reviews been completed, the Department may have been able to identify weaknesses related to questionable costs and/or the recipients' ability to meet cost share obligations.

Finally, while program officials generally performed site visits to recipients, we found that these visits focused on technical aspects of the projects and had not included reviews of compliance with Federal procurement requirements or cost documentation.  Contract specialists – the Department officials responsible for approving reimbursement requests – that we spoke with expressed concerns with being overwhelmed by their workload and did not have time to sufficiently review costs for every project.  In preliminary comments on our report, officials noted that their substantial involvement was only required for technical oversight, not financial monitoring.  Officials indicated that they relied on recipients to ensure compliance with Federal requirements and were concerned that they may be accused of negatively impacting the project's progress.  However, cooperative agreements, by definition, require the substantial involvement of the Department including enhanced oversight and stewardship responsibilities such as reviews of financial performance.  Thorough reviews of procurement practices and costs may have identified certain weaknesses noted in our report, including potential conflicts of interest and inadequate competition.

Policies and Procedures

The Department had not always developed and/or implemented policies and procedures for effectively managing administration of the Carbon Program. Specifically, we found that the program had not maintained records related to significant program decisions in accordance with regulations that could have supported the Department's decisions to accelerate existing projects or the rationale used to select projects to receive additional funding. Federal and Departmental policies require decisions of significant events to be documented and made available for examination. Due to the significant amount of funding awarded to existing projects, we believe that the Department's decision and selection process should have been formally documented to ensure that projects selected aligned with the goals of the Carbon Program. In addition, in light of the transparency and accountability requirements of the Recovery Act, a sound records management system was imperative to ensure that funds were spent in the best interest of the Government and taxpayers.

Even when policies and procedures were in place such as the selection criteria in the funding opportunity announcement, the Department had not consistently applied them to ensure effective management of the Carbon Program. Specifically, program officials selected recipients to receive funding as part of the merit review process even though the recipients did not meet established selection criteria designed to identify financial or technical issues that could impact the success of a project. As previously mentioned, three recipients received funding even though the merit review process identified significant financial and/or technical issues prior to being recommended for selection. The same recipients have experienced significant project delays that increased the risk that the projects may not be completed, objectives of the Carbon Program may not be met and Recovery Act funds may not be spent.

Finally, the Department had not developed formal procurement policies and procedures requiring officials to review funded projects for related party transactions or potential conflicts of interest. According to Federal regulations[7], the reasonableness of specific costs must be examined with particular care in connection with firms or separate divisions that may not be subject to effective competitive restraints, including consideration of arm's-length bargaining.

---

[7] 48 Federal Acquisition Regulations System Part 31 Section 31.201-3(a) and, 31.201-3(b)

Details of Finding
DOE AR 000363

As noted in this report, even though evidence of related party transactions existed in documentation submitted to the Department for recipients we evaluated, the Department had not reviewed the information as required for such transactions to identify possible conflicts of interest and subsequently reimbursed the recipients without questioning the reasonableness of the costs. In addition, although the Department's guidance on Financial Assistance Awards[8] required a consideration of the relationships among partnerships or consortiums during the award process, it did not have formal procedures requiring officials to review available information submitted by recipients regarding potential conflicts of interest. Furthermore, the Department had not established policies requiring a review of procurement practices to ensure selections made by recipients were appropriate and in accordance with relevant policies and procedures. Without adequate documentation, neither we nor the Department could determine whether subcontractor or vendor selections represented the best value to the Government.

**Impact and Path Forward**

In light of the issues we identified, we believe that Recovery Act and Carbon Program goals may not be achieved without implementation of corrective actions. Specifically, projects may not be completed, deliverables might not be received, job creation will not meet anticipated targets and Recovery Act funding could go unspent. During our review, we also identified approximately $18.3 million in questioned and/or unallowable costs that should be resolved. Unsubstantiated cost reimbursements and cost share contributions increase the risk that the Department will pay more than its agreed-upon share of project costs. In addition, our review identified other issues such as inadequate procurement practices that increase the risk that the Department may not obtain goods and services at the best price available or from the most qualified sources. This is significant because of the $1.5 billion in Recovery Act funding obligated to projects under the Carbon Program, over $860 million, or approximately 58 percent, remains to be spent.

**RECOMMENDATIONS**

Due to the significant amount of funding that remains to be spent, the Department has an opportunity to enhance its path forward. To help achieve the objectives of the Recovery Act, we recommend that the Assistant Secretary for Fossil Energy direct Carbon Program officials to:

1. Enhance monitoring procedures, including evaluating recipient documentation to support costs claimed and ensuring that reviews such as audits of internal controls are conducted, as required;

---

[8] Department of Energy Guide to Financial Assistance, Chapter 2 Section 2.5 (d)(1)

2.  Ensure that significant decisions supporting the Carbon Program are adequately documented; and,

3.  Develop and implement policies and procedures to ensure the Department conducts reviews designed to identify and mitigate potential conflicts of interest and enforce requirements pertaining to documentation of procurement decisions including reasons for sole source selections.

In addition, we recommend that the contracting officers for the Carbon Program:

4.  Conduct a review of questioned costs identified in our report and determine whether the costs were allowable and reasonable.

**MANAGEMENT REACTION AND AUDITOR COMMENTS**

Management concurred with three of the four recommendations in our report and indicated that it had initiated and/or taken corrective actions to address our findings. Management agreed that cooperative agreements required substantial involvement and commented that it was committed to effective management of its cooperative agreements and strives to implement sound management practices with the proper balance of Federal stewardship. For instance, management stated that it will review project monitoring procedures to ensure that sound guidance exists for conducting consistent, thorough reviews of documentation supporting invoiced costs. In addition, management commented that it will issue a policy statement that significant programmatic decisions should be adequately documented. Furthermore, management noted that it had taken action to recover a portion of the questioned costs identified in our report and will recover the remaining costs, as appropriate. Although management concurred with the majority of our recommendations, it did not agree that the Department should implement procedures related to documenting procurement decisions and asserted that recipients were required to report potential conflicts of interest. Management also provided technical comments that have been addressed in the body of the report, where appropriate. We have summarized management's comments and our response to each. Management's comments are included in their entirety in Appendix 4.

Management commented that the Department was not required to competitively select projects under the Carbon Program and stated that the Recovery Act guidance cited in our report was not a statutory requirement. Management also asserted that, although

the decision to use Recovery Act funding to accelerate projects was made by senior Department officials who had since left the Department, we failed to obtain access to records supporting those decisions.

Our review determined that the Department used the Recovery Act guidance as criteria when developing its project operating plan and funding opportunity announcement for the Carbon Program. As a result of the Department identifying it as criteria for implementing the program, we believe that officials should have selected projects in accordance with the guidance. We take specific issue with management's comment that we failed to obtain records, which it implies were available. As noted in our report, we made numerous attempts to obtain supporting documentation related to management's decision-making process. However, the Department was unable to provide records demonstrating the formal approval to use funds to accelerate existing projects.

Management commented that the Department did not use merit review scores to exclude projects from selection and noted that selecting officials also consider program policy factors when deciding which projects should receive financial assistance. Management also asserted that the risk of projects falling behind schedule and not meeting goals or cost share requirements is a common risk that cannot be eliminated when funding novel demonstration and research and development projects.

As noted in our report, the Department awarded funds to recipients even though the merit review process identified significant technical and/or financial issues. While we recognize the Department's ability to consider other factors in the selection process and understand that projects such as those included in our review encounter various risks, we found that the financial and/or technical issues identified by the merit review for the recipients included in our evaluation ultimately led to delays in finalizing the awards. In light of the difficulties identified during the merit review process, we believe the problems highlighted in our report were reasonably predictable and placed the projects at significant risk for failure.

Management did not agree with our recommendation that the Department should develop and implement policies and procedures designed to identify and mitigate conflicts of interest or that it should enforce requirements pertaining to documentation of procurement decisions. Management stated that obtaining full documentation of pre-award decisions was neither practical nor required. In addition, management indicated that it was the

recipients' responsibility to identify and mitigate conflicts of interest using plans or policies specific to the organization and commented that recipients are required to provide assurance to the Department that conflicts of interest do not exist.

Although management disagreed with our recommendation, Federal and Department regulations require recipients to maintain documentation supporting all costs incurred under an award when funded with Federal monies, which would include support for procurement decisions such as the use of noncompetitive sub-awards.  We agree that recipients have a duty to identify and surface conflicts of interest issues.  The Department, however, is also required to review costs for related party transactions, including potential conflicts of interest and arm's-length transactions.  The Department's guidance on Financial Assistance Awards also required a consideration of the relationships among partnerships or consortiums during the award process.

## Appendix 1

### QUESTIONED COSTS

This chart summarizes the questioned costs identified in the report. As discussed in the report, the questioned costs related to pre-award costs, unsupported costs, unallowable costs and questionable costs associated with related party transactions. These costs were discussed in the Questioned Costs and Procurement Practices sections of the report.

| Example | Questioned Costs |
|---|---|
| 1.  Costs Incurred Prior to Award | $1,082,000 |
| 2.  Unjustified Bonuses Charged to Project | $770,000 |
| 3.  Unallowable Costs Charged to Project | $600,000 |
| 4.  Unsupported Costs Reimbursed to Recipient | $10,100,000 |
| 5.  Costs Not Corresponding to Approved Budget | $3,700,000 |
| 6.  Unsupported Costs and Final Deliverables Not Received | $573,000 |
| Sub-total | $16,825,000 |
| 7.  Costs Associated with Related Party Transactions | $1,434,000 |
| **Total** | **$18,259,000** |

## Appendix 2

**OBJECTIVE**          To determine whether the Department of Energy (Department) effectively and efficiently managed the Industrial Carbon Capture and Storage Program (Carbon Program).

**SCOPE**              This audit was performed between February 2012 and March 2013, at the National Energy Technology Laboratory (NETL) in Morgantown, West Virginia and Pittsburgh, Pennsylvania.  In addition, we conducted site visits to three recipients in Bellevue, Washington; Monrovia, California; and Highland Heights, Ohio.

**METHODOLOGY**        To accomplish the objective, we:

- Obtained and reviewed relevant laws and regulations related to implementation of the American Recovery and Reinvestment Act of 2009 and financial assistance award administration.

- Reviewed the Funding Opportunity Announcement for the Carbon Program as well as merit review information and selection documentation.

- Identified a universe of 46 active and/or closed cooperative agreements under the Carbon Program and reviewed award documentation for a judgmental sample of 15 awards that were selected based on recipient type and dollar coverage.  For recipients included in our sample, we judgmentally selected financial transactions to review for questionable costs based upon reviews of recipient files.

- Conducted site visits to three recipients to discuss management of the projects, reviewed recipients' policies and procedures for tracking project costs and analyzed financial transactions related to the projects.

- Interviewed project managers and contract specialists for a sample of recipients to determine the roles and responsibilities related to monitoring of awards.

- Conducted interviews with NETL officials to discuss management of the Carbon Program.

We conducted this performance audit in accordance with generally accepted Government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe the evidence obtained provides a reasonable basis for our findings and

## Appendix 2 (continued)

conclusions based on our audit objective. Accordingly, we assessed internal controls and compliance with laws and regulations to the extent necessary to satisfy the audit objective. We assessed performance measures in accordance with the *GPRA Modernization Act of 2010* and concluded that the Department had established performance measures related to the Carbon Program. Because our review was limited, it would not necessarily have disclosed all internal control deficiencies that may have existed at the time of our audit. Finally, we conducted an assessment of computer-processed data relevant to our audit objective and found it to be reliable.

Management waived an exit conference.

Objective, Scope and Methodology
DOE AR 000370

## Appendix 3

### PRIOR REPORTS

- Audit Report on *The Department of Energy's $700 Million Smart Grid Demonstration Program Funded through the American Recovery and Reinvestment Act of 2009* (OAS-RA-13-08, January 2013).  This report found that the Department of Energy (Department) had not always managed the Smart Grid Demonstration Program effectively and efficiently.  Specifically, the report identified weaknesses related to reimbursement requests, cost-share contributions and coordination efforts with another Department program.  Further, the Department had not adequately reviewed financial transactions and planned for or monitored recipient cost-share provisions, resulting in about $12.3 million in questioned costs.

- Audit Report on *The Department of Energy's Clean Cities Alternative Fuel Vehicle Grant Program Funded under the American Recovery and Reinvestment Act* (OAS-RA-12-12, May 2012).  This report found that the Department had not always effectively managed the use of American Recovery and Reinvestment Act of 2009 funding and other post-award aspects of the Clean Cities Program.  Specifically, the report identified issues pertaining to questionable reimbursements and cost share contributions, costs incurred prior to award and recipient procurement decisions that had not been documented as required by Federal regulations.

- Audit Report on *The Department's Management of the Smart Grid Investment Grant Program* (OAS-RA-12-04, January 2012).  This report found that the Department had approved projects that used Federally-sourced funds to meet cost share requirements even though it was prohibited by regulation.  In addition, the report noted that the Department had not always followed effective business practices when reimbursing grant recipients.

- Audit Repot on *The Advanced Research Projects Agency – Energy* (OAS-RA-11-11, August 2011).  This report found that the Advanced Research Projects Agency – Energy, an agency within the Department, had not drafted or, in some cases, approved draft policies and procedures in significant areas such as monitoring and oversight of awardees and the review of awardee invoices.  The report noted that due to a lack of guidelines, the emphasis of monitoring and oversight activities, particularly during site visits, was on technical performance and not on business aspects of the awards such as the recipient's internal control structure.  In addition, the report found issues regarding the consistency of documentation submitted by recipients.

- Audit Report on *Management of Fossil Energy Cooperative Agreements* (DOE/IG-0692, July 2005).  This report found that the Office of Fossil Energy was not always adequately involved with monitoring and oversight of cooperative agreements, and Federal project officials had not always taken adequate action to address project management or financial shortcomings.  The report noted that project officials had not performed needed reviews or waived requirements designed to ensure that the Government's interests were protected.

## Appendix 4

**MANAGEMENT COMMENTS**

**Department of Energy**
Washington, DC  20585

January 17, 2013

**MEMORANDUM FOR:**     **RICKEY HASS,**
**DEPUTY INSPECTOR GENERAL FOR AUDIT AND**
**INSPECTIONS**

**FROM:**     **CHUCK MCCONNELL,**
**ASSISTANT SECRETARY FOR FOSSIL ENERGY**

**SUBJECT:**     **FE Comments on Draft Audit Report on "The Department of**
**Energy's Industrial Carbon Capture and Storage Program**
**Funded by the American Recovery and Reinvestment Act"**

The Office of Fossil Energy (FE) appreciates the opportunity to review the Inspector General's (IG) Draft Audit Report entitled, "The Department of Energy's Industrial Carbon Capture and Storage Program Funded by the American Recovery and Reinvestment Act (the ICCS Program)." FE welcomes the opportunity to work with the IG to improve business practices in our organization. FE is committed to effective management of its Cooperative Agreements and strives to implement sound management practices with the proper balance of federal stewardship. The IG identified a number of issues.  DOE FE concurs with some findings but not with others. In the enclosed response along with attachment, we provide our assessment of the findings and corrective actions to be implemented where warranted.

### BRIEF BACKGROUND

House Report 111-16 contained guidance from the conferees of the Senate and House of Representatives that DOE should use $1.52 billion of the funds appropriated by the American Recovery and Reinvestment Act (Recovery Act) for "a competitive solicitation for a range of industrial carbon capture and energy efficiency improvement projects, including a small allocation for innovative concepts of beneficial $CO_2$ reuse." Consistent with that guidance, FE issued a competitive solicitation on June 8, 2009, entitled "Recovery Act: Carbon Capture and Sequestration from Industrial Sources and Innovative Concepts for Beneficial $CO_2$ Use," Funding Opportunity Number DE-FOA-0000015, that made available approximately $1.322 billion for projects involving large-scale carbon capture and storage from industrial sources, and $100 million for projects involving innovative concepts for beneficial carbon dioxide reuse. The solicitation referred to these two categories of projects as "Area of Interest 1" and "Area of Interest 2," respectively.  The projects in these two categories comprise FE's ICCS Program, which is authorized by section 703 of the Energy Independence and Security Act, 42 U.S.C. § 17251.[1]

---

[1]  Senior FE officials decided to use approximately $91 million of these funds to expand existing projects that had been competitively selected under previous competitive solicitations.

## Appendix 4 (continued)

The solicitation was intended to result in awards to approximately 12 projects in each area of interest. Each award would have two phases; based on the results of the first phase, FE intended to select six projects in each area of interest to proceed to the second phase. FE made its selections for proceeding to phase 2 on July 12, 2010; it determined that only a total of nine projects (from both areas of interest) were suitable for continuation. Because there were many fewer projects than FE had anticipated proceeding to phase 2, approximately $575 million of Recovery Act funding that FE had allocated to this solicitation remained unobligated. With insufficient time remaining for FE to complete another competitive solicitation,[2] FE recommended to DOE's Recovery Act team that these funds be obligated to existing FE research and development (R&D) projects that could accelerate achievement of the objectives of the Department's Clean Coal Research Program. This recommendation was accepted. Many but not all of these R&D projects had been selected on a competitive basis when they were first awarded DOE funding. If they were successful, they could produce new technologies that might facilitate carbon capture from industrial sources.

### Summary of FE Assessment

DOE is committed to effective management of its ICCS and R&D programs and the cooperative agreements it awards under these programs. The audit made a number of findings and contained four recommendations. FE agrees with some of these findings and recommendations, but not all of them. FE has the following general responses to the audit report:

1. The conferees' guidance in House Report 111-16 that DOE use $1.52 billion in Recovery Act funds for a competitive solicitation is not a statutory requirement. When phase 2 selections under the ICCS competitive solicitation failed to produce sufficient awards to obligate the entire $1.52 billion, DOE decided to use the remaining funds for R&D and other projects relating to carbon capture, sequestration and beneficial use. This decision was made by senior DOE officials in consultation with the Office of Management and Budget. It is FE's understanding that the IG auditors failed to obtain access to the records of the senior officials who made these decisions but who are no longer with the Department..

2. The report states that some projects were selected for award even though they did not meet "minimum merit review financial and /or technical scores." The Department does not use minimum scores to exclude projects from selection. In addition to considering technical and financial scores, selecting officials consider program policy factors in deciding which projects should receive financial assistance.

3. The report states that a number of projects are falling behind schedule and may not meet their goals or their cost share requirements. This is a common risk when funding novel demonstration and R&D projects, and one that cannot be eliminated. Some of the projects will not reach completion. The remaining Recovery Act funds allocated to those projects will be returned to the Treasury.

The following are FE's responses to the report's specific recommendations.

**RECOMMENDATION #1:** *Enhance monitoring procedures, including evaluating recipient documentation to support costs claimed and ensuring that reviews such as audits of internal controls are conducted, as required.*

**MANAGEMENT RESPONSE:**
Project monitoring procedures will be reviewed to ensure sound guidance exists for conducting consistent, thorough reviews of documentation supporting invoiced costs. Additionally, FE has been

---

[2] Funds made available by the Recovery Act needed to be obligated no later than September 30, 2010.

## Appendix 4 (continued)

conducting periodic invoice review training to ensure both project management and procurement staffs are well trained.

Section 316 audits are conducted on for-profit entities to ensure their compliance with internal procedures. The Department's guidance for completion of these specific audits has been issued and we are carefully monitoring and enforcing the requirement. Also, recommendations identified in the audits are being communicated to the recipients via Management Decision letters.

**RECOMMENDATION #2:** *Ensure that significant decisions supporting the Carbon Program are adequately documented.*

**MANAGEMENT RESPONSE:** FE concurs that significant decisions supporting the ICCS and other programs should be adequately documented. In the future, FE will issue a policy statement to this effect, and seek to obtain copies of such documentation from senior officials before they leave the Department.

**RECOMMENDATION #3:** *Develop and implement policies and procedures designed to identify and mitigate potential conflicts of interest and enforce requirements pertaining to documentation of procurement decisions.*

**MANAGEMENT RESPONSE:** DOE implements projects in accordance with 10 CFR Part 600. Regarding the documentation of recipient procurement decisions, these regulations provide for competition to the "maximum extent practical." FE notes that with regard to the recommendation for full documentation of pre-award decisions, it is neither practical nor required to have such procedures or receive such information.

Part 600 places the primary responsibility for identification and mitigation of conflicts of interest on the recipient using plans or policies specific to the organization. It also these projects to undergo audits, which include a review of potential financial conflicts of interest. FE has developed an award provision that requires an assurance from recipients regarding the absence of any potential conflicts of interest, and requires recipients to notify DOE of any new or modified subawards or contracts they make.

**RECOMMENDATION #4:** *Contracting Officers for the Carbon Program should conduct a review of questioned costs identified in our report and determine whether the costs were allowable and reasonable.*

**MANAGEMENT RESPONSE:** The report identifies $2,973,000 in questioned costs and $13,800,000 in unsupported costs. The two projects with questioned costs will be examined in detail by FE, determinations will be made and documented, and appropriate actions taken. Of the two projects with unsupported costs, $3.7 million of the unsupported amount is associated with one project that has already been examined and the entire amount identified as improper. The Department has recovered some of these costs and is continuing to pursue recovery of the remainder. As for the second project (which accounts for the remaining $10.1 million of unsupported costs), FE is gathering additional information, and once this review is completed, FE will take appropriate action.

**ATTACHMENTS:**

1. FE Responses to Specific Report Findings

IG Report No.  <u>OAS-RA-13-15</u>

# CUSTOMER RESPONSE FORM

The Office of Inspector General has a continuing interest in improving the usefulness of its products.  We wish to make our reports as responsive as possible to our customers' requirements, and, therefore, ask that you consider sharing your thoughts with us.  On the back of this form, you may suggest improvements to enhance the effectiveness of future reports.  Please include answers to the following questions if applicable to you:

1.   What additional background information about the selection, scheduling, scope, or procedures of the audit or inspection would have been helpful to the reader in understanding this report?

2.   What additional information related to findings and recommendations could have been included in the report to assist management in implementing corrective actions?

3.   What format, stylistic, or organizational changes might have made this report's overall message more clear to the reader?

4.   What additional actions could the Office of Inspector General have taken on the issues discussed in this report that would have been helpful?

5.   Please include your name and telephone number so that we may contact you should we have any questions about your comments.

Name _____    Date _____

Telephone _____    Organization _____

When you have completed this form, you may telefax it to the Office of Inspector General at (202) 586-0948, or you may mail it to:

Office of Inspector General (IG-1)
Department of Energy
Washington, DC 20585

ATTN:  Customer Relations

If you wish to discuss this report or your comments with a staff member of the Office of Inspector General, please contact our office at (202) 253-2162.

DOE AR 000375

This page intentionally left blank.

DOE AR 000376

The Office of Inspector General wants to make the distribution of its reports as customer friendly and cost effective as possible.  Therefore, this report will be available electronically through the Internet at the following address:

U.S. Department of Energy Office of Inspector General Home Page
http://energy.gov/ig

Your comments would be appreciated and can be provided on the Customer Response Form.

DOE AR 000377

Case 3:26-cv-01417-RFL    Document 83-2    Filed 05/29/26    Page 378 of 391



An official website of the United States government    Here's how you know

**U.S. DEPARTMENT of ENERGY**

Policy & Priorities    Leadership & Organization    Topics    News & Events    About

Funding Opportunities

Office of Inspector General    Audit Report: OAS-RA-13-15

# Audit Report: OAS-RA-13-15

The Department of Energy's Industrial Carbon Capture and Storage Program Funded by the American Recovery and Reinvestment Act

[Office of Inspector General](#)

March 21, 2013

 Estimated Read Time 2 min

March 21, 2013

**The Department of Energy's Industrial Carbon Capture and Storage Program Funded by the American Recovery and Reinvestment Act**

The Department of Energy (Department) received nearly $1.5 billion through the American Recovery and Reinvestment Act of 2009 (Recovery Act) to invest in clean industrial technologies and sequestration projects through the Industrial Carbon Capture and Storage Program (Carbon Program). The National Energy Technology Laboratory awarded 46 cooperative agreements to a variety of demonstration and research and development projects. The agreements required substantial involvement by Federal project managers and relied on recipients to share in the investments needed to complete the projects. The audit found that the Department had not always effectively managed the Carbon Program and the use of Recovery Act funds. In particular, our review of the Carbon Program, including 15 recipients awarded a total of approximately $1.1 billion, revealed that the Department had not adequately documented the approval and rationale to use $575 million of the $1.1 billion reviewed to accelerate existing projects rather than proceeding with new awards as required by Federal and Department policies. In addition, the Department reimbursed recipients approximately $16.8 million without obtaining or reviewing adequate supporting documentation, and awarded three recipients over $90 million in Recovery Act funding even though the merit review process identified significant financial and/or technical issues. Further, the Department had not ensured that recipient subcontractor or vendor selections for goods and services represented the best value to the Government. Therefore, we identified up to $18.3 million in questionable reimbursement claims that were approved by the Department for just the sample of awards reviewed. The issues identified occurred, in part, because program officials had not always provided effective monitoring and oversight of recipient activities. In response to our finding, management concurred with most of the recommendations and indicated that it had initiated and/or taken corrective actions to improve the Department's implementation of the Carbon Program.

Topic: Financial Asssitance

DOE AR 000378

Case 3:26-cv-01417-RFL   Document 83-2   Filed 05/29/26   Page 379 of 391

## Audit Report: OAS-RA-13-15

**Committed to Restoring America's Energy Dominance.**

**Follow Us**

### Quick Links

Leadership & Offices

Newsroom

Contact Us

Careers

### Resources

Budget & Performance

Directives, Delegations, & Requirements

Freedom of Information Act (FOIA)

Inspector General

Privacy Program

### Federal Government

USA.gov

The White House

Open Gov    Accessibility    Privacy    Information Quality    No Fear Act    Web Policies    Vulnerability Disclosure Program

Whistleblower Protection    Equal Employment Opportunity    Notice of Court Orders

DOE AR 000379



**U.S. Department of Energy**
Office of Inspector General
Office of Audits and Inspections

# Audit Report

## The Hydrogen Energy California Project



OAS-RA-13-22

June 2013

DOE AR 000380



# Department of Energy
Washington, DC 20585

June 6, 2013

MEMORANDUM FOR THE ACTING DEPUTYASSISTANT SECRETARY FOR CLEAN
                  COAL
                  DIRECTOR FOR POLICY, OFFICE OF ACQUISITION AND
                  PROJECT MANAGEMENT

FROM:           David Sedillo
                 Director, Western Audits Division
                 Office of Inspector General

SUBJECT:      INFORMATION:  Audit Report on "The Hydrogen Energy California
                 Project"

## BACKGROUND

Under the American Recovery and Reinvestment Act of 2009, the Department of Energy's (Department) Office of Fossil Energy received $3.4 billion to focus on the research, development and deployment of technologies to use coal more cleanly and efficiently.  In September 2009, the Department approved a cooperative agreement award with a Government contribution of $308 million to Hydrogen Energy California, LLC (HECA) to construct a commercial power plant to demonstrate the capture and underground storage of carbon dioxide.  The project was expected to be completed in November 2018, at a total cost of about $2.8 billion.

In March 2011, after the Department and HECA spent approximately $75 million, HECA's original recipients notified the Department that they intended to terminate the agreement because the project did not meet their requirements for economic viability due to rising capital costs and difficulties in securing power purchase agreements from potential customers.  With the Department's assistance, HECA found new owners that believed the project could be economically viable.  In September 2011, the Department modified the cooperative agreement to recognize the change in ownership and increased total project cost to approximately $4 billion with a Department cost share of $408 million.

We initiated this audit to determine whether the Department effectively managed the modification of the HECA cooperative agreement and subsequent cost share activities.

## RESULTS OF AUDIT

The problems encountered with the terminated $2.8 billion agreement, economic viability and securing power purchase agreement arrangements were acknowledged and understood within the Department and the Office of Fossil Energy.  Thus, our audit focused on the revised agreement and on lessons learned from the earlier experience.  In short, we found that in assessing the

DOE AR 000381

viability of the modified project, the Department relied on financial projections that were not always fully supported and that the Department had not ensured that only allowable costs had been included in the recipient's cost share contribution.

## Financial Projections

The Department had not obtained and reviewed recipient documentation to substantiate key projections in the financial model used to support approval of the modified $4 billion agreement. The financial model is routinely required by the Department for projects of this nature and is used to demonstrate the financial viability of the project based on projected revenues and expenditures. Although the Department required the original recipient to support financial projections, the merit review of the award criticized the lack of supporting documentation provided by the recipient. In the case of the subsequent change of ownership, the Department did not require the new owners to provide supporting documentation for financial projections even though comparable information was available from other Departmental reports and projects at the time of the modification. For example, the Department:

- Did not reconcile interest rate projections of 5.25 percent for bonds and 6.5 percent for a bank loan. These rates were substantially lower than those previously identified by the Department as reasonable for similar projects. HECA officials stated that the interest rates projected in the financial model were based on conversations with one of its vendors and a financier; however, they did not have documentation to support these claims. Department studies published in 2008 and 2011, indicated interest rates of 8.5 percent to be reasonable for high-risk power projects with less debt, shorter debt repayment periods, and more equity than what HECA projected in its financial model.

- Did not require support for operations and maintenance costs from the recipient. We found that HECA's projected operations and maintenance costs were 36 percent lower than a similar, but smaller, carbon capture power plant. This information, while available at the time of the change in ownership, raised concerns, in our judgment, as to the reasonableness of HECA's assertions.

- Accepted estimates for property tax and insurance cost projections that were considered to be "place-holders" by the new owner. We found that an estimate by a local independent non-profit organization indicated that HECA's property taxes could be roughly 10 times higher than projected. Additionally, we found that a similar but smaller power plant's insurance costs were at least twice as high as HECA's projection. These information sources were readily available at the time of the HECA ownership change. A HECA official stated the costs presented in the financial model were placeholders and the actual amounts could be higher than the projected values.

Department officials stated that at the early stage of the project many of the projections were subject to change. We recognize that some projections in the financial model could change depending on the results of the first phase of the project. However, a realistic and fully supported financial model is an important tool for the Department to assess project risk and allows informed decisions as to future viability.

2

DOE AR 000382

We noted that, the recipient provided seven updates to the financial model since the change in ownership was formalized, although not required by the Department.  In particular, the recipient updated information on operations and maintenance, property tax and insurance costs.  While recent updates included lowered projected interest rates, the recipient's current update to the financial model showed that the total project cost was likely to increase by about $800 million after adjustments to the budgeted debt amount and expenses, including engineering costs.  Department officials told us that they reviewed the updates for reasonableness, but had not required any supporting documentation and could not explain changes made in the updates.

In response to our concerns, Department officials stated that they chose to concentrate on the primary drivers of project returns, which included items such as the total project cost and debt to equity ratio.  They stated the basic functionality of the model was also tested as well and it was always the Department's intention to validate the financial model assumptions in much greater detail before recommending advancement into the construction phase of the project.  Department officials further noted that the recipient was required to submit special status reports and obtain Contracting Officer approval when there were significant favorable or adverse impacts on the project.  However, in our view, the recent significant projected increase in the total project cost and potential adverse impact on the debt to equity ratio that has occurred since the change of ownership, as previously noted, increased the Department's risk and demonstrated the need for the Department to obtain and review supporting documentation for key projections made in financial models in modifying future cooperative agreements.

Department Guidance

Although the Department had policies and procedures governing the review and approval of original financial assistance awards, there was no guidance governing the extent of support or review required for changes in the ownership and terms of a project.  In the absence of specific policies and procedures, the Department conducted a technical analysis of the new owner's revised budget but did not perform a more extensive merit review.  A merit review was performed for the original award and included an evaluation of financial model projections.  In a technical evaluation of budget, a high-level summary of the budget and cost elements is reviewed; however, a review of supporting documentation is not required.

Department officials did not agree with our concerns regarding the lack of supporting documentation for the financial projections.  Department officials stated that the level of financial review conducted at the ownership change was likely equivalent to or better than the level performed for the original award.  However, as noted, although the Department required supporting documentation for financial projections in the original award, the merit review was critical of the lack of supporting documentation for financial projections.  In the case of the change of ownership, Department officials told us that they had not required supporting documentation. According to a 2007 report to Congress, *Issues Related to the Clean Coal Power Initiative*, the Department stated that in order to avoid unspent funding and failed financial or scientific projects in the Clean Coal Technology Program, the Department would ensure all future proposals would require comprehensive documentation and analysis of finance, marketing and siting information.  Specifically, proposal evaluations were to include an extensive financial analysis in an effort to improve the staff skill levels and procedures used to manage cooperative agreements.

3

Although it recognized the very preliminary nature of financial projections provided by HECA, the Department did not require periodic updates or a detailed analysis of the financial projections in the modification agreement.  To its credit, the recipient has provided evolving projections to the Department, even though such updates are not required under the terms and conditions of the modified agreement.  The Department required HECA to only submit a revised financial model at the end of the definition phase; however, there were no requirements to submit updated and revised financial projections as the definition phase progressed and revisions were made to the projections.  Department officials agreed that they could have added special terms and conditions to the cooperative agreement requiring updates to the financial model including support for the updates.  However, they told us that they did not have concerns regarding the recipient that warranted the imposition of special terms and conditions.  In our view, a requirement for the recipient to provide periodic updates to the financial projections was reasonable, given the history of the project, the preliminary nature of the projections related to the modified agreement, and the fact that the modified agreement was not subject to the same level of scrutiny as the original award.

Policy officials from the Department's Office of Acquisition and Project Management told us that the current policies and procedures do not address changes in ownership for financial assistance awards.  These officials also indicated that the Department was reviewing its financial assistance procedures and considering possible changes at the time of our audit.  In our view, having such policies and procedures in place would help ensure that proposals for changes in ownership are required to provide supporting documentation equivalent to the original award.  Additionally, a provision could be made for periodic updates to financial projections that are relied on in approving the modifications.

Cost Share

We also found that the Department had not ensured that the new owner was credited for only allowable costs as part of its cost share contribution.  HECA had not provided documentation supporting that its cost share contributions did not include unallowable costs.  In particular, the Department approved a $737,544 credit toward HECA's cost share for pre-award direct labor, but notified HECA that costs associated with work on modifying the cooperative agreement was not an allowable pre-award cost.

Federal Acquisition Regulation 31.205-27, *Organization Costs*, states that expenditures in connection with the acquisition of a business or changing the ownership interest of a business are not allowable.  To its credit, the Department reviewed a HECA provided summary of the pre-award activities, hours worked and labor rates charged for reasonableness.  While the summary provided during the cooperative agreement negotiations included cooperative agreement and acquisition activities, it contained no explanation to support the work performed and how the hours were allocated to each activity.  Although the Department told HECA that the cooperative agreement and acquisition costs were not allowable as pre-award costs, we noted that HECA continued to charge the entire $737,544 against its cost share commitment and never decreased the amount associated with cooperative agreement and acquisition costs.

Department officials told us that HECA recently underwent a compliance audit that included a review for unallowable costs.  The audit was completed in September 2012 and covered costs

4

incurred, including the pre-award costs from September to December 2011.  The audit did not identify any questioned costs associated with the pre-award costs; however, we noted that the invoices reviewed only contained a cost share credit for the pre-award cost.  The Department recently requested additional documentation from HECA to support the cost; however, HECA provided the same initial summary of work that included the work on cooperative agreement and acquisition activities, which the Department had identified as unallowable.  A Department official acknowledged that unallowable costs could have been incurred without HECA providing supporting documentation to prove otherwise.

<u>Potential Project Impact</u>

Our audit found that the project is progressing.  However, in our view, the Department is managing HECA at an increased risk level.  Department officials asserted that HECA, as modified, actually reduced the risk of the project by adding a fertilizer production capability, thereby adding a second source of income to the project.  We agree that this is potentially a positive step.  However, we noted that the modified cooperative agreement actually represented a substantial increase in upfront risk to the Department by allowing HECA to substantially decrease its cost share in the early stages of the project.  As such, the Department is at risk of expending $133 million for its share of project costs in the first phase without it being completed if the recipient is unable to obtain funding for the next project phase.

<u>SUGGESTED ACTIONS</u>

To help mitigate the risks we identified in the HECA project, ensure similar situations do not recur, and improve the management of cooperative agreements, we suggest that the Director for Policy, Office of Acquisition and Project Management:

1.  Develop policies and procedures that provide guidance for:

    a.  Ownership changes in financial assistance awards, especially in the area of financial records and documentation review; and

    b.  Reviewing changes to financial projections and cost share contributions to assess their impact on projects.

Furthermore, we suggest that the Deputy Assistant Secretary for Clean Coal ensure that:

2.  Program officials complete thorough reviews of HECA projections; and

3.  Costs included in the recipient's cost share contribution are allowable.

Attachment

cc:  Deputy Secretary
     Acting Under Secretary of Energy
     Acting Chief of Staff

DOE AR 000385

Attachment

## OBJECTIVE, SCOPE AND METHODOLOGY

### OBJECTIVE

The objective of the audit was to determine whether the Department of Energy (Department) effectively managed the modification of the Hydrogen Energy California (HECA) cooperative agreement and subsequent cost share activities.

### SCOPE

We conducted the audit from November 2011 to May 2013, at the National Energy Technology Laboratory, located in Pittsburgh, Pennsylvania, the Department's Office of Fossil Energy in Washington, DC; and the cooperative agreement partner in Concord, Massachusetts.

### METHODOLOGY

To accomplish the audit objective, we:

- Reviewed applicable Federal regulations, Department policies and related prior reports;

- Reviewed and analyzed data and documents related to the HECA cooperative agreement; and

- Interviewed key Department and HECA recipient personnel.

The audit was conducted in accordance with generally accepted Government auditing standards for performance audits and included tests of internal controls and compliance with laws and regulations to the extent necessary to satisfy the audit objective. The Department established performance measures regarding cooperative agreements related to Fossil Energy Programs as required by the *GPRA Modernization Act of 2010*. Because our review was limited, it would not necessarily have disclosed all internal control deficiencies that may have existed at the time of our audit. We did not solely rely on computer-generated data to satisfy our objective. Instead, we performed other procedures to satisfy ourselves as to the reliability and competence of the data by reviewing and analyzing data and performing interviews as it relates to the HECA cooperative agreement. In addition, we confirmed the validity of other data, when appropriate, by reviewing supporting source documents.

Management waived an exit conference.

6

DOE AR 000386

IG Report No.  <u>OAS-RA-13-22</u>

# CUSTOMER RESPONSE FORM

The Office of Inspector General has a continuing interest in improving the usefulness of its products.  We wish to make our reports as responsive as possible to our customers' requirements, and, therefore, ask that you consider sharing your thoughts with us.  On the back of this form, you may suggest improvements to enhance the effectiveness of future reports.  Please include answers to the following questions if applicable to you:

1. What additional background information about the selection, scheduling, scope, or procedures of the audit or inspection would have been helpful to the reader in understanding this report?

2. What additional information related to findings and recommendations could have been included in the report to assist management in implementing corrective actions?

3. What format, stylistic, or organizational changes might have made this report's overall message more clear to the reader?

4. What additional actions could the Office of Inspector General have taken on the issues discussed in this report that would have been helpful?

5. Please include your name and telephone number so that we may contact you should we have any questions about your comments.

Name _____   Date _____

Telephone _____   Organization _____

When you have completed this form, you may telefax it to the Office of Inspector General at (202) 586-0948, or you may mail it to:

Office of Inspector General (IG-1)
Department of Energy
Washington, DC 20585

ATTN:  Customer Relations

If you wish to discuss this report or your comments with a staff member of the Office of Inspector General, please contact our office at (202) 253-2162.

DOE AR 000387

This page intentionally left blank.

DOE AR 000388

The Office of Inspector General wants to make the distribution of its reports as customer friendly and cost effective as possible. Therefore, this report will be available electronically through the Internet at the following address:

U.S. Department of Energy Office of Inspector General Home Page

http://energy.gov/ig

Your comments would be appreciated and can be provided on the Customer Response Form.

DOE AR 000389


 **U.S. DEPARTMENT of ENERGY**

**Policy & Priorities**    **Leadership & Organization**    **Topics**    **News & Events**    **About**    **Funding Opportunities**

Office of Inspector General    Audit Report: OAS-RA-13-22

# Audit Report: OAS-RA-13-22

The Hydrogen Energy California Project

[Office of Inspector General](#)

June 6, 2013

Estimated Read Time 2 min

June 6, 2013

**The Hydrogen Energy California Project**

Under the American Recovery and Reinvestment Act of 2009, the Department of Energy's (Department) Office of Fossil Energy received $3.4 billion to focus on the research, development and deployment of technologies to use coal more cleanly and efficiently.  In September 2009, the Department approved a cooperative agreement award with a Government contribution of $308 million to Hydrogen Energy California, LLC (HECA) to construct a commercial power plant to demonstrate the capture and underground storage of carbon dioxide.  The project was expected to be completed in November 2018, at a total cost of about $2.8 billion.

In March 2011, after the Department and HECA spent approximately $75 million, HECA's original recipients notified the Department that they intended to terminate the agreement because the project did not meet their requirements for economic viability.  With the Department's assistance, HECA found new owners that believed the project could be economically viable.  In September 2011, the Department modified the cooperative agreement and increased total project cost to approximately $4 billion with a Department cost share of $408 million.  We initiated this audit to determine whether the Department effectively managed the modification of the HECA cooperative agreement and subsequent cost share activities.

Our audit found that the project is progressing; however, in our view, the Department is managing HECA at an increased risk level.  We noted that the modified cooperative agreement actually represented a substantial increase in upfront risk to the Department by allowing HECA to substantially decrease its cost share in the early stages of the project.  As such, the Department is at risk of expending $133 million for its share of project costs in the first phase without it being completed if the recipient is unable to obtain funding for the next project phase.  To help mitigate the risks identified in the HECA project, we provided suggestions to ensure similar situations do not recur and improve the management of cooperative agreements.

**TOPIC: Financial Assistance**

DOE AR 000390

Case 3:26-cv-01417-RFL    Document 83-2    Filed 05/29/26    Page 391 of 391

## Audit Report: OAS-RA-13-22

The Hydrogen Energy
California Project

**Committed to Restoring America's Energy Dominance.**

**Follow Us**

### Quick Links

Leadership & Offices

Newsroom

Contact Us

Careers

### Resources

Budget & Performance

Directives, Delegations, & Requirements

Freedom of Information Act (FOIA)

Inspector General

Privacy Program

### Federal Government

USA.gov

The White House

Open Gov    Accessibility    Privacy    Information Quality    No Fear Act    Web Policies    Vulnerability Disclosure Program

Whistleblower Protection    Equal Employment Opportunity    Notice of Court Orders

DOE AR 000391