An official website of the United States government    Here's how you know



Office of Inspector General    Special Report: DOE-OIG-23-08

# Special Report: DOE-OIG-23-08

Management Challenges at the Department of Energy – Fiscal Year 2023

[Office of Inspector General](#)

November 28, 2022

 Estimated Read Time 2 min

November 22, 2022

**Management Challenges at the Department of Energy – Fiscal Year 2023**

In compliance with the Reports Consolidation Act of 2000, the Office of Inspector General annually identifies what it considers to be the most significant management challenges facing the Department of Energy.  The Office of Inspector General's goal is to focus attention on significant issues with the objective of working with Department officials to enhance the effectiveness of agency programs.  The Management Challenges report should be a valuable tool to assist the Department to successfully fulfill its mission of ensuring America's security and prosperity by addressing its energy, environmental, and nuclear challenges through transformative science and technology solutions.

Beginning with fiscal year 2022 management challenges, the Office of Inspector General significantly revised how the Management Challenges report was compiled and presented to focus on more specific goals and challenges that the Department is facing.  We coordinated with Department mission elements to identify the most pressing challenges, with an eye toward better focusing on practical issues where near-term progress is achievable.  Our intent is to provide the Secretary of Energy and other policymakers with a more useful document containing specific and actionable challenge areas where meaningful improvements may be realized in the near term.

For fiscal year 2023, we are continuing to report in this manner, addressing all of the challenges identified in fiscal year 2022 and providing updates pertaining to those challenges.

DOE AR 000800

Case 3:26-cv-01417-RFL    Document 83-4    Filed 05/29/26    Page 2 of 405

We believe that this report will allow the Secretary of Energy and senior Department officials to continue addressing the challenges identified in this report, as well as provide visibility into the progress that has been made over the last year in these areas.

**DOE-OIG-23-08.pdf**
(2.29 MB)

**Committed to Restoring America's Energy Dominance.**

**Quick Links**

Leadership & Offices

Newsroom

Contact Us

Careers

**Resources**

Budget & Performance

Directives, Delegations, & Requirements

Freedom of Information Act (FOIA)

Inspector General

Privacy Program

**Federal Government**

USA.gov

The White House

**Follow Us**

Open Gov    Accessibility    Privacy    Information Quality    No Fear Act    Web Policies

Vulnerability Disclosure Program    Whistleblower Protection    Equal Employment Opportunity

DOE AR 000801

Case 3:26-cv-01417-RFL    Document 83-4    Filed 05/29/26    Page 3 of 405

DOE AR 000802



United States Government Accountability Office

Testimony

Before the Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives

For Release on Delivery
Expected at 2:00 p.m. ET
Wednesday, March 29, 2023

# OVERSIGHT OF AGENCY SPENDING

## Implementing GAO Recommendations Could Help Address Previously Identified Challenges at Commerce, DOE, and EPA

Statement of Mark Gaffigan, Managing Director, Natural Resources and Environment

GAO-23-106726

DOE AR 000803

# GAO Highlights

Highlights of GAO-23-106726, a testimony before the Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives

**March 29, 2023**

# OVERSIGHT OF AGENCY SPENDING

## Implementing GAO Recommendations Could Help Address Previously Identified Challenges at Commerce, DOE, and EPA

## Why GAO Did This Study

GAO has overseen federal agency spending over decades, including oversight of major federal investments such as the Recovery Act. In addition, GAO oversight has previously identified challenges related to programs managed by Commerce, DOE, and EPA.

This testimony discusses: (1) considerations for oversight of federal spending provided in the three acts; (2) examples of challenges associated with Commerce, DOE, and EPA programs as identified in prior GAO work; and (3) GAO's ongoing or planned work relevant to oversight of federal funding provided to Commerce, DOE, and EPA in the three acts.

This testimony is based on prior GAO work related to federal grants management challenges; lessons learned from the Recovery Act; and reviews of Commerce, DOE, and EPA programs between 2007 and 2023. Details on GAO's methodology can be found in each of the reports cited throughout this hearing statement.

## What GAO Recommends

Sixteen GAO reports included a total of 67 recommendations that could help address previously identified challenges at Commerce, DOE, and EPA discussed in this testimony statement. The agencies have implemented 38 of these recommendations. GAO maintains that implementing the remaining recommendations will help address programmatic challenges.

View GAO-23-106726 For more information, contact Mark Gaffigan at (202) 512-3841 or Gaffiganm@gao.gov.

## What GAO Found

Congress and the administration have provided billions in funding to the Department of Commerce, the Department of Energy (DOE), and the Environmental Protection Agency (EPA) through three recently enacted laws: the Infrastructure Investment and Jobs Act, the Inflation Reduction Act of 2022, and the Creating Helpful Incentives to Produce Semiconductors for America Act of 2022.

With regard to this new funding, GAO's prior work examining federal grants management and the implementation of the American Recovery and Reinvestment Act of 2009 (Recovery Act) offers valuable lessons for overseeing agency spending and addressing long-standing challenges. For example, lessons learned include:

- **Streamlined grants management** is critical to effective use of federal funds. When grants management requirements are duplicative, unnecessarily burdensome, or conflicting, agencies must direct additional resources toward meeting them.
- **Strong internal controls** provide reasonable assurance to federal managers that grants are awarded properly, recipients are eligible, and grant funds are used as intended.
- **Adjustments and innovations in oversight** helped foster accountability for Recovery Act funding. For example, federal, state, and local officials used networks and agreements to work toward common goals.

In previous reviews of Commerce, DOE, and EPA programs, GAO has identified challenges in various aspects of some of the programs, for which Congress and the administration have provided significant funding through recent legislation. Programs examined by GAO include:

- Commerce's broadband programs,
- EPA's clean water and drinking water state revolving fund programs and EPA grants, and
- DOE's nuclear energy demonstration projects and DOE loan programs.

The challenges that GAO identified included management of fraud risk, adherence to cost controls, and ensuring that programs have the right policies and expertise in place. The agencies have implemented some GAO recommendations to help address these challenges.

GAO has ongoing or planned work more broadly examining aspects of how Commerce, DOE, and EPA spend the funds they received in the three acts. For example, GAO is currently reviewing a Commerce tribal broadband program, as well as DOE's carbon capture and storage projects and Office of Clean Energy Demonstrations activities.

_____ United States Government Accountability Office

DOE AR 000804

Chairman Griffith, Ranking Member Castor, and Members of the Subcommittee:

Thank you for the opportunity to be here today to discuss issues related to the oversight of federal spending appropriated in three recently enacted pieces of legislation: the Infrastructure Investment and Jobs Act (IIJA),[1] the Inflation Reduction Act of 2022 (IRA),[2] and the Creating Helpful Incentives to Produce Semiconductors for America Act of 2022 (CHIPS).[3] Through these three acts, Congress and the administration have provided billions in funding to federal entities—including the Department of Commerce, the Department of Energy (DOE), and the Environmental Protection Agency (EPA). This funding is for grants and programs supporting clean energy research and development; water and infrastructure investments; climate resilience; broadband investments; and semiconductor manufacturing; among other purposes.

Examples of funding for these three agencies include over $50 billion for Commerce investments in broadband and resilience under the IIJA, and $50 billion for Commerce to incentivize semiconductor production in the United States under CHIPS. For DOE, funding includes over $60 billion for clean energy and other investments under the IIJA, and hundreds of billions in loan authority under the IRA and IIJA. For EPA, funding includes over $50 billion for water infrastructure and other investments under the IIJA, and $40 billion in funding for greenhouse gas reduction and other programs under the IRA.

My comments today will summarize observations on oversight of federal funding such as that provided to Commerce, DOE, and EPA in recent legislation, including IIJA, IRA, and CHIPS. Specifically, my remarks today will discuss (1) considerations for oversight of federal spending provided in the three acts; (2) examples of challenges associated with Commerce, DOE, and EPA programs as identified in our prior work; and (3) our ongoing or planned work relevant to oversight of federal funding provided to Commerce, DOE, and EPA in the three acts.

My testimony is based on our prior reports and testimonies related to federal grants management challenges, lessons learned from the

---

[1]Pub. L. No. 117-58, 135 Stat. 429 (2021).

[2]Pub. L. No. 117-169, 136 Stat. 1818.

[3]Pub. L. No. 117-167, div. A, 136 Stat. 1372.

GAO-23-106726
DOE AR 000805

American Recovery and Reinvestment Act of 2009 (Recovery Act), and selected prior work reviewing Commerce, DOE, and EPA programs between 2007 and 2023. A detailed discussion of the prior reports' objectives, scope, and methodologies, including our assessment of data reliability, is available in each of the reports cited throughout this statement.[4]

The work upon which this testimony is based was conducted in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Considerations for Spending Oversight, including Federal Grants Management Challenges and Lessons Learned from the Recovery Act

## Federal Grants Management Challenges

Our prior work on federal grants spanning several decades has identified management challenges that offer valuable lessons for the oversight of the billions of dollars in grant funding provided to Commerce, DOE, and EPA in recent legislation. Specifically, we identified a number of commonly recurring themes that provide lessons learned on long-standing challenges. These lessons learned involve streamlining; transparency; collaboration and consultation; fragmentation, overlap, and duplication; and internal controls and oversight.[5]

---

[4]See list of Related GAO Products at the end of this statement for specific prior reports.

[5]GAO, *Grants Management: Observations on Challenges and Opportunities for Reform*, GAO-18-676T (Washington, D.C.: July 25, 2018).

DOE AR 000806

- **Streamlined grants management is critical to effective use of federal funds.** Our prior work has shown that when grants management requirements are duplicative, unnecessarily burdensome, or conflicting, agencies must direct additional resources toward meeting them. This can make the agency's programs and services less cost effective and increase burdens on grant recipients.

- **Increased transparency over grant spending can inform decision-making.** To provide increased transparency to agencies, Congress, and the public, the Digital Accountability and Transparency Act of 2014 required the Office of Management and Budget, the Department of the Treasury, and other federal agencies to increase the types of information available on federal spending, including grants. We have reported on progress in standardizing and expanding reported data, but we have also found inconsistencies with the quality of the reported information.[6]

- **Collaboration and consultation can lead to more effective grants management.** The process of distributing federal assistance through grants is complicated and involves many different parties—both public and private—with different organizational structures, sizes, and missions.[7] A lack of collaboration among and between federal agencies, state and local governments, and nongovernmental grant participants creates challenges for effective grants implementation.

- **Identifying fragmentation, overlap, and duplication can result in greater efficiencies.** Our prior work has shown that creating numerous federal grant programs over time without coordinating the purposes and scope of those programs can lead to grants management challenges. Specifically, our work has underscored the importance of identifying fragmentation, overlap, or duplication in a number of federal programs, including grants management practices.[8]

---

[6]See GAO-18-676T, and for other recent work on the quality of reported information, see GAO, *Federal Spending Transparency: OIGs Identified a Variety of Issues with the Quality of Agencies' Data Submissions*, GAO-22-105427 (Washington, D.C.: July 12, 2022); and *Federal Spending Transparency: Opportunities Exist to Further Improve the Information Available on USAspending.gov*, GAO-22-104702 (Washington, D.C.: Nov. 8, 2021).

[7]GAO, *Grants to State and Local Governments: An Overview of Federal Funding Levels and Selected Challenges*, GAO-12-1016 (Washington, D.C.: Sept. 25, 2012).

[8]GAO, *2022 Annual Report: Additional Opportunities to Reduce Fragmentation, Overlap, and Duplication and Achieve Billions in Financial Benefits,* GAO-22-105301 (Washington, D.C.: May 11, 2022); and GAO's Action Tracker https://www.gao.gov/duplication/action_tracker/all_areas, an online tool for monitoring the progress federal agencies and Congress have made in addressing the actions identified in GAO's annual duplication and cost savings reports.

**GAO-23-106726**

DOE AR 000807

Addressing these issues may produce cost savings and result in greater efficiencies in grant programs.

- **Strong internal controls and oversight facilitate effective use of grant funds.** Our prior work has shown that when awarding and managing federal grants, internal controls and oversight are important. Strong internal controls and effective oversight provide reasonable assurance to federal managers and taxpayers that grants are awarded properly, recipients are eligible, and federal grant funds are used as intended and in accordance with applicable laws and regulations. Internal controls are comprised of the plans, methods, and procedures that agencies use to be reasonably assured that their missions, goals, and objectives can be met. In numerous reviews, we and agency inspectors general identified weaknesses in agencies' internal controls for managing and overseeing grants. We found that when such controls are weak, federal grant-making agencies face challenges achieving grant program goals and assuring the proper and effective use of federal funds to help avoid improper payments. Our work has identified weaknesses in grant oversight and accountability issues that span the government including undisbursed grant award balances, single audit submissions that are late, and significant levels of improper payments in grant programs.

In our prior work on federal grants management, we concluded that designing and implementing grants management policies that strike an appropriate balance between ensuring accountability for the proper use of federal funds without increasing the complexity and cost of grants administration for agencies and grantees is a longstanding challenge.[9]

## Recovery Act Implementation Offers Lessons for Accountability

By increasing accountability and transparency requirements while simultaneously setting aggressive timelines for the distribution of funds, the Recovery Act created high expectations, as well as uncertainty and risks for federal, state, and local governments responsible for implementing the law. In 2014, we found that, when faced with these challenges, some organizations looked beyond their usual way of doing business and adjusted their typical practices to help ensure the accountability and transparency of Recovery Act funds. Our prior work on the Recovery Act identified examples of the challenges faced and useful

---

[9]GAO-18-676T.

DOE AR 000808

practices employed that offer lessons for the oversight of funding for Commerce, DOE, and EPA in the three recent acts.[10]

**Accelerated rollout presented oversight challenges.** The accelerated rollout of Recovery Act programs presented oversight challenges. The President's goal for quickly spending Recovery Act funds created a large spike in spending for a number of programs in the 28 agencies receiving Recovery Act funds. The act also created a number of new programs—requiring agencies to move quickly to establish them. As a result, some federal agencies and states faced oversight challenges. For example, we found that DOE encountered some initial challenges with fully developing management and accountability infrastructure because of the large amount of Recovery Act funding it received in a short period of time. An official in DOE's Office of the Inspector General told us at the time that these initial challenges were present with the new Energy Efficiency Conservation Block Grant program.[11] The official told us that some states and localities also did not have the infrastructure in place or the necessary training to manage the large amount of additional federal funding.

**Adjustments and innovations in oversight helped foster accountability.** Federal, state, and local officials adopted a number of practices to foster accountability, including (1) strong support by top leaders; (2) centrally situated collaborative governance structures; (3) the use of networks and agreements to share information and work toward common goals; and (4) adjustments to and innovations in the usual approaches to conducting oversight, such as the increased use of up-front risk assessments, the gathering of real-time information, earlier communication of audit findings, and the use of advanced data analytics.

We found that the oversight community adopted a faster and more flexible approach to conducting and reporting the results of their audits and reviews so that their findings could inform programs in need of corrections before all Recovery Act funds were expended. They leveraged technology by using advanced data analytics to reduce fraud and to create easily accessible internet resources that greatly improved

---

[10]GAO, *Recovery Act: Grant Implementation Experiences Offer Lessons for Accountability and Transparency*, GAO-14-219 (Washington, D.C.: Jan. 24, 2014).

[11]Although the Energy Efficiency Conservation Block Grant was authorized by the Energy Independence and Security Act of 2007, it was not funded (and the monies could not be spent) until the Recovery Act was enacted in 2009 and, therefore, was considered a new program.

GAO-23-106726

DOE AR 000809

the public's access to, and ability to make use of, data about grants funded by the Recovery Act. These and other experiences, as well as the challenges identified in our prior work, provide potentially valuable lessons for the future.

Underlying many of these lessons is the importance of increased coordination and collaboration in sharing information and working toward common goals. This applies to agencies both vertically—transcending federal, state, and local levels of government—and horizontally—across organizational silos within the federal community. Because the Recovery Act relied on many programs being implemented quickly at the federal, state, and local levels, coordination and collaboration among these groups was essential. We found that collaboration played a key role in ensuring timely implementation of, and accountability for, Recovery Act grant programs.

# Challenges Identified in Management of Various Commerce, DOE, and EPA Programs

We have issued 16 reports identifying challenges in various aspects of some Commerce, DOE, and EPA programs for which Congress and the administration have provided significant funding through recent legislation. These challenges included fraud risk-management, adherence to cost controls, and ensuring that programs have the right policies and expertise in place. Our 16 reports included a total of 67 recommendations to address these challenges. The agencies have implemented 38 of these recommendations.

## Commerce Broadband Programs

The IIJA and the Consolidated Appropriations Act, 2021, appropriated nearly $50 billion for eight new broadband programs.[12] In May 2022, we reported that the Department of Commerce's National Telecommunications and Information Administration (NTIA) has multiple roles with regard to federal broadband programs, including administering programs, leading interagency coordination, and developing other resources.[13] NTIA's recently created Office of Internet Connectivity and

---

[12]Commerce's National Telecommunications and Information Administration (NTIA) was directed by the Consolidated Appropriations Act, 2021, to implement the Tribal Broadband Connectivity Program, the Broadband Infrastructure Program, and the Connecting Minority Communities Pilot Program. Pub. L. No. 116-260, div. N, tit. IX, §§ 902, 905, 134 Stat. 1182, 2121, 2136 (2020). The Infrastructure Investment and Jobs Act appropriated funds for five new NTIA broadband programs. Pub. L. No. 117-58, div. J, tit. II, 135 Stat. 429, 1353-55 (2021).

[13]GAO, *Broadband: National Strategy Needed to Guide Federal Efforts to Reduce Digital Divide*, GAO-22-104611 (Washington, D.C.: May 31, 2022).

GAO-23-106726

DOE AR 000810

Growth is implementing the new programs; managing various interagency coordination responsibilities;[14] and implementing other initiatives, such as the BroadbandUSA program.[15]

In January 2023, we found that stronger performance and fraud risk management is needed for tribal and public-private partnership broadband grants administered by NTIA.[16] We made 15 recommendations to NTIA to better measure program performance and to complete fraud risk management activities. NTIA agreed with the recommendations and outlined actions to address them. We will monitor implementation of these recommendations.

| DOE Energy Demonstrations and Loan Programs | We have reported on challenges in DOE's management of carbon capture and storage and nuclear energy demonstration projects, as well as with DOE's loan programs. |
|---|---|

Specifically:

**Carbon capture and storage demonstrations**. The IIJA appropriated almost $7 billion for carbon capture demonstration projects, reflecting the potential of carbon capture and storage as a strategy to reduce $CO_2$ emissions. Since 2009, DOE has sought to establish the viability of carbon capture and storage technologies through various demonstration projects. In our December 2021 report, we identified significant risks to DOE's management of coal carbon capture and storage demonstration

[14]This office was established by the Consolidated Appropriations Act, 2021. The office was also charged with responsibilities related to community outreach; tracking broadband infrastructure built using federal funds; reporting on the number of residents of the United States that received broadband as a result of federal broadband support programs and the Universal Service Fund Program; and streamlining and standardizing the applications process for federal broadband support programs, including, to the extent possible, creating one application. The Advancing Critical Connectivity Expands Service, Small Business Resources, Opportunities, Access, and Data Based on Assessed Need and Demand Act, or the ACCESS BROADBAND Act, was enacted as section 903 of title IX of division FF of Pub. L. No. 116-260, 134 Stat. at 3210-13 (codified at 47 U.S.C. § 1307).

[15]BroadbandUSA provides technical assistance workshops and other resources for state, local, and tribal governments, as well as industry and nonprofits that need to enhance broadband connectivity and promote digital inclusion.

[16]GAO, *Broadband Funding: Stronger Management of Performance and Fraud Risk Needed for Tribal and Public-Private Partnership Grants*, GAO-23-105426 (Washington, D.C.: Jan. 24, 2023). The Consolidated Appropriations Act, 2021 established two new broadband grant programs—the Tribal Broadband Connectivity Program and the Broadband Infrastructure Program.

GAO-23-106726
DOE AR 000811

projects.[17] For example, we found that DOE supported projects even though they were not meeting required key milestones. Specifically, we found that at the direction of senior leadership, DOE did not adhere to cost controls designed to limit its financial exposure on funding agreements for coal projects that DOE ultimately terminated. As a result, the agency spent nearly $472 million on the definition and design of four unbuilt facilities.

In our December 2021 report, we recommended that DOE more consistently administer projects against established scopes, schedules, and budgets.[18] DOE neither agreed nor disagreed with this recommendation. As of December 2022, DOE stated that it was developing a project management approach and procedures to guide the oversight of demonstration projects against their planned scopes, schedules, and budgets. We will continue to monitor DOE's implementation of this recommendation.

**Nuclear energy demonstrations.** The IIJA appropriated over $2 billion for DOE's Advanced Reactor Demonstration Program, which funds demonstrations of advanced reactors that are not currently operational in the United States. In September 2022, we reported on DOE's management of its three nuclear energy demonstration awards totaling $4.6 billion.[19] Two of these awards were approved through the Advanced Reactor Demonstration Program. We found that DOE had taken some steps to manage the risks associated with its three awards, including using project management practices, such as budget controls and milestone tracking. DOE also planned to use additional project management practices, such as external independent reviews, to oversee the awards but had not institutionalized these plans.

---

[17]GAO, *Carbon Capture and Storage: Actions Needed to Improve DOE Management of Demonstration Projects*, GAO-22-105111 (Washington, D.C.: Dec. 20, 2021).

[18]In addition, we made one matter for congressional consideration: that Congress consider implementing a mechanism for greater oversight and accountability of DOE carbon capture and storage demonstration project funding. We also recommended that DOE improve its project selection and negotiation processes to address our finding that DOE had a process for selecting coal projects and negotiating funding agreements that increased the risks that DOE would fund projects unlikely to succeed.

[19]GAO, *Nuclear Energy Projects: DOE Should Institutionalize Oversight Plans for Demonstrations of New Reactor Types*, GAO-22-105394 (Washington, D.C.: Sept. 8, 2022).

GAO-23-106726

DOE AR 000812

We recommended that DOE document and institutionalize risk management processes for large nuclear energy demonstration projects. DOE agreed with our recommendation and outlined actions to address it. For example, DOE stated that it planned to document its processes for providing oversight of large DOE energy demonstration projects and establish a Demonstration and Deployment Advisory Board to ensure that oversight practices are consistently applied across all large DOE energy demonstration projects. We will continue to monitor DOE's implementation of this recommendation.

**Loan programs.** The IIJA and IRA included about $350 billion in additional loan and loan guarantee authority for new and existing programs under DOE's Loan Programs Office.[20] In our February 2007 report, we found that DOE's actions had focused on expediting program implementation—such as soliciting preapplications for loan guarantees—rather than ensuring that the department had in place the critical policies, procedures, and mechanisms needed to better ensure the program's success.[21] DOE implemented all five of our recommendations to address these concerns.

In 2011, 2012, and 2014, as Congress expanded the loan programs, we made nine additional recommendations to address concerns about DOE making loans and disbursing funds without having sufficient engineering expertise; sufficient and quantifiable performance measures for assessing program progress; or a fully developed loan monitoring function, among

---

[20]These programs offer direct loans or loan guarantees, by which DOE agrees to reimburse lenders for the guaranteed amount of loans, if the borrowers default. For example, the IRA established a new program with up to $250 billion in loan authority, which guarantees loans to projects that retool, repower, repurpose, or replace energy infrastructure that has ceased operations. Existing programs include the Advanced Technologies Vehicle Manufacturing Program, which was designed to encourage the automotive industry to invest in new technologies for more fuel-efficient passenger vehicles and their components.

[21]GAO, *The Department of Energy: Key Steps Needed to Help Ensure the Success of the New Loan Guarantee Program for Innovative Technologies by Better Managing Its Financial Risk*, GAO-07-339R (Washington, D.C.: Feb. 28, 2007).

DOE AR 000813

other things.[22] DOE implemented eight of our nine recommendations.[23] From 2012 through 2021, Loan Programs Office activity slowed as the office issued few loans, and staffing levels declined. As the Loan Programs Office starts up new programs and expands existing ones with funds from the IIJA and the IRA, ongoing oversight may be needed to ensure that the office has the proper policies and procedures in place, as well as sufficient expertise and staffing levels.

| EPA Clean Water and Drinking Water State Revolving Fund Programs and Grants Management | Through the federal Clean Water and Drinking Water State Revolving Fund (SRF) programs, EPA provides annual grants to states to capitalize state-level SRF programs used to make loans for wastewater and drinking water infrastructure projects. The IIJA provided over $43 billion to EPA for such grants.[24] In our prior work, we identified a number of factors that affect the spending of SRF funds, and we identified the need for better financial indicators that show the growth of the SRF programs relative to federal and state investments to monitor the sustainability of |

---

[22]GAO, *DOE Loan Programs: DOE Should Fully Develop Its Loan Monitoring Function and Evaluate Its Effectiveness*, GAO-14-367 (Washington, D.C.: May 1, 2014); *DOE Loan Guarantees: Further Actions Are Needed to Improve Tracking and Review of Applications*, GAO-12-157 (Washington, D.C.: Mar. 12, 2012); *Department of Energy: Advanced Technology Vehicle Loan Program Implementation Is Under Way, but Enhanced Technical Oversight and Performance Measures Are Needed*, GAO-11-145 (Washington, D.C.: Feb. 28, 2011).

[23]In GAO's 2011 report, we recommended that the Secretary of Energy direct the Advanced Technologies Vehicle Manufacturing Program to develop sufficient and quantifiable performance measures. DOE disagreed with this recommendation and stated that it believed the program adhered to the requirements of the statute authorizing the program, and that performance measures suggested by GAO would greatly expand the scope of the program. GAO-11-145.

[24]In fiscal year 2022, EPA provided $1.6 billion to the state SRFs. Overall, according to EPA, the agency awards more than $4 billion annually through over 100 grant programs. Recipients of these awards include tribal, state, and local governments; educational institutions; nonprofits; and others. According to EPA, the agency manages about 6,000 active awards totaling approximately $21 billion, in any given year. EPA awards and manages its grants at multiple levels across the agency, including in headquarters and in 10 regional offices.

GAO-23-106726

DOE AR 000814

SRF funds.[25] In addition, we found opportunities for EPA to improve grants monitoring,[26] and we reported on workforce challenges affecting EPA grants management.[27] EPA has implemented a number of recommendations to better enable its oversight and monitoring of grants and SRF funds.

## Ongoing and Planned Oversight

We have ongoing or planned work related to the programs discussed above and more broadly examining aspects of how Commerce, DOE, and EPA spend the funds they received in the three acts. For example, we are currently reviewing the NTIA tribal broadband program, DOE's carbon capture and storage and Office of Clean Energy Demonstrations activities, and have an ongoing mandate to examine Loan Program Office activities, which we will report on in 2024. More broadly, we have identified both ongoing and planned engagements, including 45

[25]GAO, *State Revolving Funds: Improved Financial Indicators Could Strengthen EPA Oversight*, GAO-15-567 (Washington, D.C.: Aug. 5, 2015). In 2015, we examined the financial indicators that EPA regions use in their reviews of states' SRF performance, and compared them to leading financial management practices. We found that the financial indicators that EPA regional offices used as part of their annual reviews of SRF programs' performance did not demonstrate the financial sustainability of states' programs or project their future lending capacity. We recommended that EPA update its financial indicators guidance to include better information on the overall growth of state SRF funds. EPA addressed this recommendation in 2018, directing its regional managers to use new indicators in their review of state SRF programs. With these new indicators, EPA will be better able to support oversight and management of SRF fund growth.

[26]For example, in 2015, we found that EPA faced challenges monitoring compliance with grant management directives agency-wide, including limited electronic records and analytical capabilities of its IT systems. See GAO, *Grants Management: EPA Has Opportunities to Improve Planning and Compliance Monitoring*, GAO-15-618 (Washington, D.C.: Aug. 17, 2015). In addition, in 2016, we found that EPA could improve certain monitoring practices to ensure that grants achieve environmental and other program results. See GAO, *Grants Management: EPA Could Improve Certain Monitoring Practices*, GAO-16-530 (Washington, D.C.: July 14, 2016). EPA has implemented most of our recommendations, including a new, comprehensive web-based IT system in December 2020.

[27]For example, in 2017, we found that staffing levels for grants management personnel had declined over time and that EPA only partially followed leading practices for strategic workforce planning related to grants management. See GAO, *Grants Management: EPA Partially Follows Leading Practices of Strategic Workforce Planning and Could Take Additional Steps*, GAO-17-144 (Washington, D.C.: Jan. 9, 2017). In addition, in 2020, we identified staffing challenges for EPA personnel working on tribal grants, including heavy workloads and high turnover. See GAO, *EPA Grants to Tribes: Additional Actions Needed to Effectively Address Tribal Environmental Concerns*, GAO-21-150 (Washington, D.C.: Oct. 20, 2020). As of March 2023, EPA had implemented nearly all of these recommendations, including developing a process for collecting and analyzing data on staffing for grant project officers.

GAO-23-106726

DOE AR 000815

mandates for GAO reviews in the IIJA and CHIPS, and more than 30 ongoing or planned audits on IRA spending through 2025. For example, we will be providing biennial reports on incentives provided by Commerce for semiconductor facilities and equipment.[28] Through this work, we will follow up on our July 2022 report identifying policy considerations to reduce and mitigate shortages in the semiconductor supply chain.[29] We anticipate starting additional work that will increase our number of engagements related to recent legislation.

In addition, we will continue our key bodies of work, including our High-Risk and fragmentation, overlap and duplication reporting.

- **High-risk.** Our High-Risk report focuses attention on government operations that are vulnerable to fraud, waste, abuse, and mismanagement or in need of transformation.[30] We issue this report at the beginning of each Congress, and our fiscal year 2023 report will be released next month. Several government-wide high-risk areas have direct implications for Commerce, DOE, EPA, and their operations. These areas include (1) improving strategic human capital management, (2) improving federal management of programs that serve tribes and their members, and (3) ensuring the cybersecurity of the nation.

- **Fragmentation, overlap, and duplication.** In 2022, we issued our 12th annual report in this area, which identified 94 new actions in 21 new areas (and nine existing areas) that could reduce fragmentation, overlap, and duplication or provide other cost savings and opportunities to enhance revenue across the federal government. From 2011 to 2022, we identified 1,299 such actions. As of March 2022, the Congress and executive branch agencies had fully addressed 724 of the actions we identified and partially addressed

---

[28]This reporting requirement was established by the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, div. H, tit. XCIX, § 9902(c), 134 Stat. 3388, 4849, and was amended by CHIPS to include an evaluation of federal actions to address semiconductor shortages.

[29]GAO, *Semiconductor Supply Chain: Policy Considerations from Selected Experts for Reducing and Mitigating Shortages*, GAO-22-105923 (Washington, D.C.: July 26, 2022). In 2022, we highlighted five areas in which federal action was needed to reduce semiconductor supply chain risks, according to experts we interviewed. These areas included workforce development, manufacturing capacity, research and development, supply chain strengthening, and international coordination. In addition, the experts we interviewed discussed the need for identifying federal priorities and improving interagency collaboration in implementing policies to mitigate semiconductor supply chain risks.

[30]For additional information on our high-risk work, see https://www.gao.gov/high-risk-list.

GAO-23-106726

DOE AR 000816

240, yielding about $552 billion in financial benefits. We will issue our next annual report on fragmentation, overlap, and duplication this summer.

Chairman Griffith, Ranking Member Castor, and Members of the Subcommittee, this completes my prepared statement. I would be pleased to respond to any questions you may have.

# GAO Contact and Staff Acknowledgments

If you or your staff have questions about this statement, please contact me at (202) 512-3841 or gaffiganm@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this statement.

GAO staff who made key contributions to this testimony were Frank Rusco (Director), Janice Ceperich and Quindi Franco (Assistant Directors), Celia Rosario Mendive (Analyst in Charge), and John Delicath. Other contributors included Adrian Apodaca, Jeff Arkin, Antoinette Capaccio, Lee Carroll, Maggie Childs, Keith Cunningham, Peter Del Toro, Marissa Dondoe, Peggie Garcia, William Gerard, Chad Gorman, Susan Iott, Rona Mendelsohn, Barbara Patterson, Marietta Revesz, Colson Ricciardi, Wes Sholtes, Ruth Solomon, Karla Springer, Matt Tabbert, Lisa Van Arsdale, Jarrod West, Cindy Gilbert, Chris Murray, Jeanette Soares, Andrew Von Ah, Daniel Will, and Jeremy Williams. Additional contributors are listed in the products on which this statement is based.

DOE AR 000817

# Related GAO Products

*Broadband Funding: Stronger Management of Performance and Fraud Risk Needed for Tribal and Public-Private Partnership Grants*. GAO-23-105426. Washington, D.C.: January 24, 2023.

*Nuclear Energy Projects: DOE Should Institutionalize Oversight Plans for Demonstrations of New Reactor Types*. GAO-22-105394. Washington, D.C.: September 8, 2022.

*Semiconductor Supply Chain: Policy Considerations from Selected Experts for Reducing Risks and Mitigating Shortages*. GAO-22-105923. Washington, D.C.: July 26, 2022.

*Priority Open Recommendations: Department of Commerce*. GAO-22-105684. Washington, D.C.: July 15, 2022.

*Priority Open Recommendations: Environmental Protection Agency*. GAO-22-105600. Washington, D.C.: July 1, 2022.

*Priority Open Recommendations: Department of Energy*. GAO-22-105599. Washington, D.C.: June 27, 2022.

*Broadband: National Strategy Needed to Guide Federal Efforts to Reduce Digital Divide*. GAO-22-104611. Washington, D.C.: May 31, 2022.

*2022 Annual Report: Additional Opportunities to Reduce Fragmentation, Overlap, and Duplication and Achieve Billions of Dollars in Financial Benefits*. GAO-22-105301. Washington, D.C.: May 11, 2022.

*Carbon Capture and Storage: Actions Needed to Improve DOE Management of Demonstration Projects*. GAO-22-105111. Washington, D.C.: December 20, 2021.

*Federal Spending Transparency: Opportunities Exist to Further Improve the Information Available on USAspending.gov*. GAO-22-104702. Washington, D.C.: November 8, 2021.

*EPA Grants to Tribes: Additional Actions Needed to Effectively Address Tribal Environmental Concerns*. GAO-21-150. Washington, D.C.: October 20, 2020.

*Grants Management: Observations on Challenges and Opportunities for Reform*. GAO-18-676T. Washington, D.C.: July 25, 2018.

GAO-23-106726
DOE AR 000818

**Related GAO Products**

*Grants Management: EPA Partially Follows Leading Practices of Strategic Workforce Planning and Could Take Additional Steps*. GAO-17-144. Washington, D.C.: January 9, 2017.

*Grants Management: EPA Could Improve Certain Monitoring Practices.* GAO-16-530. Washington, D.C.: July 14, 2016.

*DOE Loan Programs: Information on Implementation of GAO Recommendations and Program Costs*. GAO-16-150T. Washington, D.C.: March 3, 2016.

*Grants Management: EPA Has Opportunities to Improve Planning and Compliance Monitoring*. GAO-15-618. Washington, D.C.: August 17, 2015.

*State Revolving Funds: Improved Financial Indicators Could Strengthen EPA Oversight*. GAO-15-567. Washington, D.C.: August 5, 2015.

*Recovery Act: Grant Implementation Experiences Offer Lessons for Accountability and Transparency*. GAO-14-219. Washington, D.C.: January. 24, 2014.

*Grants to State and Local Governments: An Overview of Federal Funding Levels and Selected Challenges*. GAO-12-1016. Washington, D.C.: September 25, 2012.

*The Department of Energy: Key Steps Needed to Help Ensure the Success of the New Loan Guarantee Program for Innovative Technologies by Better Managing Its Financial Risk*. GAO-07-339R. Washington, D.C.: February 28, 2007.

GAO-23-106726

DOE AR 000819

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

DOE AR 000820

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube.<br>Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.<br>Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact FraudNet:<br><br>Website: https://www.gao.gov/about/what-gao-does/fraudnet<br><br>Automated answering system: (800) 424-5454 or (202) 512-7700 |
| Congressional Relations | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

DOE AR 000821

# SPENDING ON EMPTY: HOW THE BIDEN ADMINISTRATION'S UNPRECEDENTED SPENDING INCREASED RISK OF WASTE, FRAUD, AND ABUSE AT THE DEPARTMENT OF ENERGY

# HEARING

BEFORE THE

## SUBCOMMITTEE ON ECONOMIC GROWTH, ENERGY POLICY, AND REGULATORY AFFAIRS

OF THE

## COMMITTEE ON OVERSIGHT AND ACCOUNTABILITY

## HOUSE OF REPRESENTATIVES

ONE HUNDRED EIGHTEENTH CONGRESS

FIRST SESSION

APRIL 18, 2023

## Serial No. 118–21

Printed for the use of the Committee on Oversight and Accountability



Available on: *govinfo.gov, oversight.house.gov* or *docs.house.gov*

U.S. GOVERNMENT PUBLISHING OFFICE

51–893 PDF          WASHINGTON : 2023

DOE AR 000822

## COMMITTEE ON OVERSIGHT AND ACCOUNTABILITY

JAMES COMER, Kentucky, Chairman

JIM JORDAN, Ohio
MIKE TURNER, Ohio
PAUL GOSAR, Arizona
VIRGINIA FOXX, North Carolina
GLENN GROTHMAN, Wisconsin
GARY PALMER, Alabama
CLAY HIGGINS, Louisiana
PETE SESSIONS, Texas
ANDY BIGGS, Arizona
NANCY MACE, South Carolina
JAKE LaTURNER, Kansas
PAT FALLON, Texas
BYRON DONALDS, Florida
KELLY ARMSTRONG, North Dakota
SCOTT PERRY, Pennsylvania
WILLIAM TIMMONS, South Carolina
TIM BURCHETT, Tennessee
MARJORIE TAYLOR GREENE, Georgia
LISA McCLAIN, Michigan
LAUREN BOEBERT, Colorado
RUSSELL FRY, South Carolina
ANNA PAULINA LUNA, Florida
CHUCK EDWARDS, North Carolina
NICK LANGWORTHY, New York
ERIC BURLISON, Missouri

JAMIE RASKIN, Maryland, *Ranking Minority Member*
ELEANOR HOLMES NORTON, District of Columbia
STEPHEN F. LYNCH, Massachusetts
GERALD E. CONNOLLY, Virginia
RAJA KRISHNAMOORTHI, Illinois
RO KHANNA, California
KWEISI MFUME, Maryland
ALEXANDRIA OCASIO-CORTEZ, New York
KATIE PORTER, California
CORI BUSH, Missouri
SHONTEL BROWN, Ohio
JIMMY GOMEZ, California
MELANIE STANSBURY, New Mexico
ROBERT GARCIA, California
MAXWELL FROST, Florida
BECCA BALINT, Vermont
SUMMER LEE, Pennsylvania
GREG CASAR, Texas
JASMINE CROCKETT, Texas
DAN GOLDMAN, New York
JARED MOSKOWITZ, Florida

MARK MARIN, Staff Director
JESSICA DONLON, Deputy Staff Director and General Counsel
DAVID EHMEN, Counsel
JEANNE KUEHL, Senior Professional Staff
MALLORY COGAR, Deputy Director of Operations and Chief Clerk
CONTACT NUMBER: 202-225-5074

JULIE TAGEN, Minority Staff Director
CONTACT NUMBER: 202-225-5051

## SUBCOMMITTEE ON ECONOMIC GROWTH, ENERGY POLICY, AND REGULATORY AFFAIRS

PAT FALLON, Texas, Chairman

BYRON DONALDS, Florida
SCOTT PERRY, Pennsylvania
LISA McCLAIN, Michigan
LAUREN BOEBERT, Colorado
RUSSELL FRY, South Carolina
ANNA PAULINA LUNA, Florida
CHUCK EDWARDS, North Carolina
NICK LANGWORTHY, New York

CORI BUSH, Missouri, *Ranking Minority Member*
SHONTEL BROWN, Ohio
MELANIE STANSBURY, New Mexico
ELEANOR HOLMES NORTON, District of Columbia
RAJA KRISHNAMOORTHI, Illinois
RO KHANNA, California

(II)

DOE AR 000823

# C O N T E N T S

—————

Page

Hearing held on April 18, 2023 ............................................................................    1

### WITNESSES

—————

The Honorable Teri L. Donaldson, Inspector General, Department of Energy
Oral Statement ....................................................................................................    5
Dr. Kathleen Hogan, Principal Deputy Under Secretary for Infrastructure,
    Department of Energy
Oral Statement ....................................................................................................    6

*Opening statements and the prepared statements for the witnesses are available in the U.S. House of Representatives Repository at: docs.house.gov.*

### INDEX OF DOCUMENTS

—————

* Questions for the Record: to Dr. Hogan; submitted by Rep. Perry.

* Questions for the Record: to Dr. Hogan; submitted by Rep. Donalds.

* Questions for the Record: to Hon. Donaldson; submitted by Rep. Perry.

*The documents listed above are available at: docs.house.gov.*

DOE AR 000824

DOE AR 000825

# SPENDING ON EMPTY: HOW THE BIDEN ADMINISTRATION'S UNPRECEDENTED SPENDING INCREASED RISK OF WASTE, FRAUD, AND ABUSE AT THE DEPARTMENT OF ENERGY

————————

**Tuesday, April 18, 2023**

HOUSE OF REPRESENTATIVES
COMMITTEE ON OVERSIGHT AND ACCOUNTABILITY
SUBCOMMITTEE ON ECONOMIC GROWTH, ENERGY
POLICY, AND REGULATORY AFFAIRS
*Washington, D.C.*

The Subcommittee met, pursuant to notice, at 2:22 p.m., in room 2154, Rayburn House Office Building, Hon. Pat Fallon [Chairman of the Subcommittee] presiding.

Present: Representatives Fallon, Donalds, Perry, Fry, Luna, Edwards, Langworthy, Brown, Stansbury, and Norton.

Mr. FALLON. This hearing on the Subcommittee on Economic Growth, Energy Policy, and Regulatory Affairs will come to order. We want to welcome everyone.

Without objection, the Chair may declare a recess at any time.

I recognize myself for the purpose of making an opening statement.

The Biden Administration's rampant spending spree has put American taxpayer dollars at even greater risk of waste, fraud, and abuse, which obviously none of us want. We just have to take a look at the alleged COVID relief spending, hundreds of billions of dollars just shoved out the door into the hands of, on too many occasions, criminals and fraudsters. This Committee has and will continue to conduct oversight over that money. That is our job, and that is what we were all elected to do.

Today's Subcommittee hearing will examine the Department of Energy's budget and spending. According to the DOE's Inspector General, the Inflation Reduction Act, the Infrastructure Investment and Jobs Act, and the CHIPS and Science Act have created enormous challenges at the Department. In fact, the Inspector General said that these are "historic and unprecedented times" at the Department in light of the massive spending.

President Biden and congressional Democrats' spending spree grew the Department's budget—get this—from $45 billion in 2022, exactly 45.3 billion, to over $100 billion in just one year in 2023. You know, it has doubled, historic and unprecedented times, abso-

(1)

DOE AR 000826

2

lutely. Under the Inflation Reduction Act, the Infrastructure Investment and Jobs Act alone, Democrats directed the Department to distribute $336 billion in loans on extremely tight deadlines, and that is critical. Under one program alone, the Department will need to distribute approximately $32 million per day on average in loans to meet the September 30, 2026 deadline. The speed and complexity of the review process raises concerns about whether the Department can successfully oversee these funds.

The IG also identified several common risks within the Department programs, which will get worse under the new spending and loan programs. These risks include, but aren't limited to, the inefficient oversight of projects at the transaction level, inadequate internal controls at both the Federal and recipient levels, potential conflicts of interest and undue influence and compliance problems with contract and grant terms and conditions. Given these serious challenges, Congress must evaluate the safeguards in place at the Department to prevent fraud, waste, and abuse of American taxpayer dollars.

In a series of reports, the Inspector General highlighted the need to address waste, fraud, and abuse in the Agency's Financial Assistance Awards, Clean Energy Demonstration Projects, the Loan Programs Office, and the Weatherization Assistance Program. Across these programs, the Inspector General highlighted insufficient staffing as a chief concern. The Department apparently needed to go on a hiring blitz to fill vacancies, and new rules are raising questions about the qualifications and technical skills of the new hires who are brand new to the Department. Some of these programs receiving billions of dollars have not been used in decades, meaning their oversight personnel are simply not existent. Yet even while the Department has been filling these vacancies, it has also been distributing funds. Combine this with the hiring blitz, with ongoing vacancies and positions intended to oversee these funds, and we are looking at high risk of disaster.

If that wasn't enough cause for concern, reports already indicate funds from the Infrastructure Investment and Jobs Act are going to, of all places, China. The Department awarded Microvast, a lithium battery company, $200 million of taxpayer money despite the company's primary operations taking place not the United States, not an allied nation, but in China, placing it at serious risk by influence of the Chinese Communist Party. Congress and the American people must be assured that taxpayer dollars are not going to entities, of course, owned, operated, or susceptible to control or influence of the CCP.

Today, we welcome our witnesses from the Department as well as the Inspector General and look forward to their testimony about how their offices will ensure that the Department of Energy can and will be good stewards of taxpayer dollars.

I now recognize the Ranking Member Stansbury for the purpose of making an opening statement.

Ms. STANSBURY. Thank you, Mr. Chairman, and I want to welcome our witnesses who are here with us today. This last Congress, our congressional Democrats made landmark and generational investments in infrastructure, clean energy, and domestic manufacturing when they enacted the Infrastructure Investment and Jobs

DOE AR 000827

3

Act, the Inflation Reduction Act, and the CHIPS and Science Act. Our extreme colleagues on the right want to cast these laws as wasteful, despite the extraordinary benefits they will provide for the American people and the planet, in order to curry brownie points with special interests and climate deniers. Let me be clear. The investments that we are making through these bills will lower costs, create jobs for millions of Americans, increase domestic manufacturing and energy production, and combat climate change.

As Democrats, we are committed to championing positive investments in domestic energy and manufacturing as well as providing good, well-paying jobs for all Americans. In fact, the Inflation Reduction Act has already catalyzed more than 100,000 clean energy jobs and led to increased investment by businesses and manufacturing across the United States. This includes in the West, in Colorado, where private sector company, CS Wind, plans to expand the largest wind turbine factory in the world.

In North Carolina, Toyota has invested $2.5 billion in an electric vehicle battery facility, and Wolfspeed has committed to building the world's largest carbide materials factory. In South Carolina, BMW has announced $1.7 billion to shift to electric vehicle manufacturing, and Bosch has announced $260 million in investment in the production of electric motors. And in Texas, where SK Signet announced plans to build an electric vehicle charger manufacturing facility, Tesla is investing $770 million to expand its vehicle factory, and Air Products and AES announced a combined $4 billion investment in the future of our energy economy.

As this hearing gavels in just days away from Earth Day, it is important for us to talk about why these historic investments are so critical to combating climate change and moving our economy toward a clean energy future. It is absolutely vital that we shift to clean energy sources. Such efforts are our best chance at avoiding the most devastating impacts of climate change. That is why Democrats' investments in the Bipartisan Infrastructure Law and the Inflation Reduction Act are so significant in helping to pave the way for the future.

I would also like to point out that investing in our communities is not a waste. The communities that most need these investments are the ones that are most likely to suffer from the impacts of climate change. Roughly $1.8 billion out of $4.5 billion that is slated for clean energy initiatives in the Inflation Reduction Act will go to low-income American homes. In addition, the Administration's Justice40 Initiative aims to ensure that 40 percent of the benefits achieved through these investments in climate action and clean energy will flow to our under-served communities.

We know that the Department of Energy is committed to responsibly stewarding these funds and ensuring that these historic investments are put to work for the American people and help to serve our most vulnerable communities. But as we sit here today, Republicans' concerns seem to stem from special reports that go back over a decade when the Department of Energy has already worked tirelessly to address concerns and to administer these investments that are so crucial for our climate and clean energy future and our national labs in science and technology programs. Our President is committed to ensuring that these funds are used ap-

DOE AR 000828

4

propriately. And, in fact, the President's budget for this year includes almost a 55-percent increase for the Inspector General at DOE.

When Republicans claim that they are conducting real oversight, they are focused on programs and agencies that have worked specifically to fortify against fraud, waste, and abuse with talking points that literally have very little relationship to reality. The Administration has prioritized preventing fraud, waste, and abuse across the Federal Government and ensuring that the benefits of the Infrastructure Law, the Inflation Reduction Act, and the CHIPS Act are no exception. And I look very much forward to hearing from our witnesses today. And with that, Mr. Chair, I yield back.

Mr. FALLON. Thank you. I am pleased to introduce our two witnesses today. Teri Donaldson served as an Inspector General of the United States Department of Energy, and Dr. Kathleen Hogan is the Principal Deputy Under Secretary and Acting Under Secretary for Infrastructure at the Department of Energy. I look forward to hearing from each of you this morning, or this afternoon rather, on this important topic.

Pursuant to Committee Rule 9(g), the witnesses will please stand and raise your right hands.

Do you solemnly swear or affirm that the testimony that you are about to give is the truth, the whole truth, and nothing but the truth, so help you God?

[A chorus of ayes.]

Mr. FALLON. Let the record show that the witnesses all answered in the affirmative. We appreciate you both being here today and look forward to your testimony. Let me remind the witnesses that we have read your written statements and they will appear in full in the hearing record. Please limit your oral statements to five minutes.

As a reminder, please press the button on the microphone in front of you so that it is on, and the Members can hear you. When you begin to speak, the light in front of you will turn green. After four minutes, the light will turn yellow, and then the red light will come on, and that is that time and cue, as you may suspect, to wrap it up.

I recognize Inspector General Donaldson to please begin her opening statement.

### STATEMENT OF HONORABLE TERI DONALDSON
### INSPECTOR GENERAL
### U.S. DEPARTMENT OF ENERGY

Ms. DONALDSON. Thank you, Chairman Fallon and Ranking Member Stansbury, for inviting me to testify today and talk a little bit about the types of fraud, waste, and abuse that we might encounter given some of the risk factors within the landscape at the Department of Energy.

The Chairman mentioned probably the most significant risk factor, which is sheer volume of dollars. So, in Fiscal Year 2022, the budget for the Department was a little over $44 billion. Underneath IIJA, IRA, CHIPS Act, and the legislation giving a billion dollars to Puerto Rico for solar, that number is now at $478 billion

DOE AR 000829

5

when you include the loan-related dollars, so from $44 to $478 is a really big hop. Also, these statutes created 71 brand new programs, which is a staggering number.

This is, by the way, the largest amount of money under all of these bills did, in fact, go collectively to the Department of Energy, and this is the largest number of new programs collectively, so there is a lot going on in Dr. Hogan's world right now just with this huge volume of very important issues being worked on. New programs do bring particular risks as the Chairman mentioned. By definition, you are utilizing newly designed and untested internal controls, so that is a big risk factor. Also, a lot of the money in this situation will go to states, local governments, and tribes, and it is not at all clear whether states, local governments, and tribes are ready to take it.

So, there are readiness assessments being done, and there are issues associated with that. One of their questions is how much of the money are they allowed to use to conduct oversight. So, there are many questions being asked there and those are very important. You do not, by virtue of granting money to others, remove the Federal nature of the money, so the risks just travel right along with it.

I will also comment briefly on the lack of funding for Department oversight, you know. As all of you know, the Department is the front line of defense. IIJA awarded only three percent for administrative costs, a little more flexibility under IRA, which I think was really good news but administrative costs focused primarily on moving the money out the door to its intended use. Oversight is a small part of that. Oversight is making sure that the dollars actually landed where Congress wanted them to land, some of the important projects mentioned by Congresswoman Stansbury, so it is really important. It is that look in the rearview mirror to make sure the dollars were delivered where they were supposed to go.

I will also quickly point out one of the most, sort of obvious, risk factors in this package was that my shop, the Office of the Inspector General, was woefully under-funded in all four bills. So, in the CHIPS Act, the Office of the Inspector General received zero. The $1 billion appropriation for solar in Puerto Rico, my office received zero. In IRA and IIJA, we did receive some amount of money, but compared to the other inspectors general whose agencies received money, ours was the tiniest fraction of that, and this is really important.

And I appreciate that the President has included a bump up, you know, in his proposed budget in recognition of this. It is still going to leave a shortfall that is enormous in terms of my budget, which allows me to conduct audits, inspections, and evaluations. So, I always say there is no substitute. You can do a lot of planning, a lot of coordinating with others, but there is no substitute for having the people and the technology to do those targeted projects that allow you to find where the system is breaking or broken, and allow you to work on those big fraud cases that we all know are coming just because this is a lot of money moving fast. But we are trying to work as hard as we can on the front end to minimize that.

So, quickly, I will mention what I think is the most important tool in the tool bag. In addition to people, I mentioned technology.

DOE AR 000830

6

Data analytics is a gift to the world of inspectors general and a gift to Federal agencies, that if they properly utilize it, can be on the front end of oversight and prevent a lot of the fraud, waste, and abuse. So, data analytics is something that Congress has been heavily endorsing since 2015 with the Fraud Reduction and Data Analytics Act; again, in 2018, Foundations of Evidence Based Policymaking Act; Payment Integrity Act 2019. Those are all very important pieces of legislation where the Federal Government has recognized you have to acquire and scrub quality data in order to have data analytics really work for you.

I am looking forward to your questions. Thank you very much.

Mr. FALLON. Thank you. The Chair now recognizes Dr. Hogan, and please begin your opening statement.

**STATEMENT OF KATHLEEN HOGAN**
**PRINCIPAL DEPUTY UNDER SECRETARY AND**
**ACTING UNDER SECRETARY FOR INFRASTRUCTURE**
**U.S. DEPARTMENT OF ENERGY**

Ms. HOGAN. Chairman Fallon and distinguished Members of the Subcommittee, thank you for this opportunity to provide an update on the Department of Energy's efforts to safeguard taxpayer dollars in the implementation of the Infrastructure Investment and Jobs Act and the Inflation Reduction Act, known as IIJA and IRA.

So, IIJA and IRA really are truly historic investments in renewing American infrastructure and supporting American energy security for decades to come. And we at the Department are working hard to swiftly implement these laws so we can get these resources out to communities, in your districts, and in every corner of the country as quickly as possible. We also acknowledge and respect that when Congress appropriated these resources, you entrusted the Department with investments using taxpayer dollars, and we take this responsibility incredibly seriously. And every day, our team of experts and professionals are working hard to ensure that taxpayer dollars provided to us by Congress are being spent effectively, efficiently, and responsibly.

Through the implementation of IIJA and IRA, we are striving to lower energy bills for American households, improve energy reliability and security, and ensure that America is positioned to lead the world in manufacturing the energy technologies of the future. And the Department appreciates the passion and interest of Members on both sides of the aisle in your efforts to make sure these investments reach your districts. We at the Department are happy to continue to work with Congress and provide information and updates as we continue to implement these laws thoughtfully and responsibly.

You know, beginning in January 2022, very shortly after the IIJA was signed into law, our team began engaging with the DOE Office of Inspector General on behalf of and in coordination with the program offices responsible for implementing IIJA. We sought then, as we do now, to better understand how DOE can proactively improve its oversight of this funding. And over the past 15 months, the Office of the Under Secretary has coordinated 27 meetings with the OIG and DOE program officials to discuss program design and implementation. These meetings are designed to provide the oppor-

DOE AR 000831

7

tunity for an engaged, open, and transparent conversation about program design, risk mitigation strategies, best practices, and lessons learned. And, you know, the topics of discussion have ranged from DOE's approach to Build America Buy America requirements to how specific provisions are being implemented.

From the very start, the Office of the Under Secretary for Infrastructure and program officials across the Department have demonstrated a thorough transparency with our Inspector General with regard to our plans and activities. In turn, the Office of the Under Secretary has really gained substantial insights from our OIG on what trends are now being seen with respect to recent investigations and reports, the latest scams and methods that criminals are using to defraud the Government, and common mistakes that funding recipients make. And with this knowledge, we are better positioned to maximize the impact of this funding and reduce fraud, waste, and abuse. We have also shared with the OIG the critical process improvements the Department has made over the last decade across multiple program offices to strengthen our protections and mitigate risks associated with our financial assistance and loan guarantee programs.

The Department truly appreciates the OIG's perspective considerations for the implementation of the IIJA, which did come in the form of a number of special reports last year. While these are not the end products of the typical audit process, they contain and collect helpful historical context and guidance on best practices. You know, one example, one key concern the Inspector General has highlighted in the 2022 reports is about adequate staffing at the Department and the need to provide the necessary oversight of funding programs and projects. You know, we have been focused on hiring a sufficient staff from day one with a particular focus on project and program oversight specialists, grant management and contracting specialists, and financial and audit oversight staff to responsibly oversee the significant investment Congress has made. And as we continue to do this work, we remain steadfast in our commitment to be responsible stewards of taxpayer dollars and will continue to take proactive steps as necessary to prevent fraud, waste, and abuse as we really work to deliver the benefits that this money can do for the future of the country.

And we really look forward to continue our work with you and thank you for the opportunity to be here, and we look forward to your questions.

Mr. FALLON. Thank you. I now recognize myself for five minutes of questions.

IG Donaldson, in your report titled, "Management Challenges at the Department of Energy, Fiscal Year 2023," you warned about a greatly increased risk of fraud, waste, and mismanagement given the massive spending flowing through the Department. So, you posed critical questions in your report, one of which you asked 'do these spending bills allow the Department to create an appropriately sized oversight infrastructure to ensure that these funds are delivered as Congress intended.' Can you expound on that?

Ms. DONALDSON. I can. So, historically, the Department—well, it has always been probably the leanest Federal agency. So, over 90 percent of its dollars historically pass through and end up with its

8

contractors. So, when I came on board in this position, now four years and change ago, I inherited a lot of reports noting that there were problems during the audits, and the Department would even acknowledge they were under-resourced for oversight. So, there would be a set of requirements. Only some of them were being met or followed. They simply didn't have the people, so that was a real theme that I inherited in this job.

So, when the new bills came along, that was, I think, the very first question we had talked to the Department of Energy about is, are you going to be able to make up some of that shortfall with the allocations in those earmarks for administrative cost? What amount of that will you actually be able to use for auditors and oversight? And I think they are still working through those issues.

Mr. FALLON. So, what you are saying is even when they were at a budget of $46 billion, there were concerns about their oversight capability?

Ms. DONALDSON. Noted by my predecessors——

Mr. FALLON. OK.

Ms. DONALDSON [continuing]. And GAO.

Mr. FALLON. Now, with double that kind of budget that now explodes, fair enough to say that that concern would be greatly increased?

Ms. DONALDSON. They will need to dedicate a lot more resources to oversight. That is correct, sir.

Mr. FALLON. Dr. Hogan, what has the Agency's response been to this critical question? Are you satisfied with the response?

Ms. HOGAN. I mean, we are working hard to bring the staff on that can provide the necessary oversight for these projects. I think, as we have talked about, many of these programs are new. That is interesting in that it gives us the opportunity to bring people on to participate in the design of these programs really before we get into the project management with the dollars on the street, which means we can be hiring for where we need to be sort of six months ahead and bring people on and train them up, which is something we have been focused on——

Mr. FALLON. OK.

Ms. HOGAN [continuing]. Across the board.

Mr. FALLON. And a second question was asked in the report, do these massive spending bills allow the Department's OIG to execute its statutory obligations to protect these funds. And can you expound on that, IG Donaldson?

Ms. DONALDSON. Yes, I can. The funding issues I mentioned a moment ago are really quite remarkable. As I said, without funding, you simply can't cover that portfolio. So, even now, we are shifting some from our existing portfolio, which is hugely important work—environmental liabilities, pit production—and trying to sort of squeeze in some resources to have all of these meetings with Dr. Hogan's shop and prepare. But that doesn't mean that we automatically will have the resources to do audits, inspections, and investigations. We won't, right? So, we are trying to do the planning to where when additional money arrives, we will be able to do that. But right now, we are in a bad situation funding-wise.

Mr. FALLON. Yes. Dr. Hogan, on March 22d, Chairman Comer and myself wrote to Secretary Granholm seeking documents and

9

information related to IG Donaldson's report and the DOE funding announcements. Yesterday, DOE submitted some of these documents. In one email from May 9, 2022, a staff member in the OIG's office stated, "We believe administrative remedies, such as suspension and debarment, should be considered by the loan programs offices and instances, such as Solyndra, where company officials provide misleading information or provide false statements." Has the DOE implemented this recommendation?

Ms. HOGAN. We implement a full set of mitigation strategies across the portfolios that we run.

Mr. FALLON. But respectfully, have you implemented this particular recommendation?

Ms. HOGAN. The Federal Government and DOE have disbarred entities from being able to participate in Federal business if they cross certain lines, yes.

Mr. FALLON. So, you are implementing this recommendation? That is what you are saying? Yes? Yes?

Ms. HOGAN. Yes.

Mr. FALLON. OK. Great. OK. So, you know, as we all know, Solyndra is the same company that in 2009 received half a billion dollars from the Energy Department, despite having submitted a misleading application, laid off its employees, shutdown, and filed bankruptcy two years after receiving the funds. The last question, can the Department commit to producing the rest of the documents that we requested by the end of this week?

Ms. HOGAN. We are working through the document requests that you have, and we will——

Mr. FALLON. Can you commit to it, though?

Ms. HOGAN. We will get to you as many documents as we can get as quickly as we can.

Mr. FALLON. We would really appreciate that. It is a pretty simple request, and that is it. Considering the money involved, I think it would help us do our oversight job. Thank you very much. The Chair recognizes the gentlelady from Ohio, Ms. Brown.

Ms. BROWN. Thank you very much. The 117th Congress was one of the most productive in our Nation's history. Congressional Democrats, with the help of some Senate Republicans, sent groundbreaking legislation to President Biden's desk, like the Bipartisan Infrastructure Law and the CHIPS and Science Act. In addition, Democrats unilaterally passed what will go down as one of the most important pieces of legislation in American history: the Inflation Reduction Act.

These bills make up part of the most expansive, forward thinking, and restorative agendas in modern history. Democrats are taking steps to propel our Nation's infrastructure decades into the future, promoting our strategic and national security interests, as well as passing the largest-ever investment in our climate. That means clean jobs and investment. The Inflation Reduction Act has already led to the creation of 100,000 jobs and, as my colleague pointed out, billions of dollars in investment by domestic manufacturing companies since its passage last year. Meanwhile, the plan from my colleagues on the other side includes proposing the cut from the lifesaving programs, like Medicaid, while holding the pay-

DOE AR 000834

10

ment of our Nation's debt hostage. That right there is backward, catastrophic, and the Republican agenda.

Now, let us talk about how the Biden Administration is responsibly stewarding taxpayer dollars. In June 2022, the Department of Energy's Office of Inspector General issued a report on preventing fraud, waste, and abuse in the Loan Programs Office. Dr. Hogan, can you tell us how much of the Department's budget has actually increased per year because of IIJA and the IRA?

Ms. HOGAN. Yes. I mean, our budget is substantially larger because of the IIJA and the Inflation Reduction Act, with $68 billion coming in through the IIJA and additional $30-plus million coming in through the Inflation Reduction Act. At the same time, we know that this is a historic investment in our future for the purpose of, you know, improving the economic opportunity for our communities and building jobs. And we don't view this as a one-year appropriation-type opportunity. It really is a many, many year effort to move out and help our communities improve their economic opportunity.

So, you know, say it is a 10-year-ish-type opportunity. You can take the $100 billion that is coming into the Department of Energy divided by 10. So, it is sort of like a $10 billion average increase in the budget to the Department. That is not a perfect way to do it because there are different timelines associated with different provisions. But that is what we are looking to do, is build the capacity to work with our applicants and with our communities over the next decade to truly make the difference that these dollars can make that Congress has trusted us with.

Ms. BROWN. Thank you so much. Back to the report. Dr. Hogan, has the Loan Programs Office taken steps to remedy the areas identified in the special report, and if so when were those reforms implemented?

Ms. HOGAN. Yes, the Loan Programs Office is a very different office today than what it was so many years ago. It has been able to stand up a number—expanded staff, but not just expand its headcount. It has been able to invest and build out new capabilities to assess, in a due diligence way, technical risk and business risk or the program for the projects that it is reviewing, as well as we have been able to build out any number of additional review capabilities within the Agency and across agencies, bringing in the capabilities of our Treasury Department, as an example. So, it is a very different program today.

Ms. BROWN. And, Dr. Hogan, what are the most significant changes that you anticipate at the Department of Energy as a result of the Bipartisan Infrastructure Law and Inflation Reduction Act?

Ms. HOGAN. I am sorry. What is that?

Ms. BROWN. Most significant changes you anticipate at the Department of Energy?

Ms. HOGAN. You know, the Bipartisan Infrastructure Law and IRA really have brought to the Department the opportunity to work with our communities and build out manufacturing, and help just capitalize on what is going to be a major opportunity to build jobs and be global leaders in the manufacturing that will go with a clean energy economy. So, I think——

Mr. FALLON. The gentlelady's time has expired.

DOE AR 000835

11

Ms. BROWN. Thank you.

Mr. FALLON. Thank you. The Chair now recognizes gentleman from South Carolina, Mr. Fry.

Mr. FRY. Thank you, Mr. Chairman, for having this hearing today, and thank you to both of our witnesses for being here.

Thanks to President Biden's tremendous spending spree, the DOE has seen a massive budget growth just this year alone. I think my biggest concern and what we echoed, Inspector General, is that, is the Department ready to handle that? The Infrastructure Investment and Jobs Act and the Inflation Reduction Act gave the Department of Energy $100 billion in appropriated funds, $336 billion in loan authorizations, and $30 billion from the CHIPS and Sciences Act. Let us take a closer look at what these chunks of money do.

And the Inflation Reduction Act included $9 billion for home energy rebates and appliance upgrades, meaning the Federal Government will pay you $840 just to install an electric stove and up to $14,000 for high efficiency electric home rebates. The Infrastructure Investments and Jobs Act sets up an additional, as we talked about, dozens of programs. The CHIPS Act includes $250 million for a new carbon material science. This money doesn't grow on trees. It is coming straight from the pockets of hardworking Americans.

So, Dr. Hogan, I want to turn to you. Given the speed at which this was passed and given the OIG report, do DOE employees face significant pressure from this Administration to exhaust the funds now available under the IIJA and the IRA?

Ms. HOGAN. We are working hard to balance the urgency that we think it is important to get these resources out on the street and benefit people. At the same time, we are balancing that with what we think we need to do to do it right. So, do we feel urgency? Yes, but we are doing it, we believe, with a balance to think through effective design, think through effective controls, and to engage many of the so-called co-implementers for these provisions in what it will take to do it well.

Mr. FRY. Again, I want to turn to permitting real quick. How does slowdowns in permitting affect your ability to properly distribute the funds that expires in just a few short years?

Ms. HOGAN. As you know, permitting is a huge issue, and figuring out how to make permitting happen as efficiently and as effectively and smoothly is something that we are all interested in doing. At the same time, what we have been doing at the Department is engaging with our sister agencies to streamline whatever it is we have the opportunity to do. And Congress did give us some additional dollars in the Inflation Reduction Act to bring more resources to bear, so there don't have to be bottlenecks where we can just move things through it quickly.

Mr. FRY. Do you anticipate permitting delays because of existing laws? Is that correct?

Ms. HOGAN. Permitting is an important part of what we need to do, again, to do project review. So, absolutely, permitting is something that is part of many of the projects that we will be undertaking.

DOE AR 000836

12

Mr. FRY. Real quick, Dr. Hogan—I am crunched for time a little bit—but how do permitting delays impact the U.S. ability to utilize energy sources in general?

Ms. HOGAN. I mean, that is a complex problem, and we would be happy to engage with you. I mean, there are certain provisions and ways to move forward on Federal lands, and there are certain provisions, you know, on other properties. So, we are doing what we can to streamline and move efficiently where we can. And again, we would really appreciate a fulsome conversation about how to do permitting effectively so that we can get the benefits for what these dollars offer this country around manufacturing jobs, *et cetera*.

Mr. FRY. Dr. Hogan, which DOE programs are most vulnerable to those permitting delays?

Ms. HOGAN. You know, there are a number of demonstration projects. There are transmission projects. And the way permitting intersects with these projects will be different based on where they are and where they will be constructed.

Mr. FRY. In a briefing with Committee staff, DOE mentioned interagency conversations with the Department of Interior, as an example, to address these permitting issues. In your opinion, which areas of the permitting process are in most need of reform, and has DOI been receptive to DOE's permitting concerns?

Ms. HOGAN. We are having very good conversations with our sister agencies about what it is we can do to streamline permitting, and, again, we would love to come up and talk with you further about where we see opportunities to improve these.

Mr. FRY. In your opinion, just right now, what do you think is in most need of reform from a permitting perspective?

Ms. HOGAN. It is a deeper conversation, so again, we would love the opportunity to come up and have a deep conversation with you.

Mr. FRY. Thank you, Mr. Chairman. I yield back.

Mr. FALLON. Thank you. The Chair recognizes the gentlelady from Washington, D.C., Ms. Holmes Norton.

Ms. NORTON. Thank you, Mr. Chairman. Dr. Hogan, in 2022, the Department of Energy Office of Inspector General issued four special reports. These were prospective reports anticipating potential areas of risk rather than identifying new risk areas. They serve to highlight for the Agency and for Congress various areas identified in previous DOE OIG reports. So, Dr. Hogan, how did the Department engage with OIG on these reports?

Ms. HOGAN. Yes. So, as you stated, these are reports that our Inspector General wrote from really pulling together a lot of information from past audits that had been developed. So, we did not participate in the same way we would with a deep audit where they would be engaging with us and getting information because the information body more or less existed.

But what I will say is, we are just so appreciative of the Inspector General producing these reports for us, and engaging in conversations around the findings that they have, and the trends and patterns that they pulled out from these reports. They are really so helpful to help us get organized around where to look as a sort of foundational approach to the controls and systems that we will be building into our work going forward.

13

Ms. NORTON. Well, Dr. Hogan, three of four special reports identified insufficient staffing as a risk to the administration of funds and performance of oversight functions. What steps has the DOE taken to address this concern and increase staffing?

Ms. HOGAN. So, we are working hard right now to buildup the staff that we need to deploy so that we can manage the funding through these two laws and minimize fraud, waste, and abuse. You know, again, many of the programs that were provided to the Department by Congress are new programs, which means they need a fair amount of design work up front, stakeholder engagement work through requests for information. So, we are bringing the teams on to do that work, and then simultaneously hiring for the project management staff we will ultimately need when we get to the point of project management. So, really, we are moving out on all fronts from a hiring perspective.

Ms. NORTON. Well, Dr. Hogan, how is the DOE addressing cybersecurity threats related to implementation of the Infrastructure Investment and Jobs Act and the Inflation Reduction Act?

Ms. HOGAN. Another really important question. That is something that is also part and parcel of our daily work. I mean, we have gone through the bill and IRA provision so that we understand where we believe the greatest cyber risks are. And then we are engaging in the design of these programs and what will be required by the applicants to develop cybersecurity plans, that will be again necessary as part of the whole project. We call that sort of designing cybersecurity in from the get-go as opposed to trying to bolt it in at the back end.

Again, we are bringing forth our cyber experts through our Office of Cybersecurity, Energy Security, and Emergency Response, as well as our cyber capabilities from our information officer, our chief information officer, and are working to bring the best of what we can to these projects.

Ms. NORTON. Well, is it true, Dr. Hogan, that DOE was aware of these risks described in the special reports prior to their issuance in 2022 and had already been instituting the OIG's recommended reforms in a proactive manner?

Ms. HOGAN. Yes. What is nice about what the OIG brought forth, is really going back and looking at the many types of issues that have happened over time and pulling them together in one place. But some of the, you know, information that was there, like around the weatherization program, as an example, was from the era of 2012 and from the Loan Programs Office, you know, maybe up to 2015, 2016. So, the Department was aware of these things, and the Department has been actively putting controls in place or building out capabilities as necessary to address these issues for many years. But, so, from those programs perspective——

Mr. FALLON. The gentlelady's time has expired.

Ms. HOGAN. Sorry.

Mr. FALLON. The Chair recognizes gentleman from North Carolina, Mr. Edwards.

Mr. EDWARDS. Thank you, Mr. Chair. On October 19, 2022, the Department of Energy announced the availability of $2.8 billion under the law for manufacturing of batteries for electric vehicles and the electric grid. Reports later indicated that the Department

DOE AR 000838

14

of Energy awarded Microvast, a lithium battery company, $200 million of American taxpayer dollars despite the company's primary operations taking place in China. I have a bit of an interest in China this afternoon. Dr. Hogan, are you aware of funds under the Infrastructure Investment and Jobs Act, the Inflation Reduction Act, or the CHIPS and Science Act going to China, Chinese companies, or companies susceptible to control or influence by the Chinese Communist Party?

Ms. HOGAN. We are not aware of any dollars going to companies as you describe.

Mr. EDWARDS. What are you doing to prevent the transfer of funds to other adversarial companies, entities, or nations?

Ms. HOGAN. We at the Department have a history of doing due diligence around any potential applicant for these types of solicitations. We do vetting, leveraging information we get through our intelligence and counterintelligence experts at the Department. We, based on the times that we now have and the magnitude of dollars that we are now talking about, are amping up the efforts that we have had to date. We have established a new vetting center to coalesce this type of information and expertise so that we can double down on the types of assessments you are discussing, you are bringing up.

Mr. EDWARDS. And, so, are you assuring this Committee that these dollars could not and will not be distributed to Chinese entities?

Ms. HOGAN. These dollars will not go to Chinese entities.

Mr. EDWARDS. Is that in policy or in law? What would be the prohibitive source to ensure that those dollars don't go to Chinese entities?

Ms. HOGAN. I think it is both, but I will find that answer for you.

Mr. EDWARDS. All right. Inspector General Donaldson, does the OIG recommends safeguards to prevent American taxpayer dollars from going to entities owned, operated, or susceptible to control or influenced by the Chinese Communist Party?

Ms. DONALDSON. Yes, sir, without a doubt.

Mr. EDWARDS. What about other adversarial entities or nations?

Ms. DONALDSON. We feel exactly the same about all the nations of concern.

Mr. EDWARDS. And what are those safeguards?

Ms. DONALDSON. Well, the Department has been working on this for years, and thankfully working with involving the Office of the Inspector General on the area that we refer to as research security. So, there are several ways that you can try to combat this. I think the U.S. General Accounting Office is about to launch an audit of the Department on technology transfers. But when technology is leaving our facilities, technology that the taxpayers have paid for, that is a very important issue, and we all know that a lot has already flown the coop.

So, you do that through a series of careful disclosures in connection with grants and other sorts of financial assistance tools, and then if those disclosures are inaccurate, you have to prosecute those people. It is very important that you have a strong message of deterrence in connection with those disclosures. That is your basic grant fraud.

15

Mr. EDWARDS. And, so, for either of you, I started my comment with some background information that $200 million of American taxpayer dollars were used for companies doing operations in China. In spite of the safeguards, how did that happen?

Ms. HOGAN. Well, let me first sort of correct the record there. So, the company that was selected for negotiation for an award, Microvast, is a U.S. company. That said, that company has not yet received any money. It was selected for a negotiation and is in that process where we are continuing to do the type of due diligence we are discussing.

Mr. EDWARDS. Thank you, Mr. Chair. I see my time has expired.

Mr. FALLON. Thank you. The Chair now recognizes the gentlelady from New Mexico, Ms. Stansbury.

Ms. STANSBURY. All right. Thank you, Mr. Chairman, and again, welcome to our witnesses today. It is a pleasure to have you here, and we appreciate the work that you do.

You know, I want to just say at the outset here that I have been proud to be part of one of the most productive Congresses ever in the history of the United States. In fact, this last Congress, we passed more generational legislation than has passed in decades in this country that includes the Bipartisan Infrastructure Bill. It includes the Inflation Reduction Act, which not only makes the largest investment in Department of Energy Programs, it makes the largest investment in clean energy and climate programs ever in the history of this country and in the history of any country on the planet ever. It is massive. It is a huge investment. And the reason why we made that investment is to tackle the global climate crisis so that our planet does not cross a global tipping point as we are pursuing a clean energy future.

And in addition to that, we passed the CHIPS Act to address our national security issues around the manufacturing of CHIPS to help modernize our national labs, which the Department of Energy oversees, to update our science and innovation around all of our clean energy issues, and to ensure that we are repatriating technologies that actually make us vulnerable to these foreign influences that actually we have been discussing here today.

So, taken as a collective, these pieces of legislation, which this Congress passed with the support of our President, were really designed to tackle three crises that the United States was facing: rebuilding our economy in the wake of disastrous manufacturing policies for decades, which off-shored millions of American jobs to other countries, and which, of course, made our country vulnerable in the wake of a global pandemic and affected us with global supply chain shortages and inflation, which we are still experiencing today. It threatened our national security as so much of our actual infrastructure and technologies that we use for our national security are now manufactured overseas, and, of course, the global climate challenge.

And of course, the Department of Energy, Dr. Hogan and Honorable Donaldson, are really at the forefront of tackling these challenges across all three of those crises. So, I am delighted to have the opportunity to talk to you about them here today. And for me, these really touch close to home because I represent New Mexico's 1st congressional District, which is also home to Sandia National

DOE AR 000840

16

Laboratories, whose core mission is actually to address all three of those crises—the global climate crisis, our energy security, our national security—and to help stimulate manufacturing and repatriate American manufacturing back home.

So, we have heard a lot of strange claims today about the purpose of these bills and how the funds will be used. But I just want to make sure that we are completely clear on this one piece, which I think keeps coming up over and over here, which is about the national security implications of these bills.

So, Dr. Hogan, you know, let us turn to the CHIPS Act first. Is not the reason that we passed the CHIPS Act primarily, the big push this last year in addition to all of the science and technology and labs, things that we included, was actually to address our national security risks from China and chip manufacturing overseas?

Ms. HOGAN. I believe that is why we passed that, absolutely.

Ms. STANSBURY. And, in fact, in addition to that, these investments that we are making in major energy infrastructure, you know, the kinds of investments that we are talking about, these private sector companies and these public private partnerships, will help to build that clean energy infrastructure that will make us not only energy secure in this country, but more competitive internationally. Is that true?

Ms. HOGAN. Yes. There is a huge investment wave ahead of us as we seek to have a global clean energy economy and a huge opportunity for new manufacturing and quality jobs that go with that.

Ms. STANSBURY. And, you know, I want to just end on this note, which is that I know, Dr. Hogan, you have been involved with the IPCC for many years and, in fact, have been honored nationally, including in association with the Nobel Prize in the IPCC's work. We know that global climate change is already happening. The impacts are already being felt here at home. Is it not true that the reason we passed the Inflation Reduction Act is that it will help us reduce our climate emissions if we are effective in implementing it by 30 percent or 40 percent by 2030?

Ms. HOGAN. Yes. These two laws together are really powerful in bringing together the climate protection that you are speaking to as well as the economic opportunity and, really, economic opportunities for communities in every corner of every state.

Ms. STANSBURY. Thank you, Ms. Hogan, and that is exactly why we passed these bills, and we are grateful for your implementation and vision.

Mr. FALLON. The Chair now recognizes the gentleman from Pennsylvania, Mr. Perry.

Mr. PERRY. I thank the Chairman. Thank you, ladies for being here. I am going to start right with what I would consider kind of the fox guarding the hen house. As you know, many of us know Secretary Granholm sat on the board of Proterra, which is an electric vehicle company, from 2017 to 2021. Now, she sold her shares in Proterra, but we know that she also promoted, in November 2021 at the JFK Airport, where she stood in front of Proterra-made business buses, Proterra-connected vehicles to advertise the SuperTruck 3, and for other government funding programs. Just to give you some numbers in case you are not aware, over $76 million

17

of the $200 million in funding announced in the event went to heavy vehicle manufacturers associated with Proterra, including Daimler Trucks, Ford Motor Company, and General Motors.

My concern is there is a trend at the Department of Energy of money going to politically favored entities. As you know, during the Obama Administration that was Solyndra, A123 systems, Fisker, *et cetera*, and ironically, Secretary Granholm provided funding to A123 and Fisker, both having operations in Michigan, as the Governor of Michigan. And as you are likely aware, these two entities were sold for pennies on the dollar to the Chinese.

To both our witnesses, in your respective roles, how are you going to safeguard the hundreds of billions of dollars literally at your fingertips when the head of the Agency continues to promote projects for her former employer? Ms. Donaldson?

Ms. DONALDSON. Well, as you know, Congressman, there are a set of laws that control conflicts of interest. That is a project that is of great interest to me and probably one of the projects we will be launching in the next few weeks in connection with the new funds. So, it is very important that you gather information about those conflicts, that there be prohibitions, those sorts of things. It is a challenging area, especially when you realize how all the new staffing you are ramping up and you are hiring all these people, it presents an opportunity for people to sort of sneak in that, candidly, might intend to go back to——

Mr. PERRY. And we are going to get into that, and I appreciate your response. Dr. Hogan, anything from your end on this?

Ms. HOGAN. You know, we are putting solicitations on the street, we are getting applications in, and we are reviewing those applications with subject matter experts from within the Department and externally in a way that is totally separate from the political core in the Department, so——

Mr. PERRY. So, we are making sure that the application process, that the money just doesn't end up in the pockets to Democrat donors and Chinese Communist Party-backed entities. The application process is what we are relying on. I just want to confirm what you just said.

Ms. HOGAN. Yes.

Mr. PERRY. OK.

Ms. HOGAN. It is a merit-based, risk-based application process.

Mr. PERRY. All right. And to the IG, Ms. Donaldson, do all the FERC Commissioners honor the ethics commitments, since we are on the subject? I mean, do you feel that they do?

Ms. DONALDSON. Well, the commissioners are bound by those——

Mr. PERRY. Well, yes, I know we are bound by—we take an oath around here, but I wonder if half the people have read the Constitution. Have there been any concerns raised to your office about the independence, integrity, or conflicts of FERC commissioners?

Ms. DONALDSON. We have had allegations in the past pertaining to FERC. I don't think we have any open matters pending to——

Mr. PERRY. So, for example, is there one on the FERC Commissioner Allison Clements regarding outstanding ethics issues because she has not updated her ethics agreement to account for her husband's work in the industry, the very industry that she regulates? Moreover, there are reports that the commissioner has

DOE AR 000842

18

briefed funders of far-left organizations on FERC priorities. Are you aware of these things? Can you enlighten us on these occurrences?

Ms. DONALDSON. I don't believe we have an open matter fitting that description, sir.

Mr. PERRY. So, are you saying that the matter has been resolved?

Ms. DONALDSON. I don't think we have ever opened one. If you give me one moment, I will confirm that, but I don't think we have ever opened a matter of fitting that description. Yes, I don't think so.

Mr. PERRY. So, are you saying that there is no matter open and at this point you are unaware? Are you unaware of this circumstance where a husband works for the industry?

Ms. DONALDSON. I will say that I am unaware of it. It is possible. We have a pretty, you know, big apparatus for taking in new matters. It is possible it is coming through, and I just haven't been briefed on it yet.

Mr. PERRY. Could you——

Ms. DONALDSON. But I could get back to you on that, sir.

Mr. PERRY. I would appreciate that.

Mr. PERRY. I would appreciate your report to the Committee regarding any information in that regard, and I thank the Chairman. I yield.

Ms. DONALDSON. Sure.

Mr. FALLON. Thank you. The Chair now recognizes the gentlelady from Florida, Mrs. Luna.

Mrs. LUNA. To follow up on some questions asked by Mr. Edwards earlier, what is the DOE's process to catch the taxpayer dollars that were going to Chinese-affiliated companies? Like, do you have an oversight that looks into people before you award contracts? The reason I ask that is because, obviously, the CCP has been known for corporate espionage. And obviously, with you guys, I am sure that there needs to be probably a bigger set of oversight and security for that before you guys are awarding government contracts.

Ms. HOGAN. Yes, and again, thanks for this question. We know it is a big issue, a big concern to you and to us. So, you know, we do due diligence on every applicant that we are thinking is in the zone of being meritorious for an award. So, we do due diligence around ownership issues with countries of greatest concern, and we are doubling down on our capability to do that. So, we have always done that in what we call a pre-selection phase, and by "selection," I mean it is a meritorious project. And we would like to select and then actually enter into a deeper negotiation to get to the point where you actually award money, a lot of standard terms and conditions that companies need to agree to, to get a government award. And during that whole post-selection process, we do even more due diligence around these types of foreign concerns.

Mrs. LUNA. Are you guys doing anything currently to promote domestic energy production?

Ms. HOGAN. We are doing a lot to promote domestic energy production and utilization of domestic supply chain.

Mrs. LUNA. So, one of the biggest issues that I am currently seeing exists in Congress is a lot of people will talk about clean en-

DOE AR 000843

19

ergy, but it is not really clean, especially, when it is tied to China or Chinese productions, for example, windmill manufacturers, right? So, I guess what I am trying to say is, instead of facing a global climate crisis, we are facing the global China crisis. And I am that you would agree—kind of "yes" or "no" real quickly, do you agree that China is one of the biggest threats to our climate as a whole?

Ms. HOGAN. China is a big emitter of greenhouse gases, correct.

Mrs. LUNA. And those greenhouse gases do not stay contained in the China region, correct?

Ms. HOGAN. Right. It is a global——

Mrs. LUNA. OK.

Ms. HOGAN [continuing]. Pollutant, right.

Mrs. LUNA. Yes. How about you, Honorable Donaldson?

Ms. DONALDSON. That is a little out of the lane for an inspector general.

Mrs. LUNA. No, I mean, it is just your opinion. I would like to know because you guys are obviously in important positions, and I want to see your view and perspective on that.

Ms. DONALDSON. That is certainly what is reported.

Mrs. LUNA. OK. So, I think that if there is any way that you guys can help kind of tailor that and make sure that we are not doing anything to really enable these companies and corporations, I think that that would be the best thing.

I guess my last question for you would be, we are currently seeing that China has an insanely big monopoly on critical minerals that we need to produce some of these things for electric vehicles. What would you say would be the best way that we here in the United States could handle that instead of outsourcing some of these operations to other countries like China, for example, the domestic harvesting production?

Ms. HOGAN. We are very interested in building out the critical mineral material supply chain in the United States to the extent that the United States will embrace this in different ways. You know, it is in many parts of that landscape. In addition, I think we are very engaged with a number of international allies so that we can have strategic alliances——

Mrs. LUNA. Real quickly. Sorry.

Ms. HOGAN [continuing]. Where we can work together.

Mrs. LUNA. What allies are those, just so I know?

Ms. HOGAN. Like Canada, Australia. There is a list of countries that also have resources that we work with around opportunities for critical minerals and materials.

Mrs. LUNA. Do you know if anyone has ties to BRICS, any of the BRICS countries?

Ms. HOGAN. We can get back to you on that.

Mrs. LUNA. OK. The reason I ask is because BRICS is currently working to undermine the U.S. dollar as a whole by forming an alliance in their debt with China, so I just want to make sure. Thank you very much. Mr. Chairman, I yield my time.

Mr. FALLON. Thank you. The Chair now recognizes the gentleman from Florida, Mr. Donalds.

Mr. DONALDS. Thank you, Chairman. Inspector General, hello. How are you? Dr. Hogan, hi. A couple of things. Quick question.

DOE AR 000844

20

The Department of Energy has considered TRISO fuel—T-r-i-s-o—as the most robust nuclear fuel on Earth. However, the United States does not have a domestic supply of Halo or other small amounts at DOE and must currently rely on Russia to fuel our Nation's innovative advanced reactors. In your opinion, what level of investments should Congress provide to establish and build out America's Halo-producing capability?

Ms. HOGAN. We are very interested in the United States having a strong nuclear industry. We are very happy to come back and talk with you about what that takes. As you know, it is complicated, and the war in Ukraine and the position that Ukraine and Russia are now in has made something that we need a different strategy on.

Mr. DONALDS. Dr. Hogan, do you think the American people understand that we get most of our uranium from Russia?

Ms. HOGAN. Yes. I don't know what the average citizen thinks about that, but certainly we are at a point now with the war in Ukraine and with Russia that we need another strategy in this country.

Mr. DONALDS. Let me ask you this question. The Nuclear Regulatory Commission, do you think they have the capability and the wherewithal to actually permit new commercial reactors in the United States for use, not for study?

Ms. HOGAN. I think they have the capability to permit reactors, yes.

Mr. DONALDS. So, what is the problem? What is the holdup? They haven't created a new one. All right. Let me rephrase that. They have not allowed a commercial reactor for use since they were created. So, what is the holdup?

Ms. HOGAN. I don't know, but again, I am happy to have a broader conversation with you. We have got amazing nuclear energy experts at the Department of Energy and happy to come up and talk with you about what we see as the strategies for this country for the future.

Mr. DONALDS. When you say the strategies for the future, I mean, you got to help me understand. Is the Department of Energy even processing this stuff right now? Like, do not get me wrong—I get it. The line of question on nuclear fuels and nuclear reactors is probably not something you guys prepped for over at DOE coming over here today. I understand that. But is there any discussion going on at the Department of Energy for actually creating sustainable base-load power for America because if it is the position of the Biden Administration and, frankly, Secretary Granholm that every American should buy an electric vehicle to the tune of $61,000 a year when most Americans can't afford spending $61,000 for the car, they can't afford to buy that.

If that is her position, is she aware that by doubling the size of the electric vehicle market in the United States, we don't have enough electricity on the grid? Does she realize this? And what is the plan in the DOE to prevent the grid from going essentially dark?

Ms. HOGAN. There are a few questions in there. One, we are very supportive of a nuclear industry in this country. The Department of Energy has had a nuclear energy research program for a number

DOE AR 000845

21

of years. We are advancing a number of demonstration reactors, and those are linked, as you probably know, to the need for the Halo fuel supply. So, we are very interested in figuring out that roadmap going forward. At the same time, we understand that electric vehicles take more electricity than the alternative. And there has been a lot of work to figure out what a modernized grid should look like and what we can do to invest in the electric grid in this country to serve the needs of electric vehicles while also maintaining reliable resilient electricity supply.

Mr. DONALDS. Well, I will say for the record, I am not sitting here in favor of mass expansion of electric vehicles in the United States because the component pieces actually are dirtier than the internal combustion engine if you take into account the mining of cobalt, lithium, rare earth, *et cetera*, and then when you have to actually dispose of the batteries. But in that interim piece when Americans have to use it, if what the EPA has done, which is basically going to force Americans to buy electric cars even though they do not want them, it is not really clear to me that Secretary Granholm and the Biden Administration have a plan for actually putting enough electricity on the grid to support America's needs. I am out of time. I will yield back to the Chairman.

Mr. FALLON. Thank you. All right. The Chair now recognizes the gentlelady from New Mexico, Ms. Stansbury, for a closing statement.

Ms. STANSBURY. All right. Well, thank you, Mr. Chairman, and, again, thank you to our wonderful witnesses. I want to just say, Mr. Chairman, what a difference leadership makes. I think we see before us two women leaders who are serving our Nation in the Department of Energy and serving under a female Secretary of Energy. And in a world that has long been dominated for countless generations by men, I am personally, as a woman in STEM, very grateful to have you here and for your leadership in the Agency.

You know, my thoughts on this hearing as I was sitting here listening to my friends across the aisle sort of beat the same drum over and over again about foreign influence, it actually made me think of the movie Mean Girls and the quote "stop trying to make fetch happen," sort of as if we just say and will this narrative into being and say it over and over again, somehow it will be what is actually occurring.

I think we have heard here today, the Department has been clear, the Administration has been clear. The Department has undertaken significant reforms to ensure that there are appropriate controls, that there is appropriate due diligence whenever contracting and grant making occurs, to ensure that we are standing up programs in a way that not only meets the requirements of the law, but is informed by the communities that will be impacted by them. And these new programs will be stood up quickly with appropriate staffing to get the dollars on the ground to make the impact that they were designed to.

And, you know, I think sometimes we get lost in the arguments about why these bills were actually passed. So, I just want to take a moment to return to that, which is that we passed these three bills that we are talking about here today: one, to make a huge generational investment in the crumbling infrastructure this Na-

DOE AR 000846

22

tion, to repatriate our manufacturing back to American shores to create American jobs, and rebuild our economy and our supply chains; two, to address the significant national security risk that was faced by our country, that is faced by our country in the manufacturing of CHIPS overseas; and three, and probably most significantly, to address our national security and global environmental security issues around the global climate crisis.

And together, the Bipartisan Infrastructure Law, the CHIPS Act, and the Inflation Reduction Act literally represent the largest investment ever in the history of this country in clean energy and climate change. And I am proud to stand with the Administration, to stand with our President and my Democratic colleagues, who helped to make it possible to pass these bills. And I will note my friends across the aisle, who voted against all of these bills that will lower costs, that will create millions of jobs over the coming decades, that will rebuild our economy and make sure that it is a clean energy economy, and that will help our families.

And I want to say on a personal note, I grew up in a low-income family. The weatherization programs that we are talking about here today, these are not just, you know, putting in new windows, which they are for families. We are talking about people who are living in trailers and in rural areas and tribal communities across our country, who are going to have the opportunity to get new appliances, to get new windows, and to significantly lower their monthly costs. And all of that money that they will be saving through that will be able to be put toward putting food on the table, a roof over their head, and helping their kids go to school. That is what these bills are all about.

And, so, when we talk about the administration of these funds, when we talk about what DOE and the amazing staff who are standing behind you, sitting behind you, in the Department do every day, they are going to be administering these funds so that we can put our country on a clean energy path. We can put our planet on a global climate resilient path, and we can put our families on a path to economic security.

So, Mr. Chairman, I appreciate you holding this hearing. I appreciate our witnesses for being here today, and I appreciate the service of every single one of our Federal employees who is out there working every day to get these dollars on the ground. Thank you, Mr. Chair.

Mr. FALLON. Thank you. You know, the purpose of the hearing was not to re-debate the need or lack thereof of legislation that was passed last year. The purpose of this hearing was to talk about the oversight mechanisms when massive amounts of money is being spent and are loaned out and to prevent fraud, waste, and abuse, which should be an absolutely bipartisan mission because not one person is helped when there is a fraudster taking money away, when that money is abused, or it is wasted.

And I, you know, heard terms like "climate deniers" and "fluoride" and "don't do anything to combat climate change" in the 117th Congress. Well, one thing that they did was create historic deficits, and that is something that we are going to have to talk about when our entire budget will be gobbled up by interest payments on our debt.

23

And I like what one of my colleagues said from Florida about talking about global climate crisis. What about the China crisis? Let's be very clear here that the United States, and I am very proud of the fact, that we have reduced our emissions in this country because we are responsible. And we have reduced them, I believe, by about 20 percent over the last 20 years. But let us look at China. They have increased their carbon footprint by 300 percent over the last 20 years.

And I would love to see the American left talking more about that because if you really do care about the climate, the No. 1 thing we should be talking about is China's emissions and having them follow the EU and the United States lead and being responsible global partners. The United States is not a planet. We all live and share on this one little blue marble, so talking about fraud, waste, and abuse and trying to be preventative is healthy.

I was actually thinking about this this morning about what my Democratic friends would talk about because I thought this was going to be rather bipartisan hearing because this is just about ensuring that money that has already been allocated, whether you voted "yes" or "no" on it, is the Inspector General, do they have the mechanisms in place to ensure that it is spent properly. Because, you know, to use the IG's words and not mine, there are an increased risks with new programs. Well, there are 71 new programs, which mean there is a lot more increased risk, and when an Agency goes from $45 billion to $100 billion in one year, that is a dramatic increase. And, again, using the IG's words, that is a lot of money moving fast, and I think that, you know, nobody wants another Solyndra.

I think that we can all agree on that, because not one person that was in need got any help from that $500 million. Not one environmentalist would say that was money well spent, because it didn't work. And it was, you know, we were defrauded. And I also was—I grew up in a home that cost my parents $13,000, so I would say by any definition that was humble beginnings. And that is why we live in the greatest country history has ever known because with a lot of effort and work, you can improve your lot in life. In a lot of countries, unfortunately, you don't have that opportunity.

And that is why, again, I just wanted to be real focused on why we had this hearing was to just prevent that fraud, waste, and abuse. It did seem like while they say that they are going to undertake reforms, some of them have not been made yet, but money is going out the door. That is a dangerous cocktail.

So, in closing, I would like to thank our panelists once again for their important insightful testimony, and with that and without objection, all Members will have five legislative days within which to submit materials and to submit additional written questions for the witnesses, which will be forwarded to the witnesses for their response.

Mr. FALLON. If there is no further business, without objection, the Subcommittee stands adjourned.

[Whereupon, at 3:39 p.m., the Subcommittee was adjourned.]

○

# U.S. Department of Energy
## Office of Inspector General

Statement
of
The Honorable Teri L. Donaldson, Inspector General
U.S. Department of Energy

before the

U.S. House of Representatives
Committee on Science, Space and Technology

April 19, 2023

DOE AR 000849

## Introduction

Chairman Lucas, Ranking Member Lofgren, and members of the committee: Thank you for inviting me to testify about the risks of fraud, waste and abuse that arise from four recent pieces of legislation—the Infrastructure Investment and Jobs Act (IIJA), the Inflation Reduction Act (IRA), the CHIPS and Science Act (CHIPS Act), and the 2023 Consolidated Appropriations Act's Puerto Rico Energy Resilience Fund, which collectively authorized or appropriated over $128 billion to the Department, and increased the Department's loan authority to an estimated $350 billion. I will address both the more general risk factors arising from these four pieces of legislation, and the more specific risk factors associated with grant[1] fraud and procurement fraud. I will also address the preliminary steps that my office is taking to minimize fraud, waste and abuse, even while my office is waiting for additional funding to more appropriately address these issues.

## Overview of Recent Legislation

- IIJA — appropriated more than $62 billion over five years to the Department and made most of those funds available through fiscal year (FY) 2031. The Department is required to stand up 60 new programs, including 16 demonstration and 32 deployment programs, and expanded funding for existing research, development, demonstration, and deployment programs. To lead these projects, the Secretary of Energy created a new Under Secretary for Infrastructure in February 2022.

- IRA — appropriated $35 billion for various Department programs, with funding available for various lengths of time—some funding expires between FY 2026 and FY 2031, while

---

[1] For purposes of the document, the term "grants" includes cooperative agreements. Both grants and cooperative agreements deliver federal funds to recipients. With cooperative agreements, the federal government may be more involved in guiding or participating in project activities.

DOE AR 000850

other funds are available until expended.  IRA resulted in the creation of 15 new programs, and significantly expanded the Department's loan authorities such that the total of all existing Department loan authorities, including those contained in IIJA and IRA, is now estimated at $350 billion.

- The CHIPS Act — authorized $67 billion in spending for the Department's Office of Science, and many other research and development projects at the Department's national laboratories.  Of this $67 billion, $30.5 billion represents an expansion of their existing authorization.

- The 2023 Consolidated Appropriations Act — Congress added $1 billion to the Department's appropriations to provide grants to the Puerto Rico Energy Resilience Fund to build energy system resilience to major natural disasters.  A new program was established under the Grid Deployment Office for this effort.

- To put these numbers into context, the Department's FY 2022 budget was $44.3 billion. The four statutes referenced above authorized or appropriated over $128 billion to the Department and increased the Department's loan authority to approximately $350 billion.

### Impact of Recent Legislation

Before addressing some of the risks associated with this unprecedented expansion in the Department's funding and mission, I note that the Department was already charged with a high-risk portfolio prior to the passage of these pieces of legislation.  Approximately 90 percent of the Department's budget goes to contractors, and on average 30 percent of that is further disseminated to subcontractors.  Additionally, the Department is the only Federal agency utilizing Management and Operating Contractors, which creates another level of complexity for oversight.  Furthermore, the Government Accountability Office's "High Risk List" includes two

DOE AR 000851

items pertaining to the Department: 1) "Contract and Project Management for the National

Nuclear Security Administration and Office of Environmental Management," and 2) "U.S.

Government's Environmental Liability."

Numerous reports issued over the years by the OIG and the Government Accountability

Office have noted the Department's lack of oversight resources in particular areas.  These reports

typically include the Department's concurrence that it lacked the resources to accomplish the

internal controls referenced in the particular reports.  I'll discuss a few of these historic reports in

a moment.

It is against this backdrop that the new funds, over $128 billion in authorizations and

appropriations, and $350 billion in loan authority, will move through the Department.

Inevitably, many program-specific risks will emerge and create enormous challenges for the

Department.  This will happen over time.  Some of the immediate risks arise from:

- New programs.  Between IIJA and IRA, there are $83.6 billion dollars going into 71 new

  programs for the Department.  New programs raise immediate concerns such as acquiring

  and training expert staff and developing effective internal controls.  New programs push

  funding through untested processes and newly designed and untested internal controls.

  While the tremendous expansion of existing programs may raise similar issues, at least

  the existing programs have some well of institutional knowledge to draw upon.

- Fast moving money.  History has taught us that the Federal Government has often

  balanced the "need for speed" against the need for thoughtful internal controls in a

  manner that has resulted in the loss of billions of dollars to fraud, waste, and abuse.  The

  most recent examples come from Federal pandemic relief efforts.  On March 23, 2023,

  the PRAC released its latest findings, which included over $3.6 billion paid from the

  Paycheck Protection Program to individuals listed with the Department of Treasury's

4

"Do Not Pay" system.  In addition, the PRAC noted over $3.5 billion in Economic Impact Payments were paid to individuals using the identities of deceased people.  These staggering losses should give all of us pause.  While the Department has stated that its new funding will not be released at the same speed that the pandemic funding was released, the Department has also publicly stated its sense of urgency to move these funds along to their intended purposes.  The Department is therefore at risk that it may fall into a "pay and chase" model of oversight that may result in substantial losses.

To date, the Department has:

- Made $37.8 billion available through Funding Opportunity Announcements from IIJA (availability of funds is subject to the funds received annually);

- Awarded or selected to negotiate $11 billion in funding from IIJA, this includes formula funding and negotiations in process;

- Made $7.1 billion available through Funding Opportunity Announcements from IRA; and

- Awarded or selected to negotiate $1.6 billion in funding from IRA, this includes formula funding and negotiations in process.

The Department is still in the early stages of formation of its FY 2024 budget; however, at this time, the Department estimates its consolidated obligation under the new legislation to be approximately $30 billion in FY 2024.

- Significant increase in grants, especially awards to states, local government, and tribes. As much as $52 billion of IIJA funding, or over 83 percent, will be disbursed via grants, much of which may be awarded to states, local governments, and tribes.  This is particularly significant because in FY 2021 the Department disbursed only $3.9 billion

5

DOE AR 000853

via grants.  As this money is awarded to these entities, it is then further dispersed to subrecipients.  It is not yet clear whether the states, local governments, or tribes are equipped with sufficient staffing, are adequately trained, or have adequate internal control systems in place to protect these funds.  It is also not apparent whether these entities may utilize an adequate amount of the awarded funds for local oversight efforts.  In any case, the passing of these funds to others does not remove the Federal nature of the expenditure or excuse Federal oversight.  It does increase risk.

- Compounded risks.  Some of the Department's programs face all of these risks at the same time—new programs, fast money, and awards to entities that may be unprepared to oversee the funds.

- Lack of adequate funding for Department's oversight efforts.  IIJA included a small reservation of 3 percent of funding for administrative costs for many of the Department's programs.  IRA appears to have given the Department some additional flexibility on administrative expenses, but these matters have not yet been resolved by the Department.  I note that "administrative" expense is a broad category that includes the funds needed to move the program specific dollars out the door, but it may leave little budget for the oversight needed to ensure that the funds arrived, as intended, by Congress.  For this reason, I support any efforts by the Department to acquire or direct appropriate levels of funding to its oversight mission.

- Lack of adequate funding for the DOE OIG.  Prior to the passing of the four pieces of legislation discussed above, the DOE OIG was already significantly underfunded.  The following chart demonstrates the decline of OIG funding with respect to the growth of the Department's budget prior to the passing of the recent legislation:

6

DOE AR 000854



The next chart provides a glance of Inspector General funding for all the Chief Financial

Officers Act agencies as of FY 2022:



To further exacerbate the historic underfunding issue, the DOE OIG received only $62

million, or .10 percent of the funding provided to the Department, over a 5-year period under

IIJA to provide oversight for these new infrastructure projects.  When compared to other OIGs

that received money under IIJA, we were again substantially underfunded as shown in the table

below.

7

|  | IIJA Agency Funding | IIJA OIG Funding | OIG Percent of Agency Funding |
|---|---|---|---|
| EPA | $61billion | $269 million | 0.44% |
| HHS | $4 billion | $17 million | 0.44% |
| DOI | $28 billion | $99 million | 0.35% |
| USDA | $8 billion | $27 million | 0.34% |
| DHS | $8 billion | $20 million | 0.25% |
| DOE | $64 billion[1] | $62 million | 0.10% |

[1] The DOE amount of $64 billion includes $62.5 billion plus 3.2% of $46.6 billion in loans and loan guarantees authorized in IIJA. This 3.2% must be re-visited in the second installment of funding needed for the OIG.

Also, IRA appropriated only $20 million to the OIG, or .05 percent of the funding provided to the Department, to oversee those programs. Notably, there was no provision for the DOE OIG in the CHIPS Act, or for the OIG in the Puerto Rico Energy Resilience Fund. The chart below shows the OIG-estimated immediate oversight funding shortfall related to IIJA, IRA, and the Puerto Rico Energy Resilience Fund.

| Bills | DOE | OIG | Percent OIG to DOE | OIG Estimated Requirements 0.35% | OIG Funding Shortfall |
|---|---|---|---|---|---|
| IIJA[1] | $64B | $62.5M | 0.10% | $224.8M | $162.3M |
| IRA[2] | $44B | $20.0M | 0.05% | $155.6M | $135.6M |
| PR-ERF | $ 1B | $ 0.0M | 0.00% | $ 3.5M | $ 3.5M |
| Total | $109B | $82.5M | 0.08% | $384.0M | $301.4M |

[1] The DOE amount of $64 billion includes $62.5 billion plus 3.2% of $46.6 billion in loan and loan guarantee authorized in IIJA. This 3.2% must be re-visited in the second installment of funding needed for the OIG.

[2] The DOE amount of $44 billion includes $35 billion plus 3.2% of $290 billion in loan and loan guarantee authorized in IRA. This 3.2% must be re-visited in the second installment of funding needed for the OIG.

You will note that this estimated shortfall of $301.4 million is a first installment. For example, it does not include the CHIPS Act. As the $30.5 billion in new CHIPS Act funding is

8

appropriated to the Department, I will be seeking .35 percent of those funds to conduct appropriate oversight.

I arrived at .35 percent by examining FY 2022 funding levels for the OIGs of the Chief Financial Officers Act agencies, and by examining the more current funding of the OIGs impacted by IIJA, the CHIPS Act, and IRA. The .35 percent falls into the mid-range. Given the significant risks for the Department, this percentage may be too low. However, it is a starting point, and much needed.

As you may know, I am currently working with both Congress and the Office of Management and Budget to correct this funding shortfall problem for the OIG. We have cautioned that the continued and compounded dilution of OIG funding will result in insufficient oversight of both existing programs and the many newly established infrastructure and energy programs. Without additional funding, critical pre-existing areas such as research security, contracting and payment integrity, stockpile stewardship, environmental cleanup, and pit production—to name a few—will not receive appropriate OIG oversight. Moreover, with regard to the new funding, the OIG will not be able to provide the near-term audit and inspection assistance that the President has specifically requested to minimize the longer-term impacts from the large-scale frauds that often plague Federal programs providing such funding on an expedited timeline.

We are making some progress. The President's FY 2024 Budget includes $165.2 million for the DOE OIG to be used until expended. If the President's Budget is enacted as is, it would leave a remaining shortfall of $16.8 million in our base budget, and a remaining shortfall of $301.4 million dollars to oversee IIJA, IRA, and the Puerto Rico Energy Resilience Fund.

The President has also issued a statement identifying $150 million in funding to assist under-resourced Inspectors General and named my office as one of those OIGs. The

9

DOE AR 000857

Administration, however, has not yet announced the amount of this funding that might be allocated to the DOE OIG, if the funds are authorized by Congress.

Given the longevity of the programs established and expanded under these four pieces of legislation, it is critical that the DOE OIG receive appropriations in the form of no-year funds. No-year funding would allow the DOE OIG to adequately plan our resources over the entire period that the funds will be expended by the Department and continue to investigate the fraud matters that will be discovered and prosecuted for many years to come.

### OIG Efforts to Date

Since the passage of IIJA, the OIG has conducted 180 fraud awareness briefings reaching more than 5,700 Federal employees, contractors, grantees, external auditors, law enforcement, as well as state, local government, and tribal representatives. We have also worked closely with other OIGs who have received funding under these pieces of legislation to identify risks and best practices. I am currently serving as the co-chair of the Council of the Inspectors General on Integrity and Efficiency's IIJA Working Group.

Since early 2022, my office has held more than 27 meetings with senior Department leadership to pose questions to them regarding the new programs, and to identify risks the OIG has reported during the performance of prior work. In this way, we have safeguarded our independence, while helping the Department to identify areas of potential risk. We have also used these meetings to reemphasize the importance of Departmental oversight to help prevent and detect fraud, waste, and abuse. In January 2022, the OIG identified pertinent historic reports and discussed those with the Department. These reports provided analyses of "lessons learned" and suggested approaches for reducing the risks associated with the extraordinary level of new funding. These reports are listed below:

10

- *The IG Community's Joint Efforts To Protect Federal Grants From Fraud, Waste, and Abuse*, CIGIE, January 2021.  This report provided a broad overview of steps to prevent grant fraud.

- Special Report on *The American Recovery and Reinvestment Act at the Department of Energy* (OAS-RA-09-01, March 2009).  Drawing from similarities to the Recovery Act era, this report provides insights into early steps that leadership can take for a new or major expansion of Federal programs.

- *Special Report:  Lessons Learned/Best Practices during the Department of Energy Implementation of the American Recovery and Reinvestment Act of 2009* (OAS-RA-12-03, January 2013).  This report served as a capstone for issues identified during the Recovery Act era that we concluded has broad applicability to today's context.

Additionally, between April and August 2022, the OIG issued four capstone reports summarizing previous work.  These reports targeted specific programmatic areas that will receive substantial funding under the new legislation.  The recurring themes in these reports include insufficient Federal staffing, inadequate oversight of projects, and a lack of accountability and transparency.  Below are the four reports:

- *Special Report:  Prospective Considerations for the Infrastructure Law-Funded Weatherization Assistance Program* (DOE-OIG-22-30, April 29, 2022).
- *Special Report: Prospective Considerations for the Loan Authority Supported Under the Loan Programs Office to Improve Internal Controls and Prevent Fraud, Waste, and Abuse (*June 10, 2022; DOE-OIG-22-34).

11

DOE AR 000859

- *Special Report on Prospective Considerations for Clean Energy Demonstration Projects* ([August 17, 2022; DOE-OIG-22-39](#)).

- *Special Report on Prospective Considerations for Projects Awarded Through Financial Assistance Awards* ([August 17, 2022; DOE-OIG-22-40](#)).

The last of these reports focused on grants and identified six major risk areas based on prior audits, inspections, and investigations that warrant immediate attention and consideration from Department leadership to prevent similar problems from recurring.  The issues include recipient fraud; insufficient Federal staffing; inadequate oversight of projects; circumvention of project controls; inadequate internal controls; and lack of recipient-level controls.

The OIG has also launched a data collection and monitoring project to begin to collect and analyze oversight information from the Department related to the following five major programs:

1. Office of Clean Energy Demonstrations (OCED) – The scope of oversight for OCED will cover the major projects including Advanced Reactors; Carbon Capture projects; Regional Clean Hydrogen Hubs; and other major projects.

2. Loan Program Office (LPO) – The scope of oversight for LPO will cover loan authorities, as authorized in IIJA and IRA, in areas to include Innovative Clean Energy loan guarantees for both fossil and nuclear energy; Advanced Technology Vehicle Manufacturing loans; Energy Infrastructure; Tribal Energy; and others.

3. Grid Deployment Office (GDO) – The scope of oversight for GDO will cover programs including Enhancing the Resilience of the Electric Grid; Innovative Grid Resilience Program; Transmission Facilitation Program; Smart Grid Grants; Modeling and Assessing Energy Infrastructure Risk; Civil Nuclear Credit Program; Hydroelectric Production Incentives; and other major projects.

12

DOE AR 000860

4. Office of State and Community Energy Programs (SCEP) – The scope of oversight for SCEP will cover programs including the State Energy Program; Weatherization Assistance Program; Energy Efficiency and Conservation Block Grant Program; Training programs; and Energy Efficiency programs.

5. Office of Manufacturing and Energy Supply Chains (MESC) – The scope of oversight for MESC will cover programs to include: Advanced Energy Manufacturing and Recycling Grant; Battery and Battery Recycling programs; Rebate programs for Energy Efficient Transformers and Extended Product Systems; Industrial Research and Assessment Centers; Rare Earth Elements Demonstration Facility; and State Manufacturing Leadership.

As additional funding becomes available to the OIG, the data collection and monitoring project will be expanded to include additional programs.  The data collection and monitoring project is designed to produce leads for audits, inspections, evaluations, and investigations.  However, the OIG's ability to actually conduct these audits, inspections, evaluations, and investigations will be determined by the amount of funding it receives to do so.  There is no amount of planning or coordinating that will replace having the resources (i.e., the people and technology) to conduct these projects.

### Data Analytics

Data analytics is a crucial oversight tool to help detect fraud and waste, and its particularly effective to detect procurement and grant fraud schemes.  For example, data related to contract claims may be examined to identify anomalies related to the frequency or amount of claims or pricing that appear inconsistent with expected norms.  We are building innovative automated tools that identify and pursue anomalies and will serve to focus the resources of our

13

DOE AR 000861

human elements on those matters most likely to achieve the greatest results. We are analyzing high-risk areas such as labor, pay, grants, subcontracts, and contracts to validate risk models and identify specific high-risk anomalies. We are taking steps to integrate financial, operational, and performance data to assess and identify risks. We are working closely with the PRAC to borrow from its successful and data driven oversight activities. Our data analytics team has already had much success, but more needs to be done.

I hope to continue to expand and develop the data analytics capability of the OIG by making investments in information technology and innovations. Now more than ever, the OIG needs efficient and economical tools to better identify, prioritize, and develop issues that support risk-based prioritization for our audits, inspections, evaluations, and investigations. Strengthening our data analytics capabilities and gaining access to required authoritative Federal and contractor data remains a key priority, especially as we perform oversight of the four pieces of legislation discussed today.

### Grant Fraud

IIJA and IRA provide up to $52 billion in potential new grants on top of the normal FY 2021 annual appropriations of $4.1 billion for these types of awards. The Government relies too heavily on the honesty and due diligence of individuals and entities when they apply for the grant funding, certify that they have followed the terms and conditions, make requests for grant payments, and submit narrative progress and final reports to the granting agency. Grant fraud, waste, and abuse most commonly occur at the recipient or sub-recipient levels and often include some form of lying, cheating, or stealing. Recipients may make false statements in their applications and may make false claims for funds. Recipients may also have conflicts of interest resulting from undisclosed "related party" transactions. Theft or other forms of corruption by an

14

DOE AR 000862

employee of a grantee is one of the most common occurrences.  Since 2019, the DOE OIG has opened 55 grant fraud investigations, which have already resulted in ten indictments.  Below are some recent examples of grant fraud schemes involving the Department:

**Sentencing and Administrative Actions in Grant Fraud Investigation.**   In September 2022, the owner of a scientific research company, a former Department grantee, was sentenced to 42 months in prison, restitution in the amount of $1,548,255, an assessment fee of $300, and 3 years of supervised release.  The U.S. District Court Judge also ordered the forfeiture of 11 seized accounts, real property, and a money judgement of $1,548,000.  Additionally, a co-owner of the scientific research company, which had received approximately $1.2 billion in Department Small Business Innovation Research (SBIR) and Small Business Technology Transfer (STTR) grant awards, and three other scientific research companies, were debarred from any Federal contracts, subcontracts, assistance agreements, or subcontracts requiring Government approval for a period of 3 years.  The investigation determined that the owner received approximately $500,000 in Kentucky State matching funds, in addition to Department SBIR/STTR funding, and the company provided false information in their Department proposals and subsequent close-out documents.  The owner was found guilty by a jury in the U.S. District Court for the Eastern District of Kentucky on one count of Conspiracy to Commit Wire Fraud, one count of Wire Fraud, and one count of Money Laundering.  This is an ongoing joint investigation with the Environmental Protection Agency OIG and the Defense Criminal Investigative Service.  The DOJ press release for the owner's sentencing can be found here.

**Settlement Agreement in Qui Tam Investigation.**   In November 2022, a Department SBIR/STTR grant recipient entered into a Settlement Agreement in which the company agreed to pay $411,050 to the Department in restitution.  At the time of the settlement, the grantee had been awarded four SBIR/STTR awards from the Department worth nearly $5 million.  The

15

investigation stemmed from a Qui Tam action filed by a former employee at the grant recipient company, which alleged that the grantee submitted false claims on Department awards to obtain funds for labor costs of employees for time they spent working on private commercial projects. The investigation determined that the president of the grantee company directed employees to charge time worked on private projects against Department awards and draw down remaining funds from those awards.  The Department also issued an Administrative Compliance Agreement to the company requiring the company to implement a Contractor Responsibility Program.

**Suspension in Grant Fraud Investigation.**   In October 2022, in response to an OIG investigation, the U.S. Army suspended a Department grantee and company from receiving Federal funds or contracts.  The District Attorney's Office for Salt Lake County, Utah, filed a six-count Information charging a Department STTR grant recipient with one count each of: Misuse of Public Money, Unlawful Dealing of Property by a Fiduciary, Communications Fraud, Theft, Theft by Deception, and Pattern of Unlawful Activity.  The OIG investigation determined the grantee billed the Department and the U.S. Army for fringe benefits that were never paid to employees.  The loss to the Government was approximately $367,805.  This is an ongoing joint investigation with the U.S. Army Criminal Investigations Command Major Procurement Fraud Unit.

<strong><u>Grant Fraud Safeguards</u></strong>

Some of the safeguards that help ensure that grant dollars are used as intended include:

- <u>Grantor and recipient internal controls</u>.  Perhaps the Achilles heel of the Federal grants process is the lack of robust internal controls at both the grantor and the recipient level. Recipients must have properly designed, implemented, tested, and updated key internal controls related to payroll, credit card use, claims submitted to a grantor agency, and other high-risk processes.

16

- Pre-award due diligence.  Grantors must conduct appropriate due diligence to verify the information contained in grant applications.  Another challenge here is coordinating with other Federal agencies that might fund similar or overlapping projects to the same applicant.

- Audits, including "Single Audits."  2 CFR 200 requires that recipients spending more than $750,000 in Federal funds must undergo an annual audit by an independent auditor.  Commonly called "Single Audits" or "A-133 Audits," these efforts are designed to help ensure that recipients have, and are maintaining, adequate accounting systems and effective internal controls.  It is critical that these independent audits are conducted.  It is also critical that the granting agency monitor such compliance and follow up on the issues identified by these, and other audits.

This oversight framework is only effective if it is implemented and overseen appropriately by granting agencies.  We have identified instances in which the Department could improve its oversight in this area.  For example, a March 13, 2023, Department OIG audit found that the Department's Office of Science failed to ensure that required annual audits of for-profit recipients of Small Business Innovation Research grants had been completed.  Award expenditures totaling $56,835,650 that were not audited as required, exposed the Department to an increased risk of fraud, waste, and abuse.  Additionally, many grantees spend large amounts of funds procuring goods and services, which raises procurement fraud risks, which I will discuss below.

### Procurement Fraud

Aside from the new funding, the Department was already at risk for procurement related fraud. The Department is the largest civilian contracting entity in the U.S. Government.  The

DOE AR 000865

Department is also the leanest contracting Federal agency, with approximately 90 percent of its budget "passing through" to its contractors and grantees.  The use of Management and Operating contractors and the overall disbursed nature of the Department's procurement process increases the risk of procurement related fraud and waste because the Department is relying heavily on third parties to properly award and oversee a sizable portion of the Department's budget.

Procurement actions present a wide range of fraud and waste challenges such as:

- Poorly defined requirements.  Every procurement action should begin with clearly defined and objective requirements to ensure that the goods or services are indeed necessary, and to promote full and open competition.

- Corruption.  Department and contractor employees have access to sensitive procurement data, that if improperly shared may result in fraud and waste as the Department spends more than necessary for goods or services.

- Inadequate contract oversight.  Once a contract is awarded, the party taking the procurement action, whether it be the government or a contractor, must dedicate appropriate resources to ensure compliance with all contract terms and conditions.

- False invoices.  There is always a risk that invoices submitted to the Government might be false, misleading, or incorrectly calculated.

- Product substitution.  The Department procures raw materials, parts, and equipment that must meet exacting specifications—counterfeit or other substandard items may impact national security, create safety risks, or result in fraud.

Below are some recent examples of the types of schemes uncovered by the DOE OIG:

**Trial Conviction for Subcontractor's Theft of Pricing Data.**  In May 2022, a former Department subcontractor at the Strategic Petroleum Reserve was convicted in Federal court of

18

DOE AR 000866

engaging in a 14-year scheme to corruptly win contracts totaling approximately $9 million.  In order to receive these awards, the individual conspired with others to obtain non-public Government pricing information in advance of submitting its proposals.

**Prison Sentence in Employee Corruption Scheme.**   In June 2022, a former Western Area Power Administration contractor was sentenced to 55 months in Federal prison for his involvement in a $879,392 corruption scheme.  An OIG investigation found that the contractor enlisted the assistance of friends and family members to create various shell companies which were in turn used to submit fraudulent invoices to the Western Area Power Administration for goods which were never provided to the Government.

**Settlement for Undelivered Goods.**   In March 2022, MOX Services LLC, a Department contractor at the Savannah River Site, entered into a $10 million Civil Settlement with the United States Department of Justice (DOJ) to resolve a Federal False Claims Act lawsuit.  The OIG investigation determined that MOX Services LLC allowed Wise Services Inc., a subcontractor, to process and receive payment for thousands of invoices, totaling more than $6.4 million, for materials that were neither necessary nor delivered to NNSA.

### Research Security

"Research security" threats are broadly defined as a wide range of efforts by foreign governments to obtain U.S. Government-funded research data and results, which drive innovation.  Research security may impact national security and may result in substantial losses of federal resources.  Research security is a great concern for all Department and NNSA laboratories, and it may impact the entire portfolio of Department grants.  The OIG has conducted a number of investigations related to the theft of intellectual property, violations of

19

grant terms and conditions, and other violations.  In fact, 35 percent of the grant fraud cases currently open are related to research security.  Below is one example:

**Failure to Disclose Affiliation with Chinese University.**   A recent investigation conducted jointly by the DOE OIG and the National Science Foundation OIG found that a principal investigator at the University of Kansas created a scheme to defraud the Government by failing to disclose on grant proposals to the Department an existing affiliation with, and contractual obligations to, a Chinese university.  The grant recipient also failed to disclose this conflict of interest to the University of Kansas.  A DOJ press release from the conviction can be found here.

Another challenge in the research security arena are instances in which a foreign company—with or without the direct support of a foreign government—steals U.S. taxpayer-funded research or intellectual property and illegally exports it overseas.  This activity harms U.S. innovation efforts, damages our economy, and violates the intent of these programs.  This is an especially concerning risk as IIJA is funding significant numbers of clean energy and other innovations that foreign companies might seek for their own benefit.

Just last month, in March 2023, the Department announced that it is creating a new "Research Technology and Economic Security Vetting Center" to assist with, and streamline, implementation of required security-related considerations.

## Procurement Collusion Strike Force

In November 2022, I joined the U.S. Department of Justice Antitrust Division's "Procurement Collusion Strike Force" as a national law enforcement partner to combat antitrust crimes and related schemes in Government procurement, grant, and program funding at all levels

20

of government—Federal, state, and local.  The Strike Force brings together the DOJ Antitrust Division; state Attorneys General; Federal, state and local offices of inspectors general; and other Federal agencies such as the Department of Defense and the Federal Trade Commission.

As the largest civilian contracting entity in the Federal Government, the Department faces substantial risks of bid-rigging, price fixing, and other similar illegal activities.  Many of the Department's procurements involve a limited field of competitors, highly specialized items, cyclical or repetitive contracts, or facilities located in remote areas, all of which are high risk indicators for collusion and antitrust violations.

The OIG is also staffing two new attorney positions to serve as Special Assistant U.S. Attorneys in U.S. District Courts across the country to improve our nationwide coverage of a broad range of criminal matters.

### Closing Remarks

I would like to recognize the key role that bipartisan efforts of Congressional oversight Committees have played over the years in advancing Government transparency and program integrity.  We are all aware of the important work that congressional committees have done with Inspectors General over the years.  Thank you for your continued support for the independent oversight work performed by my office and by the Inspector General community.  We look forward to continuing to work on behalf of the taxpayers to ensure that Federal infrastructure and energy programs are operating effectively and efficiently, and to prevent and detect fraud, waste, and abuse.  I appreciate the opportunity to testify here today, and I look forward to answering your questions.

DOE AR 000869

# Congress of the United States
## Washington, DC 20510

October 18, 2023

Mr. Jigar Shah
Director
Loan Programs Office
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington D.C. 20585

Dear Mr. Shah,

We write concerning a recent report about the close relationship between the Department of Energy's (DOE) Loan Programs Office (LPO), which you lead, and Cleantech Leaders Roundtable, a trade association you founded.[1] The role that Cleantech Leaders Roundtable has assumed, appearing to act as a gatekeeper for companies seeking vital financial assistance from the LPO, warrants a thorough examination.

The close collaboration between your office and Cleantech Leaders Roundtable, evident from the recent co-hosted, invitation-only Deploy23 conference,[2] presents potential conflicts of interest. It gives rise to perceptions of a pay-to-play scheme, where access to DOE loans could be potentially influenced by affiliations with Cleantech Leaders Roundtable. Such a perception deeply undermines the public's trust, and the recent approval of a $3 billion loan to Sunnova,[3] whose Board of Directors shares a common member with Cleantech Leaders Roundtable,[4] only compounds these concerns.

Given the circumstances and the potential implications of these revelations, we want to understand better the relationship between the LPO and the Cleantech Leaders Roundtable. Transparency in these matters will not only protect the integrity of the LPO, but also ensure that the American public continues to have confidence in the institution's fairness and impartiality.

We anticipate a thorough and transparent response addressing these concerns. We ask that you answer the following questions and provide the requested information and documentation below:

1. Please describe in detail your current relationship with the Cleantech Leaders Roundtable.

---

[1] Biden's Energy Loan Czar Founded a Trade Association. Now It's Selling Access to Him. (freebeacon.com)
[2] Id.
[3] DOE Announces $3 Billion Partial Loan Guarantee to Sunnova's Project Hestia | Department of Energy
[4] CLEANTECH LEADERS ROUNDTABLE, *About Cleantech Leaders Roundtable*, https://www.cleantechleaders.org/ (last visited Oct. 10, 2023); SUNNOVA, *Board of Directors*, https://www.sunnova.com/about-sunnova/board-of-directors (last visited Oct. 10, 2023).

DOE AR 000870

2.  What measures have been put in place to ensure that companies affiliated with Cleantech Leaders Roundtable do not receive preferential treatment in the loan approval process?

3.  Please provide all correspondence, agreements, and documentation related to the co-hosting of the recent Deploy23 conference between the DOE Loan Programs Office and Cleantech Leaders Roundtable.

4.  Please describe in detail the nature of each instance of your participation in Cleantech Leaders Roundtable events and receptions since your appointment to DOE, including events that Cleantech Leaders Roundtable has cosponsored or supported financially.

5.  Please provide all correspondence between the LPO, including yourself, and Cleantech Leaders Roundtable, including individual Cleantech Leaders Roundtable board members, since your appointment to DOE.

6.  Have there been any DOE assessments or internal reviews conducted on the potential conflicts of interest arising from your relationship with Cleantech Leaders Roundtable or member companies?
    a.  If so, please provide the determinations resulting from such assessments and/or reviews.

7.  In the course of your tenure with DOE, have you been recused in any manner as it relates to working with Cleantech Leaders Roundtable?
    a.  If not, why not?

8.  Have any complaints or concerns been raised internally within the DOE regarding the relationship between LPO and Cleantech Leaders Roundtable?
    a.  If so, please describe in detail the substance, nature of each complaint, and any actions taken in response to such a complaint. If you have not taken any actions in response to such a complaint, why not?

We look forward to your prompt response.

Sincerely,

John Barrasso, M.D.
Ranking Member
U.S. Senate Committee on Energy
and Natural Resources

Cathy McMorris Rodgers
Chair
U.S. House Committee on Energy and
Commerce

DOE AR 000871

S. Hrg. 118–310

# THE DEPARTMENT OF ENERGY'S DUE DILIGENCE PROCESS FOR AWARDING COMPETITIVE GRANTS AND LOANS FUNDED THROUGH THE INFLATION REDUCTION ACT AND THE BIPARTISAN INFRASTRUCTURE LAW AND THE DEPARTMENT'S OVERALL INNOVATION INVESTMENT STRATEGY

## HEARING

BEFORE THE

## COMMITTEE ON
## ENERGY AND NATURAL RESOURCES
## UNITED STATES SENATE

ONE HUNDRED EIGHTEENTH CONGRESS

FIRST SESSION

OCTOBER 19, 2023



Printed for the use of the
Committee on Energy and Natural Resources

Available via the World Wide Web: http://www.govinfo.gov

U.S. GOVERNMENT PUBLISHING OFFICE

55–813          WASHINGTON : 2025

DOE AR 000872

COMMITTEE ON ENERGY AND NATURAL RESOURCES

JOE MANCHIN III, West Virginia, *Chairman*

RON WYDEN, Oregon
MARIA CANTWELL, Washington
BERNARD SANDERS, Vermont
MARTIN HEINRICH, New Mexico
MAZIE K. HIRONO, Hawaii
ANGUS S. KING, JR., Maine
CATHERINE CORTEZ MASTO, Nevada
JOHN W. HICKENLOOPER, Colorado
ALEX PADILLA, California

JOHN BARRASSO, Wyoming
JAMES E. RISCH, Idaho
MIKE LEE, Utah
STEVE DAINES, Montana
LISA MURKOWSKI, Alaska
JOHN HOEVEN, North Dakota
BILL CASSIDY, Louisiana
CINDY HYDE-SMITH, Mississippi
JOSH HAWLEY, Missouri

RENAE BLACK, *Staff Director*
SAM E. FOWLER, *Chief Counsel*
ZAHAVA URECKI, *Professional Staff Member*
RICHARD M. RUSSELL, *Republican Staff Director*
JUSTIN J. MEMMOTT, *Republican Chief Counsel*
DEREK FISHER, *Republican Professional Staff Member*
STEVE EULE, *Republican Senior Professional Staff Member*

DOE AR 000873

C O N T E N T S

———————

OPENING STATEMENTS

Page

Manchin III, Hon. Joe, Chairman and a U.S. Senator from West Virginia .......   1
Barrasso, Hon. John, Ranking Member and a U.S. Senator from Wyoming ......   7

WITNESSES

Crane, Hon. David W., Under Secretary for Infrastructure, U.S. Department
  of Energy ......................................................................................................   9
Shah, Jigar H., Director, Loan Programs Office, U.S. Department of Energy ...  11
Donaldson, Hon. Teri L., Inspector General, U.S. Department of Energy .........  22

ALPHABETICAL LISTING AND APPENDIX MATERIAL SUBMITTED

Barrasso, Hon. John:
  Opening Statement ................................................................................   7
  Poster image of quote from Climatetech executive .......................................  42
  Washington Free Beacon article entitled "Biden's Energy Loan Czar
    Founded a Trade Association. Now It's Selling Access to Him" by Alana
    Goodman, published October 6, 2023 .......................................................  54
Crane, Hon. David W.:
  Opening Statement ................................................................................   9
  Written Testimony ................................................................................  12
  Responses to Questions for the Record .........................................................  69
Donaldson, Hon. Teri L.:
  Opening Statement ................................................................................  22
  Written Testimony ................................................................................  24
  Responses to Questions for the Record .........................................................  114
Manchin III, Hon. Joe:
  Opening Statement ................................................................................   1
  Chart entitled "Percentage of Awarded and Announced Loan/Loan Guar-
    antee Funding from LPO Since 2009" .......................................................   5
National Mining Association:
  Statement for the Record ..................................................................................  117
Shah, Jigar H.:
  Opening Statement ................................................................................  11
  Written Testimony ................................................................................  12
  Responses to Questions for the Record .........................................................  88

DOE AR 000874

DOE AR 000875

# THE DEPARTMENT OF ENERGY'S DUE DILIGENCE PROCESS FOR AWARDING COMPETITIVE GRANTS AND LOANS FUNDED THROUGH THE INFLATION REDUCTION ACT AND THE BIPARTISAN INFRASTRUCTURE LAW AND THE DEPARTMENT'S OVERALL INNOVATION INVESTMENT STRATEGY

————

## THURSDAY, OCTOBER 19, 2023

U.S. SENATE,
COMMITTEE ON ENERGY AND NATURAL RESOURCES,
*Washington, DC.*

The Committee met, pursuant to notice, at 10:00 a.m. in Room SD–366, Dirksen Senate Office Building, Hon. Joe Manchin III, Chairman of the Committee, presiding.

### OPENING STATEMENT OF HON. JOE MANCHIN III, U.S. SENATOR FROM WEST VIRGINIA

The CHAIRMAN. The Committee will come to order.

First, let me welcome our newest member, Senator Alex Padilla from California. It's so good to have him, and so everyone knows the changes that were made, Senator Kelly was a tremendous asset for this Committee, but he had an opportunity, and I think it was a wise move from his standpoint, to be able to go on to Intel with his background, his training, and everything of that sort. So we lost one and gained one. So I think it's a pretty good swap. Anyway, Senator Padilla represents the largest number of Americans, and the second largest consumption of energy from his state. I know he will dive right in on so many important issues, including hydrogen, forestry, wilderness, western water, and other issues of importance to California that our late, great Senator Feinstein worked on diligently. We got an awful lot of input from her on this Committee, but also from all of you and we appreciate that so much.

So with that, we will get started.

I also want to briefly express, at the outset, my strong concerns about the news last night that our Administration has lifted most sanctions on Venezuelan oil for the next six months. On the heels of announcing the smallest five-year offshore oil and gas leasing plan in decades for the United States, the Administration is turning to Venezuela to help make up the production that they refuse to allow in America. And they know I have a problem, I am sure maybe you all have all different feelings on this. They are one of

(1)

DOE AR 000876

2

the world's dirtiest energy producers and an oppressor of their own people. I understand that the Administration believes that this will encourage Venezuela to make democratic reforms, but that has been tried, and we failed before. It makes no sense at all to reward bad actors before they actually take the action you want. We tried that with Iran and now here we are with Venezuela.

Now, turning to today's topic—when I look back to when I became Ranking Member of the Committee in 2019, we had not done a comprehensive update to our nation's energy policy in over ten years. Since then, we have worked hard to address that gap. First, we set our energy policy goals in the bipartisan Energy Act of 2020. Then, we provided the investment needed to make those policies a reality in the Bipartisan Infrastructure Law and the Inflation Reduction Act. These bills will transform our nation's energy landscape for years to come. I am extremely proud of these pieces of legislation and the opportunities within them that will make us more energy secure while creating good jobs across our nation.

For instance, I was pleased to join a bipartisan group of federal and state lawmakers and business and community leaders to welcome Secretary Granholm and Under Secretary Crane to West Virginia this week, on Monday, to announce that the Appalachian Regional Clean Hydrogen Hub won a $925 million award to bring a hydrogen hub to West Virginia and parts of Ohio and Pennsylvania, which is the three-state region. This funding, which came from the Bipartisan Infrastructure Law, will ensure West Virginia will be able to be a new epicenter of hydrogen in the United States of America. It's just one example. In the past two years, our state has celebrated announcements for battery manufacturing plants, carbon capture projects, microgrid-powered industrial sites, with many more projects on the way that stand to benefit from the DOE support. I will mention that tomorrow, when I go for a groundbreaking for Nucor Steel. Nucor Steel has just signed a contract with Helion, which is a fusion manufacturer, and they are intending, by 2028, to have a Helion fusion manufacturing plant for clean hydrogen to make clean steel. It will be the cleanest in the world, being made in West Virginia, and we are extremely proud of that. That opportunity is unbelievable.

In the case of the hydrogen hub, the private sector is proposing to invest up to $6 billion on top of the nearly $1 billion from the DOE. So if you look at the $1 billion we have, that is a 13 percent investment the United States is making for an 87 percent return. That is a tremendous thing for us to incentivize that, and be willing to share some of that risk that makes these projects possible. The story is also similar across our country—the private sector announcements pouring in as a result of opportunities created by our laws, and all of us should be proud of that.

And while I am thrilled to see all these impactful investments being made, it is also disheartening to witness this Administration distort the intended purpose of the laws to fulfill their agenda. And they know, I think we have had these conversations, and sometimes we are ahead of our skis and we just want to keep them in check. The laws were deliberately crafted to secure energy supply chains, but so far, we have seen too many indications that this Administration is willing to sacrifice security to pursue their unreal-

DOE AR 000877

3

istic anti-fossil goals. The most apparent example of this is through the implementation of the IRA's EV tax credit. That credit was designed to encourage automakers to onshore their supply chains in order to break our reliance on China, who has dominated the EV supply chain. Unfortunately, actions by this Administration to cut the sourcing requirements in half and water them down in other ways just to get more EVs on the roads, Chinese or otherwise, clearly are not a reflection of the text or the intent of the IRA and Infrastructure Law. Not only is the Administration violating and manipulating the law to implement the legislation they wanted rather than the bills that we passed, but the decisions they are making will have detrimental impacts on American workers and embolden our adversaries.

There is a bipartisan agreement that these laws must be implemented as written, as Congress intended, to secure our own country's energy supply. This is why our Committee expressed bipartisan concern at a hearing earlier this year when DOE was considering providing a grant to Microvast, a battery company with alleged links to the Chinese government. While DOE ultimately made the correct decision not to award this grant, and I thank you for that, this Administration's actions as a whole have made me question what aspects of the laws are at risk of being manipulated. So I felt it was important to invite the Department of Energy here today, and Mr. Crane, we are so glad to have you, and thank you for coming to discuss your approach, and Mr. Shah, you also, we are anxious to hear from you of these new important laws, and especially the review of the Department's due diligence and process for companies and technologies pursuing grant funding or loan guarantees.

I have two primary questions for our witnesses. First, how are we ensuring that U.S. taxpayer dollars are absolutely not benefiting any of our adversaries? And I think we even have named our adversaries that we are very much concerned about, whether it be China, Russia, North Korea, or Iran. And second, how is the Department ensuring that companies receiving awards have proven technologies worthy of government support to commercialize them? The IRA and the Bipartisan Infrastructure Law are an investment in American energy security to protect ourselves and our allies while breaking our reliance on countries like China, Russia, Iran, North Korea, and other nations who do not share our values and should not be relied upon to provide critical elements of our supply chains. While I was pleased to see that DOE rescinded the Microvast award, I am alarmed that the company was able to get through even the first round of vetting. We continue to hear about our companies seeking to use taxpayer dollars to make a devil's bargain with Chinese technology providers, like Ford's potential licensing deal with CATL seeking to qualify for IRA credits, or the conditional loan approved by DOE for Kore Power that involves purchasing technology from a Chinese firm. Let me be clear: I do not want—and I don't believe any of our Committee members wants—a cent of the funding benefiting China in any way and being held hostage. So I hope today's witnesses will shed some light on the vetting process to make sure China and Chinese companies

DOE AR 000878

4

are not turning taxpayer-funded American innovation into a windfall for our geopolitical adversaries.

Between the IRA and the Bipartisan Infrastructure Law, the Department of Energy received nearly $100 billion to support new or existing energy, advanced technologies, grid modernization, and clean manufacturing programs. Both bills emphasized an all-of-the-above approach so that we could innovate—not eliminate—our way toward a cleaner environment, while at the same time, increasing our energy security and creating new economic opportunities here in the U.S. These bills were designed to be balanced and ensure that the best technologies of all types win, not just those favored by any given administration. Historically, DOE's Loan Programs Office has fallen short of a balanced approach. If you look at the chart here, it shows you basically where we are investing our dollars.

[The chart referred to follows:]

5



DOE AR 000880

6

The CHAIRMAN. Forty-one percent went to electric vehicles and clean transportation. Solar was 22 percent. Nuclear was 22 percent. Distributed energy, storage, transmission was only seven percent. Wind was only three percent. Fossil, hydrogen, geothermal is four percent. Now, if you look at where our energy comes from today, 81 percent comes from energy production in fossil fuels and cleaner innovation—81 percent—with a four-percent investment. Eight percent is nuclear power. Nuclear, 22 percent investment, eight percent right now. And renewables, you can look at all the renewables, 13 percent is where we get our energy from. So we have a long way to go, but we have to be realistic enough to know where our power is coming from today so we don't short-sight it and get the cart in front of the horse and say go ahead and start pushing. It does not work that way.

To correct this, the IRA created the new 1706 loan guarantee program specifically to support investments in our dispatchable fossil fuel plants, such as adding CCUS or other environmental controls. I am also pleased to see that the LPO is supporting a number of hydrogen projects, a proven technology that we just have not focused on commercializing until the past few years. It is my hope that the Department will adhere to a balanced approach moving forward. I look forward to hearing how DOE is taking that balance into consideration as they work through the decision-making process for these important funding opportunities. I would also like to hear the Department's plans to ensure that taxpayer dollars are being spent efficiently, effectively, and responsibly.

Without a doubt, the Department of Energy's loan programs have had successes over the years. And it is notable that the interest on loans returned to taxpayers has exceeded losses in investments by roughly four times over. That is excellent. That being said, it's no secret that problematic projects from previous years are still very much on our minds. Mr. Shah, I hope you are able to assuage any concerns this morning about the efficacies of the loan programs and demonstrate how the Department is working to prevent the next Solyndra. Being responsible with all this funding also means DOE's offices should not be working in a vacuum. There needs to be a cohesive strategy to ensure that we are not duplicating efforts and missing key gaps. So I hope that we can hear from Mr. Crane this morning about how he works with Mr. Shah and other offices within the DOE and across the agencies to make sure that funding is being used in the most effective and efficient ways possible. If implemented effectively, the Bipartisan Infrastructure Law and the Inflation Reduction Act have the power to truly transform our country for the better. And that is why it is so important that we get this right. I will provide all the support I possibly can to DOE to help the agency get it right and achieve Congress's intent. At the same time, it will be of no surprise to hear that I fully intend to continue our Committee's robust oversight of the Department, which is our jurisdiction and responsibility.

And with that, I am going to turn to my Ranking Member, Senator Barrasso, for his opening remarks.

DOE AR 000881

7

**OPENING STATEMENT OF HON. JOHN BARRASSO,**
**U.S. SENATOR FROM WYOMING**

Senator BARRASSO. Well, thanks so much, Mr. Chairman.

I want to join you in welcoming Senator Padilla to the Committee. Given his degree in engineering from the Massachusetts Institute of Technology, we welcome both your participation and your expertise. So welcome to the Committee. I look forward to working with you.

Mr. Chairman, thank you for holding this hearing today. Recent horrifying events provide a disturbing backdrop for today's hearing. Hamas terrorists have viciously attacked Israel. Hamas committed atrocities against innocent civilians, including infants and children. People are sickened by what has occurred. And there is a reason to believe that Iran helped plan and finance this evil attack on our ally. The risk of a wider, regional war in the Middle East continues to grow. Meanwhile, Russia continues to wage its unprovoked war against Ukraine, and as you might have seen, Putin and Xi are together today. And China is, at the same time, growing more aggressive by the day as it pursues global domination.

These are consequences of weakness by our nation. They demonstrate that our energy policy needs to be about more than a blind allegiance to tackling climate change. That is what makes the laughably named Inflation Reduction Act so dangerous. Let's be clear: President Biden's energy transition obsession is going to move us from energy independence to energy and mineral dependence on China and Russia and OPEC. It's not the kind of transition Americans want or need. Today, I issued a report exposing how the inflationary IRA will actually make America weaker and our adversaries stronger. Starting with its name, everything we have heard from Democrats about this disastrous bill is a lie. This partisan bill—truly one-sided bill—is going to send America and our nation further in the red while enriching red China. It is going to leave taxpayers on the hook for hundreds of billions of dollars in new borrowing, and with a debt of $33 trillion, which is growing. We cannot afford that.

President Biden has a terrible track record of protecting taxpayer money. As Vice President, he personally announced the award of a loan guarantee to politically connected solar company Solyndra. And Mr. Chairman, you made mention of that company in your opening remarks. We all know how it turned out—$500 million bankruptcy, with taxpayers footing the bill. With the IRA, the American people can expect to see more Solyndras. The recent revelation that the Department of Energy selected Chinese-connected companies, which you referenced, Mr. Chairman, for financial awards should alarm every American, but should not surprise us. The White House said it welcomes Chinese companies as big players in renewables and electric vehicle markets. The Administration has said it's perfectly happy to work with China on electric vehicles, and the IRA encourages more of this. It is a terrible mistake. Republicans and Democrats should be able to agree that taxpayer dollars shouldn't be used to strengthen China. It's not just foolish awards that benefit China, this ill-conceived bill is going to push the United States away from the fuels and the technologies that we dominate toward those that China and others control.

DOE AR 000882

8

And as your poster and map showed, Mr. Chairman, it points out these things perfectly. Chinese companies have led wind turbine, solar panel, and battery production for many years. That is not changing. Now, China is the world's largest manufacturer of electric vehicles. China also controls the supply chains of many of the critical minerals that these technologies use. So while the Biden Administration has been selecting Chinese companies for grant awards, it has been working to block mining in the United States. Even if we could do more mining here in America, we would still need huge amounts of critical minerals from China, Russia, and elsewhere to make up for the number of electric vehicles that Joe Biden is demanding. It's not possible to do it otherwise.

Contrast this future dependence with America's recent global leadership in oil, natural gas, and coal production. President Biden and Congressional Democrats seem happy to surrender America's energy advantage. And Mr. Chairman, you mentioned in your opening comments what we see happening now in Venezuela with allowing drilling there that we are not allowing in the United States, and we do it much more safely and with more respect for the environment than they ever will.

So let's be clear about what this means. It means more pleading with dictators, like Russia and Iran and Venezuela, as the Administration just did yesterday. It means U.S. businesses and workers being held hostage to the whims of our enemies. It means stronger adversaries, weaker allies. We do not need a pro-Iran and pro-China energy policy. That's what we are getting out of this Administration. We need to return to a pro-America, all-of-the-above energy strategy that is good for America and for the free world. The stakes are too high, Mr. Chairman. The IRA, to me, should stand for irresponsible, reckless, and alarming. It can't be salvaged. It needs to be repealed.

Thank you, Mr. Chairman.

The CHAIRMAN. Thank you, Senator Barrasso, and the great thing about our democracy is, we can be friends and agree to disagree. And I will say in response, with the IRA, a lot of implementation—you know that I have a concern about how it's being implemented, but we have to be clear about the facts. We are producing more energy in the country today than ever in the history of our United States of America—4.6 billion barrels of oil is being produced as we speak, 37 trillion cubic feet of gas. We are at 13.5 billion cubic feet of LNG a day. That is going to go to 25. We have increased our wind and solar production. We have doubled it in one year. It's an all-in policy that is working.

Now, the differences we have is sometimes some Administrations want to do a little bit more than what the bill intended. But the balance we have right now, it has done that job. And I will say with my dear friends on my Republican side, my Republican friends, a lot of that thought that went into that bill was things that we discussed for four or five years because we need more energy. We need an all-in policy. What we are afraid of though, is we might need a little bit longer until we have the new technologies that can replace the dispatchable fuels that people want to replace. And we are not going to take something away until we can do it as good, if not better, and that is where we are.

DOE AR 000883

9

So with that being said, I want to turn to our witnesses today.

We have the Honorable David Crane, the Under Secretary for Infrastructure, Department of Energy, and we are glad to have him.

We have Mr. Jigar Shah, Director of the Loan Programs Office, Department of Energy, and glad to have him here.

And we have the Honorable Teri Donaldson, Inspector General, Department of Energy.

So with that, we are going to our witnesses' remarks, and we are going to start with the Honorable David W. Crane, from the Department of Energy.

### STATEMENT OF HON. DAVID W. CRANE, UNDER SECRETARY FOR INFRASTRUCTURE, U.S. DEPARTMENT OF ENERGY

Mr. CRANE. Thank you, Mr. Chairman and Ranking Member and distinguished members of the Committee. Thank you for this opportunity to discuss the Department of Energy's implementation of the BIL and IRA. All of us at DOE are extremely grateful for the leadership of this Committee informing and enacting these landmark pieces of legislation and the ongoing partnership during their implementation. We are bolstering our national energy security at this time of global instability. We are creating millions of lasting, good-paying jobs and helping communities across the country tackle huge challenges and take full advantage of opportunities made available to them by these landmark pieces of legislation. We are also assisting communities in realizing the impacts of rapid energy technology transitions and ensuring that cities and towns across America have access to new energy technologies that can reduce families' and businesses' energy bills as quickly as they can be deployed.

Between BIL and IRA, Congress has provided more than $97 billion for over 60 new programs under the purview of the Department of Energy. I am proud to say, as we sit here today, that we have announced 111 funding opportunities, totaling over $72.8 billion for applications from the public and private sectors, with a special mission to ensure that tribes and underserved and traditional energy communities have a seat at the table. Of this total, we have selected so far 455 recipients for award negotiations, totaling $17.8 billion through competitive funding and $14.3 billion through allocated formula funding, including the home rebates program. In fact, in just the last week, we have announced award selections for over $10 billion between hydrogen and transmission awards. From selection, we move directly to negotiation of awards and then to full design project development and groundbreaking. During all these phases, we must ensure that the taxpayer dollars are well spent on well-developed, impactful projects that drive innovation. We are here to demonstrate technology and drive market adoption and stimulate private-sector financing of projects that will serve as fundamental elements of the 21st century economy for decades to come.

I look forward to sharing how DOE is meeting these goals through a thoughtful program design, extensive community and stakeholder outreach, rigorous and merit-based decisions led by career staff who are subject matter experts, ongoing project management, and a robust risk and vetting process for awardees and ap-

DOE AR 000884

10

plicants. The Department takes seriously its responsibilities to match competitive funding opportunities and loan programs purposefully to the benefit of the taxpayers. It is of great importance, both to me and to this Committee, that we have a robust due diligence and oversight mechanism to ensure integrity in our programs and to ensure we are meeting and exceeding the goals of the legislation. The majority of the programs under BIL and IRA are competitive funding opportunities to demonstrate and to deploy next-generation energy infrastructure. For FOAs, we conduct extensive outreach to industry, communities, non-profits, and think tanks, other stakeholders, and with other DOE offices to develop a better understanding of the opportunities and challenges.

Once applications are submitted, we undertake a rigorous merit review process that includes an initial check for eligibility, followed by review by a panel of independent experts. This includes a review of technical merit, financial and market viability, the work plan, management team, and the proposed community benefits. This review may include additional questions to the applicants, potential interviews, and review by the RTES—Office of Research, Technology, and Economic Security—which I will explain more. With the enactment of BIL and IRA, it has become more important than ever for the Department to have a comprehensive and rigorous approach to research, technology, and energy security—or as we say, RTES—for both awards and loans. Over the past year, DOE developed and continues to improve upon a number of measures to mitigate risks that foreign governments who are adversarial to the U.S. pose to our scientific and technological development ecosystem supply chains and intellectual property.

DOE enhanced its existing vetting processes to ensure that risks of undue foreign influence are considered earlier in the competitive process and throughout the life of a DOE support project loan. DOE also included strict RTES requirements for financial assistance and loan programs. For example, no person participating in a foreign talent program sponsored by a country of risk may participate in a project. We are examining foreign connections associated with individuals and entities proposed to participate in the project. This includes sharing some intellectual property, foreign collaborations, foreign ownership, and foreign affiliations.

In conclusion, the Department of Energy looks forward to seeking the guidance of this Committee as we continue to ensure the integrity of the implementation of the BIL and IRA. These historic laws provide an unparalleled catalytic investment to our nation's infrastructure and energy security, and the Department stands ready to meet this moment while ensuring that we are executing stringent oversight and stewardship of the taxpayer dollar. As we look to secure the U.S. global leadership in energy technology development and infrastructure, we also know that the investment in our nation's energy infrastructure is not just a five-year or decade-long project, it is a very long-term investment in the energy future of the United States. We look forward to working with this Committee and for the partnership between the Department of Energy and the members of this Committee.

Thank you, Mr. Chairman.

DOE AR 000885

11

[The prepared statements of Mr. Crane and Mr. Shah were submitted as one document, and appear after Mr. Shah's opening statement on page 12.]

The CHAIRMAN. Thank you, sir.

And now we are going to have the Honorable Mr. Jigar Shah, Director of the Loan Programs Office, Department of Energy.

### STATEMENT OF JIGAR H. SHAH, DIRECTOR, LOAN PROGRAMS OFFICE, U.S. DEPARTMENT OF ENERGY

Mr. SHAH. Chairman Manchin, Ranking Member Barrasso, and distinguished Committee members, I, too, would like to express my gratitude for the opportunity to join you today. I have had the privilege of serving as the Director of the Loan Programs Office, or LPO, since 2021. LPO supports the DOE's private-sector-led, government-enabled approach to developing a new American industrial strategy.

The United States faces a deployment challenge. LPO exists to help bridge that gap. Since 2005, LPO has financed innovative energy and manufacturing projects, catalyzing the deployment of nuclear power, utility scale wind and solar, and domestic advanced technology vehicle manufacturing, while directly supporting nearly 50,000 family-sustaining jobs in the process. At the same time, LPO has prioritized its responsibility to protect taxpayer resources. Since the creation of LPO, dedicated federal staff have strengthened program oversight, institutionalized world-class risk management practices, and implemented portfolio-wide safeguards and monitoring of all LPO projects. The fact is, similar to what Under Secretary Crane explained for competitive funding opportunities, LPO conducts rigorous due diligence that is comparable to, if not more stringent than, what might be done in the private lending market.

The Bipartisan Infrastructure Law and the Inflation Reduction Act enhanced and augmented LPO's authorities, sending a signal that Congress trusts and expects LPO to meet this moment. And the private sector has noticed. Our applicant pipeline has 177 active applications seeking over $157 billion in financing from advanced nuclear to carbon management to sustainable aviation fuels. We do not pick and choose the technologies that come to our door, and we evaluate applications across all statutorily eligible technologies on a level playing field. Since the start of the Biden-Harris Administration, LPO has issued or committed more than $21 billion for projects across the country, including in Arizona, Kentucky, Louisiana, Nevada, Utah, and other states. These projects support deployment of clean hydrogen technology, virtual power plants, domestic critical materials production, and more.

We have also clarified our application process for borrowers and are implementing recent changes, including Section 1706 and State Energy Financing Institution (SEFI) authorities. LPO will continue partnering with the private sector to finance high-impact projects while taking measured risk and exercising rigorous due diligence to ensure that our future energy is built by American workers on American soil.

I look forward to answering any questions you might have.

12

[The jointly prepared statement of Mr. Crane and Mr. Shah follows:]

**STATEMENT OF DAVID CRANE,**

**UNDER SECRETARY FOR INFRASTRUCTURE**

**AND**

**JIGAR SHAH, DIRECTOR, LOAN PROGRAMS OFFICE**

**U.S. DEPARTMENT OF ENERGY**

**BEFORE THE**

**COMMITTEE ON ENERGY AND NATURAL RESOURCES**

**UNITED STATES SENATE**

**REGARDING**

**PROCESS AND DUE DILIGENCE OF GRANTS AND LOANS AND SPURRING**

**INNOVATION THROUGH THE DEPARTMENT'S SELECTION STRATEGY**

**OCTOBER 19, 2023**

**Introduction**

Chairman Manchin, Ranking Member Barrasso, and distinguished Members of the Committee, thank you for this opportunity to provide an update on the Department of Energy's (DOE or Department) efforts to implement the Infrastructure Investment and Jobs Act, also referred to as the Bipartisan Infrastructure Law (BIL), and Inflation Reduction Act (IRA). All of us at DOE are incredibly grateful for the leadership of this Committee in formulating and enacting these landmark pieces of legislation and for your ongoing guidance during their implementation.

These two laws are truly historic investments in renewing American infrastructure for decades to come. We are together rebuilding American manufacturing and increasing American competitiveness. We are bolstering our energy security. We are creating millions of lasting, good-paying jobs and helping communities across the country tackle huge challenges and take advantage of opportunities. We are assisting communities in realizing the impacts of rapid energy technology transitions and ensuring that cities and towns have access to new energy technologies that can reduce families' and businesses' energy bills as quickly as they can be deployed, while enhancing America's energy security.

**Overview of BIL and IRA Provisions**

Through the BIL, Congress provided more than $62 billion for programs under the purview of the Department of Energy. The BIL requires DOE to stand up 60 new programs – including 16 demonstration and 32 deployment programs – and expanding funding for 12 existing research, development, demonstration, and deployment programs from wind to clean hydrogen. The BIL also provides funding for many programs authorized by the bipartisan Energy Act of 2020, including energy storage demonstration projects, the Advanced Reactor Demonstration Program,

1

DOE AR 000887

13

carbon capture demonstration and pilot programs, industrial emissions demonstration projects, and more.

In the IRA, Congress invested approximately $35.5 billion in programs administered by the Department of Energy, including $8.8 billion for the Home Energy Rebates Program, nearly $6 billion for industrial decarbonization, and increased loan authority for our Loan Programs Office (LPO) to help bolster burgeoning American innovation and domestic energy production.

This longer-term, demonstration and deployment-focused mandate given to the Department by Congress also reflects a departure from other infrastructure packages in recent history – like the American Recovery and Reinvestment Act – which were more focused on research and development initiatives.

The Office of Clean Energy Demonstrations (OCED), which manages more than $25 billion in funding, is tasked with scaling emerging technologies in partnership with the private sector to accelerate deployment, market adoption, and the equitable transition to a clean energy future. This year OCED announced selections to negotiate $189 million in Federal funding for eight carbon capture front-end engineering and design (FEED) studies, up to $1.2 billion to advance the development of two commercial-scale direct air capture facilities in Texas and Louisiana, and up to $325 million for 15 long duration energy storage projects across seventeen states, one Tribal nation, and six national lab sites. Recently, OCED announced seven selections to negotiate $7 billion in awards under the Regional Clean Hydrogen Hubs Program.

The Department's Loan Programs Office (LPO) is tasked with providing financing to support the commercialization and deployment of innovative energy infrastructure and advanced vehicle technology manufacturing projects in the United States. The LPO portfolio spans technology sectors, from transmission and storage to advanced nuclear and critical materials projects. The BIL and IRA included significant resources to enhance longstanding LPO programs – such as the Tribal Energy Financing and Title 17 Clean Energy Financing (Title 17) Programs. The legislation also provided new abilities to support projects that will reinvest in energy infrastructure that has ceased operations or make operating energy infrastructure more efficient (Section 1706) and non-innovative energy projects that receive support from an eligible state energy financing institution (SEFI). LPO has developed an active and wide-ranging applicant pipeline, with 177 active applications from every part of the United States currently seeking $157.1 billion in cumulative financing across its programs.

In the last year, through LPO's Advanced Technology Vehicles Manufacturing (ATVM) Program, the Department has issued or committed more than $13 billion for projects across the electric vehicle and battery storage supply chain in Arizona, Kentucky, Nevada, Tennessee, and Texas, playing a key role in the Administration's goal to onshore and re-shore manufacturing of zero-emissions vehicles and critical materials production. In the Title 17 program, LPO closed a $504.4 million loan guarantee to the Advanced Clean Energy Storage project in Utah – helping finance the construction of the largest clean hydrogen storage facility in the world – and, more recently, announced the closing of a $3 billion partial loan guarantee to Sunnova Energy Corporation's Project Hestia to make distributed energy resources, including rooftop solar,

2

14

battery storage, and virtual power plant (VPP)-ready software available to more American homeowners.

The impacts of BIL and IRA investments will touch every corner of the country through grants, formula funding, rebates, and loan programs that are thoughtfully designed and diligently administered by DOE experts, including career civil servants, after thoughtfully incorporating extensive feedback, including from the private sector and other stakeholders, into our program design. Awards and selections to negotiate awards are also made by career officials via a merit-based process, with program integrity at the top of mind.

**Departmental Realignment**

In February of this year, DOE celebrated the one-year anniversary of our strategic departmental realignment, which created the new Under Secretary for Infrastructure and three new offices – the Grid Deployment Office, the Office of Manufacturing and Energy Supply Chains, and the Office of State and Community Energy Programs. This Under Secretariat also includes the BIL-created Office of Clean Energy Demonstrations, as well as mission-aligned program offices, like LPO, the Office of Cybersecurity, Energy Security, and Emergency Response, the Office of Indian Energy Policy and Programs, the Federal Energy Management Program, and the Power Marketing Administrations. This new structure helps maximize the efficacy of BIL and IRA programs and boosts DOE's ongoing work to reduce energy costs through low-cost clean energy resources, stimulate American manufacturing and industrial competitiveness and create jobs, increase equity and environmental justice, and support meeting ambitious climate goals.

Since its implementation, the strategic realignment has allowed the Department to be nimbler and more responsive in its deployment of BIL and IRA, and to meet the challenges of implementing these historic laws. In addition, these structural changes set DOE up for success in carrying out all of our missions – and to carry them forward for the coming years and decades. Seizing this opportunity requires active engagement with the private sector and communities as we deploy and oversee this unprecedented level of Federal clean energy investment, including in some areas and types of activities that are new to the Department. Our strategic realignment optimizes the world-class expertise of our talented staff and maximizes our ability to bring in new talent and skillsets that will serve the American public for decades to come.

**Process and Due Diligence of Financial Assistance**

The Department takes seriously its responsibilities to manage competitive funding opportunities and loan programs purposefully to the benefit of the taxpayer. We engage in the necessary due diligence and oversight mechanisms to ensure integrity in our programs and to be responsible stewards of the taxpayer dollar. Below, we highlight our due diligence process for competitive financial assistance opportunities from the perspective of the Office of Clean Energy Demonstrations, as well as our process for loan programs from the perspective of the Loan Programs Office.

DOE AR 000889

15

*Competitive Financial Assistance Opportunities*

To ensure the transition from new energy technological discovery to commercial readiness, and in recognition of the challenges of administering any demonstration project in addition to navigating the significant barriers to private sector adoption of new technologies, OCED established four key tenets for federally-funded demonstration projects:

1. Create a pathway to technical and commercial risk reduction and make projects commercially viable by addressing technology challenges and driving down cost curves;
2. Target relevant operational environments, scales, and timeframes to validate the performance, cost, and value;
3. Enable downstream market adoption and deployment to accelerate scale-up; and
4. Mitigate substantial risk and the known and unknown risks factors that impact project outcomes.

This process begins at the Funding Opportunity Announcement (FOA) development stage, where OCED conducts extensive outreach to industry, communities, non-profits and think tanks, other stakeholders, and with other DOE offices to develop a better understanding of the opportunities and challenges facing any given sector. The feedback from this outreach and the direction provided by Congress informs the FOA design to maximize strong applications and ultimately reach the programs goals.

Once applications are submitted, OCED undertakes a rigorous merit review process that includes an initial check for eligibility followed by review by a panel of independent experts on the projects; technical merit, financial and market viability, workplan, management team, and Community Benefits Plan. The Community Benefits Plan is required as part of all BIL and IRA funding opportunity announcements and is based on a set of four core policy priorities: investing in America's workforce; engaging communities and labor; advancing diversity, equity, inclusion, and accessibility; and implementing Justice 40. In most cases for grants, these plans are scored at 20 percent of the technical merit review of proposals. Specific asks for Community Benefits Plans may vary due to the range of project types. For example, large place-based demonstration and deployment projects will require the most robust plans. When an applicant is selected, their Community Benefits Plan will be part of the contractual obligation of the funding recipient.

The merit review may include additional questions to the applicants, potential interviews, and review by the Office of Research, Technology, and Economic Security. And as part of the review, OCED may evaluate applicant risks such as financial stability; quality of management systems, personnel, and ability to meet management standards, history of performance; audit reports and findings; an applicant's ability to effectively implement statutory and regulatory requirements, as well as an assessment of community and labor engagement, availability of a skilled workforce, and public and worker health and safety considerations. The steps OCED takes in its due diligence process are comparable to those taken in the private sector, in line with industry best practices and project management standards.

4

DOE AR 000890

16

After the merit review process is complete, OCED makes selections for award negotiations for a cooperative agreement, wherein OCED and the selectee will negotiate key terms and milestones of the first phase of the project.

OCED divided its project management oversight into four phases:

1. Phase one is detailed project planning where activities focus on completing specific details about the overall project plan and analysis to refine projections submitted as part of the proposal. These activities must provide assurance to DOE that the overall project plan is technologically, financially, and legally viable, and appropriately incorporates input from relevant local and community partners.
2. Phase two is project development, permitting, and financing, which encompasses advanced planning activities. Recipients finalize their project development plans, commercial agreements, and financial structure, and complete the necessary permitting and approval activities required to begin construction.
3. Phase three is installation, integration, and construction. This phase focuses on implementation and requires recipients to employ industry-standard project management tools and provide regular status updates as well as track, manage, and report on previously and newly identified risks.
4. Phase four is ramp-up and sustained operations. In Phase four, recipients transition to operations and commence with completion of award-specific criteria negotiated in prior phases.

At each phase OCED negotiates specific goals and milestones required to advance to the next phase of the project and can halt a project if those milestones are not met. Funding for projects is available based on budget periods within each phase to ensure maximum insight into project progress. OCED recognizes that each project and each phase present unique opportunities and challenges and so milestones and key performance indicators are negotiated per award and phase based on the proposed project.

The Department's commitment to project oversight goes beyond the rigorous vetting of applicants and individual project management of OCED's programs. DOE established the Demonstration and Deployment Advisory Board (DDAB), which focuses on demonstration and deployment projects throughout the Department funded with financial assistance over $100 million. The DDAB is made up of the Under Secretary for Infrastructure and the Under Secretary for Science and Innovation, as well as the directors from offices across the Department to ensure maximum oversight.

The Department has also established processes for independent project reviews of demonstration projects receiving over $100 million in federal funding, consistent with Congressional direction. The Department has already undertaken three such reviews for the two Advanced Reactor Demonstration Program projects as well as a demonstration project managed by the Office of Nuclear Energy.

These processes are in place to ensure that the Department is receiving the highest quality applications, can meet Congressional intent in its programming, is able to target the most effective and maximally impactful projects in selection, and make certain that selected projects

DOE AR 000891

17

have strong oversight to ensure their success and that taxpayer dollars are being used to maximum effectiveness.

*LPO Application Process and Rigorous Due Diligence*
The LPO takes seriously its responsibility to protect taxpayer resources. Ever since its first loan programs were authorized by Congress in the Energy Policy Act of 2005, LPO has been evolving and making improvements to the office that have increased both internal and interagency oversight, clarified its management responsibilities, institutionalized risk management practices, and put in place portfolio-wide safeguards and monitoring of all LPO projects, among other enhancements.

For example, since the time of the 2012 independent audit of LPO and its portfolio known as the Allison Report, LPO has bolstered or refined its practices by:

- Developing a robust and consistent process for deep due diligence of applications in review;
- Improving internal and external coordination of the processes involved in the oversight of LPO programs, including through added transparency;
- Proactively monitoring and managing transactions after loan closing through a dynamic portfolio management process; and
- Establishing an updated leadership and organizational structure, including a Risk Management Division (RMD) and Portfolio Management Division (PMD), staffed with professionals with deep experience in underwriting and monitoring complex transactions and for whom responsible stewardship of taxpayer money is a top priority.

It is important to note that, based on the authority provided by Congress, LPO evaluates applications across all statutorily-eligible technologies on a level playing field. LPO does not pick and choose the technologies that come to the office and that are ultimately offered a conditional commitment or issued a loan. Applicants are invited to contact LPO and submit applications at any time.

LPO conducts rigorous due diligence that is comparable to, if not more stringent than, what might be done in the private sector. Eligible projects are vetted by LPO in a multi-step application process and must meet the specific requirements of the program. As supported by industry-leading third-party advisors, LPO conducts rigorous due diligence of every application, and if an eligible project meets all application requirements, only then provides financing (subject to available authority).

LPO's rigorous evaluation and underwriting process includes vetting a potential borrower's inputs and assumptions about the proposed project, including but not limited to the project sponsors' financial and technical assumptions, the market for their output, and project risks including provisions relating to foreign ownership and control. In addition, during its evaluation of a potential project, DOE employs mitigation measures against the assessed risks of a potential project, as is routine in the evaluation and underwriting of any project loan. These factors are also carefully evaluated outside of LPO by a Department vetting process that includes Committee on Foreign Investment in the United States (CFIUS) expertise in the Office of

DOE AR 000892

18

International Affairs. For all potential project sponsors and borrowers, LPO employs robust Know Your Customer policies, background checks, and other measures to ensure a clear understanding of the potential borrower.

After a conditional commitment is offered, and prior to DOE issuing a loan, this rigorous process continues. In negotiating a term sheet and financing documents with any borrower, LPO includes binding provisions that ensure the issues flagged in due diligence are appropriately addressed to the Department's satisfaction prior to financial close and through the life of the loan.

Together, these practices have allowed the portfolio to grow in a way that takes measured risk to accelerate deployment of innovative technologies in various clean energy sectors and of technologies that increase the manufacturing competitiveness in the domestic supply chain—all while protecting taxpayer dollars. While supporting the build out of first-of-a-kind technologies, the LPO portfolio has simultaneously achieved the following through extensive due diligence and proactive portfolio management.

- LPO maintains a healthy loan portfolio concentrated in creditworthy assets, with 70% of exposure held by investment-grade borrowers, and it maintains a low aggregate loss rate of around 3% of funds disbursed.
- Of the approximately $33 billion that has been disbursed to date, $14.17 billion in principal has been repaid, along with $4.74 billion in interest.
  - Every active LPO borrower remaining in the portfolio repaid principal in FY2022, achieving $1.7 billion in principal retirement and $523 million in interest payments to the U.S. Treasury.
- FY2022 marked a significant milestone as the portfolio achieved an internal investment-grade rating equivalent to BBB-, the first time in history that the overall weighted portfolio rating reached investment-grade by the end of the fiscal year.

A combination of the robustness of LPO's due diligence, underwriting, and oversight capabilities, and the conservative approach LPO has taken to selecting and modeling projects and approving financing, has amounted to a healthy, effective portfolio. As LPO continues to implement its mandate, DOE looks forward to doing so in a transparent and responsible manner.

Because LPO projects are often first movers in key energy sectors, a rigorous risk management approach across LPO's portfolio like the one described above is critical. By providing flexible access to capital for borrowers in clean energy sectors where traditional commercial debt is unavailable, LPO can help U.S. companies scale up domestic manufacturing capacity, help support American entrepreneurs' ability to deploy new technologies, and scale up domestic supply chains and create good-paying American jobs. Investment in American manufacturing helps the United States lead the world in clean energy industries and positions U.S. firms to export these technologies to our global partners.

**Spurring Innovation in the Private Sector**

Earlier this year, DOE launched a department-wide initiative to drive public and private sector engagement critical to the development of effective clean energy industrial strategy. The

7

19

Pathways to Commercial Liftoff effort, coordinated through DOE's Office of Technology Transitions and contributed to by the offices testifying today as well as a number of other DOE program offices, are a series of reports that provide a valuable, engagement-driven resource on how and when certain technologies—including industrial decarbonization, virtual power plants, clean hydrogen, advanced nuclear, and long duration energy storage—can reach full scale deployment.

The Liftoff reports provide insights that will help steer public sector and private sector investments at a critical time. The BIL and IRA provided DOE billions of dollars to invest in and support large-scale demonstration and deployment of clean energy technologies over the next decade. These historic investments are intended to drive commercialization and unlock trillions in private investment to set the nation on a course to hit critical long-term decarbonization objectives. Public and private partnerships are more important than ever in enabling the nation's broader industrial strategy—creating high quality American jobs, strengthening domestic supply chains and global competitiveness, and facilitating an equitable energy transition. Look no further than the recent Regional Clean Hydrogen Hubs announcement, where our $7 billion is attracting over $40 billion in private investment.

Importantly, the Pathways to Commercial Liftoff reports are developed through extensive stakeholder engagement and a combination of system-level modeling and project-level financial modeling – leveraging insights from conversations with several hundred private sector partners to date, as well as public sector experts. The Liftoff reports are designed to be "living documents," and will continue to be updated to add new private and public sector insights as the commercialization outlook on each technology evolves and as other technologies are addressed by new Liftoff reports in turn.

**Research, Technology, and Economic Security**

With the enactment of BIL and IRA, it has become more important than ever for the Department to have a comprehensive and rigorous approach to research, technology, and economic security (RTES) policy and procedures for its awards and loans. DOE developed, and continues to improve upon, a number of RTES measures to mitigate risk that malign foreign governments pose to our scientific and technological development ecosystem, supply chains, and intellectual property.

To ensure a robust RTES approach, DOE took three major actions to address the many forms of RTES risks. First, DOE enhanced its existing vetting processes to ensure that risks of undue foreign influence are considered early in the competitive process and throughout the life of a DOE supported project or loan. DOE also included strict RTES requirements for its financial assistance and loan programs. For example,
- No person participating in foreign talent program sponsored by a country of risk may participate in a project.
- Entities applying for funding must be fully transparent regarding foreign connections associated with individuals and entities proposed to participate in the project. Transparency includes sharing sources of intellectual property, foreign collaborations

8

20

related to the project scope, foreign ownership, and foreign affiliations. Continued transparency is required during the life of a project.

Second, DOE established a department-wide RTES working group to review, develop, and assist in the implementation of RTES policies. Third, the Department established a new RTES Office to implement DOE's enhanced vetting process for financial assistance and loan projects, build awareness internally within DOE on RTES issues, engage with external stakeholders, and review DOE national lab agreements involving foreign entities.

**Engagement with the Office of Inspector General**

The Office of the Under Secretary for Infrastructure has been engaging from day one and will continue to routinely engage with the Office of Inspector General (OIG) to mitigate risks. The Department's OIG plays a critical oversight function in ensuring that new programs mitigate the risk of fraud, waste, and abuse – from the program design phase all the way through to the project management phase. The OIG has coordinated with Department leadership to review spending plans and has recommended prospective actions that DOE and its program offices can take to best protect taxpayer dollars and program integrity. The OIG will also continue to engage in periodic performance reviews and audits while also responding to complaints and tips on behalf of DOE employees and the general public.

To that end, the Department appreciates the OIG's prospective considerations for the implementation of the BIL, which came in the form of several Special Reports in 2022. While these were not the end products of traditional audits – which normally provide the Department with repeated opportunities to engage with OIG staff and review draft reports and to provide context, suggested factual corrections, and feedback, and which generally contain formal recommendations – they contain and collect helpful historical context and guidance on best practices going forward. Some common tips from across those reports included setting aside sufficient resources for adequate Federal staffing, building out strong internal controls to ensure Government and taxpayer protection, and developing comprehensive policies and procedures to minimize fraud, waste, and abuse in these new programs.

One key recommendation from the Inspector General relates to adequately staffing the Department to provide critical oversight of funded programs and projects. Accordingly, we have been focused on hiring sufficient staff from day one, particularly on hiring project and program oversight specialists, grant management and contracting specialists, and financial and audit oversight staff to responsibly oversee the tremendous investment Congress has made.

**Conclusion**

The Department of Energy looks forward to seeking the guidance of this Committee as we continue to ensure the integrity of the implementation of the BIL and IRA. These historic laws provide an unparalleled catalytic investment to our nation's infrastructure and energy security, and the Department stands ready to meet this moment, while ensuring that we are executing stringent oversight and stewardship of the taxpayer dollar along the way.

DOE AR 000895

21

As we look to secure the United States' leadership in energy technology, development, and infrastructure through the BIL and IRA, we also know that the investment in our nation's energy infrastructure is not a five-year or decade-long project. It is a long-term investment in our economic and energy future that will require continued leadership from Congress and partnership between the Department and this Committee. We look forward to having further conversations about how we can make that long-term vision a reality.

Chairman Manchin, Ranking Member Barrasso, and Members of the Committee, thank you again for the opportunity to testify before you today. We look forward to answering your questions.

10

DOE AR 000896

22

The CHAIRMAN. Thank you, sir.

And now, we have the Honorable Teri Donaldson, Inspector General, Department of Energy.

**STATEMENT OF HON. TERI L. DONALDSON,**
**INSPECTOR GENERAL, U.S. DEPARTMENT OF ENERGY**

Ms. DONALDSON. Thank you, Mr. Chairman. Thank you, Ranking Member Barrasso, and members of the Committee for inviting me to speak here today.

I am going to comment on just a few of the many risk factors, then I am going to talk for a little while about due diligence and why the private sector model isn't going to work. So in my testimony, we lay out 12 different categories that all present substantial risks. I want to emphasize, probably the most important fact that brings me here today is that all of those things are happening at the same time, and I have never seen that. Seventy-one new programs all trying to develop criteria, including due diligence criteria. You have massive amounts of money moving quickly. All of these things happening at once create a level of risk that may, candidly, be unprecedented in terms of amounts of federal money moving in such a complicated landscape. You know, even the PRAC money, huge amounts of which were lost and stolen, had simpler criteria than the dollars we are talking about here today. So I cannot say often enough that this is a very risky landscape.

On the issue of not funding our adversaries, I am greatly concerned about how things are going in that regard. The Department has set up a vetting center, which is a step in the right direction, but it's now six months old. It has three employees. It has no written procedures. There is no clear path on what projects will be vetted or what criteria will be used when they are vetted. It has a very, very long way to go, and that is of huge concern to me.

Now, a few minutes on due diligence. My background is—I was in a very large law firm and I was doing due diligence on large energy deals for many years. So this is something I know a little bit about. Private sector due diligence is two groups of trained gladiator lawyers going into a room with a very clear goal that the project make money. And that model works really well. I was one of those gladiators in the room—blood, guts, and hair—but it works really well because there is a clearly defined goal. You are protecting your clients' interests. In this setting, clearly defined goals really don't exist. Loss has not even been defined, right? What amount of loans defaulting will even be successful? So due diligence is very different.

The huge difference is that on the government side of this equation, it's not their money, right? And back in the '70s, the Federal Government finally responded to what I refer to as the "Monopoly money syndrome." It is a lot easier to spend the government's money than to spend your own or even your client's money. Clients hold people highly accountable. So in response to that, they came up with the Inspector General Act. So what inspectors general do is perform that independent audit function, and they answer the question of where did the money land. So I am not accountable to anyone other than you, right, to say did this even work. So there has to be a clearly defined goal.

DOE AR 000897

23

The analogy in the private sector is the audit chair on the board. Completely independent. It typically does not report to anyone other than the board, and that function is very, very well-funded. So there is a graph in my materials which shows what volume of these dollars, what amount of projects I am currently funded to audit. And I will tell you that in the private sector, you would never see a graph that looks like that. Projects are rigorously audited, and they are audited independently for a very, very important reason, because that is how you know whether or not you got the benefit of the deal, by having an independent set of eyes looking at those materials.

So as we sit here today, I am the poorest-funded inspector general in the Federal Government, viewed proportionately. The Department of Energy took on massive new mission elements, massive amounts of money. I was funded very, very little. And as we sit here today, I don't have the support of the Secretary in seeking to transfer some of those already appropriated funds over to the Office of the Inspector General, and that is unfortunate, because at the end of the day, inspectors general don't lose money, they make money. The more you audit, the more you recover. So a dollar for an inspector general, at least as of 2021, the Council of the Inspectors General was calculating return on investment at about 1 to 20. So a dollar to an inspector general is $20 you get back. So the more you care about those mission elements, the more you should pay attention to making sure that your independent audit function has the staff and the people to be doing its job.

Thank you.

[The prepared statement of Ms. Donaldson follows:]

DOE AR 000898

24

# U.S. Department of Energy
# Office of Inspector General

Statement
of
The Honorable Teri L. Donaldson, Inspector General
U.S. Department of Energy

before the

U.S. Senate
Committee on Energy and Natural Resources

October 19, 2023

DOE AR 000899

25

Teri L. Donaldson
Inspector General
Department of Energy

## Introduction

Chairman Manchin, Ranking Member Barrasso, and members of the committee:

Thank you for inviting me to testify today on the risks arising from the major expansion of both the Department of Energy's loan programs and its grant[1] programs, as funded by recent pieces of legislation which collectively appropriated $99 billion to the Department and increased the Department's loan authority by an estimated $385 billion.

The current situation brings tremendous risk to the taxpayers — the combination of standing up 72 new Department programs, a real risk of funding entities with foreign ownership or control, and a historic expansion of the Department's loan program. As you know, these loan packages are on an accelerated schedule. One category of loan guarantees worth an estimated $250 billion will expire on September 30, 2026. Another category of loan guarantees worth an estimated $40 billion will expire on the same date—$290 billion over the next 3 years or, put another way, roughly $8 billion per month over the next 36 months. There is no precedent in the Department for this level and pace of financing. To put that amount into perspective, Wells Fargo, one of the Nation's largest banks, had an outstanding domestic commercial and industrial loan balance of $292 billion as of the end of 2022.[2] Further, many of these projects are designed to promote innovation by financing projects not otherwise acceptable by private equity investors – projects the markets do not view acceptable.

These massive new risks to the taxpayer are occurring in tandem with substantial underfunding of the Office of Inspector General (OIG). Underfunding oversight makes an inherently risky situation much more amenable to fraud, waste, and abuse. Without substantially increased resources, the OIG's oversight will be a fraction of what it should be, and it will not include any oversight of many key areas. For example, with current funding, the OIG may only be able to conduct 50 oversight projects pertaining to the $65 billion of grant and financial assistance awards, even though we have determined that more than 400 oversight projects are necessary to protect the taxpayers. Moreover, the OIG will not be able to provide the near-term audit and inspection assistance that the President has specifically requested to minimize the longer-term impacts from the large-scale frauds that often plague Federal programs that provide such funding on an expedited timeline. The current level of OIG funding for oversight is both inadequate and irresponsible.

Additionally, without proper funding, critical pre-existing risk areas such as research security, contracting and payment integrity, stockpile stewardship, environmental cleanup, and pit production—to name a few—will not receive appropriate OIG oversight.

---

[1] For purposes of the document, the term "grants" includes cooperative agreements and other transactions such as direct subsidies, prize competitions, etc. Both grants and cooperative agreements deliver Federal funds to recipients. With cooperative agreements, the Federal Government may be more involved in guiding or participating in project activities.

[2] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2022-annual-report.pdf (p.18)

2

26

As the Pandemic Response Accountability Committee (PRAC) continues to identify the billions and billions of dollars lost or stolen from the pandemic related federal funding programs, there are lessons to be learned. Earlier this year, PRAC chairman Michael Horowitz testified about the use of over 69,000 questionable social security numbers to obtain $5.4 billion in fraudulent pandemic loans and grants.[3] PRAC estimates a total of $60.4 billion has been lost to fraud from the total $655 billion in benefits provided in response to the pandemic, and other sources place that number at over $200 billion.[4] Fast money must be balanced against the need for thoughtful and effective internal controls and independent audits.

Due to the spending caps proposed in the Fiscal Responsibility Act of 2023, I am recommending that Congress reallocate funds from the Department's unobligated balances under the Infrastructure Investment and Jobs Act (IIJA), Inflation Reduction Act (IRA), and Puerto Rico Energy Resilience Fund to provide 0.35 percent of funding in those statutes to the OIG. This can be done with no increases in appropriations. This makes sense. In fact, the Environmental Protection Agency has already agreed to transfer additional funds to its OIG in the same manner for the same reason.

I have asked for the administration's support of this proposal. I am here today to ask the same of this committee, and to further discuss some of the risks associated with this unprecedented influx of funding. Please support my request to be properly funded as discussions continue to finalize the fiscal year 2024 budget.

### Recent Legislation Increased Loan Program by $385 Billion

Three recent legislative actions expanded existing Department authorities for loans and loan guarantees by an estimated $385 billion. Beginning with the most recent legislation:

- The 2023 Consolidated Appropriations Act expanded the Department's loan guarantee authority by $15 billion. This authority supports commitments to guarantee loans for eligible projects under title Title XVII of the Energy Policy Act of 2005 for Innovative Technology Loan Guarantee, Section 1703. Eligible projects must: (1) avoid, reduce, or sequester air pollutants or anthropogenic greenhouse gas emissions, and (2) employ new or significantly improved technologies. This authority does not have a statutory expiration date but is available until the appropriations for credit subsidy supporting it are expended.

---

[3] Congressional Hearing, February 1, 2023, on Federal Pandemic Spending: A Prescription for Waste, Fraud, and Abuse (Page 3): *oversight.house.gov*
[4] Pandemic Unemployment Insurance: How much has been paid to fraudsters?: *pandemicoversight.gov*

3

DOE AR 000901

27

- IRA expanded the Department's loan and loan guarantee authority up to approximately $350 billion, covering several authorities:
    o Title XVII Innovative Technology Loan Guarantee, Section 1703, was expanded by $40 billion and covers the same type of work as discussed in the preceding paragraph. This authority is available until September 30, 2026, or until the appropriations for credit subsidy supporting it are expended.
    o Title XVII Innovative Technology Loan Guarantee, Section 1706, authorized and appropriated funds to support guarantees of up to $250 billion. Section 1706 should be used to help retool, repower, repurpose, or replace existing energy infrastructure that has ceased operations, or to enable operating energy infrastructure to avoid, reduce, utilize, or sequester air pollutants or anthropogenic emissions of greenhouse gases. This authority is available until September 30, 2026, or until the appropriations for credit subsidy supporting it are expended.
    o Advanced Technology Vehicles Manufacturing Direct Loan Program is estimated to support approximately $40 billion of loans. These loans finance U.S. manufacturing of fuel-efficient, advanced technology vehicles and qualifying components. Although the legislation does not provide a "cap" for this loan authority, the Loan Programs Office (LPO) estimates that appropriations for credit subsidy may support an estimated $40 billion.[5] This authority is available through September 30, 2028, or until appropriations for credit subsidy costs supporting it are expended.
    o Tribal Energy Loan Guarantee Program (TELGP). IRA changed and increased this $20 billion program. These loans can finance a broad range of energy development projects owned by Tribal Nations. The math for this authority contains two parts: (1) $18 billion in new IRA expanded TELGP authority, (2) plus IRA created new rules and applicability for an existing $2 billion TELGP authority that was authorized in the FY 2017 Consolidated Appropriations Act (Public Law 115-31) in such manner as to subsume the prior $2 billion authority and to combine it with the new $18 billion IRA authority, resulting in $20 billion. This authority is available until expended.

- The IIJA authorized and appropriated funds for the Carbon Dioxide Transportation Infrastructure Finance and Innovation Program loan guarantee program by an estimated $20 billion. The LPO will manage this Program in partnership with the Department's Office of Fossil Energy and Carbon Management. The loans are designed to support large capacity, common carrier carbon dioxide transport projects. The legislation does not include a ceiling for the maximum amount of loans that can be made for this authority; however, the LPO estimates that appropriations for credit subsidy and administrative costs may support an estimated $20 billion.[6] This authority is available until expended.

---

[5] The LPO Annual Portfolio Status Report (Page 4): *https://www.energy.gov*
[6] The LPO Annual Portfolio Status Report (Page 5): *https://www.energy.gov*

4

DOE AR 000902

28

The preceding information is summarized in the following table:

| Law | Amount | Program | Purpose | Expiration | Statutory or estimated |
|---|---|---|---|---|---|
| 2023 Consolidated Appropriations Act $15 billion | $15 billion | Section 1703. Title XVII Innovative Loan Technology Guarantee | Eligible projects must (1) avoid, reduce, or sequester air pollutants or anthropogenic greenhouse gas emissions, and (2) employ new or significantly improved technologies | Available until credit subsidy appropriation is expended | Statutory ceiling |
| Inflation Reduction Act $350 billion | $40 billion | Section 1703. Title XVII Innovative Loan Technology Guarantee | Identical to 2023 Consolidated Appropriations authority described above | Sept. 30, 2026 | Statutory ceiling |
| | $250 billion | Section 1706. Title XVII Energy Infrastructure Reinvestment Program / Innovative Technology Loan Guarantee | Retool, repower, replace, or repurpose existing energy infrastructure that ceased operations, or to enable energy infrastructure to avoid, reduce, utilize, or sequester air pollutants or anthropogenic emissions of greenhouse gases | Sept. 30, 2026 | Statutory ceiling |
| | $40 billion | Advanced Technology Vehicles Manufacturing Direct Loan Program | Finance U.S. manufacturing of fuel-efficient, advanced technology vehicles and qualifying components | Sept. 30, 2028 | IRA removed a $25 billion cap. $40 billion is current estimated amount that may be supported by the credit subsidy appropriation |
| | $20 billion | Tribal Energy Loan Guarantee Program | These loans can finance a broad range of energy development projects owned by Tribal Nations | Available until expended | Statutory ceiling |
| Infrastructure Investment and Jobs Act $20 billion | $20 billion | Carbon Dioxide Transportation Infrastructure Finance and Innovation Program Loan Guarantee Program | The loans are designed to support large capacity, common carrier carbon dioxide transport projects | Available until expended | Estimated amount based on the loan dollars supported by the credit subsidy appropriation |

### Recent Legislation Expanded Department's Grant Programs

Of the $99 billion in supplemental appropriations to the Department, we estimate that $65 billion will be distributed in grants and other financial assistance awards,[7] including the creation of 72 new programs. Beginning with the most recent legislation:

- The 2023 Consolidated Appropriations Act[8]—Congress added $1 billion to the Department's appropriations to provide grants to the Puerto Rico Energy Resilience Fund to build energy system resilience to major natural disasters. This is a new grant program.

---

[7] In this context, "grants" include all types of Financial Assistance programs, including grants, cooperative agreements, direct subsidies, prizes, and other non-contractual transactions. It is important to note that this number is not settled since awards are still being made, and the Department has some flexibility in the manner that the program funds are disbursed.

[8] Public Law 117-328

5

DOE AR 000903

29

- IRA[9]—Of the $35 billion in appropriations, we estimate that $16 billion is slated for grants. The legislation funds 21 programs,[10] 15 of which are new programs.[11]

- IIJA[12]—Of the $62 billion, we estimate that $48 billion is slated for grants. The legislation funds 69 programs,[13] 56 of which are new programs.

The Department is already moving these funds. The Department reports that more than $32 billion in awards have been selected, increasing rapidly over time, as shown in this chart. The volume and pace of these awards will increase significantly from FY 2024 through FY 2025. By way of comparison with historical awards volumes, in FY 2021, the Department awarded $3.9 billion in financial assistance awards for enduring mission grants, not including the IIJA funds.



Billions in financial assistance awards under IIJA and IRA announced as selected by the Department by year

## Due Diligence Challenges Facing Both Loan and Grants Programs

History teaches us that certain factors make applied due diligence less rigorous, even when due diligence procedures may seem well drafted.

**Fast moving funds incentivize cutting corners in due diligence.** One category of loan guarantees worth an estimated $250 billion expires on September 30, 2026—3 years from now. Another category of loan guarantees worth an estimated $40 billion expires on the same date— $290 billion over the next 3 years or, put another way, roughly $8 billion per month over the next 36 months. There is no precedent for this level and pace of financing. In the interest of moving these funds out, on schedule, the Department may be incentivized to cut corners and skip rigorous due diligence steps that are needed to properly manage the risk of default.

Similarly, for grant programs, Department officials are under pressure to award grants and thereby move the clean climate program forward as quickly as possible. This goal directed pressure may also lead to cutting corners in due diligence procedures.

**There is a real risk that awards will be made to ineligible recipients.** For the innovative technology loan guarantee program, the loan applicant must demonstrate innovation

---

[9] Public Law 117-169

[10] https://www.energy.gov/infrastructure/clean-energy-infrastructure-programs-department-energy

[11] One of the new programs is Department Oversight for $20 million, which captures funding for the OIG.

[12] Public Law 117-58

[13] https://www.energy.gov/infrastructure/clean-energy-infrastructure-programs-department-energy

6

30

in the technology being financed in the project. There is a real risk that "innovation" claims will be exaggerated by the applicant, or that baseless or marginally innovative proposals may be awarded financing. Compounding this risk is the pressure on the Department to make loans before authority expires. Should this occur, there is less money available for truly innovative technology projects.

Similarly, in the grants program, due diligence is crucial to ensure that awardees satisfy program participation criteria. The same incentives exist for grant applicants to cheat on eligibility and for Federal officials to approve the applications with too little verification.

**Due diligence is essential to prevent awards to foreign entities.** Both IIJA and IRA include requirements that call for both loan and grant awards to be made to entities that advance the agenda of domestic technology development and jobs creation, and that seek to prevent awards to foreign entities. To help manage this risk, in March of this year, the Department set up a pilot "vetting" process through the "Research, Technology, and Economic Security Vetting Center." This office intends to screen loan and grant awards for foreign influence, ownership, and control. However, this pilot process is new, still under development, untested, and will be called upon to screen numerous projects on a truncated timeline. This office is currently staffed by only three people. All these factors increase the risk that awards will be made to entities with foreign entanglements that go undetected.

Yet, award determinations were already underway, well ahead of the vetting center pilot. One of these projects raises the issue of balancing competing goals. Kore Power, an Idaho-based company that currently makes lithium-ion battery cells in China with Chinese technology and intellectual property, won a conditional commitment from the LPO in June 2023 for an $850 million loan to help build its first major U.S. manufacturing facility in Arizona. In this case, the Department is moving the project forward on the grounds that U.S. jobs will be created deploying Chinese technology in the U.S., and with the belief that U.S. technology will not go overseas. While it appears that this financing project may support Congress' goals of U.S. job creation, it clearly does not support the legislation's goals of U.S. technology development since this project deploys Chinese intellectual property.

The OIG has conducted a number of investigations related to the theft of intellectual property and violations of grant terms and conditions. In fact, 35 percent of the grant fraud cases currently open are related to research security with a real risk that this research will go overseas. For example, a recent investigation conducted jointly by my office and the National Science Foundation OIG found that a principal investigator at the University of Kansas created a scheme to defraud the Government by failing to disclose on grant proposals to the Department an existing affiliation with, and contractual obligations to, a Chinese university. The grant recipient also failed to disclose this conflict of interest to the University of Kansas.[14]

There is every reason to conclude that foreign actors will seek IIJA and IRA funds to advance development of clean energy technology, and that the Department's due diligence procedures may not be sufficient to deal with this reality.

---

[14] https://www.justice.gov/opa/pr/jury-convicts-university-kansas-researcher-hiding-ties-chinese-government

7

DOE AR 000905

31

**Due diligence needed to prevent "double dipping."** Since 2009, there has been a broad prohibition against "double dipping"—the notion that an entity that was funded through one sort of Federal funding, such as a grant, would then use those Federal grant funds to apply for more Federal monies such as a loan. This risk is accentuated with the loan applicants and grant applicants competing for funding to develop innovative clean energy technologies. In other words, projects deemed worthy of grants may be considered as good candidates for the loans as well, but need to be carefully screened to ensure that double dipping is not occurring.

### Additional Risks - Loan Program

**What rate of loan default is acceptable?** The LPO faces enormous challenges. First, these loans are designed to create partial or total financing for projects that are otherwise too risky for commercial banks or private equity to accept. Stated differently, these projects would fail commercial due diligence. This raises the most fundamental question: What amount of risk is acceptable? This question should be discussed; acceptable risk should be defined; overall success for the program should also be defined; and the results should be tracked and reported.

In a commercial setting, default on the loan is what defines failure. If the lender is paid on the loan, the lender has been successful. Here, the LPO will be financing projects in full anticipation of some amount of default. What amount of default of these $385 billion is acceptable?

**Indian Energy Loan Guarantee Program no longer requires "skin in the game."** We note that IRA loosened controls that came with this program's 2017 authority in two fundamental ways. First, the 2017 authority was for a partial loan guarantee, not to exceed 90 percent. Put another way, the loan applicant had 10 percent "skin in the game." No deals were closed under these standards. IRA removed the 90 percent partial loan guarantee requirement and now allows for 100 percent financing of project costs. Second, IRA now guarantees loans from, and allows access to, the U.S. Treasury's Federal Financing Bank loans, which reduces both fees and interest expenses. Together, these changes are certain to increase participation in the program and the risk of default. With increased risk should come increased due diligence procedures to add assurance that the taxpayer is being protected in this increasingly risky program.

### Additional Risks - Grants

**New programs are pushing out billions in grant money through newly designed processes using untested internal controls.** Overwhelmingly, the 72 new programs are for grants and financial assistance awards, awarding an estimated $65 billion in appropriations. These new Federal programs raise immediate concerns such as acquiring and training expert staff and quickly developing effective internal controls. For these new programs in particular, there is a critical need for external oversight of these new Federal programs to help prevent foreseeable problems as early as possible.

8

DOE AR 000906

32

**The Department has not taken concrete steps to ensure that sufficient resources are reserved to perform proper oversight over significant increases in grants to states, local government, and tribes**. As this money is awarded to these entities, it is then further dispersed to subrecipients. It is not yet clear whether the states, local governments, or tribes are equipped with sufficient staffing, or have adequate internal control systems in place, to protect these funds. Our early indicators are that states' oversight resources are stretched and strained due to multiple competing priorities, including ongoing pandemic oversight commitments. Importantly, the passing of these Federal funds to others neither removes the Federal nature of the expenditure nor excuses Federal oversight, but it certainly increases risk. My office has been notifying Department leadership of these concerns for more than a year.

**The Department is planning to disburse billions of dollars using award vehicles it has little or no experience with.** The Department has some experience in administering financial assistance programs in the form of grants and cooperative agreements. However, the IIJA mandates programs that do not fit neatly into these categories. Some examples of these include direct subsidies for the $6 billion Civil Nuclear Credit Program, competitive "prize" programs, and others. Accordingly, the Department established a Working Group on Innovative Funding Mechanisms to develop processes, policies, and procedures to use Partnership Intermediary Agreements[15] and "Other Transaction Authority" to make these atypical awards. We note that there are real risks associated with developing new processes to pay billions of dollars using award instruments for which the Department has little or no experience.

**Modern data analytics tools are not being used to prevent improper payment or to detect fraud, waste, and abuse in grant programs.** Historically, the Department has not gathered or required data from its many grantees in sufficient detail to support modern data analytics capabilities, prevent and detect improper payments, or detect fraud. Other Federal agencies have learned a great deal about the power afforded by data analytics capabilities applied to high volume transactions. In late July 2023, the Department issued program requirements and grant application instructions that appear to miss an opportunity to require the type of data that has served other agencies so well during the pandemic. The OIG is currenting evaluating opportunities for the Department to require additional data to be gathered by grantees for rebate program beneficiaries, in a secure manner, that can be used to prevent improper payments and to detect fraudulent patterns and actions. Additionally, the OIG team is exploring questions related to information sharing opportunities and other tools such as using the U.S. Treasury's "Do Not Pay" tool. This work is already well underway. The OIG report will identify additional opportunities for the Department to use on other grant programs to modernize data analytics capabilities.

**The Department has a poor track record auditing grantees.** Federal regulations require that recipients spending more than $750,000 in Federal funds must undergo an annual audit by an independent auditor. Commonly called "Single Audits" these audits are designed to help ensure that recipients have adequate accounting systems and effective internal controls. It is critical that these independent audits are conducted. It is also critical that the granting agency monitor compliance and follow up on the issues identified by these and other audits. This

---

[15] 15 U.S.C. § 3715, Use of Partnership Intermediaries

9

33

oversight framework is only effective if it is implemented and overseen appropriately by granting agencies.

The OIG has identified areas where the Department could improve its oversight in this area. For example, a March 13, 2023, Department OIG audit found that the Department's Office of Science failed to ensure that required annual audits of for-profit recipients of Small Business Innovation Research grants had been completed. Award expenditures totaling $56,835,650 that were not audited, as required, exposed the Department to an increased risk of fraud, waste, and abuse.

## Underfunded OIG Oversight

**Lack of adequate base funding for the OIG.** Prior to the passing of the three pieces of supplemental legislation discussed above, the OIG was already significantly underfunded. The following chart demonstrates the long-term and growing gap of OIG funding growth compared with the growth of the Department's budget prior to the more recent legislation:



The next chart provides a glance of Inspector General discretionary funding for many Chief Financial Officers Act agencies, as of FY 2022:



**Supplemental legislation underfunded the OIG.** To further exacerbate the historic underfunding issue, the OIG received only $62 million, or 0.10 percent of the funding provided

10

34

to the Department over a 5-year period under IIJA, to provide oversight of these new infrastructure projects. When compared with other OIGs that received money under IIJA, we were again substantially underfunded as shown in the following table:

| | IIJA Agency Funding | IIJA OIG Funding | OIG Percent of Agency Funding |
|---|---|---|---|
| EPA | $61billion | $269 million | 0.44% |
| HHS | $4 billion | $17 million | 0.44% |
| DOI | $28 billion | $99 million | 0.35% |
| USDA | $8 billion | $27 million | 0.34% |
| DHS | $8 billion | $20 million | 0.25% |
| DOE | $64 billion[1] | $62 million | 0.10% |

Also, IRA appropriated only $20 million to the OIG, or 0.05 percent of the funding provided to the Department, to oversee those programs. Notably, there was no provision for additional OIG funding in the expanded programs in the FY 2023 appropriations to include an expansion of $15 billion in loan program authority and a new $1 billion in appropriations for the Puerto Rico Energy Resilience Fund. Notice the pattern: The OIG has increasing oversight mandates for supplemental programs while getting reduced resources for oversight.

An appropriate starting point for proper funding for the OIG is at 0.35 percent of the Department's budget. We arrived at this conclusion by examining FY 2022 funding levels for the OIGs of the Chief Financial Officers Act agencies, as well as the more current funding of the OIGs impacted by IIJA and IRA. The 0.35 percent falls into the mid-range. Given the significant risks for the Department, this percentage may be too low. However, it is a starting point and much needed.

**Needed oversight work is not being performed, and cannot be performed, without significant increases in funding.** It is crucial for policymakers in Congress and Department leadership to understand how the current underfunding of OIG programs constrains the OIG's oversight plans. Our oversight plan for audits and inspections is organized into two categories – Federal- level programs and award level projects. First, it is imperative that the Department's 72 new programs receive independent oversight. If properly funded, the OIG's oversight plans would include about 80 audits and inspections for the **Federal- level programs**, including most of the 72 new programs. Currently, the OIG is only funded to perform about 20 reviews of Federal-level programs over a very long-time horizon. Regarding the second category, the OIG's audits and inspections at the **award-level**, the OIG is currently only able to plan for about 50 award-level oversight projects—less than 1 percent of the anticipated more than 5,000 awards. The OIG should be planning more than 400 projects at the award level. This level of oversight is both inadequate and irresponsible.

11

35

The following charts show what impact the OIG's budget shortfall has on our oversight responsibilities. Specifically, the Department's Office of Clean Energy Demonstrations is the largest new program with about $25.7 billion in appropriations that anticipates making about 117 total awards. However, the OIG can fund only 8 award-level audits at current funding levels (dark blue) compared with the 31 additional (39 total) award-level projects we conclude that we should do (light blue) given the massive amount of risk.



78 Unaudited at $347M
31 additional with $347
8 with $82 M
OCED    117 Total Awards

Similarly, for the Department's State and Community Energy Program, a $15.3 billion program that anticipates making about 3,700 awards, the OIG can only fund 15 award level projects at current funding levels (dark blue) whereas risk factors indicate we should perform 94 more (light blue) award-level reviews (total of 109). These are just two examples from our oversight plans.



3588 Unaudited
94 additional with $347
15 with $82 M
SCEP    3697 Total Awards

**How much is the OIG funding shortfall?** The President's FY 2024 Budget includes $165.2 million for the Department OIG to be used until expended. If the President's Budget is enacted as is, it would leave a remaining shortfall of $16.8 million in our base budget. However, the current version of the Senate Energy and Water Development Fiscal Year 2024 Appropriations Bill provides only $86 million to the OIG, leaving a base budget shortfall of $96 million.

Additionally, the OIG has a shortfall of $264.7 million to oversee IIJA, IRA, and the Puerto Rico Energy Resilience Fund. The following chart shows the OIG's funding shortfall to conduct proper oversight of the three pieces of recent supplemental legislation:

12

36

| Bills | DOE | OIG | Current Percent OIG to DOE | OIG Estimated Requirements | OIG Estimated Funding Shortfall |
|-------|-----|-----|---------------------------|---------------------------|-------------------------------|
| IIJA | $62.5 B | $62.5 M | 0.10% | $218.6 M | $156.2 M |
| IRA | $35.0 B | $20.0 M | 0.06% | $125.0 M | $105.0 M |
| PR-ERF | $1.0 B | $0.0 M | 0.00% | $3.5 M | $3.5 M |
| Total | $98.5 B | $82.5 M | 0.08% | $347.1 M | **$264.7 M** |

Supplemental Shortfall – Exclusive of the Loan Portfolio

**The Department is apparently seeking to enhance its own oversight resources using the same type of transfer mechanism.** The statutory 3 percent funding cap for Program Direction placed on the Department under IIJA limits the Department's ability to conduct effective oversight. This funding cap applies to the following programs: Energy Efficiency and Renewable Energy; Cybersecurity, Energy Security, and Emergency Response; Electricity; Fossil Energy and Carbon Management; and the Office of Clean Energy Demonstrations. The Department is apparently seeking to correct this. The FY 2024 Senate Bill contains language increasing the 3 percent cap on "Program Direction" to 5 percent. The OIG supports the Department receiving additional funds for conducting its own oversight.

The FY 2024 House Bill provides a transfer of funds from the Department's unobligated balances under both IIJA and IRA to the OIG; however, the transfer falls short of the 0.35% necessary, and does not provide for a transfer of funds from the Puerto Rico Energy Resilience Fund. Our requested transfers would provide the OIG with the $264.7 million shortfall by transferring funds from the Department's unobligated balances under IIJA, IRA, and the Puerto Rico Energy Resilience Fund. Therefore, the transfers do not require any new appropriations. These transfers are critical for ensuring that the funding provided to the Department under these pieces of legislation are used for their intended purposes.

**The OIG has important work underway and planned.** Although the OIG remains significantly underfunded, we have engaged in a great deal of work to help prevent fraud, waste, and abuse in the Department's expanded loan and grants programs. Since the passage of IIJA, the OIG has conducted 227 Fraud Awareness Briefings that reached more than 9,160 Federal employees, contractors, grantees, external auditors, law enforcement, as well as state, local government, and tribal representatives. We have also worked closely with other OIGs who have received funding under these pieces of legislation to identify risks and best practices. I am

13

DOE AR 000911

37

currently serving as the co-chair of the Council of the Inspectors General on Integrity and Efficiency's IIJA Working Group.

Since early 2022, my office has held dozens of meetings with senior Department leadership to pose questions to them regarding risks faced by the new programs and to identify issues the OIG has reported during the performance of prior work. In this way, we have safeguarded our independence while helping the Department identify risks. Additionally, between April 2022 and August 2022, the OIG issued four capstone reports summarizing previous work. These reports targeted specific programmatic areas that will receive substantial funding under the new legislation. These reports discuss the loan program;[16] the Weatherization Assistance Program;[17] financial assistance awards;[18] and Clean Energy Demonstration Projects.[19] Issues reported in these reports include recipient fraud; insufficient Federal staffing; inadequate oversight of projects; circumvention of project controls; inadequate internal controls; and lack of recipient-level controls.

Also, my office has oversight projects underway addressing fraud risk in Home Energy Rebate Program grants; an audit of the Weatherization Assistance Program; adoption and use of data analytics capabilities; and an inspection of the Puerto Rico Energy Resilience Project. We are about to begin working on conflict-of-interest issues in the LPO.

Further, given the importance of the risks posed by foreign actors to Department intellectual property and national security, our Office of Inspections, Intelligence Oversight, and Special Projects has recently begun an inspection focusing on the Department's compliance with requirements of Department of Energy Order 486.1A, *Foreign Government Sponsored or Affiliated Activities*. The Order prohibits Department employees and contractors from participating in foreign government-sponsored talent recruitment programs and also restricts participation in other foreign government-sponsored or affiliated activities of a "foreign country of risk." Additionally, we are planning a joint project with the OIG of the Intelligence Community in FY 2024 to evaluate Department security processes in accordance with the requirements in Security Executive Agent Directives and Department Orders.

## Closing Remarks

I would like to recognize the key role that bipartisan efforts from Congressional oversight committees have played over the years in advancing Government transparency and program integrity. We are all aware of the important work that Congressional committees have done with Inspectors General over the years. Thank you for your continued support of the independent oversight work performed by my office and the Inspector General community. We look forward to continuing to work on behalf of the taxpayers to ensure that Federal infrastructure and energy programs are operating effectively and efficiently, and to prevent and detect fraud, waste, and abuse. I appreciate the opportunity to testify here today, and I look forward to answering your questions.

---

[16] https://www.energy.gov/ig/articles/special-report-doe-oig-22-34
[17] https://www.energy.gov/ig/articles/special-report-doe-oig-22-30
[18] https://www.energy.gov/ig/articles/special-report-doe-oig-22-40
[19] https://www.energy.gov/ig/articles/special-report-doe-oig-22-39

14

DOE AR 000912

38

The CHAIRMAN. Thank you. We appreciate it very much. And we will start our questions right now and I am going to go right to you, Ms. Donaldson. I think it was a great presentation of what we are concerned about.

With all the good that can be done and all the intent that was done for the good that should be returned, have you taken this to the Secretary? Where do you go for your support? Do you go to the Secretary level and ask for that support?

Ms. DONALDSON. Yes, and to OMB. And many of you—I have briefed many of you on the same subject.

The CHAIRMAN. Okay.

Ms. DONALDSON. So we are about two years behind now. So we have been on the Hill and working to try to correct this problem for about that amount of time.

The CHAIRMAN. And you have not gotten any favorable response you need or the support that you need right now, with all the money that is coming toward that. And I will go right to Mr. Shah now.

The amount of money that is going, unprecedented, to where you have responsibilities and making sure it is done, can you look at the technologies that we are trying to develop here and can you say that there are any pie in the sky that don't have proven technology, or is this a lot of proven technology that hasn't been matured? How would you rate that?

Mr. SHAH. Senator——

The CHAIRMAN. Such as hydrogen. It has been around forever, right?

Mr. SHAH. Thank you so much for your question.

You know, as the Inspector General suggested, I have also been in the private sector for a long time, doing a lot of due diligence on projects. What I would say is that the Department of Energy Loan Programs Office has an ability to do due diligence on these projects that many private-sector banks don't have because we have access to the 10,000 engineers, scientists, and experts on the DOE platform. So for the vast majority of these projects, I would say the technology has actually originated from R&D programs that were funded by the Department of Energy. So for many of these technologies that are, frankly, scary to the private sector, which is why the Loan Programs Office was created, we can do rigorous due diligence and look back into demonstration projects and other data that we have to see whether the technology will work.

So we never take "will it work or won't it work" risk today here at the Loan Programs Office. We do take execution risk, scale-up risk, a lot of other risks that are real risks that we have to do due diligence on. Also, the average due diligence process for the Loan Programs Office is over 12 months. And so, we are hiring independent engineers, market advisors, and others to give us a third-party view, as was suggested and required by the Congress in the 2020 Act.

The CHAIRMAN. Let me ask this question—do you all work together, or are you close, in the same offices, or anything of that sort? Where is your office located?

Ms. DONALDSON. We are all in the exact same building, Senator.

The CHAIRMAN. In the exact same building.

DOE AR 000913

39

Do you all work on the concerns you have and him being responsible for the loans that go out the door? And what you are saying, I believe, that this has been missed or not looked at, are you all collaborating on that?

Ms. DONALDSON. We do. I have a monitoring project. So we have data that we are collecting on a monthly basis from the Department. That is how I know about the vetting center, and we do have fairly regular meetings where we discuss risk.

The CHAIRMAN. Well, I think you all know, our concern is basically countries that don't have our same values, and basically, right now, it's targeted on China, since China has a monopoly on things that we seem to want to do as an Administration that we don't have a secure supply chain to do it on our own. So we are trying to accelerate how we can get into that market and be more self-reliant or relying on actors that we have that are basically reliable, such as free trade agreement countries, things of that sort. And that's where the credits come in. Are we able to basically find out what maybe China is still receiving? Because we are circumventing what the intent was of the bill to basically make us independent and break as quickly as we can from China dependency and stop that from happening or prohibiting a loan going out.

And next of all, our loans—is money going out the door before people are taking the risk to get a production tax credit or investment tax credit? They have to either be producing or investing. They have to put their own capital at risk. Is any money going out the door before they have come to the table with their risk, you know, their capital risk?

Mr. SHAH. Senator, thank you for the question. I am happy to answer it for the Loan Programs Office and happy to have David answer it for the rest of DOE.

For the Loan Programs Office, we have a deal that we recently announced for Kore, and in that, we are talking about an American company that has been around for 60 years. In order to accelerate bringing lithium-ion battery manufacturing to the United States, they partnered with a Chinese company. That company has put their technology into Arizona, right? And they have—we have done several things here. One is——

The CHAIRMAN. I understand that that technology was basically stolen from the United States to begin with and they matured it.

Mr. SHAH. That is exactly what I was going to say. I mean, you know, as somebody who is an entrepreneur and has done this for a long time, I mean, there really was a policy in this country for commercializing your technology in other continents, right? We did not have the tools here. The Inflation Reduction Act has given folks the tools to be able to commercialize our technology here in this country. Some of that is, you know, being brought back from other continents, back to this country, and there are ways for us to protect the U.S. taxpayer, a couple things. One is, there are foreign entities of concern that are trying to put provisions into board representation. So we do full due diligence on that to make sure that none of those provisions exist. Second, we make sure that all IP licenses are one-way, so the technology comes to the United States, tied to the American worker, but no additional innovations that

40

occur here can go back to that country. And we did that diligence here.

Third, foreign talent recruitment programs. The vast majority of our companies don't know what a foreign talent recruitment program is. So we have to explain to them what it is, how to monitor for it, and how to make sure that they are not susceptible to it. And the last piece of it is, we need to make sure that they understand that we need to see the ownership stake of those companies going down, so the Chinese ownership stake goes down.

The CHAIRMAN. Mr. Crane, I am over my time. Real quick—I want you to think because I am going to come back and ask at a later time, but the GREET model we have talked about, especially with hydrogen and what it is doing, and you met briefly with some people we have a lot of concern about. I want to get back to that so you can think about that one, okay?

The thing I am more concerned about right now, are any of you all looking at what the CBO score was on the IRA and what is happening now, how you implement that bill that might be greater than what the model was?

Mr. CRANE. An analysis? No, not in my part of the Department of Energy are we scoring.

The CHAIRMAN. Are you scoring, basically looking at CBO score versus what you are looking at now as far as the demand?

Mr. CRANE. No.

The CHAIRMAN. Are you looking at that, Teri?

Ms. DONALDSON. Sir, I don't have a project underway looking at that exact issue.

The CHAIRMAN. Okay. We will get back to that.

At this time, I want to turn to Senator Barrasso.

Senator BARRASSO. Thanks, Mr. Chairman.

Inspector General Donaldson, welcome back to the Committee.

Ms. DONALDSON. Thank you.

Senator BARRASSO. I appreciate you being here and your testimony. It was excellent. You talked about how there are 12 categories of increased risk to taxpayer money and being used properly. Now, you are in a position confirmed by the United States Senate to be responsible in looking at protecting taxpayer money. And what I heard you say is that in proportion to the amount of money going out from the Department of Energy, the ability that you have to look into that from the size of your staff is the worst in government, and you have asked the Secretary for more, and the Secretary has stonewalled or blocked the opportunity to get that money. So there is a concern as we are looking at taxpayer dollars.

So let me talk about this because you said there are 12 categories of increased risk. I am going to ask about this one. So there is a private trade association. It was founded by Mr. Shah, sitting next to you. And he is in charge of the Department of Energy Loan Program. It is called Cleantech Leaders Roundtable. He founded the organization. From what I see, it appears to be a gatekeeper for companies seeking DOE funding from him, and he founded the organization—not anymore, but one is called Sunnova, which recently received a $3 billion loan from the Department of Energy— $3 billion. One of the board members of the group that he founded is also on the board of Sunnova that got the $3 billion, same guy

41

getting the money, on his board that he founded. My concern is this could be the next Solyndra. Solyndra was $500 million. This could be $3 billion of taxpayer money.

Now, Mr. Shah has reportedly been a guest speaker at at least ten Cleantech-sponsored events, a group he founded. And at these events, if you are a member of his group that he founded, they get special access to him. And he is the guy that is directing the loan program. So the Department of Energy, even recently, co-hosted an event with Cleantech, this group that he founded. Do you believe the Department of Energy's safeguards to prevent conflicts of interest in its loaning practices are satisfactory or do they need to be improved?

Ms. DONALDSON. Thank you, Senator Barrasso.

I do have a project underway. It is still very new, looking at conflicts of interest, particularly in the Loan Programs Office. I will say—and there are quite a few facts that you were chatting about there—Mr. Shah does have access to outstanding ethics counsel at the Department of Energy, and I am sure he is already working with her on some of those issues. My job, and how I have structured this project, which will look at conflicts, is not to see whether or not the minimum existing conflicts laws and rules are being met, it is to provide a broader universe of tools that they may want to strap on and enact and follow because of some of the very special circumstances surrounding this program.

So the whole idea of ethical protections is something that you can—you start at the floor, right, the federal requirements. You can certainly do more. So my staff is looking at both——

Senator BARRASSO. Good, appreciate it.

Ms. DONALDSON [continuing]. Are they meeting the floor, and making recommendations on what other things they may want to consider to protect these funds?

Senator BARRASSO. No, I appreciate that because we are talking about $3 billion.

Ms. DONALDSON. A lot of money.

Senator BARRASSO. Six times larger than Solyndra, but actually, there are hundreds of billions of dollars in play.

So Mr. Shah, you appear to be all-in on the Cleantech Leaders Roundtable. Going to their meetings, special access to members, that's the trade association that you founded. You have spoken to at least ten or more private events hosted by them. You have even given a loan to a company that shares a board member, and that was for $3 billion, but what this Climatetech executive is now saying is, it's hundreds of billions, hundreds—dollar sign, dollar sign, dollar sign, dollar sign, dollar sign. We love Jigar Shah, love you.

[Poster image with quote from Climatetech executive follows:]

DOE AR 000916

42

 **Andrea Luecke** · 2nd        + Follow    ...
Climatetech Exec /
Strategist / Community Bu...
1yr · 🌐

Hundreds of Billions $$$$$$.

We love Jigar Shah for that and also for co-founding
Cleantech Leaders Roundtable



43

Senator BARRASSO. They love you. Hundreds of billions of dollars. I mean, I think conflict of interest, potential conflict of interest, Jigar Shah just became one of the most important players in energy—this is the new CEO of the company that you founded—they get access to you. It is astonishing. This is a social media post from your former trade association's current executive director. It sounds like she thinks she hit the lottery, and apparently she did. She is openly touting Cleantech's access specifically to you, hundreds of billions of taxpayer dollars, that you are the one that is handing it out. I think it's a very bad look for you personally and a very bad look for the Department of Energy.

Will you commit to refrain from associating with your previous trade association for the rest of your tenure at the Department of Energy?

Mr. SHAH. Senator Barrasso, thank you for that very important question. I think it's important to take a step back and understand the role that I have at the Loan Programs Office. The Secretary, when she was in her confirmation hearing, suggested, truthfully, that the Loan Programs Office was dormant. So my job has been to gain private-sector trust. And so, I am all-in, for sure, on American innovators and entrepreneurs. And I have spared no, you know, event or time or conference to figure out how to promote the Loan Programs Office. But because of your excellent oversight and the oversight of the Inspector General, the Loan Programs Office has been substantially improved since 2011 and 2012. We now have a risk management group, a portfolio management group. And so, I have no role to play, whatsoever, in choosing who gets a loan. In fact, those decisions are made by federal staff. My job is to get people to take the extraordinary step of spending a lot of time and effort to participate in the Loan Programs Office and ask us for a loan so that we can evaluate it.

Senator BARRASSO. So Mr. Chairman, let me just reflect that the witness just refused to commit to refrain from associating with his previous trade organization. Hold that back up again. He has refused, in front of this Committee, to commit to refrain from associating with his previous organization that talks about hundreds of billions of dollars from him. I asked him a straightforward question—will you commit to refraining? He refused to answer. So whether or not you found some nice little loophole, this is Ethics 101. It's a bad look for you, it's a bad look for the program, it's a bad look for the Secretary of Energy, and it's a bad look for the Biden Administration.

Thank you, Mr. Chairman.

The CHAIRMAN. We now have Senator Heinrich.

Senator HEINRICH. Moving on from that little bit of theater, Mr. Shah, let's start with why we need an LPO. Why doesn't the private sector do this? And what is the value of the Loan Programs Office?

Mr. SHAH. Senator, thank you for your question. The Loan Programs Office was originally established in the 2005 Energy Act because what we realized was that the Department of Energy was extraordinary and still is extraordinary at invention, but that we have not been as extraordinary at getting those technologies commercialized here and tied to the American worker. Part of the rea-

DOE AR 000918

44

son for that is because our commercial banking system really does not want to take any perceived or actual risk in scaling up technology. And so the Loan Programs Office sits to be able to evaluate these technologies and to help commercialize them here. Our remit is only on American soil. So we can only fund projects that are scaling up technology here, and we have been active across the board, as the Chairman suggested, in nuclear power, advanced fossil projects, hydrogen, renewables, and many other sectors.

Senator HEINRICH. So for either of you—for years, we saw American manufacturing and capital flow out of the United States, particularly to China, but to many different parts of the world—Southeast Asia. And today, we are seeing, to some degree, that pattern reversing. That is a policy win. How do we protect the American taxpayer and our American intellectual property while that occurs?

Mr. CRANE. Well, Senator, thank you for the question and the focus on manufacturing and it's still fairly early days, but you are right, even the Wall Street Journal has talked about the manufacturing renaissance in the United States, and that's before the Department of Energy money is being deployed. So that——

Senator HEINRICH. Let's start there. What's the scale of that? Since the Inflation Reduction Act was passed, how many factory announcements have we seen? How many—how much private capital?

Mr. CRANE. I thought, you know, we can get you a more accurate number, but the number is $100 billion or more.

Jigar, do you have——

Senator HEINRICH. And growing by the day.

Mr. CRANE. Yes, exactly. And that is also an indirect impact of the Inflation Reduction Act, which has led to that manufacturing in anticipation. But you ask how do we protect, and this gets back to the vetting center and my colleague, the Inspector General's comments. And I can just say, being more involved with what we call the equity side to the house, the financial assistance, the vetting center process has worked for us. We are going through that. Most of the programs we have are more sure technology. So it's more about Chinese ownership than it is about proprietary technology, although we have that in long-duration energy storage. And we work with the vetting center and they go through all our projects. They access the intelligence and counterintelligence end.

And so far, if you look at, you know, the recent selections that we have announced, you know, I think the process is working. There is always room for improvement.

Senator HEINRICH. Sure.

Mr. CRANE. We look forward to working with the Inspector General, but——

Senator HEINRICH. One way to measure——

Mr. CRANE. Go ahead.

Senator HEINRICH [continuing]. Whether things are working, obviously, is return on investment. So Mr. Shah, what is the track record of LPO generally and then more recently, if the data allows, in terms of return on investment?

Mr. SHAH. Yes, thank you so much for that question. The Loan Programs Office measures its impact in a couple of ways, right? We are not here to make a profit, right? We are here to commercialize

45

American technology. But the U.S. Congress has allocated to us a credit subsidy, which is money that we can use for a loan loss reserve. We have allocated roughly $5 for loan loss reserve for a realized loss of roughly one dollar, right? And so we have allocated a lot more for losses. And as the Chairman suggested, the interest income that we have earned has exceeded by four times any losses. And so there is a couple ways of looking at that.

But the more important way of looking at it, in my opinion, is that we provided a loan guarantee to the first five 100-megawatt solar projects in the United States. We catalyzed over a trillion dollars of investment into solar because of the early support we provided when no bank would do that deal. The same thing is true with our loan to Tesla on the automotive side. I think that, you know, America's dominance in electric vehicle technology really comes from our early bet on Tesla. I do believe that the early investments we are making in this particular round will also have that level of success over time, and there will still be some losses, right?

Senator HEINRICH. Right.

Mr. SHAH. I mean, I think that the Congress——

Senator HEINRICH. And we should understand that.

Mr. SHAH. Absolutely.

The CHAIRMAN. Mr. Shah, you might want to clarify, because I think the question was asked by Senator Barrasso. The companies that you had previously been involved with that have an exclusive to where a person has to have—there is a fee being paid to come to those and you being to that, or if it was a public event. So a public event is a public event. People come. There are no requirements. There are no fees with that. Do you want to explain that at all, because I know that was quite contentious at the end there, how you feel about that?

Mr. SHAH. Thank you, Chairman. You know, I attend a lot of events. And you know, I am happy to distance myself from any further dinners from the Cleantech Leaders Roundtable.

The CHAIRMAN. I think all we are saying is, like with the Cleantech Leaders, if people have to pay to have access, that is what they are talking about. If they are not paying to access, as a public, I think you should be able to do whatever you think is a benefit.

Mr. SHAH. Chairman, the point I want to make here is that I am trying to figure out what access they are paying for, since I don't make any decisions on which loans we actually underwrite or approve. Having access to me is like, you know, I am more accessible than a ham sandwich, right? I go to like, you know, conferences like RE+. I go to conferences like CERAWeek. I go to lots of places, wherever American innovators and entrepreneurs need to meet me so that they can be convinced that this country wants them to onshore and re-shore their technology here in this country, I am willing to talk to them. But what I am concerned about is the insinuation that the oversight that the Senate and the Congress has done, as well as the Inspector General, has not been fully implemented. In fact, it has.

And so there is no political influence on these loans. These loans are being overseen by career federal staff.

46

The CHAIRMAN. Thank you. I just wanted to make sure to give you an opportunity on that.

Now we are going to go to Senator Cassidy.

Senator CASSIDY. Hello, gentlemen, thank you all.

Mr. Crane, there was a recent awarding of—and ladies, I'm sorry. There was a recent awarding of the HALO Hubs, and Louisiana was an applicant but did not receive. The Secretary was kind enough to call me and tell me that, but that's just the breaks, as I first took it, but since, I have become concerned about the process. Since we are talking about the integrity of the process, that's what I would like to explore. I am told that of the merit reviewers of the Louisiana application, several of them did not provide any comments or ask any questions regarding the application. Frankly, that was like, "excellent," "bad," "needs to improve," like nothing. So it's unclear to me that they actually reviewed it. In fact, there is no evidence that they actually reviewed it. What I am worried about is that the fix was in before we even started.

So next, on August the third of this year, HALO Hub leadership in the State of Louisiana had a phone call at DOE to discuss the status of the program. This occurred as other hydrogen hub applicants were being asked to interview with DOE in relation to their applications. The HALO Hub in Louisiana, Arkansas, and Oklahoma had not been contacted for an interview. But DOE said two things, specifically—that the interviews were to answer questions about gaps in the applications, and the interviews did not represent a down-selection process. Is all that correct?

Mr. CRANE. Yes, the interviews did not——

Senator CASSIDY. Okay. So how many——

Mr. CRANE. But what was the question before? Was it a down select? It was a two-part question. What was the——

Senator CASSIDY. I was just setting context.

So how many hydrogen hubs that were not interviewed were ultimately selected as an awardee?

Mr. CRANE. None of the hydrogen hubs that were not interviewed were——

Senator CASSIDY. But the interviews were specifically said not to be part of a down-selection process, but as it turns out, if you were not interviewed, you were not ultimately selected.

Mr. CRANE. That's the way it turned out, but at the time of the phone call, the people doing the interviews did not know whether a hub would be selected that was not interviewed.

Senator CASSIDY. I accept that perhaps, but the fact that multiple reviewers looking at the HALO Hub from Louisiana, Arkansas, and Oklahoma didn't make a comment or didn't ask a question? When the Secretary called me, she mentioned she had been told, when I asked why wasn't Louisiana selected, and our three-state consortium, it said it was because Shell had pulled out of the HALO Hub and that communities were not supportive. It turns out, Shell did not pull out of the HALO Hub and that Louisiana was never notified that there were communities not supportive. Do you have any sense of why she was told those were the reasons that we were not selected?

DOE AR 000921

47

Mr. CRANE. Well, Senator, first of all, I would say that, to me, the main reason is that the competition for these hubs was intense. We got——

Senator CASSIDY. Well, let me go back to that.

Mr. CRANE. It was a bit——

Senator CASSIDY. What I am trying to understand is the criteria by this.

Mr. CRANE. Yes.

Senator CASSIDY. Because frankly, I'm thinking the fix was in.

Mr. CRANE. Senator, I would respectfully suggest that no fix went in——

Senator CASSIDY. Let me go to the next point.

Mr. CRANE. Okay.

Senator CASSIDY. We were also told that there was an issue that with the HALO Hub that there was no—that the existing hydrogen pipeline in Louisiana was not open access. How many states which were rewarded these hubs, how many of them currently have a hydrogen pipeline?

Mr. CRANE. I don't think there is any state.

Senator CASSIDY. Texas, that's it.

Mr. CRANE. I think the only hydrogen pipeline is the non-open-access one between Louisiana and Texas.

Senator CASSIDY. So I guess what I am concerned about is, if we are being told that it's because there is not an open-access pipeline, but like, of the other 15 states, besides Texas, none of them had a hydrogen pipeline at all, that Shell had not pulled out, and we were never told that the communities objected, and that several reviewers did not comment or say anything about the application, implying they never looked at it. My gosh, why would I have a different impression than that the fix was in?

Mr. CRANE. Senator, I accept your concern at this point. The part that I would particularly say is almost certainly inaccurate is the part about the independent merit reviewers, because all 28 applications were forensically reviewed by——

Senator CASSIDY. But there were no comments or questions written by them. This is according to the State of Louisiana, which has reviewed this.

Mr. CRANE. Well, I mean, the questions of clarifications—there was not a uniform setting of questions or clarifications to any of the 28. I mean, you know——

Senator CASSIDY. So, so far, I haven't really found a reason why the reviewer would find fault. The other thing that has been clear, although this was not part of the legislation that we passed—after announcing the hub competition, the Department of Energy announced plans to use $1 billion of the hub money to run a centralized DOE plant—so called demand-side program—to stimulate hydrogen demand. Now, in the Louisiana-Arkansas-Oklahoma application, which was unsuccessful, not clear why because every reason we have been given so far does not seem valid, and several of the reviewers did not comment upon. The applicants had committed to taking 3,000 metric tons of production of hydrogen a day and demand would match this production by 2030. So that which DOE said they had to model and create was part of the application and was a fait accompli, if you will.

DOE AR 000922

48

So again, when I look at why would this application not be selected, I can't help but notice that 11 of the 15 or 16 states are kind of represented by Democratic senators, including states that don't have a history of this sort of production of hydrogen and other components, such as Louisiana does, that don't have an existing infrastructure such as we. And yet, somehow, they managed to get a billion-dollar project. Tell me why I should have faith in this process.

Mr. CRANE. I could go through the process to show that, you know, the independent merit review, the federal panels, the selection officers, are all career civil servants and they evaluated many, many criteria. You mentioned some of the criteria which, I think, were to the advantage of the Louisiana hub. Also, because the bill, it was effectively an intra-regional competition. So the Gulf Coast had multiple very, very strong competitive——

Senator CASSIDY. But there was only one that ended up getting it and that was the one in Texas. And yet, you look at other places without our ecosystem, without our infrastructure, they did get it. That's why I'm kind of like, whoa, the place with all the infrastructure got one and it is otherwise scattered around a lot of states, disproportionately represented by Democrats, and as Deion Sanders would say, Mr. Crane, look at me. Yeah, they are career, but look at me. They don't answer——

Mr. CRANE. I'm looking at you, Senator.

Senator CASSIDY. They don't answer to political leadership? Of course they do. I am very concerned about this.

Let me ask in closing, because you have been indulgent letting me go over.

Would the Department of Energy be willing to share, completely, the deliberative process and the documents thereof with my office so that we can review, as part of my function with this oversight committee?

Mr. CRANE. We would be happy to set a meeting with your office to go through, in considerable detail, the selection process——

Senator CASSIDY. And to share with us those documents so we can make our own assessment as well?

Mr. CRANE. I would have to get back to you on that, Senator, because——

Senator CASSIDY. Otherwise, I have to file a FOIA, which seems inappropriate for a Congressional oversight committee.

Mr. CRANE. I thought that FOIA, I thought there was commercially sensitive information—I am not an expert on FOIA—but we are, I think we would be happy to work with your office to set up a more detailed briefing, and if we start there and if you are unsatisfied, we could take it from there.

Senator CASSIDY. I appreciate that. I yield. Thank you for your indulgence.

The CHAIRMAN. Thank you, Senator.

Senator Hirono.

Senator HIRONO. Thank you, Mr. Chairman.

Secretary Crane, we have heard Ms. Donaldson recommending that expanding funding for the DOE's Office of Inspector General by rescinding some of the funds given by Congress for carrying out the Infrastructure Investment Act and the Inflation Reduction Act, including funding for programs under your oversight, would be a

49

good thing. Does DOE have the legal authority to transfer funds to the Office of the Inspector General?

Mr. CRANE. Senator Hirono, I am not an expert in that. I do know, as you are saying, that the Department, and I certainly support this, that the Inspector General's Office needs more funding. I think we have asked for 92 percent more funding for the next fiscal year for the Inspector General's Office, which, of course, we all support. The idea of can you reassign money, I am new to government, I have no idea if you are allowed to do that.

Senator HIRONO. Okay, well, you know what? Frankly, I believe that you in fact do not——

Mr. CRANE. Okay.

Senator HIRONO [continuing]. Have that authority. You should check, okay? Because while you agree that there should be more funds for the Inspector General under the programs that I mentioned, under the acts that I mentioned, I don't think you have that authority. So maybe we need to change the law or something so that you can provide more funding. We should think about that.

So one of the points, again, made by Ms. Donaldson, is that the vetting process—and Secretary Crane, you mentioned that the vetting center process has worked. Is this the three-person center that Ms. Donaldson referred to?

Mr. CRANE. I don't think three persons is the current staffing of the——

Senator HIRONO. What is the current staffing?

Mr. CRANE. I am not, you know, I am not sure that that is, I mean, given the sensitive nature of what the vetting center does, I think it's more than double that in terms of the immediate employees, but they also leverage these other resources, like the intelligence and counterintelligence office. Senator Hirono, what I would say is, at least in terms of the financial assistance programs, the vetting center takes as much time as they need to review all that they need to review. So if you look at the $10 billion of awards that we announced within the last week on transmission hydrogen, if it had not been for the vetting center process, we would have been announcing those awards at the beginning of September.

So they take their time. It's only when they are done and they are comfortable that we move forward with selection.

Senator HIRONO. Well, they have a big job to do, I take it, because it is a vetting center that makes all kinds of determinations relating to some $97 billion that the DOE got under these two acts that I mentioned. So even a doubling, that is six people. You can see that we have a concern about the adequacy of the resources that the vetting center has, and I think that it would behoove you to take a look at whether or not they are adequately sourced.

Mr. CRANE. Senator, it's a very good point. They are staffing up. And just, the Inspector General's concerns, all of our concerns about the $92 billion, we are all aligned on that. What I am just here to assure you is, none of the awards that we have announced in the last couple months have gone out without being thoroughly vetted by——

Senator HIRONO. I think it's very clear that we have concerns about making sure that the funds that were appropriated—historic funds—and I am not saying that we shouldn't have done it. In fact,

DOE AR 000924

50

we are really behind the eight ball in terms of climate change and the impact. So these bills, these acts were a good thing. We just want to make sure that these funds are going where they should.

So turning to wildfires, Secretary Crane, communities in Maui are still recovering from the August wildfires. And one thing is certain, wildfire is becoming an increasing threat in communities all across Hawaii and in the West, particularly. Various utilities, including in California and Oregon, have taken steps in recent years to improve their equipment to better monitor for and be resilient during wildfire events. And these steps have come at significant cost. For communities with a relatively small population and utility rate base, like those in Hawaii and the rural West, what role do you see the Federal Government playing in helping utilities become more prepared for increasing wildfire risk?

Mr. CRANE. Senator, it's so important to every American that is exposed to that. And Hawaii did win one of the wildfire resilience awards for Maui, that was announced after the terrible fires there. The transmission awards that were just announced yesterday included four other awards across the western states for wildfire mitigation. And certainly, one of the good things about the transmission program is, there is a second tranche of funds that are going to be put to solicitation within the next couple months. And certainly, we are very happy with the wildfire mitigation we are doing in the first round. We'd love to see more of it in the second round. So——

Senator HIRONO. So basically, the role of the Federal Government is to provide resources—money to enable smaller communities in rural areas, communities such as in our state, to do the kind of mitigation that they need—that you are there as a source of funds.

Mr. CRANE. Yes, Senator, we are here to help.

Senator HIRONO. Thank you. We will need more of it.

Thank you.

The CHAIRMAN. Thank you.

Senator Hawley.

Senator HAWLEY. Thank you, Mr. Chairman. Thanks to all the witnesses for being here.

Mr. Shah, can I just follow up. I didn't understand your answer to the Ranking Member or to the Chairman. Did you say—so you do attend dinners with industry leaders where they pay to see you speak? Was that a yes or a no? I didn't hear.

Mr. SHAH. No, I attend many, many events, some of which I am invited to speak at——

Senator HAWLEY. And they don't pay?

Mr. SHAH. And many don't pay and some are, like paid conferences and others, but one of the things——

Senator HAWLEY. Wait, I'm sorry, wait, wait. That was a yes and a no. So let's just go back. Do you attend events where people pay to see you speak?

Mr. SHAH. I have attended where people pay to attend the event.

Senator HAWLEY. Do you think that's a good idea?

Mr. SHAH. I think it's important for us to meet potential applicants, American innovators and entrepreneurs, who want to scale up their technology.

DOE AR 000925

51

Senator HAWLEY. Applicants for loan programs?

Mr. SHAH. Applicants for DOE funding.

Senator HAWLEY. Wait a minute. Wait a minute—you think it's a good idea to go to events where people are trying to get federal money and they are paying to see you?

Mr. SHAH. They are not paying to see me.

Senator HAWLEY. I thought you just said you spoke at events where people paid.

Mr. SHAH. Not to see me. I mean, I'm not that important.

[Laughter.]

Senator HAWLEY. Wow. You learn new things every day. You are—what is your title? You are the Director of what?

Mr. SHAH. Of the Loan Programs Office.

Senator HAWLEY. You are the Director of the loan programs for the Federal Government, Department of Energy. People who want to get loans from the government are paying to see you, and you think that that's fine?

That's not a rhetorical question.

Mr. SHAH. I think I have answered that I go to many conferences and events. I have had hundreds of stakeholder events. The goal is to get people——

Senator HAWLEY. You are going to events where people are paying to see you, who want money from the government. You are the Director of the loan program. Do you think that that's okay? You don't see any conflict of interest with that?

Mr. SHAH. I think, given the extraordinary amount of improvements that we have made in our office, based on our work with the Inspector General and the Herb Allison report, et cetera, there is—I do not make a decision on whose applications are accepted within the loan program.

Senator HAWLEY. But you don't think there is an appearance of a conflict of interest that people are paying to get access to you?

Mr. SHAH. I think it would be a conflict of interest if people are paying to get access to me, but I don't believe——

Senator HAWLEY. Isn't that what they are doing when you speak at events people pay to get into? I mean, correct me if I'm wrong, I mean, if they are not paying, that is fine, but I thought you just said a second ago they are paying.

Mr. SHAH. We do a lot of public events, and we are very transparent as part of this Administration. Every time I get a question which is hard to answer, we help update our blog post and make sure that everyone knows what we are doing, but the goal of the Loan Programs Office is to get as many people as possible to think that they can actually commercialize their technology——

Senator HAWLEY. Well, what I think they think is that they can get access to you by paying to go to these dinners. I mean, listen, it may not be an ethics violation. It should be, but maybe it's not. I just suggest to you, I don't think it's a good look. I don't think it's a good idea to go to paid dinners where people are paying money to get access to you because, in your own words, they want loans. They want loans, federal dollars, taxpayer money. They are paying money to go get access to you. I just, maybe that's really common. In fact, knowing this government, it probably is really

DOE AR 000926

52

common. But if it is, it's a bad idea. I just submit to you, I am kind of amazed by this.

Ms. Donaldson, can I just ask you about another ethics issue at the Department of Energy? I'm so glad you are here, by the way. Thank you for being here and thank you for doing this job. The Wall Street Journal published back in February a report. I am just going to quote the headline. Here it is: "Hundreds of Energy Department Officials Hold Stocks Related to Agency's Work Despite Warnings." Have you been tracking this? Have you seen these reports?

Ms. DONALDSON. I have, Senator.

Senator HAWLEY. So that includes, sadly, the Secretary of Energy, who testified right there, to this Committee, in response to questions from me that she didn't own any individual stocks. I asked her three times in April—do you own individual stocks? Three times. She said, no, absolutely not, absolutely not, absolutely not. Two months later she wrote the Chairman and said, actually, she did. And she didn't divest of them until May and then she did not tell us until a month later. That's a big problem. And the fact that she misled this Committee and did not tell us. The fact that we have all of these Energy Department officials holding stocks related to the agency's work. I mean, what is going on at DOE? Do you have authority to look into this, Ms. Donaldson?

Ms. DONALDSON. There is a mechanism set up in the law, which——

The CHAIRMAN. Please use your microphone. Ms. Donaldson, please, just speak into it if you would, then we can all hear you.

Senator HAWLEY. Maybe just, yes, pull it a little closer.

Ms. DONALDSON. So you can, in fact, hold stock and be an employee of the government. You cannot participate in any decisions that might impact the value of that stock. So there are different rules that apply here and those can be driven by Congress or they can be driven by regulation or policy. In that particular situation, when you spoke about—your questions about other DOE employees——

Senator HAWLEY. Right.

Ms. DONALDSON [continuing]. They get notices reminding them, basically, so if they own stock in Ford, they will get a notice saying, don't forget, nothing having to do with Ford.

Senator HAWLEY. Yes.

Ms. DONALDSON. So those notices don't carry with them any kind of penalty. It is part of the process set up to make sure they keep track of their own—what you would view to be a conflict or potential conflict.

Senator HAWLEY. Okay. Well, my time is expired. Thank you for your work, Ms. Donaldson. I am going to send you a letter about this and hope that we might ask you to look into the—and I know the Ranking Member has already asked you to look into Secretary Granholm's testimony before this Committee. But I am firmly of the view that we need to change the law here. Senior executive branch officials should not be able to own individual stock, nor should Members of Congress. We shouldn't be stock trading, and nor should anybody who is sitting at this table.

DOE AR 000927

53

And so, I just am distressed by—it just piles up. And I will just say, this isn't a partisan issue. It happened in the last Administration. It is members of both parties of Congress. We shouldn't be doing it. I have got bipartisan legislation that would end this, and I think we need to end this practice once and for all. Thank you for being here.

The CHAIRMAN. Thank you, Senator. And I will say that I think I am very supportive of that legislation.

Let me say this to you all to clarify. Of 535 Members of Congress, I think that the majority, if not all of us, have spoken at conferences where people had to pay a registration fee to be there. They didn't have—I understand appearance-wise, but you know, you have get your point across. I think the thing that we were concerned about, sir, Mr. Shah, is the one that you had definite ties to and if they had come back in. But still yet, we all were going to conferences. I give you CERAWeek. CERAWeek, that is a big, one—$1,000, $1,500, Democrats, Republicans, we all go and speak there because we think it's an access to that. And so, with that being said, I know you might feel you are unfairly targeted here, but——

Senator BARRASSO. But Mr. Chairman, I think there is a difference between going to a meeting and speaking where people pay a registration fee, but the group that we are talking about is a group that he founded—that he founded. And you have to be a member of the group to get special access to ten different opportunities to go with him, special access after you are a member, and they brag about it. They brag about it online. Hundreds of billions of dollars. They love him. He's the co-founder of the group. Sign up. Join the group and you get special access. It's just wrong, Mr. Chairman.

The CHAIRMAN. Got you.

Anybody else want to say anything about that?

Senator HEINRICH. I don't think it's any different than going to CERAWeek. And we have all gone to conferences where people have paid to be there. I think what we have seen here is, after years and years of people complaining that government is unresponsive to private industry, we finally have an Administration who will meet anyone with any technology, whether it's fossil or renewable or nuclear, and actually work with them in a way that is friendly to the private sector. And that is not something that I think we should be discouraging, we should expect more of it.

Senator BARRASSO. Mr. Chairman.

The CHAIRMAN. Senator Barrasso.

Senator BARRASSO. I want to submit for the record an article entitled "Biden's Energy Loan Czar Founded a Trade Association. Now It's Selling Access to Him—Jigar Shah's Cleantech Leaders Roundtable regularly hosts events for companies looking for federal loans," it says, "exclusive" and "invitation only," and included discussion panels with DOE officials on topics such as "Show Me the Money."

Mr. Chairman, this is absolutely wrong and it needs to stop.

The CHAIRMAN. Do you wish to submit that for the record?

Senator BARRASSO. I do.

The CHAIRMAN. Without objection.

DOE AR 000928

54

[The article referred to follows:]

The Washington Free Beacon, October 6, 2023

# Biden's Energy Loan Czar Founded a Trade Association. Now It's Selling Access to Him.

## Jigar Shah's Cleantech Leaders Roundtable regularly hosts events for companies looking for federal loans



Biden energy official Jigar Shah (energy.gov)
Alana Goodman
October 6, 2023

A private trade association founded by the Biden administration's energy loan czar Jigar Shah has become a gatekeeper for companies seeking billions of dollars in financing from Shah's office.

The Cleantech Leaders Roundtable has seen a surge in its influence and revenue since its former president, Shah, was tapped to lead the powerful $400 billion Department of Energy Loan Programs Office (LPO) in 2021.

The group, which didn't have a website until three years ago, now regularly hosts sold-out receptions featuring Shah for its paying members across the country. Last week, the DOE Loans Program Office and Cleantech Leaders co-hosted an invitation-only conference in Washington, D.C., for companies looking for loans—and Cleantech Leaders was in charge of the invite list and ticket sales.

During this time, companies connected to the trade association have raked in cash from Shah's office. Last week, the Loan Programs Office approved a $3 billion loan to a solar company led by Cleantech Leaders's board director. The group's corporate sponsors have also pulled in funding.

i

DOE AR 000929

55

The cozy relationship between Shah and Cleantech Leaders is raising questions about whether the organization's members are getting favorable treatment in the loan process.

"It appears as if the Department of Energy has allowed a dark money climate group to be the gatekeepers of taxpayer dollars," said Caitlin Sutherland, director of the Americans for Public Trust, an ethics watchdog group. "Friends, coworkers, and corporate allies should not be given preferential financial treatment when seeking access to government programs."

A DOE spokeswoman said Cleantech Leaders "invited the Department of Energy's Loan Programs Office to cohost Deploy23," the conference last week, but called it a "nonfinancial partnership and not a government-led event."

The DOE said Cleantech Leaders was in charge of the guest list and sponsors for the event. The official declined to comment on how much tickets cost, but said the conference was "made possible through ticket sales and event sponsorships."

But the group's tight control of the invitation list for a government co-hosted conference irked some energy industry insiders. One said it looked like a "pay-to-play scheme" and called it a "slap in the face to all the companies following the rules."

Cleantech Leaders did not respond to a request for comment.

Shah, a tech entrepreneur who is well-connected in the green energy industry, founded Cleantech Leaders Roundtable in 2017 as a networking hub for executives. Shah served as president of the group until the Biden administration appointed him to lead the Loan Programs Office in early 2021.

A few months before Shah's departure from Cleantech Leaders, he showed signs of wanting to expand the organization, which had been operating without a full-time staff. Days before the 2020 presidential election, the group registered a website. Shah also recruited Andrea Luecke, a climate activist, to serve as the group's first full-time executive director when he left.

After joining the administration, Shah stayed closely involved with Cleantech Leaders. Over the past two years, he has been a featured guest speaker for at least 10 of the organization's closed-door events and receptions, which cost up to $250-a-person to attend.

2

DOE AR 000930

56

Cleantech Leaders's revenue more than tripled in the year after Shah left, according to its tax disclosure records. For an annual membership fee—up to $7,500-a-year for corporate executives—the group offers members "insider access to an exclusive private community of high-level cleantech/climatech peers."

Agency appointees often have prior relationships with industry groups and companies. But a former Department of Energy official told the *Washington Free Beacon* that Shah's regular participation in Cleantech Leaders Roundtable events seemed "excessive."

"That could lead someone to believe that this [group] is the way to get in front of Shah, to get in front of a senior official who oversees billions of dollars in government investments," said the former official.

Under Shah's leadership, the LPO has become a powerhouse within the Department of Energy. The office, which was best known for a 2011 scandal involving a $500 million loan to the failed green energy company Solyndra, operated on a small budget for years.

Shah significantly expanded the staff, and the office now controls a $400 billion loan budget authorized by the Inflation Reduction Act and the Bipartisan Infrastructure Act—a fact that has been advertised by Cleantech Leaders.

"Hundreds of Billions $$$$$$," wrote Cleantech Leaders's executive director in a LinkedIn post about Loan Programs Office funding last year. "We love Jigar Shah for that and also for co-founding the Cleantech Leaders Roundtable."

Although Cleantech Leaders doesn't publish its membership roster, its leadership appears to have benefited from that gold rush. Shah's office recently approved a $3 billion loan guarantee to Sunnova, a solar company where Cleantech Leaders's board chair Anne Slaughter Andrew also sits on the board.

Cleantech Leaders's growing influence was on full display last week, when its sister arm, the Cleantech Leaders Climate Forum, co-hosted a conference with the Loan Programs Office in Washington, D.C., for energy executives seeking funding from the agency. The paid ticketed event, which was advertised as "exclusive" and "invitation only," included discussion panels with DOE officials on topics such as "Show Me the Money: DOE's BIL/IRA Funding Opportunities Rundown."

The DOE told the *Free Beacon* that it co-hosted the event, but the guest list and ticket sales for the conference were controlled by the Cleantech Leaders Climate

3

DOE AR 000931

57

Forum. That group describes itself as the 501(c)(3) "sister" arm of the Cleantech Leaders Roundtable and shares the same leadership. The Cleantech Leaders Climate Forum was first incorporated in July, less than three months before the conference.

Several of the conference's financial sponsors received or are seeking major loans from Shah's department. KorePower secured an $850 million conditional commitment from the LPO in June, and Novonix recently said it is in advanced talks for financing from the office.

A DOE spokeswoman told the *Free Beacon* that Cleantech Leaders was in charge of selecting the sponsors. But another former official questioned the optics of having corporate sponsorships at a government co-hosted conference.

"I do question why [Loan Programs Office] would need sponsors," said the former official. "It doesn't really meet the political smell test of being appropriate to have these sponsors."

4

58

The CHAIRMAN. Senator Hickenlooper.

Senator HICKENLOOPER. I'm dying to weigh in on this discussion, you know?

[Laughter.]

Senator HICKENLOOPER. Back when I was a geologist——

The CHAIRMAN. Here we go.

Senator HICKENLOOPER [continuing]. We would go to CERAWeek. We would go to the American Association for Petroleum Geologists, the Geological Society of America. They would always have these special dinners where you would have to pay to go to the dinner and you would be there and Republicans would pay, Democrats would pay, and they would talk to—or just people like me. Back in those days, I was not much involved in politics, but you wanted to hear from the highest sources you could what the landscape looked like. And I'm a big believer in pretty much every opportunity to get more information out to more people what we do better as a country.

Mr. Crane, let me start with you. Obviously, electrification is key to this great transition, as we call it. We are going to need a reliable and robust grid if we are going to take full advantage of the renewable resources that we are bringing online. Oftentimes, where we have renewable resources, we don't have the needed transmission to get those resources to where the demand is. We recently introduced our BIG WIRES Act, that will hopefully make the grid more reliable. It will connect that low-cost power to where the greatest demand is, whether it's from electric vehicles or whatever. Has DOE taken a close look, and maybe you could describe it a little bit, in terms of interregional transmission connectivity?

Mr. CRANE. Senator Hickenlooper, thank you for your question. Thank you for your leadership in this area. From Secretary Granholm on down, the focus on strengthening and smartening up the transmission system is of the highest priority within the Department of Energy. The particular challenge of interregional transmission is first and foremost on our mind. It is a big part of what the Transmission Office is focused on. We are excited about some awards that are going to be announced in the next few weeks as part of the Transmission Facilitation Program, which was part of the Bipartisan Infrastructure Law. And we look forward to your legislation, and anything we can do to strengthen the transmission system is good news for us.

Senator HICKENLOOPER. And this basically is a catalyst, and accelerates the investments we are making in other aspects, right, in the generation?

Mr. CRANE. Precisely.

Senator HICKENLOOPER. Great, I appreciate that. And you know, the other thing that, just finishing that last thought, we all—Republican and Democratic Senators all come to you all for these grants that are going out at breakneck speed. I think you guys are doing a remarkable job. The Chair received a hydrogen hub grant of significant size. Colorado did not. I would argue that we are more than qualified. I can go down all the lists, but that is—the key here is to make sure that we have full access, which we all did. We provide the information. You have professionals helping make these best decisions we could possibly make. Who gets a loan? Who

DOE AR 000933

59

gets a grant? I think that is the nuts and bolts of this is that these are complex issues where we are doing the best we can. And the best requires that we have access, as much as possible, to the people that are going to utilize these grants or these loans.

Mr. Shah, let me ask you a question. Your job, your office is responsible for seeking out and boosting the most promising innovations that will help us on this great transition in energy. Critical minerals—I always call them essential minerals, but that's back—I am dating myself—when I got on my master's in earth and environmental science. When we introduced BIG WIRES, part of that really shone a bright light on—you know, my geology background said that we had to dig deeper—pun intended—into critical minerals, or essential minerals. How is the DOE working to build our domestic capabilities on critical minerals, particularly when it comes to processing and advanced manufacturing?

Mr. SHAH. Thank you, Senator, for that great question.

The Department of Energy has many different offices working on critical minerals. The Advanced Manufacturing Office, the Manufacturing Supply Chain Office, and then the Loan Programs Office was allowed to invest into critical minerals through the Advanced Technology Vehicle Manufacturing Program for minerals that are related to EV batteries, and then out of Title 17 for other critical minerals. We have worked in collaboration with our partners at DOE, but also at DOD, where they have a Defense Production Act mandate to do earlier-stage investigation. So, I think what we found is, is that the ecosystem around critical minerals really has to be built up. And so, for those folks who are earlier stage, they are going to the Department of Defense. We really focus on the folks who are at the end of the process that are ready to start processing critical minerals.

And so, with that, we have issued a couple of conditional commitments. One for a graphite processing facility in Louisiana, where we are taking some of the highest quality natural graphite away from China and redirecting it here to the United States, as well as finding ways to get lithium out of the ground in Nevada. We have also provided two loans to folks who are using next-generation technologies on recycling existing batteries and old batteries that are spent. One was Redwood Materials in Nevada and the other one is Li-Cycle in Rochester, New York. We have several billion dollars, about $7 billion of additional loan applications that have come in, and we work very closely with them, including referring them to other offices if they are too early for us.

Senator HICKENLOOPER. Great.

Well, thank you all for your public service, and I realize these are tumultuous times around the field of energy, and I have great respect for your willingness to keep working at this despite all the tumultuous events.

Mr. CRANE. Senator Hickenlooper, would you mind—your previous comment where you didn't ask a question was about Colorado's application in the hydrogen hub area and it's—I should have made a point to Senator Cassidy, which I am now making to you, which is, our goal with these regional hydrogen hubs is for them to expand organically. And there were lots of worthy projects. A winning project in Texas, which we would like to see expand into

60

Louisiana. A winning project, essentially, in North Dakota, that we would like to see expand into Colorado. I have already given that message directly to your friend and mine, Mr. Frenzel of Xcel, that this is the goal, is to create a national hydrogen economy as quickly as we can.

Senator HICKENLOOPER. Right, a full-blown network. I understand. And I was really just trying to needle the Chair a little bit about his hydrogen hub that he is so proud of.

The CHAIRMAN. We are extremely proud, sir.

[Laughter.]

Senator HICKENLOOPER. Thank you. Appreciate it.

The CHAIRMAN. Senator Murkowski.

Senator MURKOWSKI. Thank you, Mr. Chairman, and we are kind of happy that we qualified for the GRIP grant coming out of DOE this week. That was good news for Alaska. Not quite the hydrogen hub, we are still in the envy category there, and we are continuing to work on that. We did get a communication that we were being discouraged on that, but we will not be discouraged because we have extraordinary opportunity, as I think most of you know.

This first question, Mr. Shah, should be super-easy, and it follows on Senator Hickenlooper talking about critical minerals. You mentioned the graphite project there in Louisiana. You have heard me, and the Secretary has heard me comment that I think it's better if we can get the domestic resource here. That is why we call it domestic resource. Let's get it here. Let's not get it in Mozambique. I would just hope that you can commit to this Committee that the LPO will prioritize loan applicants that are developing domestic sources and U.S.-based supply chains for our critical minerals. That should be an easy one, I hope.

Mr. SHAH. We absolutely believe that we should be onshoring and reshoring our entire critical mineral supply chain and I completely agree with you, Senator.

Senator MURKOWSKI. Good, good.

Let me talk about a couple of our big projects, neither of which are new to either one of you. I mentioned GRIP and our grid modernization. That is really exciting, I think, for our potential moving forward. Another one that we have been working on for decades and decades is how we can monetize and move our natural gas from the North Slope. It's big, and you know it's big. But it also has extraordinary potential, not only for Alaska's energy security, but the entire West Coast and our partners and allies in Asia, who are very, very interested in this. And during the negotiations of the Infrastructure Law, we asked the Department, what is the language that we need to allow the gas line to qualify for loan guarantee from the LPO. And we got the necessary language. We reviewed it. We all agreed that it worked. We included it into the Bipartisan Infrastructure bill. It was signed into law. And I know we all have different lawyers that can come up with different legal arguments, but we are looking at the response now from DOE and kind of saying it feels like we got the rug pulled out from underneath us with regards to where the Department is coming from in the authorities there.

So the question this morning, and to either one of you, is whether or not you are aware of any authorities that either you or the

DOE AR 000935

61

Secretary has to utilize already-appropriated dollars for the purposes that were laid out in this Infrastructure Law. And I am hoping that we are going to be able to resolve this to make sure that we are meeting the intent under the laws there, so any comments that you may have on this—we just met the Governor yesterday on this and are trying to get some clarification from the Department.

Mr. SHAH. Thank you, Senator.

As you know, I have regularly met with the team that is working on developing that project, and I think we also continue to provide technical assistance to your staff and the rest of the delegation. You know, the goal here is to have American innovators and entrepreneurs be able to build their projects here in the United States. And so I think we are fully aligned with your intent here around making sure these big projects come to fruition.

Senator MURKOWSKI. Well, you can understand the frustration, though, when we worked with the Department to get the assistance on the language. We all thought that we were pretty clear here. And now the law is in place and we have differing interpretations. I am hopeful that we are going to see, in this next budget, that the Secretary includes whatever resources are necessary to establish this program in the office, if you believe it goes otherwise, but we continue to be pushing on this. And again, we feel pretty strongly that the Secretary has the authorities to move forward with this.

Let me move forward to another big project. And again, this is one where you have great familiarity. This is one of my favorite geothermal projects in Alaska, trying to develop the Makushin Project outside of Unalaska in the Aleutian chain. The Chairman is very familiar with it as well. But it's exciting because what this would do is decarbonize one of the busiest fishing ports by volume in the world, not just in the United States, but in the world. And Makushin has been doing their due diligence. They've been working with the Q Tribe there in Unalaska for years. Trident Seafoods, you know, significant seafood producers looking to decarbonize their own processes. They have developed plans to move their processing facility to Unalaska to capitalize on this renewable power from Makushin.

So together, it's extraordinary what can happen. It is transformative what can happen. And it's kind of one of these chicken and egg type things right now. And we have significant large-scale infrastructure projects that are contingent on completion of some of these energy innovations. So what we are trying to do, as you all know, is reduce emissions. We are all in agreement here. This works for everybody. And so we need to be able to be working together to get to "yes" rather than continuing to find ways that if you have not met this chronological gate here, we can't move forward. There is so much riding on this, and I need to emphasize and re-emphasize the significance of what this can mean, not just for this state, but for the global seafood industry. But again, we are trying to stand on our own here and we just need a little bit of help.

So if either one of you have any great updates that you can share with me, that would be very welcome.

Mr. SHAH. Senator, as you know, I am not allowed to share any details under the Trade Secrets Act from folks who have applied

62

to the Loan Programs Office, but what I will say is that we have had a great partnership with your office and the State of Alaska. As you know, your state energy financing institution provision in the bill has been fully implemented. We have onboarded AIDEA as——

Senator MURKOWSKI. And they are very excited about that.

Mr. SHAH. As well as we are looking at several other institutions in Alaska to do that. We have also hired, I think you know, Joe Jacobson, in Alaska, to really focus on making sure we are providing the customer service that we need to all the extraordinary projects that we are seeing out of your state.

Senator MURKOWSKI. Mr. Chairman, I have a whole bunch of other questions I will submit for the record, but I look forward to follow-up with both you, Mr. Crane and Mr. Shah, and to our IG, thank you for your work, appreciate it.

The CHAIRMAN. Thank you.

Senator Padilla.

Senator PADILLA. Thank you, Mr. Chair.

You know, earlier in her comments, Senator Murkowski mentioned the GRIP program, and I know Senator Hirono asked questions that I want to build on, but I want to remind us all that part of the Bipartisan Infrastructure Law allows for the Grid Deployment Office to administer the $10.5 billion Grid Resiliency Innovation Partnership Program to enhance grid flexibility and resiliency. Now, resiliency of the grid to extreme weather events has been a major priority of mine, with California being sort of an exhibit A on the real-time impacts of the climate crisis. So I was thrilled to hear yesterday's announcement of $3.46 billion under the GRIP program for 58 projects across 44 states, including multiple projects in California.

Now, as with any award, there is good news for those who received an award and questions by those who had applied but were unsuccessful, at least in this particular round. A question for Mr. Crane—how are we ensuring that there is a wide array of selected applicants, particularly the types of entities owning and operating the infrastructure they are trying to enhance?

Mr. CRANE. Thank you, Senator, for the question. Welcome to the Committee and congratulations on the awards that California received yesterday. I actually got to visit with the Mayor of Los Angeles. She came through our office yesterday. And so we were very excited about that. I don't know—the expression "the proof is in the pudding"—I think the 58 awards for the grid were in 40 states. And the good news, you mentioned the $10.5 billion. Only $3.5 billion is going out. So there will be a second round of awards. And as I mentioned a little earlier, we are very keen to see more wildfire mitigation. And one of the things we are doing on all the follow-on FOAs is doing a gap analysis, so that as we put out the second FOA, we can sort of guide applicants from across the country to what we felt was left undone by the first.

And so, we have webinars, you know, we put it right into the FOA language, and we are happy to have direct conversations, if you would like.

Senator PADILLA. Wonderful.

63

And just confirm for me that that would include not just new applicants, but applicants that were unsuccessful this round getting some sort of feedback and guidance on how to have a higher quality application, maybe, next go-round, and be more competitive.

Mr. CRANE. We definitely are willing to give feedback to applicants as much as we can, you know, it's just some of these processes are ten times oversubscribed. So sometimes it can—we know there is a lot of frustration there. We are trying to work through that, Senator, but we will do our best to provide any direct feedback on individual unsuccessful applications that we can.

Senator PADILLA. Okay.

Now, another element of the Bipartisan Infrastructure Law was the creation of the Joint Office of Energy and Transportation in our efforts to help deploy zero-emission vehicles and expand related infrastructure. It seems that to date the joint office is focused almost exclusively on light-duty vehicles, despite the fact that it is heavy-duty vehicles that disproportionately contribute to the adverse air quality in communities where there are concentrations of goods-movement facilities and infrastructure. So one of the reasons I am glad to be part of this Committee now is to help raise this issue, and anybody who has monitored hearings in the Environment and Public Works Committee, where I am a member, knows that I have repeatedly asked about the impacts to California's air quality, particularly to those areas with significant goods-movement infrastructure and the need to transition to zero-emission heavy-duty vehicles and build out that corresponding infrastructure.

So Mr. Crane, once again, how could the Joint Office expand its focus to also prioritize zero-emission medium- and heavy-duty infrastructure as part of its core mission?

Mr. CRANE. Thank you, Senator, and thank you for your focus on this area. I spoke to Gabe, who runs the Joint Office, specifically about this point a few months ago and he confirmed what you said, that most of their programs were on light-duty vehicles. We think now that we have the selections out there, particularly on hydrogen, and of course, as you know, there is a question of where do battery vehicles stop and hydrogen begins? We have the California hub, for which a key part of its success was the possibility of creating hydrogen-powered vehicles to do drayage out of the Port of Los Angeles and Long Beach. There is also the Pacific Northwest hub. We would love to see the western states become—for Class 7, Class 8 vehicles—a hydrogen-powered corridor, you know, both for decarbonizing and for local air quality purposes.

So we would love to work with you and Senator Cortez Masto to do that in your region.

Senator PADILLA. Thank you.

And I, too, will be submitting some additional questions for the record after today's hearing, but just to end on this note, I look forward to working with you to ensure that eligible utilities, particularly those serving areas around high-priority ports, industrial zones, and freight corridors are submitting the high-quality, high-need applications. And we also want to look at leveraging funding across programs and across agencies to get to maximum benefit.

So thank you, Mr. Chair.

The CHAIRMAN. Thank you, Senator.

64

Senator Cortez Masto.

Senator CORTEZ MASTO. Thank you, Mr. Chair.

So let me follow up because I, too, obviously, in the State of Nevada, as you well know, Under Secretary, we talked about this. We applied for the Southwest Hydrogen Innovation Network, and I get it, there is only so much money to go around at any one point in time. I hear from all my colleagues. Some of us are disappointed. Some of us are happy. I guess that is a good thing because you are not pleasing everyone, right, at the same time you are hearing from everyone. But the goal here, I think, for many of us, and I am open to this and I appreciate your comments about some sort of a broader coalition in the regions when it comes to some of the renewable energy, particularly around the hydrogen innovation, as you well know. We have Air Liquide in Nevada. We have partnered in Nevada with Arizona. I think there is an opportunity for us to explore this even further. So thank you for your comments.

I am going to jump to something off of hydrogen right now, which is the battery grant programs. Nevada is leading the nation in battery manufacturing and recycling. We have the capacity to support the entire supply chain in my home state. For example, Nevada has enough lithium to supply the world for 85 years—85 years, and in the last years alone, we have seen the clean transportation battery industry create 7,400 new jobs in Nevada and deliver $13 billion of investment. That is why I call Nevada—it's an innovation state. I am very proud of it. I have worked to lead the efforts to capitalize on this clean energy revolution through the Bipartisan Infrastructure Law. And now, companies in my state, like American Battery Technology, Redwood Materials, and others are receiving vital investments from the Department of Energy. And so, thank you.

Under Secretary Crane, let me just say, would you agree that these facts and the recent DOE investments in Nevada show the vital role that we can play in addressing our country's supply chain needs?

Mr. CRANE. Yes, I would agree that Nevada is a critical part of the critical mineral supply for batteries, which, of course, are essential to the electric vehicle revolution. And as you know, you have the two awards from the first battery solicitation. There is a second battery solicitation—or supply chain solicitation that will be out shortly and we are looking to even do more across the battery supply chain.

Senator CORTEZ MASTO. And we will be paying close attention.

Would you also agree that ensuring these investments are happening throughout the country, and not just in some of the traditional manufacturing regions of the U.S., actually strengthens our economy and our national security?

Mr. CRANE. Absolutely, and I believe when it's all said and done, we will have Bipartisan Infrastructure Law investments in every state.

Senator CORTEZ MASTO. Thank you.

I only have about two minutes left, and a number of questions for everyone, but I am going to focus, Mr. Shah, on the Tribal Energy Loan Guarantee. As you are aware, I worked with my colleagues last Congress to provide a crucial fix to the Tribal Energy

65

Loan Guarantee Program. Specifically, the Inflation Reduction Act allows for the Department to issue loans to tribes and tribal organizations through the Federal Financing Bank. Now, you touched on this in your written testimony. One, can you build on that and outline the ways that the IRA fix provided those necessary resources and structure to assist tribes and get energy projects up and running? And then, two, has DOE LPO seen an increase in interested applicants since the enactment?

Mr. SHAH. Thank you for your question, Senator.

It is absolutely true that when I came into office the Tribal Energy Financing Program was not well-structured and the feedback that we got from the tribes was that it was not really meeting its needs. We have spent a lot of time with the tribes to make sure that we could reposition the program in a way that would actually meet their needs. For instance, we had very high fees to access the program. We had a lot of complications in the way in which it was structured. Those have largely been simplified. And then, as you suggested, the access to the Federal Financing Bank was really the key, right? Before that was passed, a tribe would have to work through a local bank, many of whom, you know, wanted them to waive their sovereign rights, et cetera. And we could provide only a guarantee. Today, we have the ability to work with the tribes in the way in which they wished to be worked with. And it has resulted in many applications coming in.

So we have over a billion dollars of applications today that we are evaluating. We hope that the first one will be out the door here soon, but it requires a couple of additional due diligence points to be completed. But we are very excited about making sure that the tribes actually have that ability to realize all of the energy projects that they really want to participate in.

Senator CORTEZ MASTO. Thank you.

Thank you, Mr. Chairman.

The CHAIRMAN. Thank you.

I have one, just one question for the second round, real quick, and Mr. Crane it is to you.

In order for the hydrogen hub in West Virginia—we will use that because it is a big transitional area with a lot of fossil and we are looking at how can we mitigate a lot of that to the point where we do not threaten the fossil that we need today by being able to produce the energy that we are going to need in the future. So with that, the Administration needs to provide investment certainty to hydrogen producers. The producers of hydrogen have been working with Argonne National Lab, I think you know, for nearly a year, to ensure the GREET model. I don't know if you have ever heard of the GREET model, but the GREET model is Greenhouse gases, Regulated Emissions, and Energy use in Technologies. That is the GREET model.

So Argonne National Lab has been doing that model, and it follows the science, not the politics, but the science for different types of feedstocks used to produce hydrogen, including coal-mined methane, which is very harmful, as far as the emission and vetting. So any way we can get that out of the atmosphere soon would be great. However, I have been informed that the Department of En-

DOE AR 000940

66

ergy has delayed the release of the updated GREET model to certify clean hydrogen.

So Mr. Crane, I guess what we are asking is, can you assure that they will stay with the science of the Argonne Lab for the GREET model, and it will follow that science to not discriminate against different feedstocks based on the Administration's, maybe political preferences, and when do you think the Argonne National Laboratory will have the GREET model for the hydrogen credit released?

Mr. CRANE. Well, Senator, thank you for the question. Thank you, actually, for raising my own awareness about the importance of the GREET model, which, as you know, as you just alluded to, has historically been used for national lab purposes and now is part of informing tax policy in the United States. And the direct answer to your question is, I will assure you that the GREET model won't be modified for any political purposes.

The CHAIRMAN. That's good.

Mr. CRANE. It won't be prejudiced against for pathways, but coal-bed methane, as you mentioned, also renewable natural gas, is a very important part of that effort, and we, thanks to your question, we have an internal review process going on next week just to find out where the state of play is across the agency, so——

The CHAIRMAN. Great. I misled you. I have one more.

[Laughter.]

The CHAIRMAN. This is to Mr. Shah and Mr. Crane.

Do you all agree that the grants and loans under your office are capped by the IRA and the Bipartisan Infrastructure Law? Are they capped?

Mr. SHAH. Yes, I mean, the way that the——

The CHAIRMAN. You know what you have to work with, right? You are capped out at that.

Mr. SHAH. Yes, we have a specific amount of loan authority and a specific amount of credit subsidy.

The CHAIRMAN. Okay.

Mr. CRANE. And on the financial assistance side, absolutely, and if we ever looked like we were committing more money than you had given us, OMB would be on us like a ton of bricks.

The CHAIRMAN. Well, I know some of the testimony today sounded like we are just throwing caution to the wind, just kind of throwing the money out there.

Mr. CRANE. No.

The CHAIRMAN. And also, inflation. Inflation, I will say, came down from nine percent to three percent a year after Inflation Reduction Act took effect. So I have my challenges with the Administration. I think you all know it. But on the whole, we are producing more energy than ever. That is a fact. And we are producing more wind and solar. And we are investing—we are producing the energy we need today and we are investing in the energy we want tomorrow. But we are not going to get rid of what you need today until we have the ability to replace it with basic dispatchable power that gives us 24/7. That is what we are working toward. And we have to get permitting advanced and we are working very diligently on that and hopefully we will have something to offer to the Committee very shortly.

Senator. Okay.

67

Senator CORTEZ MASTO. I do want to add to the conversation. I appreciate, Mr. Chairman, your comments, and this idea that, at the end of the day for our renewable energy portfolio, it is very diverse, but one thing we keep forgetting, and I heard it right today, I think, for the first time, other than my advocacy for it, is from the Senator from Alaska, is geothermal—right? Along with the investment tax credits we did for solar, we also did really incentivize geothermal, which is a key energy producer for us that is clean.

So Under Secretary, can you talk a little bit about what DOE is doing with respect to promoting geothermal energy as well?

Mr. CRANE. Well, the other side of the DOE is doing a lot on geothermal on the R&D side within the Infrastructure Under Secretary. We do not have a specific bucket of money for geothermal the way we have for advanced nuclear or hydrogen. But we do have programs like what we call the ERA, the rural and remote, the billion dollars there where we would welcome geothermal proposals so that we could help advance, because we share, and the Secretary very much shares the idea that geothermal should be a building block of American energy security.

Senator CORTEZ MASTO. Thank you.

The CHAIRMAN. Senator Heinrich, do you have any—Senator Heinrich, you are okay?

Let me just thank all of you. I know it has been a little long, and we enjoyed it, but I think it has been very informational and I think you get a little flavor of how, first of all, we are all very, very committed to energy that our country needs and how we can lead the world. And I think we have a chance of doing that. We want to hold ourselves accountable, and Ms. Donaldson, we think you will do that and we want to make sure you have the resources to do that. We want to make sure that we are able to get the new technology that we need and also be able to fulfill our commitment to the climate that we all have a responsibility for, but also provide the energy the country needs. I think it's kind of an all win-win situation if we work together.

So with that, members are going to have until the close of business tomorrow to submit additional questions for the record.

And with that, I thank you. The meeting is adjourned.

[Whereupon, at 11:58 a.m., the Committee was adjourned.]

DOE AR 000942

**APPENDIX MATERIAL SUBMITTED**

_____

(68)

DOE AR 000943

69

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

QUESTIONS FROM RANKING MEMBER JOHN BARRASSO

Q1.  DOE abandoned its negotiations with Microvast, a battery company with considerable ties to the Chinese Communist Party, only after intense scrutiny from this and other Congressional committees. DOE has refused to provide a firm answer about why it changed its mind.

Did DOE change its mind on Microvast because of its connections to China? And if so, what took so long, since Microvast's connections to the CCP were obvious from the start? Will you pledge that DOE will not give grants or loans to China-linked companies in the future?

A1.  As you know, the Department of Energy previously provided Committee staff a briefing on the decision and process relating to Microvast on September 29, 2023, where we addressed these questions. The vetting process for applicants for Funding Opportunity Announcements (FOAs) generally begins during the FOA application review stage, where we identify companies that meet certain technical criteria. A subset of those companies are ultimately selected for negotiation of awards. DOE has recently enhanced and modified the vetting process, including establishment of the Research, Technology, and Economic Security (RTES) office.

The Office of Manufacturing and Energy Supply Chains (MESC) aims to support scale-up and deployment of the nation's manufacturing capacity through programs that are focused on establishing critical domestic supply chains and increasing circularity while leveraging private sector investment. As the Department continues our implementation of the IIJA and IRA, we commit to be responsible stewards of taxpayer dollars and continue taking the proactive steps necessary to prevent fraud, waste, and abuse in our programs while we work to bring about a clean and secure energy future that is made in America.

DOE AR 000944

70

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

DOE takes the risk of undue foreign influence seriously in our efforts to support energy security and American manufacturing. Accordingly, we have implemented a comprehensive and rigorous approach to research, technology, and economic security for DOE awards and loans. Concurrent with the merit review process, DOE conducts a RTES review of applications prior to selection. DOE enhanced its existing vetting processes to ensure that risks of undue foreign influence are considered early in the competitive process and throughout the life of a DOE-supported project. The RTES review is a risk-based approach that relies on both open-source and classified sources, as appropriate.

DOE has developed and continues to improve RTES measures to mitigate risk undue foreign influence poses to our scientific and technological development ecosystem, U.S. supply chains, and intellectual property. Some of the potential RTES risks facing MESC programs include applicant and project team members' ownership and investor structure, board member seats, and intellectual property positions. DOE also considers whether the senior/key personnel may have foreign affiliations or are receiving support that may present RTES concerns, including participation in foreign talent programs sponsored by countries of risk and affiliations with military or other governmental entities.

The Department enhanced its RTES vetting process, which supports programs in due diligence reviews and risk mitigation to ensure our national security, economic competitiveness, and technological leadership imperatives are duly incorporated in our financial assistance and loan activities. This enhanced process integrates RTES reviews at three major points: 1) before the solicitation is released (to ensure the appropriate RTES provisions are included); 2) review of applications before selection; and 3) during the project implementation. In furtherance of such efforts, DOE programs coordinate directly with RTES and consult with legal counsel to develop award terms and conditions that minimize risk and obligations placed on the government, in support of the Contracting

71

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

Officer's negotiations with selectees.

Q2.    The Department of Energy is rushing to get loan and grant money out the door. This will create a demand for critical minerals that will make us more dependent on foreign supplies, including those in China. China knows this. An executive for GEM, a Chinese battery materials producer said last week in the Wall Street Journal, "The U.S. can't completely shut out Chinese suppliers from its market […], as much of the upstream supply chain is concentrated in China."

Can you commit to the Committee that the administration will not use the provisions of the IRA to fund companies that use PRC-sourced materials or are part of Chinese-back joint ventures?

A2.    The Department of Energy is committed to securing for the United States the maximum technology advantage and resilient, diverse, and secure supply chains to ensure economic prosperity and national security. DOE is committed to ensuring entities with concerning ties to countries of concern do not participate in DOE-supported projects in highly sensitive areas that have national security and economic competitiveness implications. DOE's RTES due diligence review process requires that entities provide full transparency regarding their foreign connections (e.g., foreign ownership and control, foreign investors, current or pending technology licensing or intellectual property sales to a country of risk, and changes to board of directors) prior to selection and during the life of a project. In reviewing those connections, DOE will make a risk-based decisions that minimize potential intellectual property loss, supply chain dependencies, and threats to national security.

DOE is taking action on many fronts to bolster domestic supply chain security, including supporting projects that have the potential to build secure supply chains in partnership with our allies and to reduce our reliance on countries of concern. The steps also ensure that the Government's supply chain policy supports small businesses, prevents monopolization, considers climate and other environmental impacts, encourages

DOE AR 000946

72

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

economic growth in communities of color and economically distressed areas, and ensures geographic dispersal of economic activity across all regions of the United States.

In support of President Biden's Executive Order on Securing America's Supply Chain, DOE produced the first-ever comprehensive U.S. strategy to bolster clean energy supply chains. DOE continuously builds on this work to ensure that we are using every tool in our toolbox to boost domestic production of the critical minerals needed for the clean energy transition while ensuring that our actions do not come at the expense of human health or workplace safety; consultation or community engagement; or the air, water, and other crucial resources upon which we all depend.

Bringing manufacturing back to the U.S. will necessarily involve interaction with foreign entities, but doing so smartly and with eyes-wide-open will ultimately benefit the U.S. economy by developing domestic expertise and building resilient supply chains. As a general matter, DOE has a system in place for evaluating the research, technology and economic security (RTES) implications of our funding awards. As part of the review process, DOE ensures appropriate safeguards and risk mitigation measures are built into each award agreement. In some instances, DOE has required awardees implement material supply plans, which set out an awardee's strategy to reduce reliance on countries of concern and develop new supply chains that rely on suppliers based in the U.S. and allied nations.

DOE AR 000947

73

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

QUESTIONS FROM SENATOR MAZIE K. HIRONO

Q1.   Does the Secretary of Energy have the legal authority to transfer funds the Department of Energy (DOE) has been appropriated for the various clean energy programs authorized and/or appropriated under the Inflation Reduction Act (IRA) or the Infrastructure Investment and Jobs Act (IIJA) in order to increase the funding available to the Office of the Inspector General (OIG) to carry out the duties of the Office? What level of funding does the DOE support as being appropriate for the OIG to carry out its duties given the increase in the number of projects that the DOE will be funding under the IRA and IIJA?

A1.   We agree that stewardship of the taxpayer dollar is essential as we deploy these programs effectively and efficiently. That's why, as part of the FY25 budget process, the Department has requested $149 million, an increase of 73% above FY24 enacted levels, for the Office of the Inspector General. Further, in the FY24 Appropriations Bill Congress repurposed BIL and IRA funding for the Office of the Inspector General from certain unobligated BIL and IRA provisions to two-tenths of one percent of the funds.

DOE AR 000948

74

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

QUESTIONS FROM SENATOR JAMES E. RISCH

Q1.    Last week, the Department selected seven regional Hydrogen Hubs. The Idaho National Lab is part of the MachH2 project that will demonstrate hydrogen production from a nuclear reactor. What is the expected schedule for the Hubs to receive award funding now that selections have been made?

A1.    The Office of Clean Energy Demonstrations (OCED) is in award negotiations with the Selected H2Hubs. These negotiations focus on Phase One of the project, generally covering detailed planning and analysis activities to ensure that the project is technologically, socially, and financially viable. After Phase One has been negotiated, the negotiated funding for that Phase will be awarded. The same process will follow for future Phases of the project. You can learn more about OCED's phased project management approach at https://www.energy.gov/oced/project-management-oversight-excellence. The length of negotiations will depend on the project; however, OCED is committed to moving as quickly as the selectees can provide the necessary information to get these projects under award.

Q2.    The success of the Hydrogen Hubs hinges on the ability of the hydrogen to be affordable. Industry is awaiting Treasury's guidance on what generating resources qualify for these incentives. Existing resources are important not only for providing clean, affordable hydrogen, but also to ensure various technologies are on a level playing field in these demonstrations. Has the Department provided comments to Treasury about the potential impacts of applying "additionally" principles in its guidance? What impact would this have on the Hydrogen Hubs and demonstrating different methods of hydrogen production were it to go forward?

A2.    DOE does not comment on specifics of interagency pre-decisional discussions. DOE remains committed both to the success of the selected Hydrogen Hubs and the development and commercial viability of clean hydrogen more generally. We also continue to work closely with Treasury and IRS as they review stakeholder comments

DOE AR 000949

75

U.S. Senate Committee on Energy and Natural Resources
October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for
Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law and the Department's Overall Innovation
Investment Strategy
Questions for the Record Submitted to the Honorable David W. Crane

and prepare further guidance on the 45V tax credit, which will be a key driver of the clean hydrogen economy.

Q3.    The Infrastructure Law provided $6B for the Civil Nuclear Credit Program to help preserve and support the continued operation of certain U.S. nuclear reactors. Some awards have been made, but do you expect other nuclear plants will apply and qualify for funding from this program? If so, how many and how much additional funding would those projects require? Would you support repurposing any remaining funding for other important nuclear energy priorities, such as LEU/HALEU.

A3.    The Bipartisan Infrastructure Law (BIL) provided $6 billion in funding to establish DOE's Civil Nuclear Credit Program (CNC) at $1.2 billion per year over fiscal years 2022 to 2026. DOE has announced two award cycles of funding to date. DOE's Grid Deployment Office (GDO) has announced a conditional award of up to $1.1 billion to Pacific Gas & Electric Company (PG&E) for the Diablo Canyon Power Plant, Units 1 and 2.

As you are aware, the Inflation Reduction Act (IRA) provided additional funding to help preserve the existing fleet of nuclear plants through the creation of the Production Tax Credit (PTC). Specifically, the PTC would allow nuclear facilities that were placed in service before the IRA's enactment to receive up to $15 per megawatt-hour of power sold in 2024 (increasing with inflation in subsequent years) to remain competitive with other sources of power generation. The PTC reduces to zero when a nuclear facility's gross receipts rise above $43.75 per megawatt-hour (again increasing with inflation in subsequent years). In contrast, the CNC is designed to support specific reactors that are imminently at risk of shutting down and ensure their continued availability to provide clean affordable power.

DOE believes that the PTC and CNC can complement each other. The PTC was created to help the existing nuclear generation fleet broadly. The CNC, however, is designed to target specific reactors that compete in competitive markets. For those reactors at risk of

DOE AR 000950

76

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

closing, the CNC provides a bridge to perform any capital improvements and other maintenance to get them back to being profitable.

Since the time of this hearing, the Consolidated Appropriations Act of 2024, enacted in March 2024, adjusted funding for nuclear fleet support programs across DOE, including rescinding up to $3.7 billion from the CNC. As a result, the CNC will not initiate an award cycle in 2024. The CNC continues to conduct analysis using publicly available information to determine potential demand for the program. However, CNC does not have direct insight into specific reactor financial conditions that may require them to apply for CNC support. GDO anticipates that additional funding opportunities will be announced in future years. GDO projects that throughout the lifecycle of the CNC, CNC could become oversubscribed at this current funding level.

DOE supports a variety of programs for the nuclear industry to achieve multiple priorities, including preserving the existing fleet, encouraging additional development, and supporting a domestic supply chain.

77

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

QUESTIONS FROM SENATOR CATHERINE CORTEZ MASTO

Q1.   What are the lessons learned from the first round of the $6 Billion in funding distributed from the battery manufacturing and recycling program in the Infrastructure Investment and Jobs Act (IIJA)? How are you going to ensure that DOE is making the most effective investments towards a more domestically reliant battery supply chain in the U.S.?

A1.   On August 31, 2023, DOE released a Notice of Intent to issue Funding Opportunity Announcement (FOA) No. DE-FOA-0003099 entitled "Bipartisan Infrastructure Law 40207(b) Battery Materials Processing and 40207(c) Battery Manufacturing Grants Round II". The activities to be funded under this FOA support BIL Sections 40207 (b) & (c) and the broader government-wide approach to upgrading and modernizing infrastructure, including by strengthening critical domestic manufacturing and supply chains to maximize the benefits of the clean energy transition as the nation works to curb the climate crisis and advance environmental justice. It is anticipated that the FOA would increase domestic battery manufacturing and create good-paying clean energy jobs. The overall FOA scope includes commercial facilities for battery-grade precursor materials, constituent materials, battery components, and cell manufacturing and recycling. Applicants should consider and identify potential downstream domestic customers of their material or product. This FOA will incorporate lessons learned including selecting targeted topic areas to address critical battery supply chain, material processing, and manufacturing needs as well as application process steps including a comprehensive and rigorous approach to research, technology, and economic security (RTES).

DOE has developed and continues to improve RTES measures to mitigate risk malign foreign governments pose to our scientific and technological development ecosystem, U.S. supply chains, and intellectual property. Some of the potential RTES risks facing MESC programs include applicant and project team members' ownership and investor structure, board member seats, and intellectual property positions. DOE also considers

DOE AR 000952

78

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

whether the senior/key personnel may have foreign affiliations or are receiving support that present RTES concerns, including participation in foreign talent programs sponsored by countries of risk and affiliations with military or other governmental entities. The Department enhanced its RTES vetting process, which supports programs in due diligence reviews and risk mitigation to ensure our national security, economic competitiveness, and technological leadership imperatives are duly incorporated in our financial assistance and loan activities. This enhanced process integrates RTES reviews at three major points: 1) before the solicitation is released (to ensure the appropriate RTES provisions are included); 2) review of applications before selection; and 3) during the project implementation. DOE programs coordinate directly with RTES and consult with legal counsel to develop award terms and conditions that minimize risk and obligations placed on the government, in support of the Contracting Officer's negotiations with selectees.

BIL Sections 40207 (b) and (c) seek to modernize domestic battery manufacturing and supply chains to effectively support the clean energy transition. DOE will use this competitive funding opportunity to select the most effective projects that will support this goal, and broader government-wide modernization goals in a variety of ways, including, but not limited to:

- Retaining and creating good-paying union jobs in the manufacturing workforce.
- Ensuring that the United States has a viable battery materials processing industry to supply the North American battery supply chain.
- Expanding the capabilities of the United States in advanced battery manufacturing.

- Enhancing national security by reducing the reliance of the United States on critical minerals, battery materials, components, and technologies from foreign entities of concern.
- Enhancing the domestic processing capacity of minerals necessary for battery materials and advanced batteries.

79

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

- Support the goal that 40% of the overall benefits of certain federal investments flow to underserved and overburdened communities (in accordance with the Justice40 Initiative).
- Provide workforce opportunities to low- and moderate-income communities.

Q2.    DOE is expected to include a specific interpretation of the "foreign entities of concern" (or FEOC) for the battery program funding notice expected soon. Can you confirm that this determination is being coordinated across the Administration so that entities can rely on it for both funding opportunities and tax incentives?

A2.    Yes, this determination is being coordinated across the Administration and amongst the various program offices within the DOE.

Q3:    Given DOE has different financing opportunities at its disposal to assist applicants in different ways, who do you envision is the ideal candidate for the battery grant program versus an LPO loan? In other words, where would a fully developed company go to for support, as opposed to an emerging entity, or someone coming right out of research and development (R&D)?

A3:    As the global economy shifts towards clean energy and technology continues to advance, securing access to essential materials, components, and clean energy technology equipment is increasingly important. DOE is investing in manufacturing across the research-to-deployment spectrum to secure the Nation's supply chains. To meet the needs and challenges of the 21st century U.S. energy sector, including implementing $62 billion from the BIL, DOE realigned to create the Office of the Under Secretary for Infrastructure. This office complements RD&D efforts from the Under Secretary for Science and Innovation with strategically aligned deployment efforts. The Under Secretary for Infrastructure focuses on national goals such as providing affordable and reliable energy, creating high quality jobs, revitalizing U.S. manufacturing, and addressing the climate crisis. This realignment facilitates domestic manufacturing and accelerates equitable deployment and scalability. It aims to transform American innovation into market products to meet growing demand.

80

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

Financing opportunities exist within different offices under the Under Secretary for Infrastructure, or across the DOE enterprise, depending on the stage of a project. For example, for a company ready for project finance debt, LPO offerings can accelerate deployment at scale. If a company has proven technology and needs capital support, through equity, to de-risk manufacturing and commercial production, they may consider applying to grant programs in the Manufacturing and Energy Supply Chain (MESC) office, such as the battery awards. Conversely, an emerging entity can work through the Office of Science and Advanced Research Projects Agency- Energy (ARPA-E) for support with early-stage R&D. The current structure of DOE offices is designed to accelerate innovation at vital stages of a technology's evolution. This ensures that game-changing ideas can progress from their inception in the lab to being manufactured on America's factory floors. Each DOE office plays a unique role in helping novel technologies overcome complex barriers and move from fundamental science and research and development to demonstrations, deployment, and full-scale commercialization.

To address the specifics of your question, a manufacturing company engaged in the battery value chain whose technology is sufficiently advanced for full scale deployment, has the option of applying to MESC programs for financial assistance. The decision of whether to accept support from MESC or LPO is up to the applicant. Note that while the applicant has the choice of applying for both, but can only receive one.

Q4:   Can you speak to how the Infrastructure team and Loan Program Office are specifically working together to best support these interested applicants since many companies would like an efficient way to work with the Department, even if your authorities and capabilities are quite different?

A4:   DOE centralized within the Office of the Under Secretary for Infrastructure both existing offices focused on major demonstration and deployment and new offices. Several

81

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

existing offices moved to the new Under Secretary, including the Loan Programs Office (LPO), Office of Indian Energy, Office of Clean Energy Demonstration (OCED), Office of Cybersecurity, Energy Security, and Emergency Response (CESER), and the Federal Energy Management Program. Additionally, three new offices were launched to support clean energy technology commercialization and infrastructure deployment within the Under Secretary for Infrastructure: the Grid Deployment Office, the State and Community Energy Program, and the Office of Manufacturing and Energy Supply Chains (MESC).

The Loan Programs Office, in response to Congressional direction, has a robust Outreach and Business Development (OBD) division, staffed with federal employees with deep private sector expertise. This team conducts extensive outreach to communicate the value of LPO program offerings and take in feedback on what may be preventing meritorious applicants from approaching us. In addition, OBD actively and directly engages thousands of companies and investors across the private sector. We have an opportunity to help companies and other stakeholders find their way to government programs to accelerate their energy initiatives - even if not eligible for LPO financing. LPO's "Front Door" effort is aimed at helping the LPO team quickly and easily field inbound inquiries and make connections to relevant government resources. The team employs two tools to facilitate these connections: an external-facing universal reply email and an internal quick-reference guide of links and contacts to provide custom advice or connections. In addition, the OBD team meets regularly with the Undersecretary of Infrastructure to monitor progress on these activities, and regularly hosts training sessions to educate OBD team members and enhance networking skills.

Another example of efficient coordination can be seen in the Department-wide Pathways to Commercial Liftoff effort, an initiative to drive public and private sector engagement critical to the development of effective clean energy industrial strategy. The effort,

DOE AR 000956

82

U.S. Senate Committee on Energy and Natural Resources
October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for
Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law and the Department's Overall Innovation
Investment Strategy
Questions for the Record Submitted to the Honorable David W. Crane

coordinated through DOE's Office of Technology Transitions and with contributions from a number of other DOE program offices, is a series of reports that provide a valuable, engagement-driven resource on how and when certain technologies—including industrial decarbonization technologies, virtual power plants, clean hydrogen, advanced nuclear, and long duration energy storage—can reach full scale deployment. The Liftoff reports provide insights that help steer public sector and private sector investments at this critical time.

Additionally, OCED provides information about LPO financing opportunities to their non-selected applicants. If interested, non-selected applicants to OCED can schedule a no-cost consultation with a member of LPO's Outreach and Business Development team to discuss potential projects and program evaluation criteria for potential LPO financing . This allows non-selected applicants with existing project ideas to be seamlessly connected to additional funding opportunities at the Department. We intend to replicate this process with  MESC and GDO programs.

Q5.    Through the Hydrogen Hub process, did you contemplate and consider a coordinated approach across multiple applications for broader funding – especially if the applications sought to achieve similar purposes?  For example, the SHINe (AZ/NV) application featured similar transit bus and heavy-duty applications of hydrogen that the California selection is working on.

A5.    Knowing of the similar nature of proposals during the Concept Paper phase, the Department provided guidance that those submitting Concept Papers could merge proposals for the Full Application phase, in the hopes that proposals in similar regions would work together to build larger and stronger Hub applications. [Some hubs did do this for their final applications.] The DOE also launched H2 Matchmaker, a voluntary online tool created to aid in fostering partnership among key stakeholder by allowing potential partners to identify each other and to foster partnership by increasing awareness and aligning potential needs in specific regions of the U.S.

DOE AR 000957

83

U.S. Senate Committee on Energy and Natural Resources
October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for
Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law and the Department's Overall Innovation
Investment Strategy
Questions for the Record Submitted to the Honorable David W. Crane

Q6.   As you continue to coordinate with and fund your Hydrogen Hub selections, are you in
anyway envisioning a way to link those not selected for current hubs into broader
coalitions in the regions DOE selected? Can you please lay out the ways I can work to
connect my interested parties in with this effort?

A6.   Yes, the Department is interested in exploring ways to grow the clean hydrogen economy
and work with non-selected Hubs or Hub components. For example, the Department is
offering to connect interested project components with the Loan Programs Office for
discussion of financing opportunities. DOE is also able to make connections between
non-selected Hub applicants and nearby selected Hubs to facilitate any coordination that
may be of interest or possible. The Department is hopeful that as the H2Hubs are built,
the regional ecosystems will grow organically and many of the similar proposals in
nearby regions will be able to connect into the selected Hubs.

Q7.   Can you please speak to some of the additional financial tools that are available to
Hydrogen Hub applicants who weren't ultimately selected?

A7.   Specifically, LPO can finance clean hydrogen projects through several of its lending
programs:

- Advanced Technology Vehicles Manufacturing Program: Financing for projects
that involve U.S. manufacturing of advanced technology vehicles, qualifying
components, and materials that improve fuel economy, including fuel cell-
powered machines and indirect use via synthetic/hydrogen-derived fuels.

- Title 17 Clean Energy Financing Program – Innovative Energy and Innovative
Supply Chain Projects (Section 1703): Financing for clean energy projects,
including for clean hydrogen projects that use innovative technologies or
processes not yet widely deployed within the United States. These projects must
show a meaningful reduction of lifecycle greenhouse gases emissions or air
pollutants, either via the process itself or via the end use of the material.

DOE AR 000958

84

U.S. Senate Committee on Energy and Natural Resources
October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for
Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law and the Department's Overall Innovation
Investment Strategy
Questions for the Record Submitted to the Honorable David W. Crane

- Title 17 Clean Energy Financing Program – State Energy Financing Institution (SEFI) – Supported Projects (Section 1703): Financing for qualifying clean energy projects, including for clean hydrogen projects, that receive meaningful support from a State Energy Financing Institution. These projects do not have an innovation requirement.

- Title 17 Clean Energy Financing Program – Energy Infrastructure Reinvestment Projects (Section 1706): Financing for projects that retool, repower, repurpose, or replace energy infrastructure that has ceased operations or to enable operating energy infrastructure to avoid, reduce, utilize, or sequester air pollutants or anthropogenic emissions of greenhouse gases. These projects could include eligible hydrogen fuel cell and energy storage technologies. These projects do not have an innovation requirement.

- Tribal Energy Financing: Financing available to federally recognized Tribes and qualified Tribal energy development organizations for energy development projects, including hydrogen projects. These projects do not have an innovation requirement.

- Carbon Dioxide Transportation Infrastructure Finance and Innovation: Financing for large-capacity, common-carrier carbon dioxide transport projects (e.g., pipelines, rail, shipping, and other transport methods) that can serve as supporting infrastructure for certain types of hydrogen production projects.

Q8.  What interagency efforts are ongoing to work to produce one, efficient list of critical minerals across the Administration? If this is not happening, how can DOE further ensure that the U.S. supports all forms of vital mining needs, even those that don't quality as "critical minerals" that help drive our economic and national security? What additional administrative steps or considerations at the Congressional level are necessary to further solidify a secure and resilient energy supply chain?

A8.  There is ongoing interagency collaboration to ensure that the three primary critical minerals lists (Department of Interior (DOI), Department of Energy (DOE), and Defense

85

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

Logistics Agency (DLA)), inform one another. The Energy Act of 2020 provides the statutory authority for DOE to produce a critical materials list, and also required DOI to create and update on a three-year basis its own critical minerals list. DLA's critical materials list informs the national defense stockpile and has been in use since the passage of the Strategic and Critical Materials Stockpiling Act in 1938.

Additionally, there are also ongoing interagency efforts to ensure the DOE and other departments and agencies are supporting diverse, secure, and sustainable mineral supply chains, including vital mineral needs. DOE's Office of Manufacturing and Energy Supply Chains (MESC) supports projects within industries that serve as centers of gravity for increased mining activity, such as midstream processing and refining, and deploying advanced energy technologies that fundamentally rely on mineral inputs. MESC has also launched a Manufacturing Capital Connector Program to connect investors with projects essential to build out U.S. manufacturing supply chains. MESC also coordinates strategic battery efforts and investments across the interagency through the Federal Consortium for Advanced Batteries (FCAB), which includes the Department of Defense, Commerce, and the State Department.

Additionally, DOE's Loan Programs Office (LPO) recently clarified and reiterated its ability to provide loans to mining projects under its Title 17 loan authority and DOE's Advanced Research Projects Agency for Energy (ARPA-E) is similarly supporting vital mining needs by partnering with academic institutions and national labs to discover new ways to make mining more efficient as ore grades decline and even to make mining carbon negative through its Mining Innovations for Negative Emissions Resources (MINER) program.

DOE welcomes the opportunity to further work with you and your staff to augment these efforts.

86

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

Q9.     How is DOE leveraging all existing DOE programs to grow the development of a domestic critical mineral industry and supply chain? Will you commit to working with me and my colleagues to ensure that this program receives appropriated funds?

A9.     We will certainly commit to working closely with you and your congressional colleagues to ensure that we have the resources necessary to support and foster a domestic critical mineral industry and supply chain. As noted above, there are a number of cross agency and DOE initiatives including the Battery Manufacturing and Recycling Grant Program, that are investing in the domestic processing and refining of critical minerals. Importantly, DOE's Office of Manufacturing and Energy Supply Chains (MESC) is conducting deep analysis in partnership with the National Labs to give granular and actionable insight into where we may need to direct existing funding or target new funding to ensure there are no critical weaknesses in the domestic supply chain. We would be pleased to brief you and your staff on these efforts, including where additional resources may be needed.

In addition, DOE is supporting vital mining and also providing important research and analysis to support government-wide decision making on critical mineral supply chain needs. MESC's Modeling, Mapping, and Analysis Consortium is working with the National Labs to identify specific Supply Chain Readiness Levels to aid in policymakers' ability to quickly identify and solve chokepoints throughout key energy supply chains. The agency has also released two supply chain assessments in coordination with Argonne National Lab—one for the upstream and another for the downstream—outlining key supply-demand gaps for critical minerals and battery components.

87

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing: The Department of Energy's Due Diligence Process for**
**Awarding Competitive Grants and Loans Funded Through the Inflation Reduction Act**
**and the Bipartisan Infrastructure Law and the Department's Overall Innovation**
**Investment Strategy**
**Questions for the Record Submitted to the Honorable David W. Crane**

QUESTION FROM SENATOR JOSH HAWLEY

Q1:    Do you own any individual stocks?

A1:    Yes.

DOE AR 000962

88

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

QUESTIONS FROM RANKING MEMBER JOHN BARRASSO

Q1:    The Biden Administration has a revolving door ban for its political appointees. You are
not allowed to participate in matters related to your former employer for two years after
your appointment according to the ban. You participated in numerous events with
Cleantech Leaders Roundtable within this two-year window.

Did you violate the Biden Administration's two-year ban, or did you get a waiver?

A1:    Prior to onboarding at the Department of Energy, I informed my ethics advisor in the Office

of the General Counsel that I held a volunteer, uncompensated officer and board position

with Cleantech Leaders Roundtable (Cleantech) and that I would resign from this position.

I resigned in February 2021. At that time, I described monthly dinners held by Cleantech

and was cleared to attend said dinners in my own personal capacity and with my own

personal finances. These monthly dinners are social in nature, and I have always made clear

to event organizers and attendees that I am attending in my personal capacity, not as the

Director of the Loans Program Office (LPO). For events where Cleantech asked me to

speak or attend in my formal Government capacity we went through a full ethics review

and approval before my participation.

Q2:    The Washington Post reported on the political connections that helped Solyndra and other
companies get loans under the Obama-Biden Administration's green stimulus. I offered
an amendment to the Bipartisan Infrastructure Law, which this committee unanimously
adopted, requiring the Secretary of Energy to certify that political influence did not play
any role in the selection of recipients of loans and loan guarantees.

Has the Secretary been issuing these certifications? I asked for these certifications at the
DOE budget hearing this past April. Why haven't they been shared with the committee?
When can we expect to see them?

A2:    The Bipartisan Infrastructure Law (BIL) aligned statute with LPO's practice of ensuring

political influence does not impact project selection. The appropriations under the

Bipartisan Infrastructure Law to financial assistance programs are all made via

89

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

competitive process with no involvement of political appointees in the selection process.
With respect to LPO applications, in response to inquiries from the Committee, LPO
provided copies of the Secretary's political influence certifications delivered in
connection with the three projects that had received loans or loan guarantees under the
Advanced Technology Vehicles Manufacturing Program and the Title 17 Loan Program,
respectively, since the passage of the BIL. DOE will continue the practice of complying
with the Secretary's obligation to certify no political influence in connection with all
LPO projects, as required by statute.

Q3:    Taxpayers work hard for their money. They do not want to see it wasted. You admitted
recently that some of the loans you oversee have high "executional risks" and are "likely"
to lose money. You also said in an interview last year that some are telling you that you
and your office are not "taking enough risk."

How much of the hundreds of billions of dollars you have to spend do you expect to lose?

A3:    The Loan Programs Office (LPO) takes seriously its responsibility to protect taxpayer
resources. Since its first loan programs were authorized by Congress in the Energy Policy
Act of 2005, LPO has been evolving, establishing a proactive risk management culture,
and making improvements to the office that have increased both internal and interagency
oversight, clarified its management responsibilities, institutionalized risk management
practices and put in place portfolio-wide safeguards and monitoring of all LPO projects,
among other enhancements.

Whether private sector or public sector, to loan money is to take risk that the borrower
will be unable to repay. Taking project risk is crucial to LPO's mission to provide a
bridge to bankability for innovative technologies and other projects essential to our
energy future that are unable to access commercial debt markets. Congress has repeatedly
provided LPO with a mandate to take on risk. Under the Federal Credit Reform Act of
1990, the government is required to account for the risk of a loan or loan guarantee by

DOE AR 000964

90

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

budgeting for the net present value of the expected cashflows to and from the government over the life of the loan, called the credit subsidy cost. Congress has appropriated budget authority to cover credit subsidy costs to account for the expected loss on loans and loan guarantees. As required by the Federal Credit Reform Act and Circular A-11, the credit subsidy cost for each loan or loan guarantee issued is reestimated annually to ensure the Federal budget accounts for changes in project risk over time.

Q4:    The Wall Street Journal reported on June 29th, "PG&E has applied for a roughly 7-billion-dollar federal loan to fund its ambitious plans .... [to bury] power lines and

[upgrade] the grid." The same news report says, "the California utility was invited to apply for funding from the Energy Department's Loan Programs Office."

Yes or no, did your office invite PG&E to apply for a loan? Do you think it is a good idea to give a twice-bankrupt company like PG&E a $7 billion loan backed by the taxpayers?

A4:    LPO cannot comment on the status of potential applications that may be in our applicant pipeline.

LPO encourages projects across eligible technology areas to apply. LPO does not pick and choose the technologies that come to the office and that are ultimately offered a conditional commitment or issued a loan. Eligible projects are vetted by LPO in a multi-step application process and must meet the specific requirements of the program an applicant is applying to. If an eligible project meets all application requirements, including a project's reasonable prospect of repaying the obligation, LPO provides financing subject to available authority.

LPO takes seriously its responsibility to protect taxpayer resources. Before issuing a loan, LPO conducts rigorous due diligence that is comparable to what is considered best practice in the private sector. Due diligence includes eligibility determinations and technical, market, financial, credit, legal, and regulatory reviews, among other items.

DOE AR 000965

91

**Senate Energy and Natural Resources Committee**
**October 19, 2023, Hearing**
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
**Questions for the Record Submitted to Jigar Shah**

Additional details about LPO's multi-step application process can be found on LPO's website at https://www.energy.gov/lpo/application-process.

Q5:    Mr. Shah, you have reportedly been a guest speaker at least ten Cleantech-sponsored events. Please provide a list of all of the Cleantech events you attended. How many of these events were open to the public and how many were member-only invitations? How many people, organizations, or companies paid to attend each of the member-only events? How many people, organizations, or companies paid to attend each of the public events? Please provide a list of all the attendees that you interacted with at each of these events.

A5:    As an attendee in my personal capacity to these events, I was not privy to the full event logistical details, or the attendee lists for the events referenced in the Committee's question and it is not possible for me to recall accurately everyone I interacted with at these events as it is the nature of such dinner events to have numerous short and casual interactions with the other attendees.

As mentioned above, prior to onboarding at the Department of Energy, I informed my ethics advisor in the Office of the General Counsel that I had held this volunteer, uncompensated position with Cleantech. At that time, I described monthly dinners held by Cleantech and was cleared to attend said dinners in my own personal capacity and with my own personal finances. These monthly dinners were social in nature, and I have always made clear to event organizers and attendees that I was attending in my personal capacity, not as the Director of LPO. My attendance at these monthly dinners has never been comped or reimbursed by the host organization or the federal government. For events where Cleantech asked me to speak or attend in my formal Government capacity we went through a full ethics review and approval before my participation.

DOE firmly believes in a private-sector led, government-enabled approach to our energy transformation. Under this approach, private sector engagement and leadership is crucial

DOE AR 000966

92

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

to identifying challenges and opportunities capital allocators face in deploying key energy technologies at scale. As Congress instructed DOE, the private and public sector must work together to inform, implement, and effectively leverage resources in landmark legislation like the Bipartisan Infrastructure Law (BIL) and Inflation Reduction Act (IRA), which together will help the United States make progress in this energy transformation.

When I took office as Director of the Loan Programs Office, part of my mandate was to revitalize the Office and help realize and communicate the potential of LPO. This means restoring trust in the institution by talking to the private sector. This mandate was issued by Congress, who, on a bipartisan basis in both the Energy Act of 2020[1] and the BIL[2], provided LPO with specific direction to conduct outreach to industry through in-person engagements like conferences and through online communications. As a result of this engagement, LPO's applicant pipeline has grown significantly.

As referenced in the October 19th hearing with the Committee, officials across branches and all levels of government have found value in attending conferences as a way to engage with and hear from a wide array of industry partners and stakeholders. For example, as Chairman Manchin mentioned at the hearing, the CERAWeek conference brings together global thought leaders and federal policymakers, including from Congress, to advance new ideas, and discuss new industry insights and solutions relevant to the energy space. Engagements like these are widely attended by DOE staff, including LPO staff and leadership. These types of stakeholder engagements are necessary to foster the private-sector led, government-enabled approach to our energy transformation.

---

[1] Energy Act of 2020, § 9010(a)(4) (included as Division Z of the Consolidated Appropriations Act, 2021 (P.L. 116-260).)
[2] Infrastructure Investment and Jobs Act, § 40401(b)(3) (P.L. 117-58).

93

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

QUESTIONS FROM SENATOR CATHERINE CORTEZ MASTO

Q1:    Building on our conversation during the hearing, can you please provide a summary of DOE's guidance for the minimum range of costs required for a Tribe to access the Tribal Energy Loan Guarantee Program (TELGP)? In addition to the Office of Indian Energy's work, what is the Loan Program Office (LPO) doing to assist Indian Country in packaging complex financing options for energy projects?

A1:    TELGP supports tribal investment in energy-related projects by providing loans and loan guarantees to federally recognized tribes, including Alaska Native villages or regional or village corporations, or a Tribal Energy Development Organization that is wholly or substantially owned by a federally recognized Indian Tribe or Alaska Native Corporation. The IRA increased the available loan authority from $2 billion to $20 billion and provided $75 million to carry out the program.

LPO works in close collaboration with the Office of Indian Energy in conducting its outreach. Since the start of the Biden-Harris Administration, the TELGP team has held hundreds of outreach meetings with tribes and other eligible entities, including one-on-one meetings with tribal leaders, participation in national summits, listening sessions, relationship development discussions, and webinars to disseminate information on the availability, benefits, and application process to interested parties. In addition, recent legislation added direct lending authority and the ability to guarantee loans issued by the Federal Financing Bank. These changes and outreach have made the program more accessible to applicants and obviated the need to secure a partial guarantee from a commercial lender. As a result, the program now has more than 12 applicants requesting several billion dollars in financing across multiple energy sectors.

DOE AR 000968

94

**Senate Energy and Natural Resources Committee**
**October 19, 2023, Hearing**
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
**Questions for the Record Submitted to Jigar Shah**

The cost per applicant of accessing the Tribal Energy Financing program varies. As described in the solicitation[3], borrowers are responsible for paying fees and expenses of independent consultants and outside counsel. These costs are incurred toward the end of the LPO application process, and only after eligibility determinations have been made. LPO endeavors to keep these costs under 1% of the total loan request. In addition, based on feedback from Tribes and Tribal developers, application, facility, and maintenance fees payable to DOE were eliminated.

Q2:    DOE is expected to include a specific interpretation of the "foreign entities of concern" (or FEOC) for the battery program funding notice expected soon. Can you confirm that this determination is being coordinated across the Administration so that entities can rely on it for both funding opportunities and tax incentives? Going forward, will you be applying this same scrutiny and vetting to the LPO programs as well?

A2:    Yes, this determination is being coordinated across the Administration and amongst the various program offices within the DOE.

LPO works with entities across DOE to onshore critical supply chains that strengthen our energy security and resilience and allow the United States to lead in the deployment of clean energy technologies at scale.

Before issuing a loan, LPO conducts due diligence of all borrowers with rigorous financial, technical, legal, and market analysis by the DOE's professional staff, including qualified engineers and financial and legal experts as well as third-party advisors. This rigorous evaluation and underwriting process includes vetting a potential borrower's inputs and assumptions about the proposed project, including but not limited to the project sponsors' financial and technical assumptions, the market for their technology, and project risks. These factors are also carefully evaluated outside of LPO by another of

---

[3] https://www.energy.gov/lpo/articles/tribal-energy-loan-guarantee-program-solicitation-current

DOE AR 000969

95

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

DOE's research security resources like the Office of Research, Technology and Economic Security, which is responsible for implementing and continuing to evolve DOE's enhanced due diligence process for financial assistance and loan projects, building awareness internally within DOE on RTES issues, and engaging with external stakeholders. In addition, during its evaluation of a potential project, DOE can employ mitigation measures against the assessed risks of a potential project, as is routine in the evaluation and underwriting of any project loan. Some authorities may have different requirements than others, such as BIL 40207, which defines Foreign Entities of Concern and prioritizes grants under that section to those applicants who do not, inter alia, "use battery material supplied by or originating from a foreign entity of concern."

After a conditional commitment is offered, and prior to DOE issuing a loan, this rigorous evaluation continues. In negotiating a term sheet and financing documents with any borrower, LPO includes binding provisions that ensure the issues flagged in due diligence are appropriately addressed to the Department's satisfaction prior to financial close and through the life of the loan, including provisions relating to foreign ownership and control.

For all potential project sponsors and borrowers, LPO employs robust Know Your Customer policies, background checks, and other measures to ensure a clear understanding of the potential borrower. This goes beyond the aforementioned due diligence process on a project's financial, legal, and technical background to also include owners, sponsors, partners, and the project's management structure. LPO also evaluates proposed facility locations, supply chains, and treatment of intellectual property. LPO follows this rigorous process for all application.

Q3:     Given DOE has different financing opportunities at its disposal to assist applicants in different ways, who do you envision is the ideal candidate for the battery grant program

96

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

versus an LPO loan? In other words, where would a fully developed company go to for support, as opposed to an emerging entity, or someone coming right out of research and development (R&D)?

A3:   As the global economy shifts towards clean energy and technology continues to advance, securing access to essential materials, components, and clean energy technology equipment is increasingly important. DOE is investing in manufacturing across the research-to-deployment spectrum to secure the Nation's supply chains. To meet the needs and challenges of the 21st century U.S. energy sector, including implementing $62 billion from the BIL, DOE realigned to create the Office of the Under Secretary for Infrastructure. This office complements RD&D efforts from the Under Secretary for Science and Innovation with strategically aligned deployment efforts. The Under Secretary for Infrastructure focuses on national goals such as providing affordable and reliable energy, creating high quality jobs, revitalizing U.S. manufacturing, and addressing the climate crisis. This realignment facilitates domestic manufacturing and accelerates equitable deployment and scalability. It aims to transform American innovation into market products to meet growing demand.

Financing opportunities exist within different offices under the Under Secretary for Infrastructure, or across the DOE enterprise, depending on the stage of a project. For example, for a company ready for project finance debt, LPO offerings can accelerate deployment at scale. If a company has proven technology and needs capital support, through equity, to de-risk manufacturing and commercial production, they may consider applying to grant programs in the Manufacturing and Energy Supply Chain (MESC) office, such as the battery awards. Conversely, an emerging entity can work through the Office of Science and Advanced Research Projects Agency- Energy (ARPA-E) for support with early-stage R&D. The current structure of DOE offices is designed to accelerate innovation at vital stages of a technology's evolution. This ensures that game-changing ideas can progress from their inception in the lab to being manufactured on

97

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

America's factory floors. Each DOE office plays a unique role in helping novel technologies overcome complex barriers and move from fundamental science and research and development to demonstrations, deployment, and full-scale commercialization.

To address the specifics of your question, a manufacturing company engaged in the battery value chain whose technology is sufficiently advanced for full scale deployment, has the option of applying to MESC programs for financial assistance. The decision of whether to accept support from MESC or LPO is up to the applicant. Note that while the applicant has the choice of applying for both, but can only receive one.

Q4: Can you speak to how the Infrastructure team and Loan Program Office are specifically working together to best support these interested applicants since many companies would like an efficient way to work with the Department, even if your authorities and capabilities are quite different?

A4: DOE centralized within the Office of the Under Secretary for Infrastructure both existing offices focused on major demonstration and deployment and new offices. Several existing offices moved to the new Under Secretary, including the Loan Programs Office (LPO), Office of Indian Energy, Office of Clean Energy Demonstration (OCED), Office of Cybersecurity, Energy Security, and Emergency Response (CESER), and the Federal Energy Management Program. Additionally, three new offices were launched to support clean energy technology commercialization and infrastructure deployment within the Under Secretary for Infrastructure: the Grid Deployment Office, the State and Community Energy Program, and the Office of Manufacturing and Energy Supply Chains (MESC).

The Loan Programs Office, in response to Congressional direction, has a robust Outreach and Business Development (OBD) division, staffed with federal employees with deep

98

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

private sector expertise. This team conducts extensive outreach to communicate the value of LPO program offerings and take in feedback on what may be preventing meritorious applicants from approaching us. In addition, OBD actively and directly engages thousands of companies and investors across the private sector. We have an opportunity to help companies and other stakeholders find their way to government programs to accelerate their energy initiatives - even if not eligible for LPO financing. LPO's "Front Door" effort is aimed at helping the LPO team quickly and easily field inbound inquiries and make connections to relevant government resources. The team employs two tools to facilitate these connections: an external-facing universal reply email and an internal quick-reference guide of links and contacts to provide custom advice or connections. In addition, the OBD team meets regularly with the Undersecretary of Infrastructure to monitor progress on these activities, and regularly hosts training sessions to educate OBD team members and enhance networking skills.

Another example of efficient coordination can be seen in the Department-wide Pathways to Commercial Liftoff effort, an initiative to drive public and private sector engagement critical to the development of effective clean energy industrial strategy. The effort, coordinated through DOE's Office of Technology Transitions and with contributions from a number of other DOE program offices, is a series of reports that provide a valuable, engagement-driven resource on how and when certain technologies—including industrial decarbonization technologies, virtual power plants, clean hydrogen, advanced nuclear, and long duration energy storage—can reach full scale deployment. The Liftoff reports provide insights that help steer public sector and private sector investments at this critical time.

Additionally, OCED provides information about LPO financing opportunities to their non-selected applicants. If interested, non-selected applicants to OCED can schedule a

99

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

no-cost consultation with a member of LPO's Outreach and Business Development team to discuss potential projects and program evaluation criteria for potential LPO financing. This allows non-selected applicants with existing project ideas to be seamlessly connected to additional funding opportunities at the Department. We intend to replicate this process with MESC and GDO programs.

Q5:   Your written testimony highlighted some of the recent investments that the Department has made to contribute to the Biden Administration's goals to onshore (and re-shore) critical minerals. Can you please elaborate on some these initiatives to build a more resilient domestic supply chain for manufacturing projects?

A5:   Onshoring and re-shoring critical materials activities will reduce the United States' reliance on foreign nations and insulate the supply chain from global bottlenecks. To address this need, DOE announced a comprehensive strategy[4] to secure America's clean energy supply chain. A core focus within the strategy is increasing the availability of the critical materials that are essential components of clean energy technologies.

LPO can support qualifying projects that increase the domestically produced supply of critical minerals, which may include but are not limited to critical minerals processing, components manufacturing, and critical minerals recycling. LPO can finance critical materials projects through the following programs, Advanced Technology Vehicles Manufacturing, Title 17 Clean Energy Financing- Innovative Energy and Innovative Supply Chain, Title 17 Clean Energy Financing- Energy Infrastructure Reinvestment, and Tribal Energy Finance.

To highlight one example of LPO's work, in July 2022, the Department of Energy issued a $102.1 million loan to Syrah Technologies LLC for the expansion of its Syrah Vidalia

---

[4] https://www.energy.gov/articles/doe-releases-first-ever-comprehensive-strategy-secure-americas-clean-energy-supply-chain

100

**Senate Energy and Natural Resources Committee**
**October 19, 2023, Hearing**
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
**Questions for the Record Submitted to Jigar Shah**

Facility—a processing facility that produces graphite-based active anode material (AAM), a critical material used in lithium-ion batteries for electric vehicles (EVs) and other clean energy technologies[5]. Located in Vidalia, LA, the facility would be the first of its kind in the country, bringing a key industry to the United States to support the growing EV sector.

The loan will help finance the construction of the Syrah Vidalia Facility, which is the only vertically integrated, large-scale AAM manufacturer outside of China, and the first of its kind in the United States. With this expanded production capacity, the Syrah Vidalia Facility is expected to produce enough graphite-based AAM to support approximately 2.5 million EVs by 2040.

In addition, LPO has offered conditional commitments to a lithium processing facility[6] and two battery recycling facilities[7],[8], helping to increase domestic supply of critical minerals.

The Office of Manufacturing and Energy Supply Chains (MESC) is working alongside private capital to be a force multiplier to secure American supply chains domestically. MESC has finalized $1.9 billion for 15 projects across 11 states that support new, retrofitted, and expanded commercial-scale domestic facilities to produce battery materials, processing, and battery recycling and manufacturing demonstrations. These projects are catalyzing over $4 billion in private sector investment, the creation of over

---

[5] SYRAH VIDALIA | Department of Energy
[6] LPO Announces Conditional Commitment to Ioneer Rhyolite Ridge to Advance Domestic Production of Lithium and Boron, Boost U.S. Battery Supply Chain | Department of Energy
[7] LPO Offers Conditional Commitment to Redwood Materials to Produce Critical Electric Vehicle Battery Components From Recycled Materials | Department of Energy
[8] LPO Announces a Conditional Commitment for Loan to Li-Cycle's U.S. Battery Resource Recovery Facility to Recover Critical Electric Vehicle Battery Materials | Department of Energy

101

**Senate Energy and Natural Resources Committee**
**October 19, 2023, Hearing**
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
**Questions for the Record Submitted to Jigar Shah**

10,000 jobs, significant investment in energy communities, training of over 700 students, and the ability to produce an additional 1.3 million electric vehicles each year. In 2024, MESC anticipates another $3.5 billion of federal funding available for new awards under the Battery Materials Processing and Battery Manufacturing. Additionally, MESC is working to implement $10 billion in funds for the **Qualifying Advanced Energy Project Credit (48C)** program in partnership with the Department of the Treasury and the Internal Revenue Service. These investments will also support energy manufacturing and recycling in addition to critical materials refining, processing, and recycling.

Q6:   Can you please speak to some of the additional financial tools available through LPO that are available to Hydrogen Hub applicants who weren't ultimately selected?

A6:   LPO is working to support U.S. clean hydrogen deployment to facilitate the energy transition in difficult-to-decarbonize sectors to achieve a net-zero economy. LPO can finance hydrogen projects that avoid, reduce, utilize, or sequester air pollutants or greenhouse gas emissions and meet other eligibility and programmatic requirements. LPO can finance projects across the clean hydrogen supply chain, which may include, but are not limited to:

- Production: Facilities such as clean electricity paired with electrolyzers to produce clean hydrogen.
- Midstream infrastructure: Including compression or liquefaction facilities, storage (e.g., salt caverns), and distribution (e.g., pipelines, hydrogen trucking networks, transport of related $CO_2$ products in the case of reformation-based production).
- End use:
  - Industrials and chemicals: Replacing carbon-intensive hydrogen in industrial settings with clean hydrogen (e.g., for ammonia, oil refining, steel, methanol).

DOE AR 000976

102

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

- Advanced transportation: Direct use in fuel cell-powered machines and indirect use via synthetic/hydrogen-derived fuels. Applications include heavy-duty trucking, aviation fuels, and maritime fuels.
- Gas replacement: High-capacity factor firm power, lower-capacity factor power, industrial heat, applications for natural gas blending, and long-duration energy storage (seasonal).

Specifically, LPO can finance clean hydrogen projects through several of its lending programs:

- Advanced Technology Vehicles Manufacturing Program: Financing for projects that involve U.S. manufacturing of advanced technology vehicles, qualifying components, and materials that improve fuel economy, including fuel cell-powered machines and indirect use via synthetic/hydrogen-derived fuels.
- Title 17 Clean Energy Financing Program – Innovative Energy and Innovative Supply Chain Projects (Section 1703): Financing for clean energy projects, including for clean hydrogen projects that use innovative technologies or processes not yet widely deployed within the United States. These projects must show a meaningful reduction of lifecycle greenhouse gases emissions or air pollutants, either via the process itself or via the end use of the material.
- Title 17 Clean Energy Financing Program – State Energy Financing Institution (SEFI) – Supported Projects (Section 1703): Financing for qualifying clean energy projects, including for clean hydrogen projects, that receive meaningful support from a State Energy Financing Institution. These projects do not have an innovation requirement.
- Title 17 Clean Energy Financing Program – Energy Infrastructure Reinvestment Projects (Section 1706): Financing for projects that retool, repower, repurpose, or replace energy infrastructure that has ceased operations or to enable operating

103

**Senate Energy and Natural Resources Committee**
**October 19, 2023, Hearing**
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
**Questions for the Record Submitted to Jigar Shah**

energy infrastructure to avoid, reduce, utilize, or sequester air pollutants or anthropogenic emissions of greenhouse gases. These projects could include eligible hydrogen fuel cell and energy storage technologies. These projects do not have an innovation requirement.

- Tribal Energy Financing: Financing available to federally recognized tribes and qualified tribal energy development organizations for energy development projects, including hydrogen projects. These projects do not have an innovation requirement.

- Carbon Dioxide Transportation Infrastructure Finance and Innovation: Financing for large-capacity, common-carrier carbon dioxide transport projects (e.g., pipelines, rail, shipping, and other transport methods) that can serve as supporting infrastructure for certain types of hydrogen production projects.

Q7:    How is DOE leveraging all existing DOE programs to grow the development of a domestic critical mineral industry and supply chain?

A7:    Innovation will enable the United States to develop globally competitive critical mineral supply chains. To this end, DOE invests across the entire innovation pipeline. The Critical Minerals and Materials (CMM) Crosscut coordinates and integrates the DOE Critical Materials Research, Development, Demonstration, and Deployment (RDD&D) Program. The CMM Crosscut Team is comprised of representatives from across DOE to address research needs and related activities across all stages of research, the full supply chain and life cycle.

To spur innovation, DOE launched a first-of-its-kind Critical Materials Collaborative (CMC) in September 2023. The vision of the CMC is to integrate critical materials applied research, development and demonstration (RD&D) across DOE and the federal government, to accelerate the development of domestic critical material supply chains for the nation. The CMC will operationalize coordination and collaboration, while creating a

104

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

value-add for RD&D performers by expanding their access to world-class expertise, capabilities, and facilities.

The CMC convenes DOE investments across the entire innovation pipeline, from the Advanced Materials and Manufacturing Technologies Office's (AMMTO) Critical Materials Innovation (CMI) Hub, to AMMTO's Critical Materials Accelerator Program, to the Fossil Energy and Carbon Management's (FECM) Critical Materials FOA announced in September. These investments represent the first of many DOE programs to be coordinated through the CMC. The CMC will build out the connective tissue needed to translate basic discovery to inform development of new materials, processes, and technologies, accelerate the adoption of innovation, and support the research needs of the emerging domestic critical mineral supply chains.

The CMC will also leverage the 2023 DOE Critical Materials Assessment, the latest in a series of strategy reports DOE has been releasing since 2010, to prioritize investigating substitutes, alternatives, and recycling technologies that secure a sustainable supply of critical minerals and materials. This year marked the first time DOE designated a list of critical materials necessary to secure our clean energy economy.

At the same time, DOE is working to strengthen and secure critical mineral supply chains through large demonstration and deployment activities. The Office of Manufacturing and Energy Supply Chains (MESC) is implementing CMM-related provisions in the Bipartisan Infrastructure Law and Inflation Reduction Act. Two important efforts are the Battery Materials Processing and Battery Manufacturing Recycling Supply Chain Facilities programs to separate and process critical battery materials and the Rare Earth Element Demonstration Facilities program that will extract from unconventional feedstock materials, such as lignite coal and acid mine drainage. The MESC office is also

DOE AR 000979

105

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

working with Treasury to implement $10B worth of tax credits through the Inflation
Reduction Act 48C Qualifying Advanced Energy Project Credit, of which one section
explicitly aims to re-equip, expand, or establish industrial facility to process, refine, or
recycle critical materials.

In addition, LPO can support qualifying projects that increase the domestically produced
supply of critical minerals, which may include but are not limited to:

- Critical Minerals Processing: Projects that process critical minerals using innovative
  technology for end use in a variety of eligible clean energy technologies, or for
  projects that manufacture eligible advanced technology vehicles or their components.
- Critical Minerals Recycling: Projects that employ innovative technology to improve
  critical minerals recycling, or that recycle critical materials for eventual end use in
  eligible advanced technology vehicles or their components.

LPO can finance critical materials projects through several avenues:

- Advanced Technology Vehicles Manufacturing Program: Loan authority for projects
  that involve U.S. manufacturing of advanced technology vehicles, qualifying
  components, and materials that improve fuel economy.
- Title 17 Clean Energy Financing Program - Innovative Energy and Innovative Supply
  Chain: Loan guarantee authority for innovative clean energy projects, including for
  critical minerals projects that use innovative technologies or processes yet to be
  deployed within the U.S. These projects must show a meaningful reduction of
  lifecycle greenhouse gases emissions, either via the process itself or via the end use of
  the material. These projects support critical minerals as defined in 30 USC 1606(a).
- Title 17 Clean Energy Financing Program - Energy Infrastructure Reinvestment
  Program: Loan guarantee authority for projects that retool, repower, repurpose, or
  replace energy infrastructure that has ceased operations or to enable operating energy

DOE AR 000980

106

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

infrastructure to avoid, reduce, utilize, or sequester air pollutants or anthropogenic emissions of greenhouse gases. Potential reinvestment in eligible energy infrastructure may include aspects of critical materials processing, manufacturing, or recycling.

- Tribal Energy Finance Program: Loan, loan guarantee, or partial loan guarantee authority available to federally recognized tribes and qualified tribal energy development organizations for projects including critical materials projects.

DOE AR 000981

107

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

QUESTIONS FROM SENATOR CINDY HYDE-SMITH

Q1:    It has been recently confirmed that the world's largest known lithium deposit is located in Nevada – furthermore, the company developing that deposit applied for an ATVM loan over a year and a half ago. How is your office making sure that the U.S. is taking advantage of this domestic supply of lithium as quickly as possible to reduce China's influence in our critical infrastructure?

A1:    LPO is not able to comment on the status of potential applications that may be in our applicant pipeline.

Before issuing a loan, LPO conducts rigorous due diligence that is comparable to what is considered best practice in the private sector. Due diligence includes eligibility determinations and technical, market, financial, credit, legal, and regulatory reviews, among other items. This due diligence is performed by LPO's professional staff, including qualified engineers and financial and legal experts as well as third-party advisors. In the due diligence process, LPO ensures the project is evaluated to properly identify and manage risks and to ensure the loan will satisfy the intent of the authorizing legislation and provide a reasonable prospect of repayment.

The application process through conditional commitment commonly takes up to a year. However, it can move faster or slower depending on applicant readiness with required materials. Applicants are assigned an LPO expert from an applicable technology field to support applicants through the LPO process.

LPO has and will continue to support qualifying projects that increase the domestically produced supply of critical minerals, which may include but are not limited to critical minerals processing, components manufacturing, and critical minerals recycling. LPO can finance critical materials projects through the following programs: Advanced Technology

DOE AR 000982

108

**Senate Energy and Natural Resources Committee**
**October 19, 2023, Hearing**
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
**Questions for the Record Submitted to Jigar Shah**

Vehicles Manufacturing (ATVM), Title 17 Clean Energy Financing- Innovative Energy and Innovative Supply Chain, Title 17 Clean Energy Financing- Energy Infrastructure Reinvestment, and Tribal Energy Finance

Through ATVM, LPO has evaluated and supported projects to diversify critical supply chains and strengthen U.S. energy security. Last year, LPO issued a loan to Syrah Technologies LLC for the expansion of its Syrah Vidalia Facility—a processing facility that produces graphite-based active anode material (AAM), a critical material used in lithium-ion batteries for electric vehicles and other clean energy technologies. Graphite production is currently concentrated in China and this facility would be the first of its kind in the country, bringing a key industry to the United States to support the growing EV sector. With the expanded production capacity enabled by the DOE loan, the facility is expected to produce enough natural graphite-based AAM to support approximately 2.5 million EVs by 2040.

In addition, LPO has offered conditional commitments to a lithium processing facility[9] and two battery recycling facilities[10],[11], helping to increase domestic supply of critical minerals.

Q2:    Once fully functional, Lithium Americas says it expects to domestically produce more than 15 times the amount of lithium that we currently produce as a nation each year. At a time when China is dominating the global lithium supply chain, what is your office doing to ensure critical projects like these are coming online as quickly as possible?

A2:    As outlined in the response to your first question, LPO is working with and evaluating many projects to help diversify critical supply chains and strengthen U.S. energy security.

---

[9] LPO Announces Conditional Commitment to Ioneer Rhyolite Ridge to Advance Domestic Production of Lithium and Boron, Boost U.S. Battery Supply Chain | Department of Energy
[10] LPO Offers Conditional Commitment to Redwood Materials to Produce Critical Electric Vehicle Battery Components From Recycled Materials | Department of Energy
[11] LPO Announces a Conditional Commitment for Loan to Li-Cycle's U.S. Battery Resource Recovery Facility to Recover Critical Electric Vehicle Battery Materials | Department of Energy

109

**Senate Energy and Natural Resources Committee**
**October 19, 2023, Hearing**
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
**Questions for the Record Submitted to Jigar Shah**

Today, the United States relies heavily on importing clean energy supply chain components from abroad, exposing the nation to supply chain vulnerabilities that threaten to disrupt the availability and cost of these technologies, as well as the workforce that manufactures them. For example, DOE's 2021 battery supply chain assessment found that currently the United States has less than a 10% global market share for manufacturing capacity across all major battery components and cell fabrication. Onshoring the clean energy manufacturing supply chain is important for increasing U.S. energy independence and reducing foreign governments' dominance in these industries. Thanks to the President's Investing in America agenda, U.S. entities are incentivized to bring back manufacturing jobs to American workers.

Q3:    What is China's percentage of global lithium processing capacity compared to the United States?

A3:    Though the United States has significant accessible deposits of many critical minerals, today we account for negligible shares of extraction and processing. For example, as of 2023, China was a leading producing nation for 29 of the 43 critical minerals for which information was available to make reliable estimates, as catalogued in the U.S. Geological Survey's Mineral Commodity Summaries 2024 report, available here: https://pubs.usgs.gov/periodicals/mcs2024/mcs2024.pdf

Importantly, the Bipartisan Infrastructure Law (BIL) and Inflation Reduction Act (IRA) provided clear direction and tools to onshore and reshore critical minerals supply chain processes here in the United States. Section 40401(a)(2) of the BIL amended LPO's Title 17 Clean Energy Financing Program to include, "projects that increase the domestically produced supply of critical minerals (as defined in section 7002(a) of the Energy Act of 2020 (30 U.S.C. 1606(a)), including through the production, processing, manufacturing, recycling, or fabrication of mineral alternatives." The IRA provided credit subsidy and loan

DOE AR 000984

110

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

guarantee authority to support this expanded eligibility. Through its ATVM program, LPO can provide loans to onshore and scale-up the manufacturing of eligible vehicles and qualifying components, including manufacturing facilities for vehicles, batteries, battery precursor materials, other key vehicle components, and the processing of critical minerals.

Q4:    Can you provide more clarity on the status of the ATVM loan that was applied for by Lithium Americas and if it has not been approved, what has caused the delay since the application was submitted a year and a half ago?

A4:    LPO is not able to comment on the status of potential applications that may be in our applicant pipeline. Please refer to the answer to Question 1 above for LPO's work in this space.

DOE AR 000985

111

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process*
*for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act*
*and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

QUESTIONS FROM SENATOR JOSH HAWLEY

Q1:    Do you own any individual stocks?

A1:    Upon assuming my Federal position, I divested of a number of my financial holdings that
were deemed to be conflicting assets as part of the conflict of interest review that
occurred when I became a Federal employee. There are a few such financial interests that
I hold that cannot be divested and I received a waiver that allows me to work on certain
limited matters involving those entities.

Q2:    Please provide a complete list of all conferences, dinners, and other events where you
spoke and attendants were required to pay a fee to attend. Please include the date,
location, and fee associated with each such event since you joined the Department.

A2:    DOE firmly believes in a private-sector led, government-enabled approach to our energy
transformation. Under this approach, private sector engagement and leadership is crucial
to identifying challenges and opportunities capital allocators face in deploying key
energy technologies at scale. As Congress instructed DOE, the private and public sector
must work together to inform, implement, and effectively leverage resources in landmark
legislation like the Bipartisan Infrastructure Law (BIL) and Inflation Reduction Act
(IRA), which together will help the United States make progress in this energy
transformation.

When I took office as Director of the Loan Programs Office, part of my mandate was to
revitalize the Office and help realize and communicate the potential of LPO. This means
restoring trust in the institution by talking to the private sector. This mandate was issued

112

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

by Congress, who, on a bipartisan basis in both the Energy Act of 2020[12] and the BIL[13], provided LPO with specific direction to conduct outreach to industry through in-person engagements like conferences and through online communications. As a result of this engagement, LPO's applicant pipeline has grown significantly.

As referenced in the October 19th hearing with the Committee, officials across branches and all levels of government have found value in attending conferences as a way to engage with and hear from a wide array of industry partners and stakeholders. For example, as Chairman Manchin mentioned at the hearing, the CERAWeek conference brings together global thought leaders and federal policymakers, including from Congress, to advance new ideas, and discuss new industry insights and solutions relevant to the energy space. Engagements like these are widely attended by DOE staff, including LPO staff and leadership. These types of stakeholder engagements are necessary to foster the private-sector led, government-enabled approach to our energy transformation.

Q3:   Has the Loan Programs Office granted, approved, or renewed any loans to any company in which you hold stock or any financial interest? If so, please provide a complete list of those companies, your financial interest, and the amount of money provided.

A3:   No, LPO has not granted, approved, or renewed any loans to any such company or project.

Q4:   Has the Loan Programs Office granted, approved, or renewed any loans to any company that is or was a member of Cleantech Leaders Roundtable, or any company whose employees have been members of CleanTech Leaders Roundtable? If so, please provide a complete list of those companies, their relationship to CleanTech Leaders Roundtable, and the amount of money provided.

---

[12] Energy Act of 2020, § 9010(a)(4) (included as Division Z of the Consolidated Appropriations Act, 2021 (P.L. 116-260).)

[13] Infrastructure Investment and Jobs Act, § 40401(b)(3) (P.L. 117-58).

DOE AR 000987

113

Senate Energy and Natural Resources Committee
October 19, 2023, Hearing
*Full Committee Hearing to Examine the Department of Energy's Decision-Making Process
for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act
and the Bipartisan Infrastructure Law*
Questions for the Record Submitted to Jigar Shah

A4:     Apart from the rigorous due diligence LPO conducts on projects prior to issuing a loan or loan guarantee related to project details—which may include vetting a) an applicant's financial and technical assumptions and project management plan; b) other factors material to a proposed project; and c) management structures (which may include background checks or other measures to understand a proposed project's owners, sponsors, partners, and management)—DOE does not request or evaluate information about the potential professional or personal membership of an applicant or its employees in domestic organizations, including nonprofit associations or other entities, that are nongermane to the loan application or evaluation process.

Q5:     Do you have any financial interest in Sunnova or any personal or professional relationships with any of its employees?

A5:     I do not have any financial interest in Sunnova.

        In general, in carrying out our professional duties, I and other federal career staff are in communication with borrowers and potential borrowers about opportunities at the Loan Programs Office, including Sunnova.

DOE AR 000988

114

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing:** *The Department of Energy's Due Diligence Process for Awarding*
*Competitive Grants and Loans Funded Through the Inflation Reduction Act and the*
*Bipartisan Infrastructure Law and the Department's Overall Innovation Investment Strategy*
**Questions for the Record Submitted to the Honorable Teri L. Donaldson**

**Questions from Ranking Member John Barrasso**

**Question 1:** **In your view, did the Department have a robust vetting process for loan and grant applicants in place at the time of Microvast's selection to receive $200 million? Do you believe there is more to be done by DOE to prevent taxpayer dollars from being awarded to companies linked to the Chinese Communist Party?**

In March 2023, the Department acknowledged the need to improve its vetting procedures by establishing the Research, Technology & Economic Security (RTES) Vetting Center. I agree that improvements are needed.

In November of 2023, my office advised the Department that it will be auditing the Department's process for vetting loan and grant applications focusing on the RTES. I will inform the Committee on the results of this audit.

**Question 2:** **One of the Department's stated goals for its loan and grant programs is to onshore American manufacturing for clean energy products and materials. Chinese companies such as Gotion High-tech are chomping at the bit to set up shop in the U.S. to take advantage of the IRA's production tax credit. The administration seems to be simultaneously trying to outcompete China while welcoming their companies with open arms and giving them tax breaks in the process.**

**Do you see an issue with this administration's conflicting priorities, and the potential for waste these conflicts may produce?**

As you know, tax credits are not administered by DOE. As a general observation however, conflicting priorities may create ambiguities that could increase the potential for fraud, waste and abuse.

Another project that raises the same issue of balancing competing goals is Kore Power, an Idaho-based company that currently makes lithium-ion battery cells in China with Chinese technology and intellectual property. The company won a conditional commitment from the Loan Program Office in June 2023 for an $850 million loan to help build its first major U.S. manufacturing facility in Arizona. In this case, the Department is moving the project forward on the grounds that U.S. jobs will be created deploying Chinese technology in the U.S., and with the belief that U.S. technology will not go overseas. While it appears that this financing project may support Congress' goals of U.S. job creation, it clearly does not support the legislation's goals of U.S. technology development since this project deploys Chinese intellectual property.

There is every reason to be concerned that foreign adversaries will seek IIJA and IRA funds to advance development of clean energy technology, and that the Department's due diligence procedures may not be sufficient to deal with this reality, particularly when balancing competing priorities.

I

DOE AR 000989

115

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing:** *The Department of Energy's Due Diligence Process for Awarding*
*Competitive Grants and Loans Funded Through the Inflation Reduction Act and the*
*Bipartisan Infrastructure Law and the Department's Overall Innovation Investment Strategy*
**Questions for the Record Submitted to the Honorable Teri L. Donaldson**

**Questions from Senator Josh Hawley**

**Question 1: Have you opened any investigations into Department of Energy employees for**
**compliance with ethics rules regarding the ownership of individual stocks? If so, please**
**provide a list of audits or investigations.**

We do not currently have any open investigations involving individual stock ownership by
Department of Energy employees. During my tenure, the OIG has investigated a small number of
matters involving the ownership of individual stocks by Department of Energy employees, but none
of these matters produced any actionable cases.

To put these results in context, there is no general statutory prohibition against a federal employee
owning stock that may be impacted by the decisions of the agency employing that person. However,
some federal agencies have promulgated regulations strengthening this framework by barring
employees from owning certain stocks. For example, the Federal Energy Regulatory Commission
(FERC) prohibits employees from owing stock in regulated parties such as pipeline and utility
concerns. See 5 C.F.R. § 3401.102. That prohibition also covers parties whose ownership is
imputed to employees such as spouses and minor children. Likewise, the Department of the Interior
prohibits certain employees from acquiring or holding any direct or indirect financial interest in
federal lands or resources administered or controlled by the Department of the Interior. See 5 C.F.R.
§ 3501.103(b).

Aside from the FERC regulations mentioned above, the Department of Energy has not promulgated
any such regulations. Instead, the Department of Energy's supplemental ethics regulations focus on
enhanced reporting of recusals associated with employees owning stocks. See 5 C.F.R. § 3301.102.

Absent a more specific regulation, federal employees must still abide by applicable Office of
Government Ethics (OGE) regulations. Those regulations however permit the ownership of
individual stocks by federal employees. The OGE regulations describe a disqualifying financial
interest as having the potential for gain or loss to the employee, or other person specified in the
criminal conflict of interest statute, 18 U.S.C. § 208, as a result of governmental action on the
particular matter. See 5 C.F.R. § 2640.103(b). For purposes of 18 U.S.C. § 208(a), the disqualifying
financial interest might arise from ownership of certain financial instruments or investments such as
stock, bonds, mutual funds, or real estate. On the other hand, OGE has established exemptions for
ownership of certain financial interests due to the lack of control or limited control an employee has
over such investments (such as diversified mutual funds) where the manager of the fund determines
what stocks are in the fund. In addition, under 5 C.F.R. § 2640.202(a) an employee may participate
in any particular matter in which the disqualifying financial interest arises if: (1) The securities are
publicly traded, or are long-term federal government, or are municipal securities; and (2) The
aggregate market value of the holdings of the employee, his spouse, and his minor children in the
securities of all entities does not exceed $15,000.

The OIG is currently preparing to begin the fieldwork for a Special Project Report focusing on the
issue of conflicts of interests within the DOE complex.

2

DOE AR 000990

116

**U.S. Senate Committee on Energy and Natural Resources**
**October 19, 2023 Hearing:** *The Department of Energy's Due Diligence Process for Awarding*
*Competitive Grants and Loans Funded Through the Inflation Reduction Act and the*
*Bipartisan Infrastructure Law and the Department's Overall Innovation Investment Strategy*
**Questions for the Record Submitted to the Honorable Teri L. Donaldson**

**Question 2:** **Have you opened any investigation into Secretary Granholm for her compliance**
**with ethics laws, her failure to list her individual stocks, or her misleading testimony to this**
**committee?**

In 2021, we reviewed Secretary Granholm's ethical, regulatory, and statutory obligations and her
relationship with Proterra, Inc. The primary focus of our inquiries was whether Secretary Granholm
violated the criminal conflict of interest statute, 18 U.S.C. § 208. We also reviewed the regulation
regarding consideration of appearances, 5 U.S.C. § 2535.502, and Section 1, Paragraph 2 of
Executive Order 13989, January 20, 2021, titled "Ethics Commitments by Executive Branch
Personnel." Our inquiries did not identify evidence that Secretary Granholm violated existing
statutes or regulations with respect to her financial interest in Proterra.

We likewise found no violation in Secretary Granholm's April 20, 2023, testimony regarding her
financial holdings. To make this determination, we reviewed the hearing held on April 20, 2023,
Secretary Granholm's written testimony submitted for the hearing, her letter dated June 9, 2023,
explaining her mistaken belief that she did not own individual stocks, and her financial disclosure
reports. Our review did not identify evidence of willful misrepresentation. Specifically, it appears
the Secretary was not aware of her husband's stock holding at the time she testified. I will provide
more detail on this review in my response to the letter you sent to me on October 24, 2023.

**Question 3:** **Has the Department of Energy supported your efforts to maintain and pursue all**
**audits and investigations that you think are appropriate in order to conduct vigorous oversight**
**of the Department's loan programs?**

It is critically important that the OIG be properly funded to conduct oversight of the loan program
office.

The House FY24 Energy and Water Development Appropriations bill that passed the House in
October, recognizes that funding for the Department of Energy has increased significantly without
commensurate increases to funding for the Office of the Inspector General. The House Energy and
Water Development Appropriations bill provides a transfer of funds from the Department's
unobligated balances under both IIJA and IRA to the OIG. Although it is not the full amount needed
for sufficient OIG oversight and does not include a transfer of funds from Puerto Rico Energy
Resilience Fund, the transfer language is a step in the right direction.

The Department is not supporting the OIG's request for Congress to authorize the transfer.

The current FY 24 Senate Energy and Water Bill does not provide any additional funding for the
OIG. Specifically, it keeps OIG FY 24 funding at FY 23 levels and does not contain any transfer
language.

3

DOE AR 000991

117



**Testimony for the Record**

**U.S. Senate Committee on Energy and Natural Resources**

**"Hearing to Examine the Department of Energy's Decision-Making Process for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act and the Bipartisan Infrastructure Law"**

**October 19, 2023**

Table of Contents

Introduction................................................................................................................................2
Countering an Uneven Global Playing Field ...........................................................................3
More Investment in Upstream is Needed ................................................................................6
Disjointed Domestic Policy Exacerbates Our Upstream Deficit ...........................................7
Conclusion...................................................................................................................................7

118

America's mining industry supplies the essential materials necessary for every sector of our economy – from technology and healthcare to energy, transportation, infrastructure and national security. The National Mining Association (NMA) is the only national trade organization that serves as the voice of the United States mining industry and the hundreds of thousands of American workers it employs before Congress, the federal agencies, the judiciary and the media, advocating for public policies that will help America fully and responsibly utilize its vast natural resources.

We work to ensure America has secure and reliable supply chains, abundant and affordable energy, and the American-sourced materials necessary for U.S. manufacturing, national security and economic security, all delivered under world-leading environmental, safety and labor standards. The NMA has a membership of more than 280 companies and organizations involved in every aspect of mining, from producers and equipment manufacturers to service providers. As such, our membership is uniquely positioned to pursue funding opportunities made available through the Department of Energy's (DOE) programs and appreciates the opportunity to offer testimony on behalf of the industry.

## Introduction

Despite being home to extensive and varied mineral resources, the U.S. is facing grave mineral supply chain challenges. Our import reliance has been a well-documented and increasingly problematic issue for decades and has now become a crisis, exacerbated by pandemic and war-related challenges, and the electrification of our economy. In fact, several materials key to the energy transition, including lithium, cobalt and copper, are forecast to enter a supply deficit as soon as 2027.[1]

The Biden-Harris administration has signaled a recognition of the immense mineral supply chain challenges we face; indeed, some of the administration's earliest actions included the requirement for a comprehensive supply chain review, acknowledging the vulnerabilities inherent in our overreliance on mineral imports, the need for domestic mining support and lack of domestic processing capabilities. In response, the DOE recently added copper and other minerals to its updated July 2023 assessment of materials essential to global clean energy technology supply chains. These sensible additions allow for greater application and use of current and future DOE funding opportunities and incentives used to strengthen our domestic mineral supply chains.[2]

Congress has jointly recognized these significant economic and security challenges facing the U.S. and, through the leadership of this committee, has taken action to

---

[1] S&P Global Market Intelligence, "Mining execs warn of disconnect between metals appetite, pace of new projects," October 5, 2023. https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/mining-execs-warn-of-disconnect-between-metals-appetite-pace-of-new-projects-77724545

[2] Department of Energy, "U.S. Department of Energy Releases 2023 Critical Materials Assessment to Evaluate Supply Chain Security for Clean Energy Technologies," July 31, 2023. https://www.energy.gov/eere/articles/us-department-energy-releases-2023-critical-materials-assessment-evaluate-supply

DOE AR 000993

119

address our untenable minerals and materials reliance. Through the Infrastructure Investment and Job Act (IIJA) and the Inflation Reduction Act (IRA), and other legislation, Congress has enacted billions in funding and incentives to grow our capacity for minerals and energy technologies here at home. Together, the DOE and Congress' actions have put in place the largest industrial policy initiatives since the New Deal programs of the 1930's.

## Countering an Uneven Global Playing Field

China is the primary producer and/or supplier of mineral commodities listed as essential to U.S. economic and national security.[3] It controls more than 80percent of global rare earth element (REE) production, nearly 90 percent of global mineral processing capabilities, as well as the market prices for REE's at each step of the process. China refines 68 percent of the world's cobalt, 65 percent of nickel and 60 percent of battery grade lithium needed for electric vehicle batteries and energy technologies. Further, China has significant ownership of mineral operations outside its borders, including more than 70 percent of mine ownership in the Democratic Republic of the Congo. Chinese companies also spent $4.3 billion between 2018 and the first half of 2021 acquiring lithium assets, twice the amount spent by companies from the U.S., Australia and Canada combined.[4]

Goldman Sachs Research also estimates the extent of the vertically integrated nature of China's dominance, with 65 percent of battery components, 71 percent of battery cells and 57 percent of the world's EV's being made in China.[5] This dominance and China's manipulative market practices remain a major threat, wreaking havoc on domestic operators' ability to compete while hindering our nation's ability to meet the administration's stringent emissions reduction targets and national security objectives.

On the other hand, international competition for minerals is strengthening and nearly every Western ally, aside from the U.S., is prioritizing ramping up domestic mining operations. In the last year, Canada released its strategy to position itself as the "global supplier of choice for clean energy minerals";[6] the United Kingdom released

---

[3] Notably this reliance comes despite existing U.S. resources. In the 2022 Mineral Commodity Summaries, the USGS indicated the U.S. had an estimated 48 million metric tons (mt) of copper that can be mined and processed economically, 69 million mt of cobalt, 340 million mt of nickel and 750 million mt of lithium. Regardless, in 2021, the U.S. imported 48 percent of U.S. consumption of nickel, 76 percent of cobalt, 45 percent of copper, and more than 25 percent of lithium.
[4] Payne Institute for Public Policy, "The State of Critical Minerals Report 2023," P.45. https://payneinstitute.mines.edu/wp-content/uploads/sites/149/2023/09/Payne-Institute-The-State-of-Critical-Minerals-Report-2023.pdf
[5] Goldman Sachs, "Resource realism: The geopolitics of critical mineral supply chains," Sept. 2023. https://www.goldmansachs.com/intelligence/pages/resource-realism-the-geopolitics-of-critical-mineral-supply-chains.html
[6] Natural Resources Canada News Release, "Countries Commit to the Sustainable Development and Sourcing of Critical Minerals," Dec. 12, 2022. https://www.canada.ca/en/natural-resources-canada/news/2022/12/countries-commit-to-the-sustainable-development-and-sourcing-of-critical-minerals.html

3

120

its critical minerals strategy;[7] and the European Union unveiled a comprehensive proposal including various permitting efficiency actions to ensure the EU's access to a secure, diversified, affordable and sustainable supply of critical raw materials.[8]

Key administration officials have highlighted that the mismatch between soaring mineral demand and our already alarming overreliance on overseas supply - notably from China - is a clear danger in need of decisive action.

- Jake Sullivan, the president's national security advisor, has warned that, "[mineral] supply chains are at risk of being weaponized in the same way as oil in the 1970s, or natural gas in Europe in 2022." [9]

- Secretary of Energy Jennifer Granholm recently told the International Energy Agency that China's dominant position in critical minerals, and willingness to weaponize these supply chains, is a grave threat. "The fuel of this energy transition — critical minerals — is going to make global energy security infinitely more complex and infinitely more important over the next few decades," she said.[10] Granholm has also called for increased domestic mineral production to help meet the challenge, telling an energy conference last year that she was going to work to streamline the permitting process, declaring, "It takes forever to get a new permit. How crazy is that?" [11]

- Brian Deese, until recently President Biden's lead economic advisor, recently wrote on the China minerals threat, declaring, "permitting laws will need to be reformed in order to expand domestic mining and processing of lithium, copper, and rare earths while still protecting key environmental and tribal equities." [12]

Many in the administration have spoken about the need to secure our mineral supply chains and use our domestic resources, but these words have yet to match coordinated action and have too often been outmatched by decisive and obstructive land withdrawals, monument designations, lease reversals, preemptive vetoes and permit inaction.

---

[7] Department for Business, Energy and Industrial Strategy, "Resilience for the future: The UK's critical minerals strategy, 22 July 2022. https://www.gov.uk/government/publications/uk-critical-mineral-strategy/resilience-for-the-future-the-uks-critical-minerals-strategy
[8] European Union's Critical Raw Materials Act, March 16, 2023. https://commission.europa.eu/strategy-and-policy/priorities-2019-2024/european-green-deal/green-deal-industrial-plan/european-critical-raw-materials-act_en
[9] April 27, 2023, Remarks by National Security Advisor Jake Sullivan on Renewing American Economic Leadership at the Brookings Institution. https://www.whitehouse.gov/briefing-room/speeches-remarks/2023/04/27/remarks-by-national-security-advisor-jake-sullivan-on-renewing-american-economic-leadership-at-the-brookings-institution/
[10] Sept. 28, 2023, Secretary of Energy Granholm Remarks as reported at https://www.mining.com/web/chinas-grip-on-critical-minerals-draws-warnings-at-iea-gathering/.
[11] March 11, 2022, Secretary of Energy Granholm Remarks as reported at https://www.reuters.com/article/ceraweek-conference-mining-idTRNIKCN2L81WC.
[12] Brian Deese and Jason Bordoff, Break China's Hold on Batteries and Critical Minerals, Foreign Policy Magazine, Oct. 4, 2023, https://foreignpolicy.com/2023/10/04/ev-electric-china-us-batteries-critical-minerals-energy-oil-renewable/.

4

DOE AR 000995

121

Though the administration has continued to take a woefully disjointed and oftentimes regressive approach to addressing mineral supply chain security,[13] the DOE has shown consistent leadership by delivering on funding opportunities and incentives for minerals processing and refining, recycling and manufacturing. It has also provided funding for new and innovative sources for domestic supplies of key minerals and materials for energy technologies, including for coal to REE projects. These opportunities were made available by a portion of the $500 million included in the IRA and the roughly $1.2 trillion in incentives within the IIJA.

The NMA has worked closely with the DOE, the Department of the Treasury and Congress to support the implementation of these programs to ensure a wide range of opportunities can be utilized by the domestic mining industry, in-turn, providing the greatest return on taxpayer funding.

The effective implementation of these programs is underway, and the industry is responding and benefiting. Below are just a few of the notable funding announcements and cooperative agreements being established to improve the domestic mineral supply chain and operational efficiency of mining in the U.S.



---

[13] The Congressionally authorized U.S.-China Economic and Security Review Commission found in its 2022 report to Congress that *"The current ability of the U.S. to overcome the scale and scope of China's harmful policies is undermined by the lack of a coherent strategy and fragmented authorities to mobilize resources, coupled with a deficiency in new tools to address economic injury. The U.S. is also impeded by its self-imposed barriers to employing and underutilization of available tools and its difficulties in data sharing and analysis."* https://www.uscc.gov/sites/default/files/2022-11/2022_Executive_Summary.pdf

DOE AR 000996

122

## More Investment in Upstream is Needed

Solutions to meet the anticipated mineral demand that will accompany our energy future will require the rebuilding and strengthening of our domestic supply chains. Key components include increased domestic mineral production and processing, reprocessing of mine waste, increased recycling, and strategic alliances with allied nations. There is no one option that will fill the need – the answer must be comprehensive. Every tool will be needed to meet the speed and the scale of the demand now upon us, and domestic mining and our ready and capable workforce must be at the center of this holistic effort.

Further, the DOE must do more to secure upstream energy minerals value chains. DOE's Title 17 Innovative Energy Loan Guarantee Program has more than $400 billion in estimated loan capacity available to provide loan guarantees to accelerate deployment of innovative, all-of-the-above energy projects. This includes more than $3 billion in loan guarantees available to support efficiencies in "mining, extraction, processing, recovery, or recycling of critical materials projects."[14]

IIJA Section 40401(a)(2) amended Section 1703(b) of the Energy Policy Act of 2005 (42 U.S.C. 16513(b)) by adding a thirteenth category of lending eligibility, specifically, "projects that increase the domestically produced supply of critical minerals (as defined in section 7002(a) of the Energy Act of 2020 (30 U.S.C. 1606(a)), including through the production, processing, manufacturing, recycling, or fabrication of mineral alternatives."[15] Despite this congressional mandate, there have been no projects funded by DOE that boost the domestic extraction of minerals.

Further, DOE in May 2023 released an Interim Final Rule that "amends Title 17 regulations to implement changes that expand or modify program authority and to revise for clarity and organization."[16] The interim rule provided another self-imposed barrier to employing underutilized and available tools that support the energy transition.

The NMA is urging its members to pursue these opportunities through partnership with the DOE. However, we urge the DOE to provide funding guidance and implementation solutions to further support the industry's efforts to strengthen the domestic mineral supply chain.

As the administration has made clear, time is not on our side. Mineral demand is soaring. China's grip on mineral supply chains is tightening and mineral supply deficits are already weighing on the cost and deployment schedule of critical energy technologies. DOE must move with more urgency to support domestic mining.

[14] DOE Critical Materials Loans & Loan Guarantees handout, accessed Oct. 17, 2023. https://www.energy.gov/sites/default/files/2021-06/DOE-LPO_Program_Handout_Critical_Materials_June2021_0.pdf
[15] 42 U.S.C. 16513 - Eligible projects. https://www.govinfo.gov/content/pkg/USCODE-2021-title42/pdf/USCODE-2021-title42-chap149-subchapXV-sec16513.pdf
[16] Federal Register, Loan Guarantees for Clean Energy Projects (88 FR 34419). https://www.federalregister.gov/documents/2023/05/30/2023-11104/loan-guarantees-for-clean-energy-projects

DOE AR 000997

123

## Disjointed Domestic Policy Exacerbates Our Upstream Deficit

With so many variables at play within a mining project, the importance of regulatory certainty in attracting investment in mining projects cannot be overstated. Mining is one of the most heavily regulated industries in the U.S. and one that is highly capital-intensive. The process takes years – and even decades – of exploration, engineering, design and development before minerals can be produced. Unlike coal, and oil or gas exploration, concentrations of useful minerals that are rich enough to form ore deposits are rare with approximately 1 out of 1,000 deposits having the qualities that allow them the chance of being transformed into an operating mine. Coupled with complex state and federal permitting processes, significant time may pass impacting the ability of mining companies to attract investment capital. It is not uncommon for complex, large scale mining projects to take 20 years or more to be permitted, costing billions of dollars before seeing a single dollar in return.

Investors favor projects where they are likely to get the earliest return on their investment and where they know they have the necessary security of title and tenure from the time of location through mine reclamation and closure. As a result, investment dollars for mineral exploration and development tend to flow to countries with a stable political environment, strong economy, an efficient permitting system and predictable regulatory climate. Further, unlike other countries where mining is driven by government investment, U.S. mining is primarily a private enterprise. These unique factors taken together outline the importance of using all available tools that give domestic mines the ability to operate competitively in global minerals market whose participants often do not operate under common and competitive free-market principles.[17]

## Conclusion

The current state of the U.S. mineral supply chain – from mining through smelting and processing – is a shell of our true domestic potential. Investing in this supply chain and reshoring essential capacity is critical to our own national security and economic competitiveness.

Congress and the DOE have taken important first steps to solving our nation's disjointed minerals policy. However, much more needs to be done to provide certainty, restore investor confidence, and loosen the grip of geopolitical competitors and economic adversaries. This will ensure our nation's ability to meet the dramatic increases in minerals production that will be needed in the coming decades to keep up with new technologies, infrastructure, manufacturing, let alone the administration's energy transition goals.

With more than $6 trillion worth of mineral resources here in the U.S., a highly trained and highly compensated workforce, and world-class environmental, labor, and safety standards, the DOE must take advantage of its coordinated approach to

---

[17] Politico, "Action on critical minerals is needed now," Sept. 2023.
https://www.politico.eu/article/action-critical-minerals-needed-now/

7

DOE AR 000998

124

strengthening domestic mineral supply chains, specifically by accepting and supporting mine projects that responsibly increase our domestic ability to extract and produce minerals. While approving a large amount of processing and recycling projects, equal-footing must be given to the extraction projects that are at the beginning of the supply chain for energy technologies and essential to the success of DOE's mission.

The NMA appreciates the opportunity to provide comments to the committee and looks forward to working with Congress and the DOE to support a robust domestic mineral supply chain for generations to come.

DOE AR 000999

# U.S. Department of Energy
## Office of Inspector General

Statement
of
The Honorable Teri L. Donaldson, Inspector General
U.S. Department of Energy


before the


U.S. Senate
Committee on Energy and Natural Resources


October 19, 2023


DOE AR 001000

Teri L. Donaldson
Inspector General
Department of Energy

## Introduction

Chairman Manchin, Ranking Member Barrasso, and members of the committee:

Thank you for inviting me to testify today on the risks arising from the major expansion of both the Department of Energy's loan programs and its grant[1] programs, as funded by recent pieces of legislation which collectively appropriated $99 billion to the Department and increased the Department's loan authority by an estimated $385 billion.

The current situation brings tremendous risk to the taxpayers — the combination of standing up 72 new Department programs, a real risk of funding entities with foreign ownership or control, and a historic expansion of the Department's loan program. As you know, these loan packages are on an accelerated schedule. One category of loan guarantees worth an estimated $250 billion will expire on September 30, 2026. Another category of loan guarantees worth an estimated $40 billion will expire on the same date—$290 billion over the next 3 years or, put another way, roughly $8 billion per month over the next 36 months. There is no precedent in the Department for this level and pace of financing. To put that amount into perspective, Wells Fargo, one of the Nation's largest banks, had an outstanding domestic commercial and industrial loan balance of $292 billion as of the end of 2022.[2] Further, many of these projects are designed to promote innovation by financing projects not otherwise acceptable by private equity investors – projects the markets do not view acceptable.

These massive new risks to the taxpayer are occurring in tandem with substantial underfunding of the Office of Inspector General (OIG). Underfunding oversight makes an inherently risky situation much more amenable to fraud, waste, and abuse. Without substantially increased resources, the OIG's oversight will be a fraction of what it should be, and it will not include any oversight of many key areas. For example, with current funding, the OIG may only be able to conduct 50 oversight projects pertaining to the $65 billion of grant and financial assistance awards, even though we have determined that more than 400 oversight projects are necessary to protect the taxpayers. Moreover, the OIG will not be able to provide the near-term audit and inspection assistance that the President has specifically requested to minimize the longer-term impacts from the large-scale frauds that often plague Federal programs that provide such funding on an expedited timeline. The current level of OIG funding for oversight is both inadequate and irresponsible.

Additionally, without proper funding, critical pre-existing risk areas such as research security, contracting and payment integrity, stockpile stewardship, environmental cleanup, and pit production—to name a few—will not receive appropriate OIG oversight.

---

[1] For purposes of the document, the term "grants" includes cooperative agreements and other transactions such as direct subsidies, prize competitions, etc. Both grants and cooperative agreements deliver Federal funds to recipients. With cooperative agreements, the Federal Government may be more involved in guiding or participating in project activities.

[2] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2022-annual-report.pdf (p.18)

2

DOE AR 001001

As the Pandemic Response Accountability Committee (PRAC) continues to identify the billions and billions of dollars lost or stolen from the pandemic related federal funding programs, there are lessons to be learned.  Earlier this year, PRAC chairman Michael Horowitz testified about the use of over 69,000 questionable social security numbers to obtain $5.4 billion in fraudulent pandemic loans and grants.[3]  PRAC estimates a total of $60.4 billion has been lost to fraud from the total $655 billion in benefits provided in response to the pandemic, and other sources place that number at over $200 billion.[4]  Fast money must be balanced against the need for thoughtful and effective internal controls and independent audits.

Due to the spending caps proposed in the Fiscal Responsibility Act of 2023, I am recommending that Congress reallocate funds from the Department's unobligated balances under the Infrastructure Investment and Jobs Act (IIJA), Inflation Reduction Act (IRA), and Puerto Rico Energy Resilience Fund to provide 0.35 percent of funding in those statutes to the OIG. This can be done with no increases in appropriations.  This makes sense.  In fact, the Environmental Protection Agency has already agreed to transfer additional funds to its OIG in the same manner for the same reason.

I have asked for the administration's support of this proposal.  I am here today to ask the same of this committee, and to further discuss some of the risks associated with this unprecedented influx of funding.  Please support my request to be properly funded as discussions continue to finalize the fiscal year 2024 budget.

## Recent Legislation Increased Loan Program by $385 Billion

Three recent legislative actions expanded existing Department authorities for loans and loan guarantees by an estimated $385 billion.  Beginning with the most recent legislation:

- The 2023 Consolidated Appropriations Act expanded the Department's loan guarantee authority by $15 billion.  This authority supports commitments to guarantee loans for eligible projects under title Title XVII of the Energy Policy Act of 2005 for Innovative Technology Loan Guarantee, Section 1703.  Eligible projects must: (1) avoid, reduce, or sequester air pollutants or anthropogenic greenhouse gas emissions, and (2) employ new or significantly improved technologies.  This authority does not have a statutory expiration date but is available until the appropriations for credit subsidy supporting it are expended.

---

[3] Congressional Hearing, February 1, 2023, on Federal Pandemic Spending: A Prescription for Waste, Fraud, and Abuse (Page 3): *oversight.house.gov*
[4] Pandemic Unemployment Insurance: How much has been paid to fraudsters?: *pandemicoversight.gov*

3

- IRA expanded the Department's loan and loan guarantee authority up to approximately $350 billion, covering several authorities:
    - Title XVII Innovative Technology Loan Guarantee, Section 1703, was expanded by $40 billion and covers the same type of work as discussed in the preceding paragraph. This authority is available until September 30, 2026, or until the appropriations for credit subsidy supporting it are expended.
    - Title XVII Innovative Technology Loan Guarantee, Section 1706, authorized and appropriated funds to support guarantees of up to $250 billion. Section 1706 should be used to help retool, repower, repurpose, or replace existing energy infrastructure that has ceased operations, or to enable operating energy infrastructure to avoid, reduce, utilize, or sequester air pollutants or anthropogenic emissions of greenhouse gases. This authority is available until September 30, 2026, or until the appropriations for credit subsidy supporting it are expended.
    - Advanced Technology Vehicles Manufacturing Direct Loan Program is estimated to support approximately $40 billion of loans. These loans finance U.S. manufacturing of fuel-efficient, advanced technology vehicles and qualifying components. Although the legislation does not provide a "cap" for this loan authority, the Loan Programs Office (LPO) estimates that appropriations for credit subsidy may support an estimated $40 billion.[5] This authority is available through September 30, 2028, or until appropriations for credit subsidy costs supporting it are expended.
    - Tribal Energy Loan Guarantee Program (TELGP). IRA changed and increased this $20 billion program. These loans can finance a broad range of energy development projects owned by Tribal Nations. The math for this authority contains two parts: (1) $18 billion in new IRA expanded TELGP authority, (2) plus IRA created new rules and applicability for an existing $2 billion TELGP authority that was authorized in the FY 2017 Consolidated Appropriations Act (Public Law 115-31) in such manner as to subsume the prior $2 billion authority and to combine it with the new $18 billion IRA authority, resulting in $20 billion. This authority is available until expended.

- The IIJA authorized and appropriated funds for the Carbon Dioxide Transportation Infrastructure Finance and Innovation Program loan guarantee program by an estimated $20 billion. The LPO will manage this Program in partnership with the Department's Office of Fossil Energy and Carbon Management. The loans are designed to support large capacity, common carrier carbon dioxide transport projects. The legislation does not include a ceiling for the maximum amount of loans that can be made for this authority; however, the LPO estimates that appropriations for credit subsidy and administrative costs may support an estimated $20 billion.[6] This authority is available until expended.

---

[5] The LPO Annual Portfolio Status Report (Page 4): *https://www.energy.gov*
[6] The LPO Annual Portfolio Status Report (Page 5): *https://www.energy.gov*

4

DOE AR 001003

The preceding information is summarized in the following table:

| Law | Amount | Program | Purpose | Expiration | Statutory or estimated |
|---|---|---|---|---|---|
| 2023 Consolidated Appropriations Act $15 billion | $15 billion | Section 1703. Title XVII Innovative Loan Technology Guarantee | Eligible projects must (1) avoid, reduce, or sequester air pollutants or anthropogenic greenhouse gas emissions, and (2) employ new or significantly improved technologies | Available until credit subsidy appropriation is expended | Statutory ceiling |
| Inflation Reduction Act $350 billion | $40 billion | Section 1703. Title XVII Innovative Loan Technology Guarantee | Identical to 2023 Consolidated Appropriations authority described above | Sept. 30, 2026 | Statutory ceiling |
| | $250 billion | Section 1706. Title XVII Energy Infrastructure Reinvestment Program / Innovative Technology Loan Guarantee | Retool, repower, replace, or repurpose existing energy infrastructure that ceased operations, or to enable energy infrastructure to avoid, reduce, utilize, or sequester air pollutants or anthropogenic emissions of greenhouse gases | Sept. 30, 2026 | Statutory ceiling |
| | $40 billion | Advanced Technology Vehicles Manufacturing Direct Loan Program | Finance U.S. manufacturing of fuel-efficient, advanced technology vehicles and qualifying components | Sept. 30, 2028 | IRA removed a $25 billion cap. $40 billion is current estimated amount that may be supported by the credit subsidy appropriation |
| | $20 billion | Tribal Energy Loan Guarantee Program | These loans can finance a broad range of energy development projects owned by Tribal Nations | Available until expended | Statutory ceiling |
| Infrastructure Investment and Jobs Act $20 billion | $20 billion | Carbon Dioxide Transportation Infrastructure Finance and Innovation Program Loan Guarantee Program | The loans are designed to support large capacity, common carrier carbon dioxide transport projects | Available until expended | Estimated amount based on the loan dollars supported by the credit subsidy appropriation |

## Recent Legislation Expanded Department's Grant Programs

Of the $99 billion in supplemental appropriations to the Department, we estimate that $65 billion will be distributed in grants and other financial assistance awards,[7] including the creation of 72 new programs. Beginning with the most recent legislation:

- The 2023 Consolidated Appropriations Act[8]—Congress added $1 billion to the Department's appropriations to provide grants to the Puerto Rico Energy Resilience Fund to build energy system resilience to major natural disasters. This is a new grant program.

---

[7] In this context, "grants" include all types of Financial Assistance programs, including grants, cooperative agreements, direct subsidies, prizes, and other non-contractual transactions. It is important to note that this number is not settled since awards are still being made, and the Department has some flexibility in the manner that the program funds are disbursed.

[8] Public Law 117-328

5

DOE AR 001004

- IRA[9]—Of the $35 billion in appropriations, we estimate that $16 billion is slated for grants.  The legislation funds 21 programs,[10] 15 of which are new programs.[11]

- IIJA[12]—Of the $62 billion, we estimate that $48 billion is slated for grants.  The legislation funds 69 programs,[13] 56 of which are new programs.

The Department is already moving these funds.  The Department reports that more than $32 billion in awards have been selected, increasing rapidly over time, as shown in this chart.  The volume and pace of these awards will increase significantly from FY 2024 through FY 2025.  By way of comparison with historical awards volumes, in FY 2021, the Department awarded $3.9 billion in financial assistance awards for enduring mission grants, not including the IIJA funds.



Billions in financial assistance awards under IIJA and IRA announced as selected by the Department by year

## Due Diligence Challenges Facing Both Loan and Grants Programs

History teaches us that certain factors make applied due diligence less rigorous, even when due diligence procedures may seem well drafted.

**Fast moving funds incentivize cutting corners in due diligence.**  One category of loan guarantees worth an estimated $250 billion expires on September 30, 2026—3 years from now.  Another category of loan guarantees worth an estimated $40 billion expires on the same date—$290 billion over the next 3 years or, put another way, roughly $8 billion per month over the next 36 months.  There is no precedent for this level and pace of financing.  In the interest of moving these funds out, on schedule, the Department may be incentivized to cut corners and skip rigorous due diligence steps that are needed to properly manage the risk of default.

Similarly, for grant programs, Department officials are under pressure to award grants and thereby move the clean climate program forward as quickly as possible.  This goal directed pressure may also lead to cutting corners in due diligence procedures.

**There is a real risk that awards will be made to ineligible recipients.**  For the innovative technology loan guarantee program, the loan applicant must demonstrate innovation

---

[9] Public Law 117-169
[10] *https://www.energy.gov/infrastructure/clean-energy-infrastructure-programs-department-energy*
[11] One of the new programs is Department Oversight for $20 million, which captures funding for the OIG.
[12] Public Law 117-58
[13] *https://www.energy.gov/infrastructure/clean-energy-infrastructure-programs-department-energy*

DOE AR 001005

in the technology being financed in the project. There is a real risk that "innovation" claims will be exaggerated by the applicant, or that baseless or marginally innovative proposals may be awarded financing. Compounding this risk is the pressure on the Department to make loans before authority expires. Should this occur, there is less money available for truly innovative technology projects.

Similarly, in the grants program, due diligence is crucial to ensure that awardees satisfy program participation criteria. The same incentives exist for grant applicants to cheat on eligibility and for Federal officials to approve the applications with too little verification.

**Due diligence is essential to prevent awards to foreign entities.** Both IIJA and IRA include requirements that call for both loan and grant awards to be made to entities that advance the agenda of domestic technology development and jobs creation, and that seek to prevent awards to foreign entities. To help manage this risk, in March of this year, the Department set up a pilot "vetting" process through the "Research, Technology, and Economic Security Vetting Center." This office intends to screen loan and grant awards for foreign influence, ownership, and control. However, this pilot process is new, still under development, untested, and will be called upon to screen numerous projects on a truncated timeline. This office is currently staffed by only three people. All these factors increase the risk that awards will be made to entities with foreign entanglements that go undetected.

Yet, award determinations were already underway, well ahead of the vetting center pilot. One of these projects raises the issue of balancing competing goals. Kore Power, an Idaho-based company that currently makes lithium-ion battery cells in China with Chinese technology and intellectual property, won a conditional commitment from the LPO in June 2023 for an $850 million loan to help build its first major U.S. manufacturing facility in Arizona. In this case, the Department is moving the project forward on the grounds that U.S. jobs will be created deploying Chinese technology in the U.S., and with the belief that U.S. technology will not go overseas. While it appears that this financing project may support Congress' goals of U.S. job creation, it clearly does not support the legislation's goals of U.S. technology development since this project deploys Chinese intellectual property.

The OIG has conducted a number of investigations related to the theft of intellectual property and violations of grant terms and conditions. In fact, 35 percent of the grant fraud cases currently open are related to research security with a real risk that this research will go overseas. For example, a recent investigation conducted jointly by my office and the National Science Foundation OIG found that a principal investigator at the University of Kansas created a scheme to defraud the Government by failing to disclose on grant proposals to the Department an existing affiliation with, and contractual obligations to, a Chinese university. The grant recipient also failed to disclose this conflict of interest to the University of Kansas.[14]

There is every reason to conclude that foreign actors will seek IIJA and IRA funds to advance development of clean energy technology, and that the Department's due diligence procedures may not be sufficient to deal with this reality.

---

[14] https://www.justice.gov/opa/pr/jury-convicts-university-kansas-researcher-hiding-ties-chinese-government

7

**Due diligence needed to prevent "double dipping."**  Since 2009, there has been a broad prohibition against "double dipping"—the notion that an entity that was funded through one sort of Federal funding, such as a grant, would then use those Federal grant funds to apply for more Federal monies such as a loan.  This risk is accentuated with the loan applicants and grant applicants competing for funding to develop innovative clean energy technologies.  In other words, projects deemed worthy of grants may be considered as good candidates for the loans as well, but need to be carefully screened to ensure that double dipping is not occurring.

## Additional Risks - Loan Program

**What rate of loan default is acceptable?**  The LPO faces enormous challenges.  First, these loans are designed to create partial or total financing for projects that are otherwise too risky for commercial banks or private equity to accept.  Stated differently, these projects would fail commercial due diligence.  This raises the most fundamental question: What amount of risk is acceptable?  This question should be discussed; acceptable risk should be defined; overall success for the program should also be defined; and the results should be tracked and reported.

In a commercial setting, default on the loan is what defines failure.  If the lender is paid on the loan, the lender has been successful.  Here, the LPO will be financing projects in full anticipation of some amount of default.  What amount of default of these $385 billion is acceptable?

**Indian Energy Loan Guarantee Program no longer requires "skin in the game."**  We note that IRA loosened controls that came with this program's 2017 authority in two fundamental ways.  First, the 2017 authority was for a partial loan guarantee, not to exceed 90 percent.  Put another way, the loan applicant had 10 percent "skin in the game."  No deals were closed under these standards.  IRA removed the 90 percent partial loan guarantee requirement and now allows for 100 percent financing of project costs.  Second, IRA now guarantees loans from, and allows access to, the U.S. Treasury's Federal Financing Bank loans, which reduces both fees and interest expenses.  Together, these changes are certain to increase participation in the program and the risk of default.  With increased risk should come increased due diligence procedures to add assurance that the taxpayer is being protected in this increasingly risky program.

## Additional Risks - Grants

**New programs are pushing out billions in grant money through newly designed processes using untested internal controls.**  Overwhelmingly, the 72 new programs are for grants and financial assistance awards, awarding an estimated $65 billion in appropriations.  These new Federal programs raise immediate concerns such as acquiring and training expert staff and quickly developing effective internal controls.  For these new programs in particular, there is a critical need for external oversight of these new Federal programs to help prevent foreseeable problems as early as possible.

DOE AR 001007

**The Department has not taken concrete steps to ensure that sufficient resources are reserved to perform proper oversight over significant increases in grants to states, local government, and tribes**.  As this money is awarded to these entities, it is then further dispersed to subrecipients.  It is not yet clear whether the states, local governments, or tribes are equipped with sufficient staffing, or have adequate internal control systems in place, to protect these funds.  Our early indicators are that states' oversight resources are stretched and strained due to multiple competing priorities, including ongoing pandemic oversight commitments.  Importantly, the passing of these Federal funds to others neither removes the Federal nature of the expenditure nor excuses Federal oversight, but it certainly increases risk.  My office has been notifying Department leadership of these concerns for more than a year.

**The Department is planning to disburse billions of dollars using award vehicles it has little or no experience with.**  The Department has some experience in administering financial assistance programs in the form of grants and cooperative agreements.  However, the IIJA mandates programs that do not fit neatly into these categories.  Some examples of these include direct subsidies for the $6 billion Civil Nuclear Credit Program, competitive "prize" programs, and others.  Accordingly, the Department established a Working Group on Innovative Funding Mechanisms to develop processes, policies, and procedures to use Partnership Intermediary Agreements[15] and "Other Transaction Authority" to make these atypical awards.  We note that there are real risks associated with developing new processes to pay billions of dollars using award instruments for which the Department has little or no experience.

**Modern data analytics tools are not being used to prevent improper payment or to detect fraud, waste, and abuse in grant programs.**  Historically, the Department has not gathered or required data from its many grantees in sufficient detail to support modern data analytics capabilities, prevent and detect improper payments, or detect fraud.  Other Federal agencies have learned a great deal about the power afforded by data analytics capabilities applied to high volume transactions.  In late July 2023, the Department issued program requirements and grant application instructions that appear to miss an opportunity to require the type of data that has served other agencies so well during the pandemic.  The OIG is currenting evaluating opportunities for the Department to require additional data to be gathered by grantees for rebate program beneficiaries, in a secure manner, that can be used to prevent improper payments and to detect fraudulent patterns and actions.  Additionally, the OIG team is exploring questions related to information sharing opportunities and other tools such as using the U.S. Treasury's "Do Not Pay" tool.  This work is already well underway.  The OIG report will identify additional opportunities for the Department to use on other grant programs to modernize data analytics capabilities.

**The Department has a poor track record auditing grantees.**  Federal regulations require that recipients spending more than $750,000 in Federal funds must undergo an annual audit by an independent auditor.  Commonly called "Single Audits" these audits are designed to help ensure that recipients have adequate accounting systems and effective internal controls.  It is critical that these independent audits are conducted.  It is also critical that the granting agency monitor compliance and follow up on the issues identified by these and other audits.  This

---

[15] 15 U.S.C. § 3715, Use of Partnership Intermediaries

DOE AR 001008

oversight framework is only effective if it is implemented and overseen appropriately by granting agencies.

The OIG has identified areas where the Department could improve its oversight in this area.  For example, a March 13, 2023, Department OIG audit found that the Department's Office of Science failed to ensure that required annual audits of for-profit recipients of Small Business Innovation Research grants had been completed.  Award expenditures totaling $56,835,650 that were not audited, as required, exposed the Department to an increased risk of fraud, waste, and abuse.

## Underfunded OIG Oversight

**Lack of adequate base funding for the OIG.**  Prior to the passing of the three pieces of supplemental legislation discussed above, the OIG was already significantly underfunded.  The following chart demonstrates the long-term and growing gap of OIG funding growth compared with the growth of the Department's budget prior to the more recent legislation:



The next chart provides a glance of Inspector General discretionary funding for many Chief Financial Officers Act agencies, as of FY 2022:



**Supplemental legislation underfunded the OIG.**  To further exacerbate the historic underfunding issue, the OIG received only $62 million, or 0.10 percent of the funding provided

10

DOE AR 001009

to the Department over a 5-year period under IIJA, to provide oversight of these new infrastructure projects.  When compared with other OIGs that received money under IIJA, we were again substantially underfunded as shown in the following table:

|  | IIJA Agency Funding | IIJA OIG Funding | OIG Percent of Agency Funding |
|---|---|---|---|
| EPA | $61billion | $269 million | 0.44% |
| HHS | $4 billion | $17 million | 0.44% |
| DOI | $28 billion | $99 million | 0.35% |
| USDA | $8 billion | $27 million | 0.34% |
| DHS | $8 billion | $20 million | 0.25% |
| DOE | $64 billion[1] | $62 million | 0.10% |

Also, IRA appropriated only $20 million to the OIG, or 0.05 percent of the funding provided to the Department, to oversee those programs.  Notably, there was no provision for additional OIG funding in the expanded programs in the FY 2023 appropriations to include an expansion of $15 billion in loan program authority and a new $1 billion in appropriations for the Puerto Rico Energy Resilience Fund.  Notice the pattern: The OIG has increasing oversight mandates for supplemental programs while getting reduced resources for oversight.

An appropriate starting point for proper funding for the OIG is at 0.35 percent of the Department's budget.  We arrived at this conclusion by examining FY 2022 funding levels for the OIGs of the Chief Financial Officers Act agencies, as well as the more current funding of the OIGs impacted by IIJA and IRA.  The 0.35 percent falls into the mid-range.  Given the significant risks for the Department, this percentage may be too low.  However, it is a starting point and much needed.

**Needed oversight work is not being performed, and cannot be performed, without significant increases in funding.**  It is crucial for policymakers in Congress and Department leadership to understand how the current underfunding of OIG programs constrains the OIG's oversight plans.  Our oversight plan for audits and inspections is organized into two categories – Federal- level programs and award level projects.  First, it is imperative that the Department's 72 new programs receive independent oversight.  If properly funded, the OIG's oversight plans would include about 80 audits and inspections for the **Federal- level programs**, including most of the 72 new programs.  Currently, the OIG is only funded to perform about 20 reviews of Federal-level programs over a very long-time horizon.  Regarding the second category, the OIG's audits and inspections at the **award-level**, the OIG is currently only able to plan for about 50 award-level oversight projects—less than 1 percent of the anticipated more than 5,000 awards.  The OIG should be planning more than 400 projects at the award level.  This level of oversight is both inadequate and irresponsible.

11

DOE AR 001010

The following charts show what impact the OIG's budget shortfall has on our oversight responsibilities. Specifically, the Department's Office of Clean Energy Demonstrations is the largest new program with about $25.7 billion in appropriations that anticipates making about 117 total awards. However, the OIG can fund only 8 award-level audits at current funding levels (dark blue) compared with the 31 additional (39 total) award-level projects we conclude that we should do (light blue) given the massive amount of risk.



Similarly, for the Department's State and Community Energy Program, a $15.3 billion program that anticipates making about 3,700 awards, the OIG can only fund 15 award level projects at current funding levels (dark blue) whereas risk factors indicate we should perform 94 more (light blue) award-level reviews (total of 109). These are just two examples from our oversight plans.



**How much is the OIG funding shortfall?** The President's FY 2024 Budget includes $165.2 million for the Department OIG to be used until expended. If the President's Budget is enacted as is, it would leave a remaining shortfall of $16.8 million in our base budget. However, the current version of the Senate Energy and Water Development Fiscal Year 2024 Appropriations Bill provides only $86 million to the OIG, leaving a base budget shortfall of $96 million.

Additionally, the OIG has a shortfall of $264.7 million to oversee IIJA, IRA, and the Puerto Rico Energy Resilience Fund. The following chart shows the OIG's funding shortfall to conduct proper oversight of the three pieces of recent supplemental legislation:

DOE AR 001011

| Supplemental Shortfall -- Exclusive of the Loan Portfolio | | | | | |
|---|---|---|---|---|---|
| **Bills** | **DOE** | **OIG** | **Current Percent OIG to DOE** | **OIG Estimated  Requirements** | **OIG Estimated Funding Shortfall** |
| **IIJA** | $62.5 B | $62.5 M | 0.10% | $218.6 M | $156.2 M |
| **IRA** | $35.0 B | $20.0 M | 0.06% | $125.0 M | $105.0 M |
| **PR-ERF** | $1.0 B | $0.0 M | 0.00% | $3.5 M | $3.5 M |
| **Total** | $98.5 B | $82.5 M | 0.08% | $347.1 M | **$264.7 M** |

**The Department is apparently seeking to enhance its own oversight resources using the same type of transfer mechanism.**  The statutory 3 percent funding cap for Program Direction placed on the Department under IIJA limits the Department's ability to conduct effective oversight.  This funding cap applies to the following programs: Energy Efficiency and Renewable Energy; Cybersecurity, Energy Security, and Emergency Response; Electricity; Fossil Energy and Carbon Management; and the Office of Clean Energy Demonstrations.  The Department is apparently seeking to correct this.  The FY 2024 Senate Bill contains language increasing the 3 percent cap on "Program Direction" to 5 percent.  The OIG supports the Department receiving additional funds for conducting its own oversight.

The FY 2024 House Bill provides a transfer of funds from the Department's unobligated balances under both IIJA and IRA to the OIG; however, the transfer falls short of the 0.35% necessary, and does not provide for a transfer of funds from the Puerto Rico Energy Resilience Fund.  Our requested transfers would provide the OIG with the $264.7 million shortfall by transferring funds from the Department's unobligated balances under IIJA, IRA, and the Puerto Rico Energy Resilience Fund.  Therefore, the transfers do not require any new appropriations.  These transfers are critical for ensuring that the funding provided to the Department under these pieces of legislation are used for their intended purposes.

**The OIG has important work underway and planned.**  Although the OIG remains significantly underfunded, we have engaged in a great deal of work to help prevent fraud, waste, and abuse in the Department's expanded loan and grants programs.  Since the passage of IIJA, the OIG has conducted 227 Fraud Awareness Briefings that reached more than 9,160 Federal employees, contractors, grantees, external auditors, law enforcement, as well as state, local government, and tribal representatives.  We have also worked closely with other OIGs who have received funding under these pieces of legislation to identify risks and best practices.  I am

13

DOE AR 001012

currently serving as the co-chair of the Council of the Inspectors General on Integrity and Efficiency's IIJA Working Group.

Since early 2022, my office has held dozens of meetings with senior Department leadership to pose questions to them regarding risks faced by the new programs and to identify issues the OIG has reported during the performance of prior work. In this way, we have safeguarded our independence while helping the Department identify risks. Additionally, between April 2022 and August 2022, the OIG issued four capstone reports summarizing previous work. These reports targeted specific programmatic areas that will receive substantial funding under the new legislation. These reports discuss the loan program;[16] the Weatherization Assistance Program;[17] financial assistance awards;[18] and Clean Energy Demonstration Projects.[19] Issues reported in these reports include recipient fraud; insufficient Federal staffing; inadequate oversight of projects; circumvention of project controls; inadequate internal controls; and lack of recipient-level controls.

Also, my office has oversight projects underway addressing fraud risk in Home Energy Rebate Program grants; an audit of the Weatherization Assistance Program; adoption and use of data analytics capabilities; and an inspection of the Puerto Rico Energy Resilience Project. We are about to begin working on conflict-of-interest issues in the LPO.

Further, given the importance of the risks posed by foreign actors to Department intellectual property and national security, our Office of Inspections, Intelligence Oversight, and Special Projects has recently begun an inspection focusing on the Department's compliance with requirements of Department of Energy Order 486.1A, *Foreign Government Sponsored or Affiliated Activities*. The Order prohibits Department employees and contractors from participating in foreign government-sponsored talent recruitment programs and also restricts participation in other foreign government-sponsored or affiliated activities of a "foreign country of risk." Additionally, we are planning a joint project with the OIG of the Intelligence Community in FY 2024 to evaluate Department security processes in accordance with the requirements in Security Executive Agent Directives and Department Orders.

## Closing Remarks

I would like to recognize the key role that bipartisan efforts from Congressional oversight committees have played over the years in advancing Government transparency and program integrity. We are all aware of the important work that Congressional committees have done with Inspectors General over the years. Thank you for your continued support of the independent oversight work performed by my office and the Inspector General community. We look forward to continuing to work on behalf of the taxpayers to ensure that Federal infrastructure and energy programs are operating effectively and efficiently, and to prevent and detect fraud, waste, and abuse. I appreciate the opportunity to testify here today, and I look forward to answering your questions.

---

[16] *https://www.energy.gov/ig/articles/special-report-doe-oig-22-34*
[17] *https://www.energy.gov/ig/articles/special-report-doe-oig-22-30*
[18] *https://www.energy.gov/ig/articles/special-report-doe-oig-22-40*
[19] *https://www.energy.gov/ig/articles/special-report-doe-oig-22-39*

DOE AR 001013

JOE MANCHIN III, West Virginia, *Chairman*
RON WYDEN, Oregon
MARIA CANTWELL, Washington
BERNARD SANDERS, Vermont
MARTIN HEINRICH, New Mexico
MAZIE K. HIRONO, Hawaii
ANGUS S. KING, JR., Maine
CATHERINE CORTEZ MASTO, Nevada
JOHN W. HICKENLOOPER, Colorado
ALEX PADILLA, California

RENAE BLACK, MAJORITY STAFF DIRECTOR
SAM E. FOWLER, MAJORITY CHIEF COUNSEL

# United States Senate

COMMITTEE ON ENERGY AND NATURAL RESOURCES

WASHINGTON, DC 20510–6150

JOHN BARRASSO, Wyoming
JAMES E. RISCH, Idaho
MIKE LEE, Utah
STEVE DAINES, Montana
LISA MURKOWSKI, Alaska
JOHN HOEVEN, North Dakota
BILL CASSIDY, Louisiana
CINDY HYDE-SMITH, Mississippi
JOSH HAWLEY, Missouri

RICHARD M. RUSSELL, MINORITY STAFF DIRECTOR
JUSTIN J. MEMMOTT, MINORITY CHIEF COUNSEL

October 25, 2023

Mr. Jigar Shah
Director
Loan Programs Office
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

Dear Mr. Shah,

I write with great concern regarding clear inconsistencies between your recent testimony before the Senate Committee on Energy and Natural Resources (Committee) and a recent account presented in the Wall Street Journal detailing your activities within the Department of Energy's Loan Programs Office (LPO).

Before the Committee on October 19, 2023, you made it a point to underplay your involvement and influence in the LPO, suggesting a minimal or sideline role. You said to the Committee, "I have no role to play whatsoever in choosing who gets a loan. In fact, those decisions are made by federal staff." You stated later in the hearing that you are "not that important."[1]

The July 3, 2023 Wall Street Journal article titled "Joe Biden's $400 Billion Man" presents a contrary narrative. The article clearly indicates that you have been instrumental in the process of giving loans to companies you personally identify. The most glaring contradiction lies in your association with Li-Cycle Holdings. The Wall Street Journal article explicitly states that you reached out to and coaxed Ajay Kochhar, the CEO of Li-Cycle Holdings, into taking a $375 million federal loan. The Wall Street Journal states:

> "Some [companies were] reluctant to apply, worried about the complicated approval process and the risks of taking a government loan. Shah, eager to get funds out the door, can be impatient. In September, he pressed a startup company that has a plan for recycling batteries to borrow hundreds of millions of dollars from the federal government to construct a plant.

> The company's chief executive, Ajay Kochhar, was hesitant, unsure how quickly it could repay. "Get your ass to Pittsburgh," where a clean-energy conference was about to start, Shah told the executive, according to people familiar with the conversation.

---

[1] 'It's a Very Bad Look': Biden Energy Loan Czar Freezes Up During Senate Hearing on 'Pay-To-Play' Allegations (freebeacon.com)

DOE AR 001014

*At a coffee shop soon after, Shah told Kochhar, of Li-Cycle Holdings, that its recycling plant could easily generate enough revenue for repayment. Five months later, the two announced a $375 million federal loan.* "[2]

These actions don't align with someone in a mere peripheral role, but rather with someone who wields significant influence and actively exercises it. Your involvement in Li-Cycle's loan process is extremely concerning given Li-Cycle's October 23rd decision to "pause" construction on the facility you endorsed for funding, resulting in the layoff of 200 construction workers.[3]

It is now clear that you personally recruited and facilitated a federally-backed loan of $375 million to a company that is on the brink of collapse. The bad judgment of pushing for a taxpayer-backed loan to a company with a huge risk profile demonstrates the lack of internal controls in your loan-making process.

Given the growing uncertainty about your precise role in the LPO, underscored by differences between your testimony and the Wall Street Journal's portrayal, it's crucial for transparency, accountability, and public trust that these inconsistencies be addressed. Are you "Joe Biden's $400 Billion Man," or are you "not that important?"

I ask that you provide a response to this letter, as well as the October 18th letter sent to you by Chair Rodgers of the House Committee on Energy and Commerce and myself, no later than November 8, 2023.

Sincerely,

John Barrasso, M.D.
Ranking Member

---

[2] Joe Biden's $400 Billion Man - WSJ
[3] 'A punch in the belly': Unions reel from Li-Cycle's abrupt hold on construction project | WHAM (13wham.com)

DOE AR 001015

## Questions

1. How do you reconcile the differences between your testimony to the Committee and the account given in the Wall Street Journal, especially concerning your involvement in LPO decisions?

2. Can you provide clarity on your role and influence within the LPO, especially in light of the Wall Street Journal article's depiction of your proactive involvement in pursuing potential loan recipients?

3. The Wall Street Journal article highlighted above states, "All the loans need a series of approvals from a committee of senior Energy Department staff, as well as Energy Secretary Jennifer Granholm, the White House Office of Management and Budget and the Treasury Department."
   a. Does this include explicit approval by you?
   b. What parts of the approval process are you involved in?
      i. Please describe each of these parts in detail.

4. Given the narrative presented in the WSJ article, can you elaborate on the procedures and criteria that the LPO employs in determining the suitability of a company for a loan, ensuring that taxpayers' funds are utilized judiciously?
   a. Please describe in detail the LPO decision-making process to include:
      i. The structure of LPO's decision-making body, including names, titles, and associated responsibilities
      ii. The levels of approvals necessary for each loan, whether dependent upon the size of the company or the size of the loan
      iii. Any applicable process to overrule the decisions of lower ranking officials that you or any of your superiors may exercise
   b. Does the LPO have a credit review board?
      i. Are you a member of this board?
         1. If so, please describe in detail your role on this board.

5. How does the LPO plan to address public concerns and ensure transparency and clarity in its operations moving forward?

6. How do you justify the advocacy for such a significant loan to Li-Cycle Holdings when the company itself later announced a "pause" on construction of the very project the loan was meant to support?

DOE AR 001016

JOE MANCHIN III, West Virginia, *Chairman*
RON WYDEN, Oregon
MARIA CANTWELL, Washington
BERNARD SANDERS, Vermont
MARTIN HEINRICH, New Mexico
MAZIE K. HIRONO, Hawaii
ANGUS S. KING, JR., Maine
CATHERINE CORTEZ MASTO, Nevada
JOHN W. HICKENLOOPER, Colorado
ALEX PADILLA, California

RENAE BLACK, MAJORITY STAFF DIRECTOR
SAM E. FOWLER, MAJORITY CHIEF COUNSEL

# United States Senate

COMMITTEE ON ENERGY AND NATURAL RESOURCES

WASHINGTON, DC 20510–6150

JOHN BARRASSO, Wyoming
JAMES E. RISCH, Idaho
MIKE LEE, Utah
STEVE DAINES, Montana
LISA MURKOWSKI, Alaska
JOHN HOEVEN, North Dakota
BILL CASSIDY, Louisiana
CINDY HYDE-SMITH, Mississippi
JOSH HAWLEY, Missouri

RICHARD M. RUSSELL, MINORITY STAFF DIRECTOR
JUSTIN J. MEMMOTT, MINORITY CHIEF COUNSEL

November 8, 2023

Ms. Susan Beard
Designated Agency Ethics Official
U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

Dear Ms. Beard,

I write with deep concern regarding potential conflicts of interest within the Department of Energy's (DOE) Loan Programs Office (LPO). These concerns encompass both the involvement of LPO Director Jigar Shah in specific loan decisions and his relationships with external organizations, particularly Cleantech Leaders Roundtable.

I am troubled by the discrepancies between Mr. Shah's October 19, 2023 testimony before the Senate Committee on Energy and Natural Resources[1] and accounts presented in the Wall Street Journal regarding his influence in the LPO's loan-making processes.[2] The Wall Street Journal's depiction of Mr. Shah's proactive role, especially in the case of Li-Cycle Holdings and the significant loan facilitated under his watch, starkly contrasts his self-described minimal involvement.

Furthermore, a recent report has highlighted a concerning relationship between the LPO and Cleantech Leaders Roundtable, a trade association founded by Mr. Shah. Mr. Shah's apparent close collaboration with this organization has included his participation as a guest speaker for "at least 10 of the organization's closed-door events and receptions, which cost up to $250-a-person to attend."[3]

The potential for conflicts of interest, especially in light of a $3 billion loan approval for Sunnova, a company who shares a board member with Cleantech Leaders Roundtable,[4] cannot be overlooked. The board member in question, Anne Slaughter Andrew, is the spouse of the former Chair of the Democratic National Committee, Joe Andrew. Such intertwining of personal, political, and professional relationships raises further questions about the impartiality of loan approvals and the susceptibility of the process to undue political influence.

Mr. Shah, in his close collaboration with the Cleantech Leaders Roundtable, also appears to be in clear violation of the Biden Ethics Pledge's Revolving Door Ban. Upon Mr. Shah's appointment, he was required to certify that:

---

[1] Full Committee Hearing to Examine the Department of Energy's Decision-Making Pro... (senate.gov)
[2] Joe Biden's $400 Billion Man - WSJ
[3] Biden's Energy Loan Czar Founded a Trade Association. Now It's Selling Access to Him. (freebeacon.com)
[4] Id.

DOE AR 001017

*"[He] will not for a period of 2 years from the date of [his] appointment participate in any particular matter involving specific parties that is directly and substantially related to [his] former employer or former clients, including regulations and contracts."*[5]

As the Designated Agency Ethics Official, your oversight is paramount in ensuring that the DOE operates with the highest ethical standards. Given the severity of these issues, I am requesting the following:

1. An official ethics review of Mr. Shah's relationship with Cleantech Leaders Roundtable, as well as other external organizations Mr. Shah has engaged with in his official capacity.

2. A thorough examination and assessment of Mr. Shah's adherence to the Biden Ethics Pledge, including any actions taken by Mr. Shah that may conflict with the pledge's stipulations. This should cover an evaluation of Mr. Shah's recusal protocols and decisions, especially pertaining to matters that could directly benefit his former trade association and its members within the two-year timeframe outlined by the pledge. Please provide documentation on how these protocols have been enforced and any violations that have been identified and addressed.

3. Detailed information on all communications, events, and collaborations between the LPO (including Mr. Shah) and Cleantech Leaders Roundtable, and documentation of any potential influence on loan decisions.

4. A comprehensive overview of DOE's internal reviews or assessments concerning these potential conflicts of interest, including findings and actions taken.

5. Clarification on whether Mr. Shah has faced any recusal concerning dealings with Cleantech Leaders Roundtable or related entities during his tenure at DOE.

6. A full report on any internal complaints or concerns within the DOE regarding the LPO's relationship with Cleantech Leaders Roundtable and the subsequent responses to such complaints.

7. A detailed description of all ethics guidance provided to Mr. Shah related to his employment at DOE.

8. A detailed description of all ethics guidance your office provided to Mr. Shah related to his involvement with the Cleantech Leaders Roundtable.

---

[5] Executive Order on Ethics Commitments by Executive Branch Personnel | The White House

I urge you to address these issues with the urgency and seriousness they warrant. I expect a comprehensive response to these concerns and requests no later than November 21, 2023.

Thank you for your prompt attention to this matter.

Sincerely,

John Barrasso, M.D.
Ranking Member

JOE MANCHIN III, West Virginia, *Chairman*
RON WYDEN, Oregon
MARIA CANTWELL, Washington
BERNARD SANDERS, Vermont
MARTIN HEINRICH, New Mexico
MAZIE K. HIRONO, Hawaii
ANGUS S. KING, JR., Maine
CATHERINE CORTEZ MASTO, Nevada
JOHN W. HICKENLOOPER, Colorado
ALEX PADILLA, California

RENAE BLACK, MAJORITY STAFF DIRECTOR
SAM E. FOWLER, MAJORITY CHIEF COUNSEL

## United States Senate

COMMITTEE ON ENERGY AND NATURAL RESOURCES

WASHINGTON, DC 20510–6150

WWW.ENERGY.SENATE.GOV

JOHN BARRASSO, Wyoming
JAMES E. RISCH, Idaho
MIKE LEE, Utah
STEVE DAINES, Montana
LISA MURKOWSKI, Alaska
JOHN HOEVEN, North Dakota
BILL CASSIDY, Louisiana
CINDY HYDE-SMITH, Mississippi
JOSH HAWLEY, Missouri

RICHARD M. RUSSELL, MINORITY STAFF DIRECTOR
JUSTIN J. MEMMOTT, MINORITY CHIEF COUNSEL

December 13, 2023

The Honorable Teri L. Donaldson
Office of Inspector General
U.S. Department of Energy
1000 Independence Ave., SW
Washington, DC 20585

Dear Inspector General Donaldson,

I am urgently calling for a comprehensive investigation into systemic issues within the Loan Programs Office (LPO) at the U.S. Department of Energy (DOE), particularly highlighted by the conduct of its Director, Jigar Shah. The relationships and interactions between Director Shah and the Cleantech Leaders Roundtable (CTLR), an organization he founded, raise significant questions about the impartiality of the LPO's operations. I am concerned that Director Shah's position as Director of the LPO has been turned into a profit center for CTLR. I am also concerned that CTLR members are receiving special treatment by the LPO.

These conflicts are detailed in my attached correspondence to Director Shah and separately to DOE's Designated Agency Ethics Official, Susan Beard. A notable instance is the $3 billion partial loan guarantee awarded to Sunnova under Director Shah's leadership, where Anne Slaughter Andrew, a board member of Sunnova, also served on the CTLR board. Her subsequent departure from the CTLR board, following inquiries from legislative bodies, underscores the need for thorough scrutiny.

New evidence starkly contradicts Director Shah's claims of disassociation from CTLR in his attached December 7, 2023 letter, including his continued promotion on CTLR's website. Archives of CTLR's official website reveal CTLR was still promoting Director Shah's close affiliation with the organization, as well as Shah's official government title, as early as December 2021[1] and as recently as March 2023,[2] a full two years after Director Shah officially left CTLR. As late as March 2023, Director Shah was listed as "Board President Emeritus" at CTLR.[3] The current CTLR website no longer features Director Shah on its home page.[4]

---

[1] Cleantech Leaders Roundtable (archive.org)
[2] Cleantech Leaders Roundtable (archive.org)
[3] Id.
[4] Cleantech Leaders Roundtable

CTLR's Executive Director Andrea Luecke has repeatedly affiliated Director Shah with CTLR well after Director Shah began his tenure as LPO Director[5, 6] even promoting access to Director Shah at invite-only events as a means to build CTLR's membership.[7]

Furthermore, it appears that Director Shah is downplaying his role within the LPO to mitigate concerns about his close ties with CTLR. Despite his assertions before the Senate Committee on Energy and Natural Resources on October 19, 2023, about minimal involvement in LPO's decision-making, there is substantial evidence pointing to his considerable influence within the office. Director Shah claimed, "I have no role to play whatsoever in choosing who gets a loan. In fact, those decisions are made by federal staff," and characterized himself as "not that important."[8] However, the reality of his role seems to contradict these statements.

Director Shah's impact within the LPO extends beyond direct involvement in loan approvals. As he himself notes in his December 7th letter, his influence is more nuanced, subtly guiding the direction of the LPO. This indirect yet significant sway in LPO activities underscores his integral contribution to the office's strategic operations.

The industry-wide recognition of Director Shah's influence further attests to his prominence and sway within the LPO. His listing as a "Titan" on the *Time* 100 Most Influential Climate Leaders in Business 2023 list[9] is a testament to his status in the sector. This is further corroborated by Anne Slaughter Andrew, who, at the Deploy23 event, referred to him as "our resident sage,"[10] a mark of deep respect from a peer in the industry. Additionally, CTLR member Catherine McLean likened Director Shah to a one-name celebrity "like Madonna" in an interview with CTLR Executive Director Andrea Luecke.[11]

These observations highlight Director Shah's individual impact on the LPO. His insights and guidance play a pivotal role in shaping the LPO's decision-making and strategic direction, pointing to a concentration of his influence within the office. This situation emphasizes the significance of leadership in molding the ethics and practices of the LPO and underscores the necessity of maintaining balance and impartiality in LPO's operations.

In light of these concerns, the proposed investigation should focus on the following areas:

1. **Evaluation of Discrepancies in Director Shah's Disassociation Claims with CTLR:** An examination of the inconsistencies between Director Shah's stated disassociation from CTLR and evidence of his continued recognition as "Board President Emeritus" by the

---

[5] Post | LinkedIn
[6] Post | LinkedIn
[7] Post | LinkedIn
[8] 'It's a Very Bad Look': Biden Energy Loan Czar Freezes Up During Senate Hearing on 'Pay-To-Play' Allegations (freebeacon.com)
[9] The 100 Most Influential Climate Leaders in Business 2023 | TIME
[10] Deploy23 Plenary 3: Driving Deployment – A Culture of Innovation - YouTube
[11] Interview with Andrea Luecke, Executive Director of Cleantech Leaders Roundtable - Dylan Green (dylan-green.com)

organization, and its potential effects on the transparency of decision-making within the LPO. Specifically:

    i.    Did Director Shah authorize the use of his name and DOE title for CTLR's webpage?

        1.    If he did not, what cease and desist actions did DOE's LPO take to prevent CTLR from using an official DOE title to promote its activities and expand its membership?

    ii.    In his December 7, 2023 letter to me, Director Shah claims his activities listed in my October 18, 2023 letter were conducted "in a personal capacity."

        1.    For all activities covered by my October 18, 2023 letter was Director Shah on official leave? Did he personally cover all expenses related to the events?

        2.    Is it common practice for senior DOE officials to attend events that appear directly related to their official functions in a non-official "personal" capacity?

2. **Review of LPO Processes and Procedures Related to the Awarding of Loans and Loan Guarantees:** This includes a comprehensive review of the financials and board controls of applicants, ensuring thorough due diligence and integrity in the selection process, along with an analysis of internal DOE decision-making processes to assess the levels of approval and the checks and balances within the LPO.

3. **Conflict of Interest and Impartiality Protocols:** Review the LPO's conflict of interest policies and impartiality protocols, especially in relation to high-level executives and their external organizational ties. As it relates to Director Shah specifically:

    i.    Was Director Shah recused from participation in CTLR events?

        1.    If not, should Director Shah have been recused to prevent conflicts of interest or the appearance of conflicts of interest?

4. **Influence Dynamics within the LPO:** Investigate the internal influence dynamics, focusing on the impact of leadership prominence on staff decisions, loan approvals, and the strategic direction of the office.

5. **Systemic Influence and Association within the LPO:** An evaluation of how personal and professional associations, as demonstrated by Director Shah's relationship with CTLR, affect decision-making within the LPO and its ethical operation.

6. **Analysis of the Sunnova Loan Guarantee and Anne Slaughter Andrew's Role:** An inquiry into the approval process of the $3 billion loan guarantee to Sunnova, including an investigation into any potential conflict of interest arising from Anne Slaughter Andrew's dual roles.

DOE AR 001022

An investigation is critical to ensure the LPO operates with the highest standards of integrity, impartiality, and transparency.

Thank you for your prompt attention to this matter.

Sincerely,

John Barrasso, M.D.
Ranking Member

DOE AR 001023

# Congress of the United States

## Washington, DC 20510

October 18, 2023

Mr. Jigar Shah
Director
Loan Programs Office
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington D.C. 20585

Dear Mr. Shah,

We write concerning a recent report about the close relationship between the Department of Energy's (DOE) Loan Programs Office (LPO), which you lead, and Cleantech Leaders Roundtable, a trade association you founded.[1] The role that Cleantech Leaders Roundtable has assumed, appearing to act as a gatekeeper for companies seeking vital financial assistance from the LPO, warrants a thorough examination.

The close collaboration between your office and Cleantech Leaders Roundtable, evident from the recent co-hosted, invitation-only Deploy23 conference,[2] presents potential conflicts of interest. It gives rise to perceptions of a pay-to-play scheme, where access to DOE loans could be potentially influenced by affiliations with Cleantech Leaders Roundtable. Such a perception deeply undermines the public's trust, and the recent approval of a $3 billion loan to Sunnova,[3] whose Board of Directors shares a common member with Cleantech Leaders Roundtable,[4] only compounds these concerns.

Given the circumstances and the potential implications of these revelations, we want to understand better the relationship between the LPO and the Cleantech Leaders Roundtable. Transparency in these matters will not only protect the integrity of the LPO, but also ensure that the American public continues to have confidence in the institution's fairness and impartiality.

We anticipate a thorough and transparent response addressing these concerns. We ask that you answer the following questions and provide the requested information and documentation below:

1. Please describe in detail your current relationship with the Cleantech Leaders Roundtable.

---

[1] Biden's Energy Loan Czar Founded a Trade Association. Now It's Selling Access to Him. (freebeacon.com)
[2] Id.
[3] DOE Announces $3 Billion Partial Loan Guarantee to Sunnova's Project Hestia | Department of Energy
[4] CLEANTECH LEADERS ROUNDTABLE, About Cleantech Leaders Roundtable, https://www.cleantechleaders.org/ (last visited Oct. 10, 2023); SUNNOVA, Board of Directors, https://www.sunnova.com/about-sunnova/board-of-directors (last visited Oct. 10, 2023).

2.  What measures have been put in place to ensure that companies affiliated with Cleantech Leaders Roundtable do not receive preferential treatment in the loan approval process?

3.  Please provide all correspondence, agreements, and documentation related to the co-hosting of the recent Deploy23 conference between the DOE Loan Programs Office and Cleantech Leaders Roundtable.

4.  Please describe in detail the nature of each instance of your participation in Cleantech Leaders Roundtable events and receptions since your appointment to DOE, including events that Cleantech Leaders Roundtable has cosponsored or supported financially.

5.  Please provide all correspondence between the LPO, including yourself, and Cleantech Leaders Roundtable, including individual Cleantech Leaders Roundtable board members, since your appointment to DOE.

6.  Have there been any DOE assessments or internal reviews conducted on the potential conflicts of interest arising from your relationship with Cleantech Leaders Roundtable or member companies?
    a.  If so, please provide the determinations resulting from such assessments and/or reviews.

7.  In the course of your tenure with DOE, have you been recused in any manner as it relates to working with Cleantech Leaders Roundtable?
    a.  If not, why not?

8.  Have any complaints or concerns been raised internally within the DOE regarding the relationship between LPO and Cleantech Leaders Roundtable?
    a.  If so, please describe in detail the substance, nature of each complaint, and any actions taken in response to such a complaint. If you have not taken any actions in response to such a complaint, why not?

We look forward to your prompt response.

Sincerely,

John Barrasso, M.D.
Ranking Member
U.S. Senate Committee on Energy
and Natural Resources

Cathy McMorris Rodgers
Chair
U.S. House Committee on Energy and
Commerce

DOE AR 001025

JOE MANCHIN III, West Virginia, *Chairman*
RON WYDEN, Oregon
MARIA CANTWELL, Washington
BERNARD SANDERS, Vermont
MARTIN HEINRICH, New Mexico
MAZIE K. HIRONO, Hawaii
ANGUS S. KING, JR., Maine
CATHERINE CORTEZ MASTO, Nevada
JOHN W. HICKENLOOPER, Colorado
ALEX PADILLA, California

RENAE BLACK, MAJORITY STAFF DIRECTOR
SAM E. FOWLER, MAJORITY CHIEF COUNSEL

# United States Senate

COMMITTEE ON ENERGY AND NATURAL RESOURCES

WASHINGTON, DC 20510-6150

JOHN BARRASSO, Wyoming
JAMES E. RISCH, Idaho
MIKE LEE, Utah
STEVE DAINES, Montana
LISA MURKOWSKI, Alaska
JOHN HOEVEN, North Dakota
BILL CASSIDY, Louisiana
CINDY HYDE-SMITH, Mississippi
JOSH HAWLEY, Missouri

RICHARD M. RUSSELL, MINORITY STAFF DIRECTOR
JUSTIN J. MEMMOTT, MINORITY CHIEF COUNSEL

October 25, 2023

Mr. Jigar Shah
Director
Loan Programs Office
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

Dear Mr. Shah,

I write with great concern regarding clear inconsistencies between your recent testimony before the Senate Committee on Energy and Natural Resources (Committee) and a recent account presented in the Wall Street Journal detailing your activities within the Department of Energy's Loan Programs Office (LPO).

Before the Committee on October 19, 2023, you made it a point to underplay your involvement and influence in the LPO, suggesting a minimal or sideline role. You said to the Committee, "I have no role to play whatsoever in choosing who gets a loan. In fact, those decisions are made by federal staff." You stated later in the hearing that you are "not that important."[1]

The July 3, 2023 Wall Street Journal article titled "Joe Biden's $400 Billion Man" presents a contrary narrative. The article clearly indicates that you have been instrumental in the process of giving loans to companies you personally identify. The most glaring contradiction lies in your association with Li-Cycle Holdings. The Wall Street Journal article explicitly states that you reached out to and coaxed Ajay Kochhar, the CEO of Li-Cycle Holdings, into taking a $375 million federal loan. The Wall Street Journal states:

> "Some [companies were] reluctant to apply, worried about the complicated approval process and the risks of taking a government loan. Shah, eager to get funds out the door, can be impatient. In September, he pressed a startup company that has a plan for recycling batteries to borrow hundreds of millions of dollars from the federal government to construct a plant.
>
> The company's chief executive, Ajay Kochhar, was hesitant, unsure how quickly it could repay. "Get your ass to Pittsburgh," where a clean-energy conference was about to start, Shah told the executive, according to people familiar with the conversation.

---

[1] 'It's a Very Bad Look': Biden Energy Loan Czar Freezes Up During Senate Hearing on 'Pay-To-Play' Allegations (freebeacon.com)

DOE AR 001026

*At a coffee shop soon after, Shah told Kochhar, of Li-Cycle Holdings, that its recycling plant could easily generate enough revenue for repayment. Five months later, the two announced a $375 million federal loan."*[2]

These actions don't align with someone in a mere peripheral role, but rather with someone who wields significant influence and actively exercises it. Your involvement in Li-Cycle's loan process is extremely concerning given Li-Cycle's October 23rd decision to "pause" construction on the facility you endorsed for funding, resulting in the layoff of 200 construction workers.[3]

It is now clear that you personally recruited and facilitated a federally-backed loan of $375 million to a company that is on the brink of collapse. The bad judgment of pushing for a taxpayer-backed loan to a company with a huge risk profile demonstrates the lack of internal controls in your loan-making process.

Given the growing uncertainty about your precise role in the LPO, underscored by differences between your testimony and the Wall Street Journal's portrayal, it's crucial for transparency, accountability, and public trust that these inconsistencies be addressed. Are you "Joe Biden's $400 Billion Man," or are you "not that important?"

I ask that you provide a response to this letter, as well as the October 18th letter sent to you by Chair Rodgers of the House Committee on Energy and Commerce and myself, no later than November 8, 2023.

Sincerely,

John Barrasso, M.D.
Ranking Member

---

[2] Joe Biden's $400 Billion Man - WSJ
[3] 'A punch in the belly': Unions reel from Li-Cycle's abrupt hold on construction project | WHAM (13wham.com)

DOE AR 001027

## Questions

1. How do you reconcile the differences between your testimony to the Committee and the account given in the Wall Street Journal, especially concerning your involvement in LPO decisions?

2. Can you provide clarity on your role and influence within the LPO, especially in light of the Wall Street Journal article's depiction of your proactive involvement in pursuing potential loan recipients?

3. The Wall Street Journal article highlighted above states, "All the loans need a series of approvals from a committee of senior Energy Department staff, as well as Energy Secretary Jennifer Granholm, the White House Office of Management and Budget and the Treasury Department."
   a. Does this include explicit approval by you?
   b. What parts of the approval process are you involved in?
      i. Please describe each of these parts in detail.

4. Given the narrative presented in the WSJ article, can you elaborate on the procedures and criteria that the LPO employs in determining the suitability of a company for a loan, ensuring that taxpayers' funds are utilized judiciously?
   a. Please describe in detail the LPO decision-making process to include:
      i. The structure of LPO's decision-making body, including names, titles, and associated responsibilities
      ii. The levels of approvals necessary for each loan, whether dependent upon the size of the company or the size of the loan
      iii. Any applicable process to overrule the decisions of lower ranking officials that you or any of your superiors may exercise
   b. Does the LPO have a credit review board?
      i. Are you a member of this board?
         1. If so, please describe in detail your role on this board.

5. How does the LPO plan to address public concerns and ensure transparency and clarity in its operations moving forward?

6. How do you justify the advocacy for such a significant loan to Li-Cycle Holdings when the company itself later announced a "pause" on construction of the very project the loan was meant to support?

DOE AR 001028

JOE MANCHIN III, West Virginia, *Chairman*
RON WYDEN, Oregon
MARIA CANTWELL, Washington
BERNARD SANDERS, Vermont
MARTIN HEINRICH, New Mexico
MAZIE K. HIRONO, Hawaii
ANGUS S. KING, JR., Maine
CATHERINE CORTEZ MASTO, Nevada
JOHN W. HICKENLOOPER, Colorado
ALEX PADILLA, California

RENAE BLACK, MAJORITY STAFF DIRECTOR
SAM E. FOWLER, MAJORITY CHIEF COUNSEL

# United States Senate

### COMMITTEE ON ENERGY AND NATURAL RESOURCES

### WASHINGTON, DC 20510-6150

JOHN BARRASSO, Wyoming
JAMES E. RISCH, Idaho
MIKE LEE, Utah
STEVE DAINES, Montana
LISA MURKOWSKI, Alaska
JOHN HOEVEN, North Dakota
BILL CASSIDY, Louisiana
CINDY HYDE-SMITH, Mississippi
JOSH HAWLEY, Missouri

RICHARD M. RUSSELL, MINORITY STAFF DIRECTOR
JUSTIN J. MEMMOTT, MINORITY CHIEF COUNSEL

November 8, 2023

Ms. Susan Beard
Designated Agency Ethics Official
U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

Dear Ms. Beard,

I write with deep concern regarding potential conflicts of interest within the Department of Energy's (DOE) Loan Programs Office (LPO). These concerns encompass both the involvement of LPO Director Jigar Shah in specific loan decisions and his relationships with external organizations, particularly Cleantech Leaders Roundtable.

I am troubled by the discrepancies between Mr. Shah's October 19, 2023 testimony before the Senate Committee on Energy and Natural Resources[1] and accounts presented in the Wall Street Journal regarding his influence in the LPO's loan-making processes.[2] The Wall Street Journal's depiction of Mr. Shah's proactive role, especially in the case of Li-Cycle Holdings and the significant loan facilitated under his watch, starkly contrasts his self-described minimal involvement.

Furthermore, a recent report has highlighted a concerning relationship between the LPO and Cleantech Leaders Roundtable, a trade association founded by Mr. Shah. Mr. Shah's apparent close collaboration with this organization has included his participation as a guest speaker for "at least 10 of the organization's closed-door events and receptions, which cost up to $250-a-person to attend."[3]

The potential for conflicts of interest, especially in light of a $3 billion loan approval for Sunnova, a company who shares a board member with Cleantech Leaders Roundtable,[4] cannot be overlooked. The board member in question, Anne Slaughter Andrew, is the spouse of the former Chair of the Democratic National Committee, Joe Andrew. Such intertwining of personal, political, and professional relationships raises further questions about the impartiality of loan approvals and the susceptibility of the process to undue political influence.

Mr. Shah, in his close collaboration with the Cleantech Leaders Roundtable, also appears to be in clear violation of the Biden Ethics Pledge's Revolving Door Ban. Upon Mr. Shah's appointment, he was required to certify that:

---

[1] Full Committee Hearing to Examine the Department of Energy's Decision-Making Pro... (senate.gov)
[2] Joe Biden's $400 Billion Man - WSJ
[3] Biden's Energy Loan Czar Founded a Trade Association. Now It's Selling Access to Him. (freebeacon.com)
[4] Id.

DOE AR 001029

*"[He] will not for a period of 2 years from the date of [his] appointment participate in any particular matter involving specific parties that is directly and substantially related to [his] former employer or former clients, including regulations and contracts."*[5]

As the Designated Agency Ethics Official, your oversight is paramount in ensuring that the DOE operates with the highest ethical standards. Given the severity of these issues, I am requesting the following:

1. An official ethics review of Mr. Shah's relationship with Cleantech Leaders Roundtable, as well as other external organizations Mr. Shah has engaged with in his official capacity.

2. A thorough examination and assessment of Mr. Shah's adherence to the Biden Ethics Pledge, including any actions taken by Mr. Shah that may conflict with the pledge's stipulations. This should cover an evaluation of Mr. Shah's recusal protocols and decisions, especially pertaining to matters that could directly benefit his former trade association and its members within the two-year timeframe outlined by the pledge. Please provide documentation on how these protocols have been enforced and any violations that have been identified and addressed.

3. Detailed information on all communications, events, and collaborations between the LPO (including Mr. Shah) and Cleantech Leaders Roundtable, and documentation of any potential influence on loan decisions.

4. A comprehensive overview of DOE's internal reviews or assessments concerning these potential conflicts of interest, including findings and actions taken.

5. Clarification on whether Mr. Shah has faced any recusal concerning dealings with Cleantech Leaders Roundtable or related entities during his tenure at DOE.

6. A full report on any internal complaints or concerns within the DOE regarding the LPO's relationship with Cleantech Leaders Roundtable and the subsequent responses to such complaints.

7. A detailed description of all ethics guidance provided to Mr. Shah related to his employment at DOE.

8. A detailed description of all ethics guidance your office provided to Mr. Shah related to his involvement with the Cleantech Leaders Roundtable.

---

[5] <u>Executive Order on Ethics Commitments by Executive Branch Personnel | The White House</u>

DOE AR 001030

I urge you to address these issues with the urgency and seriousness they warrant. I expect a comprehensive response to these concerns and requests no later than November 21, 2023.

Thank you for your prompt attention to this matter.

Sincerely,

John Barrasso, M.D.
Ranking Member

# Department of Energy

Washington, DC 20585

December 7, 2023

The Honorable John Barrasso
Ranking Member
Committee on Energy and Natural Resources
United States Senate
Washington, DC 20510

Dear Ranking Member Barrasso,

Thank you for your October 18, 2023 and October 25, 2023 letters regarding my work at the Loan Programs Office (LPO), and specifically about my engagement with Cleantech Leaders Roundtable (CTLR) and DOE's conditional commitment for a loan to Li-Cycle.

I share the Committee's view that it is critical that LPO's programs and evaluation process are fair and impartial, and that potential applicants and the American people see them as fair and impartial. Ensuring proper transparency into and oversight of LPO is paramount to attracting United States companies to work with the office to apply for a loan or loan guarantee and to maintaining the public's trust that taxpayer resources for these programs are protected.

The Department firmly believes in a private-sector led, government-enabled approach to our energy transformation. Under this approach, private sector engagement and leadership is crucial to identifying challenges and opportunities capital allocators face in deploying key energy technologies at scale. As Congress instructed DOE, the private sector and public sector must work together to inform, implement, and effectively leverage resources in landmark legislation like the Infrastructure Investment and Jobs Act (IIJA) and Inflation Reduction Act (IRA), which together will help the United States make progress in this energy transformation.

When I became Director of the Loan Programs Office, I was tasked with managing our existing active portfolio of loans that were largely originated in the 2010 to 2011 timeframe. The program had otherwise been chiefly dormant. Our applicant pipeline had been very slow to grow, and the private sector did not understand or know how to engage LPO's application process. The LPO application process is rigorous and can take considerable time and effort on the part of the applicant. Part of my mandate was to revitalize the Office and help realize and communicate the potential of LPO. This means restoring trust in the institution by talking to the private sector. This mandate is shared by Congress, who, on a bipartisan basis in both the Energy Act of 2020[1]

---

[1] Energy Act of 2020, § 9010(a)(4) (included as Division Z of the Consolidated Appropriations Act, 2021 (P.L. 116-260) (instructing DOE to "conduct outreach, including through conferences and online programs, to disseminate

and the IIJA,[2] provided LPO with specific direction to conduct outreach to industry through in-person engagements like conferences and through online communications.

In part in response to these directions, LPO stood up its Outreach and Business Development Division. We hired federal employees with deep private sector expertise, and with diverse technological and geographical backgrounds, in order to regain the trust of America's entrepreneurs and educate industry on opportunities for project financing at LPO. Part of my job is to participate in these outreach efforts to communicate the value of LPO program offerings and take in individual feedback on what may be preventing meritorious applicants from approaching us. In discharging these duties, my team and I have attended hundreds of gatherings and met hundreds of founders to discuss LPO programs. LPO is constantly looking for opportunities to find new entrepreneurial audiences, and welcomes any Congressional recommendations on forums and conferences to attend and spread the word. At these events and engagements, we share publicly available information about LPO and its evaluation process with attendees. Departmental officials, including myself, never offer anyone preferential treatment or share information about LPO or its evaluation process that goes beyond what is available to the broader public, including on our website at energy.gov/lpo and in our public program guidance and solicitations.

LPO's loan application evaluation process, including reviewing and validating applications and underwriting transactions, is the responsibility of the federal staff of the Loan Programs Office. As Director, I stand behind the project finance, technical, and legal expertise and review performed by our expert LPO federal staff, contractor support staff, and third-party advisers. Oftentimes, federal staff elevate transaction-level issues or developments to LPO senior leadership, including our division directors and myself, for our awareness, feedback, and to help with problem-solving. However, I do not make individual decisions regarding whether an application gets through our evaluation process, or whether an applicant ultimately gets issued a loan.

Thanks to Congressional oversight and direction – and in part due to recommendations from the DOE Office of the Inspector General, the Government Accountability Office, and from a 2012 independent review led by Herb Allison – LPO has implemented important reforms that codified and strengthened LPO's structure and governance improvements.

Today, as a result of these reforms, LPO is better prepared to impartially evaluate and underwrite applications and manage risk with proper oversight and without political interference. The

_____

information to potential applicants," and to "conduct outreach to encourage participation of supporting finance institutions and private lenders in eligible projects").)

[2] Infrastructure Investment and Jobs Act, § 40401(b)(3) (P.L. 117-58) (instructing DOE to "conduct outreach, including through conferences and online programs, to disseminate information on awards and loans under this section to potential applicants").

2

DOE AR 001033

Department conducts rigorous due diligence that is comparable to, if not more stringent than, what might be done in the private sector. Due diligence includes eligibility determinations and technical, market, financial, credit, legal, and regulatory reviews, among other items. This involves thorough, comprehensive credit underwriting of the transaction with robust risk management processes infused throughout. Through this process LPO identifies clear conditions that must be met prior to closing and funding a given transaction. LPO's transaction process and evaluation criteria are outlined for the public in detail on LPO's website[3] and in its program guidance.[4]

After transactions undergo internal LPO validation, they are subject to approval by the Credit Review Board (CRB), the Secretary of Energy, and the Office of Management and Budget (OMB). LPO submits detailed information about the project to OMB and the U.S. Department of the Treasury (U.S. Treasury). OMB reviews the transaction and LPO's estimation of the credit subsidy cost for all loan programs. U.S. Treasury reviews transactions, which includes providing the required written analysis of the financial terms and conditions of the proposed loan for Title 17 transactions. The CRB, composed of senior DOE officials from outside of LPO, is routinely briefed on pending transactions, and the decision about whether to move forward with a given transaction is put to the CRB for a vote prior to conditional commitment. While the CRB is briefed by LPO staff, including myself, on pending transactions, it is responsible for and empowered to seek any information it finds relevant, and is not comprised of LPO staff. If a transaction receives CRB's recommendation that the Secretary of Energy approve the transaction, it must receive both OMB concurrence on the transaction's terms and conditions and apportionment of relevant funds, as well as the Secretary's approval, prior to the conditional commitment being issued to the applicant.[5] I am a part of the concurrence process that communicates details of the potential deals to the Secretary, but again, I do not make the decision on approving these transactions.[6]

The Infrastructure Investment and Jobs Act also put into statute the evaluation elements for the reasonable prospect of repayment as a condition of loan approval and aligned statute with LPO's practice of ensuring political influence does not impact project selection.[7] In addition, LPO has

---

[3] U.S. Department of Energy, Loan Programs Office, "Investing with LPO," available at https://www.energy.gov/sites/default/files/2022-11/DOE-LPO_Investing_with_LPO.pdf.

[4] *E.g.*, U.S. Department of Energy, Loan Programs Office, "Program Guidance for Title 17 Clean Energy Financing Program" (May 19, 2023), available at https://www.energy.gov/lpo/articles/program-guidance-title-17-clean-energy-program (outlining evaluation criteria in the Title 17 Clean Energy Financing Program).

[5] U.S. Department of Energy, Loan Programs Office, "Getting to Know LPO: Managing Risk, Monitoring a Growing Portfolio, and Protecting Taxpayers," (Nov. 3, 2022) available at https://www.energy.gov/lpo/articles/getting-know-lpo-managing-risk-monitoring-growing-portfolio-and-protecting-taxpayers.

[6] See U.S. Department of Energy Redelegation Order No. S3-DEL-LP1-2023, § 1.5, available at https://www.directives.doe.gov/delegations-documents/s3-del-lp1-2023/@@images/file.

[7] U.S. Department of Energy, Loan Programs Office, "Getting to Know LPO: Energy Act of 2020, BIL Implementation," (Nov. 10, 2022) available at https://www.energy.gov/lpo/articles/getting-know-lpo-energy-act-2020-bil-implementation.

3

DOE AR 001034

enhanced its public reporting, including through the Monthly Application Activity Report,[8] an updated active portfolio summary map,[9] the continued publication of the Annual Portfolio Status Report,[10] and reports to Congress as directed in the Energy Act of 2020 and IIJA.

I would be remiss if I did not remind the Committee that even with these mitigants, providing high-impact debt financing in line with the LPO mandate carries some risk. While we proactively manage risk when underwriting a loan and monitoring the performance of that loan across the life of a project, it is possible – and indeed, to be expected – that some projects with a reasonable prospect of repayment might not be repaid or recovered in full. Congress has also anticipated these potential losses and accordingly has provided considerable and ample credit subsidy appropriations, which allow the government to budget for expected losses.

I personally take very seriously my responsibility for following proper ethical guidelines to ensure public trust in LPO programs and to avoid any perception of impropriety. As you know, prior to taking my position at LPO, I was a donor and board member of CTLR, a nonprofit organization that is a convener of leaders in the cleantech and climate tech industries. Upon taking office, I consulted DOE ethics advisers and agreed to resign from the CTLR board position to avoid any perception of a potential conflict. I have been unaffiliated with CTLR since I took office, but attended a number of their events in my personal capacity. I consulted DOE ethics experts on any engagements where I was a featured speaker, as is our practice.

I have strived to be clear in my communications with CTLR whether I am participating in my official capacity or my personal capacity. For example, events alluded to in your October 18 letter clearly indicated I was attending in a personal capacity. My attendance in my personal capacity demonstrates my deep interest and engagement with the climate tech industry. Listening to private sector industry experiences enriches my personal understanding of these issues and makes me a better LPO Director. These engagements are *not* forums to discuss details about LPO's evaluation process, business confidential or proprietary applicant information, or other matters that are handled in LPO's official business as part of the evaluation and due diligence of applications.

For the Demonstrate Deploy Decarbonize 2023 (Deploy23) conference, which DOE co-hosted with Cleantech Leaders Climate Forum more than two years after I joined LPO,[11] LPO and DOE staff attended this event in their official capacity. When helping to organize Deploy23, LPO staff

---

[8] U.S. Department of Energy, Loan Programs Office, "Monthly Application Report," available at https://www.energy.gov/lpo/monthly-application-activity-report.
[9] U.S. Department of Energy, Loan Programs Office, "Portfolio Projects," available at https://www.energy.gov/lpo/portfolio-projects.
[10] U.S. Department of Energy, Loan Programs Office, "Annual Portfolio Status Report," available at https://www.energy.gov/lpo/annual-portfolio-status-report.
[11] Cleantech Leaders Climate Forum is a sister 501(c)(3) organization to Cleantech Leaders Roundtable, a 501(c)(4) nonprofit.

DOE AR 001035

conducted a review within DOE to ensure LPO adhered to the proper event and conference guidelines in the planning and execution of the event. As the inaugural Demonstrate Deploy Decarbonize event, LPO asked for input from across the Department and received feedback and lessons learned prior to and after Deploy23 that DOE will use to guide other events moving forward. In relation to Deploy23 or any other event, neither CTLR nor any of its members, nor any other attendee of these events, received preferential treatment on any LPO or DOE official business matter in general or based upon DOE staff's mere attendance at these events.

As I testified on October 19, 2023 before the Senate Committee on Energy and Natural Resources, I do not individually choose which entities are issued a loan or loan guarantee by the Department. One of my responsibilities as Director of the Loan Programs Office, however, is to get applicants to take the extraordinary step of investing significant effort in applying to LPO. LPO has a responsibility to continue to seek out and meet entrepreneurs, founders, and executives in as many other relevant and appropriate fora around the country as possible, consistent with our mission and mandate from Congress. The dedicated outreach from the entire LPO team has led to increased interest in the office from companies across the United States, with $157 billion in financing requested across 177 active applications as of the end of September 2023 in areas ranging from advanced nuclear, to carbon management, to clean hydrogen and beyond—a testament to the trust LPO has fostered anew with the private sector. Since the start of the Biden-Harris Administration, LPO has issued or committed more than $21 billion for projects supporting the deployment of clean hydrogen technology, virtual power plants, domestic critical materials production, and more. These loans, once finalized and once projects are fully operational, will together support up to 40,000 jobs in communities across the United States.

Thank you for the opportunity to discuss this matter. If you have any further questions, please contact Rebecca Ward, Deputy Assistant Secretary for Senate Affairs, at 202-586-5450.

Sincerely,

**Jigar H. Shah**
Digitally signed by
Jigar H. Shah
Date: 2023.12.06
21:24:09 -05'00'

Jigar Shah
Director, Loan Programs Office

cc:    The Honorable Joe Manchin III
       Chair, Committee on Energy and Natural Resources

5

DOE AR 001036

**CATHY McMORRIS RODGERS, WASHINGTON**
**CHAIR**

**FRANK PALLONE, JR., NEW JERSEY**
**RANKING MEMBER**

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States
## House of Representatives
**COMMITTEE ON ENERGY AND COMMERCE**
2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6115
Majority (202) 225-3641
Minority (202) 225-2927

January 23, 2024

Mr. Jigar Shah
Director
Loan Programs Office
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20002

Dear Mr. Shah,

We write to you regarding your inadequate responses to the Committee's previous requests for information concerning the Department of Energy's (DOE) Loan Programs Office (LPO) and your own activities as Director of that office.

Recent reports,[1] your testimony before the Senate Energy and Natural Resources Committee,[2] and the exponential expansion of the LPO's loan authority of over $400 billion[3] have raised legitimate questions regarding how the program plans to spend taxpayer dollars. As the LPO continues publicly to emphasize its commitment to transparency,[4] full cooperation would have provided this program office with an opportunity to address these issues. However,

[1] *See, e.g.*, Letter from Cathy McMorris Rodgers, Chair, House Energy and Commerce Committee, and John Barrasso, Ranking Member, Senate Energy and Commerce Committee, to Jigar Shah, Director, Loan Programs Office, Department of Energy (Dec. 7, 2023) [hereinafter December Joint Letter] (citing reports of alarming business practices by Sunnova); Letter from Cathy McMorris Rodgers, Chair, House Energy and Commerce Committee et al., to Jigar Shah, Director, Loan Programs Office, Department of Energy (Dec. 4, 2023) [hereinafter December E&C Letter] (citing reports of financial struggles of Li-Cycle); Letter from Cathy McMorris Rodgers, Chair, House Energy and Commerce Committee, and John Barrasso, Ranking Member, Senate Energy and Commerce Committee, to Jigar Shah, Director, Loan Programs Office, Department of Energy (Oct. 18, 2023) (citing reports concerning Director Shah's involvement with Cleanteach Leaders Roundtable) [hereinafter October Joint Letter].
[2] *See Full Committee Hearing to Examine the Department of Energy's Decision-making Process for Awarding Competitive Loans and Grants Funded Through the Inflation Reduction Act and the Bipartisan Infrastructure Law: Hearing Before the S. Comm. on Energy and Natural Res., 118th Cong. (2023).*
[3] *See* OFFICE OF THE INSPECTOR GEN., DEP'T OF ENERGY, SEMIANNUAL REPORT TO CONGRESS FOR THE PERIOD ENDING SEPT. 30, 2023 (2023) (introductory message).
[4] LOAN PROGRAMS OFFICE, DEP'T OF ENERGY, *LPO's Monthly Application Activity Report Annual Snapshot: Insights from a Continued Commitment to Transparency*, Dec. 15. 2023 (noting ways LPO "prioritizes transparency").

DOE AR 001037

Letter to Mr. Jigar Shah
Page 2

you have failed to cooperate in a meaningful way with the Committee's efforts to exercise its constitutionally based oversight responsibilities.

Over the last few months, the Committee has requested numerous documents regarding specific loans and loan applications, the general application review process, and ethical concerns surrounding your involvement with an outside organization. On October 18, 2023, Chair Rodgers and Senate Energy and Natural Resources Ranking Member John Barrasso requested more information about the nature of your involvement with Cleantech Leaders Roundtable during your time leading the LPO.[5] On December 4, 2023, Chairs Rodgers, Griffith, and Duncan requested more information about the LPO's process for vetting and approving loan applications in light of reports of the poor financial position of Li-Cycle, a company that received a conditional commitment for a loan.[6] On December 7, 2023, Chair Rodgers and Ranking Member Barrasso wrote to you seeking more information about the LPO's review and awareness of troubling business practices by Sunnova, a recent partial loan guarantee recipient.[7]

The DOE issued a December 7, 2023, response that purportedly addressed the first two letters.[8] However, this response failed to include or address much of the requested information. Among other information, our October 18, 2023, letter requested correspondence, agreements, and documentation regarding the Deploy23 Conference the DOE co-hosted; correspondence between the LPO and Cleantech Leaders Roundtable; and a description of the nature of each instance of your participation in Cleantech Leaders Roundtable events and receptions since your appointment to the DOE.[9] The DOE failed to provide this information. The response also omitted requested items concerning the approval process for each loan, including internal memoranda governing the process, as well as the names and titles of officials who participate in each stage of the process.[10] While the DOE's narrative response included links to documents, such as external guidance and regulations,[11] the DOE has failed to produce any communications, internal documents, or information on internal reviews as requested. Your response, therefore, is insufficient.

As of the date of this letter, the Committee has not received a response to its December 7, 2023, joint letter with Ranking Member Barrasso regarding the LPO's partial loan guarantee to Sunnova.

The DOE has not been cooperative with the Committee's efforts to fulfill its legitimate congressional oversight responsibilities and investigate allegations of misuse of taxpayer dollars. Given your inadequate and incomplete response, we request that the DOE provide the remaining information and documents requested in the October 18, 2023, December 4, 2023, and December 8, 2023, letters no later than February 6, 2024. If the DOE does not provide the requested

---

[5] October Joint Letter, *supra* note 1.
[6] December E&C Letter, *supra* note 1.
[7] *See* December Joint Letter, *supra* note 1.
[8] Letter from Jigar Shah, Director, Loan Programs Office, Department of Energy, to Cathy McMorris Rodgers, Chair, House Energy and Commerce Committee, and John Barrasso, Ranking Member, Senate Energy and Commerce Committee (Dec. 7, 2023) [hereinafter DOE December Response].
[9] *See* October Joint Letter, *supra* note 1.
[10] *See* December E&C Letter, supra note 1 (listing these request items).
[11] *See* DOE December Response, supra note 8.

Letter to Mr. Jigar Shah
Page 3

documents by this date, the Committee will be forced to consider other available remedies, including compulsory process.

     If you have any questions, please contact the Oversight and Investigations Majority staff at (202) 225-3641. Thank you for your prompt attention to this matter.

Sincerely,

Cathy McMorris Rodgers
Chair
Committee on Energy and
Commerce

H. Morgan Griffith
Chair
Subcommittee on Oversight and
Investigations

Jeff Duncan
Chair
Subcommittee on Energy, Climate, and
Grid Security

Attachments

CC: Frank Pallone Jr., Ranking Member, Energy and Commerce Committee
Kathy Castor, Ranking Member, Subcommittee on Oversight and Investigations
Diana DeGette, Ranking Member, Subcommittee on Energy, Climate, and Grid Security

DOE AR 001039


History Tools

# The Spectacular Rise and Fall of Solyndra: A Cautionary Tale of Clean Energy Hubris

by history tools / March 27, 2024

In the late 2000s, Solyndra skyrocketed to fame as the next big thing in solar energy. Backed by hundreds of millions in private funding and government support, their novel technology promised cheaper, easier solar at scale. But by 2011, Solyndra had crashed into bankruptcy, leaving behind a battered industry, angry politicians, and serious questions about the future of clean energy. What happened? This is the story of Solyndra's spectacular rise and even more spectacular fall.

## The Promise of a Solar Revolution

Solyndra aimed to upend the economics of traditional solar panels. Founded in 2005 by semiconductor expert Chris Gronet, the company's panels used innovative

DOE AR 001040

cylindrical modules rather than standard flat plates. This tube design allowed the capture of solar energy across 360 degrees and distributed light more evenly across the cells. The result: more power from less roof space.

Even more disruptive was Solyndra's material innovation. While most solar panels relied on polysilicon, an increasingly expensive component, Solyndra's thin-film cells required almost no polysilicon. As prices sometimes exceeded $400/kg, this choice gave them a major cost advantage.

Investors and industry insiders flocked to the young startup. By 2008, despite having no commercial products yet, Solyndra raised over $600 million in venture funding. The promise of cheaper, better solar energy was too compelling to resist.

| Year | Polysilicon Price (per kg) |
| --- | --- |
| 2006 | $100 |
| 2008 | $475 |
| 2011 | <$100 |

Meanwhile, the U.S. government was doubling down on clean energy investments. Citing jobs, manufacturing leadership, and climate concerns, the Obama administration passed the 2009 Recovery Act, which included over $90 billion in green energy support – loans, grants, tax credits and more intended to foster the next generation of renewable innovators.

Solyndra made the perfect poster child, and in 2009 the Department of Energy (DOE) offered them a mammoth $535 million loan guarantee. For the solar startup, it was a vote of supreme confidence. To the newly minted "green jobs" movement and its supporters, it was the beginning of a clean energy revolution.

What came next shocked everyone.

## The Fall: Cheap Panels, Bad Books, and Broken Promises

It started with changes to the global solar supply chain. While designing around high polysilicon costs, Solyndra failed to anticipate an oncoming glut. Chinese manufacturing ramped up massively, causing polysilicon prices to plunge over 90% from 2008 highs. Suddenly all solar panels were cheap – and Solyndra's once-enviable cost advantage vanished.

DOE AR 001041

Case 3:26-cv-01417-RFL    Document 83-4    Filed 05/29/26    Page 243 of 405

| Year | Solyndra Revenue | Solyndra Losses |
|------|------------------|-----------------|
| 2009 | $100 million | $172 million |
| 2010 | $60 million | $329 million |
| 2011 | $26 million | $557 million |

At the same time, gas and energy prices softened during the recession, shrinking projected utility returns from solar arrays. Installation slowed across the sector. These macroeconomic shifts meant Solyndra had to sell far more panels below cost just to a keep factory humming. The red ink was piling up.

Raising more private capital was impossible after the post-2008 financial crisis. Solyndra turned back to the DOE, seeking permission to restructure their loan and keep operations running. But the agency balked after discovering irregularities in financial statements and models.

In 2011 Solyndra simply ran out of cash, shuttering its massive new production facility unfinished and declaring bankruptcy. Over 1,000 employees lost jobs overnight. Investors were wiped out, and the DOE loan guarantee evaporated almost entirely, leaving taxpayers with a $500+ million bill.

| Initial DOE Loan | Taxpayer Losses After Default |
|------------------|-------------------------------|
| $535 million | $528 million |

In the messy aftermath, further details emerged regarding mismanagement and unscrupulous budgeting. TO audit reports cited numerous red flags about stability that went unheeded. Whistleblowers came forward alleging that leadership hid Solyndra's shaky position to maintain funding. Whether deliberate deception or reckless optimism, the company culture clearly prized rapid growth over sustainability.

All this for a company with less than $200 million in total lifetime revenue.

# The Solyndra Technology: Cylindrical Solar Magic

Much of the early hype around Solyndra centered on its unconventional panel design and manufacturing advances. Their cylindrical modules represented a radically different approach than the flat plate standard...

DOE AR 001042

Case 3:26-cv-01417-RFL    Document 83-4    Filed 05/29/26    Page 244 of 405

[several paragraphs with details on Solyndra's solar cell tech and perceived benefits]

This innovative platform drove intense interest from investors and greens alike. However, the economic pressures of plunging polysilicon prices and slower-than-expected adoption would reveal cracks in the foundation...

[analysis of how tech advantage was dependent on high material costs and could not scale efficiently]

While the concepts were sound in theory, realistic manufacturing costs did not drop nearly fast enough to compete as silicon prices tanked worldwide. Sophisticated engineering alone could not outweigh macro conditions across global solar markets.

## The DOE Loan Decision Under Political Fire

When Solyndra became the first company to land a loan guarantee through the DOE's high-profile financing program, it validated years of research into thin-film solar advances. But retrospective analysis shows the approval process lacked sufficient skepticism...

[details on loan application analysis, oversight measures, warning signs missed]

In the drive to jumpstart America's next energy revolution, the DOE moved too fast while prioritizing technological potential over business fundamentals. Political eagerness to seed a whole new industry anchored in green innovation ended up clouding hard-nosed evaluation.

Government scientists rightly recognized Solyndra's solar tech as promising – but failed to reconcile Silicon Valley dreams with Wall Street realities...

[more analysis on misaligned priorities / incentives and communication gaps between public and private stakeholders]

## The Attempts to Stay Afloat as Cash Dwindled

Withpolysilicon prices undoing their competitive positioning and installations lagging projections, Solyndra's leadership still believed enough in their technical edge explore every option before bankruptcy, seeking more private capital to keep the lights while adjusting business models...

[overview unsuccessful investor pitches, emergency restructuring negotiations, new pricing strategies etc]

But after years of glowing media coverage and hundreds of millions in support, no one stepped up to toss a lifeline. The solar darling had lost its luster.

DOE AR 001043

Case 3:26-cv-01417-RFL   Document 83-4   Filed 05/29/26   Page 245 of 405

In just two years, rosy forecasts of market-leading solar had curdled into financial distress – the result of management both unwilling to compromise lofty ambitions and unable to communicate honestly with backers as adaptability became critical.

## The Solyndra Culture: Growth Over Sustainability

Interviews with former employees and internal documents paint Solyndra as obsessed with exponential manufacturing expansion, prioritizing lightning-fast scale over methodical stability – a "build it bigger and the savings will come" mentality...

[examples anecdotes on company culture, leadership focus on rapid growth fueled by easy money]

CFO Bill Stover highlighted this mindset in 2010 as losses mounted, asserting:

> "It's very important to realize that this is a growth startup company, so growth cannot be linear. It's just the way this stuff happens, and it's exacerbated by an imbalance between supply and demand right now."

This attitude proved naive and disastrous. Solyndra needed both aggressive growth AND savvy stewardship to turn innovation into game-changing energy solutions. Vision required grounding.

In driving hard towards an ambitious technological future, leadership took wildly optimistic assumptions at face value while dismissing gathering storms. A more measured scaling strategy may have exposed flaws before balance sheets drowned in red ink.

## Global Solar Soars Regardless

In retrospect, the solar industry *needed* a shock to the system...

Even with all the hype and half-billion taxpayer dollars invested, the sad saga of Solyndra barely made a dent in renewable momentum. Installations continued their meteoric rise globally, with solar power expanding by over 1000% in the decade since.

| Year | Global Solar Installations |
| --- | --- |
| 2011 | 30 GW |

DOE AR 001044

| Year | Global Solar Installations |
|------|---------------------------|
| 2021 | 160 GW |

Costs dropped across the board as manufacturing processes matured. Chinese factories drove down polysilicon prices and panel costs dramatically just as Solyndra faltered. Renewables grew increasingly competitive with fossil fuel electricity without dependence on niche technological advances.

The lessons here cut both ways...

1. Solyndra's collapse stemmed from solvable problems, not any inherent flaws in solar itself as critics charge. Indeed, the industrial boom that undermined their technology only bolstered confidence in renewable energies overall.

2. However, for other next-gen startups to succeed where Solyndra failed, the cycle of overfunding paired with irrational exuberance must end. Investors and policymakers should apply skepticism even in pursuing bold visions of clean energy futures.

Solyndra proves that realizing lasting change from early-stage green investments requires both rigorous risk evaluation and patience to ride out inevitable market turbulence. Their technology was not itself abject failure – but rather the lofty dreams and hubris behind it.

In that regard, Solyndra still enlightens the path ahead for clean energy.

## The Political Fallout – Stains on Policy Visions

Beyond economic ripples, the photometric rise and calamitous fall of Department of Energy poster child Solyndra also fractured political landscapes, fueling fierce value debates that shape environmental policy battles still...

For conservatives, Solyndra encapsulated all suspicions of wasteful green "boondoggles" – taxpayer dollars funneling by the billion to unvetted ventures doomed to implode...

[overview Congressional hearings, Obama campaign messaging, media coverage on left-right divide]

These narratives complicated investment calculations across advanced energy fields. Already averse to prioritizing climate issues, the right leveraged Solyndra as masters of politically expedient cherry-picking, wielding its failures as exemplar of hubris without acknowledging the solar sector's phoenix-like resurgence overall.

DOE AR 001045

Yet liberals also glossed over internal dysfunction at the DOE loan program, papering over painful mismanaged risks that hurt public faith in good-faith development of cutting-edge solutions...

[analysis of muted criticisms on left, lessons both sides drew selectively]
In truth, neither party escaped the broken promises unscathed. Everyone emerged more cynical.

The dream of solar innovation persevered, but confidence in institutions faltered. Program supporters retreated to less ambitious positions while opponents calcified antipathy towards stumbling visionaries. The rift between technocratic optimism and free market realism yawned wider in the wreckage.

## Conclusion: Eyes to the Future

Looking back, Solyndra's saga represented a microcosm of society's tortured relationship with renewable innovation – desperate for urgent change yet punished by the vagaries of unforgiving emerging economics along the way.

Technological potential alone cannot overwhelm global commercial forces. Political hope flounders in the wake of busted balance sheets. And the ultimate objectives of environmental sustainability end up buried under job losses and recriminations.

Future tech reports

Yet for all the controversy swirling about Solyndra's abrupt demise, their idealist reach leaves an imprint on energy's evolution. From solar panels proliferating across rooftops to ever-cheaper EV batteries fast replacing gas cars, radical visions shape progress.

The company's financial ruin blinded many to just how prescient their vision proved. Or how rapidly such concepts transition from fanciful dreams to conventional wisdom.

Other risky bets in myriad labs today will likely stumble under their own grand ambitions. But green innovation marches forward regardless. It has to in order to drive the wide-scale change needed by mid-century.

Solyndra's place as emblem of that messy journey remains fitting – forever a lightning rod for humanity's complicated relationship to environmental imagination made real. Their story illuminates timeless tensions between yearning for revolutionary change and demanding flawless execution.

DOE AR 001046



The 6 Best Solar Companies in
Minnesota to Save You Money
March 30, 2024
In "Companies"

The 7 Best Solar Companies in North
Dakota To Power Your Home
March 29, 2024
In "Articles"



The Top 10 Solar Companies in
Nebraska: Your Guide to Going Solar
in the Cornhusker State
March 29, 2024
In "Companies"

## Related Posts:

1. Twitter: A Complete History and Analysis of the Social Media Giant

2. Seagate Technologies: The Complete Guide

3. Is Temu Legit? What Savvy Shoppers Need to Know

4. The Spectacular Rise and Fall of Jawbone

5. The World's Largest Electricity Companies: Powering the Planet

6. The Rise and Fall of Postini: A Pioneer in Email Security

7. How Much Do Tesla Solar Panels Cost For Your Home?

8. The Ultimate Guide to Maximizing Income with Gig Economy Apps






Tags:    COMPANIES    EV    FAILURE    HOW TO    SOLAR POWER

DOE AR 001047

Case 3:26-cv-01417-REL    Document 83-4    Filed 05/29/26    Page 249 of 405



**WI's Environmental Future**     **Print Manual**                    **Download PDF File**

Ad  350 Wisconsin            Ad  Manuals by Blazer            Ad  PDFStunner

f  Historytools.org

y  A Source for News and

p  nsights on Tech Tools,

    Computers, Innovators,

in  nventions, and Technological

ͣ  Developments

**Recent Posts**

How Pamphlets and
Newspapers Shaped Public
Opinion During the American
Revolution
April 26, 2026

The Untold History of
Tropicana: From Florida
Groves to Breakfast Staple
April 26, 2026

How to Unsend iMessages on
iPhone
April 26, 2026





ABOUT    CONTACT    PRIVACY POLICY

DOE AR 001048



# Department of Energy
# Office of Inspector General
Washington, DC 20585

April 3, 2024

The Honorable John Barrasso, M.D.
Ranking Member
Committee on Energy & Natural Resources
United States Senate
307 Dirksen Senate Office Building
Washington DC, 20510

Dear Ranking Member Barrasso:

Re: Department of Energy Loan Programs Office (LPO)

Thank you for your letter dated December 13, 2023, which noted your concerns regarding the Loan Programs Office (LPO).  I have attached your letter for your convenience.

We have summarized your concerns as follows:

First, you raise concerns about conflicts of interests or influences within the LPO.  These concerns include Director Shah's previous relationship with the Cleantech Leaders Roundtable, and the approval of the Sunnova loan guarantee.  Second, you have raised the more general topic of the process that will be used by the LPO to approve loans and loan guarantees.

Regarding conflicts of interest, you will be pleased to learn that we are initiating a series of audits to examine the LPO's implementation of conflicts of interest policies and rules.  Despite being underfunded for purposes of conducting oversight of the LPO, we understand the significance of this issue and agree that it should be examined as soon as possible.  Additionally, we are aware of your specific concerns regarding Director Shah and the Sunnova loan guarantee and are currently evaluating these issues.

Regarding your more general concern about the process that the LPO will use to approve loans and loan guarantees, we are currently completing a procurement to acquire expert assistance to enable the OIG to conduct a more general programmatic review of the LPO.  During this programmatic review, we will also be identifying and selecting specific loans and loan guarantees for further evaluation.

These OIG projects are still in the early stages.  We will keep you advised as these efforts progress.  If your staff has any further questions, please contact my Chief of Staff, Ryan Cocolin, at 202-586-8672 or ryan.cocolin@hq.doe.gov.

Sincerely,

Teri L. Donaldson
Inspector General

DOE AR 001049



United States Government Accountability Office

## Report to Congressional Committees

**May 2024**

# DECARBONIZATION

# Opportunities Exist to Improve the Department of Energy's Management of Risks to Carbon Capture Projects



# GAO Highlights

Highlights of GAO-24-106489, a report to congressional committees

**May 2024**

# DECARBONIZATION

## Opportunities Exist to Improve the Department of Energy's Management of Risks to Carbon Capture Projects

## Why GAO Did This Study

In 2023, carbon dioxide ($CO_2$), the most abundant greenhouse gas, reached a record high concentration in the Earth's atmosphere, according to the National Oceanic and Atmospheric Administration. Scientific assessments have shown that reducing $CO_2$ emissions could help mitigate the negative effects of climate change. The federal government aims to achieve net-zero greenhouse gas emissions, including $CO_2$, by no later than 2050.

Carbon capture and direct air capture technologies have the potential to help the government meet the 2050 goal. The 2021 Infrastructure Investment and Jobs Act appropriated about $12 billion for DOE to administer new carbon capture and direct air capture projects.

Congress included a provision in the USE IT Act for GAO to review federally funded carbon capture and direct air capture projects. This report (1) describes the funds obligated by DOE to support these projects from fiscal years 2018 through 2023 and (2) examines DOE's project selection and management. GAO analyzed laws, regulations, and guidance; DOE funding data; and DOE documents for a sample of 40 projects. GAO selected projects to range in type, funding, and stage. GAO also interviewed DOE officials.

## What GAO Recommends

GAO is recommending that FECM (1) more clearly document project risk treatment strategies and (2) ensure that the office adheres to guidance for selecting projects that are deemed to be technically acceptable. DOE agreed with GAO's recommendations.

View GAO-24-106489. For more information, contact Frank Rusco at (202) 512-3841 or ruscof@gao.gov.

## What GAO Found

The Department of Energy (DOE) obligated almost $1.4 billion across 654 research and development projects to support carbon capture, utilization, and storage and direct air capture technologies from fiscal years 2018 through 2023. DOE's Office of Fossil Energy and Carbon Management (FECM) administered $950 million (69 percent) of funds and 410 projects (63 percent).

**The Department of Energy's Obligations for Carbon Capture Projects by Office and Project Type from Fiscal Years 2018 through 2023**



Source: GAO analysis of DOE data. | GAO-24-106489

Based on a review of DOE documentation for a nongeneralizable sample of 40 projects, GAO identified several practices, such as risk reviews, that DOE offices used to manage risks. However, FECM—responsible for the majority of projects, including 25 in GAO's sample of 40—engaged in practices as discussed below that could undermine the likelihood of project success:

**Risk treatment.** FECM did not clearly document risk treatment strategies for some projects—which can be important for project continuity given turnover in project managers. Additionally, FECM did not clearly document that project awardees reviewed project risks and treatment strategies for identified risks on a regular basis.

**Project selection.** DOE guidance states it should only select projects that are technically acceptable. However, GAO identified one case where FECM selected a $14.6 million project even though its technical score did not meet FECM's threshold. FECM was unable to provide documentation as to why this project was selected. This project, which is ongoing, has since experienced cost overruns and delays, resulting in an additional $5.1 million in FECM funding and an additional 18 months to complete.

It is unclear how widespread these practices are across all 410 FECM projects. However, by documenting risk treatment strategies and adhering to project selection guidance, FECM would provide greater assurances that selected projects are likely to succeed. This could also help reduce the risk to the over $12 billion appropriated for new carbon capture and direct air capture projects.

_____ United States Government Accountability Office

DOE-AR-001051

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 4 |
| | DOE Obligated Almost $1.4 Billion to Support Carbon Capture Projects from Fiscal Years 2018 through 2023 | 8 |
| | DOE Offices Addressed Project Selection and Management Risks in Various Ways, but FECM Inconsistently Addressed Risks in Reviewed Carbon Capture Projects | 12 |
| | Conclusions | 18 |
| | Recommendations for Executive Action | 18 |
| | Agency Comments | 19 |
| Appendix I | Comments from the Department of Energy | 22 |
| Appendix II | GAO Contact and Staff Acknowledgments | 24 |

Figures

| | | |
|---|---|---|
| | Figure 1: Components of Carbon Capture, Utilization, and Storage and Direct Air Capture | 5 |
| | Figure 2: Roles of Department of Energy (DOE) Offices Across Technology Readiness Levels | 7 |
| | Figure 3: Department of Energy (DOE) Carbon Capture Project Obligations, Fiscal Years 2018–2023 | 9 |
| | Figure 4: Department of Energy (DOE) Obligations and Number of Projects for Carbon Capture Projects, by Office and Project Type, Fiscal Years 2018–2023 | 11 |

GAO-24-106489  Decarbonization
DOE AR 001052

**Abbreviations**

| | |
|---|---|
| ARPA-E | Advanced Research Projects Agency-Energy |
| CCUS | Carbon capture, utilization, and storage |
| CO2 | Carbon dioxide |
| DAC | Direct air capture |
| DOE | Department of Energy |
| EERE | Office of Energy Efficiency and Renewable Energy |
| FECM | Office of Fossil Energy and Carbon Management |
| OCED | Office of Clean Energy Demonstrations |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

GAO-24-106489  Decarbonization

DOE AR 001053



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

May 16, 2024

Congressional Committees

In 2023, carbon dioxide ($CO_2$), the most abundant greenhouse gas, reached a record high concentration in the Earth's atmosphere for the modern era, according to the National Oceanic and Atmospheric Administration. Key scientific assessments have shown that reducing $CO_2$ emissions could help mitigate the negative effects of climate change. Each year, the federal government reports spending billions of dollars on efforts to help limit the magnitude of climate change, with many of these activities focusing on reducing emissions. Executive Order 14057: Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability, issued in 2021, aims to have the government lead by example to achieve net-zero emissions, including $CO_2$, economy wide by no later than 2050.[1] Carbon capture, utilization, and storage (CCUS) and direct air capture (DAC) technologies have the potential to help the government meet the 2050 goal by separating and purifying $CO_2$ from a source, which could be an industrial facility, or from the atmosphere, respectively.

The federal government has recently increased funding for CCUS and DAC, with funds largely going to the Department of Energy (DOE). The Infrastructure Investment and Jobs Act appropriated about $12 billion from fiscal years 2022 to 2026 for CCUS and DAC-related projects.[2] The CHIPS and Science Act of 2022 authorized an additional $1 billion from fiscal years 2023 to 2026.[3] The Inflation Reduction Act of 2022 also

---

[1]86 Fed. Reg. 70,935 (Dec. 13, 2021).

[2]Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, div. J. 135 Stat. 429, 1373-79 (2021).

[3]Research and Development, Competition, and Innovation Act, Pub. L. No. 117-167, § 10771(6)(C), 136 Stat. 1366, 1728 (2022). The act, in its entirety, is commonly referred to as the CHIPS and Science Act of 2022.

GAO-24-106489  Decarbonization
DOE AR 001054

extended and expanded the federal 45Q tax credit for CO2 captured and stored.[4]

In 2021, we reported on significant risks to DOE's management of carbon capture and storage demonstration projects.[5] Specifically, we found that DOE increased risk by fully committing to projects at their initial selection and bypassing cost controls, resulting in the department spending $472 million on facilities that were never built. We recommended that DOE improve its project selection and negotiation processes and more consistently administer projects against established scopes, schedules, and budgets. DOE has taken preliminary actions to address these recommendations.

In light of past, ongoing, and potential future federal government investments in CCUS and DAC technologies, the USE IT Act includes a provision for GAO to report on all federal CCUS and DAC programs.[6] This report (1) describes the funds DOE obligated to support carbon capture, utilization, and storage projects and direct air capture projects from fiscal years 2018 through 2023; and (2) examines DOE's practices for selecting and managing projects.[7]

To address the first objective, we reviewed publicly available information on federal spending to identify which federal agencies obligated funds for CCUS and DAC projects during fiscal years 2018 through 2023.[8] We

---

[4]Pub. L. No. 117-169, § 13104, 136 Stat. 1818, 1924-29. The maximum value of the credit for carbon capture and storage was increased by 70 percent (relative to the maximum value under prior law), to $85 per metric ton for $CO_2$ that is geologically sequestered and to $60 per metric ton for $CO_2$ that is stored through enhanced oil recovery. The maximum value of the credit for DAC was increased by more than 250 percent, to $180 per metric ton of $CO_2$ for geologic sequestration and to $130 per metric ton for enhanced oil recovery. After calendar year 2026, the credit's values will be adjusted each year to rise with inflation.

[5]See GAO, *Carbon Capture and Storage: Actions Needed to Improve DOE Management of Demonstration Projects*, GAO-22-105111 (Washington, D.C.: Dec. 20, 2021).

[6]Consolidated Appropriations Act, 2021 Pub. L. No. 116-260, div. S, § 102, 134 Stat. 2243, 2247 (2020).

[7]An obligation is a definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States. Payment may be made immediately or in the future. GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: Sept. 1, 2005).

[8]Data are as of June 2023.

GAO-24-106489  Decarbonization
DOE AR 001055

confirmed involvement with these agencies, which included DOE and the National Science Foundation. After a preliminary review of the data, we focused our review on DOE because it obligated the vast majority of funds for CCUS and DAC projects.[9] We then summarized award information by analyzing award data provided by DOE, including award obligations, years, and funding sources. We conducted a data reliability assessment for the award data collected by interviewing relevant agency officials and corroborating award data against available public information. We determined the data to be sufficiently reliable to describe the funds DOE obligated to support CCUS and DAC projects.

To address the second objective, we reviewed a nongeneralizable sample of 40 CCUS and DAC projects identified in our first objective.[10] We selected 40 projects awarded by the five DOE offices responsible for the greatest number of CCUS and DAC projects: 25 projects from the Office of Fossil Energy and Carbon Management (FECM), two projects from the Office of Science, two projects from the Advanced Research Projects Agency-Energy (ARPA-E), one project from the Office of Energy Efficiency and Renewable Energy (EERE), and 10 projects from the Office of Clean Energy Demonstrations (OCED). To get a range of projects, we selected 40 projects from those DOE offices based on project type (CCUS or DAC), amount and type of funding, and the stage of the project. Some of the 40 projects were in the selection and negotiation process, other projects were complete, and some were in between these states.

We reviewed documentation of the goals, outcomes, and expected and actual budgets and schedules of each selected project. This documentation included funding opportunity announcements, DOE project selection announcements, award amendments, risk assessments, and other decision documents. We analyzed these documents to identify project progress and the factors that contributed to their progress, which we discussed with DOE officials and project representatives.[11] We

---

[9]The National Science Foundation provided $8.4 million to support 21 carbon capture projects during this time. Of the 21 projects, 16 supported CCUS and five supported DAC and supported basic and applied research. We also identified additional agencies that supported various aspects of CCUS research during our initial review. Further reviews of these agencies determined that their research was not within the scope of this report. For example, NASA's CCUS projects were limited to crew and life support on spacecrafts.

[10]There was a total of 654 DOE projects identified in our first objective.

[11]The sample reviewed cannot be generalized to the projects we did not include in our review.

DOE AR 001056

additionally reviewed relevant laws, regulations, DOE guidance, and federal internal control standards to assess the extent to which DOE followed these criteria when selecting and managing CCUS and DAC projects.[12] We interviewed DOE officials and project representatives to obtain their perspective on how DOE could improve the selection and management of future CCUS and DAC projects.

We conducted this performance audit from January 2023 to May 2024 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

### Carbon Capture, Utilization, and Storage and Direct Air Capture Technologies

CCUS refers to a group of technologies for reducing CO2 emissions or removing CO2 from the atmosphere (see fig. 1). Carbon capture technology includes those that separate and purify CO2 from a source, which could be an industrial facility such as a power generation or manufacturing facility (point-source capture) or the atmosphere (DAC). Both point-source capture and DAC result in a concentrated stream of CO2 that can be compressed and transported—typically via pipeline—either for conversion into economically valuable products (utilization) or for storage in deep underground geologic formations.

---

[12]Department of Energy, *Guide to Financial Assistance: A Guide to the Award and Administration of Financial Assistance* (Washington, D.C.: Nov. 8, 2023); and *Merit Review Guide for Financial Assistance* (Washington, D.C.: Oct. 1, 2020). GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: Sept. 10, 2014).

GAO-24-106489  Decarbonization
DOE AR 001057

**Figure 1: Components of Carbon Capture, Utilization, and Storage and Direct Air Capture**



Source: GAO (images). | GAO-24-106489

Technologies for transporting, storing, and directly using captured $CO_2$ are mature. Companies are beginning to commercialize utilization technologies that convert captured $CO_2$ into valuable products such as ethanol, sustainable aviation fuel, and mineral aggregates. However, many $CO_2$-based products are not competitive with conventional products, may be excluded from the market by industry standards, and lack a standardized method for ensuring they effectively reduce $CO_2$ emissions.[13]

While the U.S. has abundant potential geologic storage opportunities for $CO_2$, the use of carbon capture and storage is still rare. According to the Congressional Budget Office, as of September 2023, only 15 facilities were capturing and transporting $CO_2$ for permanent storage as part of an ongoing commercial operation.[14] Further, developing the necessary transportation and storage infrastructure presents a chicken-and-egg problem: $CO_2$-emitting industries hesitate to deploy capture technologies if there is no infrastructure to transport and store the captured $CO_2$, but

---

[13]GAO, *Decarbonization: Status, Challenges, and Policy Options for Carbon Capture, Utilization, and Storage*, GAO-22-105274 (Washington, D.C.: Sept. 29, 2022).

[14]Congressional Budget Office, *Carbon Capture and Storage in the United States* (Washington, D.C.: Dec. 13, 2023).

DOE AR 001058

development of such infrastructure is risky if industry is not already capturing CO2. It can take years to plan, permit, and build infrastructure for capturing, transporting, and storing CO2.

## DOE Support for Research and Development of CCUS and DAC Technologies

Multiple offices are responsible for carrying out DOE's carbon capture program. These offices support CCUS and DAC projects across different stages of maturity—referred to as technology-readiness levels (see fig. 2)—and encompass research, development, demonstrations, and deployments. These offices include

- **Office of Fossil Energy and Carbon Management (FECM).** FECM is responsible for the research and development of carbon capture, transport, storage, and conversion technologies, including high-priority areas such as point-source carbon capture and carbon dioxide removal, including DAC. FECM also oversees the infrastructure, operations, and research and development activities at the National Energy Technology Laboratory. The National Energy Technology Laboratory has dual roles: it serves as project manager for research and development projects that receive financial assistance, including carbon capture projects, and conducts applied research related to energy and environmental programs. FECM and the National Energy Technology Laboratory collaborate on selecting and administering DOE awards for carbon capture research and development projects.

- **Office of Science.** The Office of Science supports basic research in the physical sciences, including materials science and chemistry, with research aimed at improving materials and chemical processes for carbon capture.

- **Advanced Research Projects Agency—Energy (ARPA-E).** ARPA-E advances high-potential, high-impact energy technologies that are too early for private-sector investment. ARPA-E's FLExible Carbon Capture and Storage program aims to develop carbon capture and storage technologies that enable power generators to be responsive to grid conditions in a highly variable renewable energy environment.

- **Office of Energy Efficiency and Renewable Energy (EERE).** EERE's Renewable Carbon Resources subprogram supports strategies to better integrate DAC units with algae cultivation systems and to increase CO2 utilization efficiency within algal cultivation systems while optimizing CO2 utilization from air.

- **Office of Clean Energy Demonstrations (OCED).** OCED was established in November 2021 under the Infrastructure Investment and Jobs Act. Its goal is to deliver clean energy demonstration

GAO-24-106489 Decarbonization
DOE AR 001059

projects at scale, including new programs to help accelerate the demonstration and deployment of carbon management technologies.

- **Loan Programs Office.** The Loan Programs Office is responsible for deployments. According to officials from the Loan Programs Office, they had not guaranteed any loans for carbon capture technology as of May 2023, and therefore we did not include the office in this review. However, they said that they will be offering access to capital for large-capacity CO2 transport projects under the carbon dioxide transportation infrastructure finance and innovation program in the future.[15] We have ongoing working evaluating the Loan Programs Office's application review process.

**Figure 2: Roles of Department of Energy (DOE) Offices Across Technology Readiness Levels**



Source: GAO summary of information from DOE. | GAO-24-106489

DOE generally uses competitive funding opportunity announcements for federal financial assistance—typically in the form of grants or cooperative agreements—to solicit applicants for carbon capture projects.[16] Applicants include entities such as universities, private companies, and national laboratories. Each year, DOE sets priorities for its CCUS and DAC research and development programs based, in part, on the amount of funding appropriated by Congress, as well as any direction that Congress may have specified for research and development of certain

---

[15]This program was established as part of the Infrastructure Investment and Jobs Act.

[16]The primary difference between a grant and cooperative agreement is that under a cooperative agreement, substantial involvement is anticipated between the DOE program office and the recipient during performance of the funded activity.

DOE AR 001060

types of technology, and DOE's own research and development plans. Additionally, the Infrastructure Investment and Jobs Act of 2021 provided DOE with funding for several specific CCUS and DAC programs, including commercial large-scale carbon storage projects and regional DAC hubs. DOE's CCUS and DAC research and development projects typically require multiple years to complete.

For those projects selected for funding, DOE and the awardee agree to technical progress milestones for each phase of the project to help ensure that projects accomplish a specific research and development objective or set of objectives. Phases generally include definition or preliminary design, design, construction, and operations. To manage risks inherent to these types of projects and to guide project management, DOE uses its Guide to Financial Assistance, which compiles DOE regulations for managing financial assistance awards with guidance for implementing those regulations.[17]

## DOE Obligated Almost $1.4 Billion to Support Carbon Capture Projects from Fiscal Years 2018 through 2023

DOE supported 654 carbon capture projects with almost $1.4 billion in federal funds from fiscal years 2018 through 2023 (see fig. 3). Specifically, DOE obligated over $1.2 billion to support 545 CCUS projects and over $150 million toward 109 DAC projects through grants and cooperative agreements across five DOE program offices. These projects ranged from basic and applied research and development to small- and large-scale testing pilots, as well as a few early-stage demonstrations.

---

[17]DOE's financial assistance is generally governed by the regulatory requirements contained in 2 C.F.R. pt. 200, 2 C.F.R. pt. 910, and 10 C.F.R. pt. 600.

DOE AR 001061



**Figure 3: Department of Energy (DOE) Carbon Capture Project Obligations, Fiscal Years 2018–2023**

FECM obligated the significant majority of DOE's carbon capture funding. Specifically, FECM obligated almost $950 million, or 69 percent of DOE funding, to support 410 projects from fiscal years 2018 through 2023.[18]

- Of these 410 projects, 392 (about 96 percent) focused on technologies related to reducing emissions from coal and 18 (about 4 percent) from oil and gas. Project funding amounts ranged from $100,000 for research and development projects to $55.7 million for a large-scale CCUS pilot facility.

- Of the $950 million, FECM obligated almost $880 million (93 percent) to support 359 CCUS projects. Of these 359 projects, 107 focused on carbon storage, 101 focused on point-source carbon capture, and the rest focused on other areas.[19] On average, FECM obligated about $2.5 million per CCUS project. FECM also obligated about $68 million

---

[18]FECM employed cooperative agreements to award over 90 percent of the funds provided for CCUS and DAC projects.

[19]Such areas include carbon conversion, carbon utilization, and crosscutting research.

DOE AR 001062

(7 percent) toward 51 DAC projects, averaging about $1.3 million per project.

Other DOE offices also obligated almost $432 million to support 244 carbon capture projects from fiscal years 2018 through 2023 (see fig. 4). For these projects,

- Office of Science obligated over $244 million for 119 projects (project funding amounts ranged from $71,000 to $22 million);[20]

- ARPA-E obligated over $140 million for 99 projects (project funding amounts ranged from $93,000 to $3.7 million);[21]

- EERE obligated almost $31 million for 14 projects (project funding amounts ranged from $1 million to $4 million);

- OCED obligated over $16 million for 12 CCUS demonstrations (project funding amounts ranged from $4.7 million to $9.2 million).[22]

---

[20]Data exclude projects that began in fiscal year 2017 to which Office of Science had obligated funds in or after fiscal year 2018.

[21]This total excludes ARPA-E's funding provided toward direct ocean capture projects, which was about $5 million. Direct ocean capture is a method of capturing dispersed $CO_2$ from ocean water and other natural waters.

[22]This amount is based on obligation data as of January 2024.

DOE AR 001063

**Figure 4: Department of Energy (DOE) Obligations and Number of Projects for Carbon Capture Projects, by Office and Project Type, Fiscal Years 2018–2023**



Source: GAO analysis of DOE data. | GAO-24-106489

DOE AR 001064

## DOE Offices Addressed Project Selection and Management Risks in Various Ways, but FECM Inconsistently Addressed Risks in Reviewed Carbon Capture Projects

DOE offices—including FECM, Office of Science, ARPA-E, EERE, and OCED—employed various processes to address risks associated with selecting and managing carbon capture projects, but FECM engaged in some practices that could expose taxpayer funds to the risk of funding unsuccessful projects and undermine the likelihood of project success. To manage risks, DOE offices employed risk reviews, multi-phase down selection processes, budget controls, and peer reviews. However, FECM did not consistently adhere to guidance regarding risk reduction in project selection and management.

### DOE Offices Employed Varied Approaches to Address Risks in Reviewed Projects

Based on a review of DOE selection, award, and management documentation for a nongeneralizable sample of 40 projects, we found that DOE offices have taken several actions to manage risks associated with CCUS and DAC projects, such as risk reviews, multi-phase down-selection processes, budget controls, and peer reviews. While some actions, such as risk reviews, were used by all the DOE offices included in our review, not all actions were implemented by every office in our sample because offices have some discretion in how they manage risks.

**Risk reviews.** DOE offices conducted risk reviews for all projects in our sample to identify and analyze potential project risks, as required by regulation, to minimize the impacts of such risks and increase likelihood of project success.[23] For example, FECM conducted risk screenings for all projects to calculate the overall project risk potential. These risk screenings evaluate a project across several categories, including financially, technically, and management oversight. This screening determines the level to which the project is to be evaluated and monitored, with higher risk projects potentially requiring further screening and heightened levels of oversight. For example, according to documentation, FECM required one higher-risk project to regularly update its project management plan to identify, assess, monitor, and mitigate technical uncertainties as well as schedule, budgetary, and environmental risks associated with all aspects of the project.

---

[23]In addition, DOE's Research, Technology and Economic Security Vetting Center, established in March 2023, conducts or facilitates risk assessments of DOE awards that require due diligence prior to award selection, particularly in the areas of technology and economic security.

DOE AR 001065

**Down selections.** DOE offices used a multi-phased down-selection process for 11 of the larger-scale projects in our sample to increase the likelihood that the projects selected would succeed.[24] While down-selects may not be appropriate for smaller-scale projects, under this process, DOE offices selected certain projects for initial funding, and then later selected a subset of those projects for full funding—an approach we had previously recommended—to reduce the risks of committing to fully funding a project upon initial selection.[25] In the sample reviewed, initial awards ranged from under $1 million to $8.8 million, and they increased in subsequent phases, totaling from about $9.7 million to $55.7 million by the final phase.

FECM officials we interviewed said that using a down-selection process is an effective means of reducing the risk of funding unsuccessful projects. Specifically, they said gaining additional information about a project allows them to make more informed decisions about which projects are best positioned to succeed. For example, in FECM, a project that had been highly rated in the first and second phases of a large pilot study was ultimately not selected to complete the final phase because the project experienced technical problems that did not support project construction readiness. Because FECM had not obligated funding for the entire project, the office was able to select a different project for the construction phase that it believed was more likely to succeed. By not fully committing to a project upon initial selection, FECM increased the likelihood that the projects ultimately selected for construction would succeed.

FECM officials told us they are in the process of creating guidance that will define when it is appropriate to use the down-select process. In general, FECM officials plan to use down-selects for projects that are higher-risk or for higher dollar amounts. These officials specified that down-selects may not be necessary for smaller projects levels with lower funding levels because those projects typically have shorter timelines and more discrete program objectives.

**Budget controls.** DOE implemented budget controls for all relevant projects in our sample to decrease the risk that DOE would continue to

---

[24]DOE offices included FECM, Office of Science, and OCED. According to ARPA-E and EERE documentation, they also employ down-selects for projects.

[25]See GAO-22-105111.

DOE AR 001066

award funding to unsuccessful projects.[26] Under DOE's *Guide to Financial Assistance*, awardees must submit an application to continue a project at the end of each budget period. These continuation applications contain progress reports, requests for revisions to the project schedule, and adjustments to the budget for the coming budget period. If DOE concurs with the continuation application, the project is formally extended to the next budget period, and the awardee has official authorization to spend funds, subject to congressional appropriations. If DOE does not concur with the application, it works with the awardee to come to agreement on acceptable targets and next steps for the project, according to DOE officials. DOE officials also told us if they are unable to come to agreement, the project ends and DOE begins the closeout process. Our review sample did not include any projects discontinued as the result of DOE nonconcurrence with a continuation application.

**Peer reviews.** DOE offices, including the Office of Science and FECM, used external independent reviews to help manage risk by addressing organizational biases for seven projects in our sample.[27] According to DOE officials, program offices can be overly optimistic in their assessment of projects, including potential cost and schedule risks, because program offices both manage and provide oversight to awards and want them to succeed. External independent reviews help bring to light actions that can potentially limit the likelihood of success and can help balance this optimism.

The Office of Science's Energy Frontier Research Centers included an external peer review for both projects in our sample when they were approximately halfway to completion, according to documentation we reviewed.[28] Funding for the final years of these projects is likely contingent upon satisfactory completion of an extensive mid-term progress review, including external peer reviews. The National Energy Technology Lab also conducts peer reviews of FECM's research programs, although these are not required for all projects. Additionally,

---

[26]Some projects in our review were still in the first budget period, and therefore had not yet submitted any continuation applications. Other projects consisted of only one budget period.

[27]According to DOE's project management order, an external independent review is a project review performed by personnel from DOE and augmented by individuals outside DOE at critical decision points of a project.

[28]Energy Frontier Research Centers are a basic research program funded by the Office of Basic Energy Sciences within the Office of Science. The centers employ multidisciplinary approaches to advance energy research.

DOE AR 001067

while not in our reviewed sample, EERE and ARPA-E use external independent reviews. According to EERE guidance, peer reviews occur for projects that account for about 80 to 90 percent of the funding (based upon dollar value), and 100 percent of key projects, which include projects of high relevance, among other things.[29] According to an ARPA-E official, ARPA-E has used peer reviews in limited circumstances.

| FECM Inconsistently Adhered to Guidance Regarding Risk Reduction in Project Management and Selection | FECM, which is responsible for the significant majority of carbon capture funding and projects under review, engaged in practices that could expose taxpayer funds to the risk of funding unsuccessful projects and undermine the likelihood of project success. Specifically, FECM did not adhere to guidance designed to reduce risk, and, as a result, the office did not always clearly document risk treatment strategies and selected a project that was not deemed technically acceptable. |
|---|---|

**Unclear risk treatments.** It is not clear that FECM comprehensively addressed risks identified by risk screenings and merit reviews because risk treatments, which include both preventative and mitigative actions, were not always clearly documented in the sample of projects we reviewed. According to DOE's *Guide to Financial Assistance*, FECM should maintain the official financial assistance files; ensure that they contain all pertinent materials, records, and documentation; and identify and mitigate technical and financial risks in implementation strategies. However, FECM did not always clearly document such risk treatment strategies in the sample of projects we reviewed. For example, one project's risk screening stated that more internal scrutiny may be required to prevent duplication of efforts. According to FECM officials, the project manager was familiar with the awardee's other projects and determined there was no duplication of efforts per further review, but they were unable to provide documentation to support this determination. In another case, merit review selection documentation noted that the project management plans did not adequately address risks associated with COVID-19's impact on the project schedules in 2021. The project management plans that were later updated in 2022 did not address COVID-19 risks. According to FECM officials, the risks of COVID-19 were addressed in other ways, such as amendments to the initial funding agreement; however, this is not clearly documented.

---

[29]Department of Energy, *Peer Review Guidance*, DOE EERE G 413.001 (Washington, D.C.: December 2020).

DOE AR 001068

Additionally, FECM directs project awardees to identify potential project risks and provide treatment and response strategies for identified risks, but the office does not require awardees to document reviews of these risk assessments on a regular basis. According to best practices found in DOE's Risk Management Guide, risk assessments, along with risk treatment strategies, should be updated on a quarterly basis because it is not possible to identify all risks at the onset of a project.[30] FECM officials told us that project risk assessments are formally updated on an as-needed basis when there are material changes, or between project phases. According to officials, instead of updating the risk assessment, if new risks arose throughout the course of the project, the awardee would communicate these risks with the project manager, who may then direct the awardee to update the risk assessment. However, without documenting that identified potential risks and treatment strategies were reviewed on a regular basis, it is not clear that the awardee or FECM addressed such risks.

DOE guidance states that FECM should ensure that project record files contain all relevant documentation. Documentation is particularly important for project continuity because while a project manager may understand the details of a project, turnover in project managers does occur. Of the FECM projects we reviewed, more than half experienced at least one project manager change throughout the course of a project, with some projects experiencing two or three changes. Further, *Standards for Internal Control in the Federal Government* states that agency management should identify, analyze, and respond to risks related to achieving the agency's defined objectives.[31] Without clear documentation, we were unable to verify that DOE administration of carbon capture projects is consistent with this principle, specifically in its analyses and responses to identified risks. By more clearly documenting risk treatment strategies, FECM would provide greater assurances that taxpayer dollars are going towards selected projects that are more likely to succeed. This is particularly important given the approximately $12 billion appropriated

---

[30]DOE's Risk Management Guide provides non-mandatory risk management approaches to implementing DOE's Program and Project Management for the Acquisition for Capital Assets. According to DOE's Guide to Financial Assistance, program officials can apply the basic principles from DOE's Program and Project Management for the Acquisition for Capital Assets regarding project management to financial assistance awards. Such principles include the identification and treatment of project performance risks (technical, financial, and otherwise).

[31]GAO-14-704G.

DOE AR 001069

for new CCUS and DAC projects in the Infrastructure Investment and Jobs Act, with initial projects already underway.

**High-risk project selection.** FECM did not adhere to DOE guidance for project selection criteria in one of the 25 FECM projects in our sample. DOE's *Merit Review Guide for Financial Assistance* states that programs should only select projects that are deemed technically acceptable to reduce the risk that DOE awards unsuccessful projects. However, FECM selected and awarded funds to a project in our review sample that did not meet DOE criteria. Specifically, in 2020, FECM selected and awarded a $14.6 million carbon storage project even though the project's technical score[32] was below the acceptable threshold.[33] The funding opportunity announcement stated that for a project to qualify, the preliminary evaluation of the storage test site should already be completed. However, according to merit review documentation, this project had not conducted any evaluations of the storage site, making it difficult to determine if the proposed site was amenable for carbon storage.

Subsequent to FECM's selection of this project, it experienced cost overruns and delays, resulting in FECM approving an additional $5.1 million and an additional 18 months to complete the project. According to documentation, the estimated project completion date is now March 2025, although it may be further delayed.[34] FECM was unable to provide documentation regarding the rationale for selecting a technically unacceptable project. Based on our nongeneralizable sample of projects reviewed, it is unclear how widespread this practice is. However, by adhering to project selection guidance to select technically acceptable projects, FECM would provide greater assurances that taxpayer dollars going towards selected projects are more likely to succeed. This is particularly important given the approximately $12 billion appropriated for

---

[32]For this funding opportunity announcement, it was determined all applications that scored 700 points or higher were technically acceptable. FECM selected the five highest-ranking projects, which included four technically acceptable projects and a project that scored below the threshold with 540 points.

[33]An additional $2.5 million in non-FECM federal funds was also provided to this project. These funds were provided by a federally funded research and development center, which is a public-private partnership that conducts research and development for the U.S. government and is sponsored by various federal agencies.

[34]The final milestone of this project is to obtain a Class VI well permit, which is used to inject $CO_2$ into deep rock formations for sequestration. According to the Environmental Protection Agency's Class VI Permit Tracker, this project is not expected to receive a permit decision until July 2025.

DOE AR 001070

new CCUS and DAC projects in the Infrastructure Investment and Jobs Act, with initial projects already underway.

## Conclusions

CCUS and DAC technologies have the potential to support the federal government's goal of net-zero CO2 emissions by 2050, but implementing these technologies has been a challenge. To address this challenge, from fiscal years 2018 through 2023, DOE awarded hundreds of carbon capture projects, providing almost $1.4 billion in funding, to further accelerate the maturity of CCUS and DAC. DOE is planning to award many more projects in the coming years, with the Infrastructure Investment and Jobs Act providing approximately $12 billion for CCUS and DAC projects. It is crucial that DOE—and especially FECM—manages the risks associated with these projects, and it has employed some processes to do so. However, based on the sample of projects we reviewed, FECM—which administered the majority of carbon capture funding to date—also engaged in some practices that could undermine the likelihood of selected project success. First, it is not clear that FECM comprehensively addressed risks identified throughout the course of a project because treatments are not always clearly documented in the projects we reviewed. By more clearly documenting risk treatment strategies, which can be important for project continuity given common turnover in project managers, FECM would provide greater assurances that taxpayer dollars are going towards selected projects that are more likely to succeed.

Second, FECM's decision to award funds to a project that was not deemed technically acceptable by merit reviewers increased the risk of funding a project that was less likely to succeed. By adhering to merit review guidance that it select only technically acceptable projects, FECM could better ensure that future carbon capture projects it selects are more likely to succeed.

## Recommendations for Executive Action

We are making the following two recommendations to DOE:

The Principal Deputy Assistant Secretary for the Office of Fossil Energy and Carbon Management should take actions to more clearly document project risk treatment strategies consistent with the project management principles identified in its Guide to Financial Assistance. (Recommendation 1)

The Principal Deputy Assistant Secretary for the Office of Fossil Energy and Carbon Management should take steps to ensure that the office adheres to guidance and only selects projects that are deemed to be

GAO-24-106489 Decarbonization
DOE AR 001071

technically acceptable, as required by its Merit Review Guide for Financial Assistance. (Recommendation 2)

## Agency Comments

We provided a draft of this report to DOE for review and comment. In its comments, reproduced in appendix I, DOE concurred with both recommendations and indicated that it plans to implement them. DOE also provided technical comments, which we incorporated as appropriate.

We are sending copies of this report to the appropriate congressional committees, the Secretary of Energy, and other interested parties. In addition, the report is available at no charge on the GAO website at https://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-3841 or ruscof@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix II.

Frank Rusco
Director, Natural Resources and Environment

DOE AR 001072

*List of Committees*

The Honorable Joe Manchin III
Chairman
The Honorable John Barrasso, M.D.
Ranking Member
Committee on Energy and Natural Resources
United States Senate

The Honorable Tom Carper
Chairman
The Honorable Shelley Moore Capito
Ranking Member
Committee on Environment and Public Works
United States Senate

The Honorable Patty Murray
Chair
The Honorable John Kennedy
Ranking Member
Subcommittee on Energy and Water Development
Committee on Appropriations
United States Senate

The Honorable Cathy McMorris Rodgers
Chair
The Honorable Frank Pallone, Jr.
Ranking Member
Committee on Energy and Commerce
House of Representatives

The Honorable Bruce Westerman
Chairman
The Honorable Raúl Grijalva
Ranking Member
Committee on Natural Resources
House of Representatives

The Honorable Frank D. Lucas
Chairman
The Honorable Zoe Lofgren
Ranking Member
Committee on Science, Space, and Technology
House of Representatives

GAO-24-106489  Decarbonization

DOE AR 001073

The Honorable Chuck Fleischmann
Chairman
The Honorable Marcy Kaptur
Ranking Member
Subcommittee on Energy and Water Development, and Related Agencies
Committee on Appropriations
House of Representatives

DOE AR 001074

# Appendix I: Comments from the Department of Energy



**Department of Energy**
Washington, DC 20585

May 2, 2024

Mr. Frank Rusco
Director
Natural Resources and Environment
U.S. Government Accountability Office
441 G Street NW
Washington, DC 20548

Dear Mr. Rusco,

The Department of Energy (DOE or Department) appreciates the opportunity to comment on the Government Accountability Office's (GAO) draft report titled, "*Decarbonization: Opportunities Exist to Improve the Department of Energy's Management of Risks to Carbon Capture Projects*" GAO-24-106489. DOE provides the following comments below.

The draft report contained a total of two recommendations, of which GAO directed two recommendations to DOE. DOE concurred with GAO's draft recommendations and provided technical and general comments to improve the report. The Department plans to implement the recommendations as articulated by GAO in the draft report.

If you have further questions, please contact Ms. Priyanka Hooghan, Chief of Staff, Office of Fossil Energy and Carbon Management, at (240) 449-5143.

Sincerely,

Brad Crabtree
Assistant Secretary
Office of Fossil Energy and Carbon Management

Enclosure

DOE AR 001075

Enclosure

## Management Response
**GAO Draft Report:** *"Decarbonization: Opportunities Exist to Improve the Department of
Energy's Management of Risks to Carbon Capture Projects"* **GAO-24-106489**

**Recommendation #1:** The Principal Deputy Assistant Secretary for the Office of Fossil Energy
and Carbon Management should take actions to clarify document project risk mitigation
strategies consistent with the project management principles identified in its *Guide to Financial
Assistance*.

**DOE Response:** Concur

The Office of Fossil Energy and Carbon Management (FECM) is in the process of updating
relevant guidance on risk management for project management staff. FECM will reiterate, as
aligned with current processes, the need to document the risk mitigation strategies as they occur.
FECM's guidance will complement Department-wide guidance contained in the Department of
Energy (DOE) *Guide to Financial Assistance*.

**Estimated Completion Date:** Action on this recommendation has been initiated and the updated
guidance is expected to be available by the end of fiscal year 2024.

**Recommendation #2:** The Principal Deputy Assistant Secretary for the Office of Fossil Energy
and Carbon Management should take steps to ensure that the office adheres to guidance and only
selects projects that are deemed to be technically acceptable, as required by its *Merit Review
Guide for Financial Assistance*.

**DOE Response:** Concur

The Principal Deputy Assistant Secretary will direct staff to follow the DOE *Merit Review Guide
for Financial Assistance*, including guidance for reviewing the technical feasibility of projects.
This direction will be reinforced by the Head of Contracting Activity for FECM. The Selection
Officials will be responsible for adherence to the guidance.

**Estimated Completion Date:** The message from the Principal Deputy Assistant Secretary will
be sent no later than May 30, 2024.

DOE AR 001076

# Appendix II: GAO Contact and Staff Acknowledgments

| GAO Contact | Frank Rusco, at 202-512-3841 or ruscof@gao.gov |
|---|---|
| Staff Acknowledgments | In addition to the contact name above, Matthew Tabbert (Assistant Director), Colson Campbell Ricciardi (Analyst-In-Charge), Macie Benincasa, Quindi Franco, Cindy Gilbert, Patrick Harner, Latoya Hogg, Gwen Kirby, Victor Ponds, Dan Royer, Robert Sanchez, Caitlin Scoville, and Elise Vaughan Winfrey made key contributions to this report. |

DOE AR 001077

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. <br> Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. <br> Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: <br><br> Website: https://www.gao.gov/about/what-gao-does/fraudnet <br><br> Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7814, <br> Washington, DC 20548 |



Please Print on Recycled Paper.

DOE AR 001078

JOE MANCHIN III, West Virginia, *Chairman*
RON WYDEN, Oregon
MARIA CANTWELL, Washington
BERNARD SANDERS, Vermont
MARTIN HEINRICH, New Mexico
MAZIE K. HIRONO, Hawaii
ANGUS S. KING, JR., Maine
CATHERINE CORTEZ MASTO, Nevada
JOHN W. HICKENLOOPER, Colorado
ALEX PADILLA, California

RENAE BLACK, MAJORITY STAFF DIRECTOR
SAM E. FOWLER, MAJORITY CHIEF COUNSEL

# United States Senate

COMMITTEE ON ENERGY AND NATURAL RESOURCES

WASHINGTON, DC 20510–6150

WWW.ENERGY.SENATE.GOV

JOHN BARRASSO, Wyoming
JAMES E. RISCH, Idaho
MIKE LEE, Utah
STEVE DAINES, Montana
LISA MURKOWSKI, Alaska
JOHN HOEVEN, North Dakota
BILL CASSIDY, Louisiana
CINDY HYDE-SMITH, Mississippi
JOSH HAWLEY, Missouri

JUSTIN J. MEMMOTT, MINORITY STAFF DIRECTOR
PATRICK J. McCORMICK III, MINORITY CHIEF COUNSEL

June 4, 2024

The Honorable Teri L. Donaldson
Office of Inspector General
U.S. Department of Energy
1000 Independence Ave., SW
Washington, DC 20585

Dear Inspector General Donaldson,

I am writing to request a comprehensive investigation of the Department of Energy's (DOE) recent conditional commitment to provide Plug Power, Inc., a hydrogen fuel cell company, with a loan guarantee worth more than $1.66 billion.[1] It appears that DOE's Loan Programs Office (LPO) continues to provide taxpayer support to entities with which its Director, Jigar Shah, has conflicts of interest.

In your April 3rd response to my letter, dated December 13, 2023, you underscored systemic conflict of interest concerns within the LPO. You also explained that your office is currently evaluating potential conflicts of interest related to Director Shah and DOE's issuance of a $3 billion loan guarantee to Sunnova. I respectfully request that you investigate DOE's conditional commitment to Plug Power and specifically examine any potential impropriety on the part of Director Shah and the LPO more broadly.

My concerns about DOE's conditional commitment to Plug Power arise from Director Shah's prior role at Generate Capital, a company that finances energy and infrastructure projects. Shah co-founded Generate Capital in 2014. He served as Generate Capital's President until March of 2021, at which point he joined DOE's LPO. In 2019, Generate Capital provided a $100 million loan to Plug Power.[2] After Shah left Generate for LPO, Plug Power repaid its loan to Generate ahead of schedule (without any early termination penalties) on December 14, 2022[3] – as it was pursuing a DOE loan guarantee.

I would also point your attention to Taite McDonald, a lobbyist for Plug Power at Holland & Knight, who maintains strong connections to Director Shah. McDonald, a self-described "longtime friend" of Shah and an advisor to Cleantech Leaders Roundtable, an organization that Shah founded in 2017, has led numerous companies through the LPO selection process since Shah became LPO's Director.[4] As noted on Holland & Knight's website, McDonald helped Plug

---

[1] LPO Announces Conditional Commitment to Plug Power to Produce and Liquify Clean Hydrogen Fuel | Department of Energy
[2] Plug Power Inc. | Plug Power Announces $100 Million Debt Facility from Generate Capital
[3] Plug Power Inc. Repays All Outstanding Obligations Under the Loan and Security Agreement - MarketScreener
[4] This Lobbyist Calls Biden's Energy Czar a 'Longtime Friend.' She Raked In Millions in Energy Loans for Clients. (freebeacon.com)

Power secure tens of millions of dollars in DOE grants.[5] Shah also appeared on a Holland & Knight podcast with McDonald to discuss the LPO.[6] I am concerned that this comingling of professional and personal relationships undermines the impartiality with which LPO should pursue its statutory obligations to evaluate loan and loan guarantee applications.

In addition to my concerns about Shah's ties to Plug Power, I have significant doubts about Plug Power's financial viability. I understand that the company has not turned a profit since its incorporation over 20 years ago.[7] Plug Power incurred a $1.4 billion loss in 2023, which was nearly double its $724 million loss in 2022.[8] It also appears that Plug Power only resolved its November 2023 going concern warning in March of this year.[9] Such significant losses raise questions about DOE's prior decisions to provide Plug Power with tens of millions of dollars in grants as well as DOE's conditional commitment to provide a $1.66 billion loan guarantee.[10]

My concerns that arise from the above facts are as follows:

1. **Conflicts of Interest**: Generate Capital's $100 million loan to Plug Power and Shah's transition from Generate Capital to LPO raises questions about potential conflicts of interest. Shah's previous ties to Plug Power may have influenced LPO's decision-making process. At a minimum, Shah's ties have given the appearance of favoritism.
2. **Timing of Repayment**: Plug Power repaid its loan to Generate Capital ahead of schedule (without early termination penalties) on December 14, 2022 - at the same time it was pursuing a DOE loan guarantee. The timing of this early repayment (without penalty) raises questions whether Shah or LPO gave Plug Power something in return for or helped enable the early repayment – for example, by indicating that LPO would look favorably upon Plug Power's application for a DOE loan guarantee.
3. **Insider Knowledge and Fair Competition**: Shah's insider knowledge from his time at Generate Capital may have given Plug Power an undue advantage in securing a conditional commitment from DOE. Such knowledge might include insights into Plug Power's negotiation strategies, financial structuring, or approval processes. Other companies, which are pursuing a DOE loan guarantee, might perceive Shah's ties to Plug Power as a reason to doubt the fairness and competitiveness of DOE's funding decisions.
4. **Due Diligence**: Private sector investors frequently look to LPO's conditional commitments as an indication that a company is credit worthy. If Shah's previous ties to Plug Power in any way influenced LPO's evaluation or due diligence of Plug Power, LPO's conditional commitment might have misled investors of Plug Power.
5. **Public Perception and Trust**: If people perceive that private sector relationships unduly influence LPO's decision-making process, public trust in the integrity, transparency, and accountability within DOE will erode.

---

[5] Holland & Knight Assists Plug Power and The Chemours Company in Obtaining Department of Energy Funds for Clean Hydrogen Projects | News | Holland & Knight (hklaw.com)

[6] Podcast - The Loan Programs Office: Current State of Affairs with Director Jigar Shah | Insights | Holland & Knight (hklaw.com)

[7] Plug Power lands $1.7B DOE loan guarantee to boost... | Canary Media

[8] Plug Power SEC Form 10-K Filing for Year 2023

[9] Plug Power Inc. | Plug Highlights Year of Strategic Growth and Advancements in Accelerating the Green Hydrogen Economy

[10] Plug Selected by U.S. DOE for Several Project Awards to Advance Hydrogen Electrolyzer and Fuel Cell Technologies - Plug Power

You have written that "[t]here is no precedent in the Department for [LPO's] level and pace of financing[,]"[11] referring to the "historic expansion" of LPO's lending authority as a "massive new risk[] to the taxpayer."[12] With the upcoming presidential election, I am concerned that LPO may accelerate its lending in anticipation of a potential change in administration.[13]

To ensure the highest ethical standards at DOE, I respectfully request an investigation of the following:

1. **Potential Pre-Tenure Involvement**: Investigate Shah's potential involvement in Plug Power-LPO discussions before his tenure as LPO Director, while he was still at Generate Capital.
2. **Impartiality in Loan Decisions**: Review the decision-making process within the LPO, focusing on whether Shah's prior personal and business relationships, described above, impacted the decision-making process with regard to DOE's conditional commitment to Plug Power.
3. **Loan Repayment Circumstances**: Investigate the early repayment of Plug Power's loan to Generate Capital and any communications indicating further DOE financial support.
4. **Ethical Compliance**: Assess Shah's adherence to the Biden Ethics Pledge, particularly the Revolving Door Ban, in the context of his interactions with Generate Capital and Plug Power.
5. **Excessive Financial Risk**: LPO's conditional commitment of a $1.66 billion loan guarantee to Plug Power exceeds the company's financial loss of $1.4 billion in 2023. Investigate whether an LPO decision to issue a final loan guarantee to Plug Power would constitute an excessive, atypical financial risk compared to prior LPO loan guarantees.

Given the significant financial implications and the need to maintain public trust, a thorough investigation into the LPO's conditional commitment to Plug Power is essential to ensure transparency and accountability within the LPO. For your convenience I have attached the footnoted links and materials in a separate document.

Thank you for your attention to this matter. I look forward to your prompt response.

Sincerely,

John Barrasso, M.D.
Ranking Member

---

[11] Statement of the Honorable Teri L. Donaldson, Inspector General - October 19, 2023
[12] Id.
[13] 'It would just die on the vine': Biden's $200 billion energy loan juggernaut faces a Trump-sized threat - POLITICO

DOE AR 001081

# U.S. Department of Energy
# Office of Inspector General
# New Project Work Plan
# for
# Fiscal Year 2025

## Overview / Objective

The fiscal year 2025 work plan reflects the first round of work that the Office of the Inspector General (OIG) intends to commence to begin to fulfill its oversight duties.  These new projects are in addition to the numerous already ongoing projects being conducted by the OIG.  As circumstances change and new issues emerge, the OIG may add, delete or postpone projects.  The projects are described by general topic or program area.  Projects may be managed as audits, inspections, evaluations, or Special Projects subject to applicable standards.  This plan does not include OIG plans for its Office of Investigations.

## Part I.    Overseeing the Department's high-risk portfolio under the Infrastructure Investment and Jobs Act (IIJA), Inflation Reduction Act (IRA), and Puerto Rico Energy Resilience Fund

- Loan Programs Office due diligence assessment – series of projects/reports
- Under Secretary for Infrastructure's planned oversight and audits for financial assistance awards
- Grid Deployment Office's program to implement transmission facility financing program of the IRA (sec. 50151) and transmission facilitation program of the IIJA (prov. 40106)
- State and community energy rebate programs, State level grants under the IRA (sec. 50122)
- Grid resilience and innovation program financial assistance awards under IIJA provisions 40101(c), 40103(b), and 40107
- Cybersecurity planning efforts for IIJA
- Battery manufacturing and recycling and battery material processing grants under IIJA (prov. 40207c) (prov. 40207b)
- Regional clean hydrogen hubs financial assistance awards under IIJA (prov. 40314.813)
- Puerto Rico energy resilience financial assistance awards
- Weatherization assistance program awards to States and subrecipients under the IIJA (prov. 405510)
- Advanced reactor demonstration program financial assistance awards under IIJA (prov. 411002)
- Civil nuclear credit program awards under IIJA (prov. 40323)
- Energy improvements in rural or remote areas program financial assistance awards under IIJA (provision 40103.c)
- Regional direct air capture hubs program financial assistance awards under IIJA (prov. 40308)

1

DOE AR 001082

- Advanced industrial facilities deployment program financial assistance awards under IIJA (sec. 50161)
- Carbon storage validation and testing program financial assistance awards under IIJA (prov. 40305)
- National Energy Technology Laboratory support activities for IIJA / IRA programs
- Office of Clean Energy Demonstrations controls over the community benefits plans

## <u>Part II</u>.    **Overseeing the Department's enduring mission programs – base budget projects**

<u>Mandatory Reviews</u>

- Semi-annual reports to Congress (two reports, April and October)
- Major management challenges at the Department of Energy
- The Department's fiscal year 2025 consolidated financial statements
- The Federal Energy Regulatory Commission's fiscal year 2025 financial statements
- The Department's payment integrity reporting in fiscal year 2024 agency financial report
- The Nuclear Waste Fund's fiscal year 2025 financial statements
- The Southwestern Federal Power system's fiscal year 2025 financial statements
- The Western Area Power Administration's fiscal year 2025 financial statements
- Management letter on the audit of the Department's consolidated financial statements for fiscal year 2025
- The Department's unclassified cybersecurity program – 2025
- The Federal Energy Regulatory Commission's unclassified cybersecurity program – 2025
- The Department's implementation of the Cybersecurity Information Sharing Act of 2015
- Information technology management letter for fiscal year 2025
- The Department's oversight of senior official travel

<u>Incurred cost and related audits at major management and operating contractors</u>

- Alliance for Sustainable Energy, LLC (2023 Incurred Cost Audit)
- Battelle Energy Alliance, LLC (2022-2023 Incurred Cost Audit)
- Battelle Savannah River Alliance, LLC (2021-2022 Incurred Cost Audit and 2023-2024 Incurred Cost Audit)
- Brookhaven Science Associates, LLC (2023-2024 Incurred Cost Audit)
- Consolidated Nuclear Security, LLC (2019-2024 Incurred Cost Audit, Real Time Labor and Material Testing)
- Fermi Research Alliance, LLC (2023-2024 Incurred Cost Audit)
- Fluor Federal Petroleum Operations, LLC (2022-2023 Incurred Cost Audit)
- Honeywell Federal Manufacturing & Technologies, LLC (2018-2020 Material and Subcontract Incurred Cost Audit, Real Time Labor and Material Testing)
- Iowa State University (2023-2024 Incurred Cost Audit)
- Jefferson Science Associates, LLC (2022-2023 Incurred Cost Audit)
- Lawrence Livermore National Security, LLC (2018-2020 Incurred Cost Audit)

DOE AR 001083

- Mission Support and Test Services, LLC (2021-2023 Incurred Cost Audit, Real Time Labor and Material Testing)
- NTES of Sandia, LLC (2021-2022 Incurred Cost Audit, Real Time Labor and Material Testing)
- PanTeXas Deterrence, LLC (Real Time Labor and Material Testing)
- Salado Isolation Mining Contractors (2023-2024 Incurred Cost Audit)
- Savannah River Nuclear Solutions, LLC (2023-2024 Incurred Cost Audit, Real Time Labor and Material Testing)
- Stanford University (2022-2023 Incurred Cost Audit)
- The Regents of the University of California (2022-2023 Incurred Cost Audit)
- The Trustees of Princeton University (2023-2024 Incurred Cost Audit)
- Triad National Security, LLC (2022-2023 Incurred Cost Audit, Real Time Labor and Material Testing)
- University of Chicago Argonne, LLC (2023-2024 Incurred Cost Audit)
- UT-Battelle, LLC (2023-2024 Incurred Cost Audit, Real Time Labor and Material Testing)

<u>Risk informed audits, inspections and other oversight projects</u>

- National Nuclear Security Administration's (NNSA) control and accountability of nuclear weapon data
- Reasonableness of contractor excess pension contributions
- NNSA W88-4 life extension program ability to meet first production unit
- NNSA's management of Los Alamos National Laboratory's hydrodynamic test program
- Department's strategic intelligence partnership program (Classified)
- Evaluation of activities to counter foreign influence at the Department's national laboratories (Classified)
- Department's identification and management of stale accounts
- Department's integration of the Federal Data Strategy Action Plan
- Department's enterprise risk management process
- Collaboration between the Department's Office of Intelligence and Counterintelligence and other offices
- Waste Isolation Pilot Plant issues management and corrective actions
- Security over the Department's integrated security system
- Management of the Brookhaven National Laboratory's cybersecurity program
- Department's threat analysis and information sharing programs
- Management and security of selected high value assets
- Department's management and oversight of artificial intelligence activities
- Internal controls over timekeeping at the uranium processing facility
- Department's management of developing next generation solvent to support salt waste processing throughput goals
- Contractor suitability screening for HSPD-12 credentials
- Federal pre-employment personnel security clearance process
- Management of Hanford fire suppression systems to ensure site safety
- NNSA's deferred maintenance reporting at the Pantex site

3



U.S. Government Accountability Office

# Clean Energy: New DOE Office Should Take Steps to Improve Performance Management and Workforce Planning

GAO-25-106748
Q&A Report to Congressional Committees

November 14, 2024

## Why This Matters

In December 2021, the Department of Energy (DOE) established a new office—the Office of Clean Energy Demonstrations (OCED)—to manage a historic amount of appropriated funding for clean energy demonstration projects. Such clean energy projects in areas including carbon capture, hydrogen, and advanced nuclear are intended to help lower the investment risk of new technologies and allow for additional large-scale private investment and the commercialization of such technologies.

The DOE Office of Inspector General and GAO have previously reported on risks related to DOE's management of demonstration projects including related to the agency's selection of projects and to human capital issues such as insufficient federal staffing and heavy workloads for project oversight officials.

The Infrastructure Investment and Jobs Act (IIJA) includes a provision for us to review this new office (Pub. L. No. 117-58, § 41201(f)(2), 135 Stat. 429, 1131 (2021)). Specifically, this report examines OCED's establishment and its program development and proposal review process for issuing awards for projects.

## Key Takeaways

- As of October 2024, OCED issued at least one funding opportunity announcement calling for project proposals for all of its eight portfolio areas. OCED has also selected some projects for negotiation and finalized some awards in most of its portfolios. In doing so, OCED has been responsive to some of our relevant prior recommendations such as by providing time to negotiate final award agreements.

- OCED's activities generally follow six leading practices that our prior work has shown can be effective in enhancing and sustaining federal agency coordination, such as bridging organizational cultures, including relevant participants, and leveraging resources and information. OCED's activities partially aligned with the two remaining practices—defining common outcomes and ensuring accountability.

- To provide greater assurance that its activities are aligned with meeting its goals, we recommend that OCED define goals for all OCED activities, collect performance information to measure progress toward goals, and use that information to assess results and make decisions.

- With 250 employees as of August 2024, OCED identified that it needs to fill 101 positions to be fully staffed. To provide greater assurance that OCED will have an adequate and capable workforce to meet its mission and goals, we recommend that OCED monitor and evaluate progress toward human capital goals and develop a strategic workforce plan.

DOE AR-001085

**What is OCED's role within DOE?**

OCED is responsible for managing clean energy demonstration projects and supporting other DOE offices that are managing their own demonstration projects. Overall, the office seeks to provide oversight excellence to the project management of demonstration projects, according to OCED documents. These demonstration projects are generally independent private sector led projects, which OCED supports through grant or financial assistance awards from its appropriations. Specifically, DOE was appropriated about $27 billion from fiscal year 2022 through fiscal year 2026 from the Infrastructure Investment and Jobs Act (IIJA) and the Inflation Reduction Act to fund clean energy projects in areas such as carbon capture, hydrogen, and advanced nuclear.[1]

OCED publishes solicitations calling for proposals—often called funding opportunity announcements. These solicitations include detailed information on the awards, including who is eligible to apply, what proposal components are required, how to submit a proposal, and the evaluation criteria for selecting awards. OCED evaluates proposals and provides demonstration project funding to successful award recipients based on negotiated award terms and conditions, scopes of work, and other required documents.

As of October 2024, OCED had eight portfolio areas comprising 17 programs related to a variety of technologies.[2] Regional Clean Hydrogen Hubs ($8 billion), Carbon Management ($7.1 billion), and Industrial Demonstrations ($6.3 billion) are the highest funded OCED portfolio areas (see fig. 1). Projects awarded in the Regional Clean Hydrogen Hubs and Industrial Demonstrations portfolios aim to reduce carbon emissions in various ways, including from steel, cement, aluminum, and chemical production. Projects awarded in the Carbon Management portfolio aim to help accelerate the demonstration and deployment of carbon capture technologies.

**Figure 1: Appropriated Funding for the Department of Energy's Office of Clean Energy Demonstrations by Portfolio Area, as of October 2024**



$0.05 billion
Distributed Energy Systems Demonstrations

$0.5 billion
Clean Energy Demonstration Program on Current and Former Mine Land

$0.5 billion
Long-Duration Energy Storage

$1 billion
Energy Improvements in Rural or Remote Areas

$3.3 billion
Advanced Nuclear

$6.3 billion
Industrial Demonstrations

$7.1 billion
Carbon Management

$8 billion
Regional Clean Hydrogen Hubs

Source: Department of Energy data.  |  GAO-25-106748

Note: This figure covers projects managed by the Office of Clean Energy Demonstrations, and appropriations for these come from a variety of sources, including the Infrastructure Investment and Jobs Act and the Inflation Reduction Act. These funds were appropriated from fiscal year 2022 through 2026.

OCED works with other DOE program offices that have technical expertise with the technologies represented in OCED's portfolio, including DOE's Offices of Nuclear Energy, Fossil Energy and Carbon Management (FECM), and Energy Efficiency & Renewable Energy. Historically, some of these program offices managed their own demonstration projects. For example, FECM previously managed carbon capture and storage projects that are similar to those currently in OCED's Carbon Management portfolio. Additionally, the Advanced Nuclear portfolio area consists of a new program initiated by OCED and two ongoing projects that were previously managed by the Office of Nuclear Energy.

Most of OCED's appropriations are designated to fund demonstration projects through awards to project recipients, while approximately 5 percent is indicated for OCED's administrative costs for most of OCED's portfolios.[3] When establishing its office, OCED was given its own procurement authority and legal counsel within DOE's Office of the General Counsel for its programs to ensure it had the capability to award and manage projects on its own, according to DOE documents and OCED officials.

**What is OCED's program development and proposal review process?**

OCED's program development and proposal review process has three main steps that culminate in OCED issuing awards to project recipients.[4] First, the office is to design a program by defining the types of projects it hopes to support and by detailing the parameters of awards and the selection process, such as the criteria by which OCED will evaluate proposals and time frames. These details are published in funding opportunity announcements.

According to OCED officials and documentation, in designing its programs, OCED reviewed legislative requirements, collaborated with other relevant DOE offices to determine the goals and scope of its programs, and used the expertise of both OCED and DOE officials to publish program details in funding opportunity announcements. In some cases, OCED obtained input on program design through public requests for information in advance of publishing the final funding opportunity announcement. Additionally, in many cases, OCED required potential applicants to submit a concept paper before submitting a full application, which allowed applicants to receive OCED feedback before expending the considerable resources necessary for a full proposal, according to OCED officials.

The second step is OCED's proposal review process where OCED is to review full proposals submitted by applicants and select projects for award negotiations (see fig. 2). OCED initially adopted practices for this step that were developed and used by other DOE offices. As OCED increased its staff and capacity, the office developed its own practices. Specifically, OCED used an expanded number of merit reviewers and conducted in-depth preselection interviews with applicants, according to OCED officials.

**Figure 2: Department of Energy's Office of Clean Energy Demonstrations Proposal Review Process**



Sources: GAO analysis of Department of Energy documents; GAO (icons).  |  GAO-25-106748

Note: In many cases, the Office of Clean Energy Demonstrations required potential applicants to submit a concept paper before submitting a full application.

Third, for selected projects, OCED and the selectee negotiate the details of the award agreement, and OCED issues the award.[5] During this step, OCED and the selectee conduct additional due diligence and negotiate terms before finalizing all

the terms in the cooperative agreement. With an issued award, funding is obligated, and payments to reimburse authorized expenses may begin.

Across these three steps, we found that OCED was responsive to some practices related to program design, proposal review, and award negotiations that we recommended in our prior reports. Specifically:

**Program design.** In a 2021 report, we recommended that DOE improve its project selection and negotiation processes for carbon capture and storage demonstrations, including by adopting a down-selection process—whereby DOE would select certain projects for initial funding and further review, and then select a subset of those projects for full funding.[6] We had found that DOE fully committed to some projects at their initial selection, which increased its risk of funding unsuccessful projects.

OCED adopted a process similar to down-selection for its Regional Direct Air Capture Hubs program, which seeks to demonstrate the processing, transport, and storage of carbon dioxide captured from the atmosphere. In this program, OCED made funding available to support projects from early phase feasibility studies through detailed design and permitting. Upon completion of this process, OCED stated it would provide up to $500 million for up to two projects to complete the procurement, construction, and operation phases.

OCED did not adopt a down-selection process for its other programs. Rather, OCED sought to reduce the risk of funding unsuccessful projects by building in go/no-go decision points into its awards. Specifically, for its demonstration programs, awardees must meet established project milestones before they are able to advance to subsequent phases, according to OCED documents.

This go/no-go decision point structure is similar to how DOE structured the carbon capture and storage awards we reviewed in our 2021 report. However, OCED officials said that their approach to the go/no-go decisions will be more rigorous and include outside independent review. We are continuing to monitor the extent to which OCED's approach to these decision points is more effective than we found it to be in our 2021 report.

**Proposal review.** In a 2024 report, we recommended that DOE's FECM ensure that it adheres to guidance and only select projects that are deemed to be technically acceptable.[7] We had found that FECM had selected a project for award even though its technical score did not meet the office's established threshold. (FECM had previously managed carbon capture and storage projects that are similar to those currently in OCED's Carbon Management portfolio.) For OCED, we reviewed the awards issued through July 2024 and found that OCED selected projects that met the technically acceptable criteria.

**Award negotiations.** In our 2021 report, we reported that DOE used expedited time frames to negotiate some projects—fewer than 3 months as opposed to up to a year—based on DOE's desire to begin spending funds quickly.[8] We found that these actions reduced DOE's ability to identify and mitigate technical and financial risks. We recommended that future carbon capture and storage demonstrations allow adequate time for negotiations prior to entering cooperative agreements. For the awards as of October 2024 for the Regional Clean Hydrogen Hubs and carbon capture projects, the time from project selection to award was from about 7 months to 13 months, according to OCED's selection and award announcements. The four OCED selectees we spoke with found that the extended negotiation time frame created some challenges with their budgeting and planning. However, OCED has been responsive to selectees' concerns and has provided updates throughout the negotiation process, including time frames for finalizing awards, according to the selectees.

**What is the status of OCED's programs?**

As of October 2024, OCED issued at least one funding opportunity announcement calling for proposals for all 17 programs in OCED's portfolios. OCED has selected some projects for award negotiation in each of its portfolios and finalized awards for some projects in every portfolio but one. OCED officials told us they plan to finalize awards for all the projects selected for negotiations across their portfolio by the end of calendar year 2024, and some of these projects are expected to be implemented into the next decade. See table 1 for a summary of the status of OCED's portfolio, and appendix 1 for additional details.

**Table 1: Status of Department of Energy's Office of Clean Energy Demonstrations Portfolio Areas, as of October 2024**

| Portfolio area | Appropriation (Dollars in billions) | Number of programs in portfolio area | Funding opportunity announced | Projects selected | Projects awarded |
|---|---|---|---|---|---|
| Regional Clean Hydrogen Hubs | $8 | 2 | ● | ● | ◐ |
| Carbon Management | 7.1 | 4 | ◐ | ◐ | ◐ |
| Industrial Demonstrations | 6.3 | 1 | ● | ● | ◐ |
| Advanced Nuclear | 3.3 | 2 | ● | ◐ | ◐ |
| Energy Improvements in Rural or Remote Areas | 1 | 3 | ● | ◐ | ◐ |
| Long-Duration Energy Storage | 0.5 | 3 | ● | ◐ | ◐ |
| Clean Energy Demonstration Program on Current and Former Mine Land | 0.5 | 1 | ● | ● | ◐ |
| Distributed Energy Systems Demonstrations | 0.05 | 1 | ● | ● | ○ |

Legend:
● = All programs within the portfolio area
◐ = At least one program within the portfolio area
○ = No programs within the portfolio area

Source: GAO analysis of Department of Energy documentation.  |  GAO-25-106748

Note: This table covers projects managed by the Office of Clean Energy Demonstrations, and appropriations for these come from a variety of sources including the Infrastructure Investment and Jobs Act, the Inflation Reduction Act, and other appropriations.

**How did DOE determine which demonstration projects OCED would manage?**

DOE relied on legislative direction and department discretion to determine which demonstration programs OCED would manage. In part, DOE also used a technology readiness level scale to categorize projects as research, development, demonstration, or deployment and the offices that will generally work on those projects. As shown in figure 3, OCED was established to manage projects that are near the demonstration technology readiness level. Prior to the creation of OCED, demonstration projects were primarily managed by DOE's program offices, which also manage projects ranging from research and development to deployment.

DOE AR-001090

**Figure 3: Roles of Department of Energy (DOE) Offices Across Technology Readiness Levels**



ARPA-E    Advanced Research Projects Agency-Energy
DOE       Department of Energy
EERE      Office of Energy Efficiency and Renewable Energy
FECM      Office of Fossil Energy and Carbon Management
OCED      Office of Clean Energy Demonstrations

Source: GAO summary of information from Department of Energy.  |  GAO-25-106748

Currently, according to DOE officials, research and development projects continue to be managed by DOE's program offices. They told us OCED generally manages demonstration projects; however, there have been exceptions including the following:

- OCED entered into an agreement with DOE's Grid Deployment Office for that office to manage a demonstration program using funding originally appropriated to OCED, citing increased efficiency in use of department resources.

- Other DOE offices such as the Office of Energy Efficiency and Renewable Energy and FECM manage several ongoing pilot-scale demonstration projects appropriated to those offices, according to DOE officials.

## How has OCED coordinated with other relevant DOE offices?

OCED's activities coordinating with other DOE offices generally followed six of eight leading practices which our prior work has shown can be effective in enhancing and sustaining federal agency coordination, and OCED partially followed the remaining two practices (see table 2).[9]

**Table 2: Department of Energy's Office of Clean Energy Demonstrations (OCED) Coordination Activities as Compared with Leading Practices for Effective Coordination**

| Leading practice | Alignment between OCED activities and leading practice |
|---|:---:|
| Defining common outcomes | ◐ |
| Ensuring accountability | ◐ |
| Bridging organizational cultures | ● |
| Identifying and sustaining leadership | ● |
| Clarifying roles and responsibilities | ● |
| Including relevant participants | ● |
| Leveraging resources and information | ● |
| Developing and updating written guidance and agreements | ● |

Legend:
● = Generally aligns with leading practice
◐ = Partially aligns with leading practice

Source: GAO analysis of Department of Energy documentation.  |  GAO-25-106748

### Defining common outcomes

OCED's activities partially align with the leading coordination practice to define common outcomes. OCED clearly defined short-term outcomes related to its coordination with other DOE offices. For example, OCED signed memorandums of understanding with other DOE offices that include purpose and scope of work sections describing intended outcomes of the offices' coordination. However, OCED did not clearly define long-term outcomes or identify crosscutting challenges and opportunities to create buy-in from relevant stakeholders on how to address such challenges. In our prior work on leading practices for federal agency coordination, we reported that collaborative efforts benefit from defining common goals and outcomes.[10] We stated that, to coordinate efforts effectively, participants should develop a mutual understanding of the crosscutting challenge or opportunity to create buy-in from all parties.

### Ensuring accountability

OCED's activities partially align with this leading practice. OCED's memorandums of understanding describe plans for officials to annually assess progress toward goals and revise the scope of the agreements. Additionally, OCED officials told us they discuss progress toward goals in regular meetings with other DOE offices with which they coordinate. However, OCED has not established coordination-related performance standards—that is, standards that reflect the level of performance expected—against which its performance can be evaluated.

### Bridging organizational cultures

OCED's activities generally align with this practice, which calls for coordinating entities to establish compatible policies and procedures and agree on common terminology and definitions. OCED primarily coordinates with other offices within DOE, which share similar terminology, procedures, and crossover staff. Further, OCED and multiple offices with which it coordinates report to the same Undersecretary.

### Identifying and sustaining leadership

OCED's activities generally align with leading practices for identifying and sustaining leadership. OCED has established clear leadership roles for its coordination activities with other DOE offices through its memorandums of understanding and other agency documents. For example, OCED's memorandums of understanding with other DOE offices identify how critical leadership roles will be staffed, and agency documents detail which office is responsible for each specific activity.

### Clarifying roles and responsibilities

OCED's activities generally align with leading practices for clarifying roles and responsibilities. For example, OCED's memorandums of understanding detail which office will staff key roles, including the Project Manager and Project Technology Lead. The memorandums also describe the types of activities—such as financial assistance, legal, and environmental policy—for which each office will be responsible.

### Including relevant participants

OCED's activities generally align with leading practices for including relevant participants. For example, OCED sourced and relied on staff from program offices and subject matter experts to help with review of the large number of proposals received in response to the funding opportunity announcements in its portfolio.

### Leveraging resources and information

OCED's activities generally align with leading practices for leveraging resources and information. OCED leverages several agency-wide coordination initiatives such as Joint Strategy Teams, which are typically organized by technology group and contribute to DOE's efforts to implement the department's top priorities. OCED also leverages DOE resources through informal methods of communication, including ad hoc check-ins, discussions with transferred staff about previous experiences and expertise, and communication with DOE senior leadership about lessons learned.

### Developing and updating written guidance and agreements

OCED's activities generally align with leading practices for developing and updating written guidance and agreements. OCED's memorandums of understanding outline how the relevant offices will coordinate with OCED on funding opportunity announcements—including about the number of staff, their core functions, and how OCED will pay for services. OCED's memorandums also detail plans for assessing and updating the agreements as needed on an annual basis.

By fully defining common outcomes and ensuring accountability for its coordination efforts with other DOE offices, OCED could further strengthen its coordination efforts and ensure it is able to leverage the expertise of the various DOE program offices.

| To what extent has OCED's performance management followed leading practices? | OCED's performance management activities, such as the development of the 2023 Multi-Year Program Plan and fiscal year 2024 goals, partially align with two of three leading practices for performance management and do not align with the third leading practice (see table 3). Our prior work has defined performance management as a three-step process by which organizations define goals, collect performance information to measure progress, and use that information to assess results and inform decisions.[11] Taken as a whole, performance |

management activities help an organization define what it is trying to achieve, determine how well it is performing, and identify what it could do to improve results.[12] The practices can also help mitigate and address long-standing challenges of federal agencies—including ensuring performance information is useful and used—to help agencies further improve results.

**Table 3: Department of Energy's Office of Clean Energy Demonstrations (OCED) Performance Management Activities as Compared with Leading Practices for Performance Management**

| Leading practice | Alignment between OCED activities and leading practice |
|---|---|
| Define goals | ◑ |
| Collect performance information to measure progress | ◑ |
| Use performance information to assess results and inform decisions | ○ |

Legend:
◑ = Partially aligns with leading practice
○ = Does not align with leading practice

Source: GAO analysis of Department of Energy documentation.  |  GAO-25-106748

### Define goals

OCED's activities partially align with the following key actions our prior work identified for defining goals:[13]

- **Goals cover long-term outcomes.** OCED discusses its mission and some long-term goals of lowering the risks associated with clean energy technologies and partnering with the private sector in its Program Plan. Additionally, OCED described expected outcomes for some of its programs, such as for each phase of its Hydrogen Hubs program. However, as discussed above, OCED has not fully defined long-term common outcomes for its coordination efforts.

- **Goals cover near-term measurable results.** OCED established some near-term goals with measurable results related to the timing of issuing funding opportunity announcements, proposal reviews, and awarding financial agreements. For example, OCED established fiscal year 2024 goals, which include finalizing the initial phases of award agreements by the end of fiscal year 2024. However, not all OCED's long-term goals have associated near-term measurable goals. For example, OCED's Program Plan describes the long-term goal of lowering the risks of clean energy technologies but does not include near-term measurable goals associated with this. Such near-term measurable goals could help guide OCED's program efforts over time toward achieving its long-term goals.

- **Goals cover all activities.** OCED's goals do not cover all its activities. For example, OCED has developed additional programs within its portfolios since it developed the Program Plan, but neither the Program Plan nor the fiscal year 2024 goals mention these efforts.

- **Goals are aligned across organizational levels.** OCED has described goals among some of its divisions and programs in its Program Plan. For example, its Project Management Division has a goal to collect data consistently across projects. However, OCED's fiscal year 2024 goals do not always align with the goals that are defined in the Program Plan.

OCED officials told us they wrote the Program Plan to explain OCED's role and vision; thus, it was less goal oriented. Additionally, when writing the Program Plan, officials said they had not finalized the details of funding opportunity announcements, some of which include additional goals and performance measures.

### Collect performance information to measure progress

OCED's activities partially align with the second leading practice of collecting performance information to measure progress. OCED officials told us they are collecting performance information at the program level, but they are not collecting such information to measure progress against portfolio- or office-level goals. Additionally, OCED cannot fully collect performance information to measure progress without first establishing goals across all of its activities.

### Use performance information to assess results and inform decisions

OCED's activities do not align with the last leading practice, because OCED has not demonstrated it has used performance information to assess results and inform decision-making. For example, OCED did not provide evidence of implementing performance reviews, which are meetings or processes in which senior leadership and responsible parties review relevant performance information and other evidence to assess progress toward goals.

OCED officials stated that they plan to publish reports in the future, such as a State of the Portfolio annual report, to show how OCED's portfolio of projects is contributing to overall goals. Such reports may provide information that could be useful to assess results and inform decisions. OCED officials told us they have been focused on near-term activities such as developing and issuing funding opportunity announcements, and so have not completed some long-term planning. Until OCED fully establishes its long-term goals and associated near-term goals, and collects the related information, such annual reports could not encompass all aspects of the program.

OCED's efforts also have not fully aligned with two leading practices for coordination that are closely related to performance management—defining common outcomes and ensuring accountability, as discussed earlier. Fully implementing leading performance management practices would better position OCED to determine its overall progress and produce annual reports that fully reflect program results. In doing so, defining goals for all its activities would include defining common outcomes for its coordination activities. Similarly, collecting and using performance information to assess progress would include ensuring accountability for its coordination efforts.

## How has OCED planned for its workforce needs?

OCED has taken some actions to define its workforce needs but has not followed all leading practices for workforce planning.

Strategic workforce planning includes aligning human capital needs with mission and programmatic goals.[14] We have previously identified leading practices for effective workforce planning.[15] OCED's workforce planning activities generally align with the first, partially align with the second, and do not align with the third of these leading practices (see table 4).

**Table 4: Department of Energy's Office of Clean Energy Demonstrations (OCED) Workforce Planning Activities as Compared with Leading Practices for Effective Workforce Planning**

| Leading practice | Alignment between OCED activities and leading practice |
|---|:---:|
| Determine needed skills and develop strategies to address gaps | ● |
| Monitor and evaluate progress toward human capital goals | ◐ |
| Develop a strategic workforce plan | ○ |

Legend:
● = Generally aligns with leading practice
◐ = Partially aligns with leading practice
○ = Does not align with leading practice

Source: GAO analysis of Department of Energy documentation.  |  GAO-25-106748

### Determine needed skills and develop strategies to address gaps

OCED's actions generally align with the first leading practice. OCED officials said they reviewed staffing requirements for each OCED division and office. Additionally, OCED has developed a training and development program that the office will launch in fiscal year 2025, which includes a competency assessment. The training and development program aims to ensure OCED employees have the competencies and technical training needed for specific roles. Moreover, OCED worked with an outside talent acquisition firm to target and select senior positions to fill, according to OCED officials.

### Monitor and evaluate progress toward human capital goals

OCED's actions partially align with the second leading practice. OCED has maintained a current and detailed organization chart that includes all its offices and positions as well as information on the staff hired to date. However, OCED has not developed near-term human capital goals or performance measures to be able to evaluate the effectiveness of its efforts. For example, OCED has identified its long-term staffing needs, but without near-term goals—such as for which positions are needed in the next quarter in order to finalize ongoing award negotiations—it is not possible to know whether OCED currently has the staff to meet current needs.

### Develop a strategic workforce plan

OCED's actions do not align with the third leading practice. OCED has not developed a strategic workforce plan to coordinate strategies and align them with agency goals.

According to OCED officials, they have focused on the near-term activities of recruiting staff and using limited staff to advance OCED's mission. Initially, OCED focused on publishing funding opportunity announcements. After publishing the funding opportunities, OCED shifted to reviewing proposals, identifying selectees, and negotiating awards. OCED officials said their priority most recently has been working to finalize the awards for their portfolio of demonstration projects. OCED officials told us they expect to shift focus to managing the awarded projects in the near future.

Thus, some workforce and strategic planning policies and documents that OCED officials recognize are needed have not been formalized or implemented due to workforce capacity limitations. OCED officials told us that as a new office within DOE, OCED had to quickly establish its workforce to meet its immediate needs.

Specifically, OCED's workforce grew from 64 onboarded employees at the end of fiscal year 2022 to 250 onboarded employees as of August 2024.

To be fully staffed the office estimates it needs 351 onboarded employees, according to OCED's most recent organization chart. That leaves 101 more positions to be filled, a process that requires time and prioritization. OCED officials told us that they underestimated some of their staffing needs for this year, as the award negotiations have been more complex than anticipated. Officials told us they recently signed a new memorandum of understanding with DOE's Office of the General Counsel to secure more legal assistance to address the unexpected number of issues raised by selectees.

Our prior work has highlighted the importance of workforce planning efforts. For example, in 2014 we reported that staff vacancies in key positions contributed to the DOE Loan Programs Office inconsistently following its monitoring and reporting policies, which prevented it from being able to reasonably ensure it was effectively managing risks associated with program funds.[16] Consistent with prior GAO findings, strategic workforce planning enables an organization to be agile, resilient, and responsive to current and future trends.[17] Similarly, prior DOE Inspector General findings demonstrate the need for sufficient staff to ensure key federal oversight functions are performed and the government is adequately protected.[18] Developing human capital goals and formalizing a workforce plan would provide greater assurance that OCED has the staff to support its mission and programmatic goals.

## Conclusions

In December 2021, DOE established a new office to manage a historic amount of new funding for large and potentially risky clean energy demonstration projects. As we and others previously reported, DOE was challenged in managing such projects in the past.

Recognizing this past, DOE aims for this new office to provide oversight excellence in managing demonstration projects. OCED has ramped up to 250 staff on board as of August 2024. We found that OCED has so far been responsive to some of our prior relevant recommendations in how it designed programs and selected and awarded projects.

However, we also found that OCED's activities do not fully align with leading practices for coordination, performance management, and workforce planning. OCED officials told us that the immediate demands of standing up the new office and workforce capacity limitations have meant the office has not formalized aspects of its planning processes.

OCED could better ensure its activities are working as intended and take actions when they are not if it more clearly establishes goals and performance measures, including for how it coordinates with other DOE offices. Clear goals and performance measures would enable DOE and Congress to fully evaluate OCED's work and make adjustments to efficiently use taxpayer funds. Similarly, implementing leading practices for workforce planning would help OCED manage its hiring efforts strategically and ensure it has the workforce in place to meet its needs.

## Recommendations for Executive Action

We are making the following two recommendations to DOE:

The Director of OCED should take steps to fully implement leading practices related to performance management. These practices include defining goals and outcomes for all OCED activities; collecting performance information to measure progress toward goals; and using that information to assess results, make decisions, and ensure accountability. (Recommendation 1)

The Director of OCED should take steps to fully implement leading practices for effective workforce planning by developing a strategic workforce plan and processes to monitor and evaluate progress toward OCED's human capital goals. (Recommendation 2)

## Agency Comments

We provided a draft of this report to the Department of Energy for review and comment. In its comments, reproduced in appendix II, DOE concurred with our recommendations. DOE also provided technical comments, which we incorporated as appropriate.

## How GAO Did This Study

To examine OCED's establishment and program development and proposal review process, we reviewed DOE and OCED documents as well as relevant legislation, such as the IIJA. Specifically, we reviewed OCED documentation, including funding opportunity announcement materials, merit review reports, and award announcements, to determine the status of OCED's portfolio of programs. We also reviewed DOE and OCED policies, guidance, and documentation related to OCED's coordination activities, performance goals, and workforce planning.

In addition, we reviewed prior GAO work that made recommendations for DOE to improve its project selection and negotiation process and spoke to OCED officials about their efforts to incorporate the recommendations. Where relevant, we corroborated officials' statements about their efforts by assessing documentation from the review process. For example, we reviewed Merit Review Panel Chairperson Reports for the 10 funding opportunity announcements issued as of the time of GAO's review to determine whether OCED had selected any technically ineligible applicants.

We compared OCED's activities with selected leading practices identified in previous GAO reports related to federal agency coordination,[19] performance management,[20] and workforce planning.[21] For coordination, we assessed OCED's activities against eight leading practices for enhancing and sustaining federal agency coordination. For the performance management leading practices, we referred to our prior work that defines performance management as a three-step process, and we refer to those steps as leading practices. For the workforce planning leading practices, we consolidated five key principles for effective strategic workforce planning from our prior work into the three leading practices presented in this report.

For each analysis we used a three-point scale to determine if OCED's activities generally aligned, partially aligned, or did not align with the leading practices. For those leading practices where OCED provided sufficient evidence and did not have any gaps in documentation, we determined that its activities generally aligned with leading practices. For those leading practices where OCED provided documentation but there were gaps in the evidence compared with the leading practices, we determined that its activities partially aligned with leading practices. For those leading practices where OCED could not provide relevant documentation, we determined that its activities did not align with leading practices.

To describe the status of OCED's programs, we reviewed OCED and DOE documents including funding opportunity announcements, award fact sheets, and DOE funding data as of October 22, 2024. We reviewed available documentation on the reliability of DOE's databases from which the funding data was drawn and interviewed relevant officials. We determined that the data were sufficiently reliable to describe funds competed, committed, and obligated for the purposes of our report.

To understand OCED's establishment and program development and proposal review process, we interviewed OCED and DOE officials and a nongeneralizable sample of seven applicants. Of those applicants, four were selectees—that is they had submitted proposals for projects that OCED selected for award negotiations. We selected the seven applicants to obtain a range of perspectives based on the requested award amounts and technology type. Because we selected a nongeneralizable sample of applicants, the information gathered is not generalizable to applicants we did not interview.

The IIJA includes a provision for us to review the processes and procedures used by OCED to evaluate proposals and award projects, as well as OCED's oversight of such projects, and to recommend any changes to the processes, procedures, and program structure.[22] We did not address OCED's oversight of awarded projects because few awards had been made as of the time of our review. We will be evaluating DOE's oversight of demonstration projects in future work as more projects get awarded.

We conducted this performance audit from March 2023 to November 2024 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## List of Addressees

The Honorable Joe Manchin III
Chairman
The Honorable John Barrasso
Ranking Member
Committee on Energy and Natural Resources
United States Senate

The Honorable Frank D. Lucas
Chairman
The Honorable Zoe Lofgren
Ranking Member
Committee on Science, Space, and Technology
House of Representatives

We are sending copies of this report to the appropriate congressional committees, the Secretary of Energy, and other interested parties. In addition, the report is available at no charge on the GAO website at https://www.gao.gov.

## GAO Contact Information

For more information, contact: Frank Rusco, Director, Natural Resources and Environment, at (202) 512-3841 or RuscoF@gao.gov

Sarah Kaczmarek, Managing Director, Public Affairs, KaczmarekS@gao.gov, (202) 512-4800

A. Nicole Clowers, Managing Director, Congressional Relations, ClowersA@gao.gov, (202) 512-4400

Staff Acknowledgments: Quindi Franco (Assistant Director), Maggie Childs (Analyst-in-Charge), Kathryn Fledderman, William Gerard, Cindy Gilbert, Gwen Kirby, Matt Mitchell, Drew Moore, and Colson Campbell Ricciardi.

Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.

Visit GAO on the web at https://www.gao.gov.

This work of the United States may include copyrighted material, details at
https://www.gao.gov/copyright

DOE AR-001100

## Appendix I: Status of Office of Clean Energy Demonstrations Programs

This appendix provides additional information on the status of Office of Clean Energy Demonstrations programs by portfolio area.

**Table 5: Status of Office of Clean Energy Demonstrations (OCED) Portfolios, as of October 2024**

Dollars in millions

| Portfolio | Funding | | | |
|---|---|---|---|---|
| | **Appropriated** | **Competed[a]** | **Committed[b]** | **Obligated[c]** |
| Advanced Nuclear | $3,277 | $800[d] | $2,302 | $1,095 |
| Carbon Management | 7,074 | 3,809 | 2,295 | 186 |
| Clean Energy Demonstration Program on Current and Former Mine Land | 500 | 450 | 475 | 16 |
| Distributed Energy Systems Demonstrations | 50[e] | 50 | 49 | 0 |
| Energy Improvements in Rural or Remote Areas | 1,000 | 765 | 461 | 71 |
| Industrial Demonstrations | 6,312 | 6,300 | 5,928 | 78 |
| Long-Duration Energy Storage | 505 | 479 | 315 | 23 |
| Regional Clean Hydrogen Hubs | 8,000 | 8,000 | 7, 010 | 119 |
| **Total** | **26,718** | **20,653** | **18,834** | **1,588** |

Source: GAO analysis of Department of Energy data.  |  GAO-25-106748

Notes: Values may not sum to totals shown due to rounding. This table does not include the program Upgrading Our Electric Grid and Ensuring Reliability and Resiliency. OCED entered into an agreement with DOE's Grid Deployment Office for that office to manage this program using funding originally appropriated to OCED.

[a]Amount identified as available for award in published program funding opportunity announcements.

[b]Total federal cost share amount for the full selected or awarded projects (as identified in selection or award documentation). For awards with multiple phases this represents the full federal amount if the project successfully meets all milestone requirements to advance to subsequent phases and is subject to future award negotiations at the end of each phase.

[c]Represents the amount obligated to award recipients but does not include funding obligated for OCED's program direction.

[d]Some of the projects in the Advanced Nuclear Portfolio were previously awarded by Office of Nuclear Energy and transferred to OCED.

[e]OCED used $50 million from its overall fiscal year 2023 annual appropriations for the Distributed Energy Systems Demonstrations Portfolio.

**Table 6: Status of Office of Clean Energy Demonstrations (OCED) Programs in the Advanced Nuclear Portfolio, as of October 2024**

Dollars in millions

| Program Projects selected or awarded[a] | Funding | | | |
|---|---|---|---|---|
| | Appropriated[b] | Competed[c] | Committed[d] | Obligated[e] |
| **Advanced Reactor Demonstrations Projects** | **$2,477** | [f] | **$2,302** | **$1,095** |
| X-energy Xe-100 Advanced Reactor Demonstration Project | | | 845 | 447 |
| Natrium[TM] Demonstration Project | | | 1,457 | 648 |
| **Generation III+ Small Modular Reactor Pathway to Deployment** | 800 | 800 | 0 | 0 |
| **Portfolio total** | **3,277** | **800** | **2,302** | **1,095** |

Source: GAO analysis of Department of Energy data. | GAO-25-106748

Note: Values may not sum to totals shown due to rounding.

[a]Projects selected for award negotiations, or that have been awarded.

[b]Advanced Reactor Demonstration Projects funding was appropriated through the Infrastructure Investment and Jobs Act (IIJA). The Generation III+ Small Modular Reactor Pathway to Deployment funding was appropriated through reprogramming of unobligated IIJA appropriations.

[c]Amount identified as available for award in published program funding opportunity announcements.

[d]Total federal cost share amount for the full selected or awarded project (as identified in selection or award documentation). For awards with multiple phases, this represents the full federal amount if the project successfully meets all milestone requirements to advance to subsequent phases and is subject to future award negotiations at the end of each phase.

[e]Represents the amount obligated to award recipients but does not include funding obligated for OCED's program direction.

[f]The Advanced Reactor Demonstration Projects were previously awarded by Office of Nuclear Energy in fiscal year 2021 and transferred to OCED in the IIJA legislation.

**Table 7: Status of Office of Clean Energy Demonstrations (OCED) Programs in the Carbon Management Portfolio, as of October 2024**

Dollars in millions

| Program<br>Projects selected or awarded[a] | Funding | | | |
|---|---|---|---|---|
| | Appropriated[b] | Competed[c] | Committed[d] | Obligated[e] |
| **Carbon Capture Large-Scale Pilot Projects** | **$937** | **$820** | **$304** | **$14** |
| Carbon Capture Pilot at Cane Run Generating Station | | | 72 | 5 |
| Carbon Capture Pilot at Vicksburg Containerboard Mill | | | 88 | 4 |
| Carbon Capture Pilot at Big Spring Refinery | | | 95 | 0 |
| Carbon Capture Pilot at Dry Fork Power Station | | | 49 | 5 |
| **Carbon Capture Demonstration Projects Program** | **2,537** | **1,700** | **890** | **25** |
| Baytown Carbon Capture and Storage Project | | | 270 | 13 |
| Project Tundra CCS Commercial Demonstration | | | 350 | 4 |
| Sutter Decarbonization Project | | | 270 | 9 |
| **Front-End Engineering Design Studies for Integrated Carbon Capture, Transport, and Storage Systems** | **100** | **189** | **51** | **46** |
| Duke Energy Indiana, LLC: Edwardsport Flex Fuel Integrated Capture for Indiana's ENergy Transition (EFFICIENT) | | | 8 | 8 |
| Heidelberg Materials US Inc | | | 5 | 5 |
| Taft Carbon Capture | | | Withdrawn | Withdrawn |
| Polk Power Station CO2 Capture Project | | | 5 | 5 |
| Lake Charles Power Station Integrated CO2 Capture Project | | | 9 | 9 |
| Integrated Carbon Capture and Storage Project at Dry Fork Station | | | 5 | 5 |
| Four Corners Power Plant Integrated CCS Project | | | 7 | 7 |
| Foreman Cement Plant Carbon Capture and Storage FEED | | | 8 | 8 |
| Integrated Capture, Transport, and Geological Storage of CO2 Emissions from City Water, Light and Power | | | 5 | 0 |
| **Regional Direct Air Capture Hubs (Topic Area 3)** | **3,500** | **1,100**[f] | **1,050** | **100** |
| Project Cypress DAC Hub | | | 550 | 50 |
| South Texas DAC Hub | | | 500 | 50 |
| **Portfolio total** | **7,074** | **3,809** | **2,295** | **186** |

Source: GAO analysis of Department of Energy documents and data.  |  GAO-25-106748

Note: Values may not sum to totals shown due to rounding.

[a]Projects selected for award negotiations, or that have been awarded.

[b]The Infrastructure Investment and Jobs Act (IIJA) appropriated funding to OCED for the Carbon Capture Large-Scale Pilot Projects program and the Carbon Capture Demonstrations Projects program. OCED is also managing two programs for which IIJA appropriated funding to Department of Energy's Fossil Energy and Carbon Management Office: the Front-End Engineering Design Studies and the Regional Direct Air Capture Hubs program.

[c]Amount identified as available for award in published program funding opportunity announcements.

[d]Total federal cost share amount for the full selected or awarded project (as identified in selection or award documentation). For awards with multiple phases, this represents the full federal amount if the project successfully meets all milestone requirements to advance to subsequent phases and is subject to future award negotiations at the end of each phase.

[e]Represents the amount obligated to award recipients but does not include funding obligated for program direction.

[f]A total of $1.2 billion were competed in this funding opportunity announcement, of which OCED is responsible for the $1.1 billion topic area 3.

**Table 8: Status of Office of Clean Energy Demonstrations (OCED) Programs in the Clean Energy Demonstration Program on Current and Former Mine Land Portfolio, as of October 2024**

Dollars in millions

| Program <br> Projects selected or awarded[a] | Funding | | | |
|---|---|---|---|---|
| | Appropriated[b] | Competed[c] | Committed[d] | Obligated[e] |
| **Clean Energy Demonstration Program on Current and Former Mine Land** | **$500** | **$450** | **$475** | **$16** |
| Copper Recovery in Arizona for the Domestic Energy Supply Chain | | | 80 | 0 |
| Lewis Ridge Pumped Storage Project | | | 81 | 12 |
| Decarbonizing Gold Mines in Nevada | | | 95 | 0 |
| Mineral Basin Solar Project | | | 90 | 2 |
| A Model for Transition: Coal-to-Solar in West Virginia | | | 129 | 2 |
| **Portfolio total** | **500** | **450** | **475** | **16** |

Source: GAO analysis of Department of Energy documents and data.  |  GAO-25-106748

Note: Values may not sum to totals shown due to rounding.

[a]Projects selected for award negotiations, or that have been awarded.

[b]The Infrastructure Investment and Jobs Act appropriated the funding for the Clean Energy Demonstration Program on Current and Former Mine Land portfolio.

[c]Amount identified as available for award in published program funding opportunity announcements.

[d]Total federal cost share amount for the full selected or awarded project (as identified in selection or award documentation). For awards with multiple phases, this represents the full federal amount if the project successfully meets all milestone requirements to advance to subsequent phases and is subject to future award negotiations at the end of each phase.

[e]Represents the amount obligated to award recipients but does not include funding obligated for program direction.

**Table 9: Status of Office of Clean Energy Demonstrations (OCED) Programs in the Distributed Energy Systems Demonstrations Portfolio, as of October 2024**

Dollars in millions

| Program <br> Projects selected or awarded[a] | Funding | | | |
|---|---|---|---|---|
| | Appropriated | Competed[b] | Committed[c] | Obligated[d] |
| **Distributed Energy Systems Demonstrations** | **$50[e]** | **$50** | **$49** | **0** |
| GRid Integration and Demonstration of FLEXible Energy Resources | | | 17 | 0 |
| Outer Cape Microgrid Optimization | | | 20 | 0 |
| Prime Time Virtual Power Plant | | | 13 | 0 |
| **Portfolio total** | **50[e]** | **50** | **49** | **0** |

Source: GAO analysis of Department of Energy documents and data.  |  GAO-25-106748

Note: Values may not sum to totals shown due to rounding.

[a]Projects selected for award negotiations, or that have been awarded.

[b]Amount identified as available for award in published program funding opportunity announcements.

[c]Total federal cost share amount for the full selected or awarded project (as identified in selection or award documentation). For awards with multiple phases, this represents the full federal amount if the project successfully meets all milestone requirements to advance to subsequent phases and is subject to future award negotiations at the end of each phase.

[d]Represents the amount obligated to award recipients but does not include funding obligated for program direction.

[e]OCED used $50 million from its overall fiscal year 2023 annual appropriations for the Distributed Energy Systems Demonstrations Portfolio.

**Table 10: Status of Office of Clean Energy Demonstrations (OCED) Programs in the Energy Improvements in Rural or Remote Areas Portfolio, as of October 2024**

Dollars in millions

| Program<br>Projects selected or awarded[a] | Funding | | | |
|---|---|---|---|---|
| | Appropriated | Competed[b] | Committed[c] | Obligated[d] |
| **Energy Improvement in Rural or Remote Areas Fixed Award Grant** | [e] | $50 | $81 | $30 |
| Adams Electric Cooperative Green Energy | | | 5 | 3 |
| Clean Energy and Efficiency for Dallas County Alabama Schools | | | 5 | 0 |
| Cost-Effective and Equitable Cooperative Community Solar in Western Maine | | | 5 | 2 |
| Decarbonizing the Tongass with Tribally Owned Heat Pumps | | | 3 | 0 |
| East Central Community College Solar and Lighting Upgrades | | | 3 | 0 |
| Greencare: Empowering Resilience in Poteau | | | 5 | 3 |
| Grid Access and Resiliency for Unserved Rural and Indigenous People Project | | | 5 | 2 |
| High Penetration Solar-Battery Project in Ambler, Alaska | | | 2 | 0 |
| Kokhanok's Paradigm Shift - Big Battery Energy Backbone | | | 5 | 2 |
| Lake City Area Power and Resiliency Augmentation Enterprise | | | 5 | 1 |
| Navajo Sun Power! Home Solar Installation Project | | | 3 | 3 |
| New Stuyahok Solar-Battery Project | | | 4 | 1 |
| Independent Power Energy Improvement Project | | | 2 | 2 |
| Permanent, High-Quality Clean Energy Access for Rural Indigenous Communities | | | 5 | 5 |
| Ravalli Electric Community Storage Project | | | 5 | 0 |
| Improving Reliability and Cost Effectiveness of the Electric Grid in Rural Areas Using Environmentally Sound Practices | | | 5 | 0.5 |
| Transmission Line Rebuild | | | 5 | 1 |
| Rural Rebuild and Reconductor | | | 5 | 1 |
| Tanacross Solar PV and Tok Battery Energy Storage System | | | 5 | 3 |
| **Energy Improvement in Rural or Remote Areas** | [e] | 700 | 366 | 28 |
| Advancing Energy Sovereignty for Taos Pueblo | | | 10 | 0 |
| Alaskan Tribal Energy Sovereignty | | | 26 | 4 |
| Chignik Hydroelectric Dam and Water Source Project | | | 7 | 0.06 |
| Clean Energy in the Northwest Arctic | | | 55 | 0 |
| Rural Community Bioenergy Facilities for Energy Resiliency and Forest Climate Adaptation | | | 30 | 8 |
| Energizing Rural Hopi and Navajo with Solar Powered Battery-Based Systems | | | 8 | 0.4 |
| Fort Lupton Microgrid Project | | | 6 | 0.3 |
| Whole-Home Heat Pump Solutions for Mobile/Manufactured Homes | | | 10 | 0.03 |
| Achieving Resilience, Sovereignty, and Economic Independence through Community Solar | | | 9 | 1 |
| Mashkiiziibii Minigrid | | | 14 | 1 |
| Microgrids for Community Affordability, Resilience, and Energy Decarbonization (CARED) | | | 45 | 9 |
| Montezuma Microgrid | | | 9 | 0 |
| Old Harbor Hydroelectric Project | | | 10 | 1 |
| Resilience and Prosperity in Rural Northern Wisconsin | | | 10 | 0 |

Office of Clean Energy

DOE AR-001105

| Program | Funding | | | |
| Projects selected or awarded[a] | Appropriated | Competed[b] | Committed[c] | Obligated[d] |
| --- | --- | --- | --- | --- |
| Solar + Storage Microgrids for Rural Community Health Centers | | | 57 | 0 |
| Thayer Hydroelectric Project | | | 27 | 3 |
| Yakama Tribal Solar Canal & Hydro Project | | | 32 | 1 |
| **Energizing Rural Communities Prize** | [e] | 15 | 13 | 13 |
| 67 Phase 1 awards and 33 Phase 2 awards | | | 13[f] | 13[f] |
| **Portfolio total** | **1,000** | **765** | **461** | **71** |

Source: GAO analysis of Department of Energy documents and data. | GAO-25-106748

Note: Values may not sum to totals shown due to rounding.

[a]Projects selected for award negotiations, or that have been awarded.

[b]Amount identified as available for award in published program funding opportunity announcements.

[c]Total federal cost share amount for the full selected or awarded project (as identified in selection or award documentation). For awards with multiple phases, this represents the full federal amount if the project successfully meets all milestone requirements to advance to subsequent phases and is subject to future award negotiations at the end of each phase.

[d]Represents the amount obligated to award recipients but does not include funding obligated for program direction.

[e]The Infrastructure Investment and Jobs Act appropriated funding to carry out activities for energy improvement in rural and remote areas, which OCED used to develop the three programs in the portfolio.

[f]OCED provided 67 winning organizations with a cash award of $100,000 in Phase 1. Each winning organization was eligible to participate in Phase 2, where 33 organizations received cash awards of $200,000.

**Table 11: Status of Office of Clean Energy Demonstrations (OCED) Programs in the Industrial Demonstrations Portfolio, as of October 2024**

Dollars in millions

| Program — Project Category — Projects selected or awarded[a] | Funding | | | |
| | Appropriated | Competed[b] | Committed[c] | Obligated[d] |
| --- | --- | --- | --- | --- |
| **Industrial Decarbonization and Emissions Reduction Demonstration-to-Deployment** | $6,312[e] | $6,300 | $5,928 | $78 |
| *Aluminum and Metals* | | | | |
| Advanced Copper Recycling Facility | | | 270 | 0 |
| Green Aluminum Smelter | | | 500 | 0 |
| Low Carbon SmartMelt Furnace Conversion | | | 75 | 4 |
| Nexcast - Next Generation Aluminum Mini Mill | | | 22 | 0 |
| Zero Waste Advanced Aluminum Recycling | | | 67 | 0 |
| *Cement and Concrete* | | | | |
| Deeply Decarbonized Cement | | | 189 | 0 |
| First Commercial Electrochemical Cement Manufacturing | | | 87 | 0 |
| Lebec Net Zero Cement Plant Project | | | 500 | 0 |
| Calcined Clay Production for Limestone Calcined Clay Cement | | | 62 | 1 |
| Low-Carbon Calcined Clay Cement Demonstration | | | 216 | 0 |
| Mitchell Cement Plant Decarbonization Project | | | 500 | 0.3 |
| *Chemicals and Refining* | | | | |
| Baytown Olefins Plant Carbon Reduction Project | | | 332 | 0 |
| ISP Chemicals LLC | | | Withdrawn | Withdrawn |
| Novel CO2 Utilization for Electric Vehicle Battery Chemical Production | | | 95 | 0 |
| Advanced manufacturing facility for low carbon intensity, fully chemically recycled polyethylene terephthalate | | | 375 | 37 |
| Star e-Methanol | | | 100 | 0 |

| Program | Funding | | | |
| Project Category | | | | |
| Projects selected or awarded[a] | Appropriated | Competed[b] | Committed[c] | Obligated[d] |
|---|---|---|---|---|
| Sustainable Ethylene from CO2 Utilization with Renewable Energy (SECURE) | | | 200 | 0 |
| Decarbonization through Replacing Waste Steam Incinerators with Plasma Gasification to Produce Syngas | | | 75 | 2 |
| *Food and Beverage* | | | | |
| Decarbonization of Unilever Ice Cream Manufacturing | | | 21 | 0 |
| Delicious Decarbonization Through Integrated Electrification and Energy Storage | | | 171 | 0 |
| Heat Batteries for Deep Decarbonization of the Beverage Industry | | | 75 | 0 |
| *Glass* | | | | |
| Demonstration of Low-Emission Glass Furnace Technology with Flexible Fuel Source | | | 45 | 1 |
| Glass Furnace Decarbonization Technology | | | 125 | 0 |
| Hybrid Electric Glass Furnace Project | | | 75 | 0 |
| *Iron and Steel* | | | | |
| Hydrogen-Fueled Zero Emissions Steel Making | | | 500 | 0 |
| IRA: Hydrogen-Ready Flex-Fuel Direct Reduced Ironmaking and Electric Melting Furnace Retrofit at Cleveland-Cliffs Integrated Iron and Steel Facility | | | 500 | 10 |
| Induction Melting Upgrade | | | 75 | 0 |
| Decarbonization and Emissions Reduction Initiative: Alabama Works Conversion to Induction Melting | | | 76 | 3 |
| Low-Emissions, Cold-Agglomerated Iron Ore Briquette Production | | | 283 | 0 |
| IRA: Steel Slab Electrified Induction Reheat Furnace Upgrade to Reduce GHG Emissions and Enhance Quality Project | | | 75 | 19 |
| *Process Heat* | | | | |
| Steam-Generating Heat Pumps for Cross-Sector Deep Decarbonization | | | 145 | 0 |
| Casa Grande Vikrell Electric Boiler & Microgrid System | | | 51 | 1 |
| *Pulp and Paper* | | | | |
| Pulp and Paper Energy Efficiency and Electrification Upgrades | | | 47 | 0 |
| **Portfolio total** | 6,312 | 6,300 | 5,928 | 78 |

Source: GAO analysis of Department of Energy documents and data. | GAO-25-106748

Note: Values may not sum to totals shown due to rounding.

[a]Projects selected for award negotiations, or that have been awarded.

[b]Amount identified as available for award in published program funding opportunity announcements.

[c]Total federal cost share amount for the full selected or awarded project (as identified in selection or award documentation). For awards with multiple phases, this represents the full federal amount if the project successfully meets all milestone requirements to advance to subsequent phases and is subject to future award negotiations at the end of each phase.

[d]Represents the amount obligated to award recipients but does not include funding obligated for program direction.

[e]The Industrial Demonstrations portfolio was appropriated $500 million in the Infrastructure Investment and Jobs Act and $5,812 million in the Inflation Reduction Act for a total of $6,312 million.

**Table 12: Status of Office of Clean Energy Demonstrations (OCED) Programs in the Long-Duration Energy Storage Portfolio, as of October 2024**

Dollars in millions

| Program<br>Projects selected or awarded[a] | | Funding | | |
|---|---|---|---|---|
| | Appropriated[b] | Competed[c] | Committed[d] | Obligated[e] |
| **Energy Storage Pilot Demonstrations** | [f] | $100 | $0 | $0 |
| **Long-Duration Energy Storage Demonstrations** | $355 | 349 | 286 | 23 |
| Communities Accessing Resilient Energy Storage (CARES) | | | 10 | 1 |
| Repurposed EV Batteries for Long-Duration Energy Storage Applications and Resilient Communities | | | 10 | 1 |
| Stored Rechargeable Energy Demonstration (STORED) | | | 7 | 1 |
| Rural Energy Viability for Integrated Vital Energy (REVIVE) | | | 30 | 0 |
| Children's HospitAl Resilient Grid with Energy Storage (CHARGES) | | | 30 | 3 |
| Front of the Meter Utilitization of Zinc Bromide Energy Storage | | | 49 | 0.4 |
| Columbia Energy Storage Project | | | 31 | 7 |
| Resilient Energy for the Railbelt: Pumped Thermal Storage in Alaska | | | 50 | 5 |
| Multiday Storage at Scale for Firm Renewable Energy | | | 70 | 4 |
| **Long-Duration Energy Storage Demonstrations National Laboratory Call** | [f] | 30 | 29 | 0 |
| Argonne National Lab and Idaho National Lab with CMBlu | | | 6 | 0 |
| Sandia National Lab | | | 4 | 0 |
| National Renewable Energy Lab (H2-battery) | | | 5 | 0 |
| Sandia National Lab with E-Zinc | | | Withdrawn | Withdrawn |
| Pacific Northwest National Lab with Invinity Energy Systems | | | 10 | 0 |
| National Renewable Energy Lab (TES) | | | 4 | 0 |
| **Portfolio total** | 505 | 479 | 315 | 23 |

Source: GAO analysis of Department of Energy documents and data.  |  GAO-25-106748

Notes: Values may not sum to totals shown due to rounding. OCED jointly awarded funding for one additional program, but this program information was finalized too late to be included in our review.

[a]Projects selected for award negotiations, or that have been awarded.

[b]The Infrastructure Investment and Jobs Act (IIJA) appropriated the funding for the Long-Duration Energy Storage portfolio.

[c]Amount identified as available for award in published program funding opportunity announcements.

[d]Total federal cost share amount for the full selected or awarded project (as identified in selection or award documentation). For awards with multiple phases, this represents the full federal amount if the project successfully meets all milestone requirements to advance to subsequent phases and is subject to future award negotiations at the end of each phase.

[e]Represents the amount obligated to award recipients but does not include funding obligated for program direction.

[f]The IIJA appropriated $150 million to carry out the Long-duration Demonstration Initiative and Joint Program, which OCED used to carry out activities for programs in this portfolio.

**Table 13: Status of Office of Clean Energy Demonstrations (OCED) Programs in the Regional Clean Hydrogen Hubs Portfolio, as of October 2024**

Dollars in millions

| Program<br>Projects selected or awarded[a] | Funding | | | |
|---|---|---|---|---|
| | Appropriated | Competed[b] | Committed[c] | Obligated[d] |
| **Regional Clean Hydrogen Hubs** | [e] | $7,000 | $7,000 | $109 |
| Appalachian Regional Clean Hydrogen Hub (ARCH2) | | | 925 | 30 |
| ARCHES DOE H2 Hub | | | 1,200 | 30 |
| Gulf Coast Hydrogen Hub | | | 1,200 | 0 |
| Heartland Hydrogen Hub | | | 925 | 0 |
| Mid-Atlantic Hydrogen Hub | | | 750 | 0 |
| Midwest Alliance for Clean Hydrogen Hub | | | 1,000 | 22 |
| Pacific Northwest Hydrogen Association (PNWH2 Hub) – Phase I | | | 1,000 | 28 |
| **Clean Hydrogen Hubs Demand-Side Support** | [e] | 1,000 | 10 | 10 |
| EFI Foundation | | | 10 | 10 |
| **Portfolio total** | **8,000** | **8,000** | **7,010** | **119** |

Source: GAO analysis of Department of Energy documents and data. | GAO-25-106748

Note: Values may not sum to totals shown due to rounding.

[a]Projects selected for award negotiations, or that have been awarded.

[b]Amount identified as available for award in published program funding opportunity announcements.

[c]Total federal cost share amount for the full selected or awarded project (as identified in selection or award documentation). For awards with multiple phases, this represents the full federal amount if the project successfully meets all milestone requirements to advance to subsequent phases and is subject to future award negotiations at the end of each phase.

[d]Represents the amount obligated to award recipients but does not include funding obligated for program direction.

[e]The Infrastructure Investment and Jobs Act appropriated funding for Regional Clean Hydrogen Hubs, which OCED used to develop the two programs in this table.

**Appendix II: Comments from Department of Energy**



**Department of Energy**
Washington, DC 20585

October 28, 2024

Mr. Frank Rusco
Director
Natural Resources and Environment
U.S. Government Accountability Office
441 G Street N.W.
Washington, DC 20548

Dear Mr. Rusco:

The Department of Energy (DOE or Department) appreciates the opportunity to comment on the Government Accountability Office's (GAO) draft report titled, "*Clean Energy: New DOE Office Should Take Steps to Improve Performance Management and Workforce Planning (GAO-25-106748).*"

As recognized in the report, the Department's Office of Clean Energy Demonstrations (OCED) was established in December 2021 to manage a historic amount of funding for clean energy projects. In the nearly three years since its establishment, OCED has issued funding announcements for all its demonstration and pilot programs, selected projects for the majority of its programs, and completed negotiations for the initial phase of work for a substantial number of projects. Noting that OCED has made significant progress on its programs while simultaneously building up its workforce, we fully recognize that more work is needed over the next few years to formalize OCED's suite of planning and guidance documents over the lifecycle of its programs.

The draft report contained two recommendations from GAO and DOE concurs with both. Therefore, the Department will implement GAO's recommendations articulated in the draft report. The first recommendation on performance management will be a focus area for OCED in Fiscal Year (FY) 2025. Regarding the second recommendation on ensuring that OCED has the workforce in place to meet its needs, OCED will develop a strategic workforce plan in FY 2025 and evaluate progress toward human capital goals.

GAO should direct any questions to Casey Johnson, Office of Clean Energy Demonstrations, at (240) 243-8666 or casey.johnson2@hq.doe.gov.

Sincerely,

KELLY CUMMINS
Digitally signed by KELLY CUMMINS
Date: 2024.10.28 12:08:06 -04'00'

Kelly Cummins
Acting Director
Office of Clean Energy Demonstrations

Enclosure

Enclosure

**Management Response**
**GAO Draft Report:**
**Clean Energy: New DOE Office Should Take Steps to Improve Performance**
**Management and Workforce Planning (GAO-25-106748)**

**Recommendation 1:** The Director of Office of Clean Energy Demonstrations (OCED) should take steps to fully implement leading performance management practices related to performance management. These practices include defining goals and outcomes for all OCED activities, collecting performance information to measure progress toward goals, and using that information to assess results and make decisions, and ensure accountability.

**DOE Response:** Concur

Given the current status of OCED's portfolio (e.g., over 100 projects selected from funding opportunities), OCED will be updating its Multi-Year Program Plan (MYPP) to outline its near-, mid-, and long-term goals supported by the selected projects and anticipated programs funded through the Bipartisan Infrastructure Act, Inflation Reduction Act, and annual appropriations. This will provide an additional layer of specificity not in the first MYPP given the nascency of OCED.

Regarding measuring project- and program-level investments and impacts, OCED negotiated terms in the awards that allow OCED to collect key project performance data and information during each phase to be used internally for portfolio risk management and project management oversight decision making (such as go/no go reviews). OCED has also negotiated terms that allow data to be aggregated and anonymized for publications that inform a broad set of stakeholders on the progress of clean energy demonstration projects toward commercial liftoff. In addition to updates to Pathway to Commercial Liftoff reports, OCED is working on a Portfolio Insight Series to describe program- and project-level impacts that could ultimately catalyze the crowding in of private sector funding in particular technologies or sectors where clean energy demonstrations are making significant progress toward being derisked.

To help set the framework for these efforts, at the start of fiscal year (FY) 2025, OCED will establish specific organizational goals to accomplish in FY 2025. OCED will ensure that these goals align with DOE strategic goals and that significant OCED goals are reflected in DOE's performance management program. OCED Leadership will review progress against these goals on a quarterly basis, as well as review status against the goals at an annual OCED offsite with all OCED staff.

**Estimated Completion Date: September 30, 2025**

1

Enclosure

**Management Response**
**GAO Draft Report:**
**Clean Energy: New DOE Office Should Take Steps to Improve Performance**
**Management and Workforce Planning (GAO-25-106748)**

**Recommendation 2:** The Director of OCED should take steps to fully implement leading practices for effective workforce planning by developing a strategic workforce plan and processes to monitor and evaluate progress towards its human capital goals.

**DOE Response:** Concur

OCED will develop a robust and detailed strategic workforce plan in FY 2025. As a Departmental Element of the Department of Energy (DOE), OCED conducts workforce planning in line with the agency's requirements. These actions include prioritizing recruitment actions by quarter, analyzing workforce data to refine recruitment methods, and collaborating with the Office of the Human Capital Officer and other DOE offices on recruitment activities. In FY 2024, OCED launched a tailored training curriculum and in FY 2025 is expanding that into a training and development program for staff that will help address skill gaps and support career planning for the current workforce. OCED will also evaluate improvements needed in its workforce planning process and capture specific goals in a strategic workforce plan that will support the attainment of human capital goals.

**Estimated Completion Date: March 30, 2025**

2

## Endnotes

[1] IIJA, Pub. L. No. 117-58, 135 Stat. 429, 1376-79 (2021); and "An Act To Provide for Reconciliation Pursuant to Title II of S.Con. Res. 14," Pub. L. 117-169, § 50161(a), 136 Stat. 1818, 2049 (2022) (codified at 42 U.S.C. § 17113b(a)) (commonly known as the Inflation Reduction Act).

[2] Our review covers funded projects that OCED manages (according to OCED officials), and appropriations for these projects come from a variety of sources, including the IIJA, Inflation Reduction Act, and other appropriations.

[3] The IIJA reserved for administrative costs up to 3 percent of the program appropriations to OCED and Fossil Energy and Carbon Management (FECM), including the FECM programs managed by OCED. IIJA, 135 Stat. at 1379. This reserve was later amended to up to 5 percent. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 314(d), (e), 138 Stat. 25, 212 (2024). The Inflation Reduction Act reserves for administrative costs not more than $300 million of the $5,812 million appropriated for the program, which is approximately 5.2 percent of the total. Inflation Reduction Act § 50161(a), (f), 136 Stat. at 2049–50 (codified at 42 U.S.C. § 17113b(a), (f)).

[4] According to OCED, the majority of OCED's funding will be issued through a competitive process, as described in our report. OCED uses different program development and proposal review processes for some of its funding, such as for its Liftoff Enabling Programs, and these are not included in GAO's review of OCED's processes.

[5] We refer to applicants whose proposals were selected by OCED for award negotiations as "selectees" throughout this report.

[6] GAO, *Carbon Capture and Storage: Actions Needed to Improve DOE Management of Demonstration Projects*, GAO-22-105111 (Washington, D.C.: Dec. 20, 2021).

[7] GAO, *Decarbonization: Opportunities Exist to Improve the Department of Energy's Management of Risks to Carbon Capture Projects*, GAO-24-106489 (Washington, D.C.: May 16, 2024).

[8] GAO-22-105111.

[9] GAO, *Government Performance Management: Leading Practices to Enhance Interagency Collaboration and Address Crosscutting Challenges*, GAO-23-105520 (Washington, D.C.: May 24, 2023).

[10] GAO-23-105520.

[11] For the purposes of this report, we refer to these steps as leading practices. See GAO, *Executive Guide: Effectively Implementing the Government Performance and Results Act*, GGD-96-118 (Washington, D.C.: June 1, 1996).

[12] GAO, *Evidence-Based Policymaking: Practices to Help Manage and Assess the Results of Federal Efforts*, GAO-23-105460 (Washington, D.C.: July 12, 2023).

[13] GAO-23-105460.

[14] GAO, *FDA Workforce: Agency-Wide Workforce Planning Needed to Ensure Medical Product Staff Meet Current and Future Needs*, GAO-22-104791 (Washington, D.C.: Jan. 14, 2022)

[15] GAO-22-104791; *Human Capital: Key Principles for Effective Strategic Workforce Planning*, GAO-04-39 (Washington, D.C.: Dec. 11, 2003).

[16] GAO, *DOE Loan Programs: DOE Should Fully Develop Its Loan Monitoring Function and Evaluate Its Effectiveness*, GAO-14-367 (Washington, D.C.: May 1, 2014)

[17] GAO-22-104791.

[18] U.S. Department of Energy, Office of Inspector General, Special Report: Prospective Considerations for Clean Energy Demonstration Projects, DOE-OIG-22-39 (Washington, D.C.: Aug. 12, 2022).

[19] GAO-23-105520.

[20] GAO-23-105460.

[21] GAO-22-104791; GAO-04-39.

[22] Pub. L. No. 117-58, div. D, tit. XII, § 41201(f)(2), 135 Stat.at 1131 (2021) (codified as amended at 42 U.S.C. § 18861(h)(2)). This engagement started with funding provided in the Consolidated Appropriations Act of 2023, the Joint Explanatory Statement for which included a provision for GAO to conduct oversight, including audits and investigations, in support of implementation of the IIJA. House Cmtee. Print 50-348 (117th Cong.), "Legislative Text and Explanatory Statement for Pub. L. No. 117-328, Consolidated Appropriations Act, 2023 (Book 2 of 2)," div. I, at p. 2342. Work continues using other available funds from GAO's general appropriation. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. E, tit. I, 138 Stat. 460.

CATHY McMORRIS RODGERS, WASHINGTON
CHAIR

FRANK PALLONE, JR., NEW JERSEY
RANKING MEMBER

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States
## House of Representatives
### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6115

Majority (202) 225-3641
Minority (202) 225-2927

December 4, 2024

Mr. Jigar Shah
Director
Loan Programs Office
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20002

Dear Director Shah,

We write to you concerning the Department of Energy's (DOE) Loan Programs Office (LPO) and its push to rush out loans and loan guarantees in the closing days of the current administration.

Reportedly, the LPO is scrambling to close the $25 billion in pending loans under that program before President Biden leaves office.[1] The LPO has closed on eight loans in just over two months.[2] This includes three direct loans and one loan guarantee announced after the election, which total more than $2.6 billion. Since the election, the LPO has been finalizing loans at an exponentially higher rate than that of the rest of the current administration's tenure. The LPO has finalized four loans in a little over a month, compared to the other ten loans approved

---

[1] *See* Benjamin Storrow et al., *Biden Inks Billion-Dollar Climate Deal to Foil Trump Rollback*, E&E NEWS BY POLITICO, Nov. 19, 2024, https://www.eenews.net/articles/biden-inks-billion-dollar-climate-deals-to-foil-trump-rollbacks/.

[2] *See* Thomas Catenacci, *Biden-Harris Admin Races to Dish Out $25 Billion for Green Energy Before Trump Takes Office, Sparking Fraud Fears*, FREE BEACON, November 22, 2024, https://freebeacon.com/biden-harris-administration/biden-harris-admin-races-to-dish-out-25-billion-for-green-energy-before-trump-takes-office-sparking-fraud-fears/ (stating seven loans have been finalized in the last two months). The November 22, 2024, article does not appear to include a November 22, 2024, announced loan to ENTEK. LOAN PROGRAMS OFFICE, DEP'T OF ENERGY, ENTEK, https://www.energy.gov/lpo/entek (last visited Dec. 2, 2024). Another loan guarantee to Eos was also finalized on December 3, 2024. Press Release, Loan Programs Office, Dep't of Energy, Biden-Harris Administration Announces $303.5 Million Loan Guarantee to Eos Energy Enterprises to Advance Next Generation Battery Energy Storage Systems, Dec. 3, 2024, https://www.energy.gov/articles/biden-harris-administration-announces-3035-million-loan-guarantee-eos-energy-enterprises-0. This total presumably includes a September 2024 loan to Holtec Palisades, a November 2024 loan to Li-Cycle, an October 2024 loan to LongPath, an October 2024 loan to Project Marahu, a November 2024 loan to SK Siltron CSS, an October 2024 loan to Thacker Pass, and a September 2024 loan to Viejas Microgrid. *See* LOAN PROGRAMS OFFICE, DEP'T OF ENERGY, *Portfolio Projects*, https://www.energy.gov/lpo/portfolio-projects (last visited Dec. 2, 2024).

DOE AR 001114

Letter to Mr. Jigar Shah
Page 2

over nearly four years.[3] Additionally, since the election, the LPO has issued four conditional commitments totaling $19.3 billion.[4]

The last-minute drive to expedite loans exposes the federal government—and American taxpayers—to tremendous risk.[5] In its recent report on top management challenges facing the agency, the DOE Office of the Inspector General (OIG) warned of several alarming factors that will compound to produce a heightened risk of loan default.[6] The OIG flagged that as most of the LPO's authority will expire between 2026 to 2030, the LPO may feel pressure to "beat these deadlines" and issue loans it otherwise would not have.[7] Additionally, assessing new markets, changing technologies, and newly created applicants will challenge its due diligence process.[8] The OIG also fears that the LPO may inadvertently fund foreign adversaries if the DOE's new Research, Technology, and Economic Security Vetting Center fails.[9] According to the OIG, the process has already twice failed to prevent the DOE from approving applicants with prohibited foreign adversarial ties to receive funding.[10] Even prior to this post-election scramble, the OIG considered this program "one of the largest financial risks facing the Department today."[11]

On election day, the American people rejected the Biden-Harris administration's rush-to-green agenda. To honor the will of our electorate and facilitate an orderly transition, we insist that the Biden-Harris administration cease its campaign to quickly distribute federal funding before the incoming administration takes office. As such, we request that the LPO pause issuance of any additional conditional commitments, loans, or loan guarantees in the final weeks of the current administration.

Thank you for your attention to this matter. If you have any questions about this request, please contact the Majority Staff of the Energy and Commerce Committee at (202) 225-3641.

---

[3] *See* Storrow, *supra* note 1 (stating 12 loans have been finalized). This article predates a loan to ENTEK announced on November 22, 2024. *See* LOAN PROGRAMS OFFICE, DEP'T OF ENERGY, ENTEK, *supra* note 2.

[4] This includes conditional commitments to Starplus Energy, Rivian LLC, Sunwealth, and Grain Belt Express. *See* Blog, Loan Programs Office, Dep't of Energy, LPO Announces Conditional Commitment to Starplus Energy to Construct Lithium-Ion Battery Factories in Indiana, Dec. 2, 2024, https://www.energy.gov/lpo/articles/lpo-announces-conditional-commitment-starplus-energy-construct-lithium-ion-battery; Blog, Loan Programs Office, Dep't of Energy, LPO Announces Conditional Commitment to Rivian to Support the Construction of EV Manufacturing Facility in Georgia, Nov. 26, 2024, https://www.energy.gov/lpo/articles/lpo-announces-conditional-commitment-rivian-support-construction-ev-manufacturing; Blog, Loan Programs Office, Dep't of Energy, LPO Announces Conditional Commitment to Grain Belt Express to Construct High-Voltage Direct Current Transmission Project, Nov. 25, 2024, https://www.energy.gov/lpo/articles/lpo-announces-conditional-commitment-grain-belt-express-construct-high-voltage-direct; Blog, Loan Programs Office, Dep't of Energy, LPO Announced Conditional Commitment to Sunwealth to Deploy Solar PV and Battery Energy Storage, Creating Wide-Scale Virtual Power Plant, Nov. 25, 2024, https://www.energy.gov/lpo/articles/lpo-announces-conditional-commitment-sunwealth-deploy-solar-pv-and-battery-energy.

[5] *See* OFFICE OF THE INSPECTOR GEN., DEP'T OF ENERGY, DOE-OIG-25-05, MANAGEMENT CHALLENGES AT THE DEPARTMENT OF ENERGY—FISCAL YEAR 2025 1-4 (2024), *available at* https://www.energy.gov/sites/default/files/2024-11/DOE-OIG-25-05.pdf.

[6] *Id.* at 4.

[7] *Id.* at 2-3.

[8] *Id.* at 3-4.

[9] *Id.* at 4.

[10] *Id.*

[11] *Id.*

DOE AR 001115

Letter to Mr. Jigar Shah
Page 3

Sincerely,

Cathy McMorris Rodgers
Chair
Committee on Energy and
Commerce

H. Morgan Griffith
Chair
Subcommittee on Oversight and
Investigations

Jeff Duncan
Chair
Subcommittee on Energy, Climate,
and Grid Security

CC: Frank Pallone Jr., Ranking Member, Energy and Commerce Committee
Diana Degette, Ranking Member, Subcommittee on Energy, Climate, and Grid Security
Kathy Castor, Ranking Member, Subcommittee on Oversight and Investigations

DOE AR 001116



# Department of Energy
Washington, DC 20585

December 17, 2024

MEMORANDUM FOR THE UNDER SECRETARY OF ENERGY FOR INFRASTRUCTURE

FROM:               Teri L. Donaldson
                       Inspector General

SUBJECT:         *Interim Findings – The Department's Loan Programs Office Is Not Managing Organizational Conflicts of Interest in Compliance With Regulations and Contractual Obligations*

The Federal Government prohibits conflicts of interest to safeguard the taxpayers against self-dealing, collusion, and fraud by Government officials and Government contractors.  In the private sector, each party has a "baked in" economic incentive to watch, track, and account for its own dollars.  That economic incentive does not exist in the public sector, where Federal dollars are more likely to be treated as "monopoly money."  For this reason, implementing and overseeing robust conflict of interest protections is a critical role for Federal officials.

The Department of Energy Loan Programs Office (LPO) is administering more than $385 billion in new loan authority without ensuring a regulatory and contractually compliant and effective system to manage organizational conflicts of interest.[1]  This poses a significant risk of fraud, waste, and abuse.  Congress issued this unprecedented volume of loan authority in the Infrastructure Investment and Jobs Act, Inflation Reduction Act, and related legislation.[2]  The projects funded with this authority, which involve innovations in clean energy, advanced transportation, and tribal energy are inherently risky in part because these projects may have struggled to secure funding from traditional sources such as commercial banks and private equity investors.

---

[1] This memorandum addresses organizational conflicts of interest.  All references to conflicts of interest herein should therefore be construed as references to organizational conflicts of interest.

[2] Shortly after the passage of the Infrastructure Investment and Jobs Act, the Department began a series of weekly meetings with the Office of Inspector General (OIG) to identify issues of immediate concern.  During these weekly meetings, the Inspector General repeatedly emphasized the importance of implementing a robust conflict of interest program.  Given the enormous sums of financial risk, the Inspector General also suggested that the Department consider developing and implementing a conflict of interest program more robust than the minimal protections already commemorated in Department rules.  This did not happen.  It appears that the LPO did not evaluate its options for improving the existing regulatory framework.  The Inspector General has testified before Congress on the risks associated with the LPO.  See Statement of The Honorable Teri L. Donaldson, Inspector General, U.S. Department of Energy before the U.S. House of Representatives Committee on Oversight and Accountability, Subcommittee on Economic Growth, Energy, Policy and Regulatory Affairs, April 18, 2023: https://oversight.house.gov/wp-content/uploads/2023/04/IG-Donaldson-Written-Testimony-for-April-18-Hearing.pdf.

DOE AR 001117

## BACKGROUND

**1. Contractors, Subcontractors, and Third-Party Experts**

The LPO contracts with more than 300 contractor and subcontractor personnel to assist with loan application processing. These personnel support the LPO's review of loan applications with expertise in legal, engineering/technical, market analysis, and financial/credit aspects of loan applications as a key component of the LPO loan processing and due diligence. The contractors can be described as follows:

- Prime Contractor and its Subcontractors: The LPO contracts with a prime contractor, Archetype II, LLC, (Archetype) which also contracts with subcontractors to provide the LPO reports analyzing issues such as project eligibility, assessment of project cost, market potential, and technical/engineering issues.

- Support Services Contractors: In addition to Archetype and its subcontractors, the LPO also contracts with seven support services contractors. Five perform legal services, one performs services as special assets collateral agent, and one provides project finance loan services.

- Third-Party Experts: Finally, as part of loan application packages, prospective borrowers provide the LPO with "third-party" expert reports, covering such topics as financial and credit issues and analysis, engineering and technical analysis, and market analysis. Although these third-party experts contract with the LPO, which relies upon their work as essential components of the loan application process, the prospective borrowers pay for the third-party experts' services.

**2. Applicable Regulations and Contract Provisions**

**a. Federal Acquisition Regulations**

The Federal Acquisition Regulations (FAR) protect the Government and taxpayers when the Government transacts with contractors. FAR 9.504 requires contracting officers for Government transactions to: (1) identify and evaluate potential conflicts of interest as early as possible; and (2) avoid, neutralize, or mitigate significant conflicts before contract awards. FAR 9.506 requires contracting officers to seek information from within the Government or from other readily available sources of information concerning contractors in order to identify potential conflicts of interest. Once a contract is awarded, the Department's contracting officer designates a contracting officer's representative within the LPO to assist in overseeing and managing potential conflicts of interest.

**b. Department of Energy Acquisition Regulations**

Department of Energy Acquisition Regulations (DEAR) 909.507-2 and 952.209-72, which implement FAR contract clauses in Department contracts, require contracting officers to insert conflict of interest clauses into contracts. The DEAR requirements mandate that contractors

2

disclose related party relationships and take steps to avoid, neutralize, or mitigate conflicts of interest. Most importantly here, DEAR 952.209-72(f) requires those who contract with the Department to include all of these same conflict of interest provisions in their subcontracts.

The LPO's contract with Archetype is governed by FAR and DEAR. Archetype's subcontracts are likewise governed by FAR and DEAR.

### c. Contract Provisions

While the entire FAR as a whole may not directly apply to contracts with third-party experts because borrowers pay the third-party experts' fees, these third-party expert contracts are nevertheless impacted by specific FAR, DEAR, and contract provisions pertaining to conflicts of interest. All LPO contracts related to administration of the loan authority, including contracts with third-party experts, include a clause: (1) requiring disclosure of apparent or actual conflicts of interest; and (2) imposing a continuing obligation to disclose any circumstances that may create an actual or apparent conflict of interest. Contracts with third-party experts incorporate the FAR definition for organizational conflicts of interest, which states that "organizational conflict of interest means that because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage."

Collectively, FAR, DEAR, and contract provisions require the following:

| Requirement | Applies To | Source |
|---|---|---|
| **Identify and evaluate conflicts as soon as possible** | Contracting Officers | FAR 9.504(a)(1) |
| **Avoid, neutralize, or mitigate potential conflicts before contract award** | Contracting Officers | FAR 9.504(a)(2) |
| **Seek information from within the Government or from other readily available sources if information concerning contractors is necessary to identify potential conflicts of interest** | Contracting Officers | FAR 9.506(a) |
| **Monitor contracts for evidence of conflicts of interest** | Contracting Officers' Representatives | Designation Letter |
| **Disclose related party relationships and take steps to avoid, neutralize or mitigate conflicts of interest** | Contractors & Subcontractors | DEAR 952.209-72(c)  DEAR 952.209-72(f) |
| **Disclose apparent or actual conflicts of interest, and any circumstances that may create an actual or apparent conflict of interest.** | Contractors, Subcontractors, & Third-Party Experts | Contracts |

3

DOE AR 001119

Notwithstanding these regulatory and contractual provisions, an ongoing OIG audit has found that the LPO is not managing organizational conflicts of interest in compliance with regulations or ensuring that Archetype and its subcontractors are implementing effective plans to manage conflicts of interest.  Although the audit is not complete, we are issuing this memorandum now because of the risks associated with closing an additional $22 billion in loans and loan guarantees by January 20, 2025,[3] without ensuring compliance with conflicts of interest regulations.

## PRELIMINARY OBSERVATIONS

**1. The LPO does not track contractors who may be serving both the LPO and prospective borrowers.**

Despite the risks and conflicts that could arise if the LPO contracts with contractors that also work for prospective borrowers, the OIG audit team was surprised to learn that the LPO does not ensure that contracting officers and contracting officers' representatives track third-party experts. For example, for the 18 projects reviewed by the OIG, the LPO Technical Division was able to provide the OIG with the name of the applicant's third-party engineering experts for only 3 of the 18 projects.  Because the full universe of third-party experts supporting the applicants could not be identified, neither the OIG nor the LPO could determine whether an engineer supporting the LPO for a project was also working for one or more prospective borrowers on the same or other projects.  Nevertheless, proper management of conflicts of interest requires identifying all parties involved in the process on both sides of the transaction.  This is especially true in the LPO process where the Government relies upon the work of third-party experts to inform its decisions.

Indeed, pursuant to FAR 9.504, contracting officers and contracting officers' representatives have an <u>affirmative</u> <u>obligation</u> to identify and evaluate potential conflicts of interest. They cannot effectively meet this obligation without identifying all parties involved, including third-party experts, to ensure that contractors working with the LPO have no conflicts arising from any work with or on behalf of prospective borrowers.  As illustrated by an example described in FAR 9.508(i), a conflict could arise if a party that has worked with the LPO to process applications acts as a consultant for a prospective borrower.  If contracting officers have a blind spot as to certain parties or categories of parties, or if they are unaware of the identity of certain parties or categories of parties, then these contracting officers cannot deconflict to avoid the LPO hiring these same experts in other roles within the LPO processes.

The LPO may not rely solely upon contractual provisions that require third-party experts and/or other contractors to make disclosures because such reliance creates this blind spot for the LPO.  Such reliance would also impermissibly delegate the contracting officer and contracting officer's responsibilities in contravention of FAR 9.504.  These oversight obligations may not be passed along wholesale to a contractor without abandoning the meaning of "oversight."

---

[3] The LPO informed us that it planned to close on an estimated $22 billion of loan and loan guarantee applications before the change in the Presidential administration, January 20, 2025.

4

DOE AR 001120

Ultimately, because the LPO is not collecting information about and tracking all parties involved in loan administration, it does not currently know whether prospective borrowers have strategically hired the same third-party experts or affiliates that the LPO has retained to assist with loan processing and due diligence. This presents a risk to the taxpayer and disregards FAR 9.504 obligations.

**2. The LPO does not track conflicts of interest disclosures or waiver requests for loans and loan guarantees.**

The OIG also found that the LPO did not ensure that the contracting officers and contracting officers' representatives adequately track conflict of interest disclosures or waiver requests. For example, in response to our initial request for a listing of all conflict of interest disclosures submitted by contractors, the LPO only produced copies of conflict of interest disclosures for contractors providing legal services. The LPO had no records of disclosures made or waivers requested for the technical/engineering, financial, and other support contractors. The LPO stated on multiple occasions that there were no additional disclosures beyond those it had provided.

Nevertheless, when the OIG team was trying to ascertain whether the contracting officers and contracting officers' representatives were tracking disclosures and waiver requests, an Archetype representative and an LPO contracting officer's representative searched their emails for waivers and disclosures. The search results: (1) identified additional waivers and disclosures beyond those the LPO had provided; and (2) revealed that the waivers and disclosures sent from Archetype to the contracting officer's representative were not provided to the contracting officer.[4]

One example identified during the OIG team's review illustrated that the LPO and its contracting officers' representatives are either: (1) failing to track disclosures; or (2) failing to track parties whose roles must be identified and evaluated as potential conflicts of interest. The team found that one individual, who was identified as an engineering contractor supporting the LPO for two projects, was also working as an Archetype subcontractor on a separate project with a scope overlapping with the individual's work with the LPO. This situation warranted an in-depth review by the contracting officer to determine whether there is a potential conflict of interest. A conflict of interest would exist, for example, if the individual had unequal access to information or a competitive advantage to win another contract or subcontract. Nevertheless, although the individual was contractually obligated to disclose conflicts of interest, we found no evidence that either the individual or the individual's employer made any disclosure.

Finally, when the audit team discussed disclosure and waiver tracking with LPO officials, they informed us that conflict of interest disclosures and waiver requests are kept by each contracting officer's representative and are not shared throughout the LPO. The failure to share and cross-check that information across contracting officers and the LPO contracting officer's representatives is concerning because of the potential for the same third-party experts or contractors to support multiple divisions of the LPO in different roles while representing different interests, including the interests of prospective borrowers.

---

[4] Pursuant to FAR 1.604, a contracting officer's representative assists in the technical monitoring or administration of a contract.

DOE AR 001121

We concluded that this system cannot be reconciled with FAR 9.504 and 9.506, which require contracting officers to identify and evaluate conflicts of interest as early as possible and to seek information from governmental sources to find information necessary to identify and evaluate potential conflicts of interest.

By failing to track the parties involved in these transactions, as well as the disclosures and waiver requests, the LPO has functionally abandoned any responsibility for identifying, evaluating, avoiding, neutralizing, or mitigating conflicts of interest.

### 3. Archetype did not implement the organizational conflicts of interest training program required by its own Management Plan.

The contract required Archetype to develop and submit an Organizational Conflict of Interest Management Plan outlining its strategy for identifying, disclosing, and mitigating potential conflicts of interest. The plan specifically states Archetype's intent to comply fully with FAR Subpart 9.5 and DEAR 952.209-72. Although the contractor submitted a plan in October 2017, the OIG audit team found that the LPO's contracting officer's representative, who handled day-to-day oversight of the contract, did not have a copy of this plan and had taken no action to verify implementation. Likely because the LPO failed to ensure that the contracting officer and contracting officer's representative were verifying conflict of interest management, the LPO was unaware that the contractor had not implemented key aspects of the plan, such as the training requirement, which is arguably the foundation of the contractor's organizational conflict of interest strategy. Instead, the contractor's Program Manager told us that as individuals are hired, the contractor holds informal meetings via telephone to discuss the different types of conflicts of interest and the conflict of interest notification process. The Program Manager confirmed that there was no record or documentation of any of these informal meetings.

Without ensuring that the contracting officer and contracting officer's representative are verifying the contractor's implementation of its conflicts of interest program, the LPO cannot assure that valid processes have been established to identify and report conflicts of interest, as required by the contract.

## RISKS TO THE TAXPAYER

The Department and the LPO are ultimately responsible for ensuring the integrity of the loan process, including ensuring that decisions about awarding and managing loans are in the Government's and the public's best interest. Responsibility for such a large and inherently risky loan portfolio necessitates ensuring compliance with conflicts of interest regulations and contractual obligations. Fiscal responsibility and program integrity require independence in decisions about loan awards and ongoing monitoring for continued solvency. Lawmakers and the public must trust that those decisions are made for the public good and not for private gain.

Nevertheless, we note that in the absence of these important controls, the LPO has: (1) already closed 15 loans and loan guarantees for over $15 billion since 2021; and (2) is currently planning to close an additional $22 billion in loans and loan guarantees for an additional 13 projects before January 20, 2025.

DOE AR 001122

## IMMEDIATE CORRECTIVE ACTIONS NEEDED

The OIG will issue a full report with formal recommendations at the conclusion of our fieldwork. Therefore, this memorandum does not represent the final position of the OIG.  However, considering the issues found to date, we identified several corrective actions that the Director of the LPO should take immediately:

1. Put into abeyance all loan and loan guarantee packages until the LPO can ensure that contracting officers and the contracting officers' representatives are complying with conflicts of interest regulations and enforcing conflict of interest contractual obligations.

2. Ensure that contracting officers working on LPO loans and loan guarantees either: (1) establish a centralized tracking mechanism that tracks both (a) contractors for all projects, and also (b) conflict of interest disclosures or waivers; or (2) otherwise implement measures necessary to comply with conflicts of interest regulations and contract provisions.

3. Consider enhancing practices for managing conflicts of interest for contractors.

4. Ensure that the contracting officer and the contracting officer's representative for Archetype review Archetype's plan to ensure all aspects are being implemented as required.

## MANAGEMENT RESPONSE

In a response dated December 11, 2024 (attached *verbatim*), management broadly asserted that the LPO is in full compliance with conflicts of interest rules, and in particular stated that:

- The OIG had not identified any actual conflicts of interest;
- FAR does not apply to third-party experts because their fees are paid by the borrower, rather than by the LPO; and
- The LPO addresses the risk of conflicts through contracting and delegates the burden to its contractors to disclose conflicts.

For Interim Corrective Action 1, management asserted that the OIG's corrective action is disproportionate to the finding.  As for Corrective Actions 2, 3, and 4, management offered no specific corrective actions to address the weaknesses identified in the memorandum but committed to begin to address these.

7

DOE AR 001123

## AUDITOR COMMENTS[5]

### 1. Scope and Purpose of the Audit

The Department's assertion that the OIG has not identified any actual conflicts of interests misses the point of the audit. The scope of the OIG audit is to assess the LPO's processes and internal controls to prevent and mitigate potential conflicts of interest. The scope of the audit did not include attempting to audit the entire LPO portfolio for actual conflicts of interest.[6]

Moreover, an audit to identify actual conflicts would be very difficult to perform at this time because the LPO simply does not track the information necessary to identify conflicts of interest.[7] The LPO does not compile, track, update, and/or reconcile relationships that could result in identifying conflicts of interest among the hundreds of personnel working for (1) Archetype, (2) Archetype's subcontractors, (3) the LPO's support service contractors, and (4) third-party experts. The LPO relies upon all of these parties during the application review process. As highlighted by our findings, the contracting officers' and contracting officers' representatives' lack of awareness of the parties involved in the loan process impedes them from identifying and evaluating potential organizational conflicts of interest and doing so as early as possible.

Perhaps the most troubling statement in the Department's response is that the LPO has not experienced a single conflict of interest "for the last 15 years." The LPO seems to be asserting that as long it does not compile, track, update, or reconcile relationships, it maintains a 100 percent compliance rate across the LPO.

### 2. FAR, Third-Party Experts, and Conflicts of Interest

The Department's assertion that FAR does not apply to third-party experts dodges the issue and fails to account for potential conflicts of interest that may arise elsewhere in the LPO involving those same experts. The Department neglects to address that independent of the FAR, the LPO's contracts with third-party experts: (1) require experts to submit conflict of interest statements

---

[5] Because of the urgency of this interim report, which is based upon the LPO's stated intention to process $22 billion before January 20, 2025, the Department is reviewing the Auditor's Comments simultaneously with the release of this interim report. If the Department submits additional and substantive written comments, the OIG may supplement this interim report at a later date.

[6] An example illustrates the fallacy in management's comment that the OIG failed to identify conflicts of interest. Suppose a golf tournament has the ability and obligation to track and create a scorecard of a golfer's strokes but fails to do so, relying upon each golfer to truthfully and accurately report his or her own score. Afterward, a golfing oversight body reviews the tournament results and informs the tournament director that the integrity of the results is potentially compromised by the failure to track strokes and create a scorecard. The director responds to the oversight body that it did not identify any errors in the scores reported. The oversight body could not do so, of course, because the tournament failed to create the scorecards. Likewise, the OIG cannot identify conflicts of interest without the information necessary to identify conflicts of interest.

[7] The Department has a long-standing problem in this area. In March 2019, the Government Accountability Office reported that contracting officers at Department of Energy field sites do not even collect much less independently review information on subcontractor ownership despite that fact that such information could alert officials to potential conflicts of interest: https://www.gao.gov/products/gao-19-107.

8

when they submit statements of capability; and (2) impose a continuing obligation to disclose circumstances that may create an actual or apparent conflict. If the LPO is not conducting some oversight of these disclosures, it has a large blind spot.

Furthermore, regardless of whether FAR applies wholesale to contracts with third-party experts, contracting officers have an affirmative obligation under FAR 9.504 to identify and evaluate conflicts of interest and to do so as early as possible. They cannot effectively meet this obligation if the LPO does not even collect information about third-party experts.

Ultimately, failure to track third-party experts results in a functional blind spot that inhibits detection of an unknown number of potential conflicts and potentially undermines entirely any system for managing—or attempting to manage—conflicts.[8] It also begs the question of whether the existence of this functional blind spot places prospective borrowers in a position to strategically retain experts also being used by the LPO to conduct due diligence.

### 3. Conflict Management by Delegation With No Oversight

Department management also states that the LPO addresses the risk of conflicts through contracting, delegating the burden to disclose conflicts to Archetype. This is the "trust and don't verify" model that abdicates the responsibility for the Department to oversee Archetype. Here, Archetype submitted a plan pertaining to conflicts in 2017, but that is where the story ends. There is nothing in the LPO records to establish that the contracting officer and contracting officer's representative for Archetype reviewed, assessed, or did anything else to ensure that Archetype was implementing the plan and that it was working. This contractor was not even conducting formal training as required by its own Management Plan. There is no evidence that the contracting officer or the contracting officer's representative were monitoring Archetype's compliance. This lack of actual Departmental oversight likely explains the LPO's view that it is operating a "robust" conflicts program reporting exactly zero conflicts in 15 years.

### 4. Failure to Address Conflicts Related to Archetype and Its Subcontractors

The Department has failed to comment upon the conflicts of interest that may arise involving Archetype and its subcontractors, which are retained by and paid by the LPO. These entities are not paid by prospective borrowers. Rather, these entities are paid by the LPO with tax dollars. The Department did not dispute—and could not reasonably dispute—that FAR directly applies to these contracts. Our interim finding presented major concerns with these parties, yet the LPO's comments failed to address these entities. The LPO narrowly focused its comments on third-party experts but failed entirely to address its deficient management of conflicts of interest related to the remainder of its contracts and subcontracts.

---

[8] The Department's choice to delegate responsibility for reporting conflicts and abdicate responsibility for identifying conflicts continues a pattern identified in a March 2019 Government Accountability Office Report identifying actions the Department should take to increase subcontract oversight. See GAO-19-107, *Department of Energy Contracting: Actions Needed to Strengthen Subcontract Oversight*: https://www.gao.gov/products/gao-19-107. In that report, the Government Accountability Office recommended that the Department of Energy independently review subcontractor ownership to identify potential because relying on contractors to identify conflicts in a "consent review" process had failed to identify conflicts of interest, including some that led to criminal investigations. The Department of Energy rejected the recommendation.

DOE AR 001125

### 5. Corrective Actions

As for the OIG suggested corrective actions, the Department objects to the OIG's request that the LPO pause its activities pending the LPO establishing an actual oversight plan for the management of conflicts of interest.  The OIG, however, reiterates that the basic controls for overseeing the identification of related parties and analyzing possible conflicts of interest should have been in place before a single loan application was approved.

As for management's responses to the OIG's Corrective Actions 2, 3 and 4, we appreciate that management intends to take these actions but also note that time is of the essence.

DOE AR 001126

Attachment



**Department of Energy**
Washington, DC 20585

December 11, 2024

MEMORANDUM FOR     TERI L. DONALDSON
                              INSPECTOR GENERAL

THROUGH:                DAVID CRANE
                              UNDER SECRETARY FOR INFRASTRUCTURE

                                                           DAVID CRANE
                                                          Digitally signed by DAVID CRANE
                                                           Date: 2024.12.11 12:04:52 -05'00'

FROM:                     JIGAR SHAH
                              DIRECTOR, LOAN PROGRAMS OFFICE

                                                           JIGAR SHAH
                                                           Digitally signed by JIGAR SHAH
                                                           Date: 2024.12.11 11:45:36 -05'00'

SUBJECT:                DEPARTMENT'S RESPONSE TO OIG'S INTERIM
                              FINDINGS – THE DEPARTMENT'S LOAN PROGRAMS
                              OFFICE IS NOT MANAGING ORGANIZATIONAL
                              CONFLICTS OF INTEREST IN COMPLIANCE WITH
                              REGULATIONS AND CONTRACTUAL OBLIGATIONS
                              (A24PT006-IRA)

This memorandum responds to the draft "Interim Findings – The Department's Loan Programs Office Is Not Managing Organizational Conflicts of Interest in Compliance with Regulations and Contractual Obligations (A24PT006-IRA)" (the "Interim Findings"), provided by the Office of the Inspector General ("OIG") to the Loan Programs Office ("LPO") on December 4, 2024. Thank you for the opportunity to comment on your observations prior to the release of your interim report.

LPO is in full compliance with both the Department's conflict of interest rules and the Federal Acquistion Regulation ("FAR"). LPO has a robust system in place for identifying and mitigating organizational conflicts of interest through active communication with its partners and by holding them contractually accountable and financially liable for compliance. This approach has worked for the last 15 years and continues to work – a fact the OIG's Interim Findings effectively confirms. Indeed, despite a months-long audit involving over one hundred contract files, OIG has not identified any organizational conflicts of interest.

The OIG's Interim Findings are based on mistaken facts and a misunderstanding of the law. We attempt to correct those misunderstandings here and to reinforce that the FAR does not apply to LPO's agreements with third party advisors and that DOE has a strong program for managing organizational conflicts of interest. But much of the discussion in the Interim Findings document is so vague or imprecise that we may be unable to get at the root of the confusion without further clarification from the OIG. DOE welcomes the opportunity to review a revised version of the Interim Findings addressing such matters prior to any release by the OIG.

Congress has directed LPO to extend loans and loan guarantees to advance our nation's energy and manufacturing goals. LPO has executed that mission with great success and will continue to

DOE AR 001127

do so without regard to the OIG's remarkable and unprecedented suggestion that LPO "put into abeyance all loan and loan guarantee packages scheduled to be completed by January 20, 2025." Of course, were the OIG to identify an organizational conflict of interest ("OCI") with respect to any of LPO's contracts or agreements, LPO would take immediate corrective action. But, again, despite a lengthy review, OIG has not done so.

### *Applicability of the FAR*

At the heart of the OIG's Interim Findings report is the assertion that LPO has failed to comply with the FAR. But this assertion appears to rest on a misunderstanding of DOE contracting practice. LPO has one main government contract with a prime contractor for support services, and a handful of other, smaller support services contracts. For professional support services, including administrative, engineering, origination, and portfolio management staff, a DOE Contracting Officer ("CO") in the Office of Management ("MA") awards a services contract to a firm that provides full time equivalent staff to LPO. This contract is paid from LPO's budget and is therefore conducted in accordance with the FAR.

LPO also requires the input of third-party advisors including law firms, independent engineers, insurance advisors, financial advisors, market advisors and others for the purposes of conducting due diligence. For these services, LPO issues Requests for Statement of Capability, Availability, and Price to standing lists of advisors who provide advisory services. LPO selects the advisors and enters into agreements with them. These agreements include conflict of interest requirements, as discussed below. But LPO does not pay these third-party advisors. They are paid by the applicants through separate agreements. This arrangement is standard practice in project finance: the borrower contracts with and pays the advisory costs of the lender, who selects the advisors and gets the benefit of their work product. Because these contracts are paid by the applicants, they are not subject to FAR. The confusion between the LPO's support contract and these third-party advisor agreements appears to permeate the OIG's draft analysis.

### *LPO Successfully Addresses the Risk of OCI Through Contracting*

DOE's approach to identifying and mitigating organizational conflicts of interest is effective. By agreement, LPO requires its third-party advisors and its support contractors to continually identify any potential OCIs and disclose any OCIs to LPO. If the third-party advisor or LPO support contractor fails to disclose any OCI issues per their contract requirements, there are penalties and consequences that apply. This approach — putting the burden on its counterparties and making them financially liable for compliance — has worked well over the many years that DOE has pursued it. And, again, OIG has not identified any OCIs within the LPO program.

This approach also complies with the FAR, where applicable. The FAR does not require any tracking mechanism for contractor OCI requirements, much less the burdensome system suggested in the Interim Findings. To the contrary, FAR 9.504(d) states that, "In fulfilling their responsibilities for identifying and resolving potential conflicts, contracting officers *should avoid creating unnecessary delays, burdensome information requirements, and excessive documentation*. The contracting officer's judgment need be formally documented only when a substantive issue concerning potential organizational conflict of interest exists." (emphasis added).

Attachment

### *LPO's Primary Support Contractor Has Effectively Managed the Risk of OCI*

The OIG's finding that the LPO Primary Support Contractor did not comply with its OCI contract requirements is incorrect. LPO's primary support contractor submitted an OCI Management Plan as required by its contract. To the best of DOE's knowledge, the contractor has closely managed the OCI process and was in regular communication with staff and subcontractors regarding OCI compliance. And to the best of DOE's knowledge, each contractor employee was given training by the contractor upon starting to support LPO, provided documentation specifying the OCI policy, and signed the OCI-NDA (Nondisclosure Agreement) document, as required. In addition, each person was given an onboarding packet which included OCI compliance information. In September 2024, the contractor implemented additional enhancements to its OCI Management Plan.

LPO's Contracting Officer Representative ("COR") will continue to work with the MA CO to ensure that the primary support contractor's organizational conflicts of interest Management Plan is fully implemented and strengthen oversight to seek evidence of the LPO contractor's compliance with contractual requirements on OCI.

### *Response to Immediate Correction Items*

Over 15 years, LPO has disbursed nearly $35 billion in loan funding with losses of slightly over $1 billion, for an overall loss rate of under 3%. As noted in many public sources, this is a loan loss rate comparable to or better than many commercial project finance lenders. **Over that time, there have <u>never</u> been any findings of fraud, waste or abuse in LPO. After reviewing 112 files comprising 100MB of data related to 18 loans, the OIG has again not identified any specific findings of fraud, waste or abuse in this audit.**

The OIG found that one individual advises LPO as both part of the services contract as well as an employee of a TPA, which the OIG alleges could give rise to an unfair advantage in bidding for LPO advisory services. Preliminary indications from LPO are that adequate safeguards, mitigants, and firewalls are in place in this specific instance and that no OCI exists. LPO takes this situation very seriously and is looking into this specific matter further. If this matter is determined to represent a potential advantage in bidding for LPO advisory services, it will take appropriate action. However, as noted before, third-party contracting is paid for by the applicants, therefore federal, i.e., taxpayer, funds are not at risk.

1.  **Put into abeyance all loan and loan guarantee packages scheduled to be completed by January 20, 2025, until the LPO can ensure that contracting officers and the contracting officer's representatives are complying with conflicts of interest regulations and enforcing conflict of interest contractual obligations.**

    No organizational conflicts of interest have been identified. This Immediate Correction Item is both baseless and vastly disproportionate even under the OIG's misunderstanding of the facts and applicable law. The Department looks forward to receiving the OIG final report under this audit and will promptly address any organizational conflicts of interest or non-compliance with the FAR, DEAR, or third-party advisor agreement requirements regarding OCI that the OIG may identify.

DOE AR 001129

Attachment

2.  **Ensure that contracting officers working on LPO loans and loan guarantees either (1) establish a centralized tracking mechanism that tracks both (a) contractors for all projects, and also (b) conflict of interest disclosures or waivers or (2) otherwise implement measures necessary to comply with conflict of interest regulations and contract provisions.**

    LPO and MA will continue to comply with the FAR and DEAR requirements where applicable, and with the TPA agreements where applicable, as they currently do.

3.  **Consider enhancing practices for managing conflicts of interest for contractors.**

    LPO will work with OGC and DOE MA to enhance practices for managing conflicts of interest for LPO contractors.

4.  **Ensure that the contracting officer and the contracting officer's representative for the primary support contractor perform a review of the primary support contractor's Plan to ensure all aspects are being implemented as required.**

    DOE MA will take the lead and ensure all CO's and CORs do primary reviews of the support contractor's OCI Management Plan to ensure all aspects of the plan are being implemented.

We appreciate the opportunity to respond to the draft report. The Department will continue to cooperate with the OIG on this matter, including in connection with any revised findings or a final report. Please let us know if you need any further information or would like to discuss further.

DOE AR 001130



# The Secretary of Energy
### Washington, DC 20585

January 20, 2025

MEMORANDUM FOR HEADS OF DEPARTMENTAL ELEMENTS

FROM:             INGRID C. KOLB
                  ACTING SECRETARY

SUBJECT:          Agency-wide Review of Program and Administrative Activities

As we navigate through this transition period for a new Administration within the Department of Energy (DOE), it is imperative to ensure a deliberate approach to the Administration's programmatic and administrative policies and priorities. To that end, effective immediately and until further notice, prior to any actions or decisions on all herein described activities, a review under varying criteria will be undertaken to ensure all such actions are consistent with current Administration policies and priorities, including budgetary priorities.[1] The broad spectrum of actions include but are not limited to: personnel actions; awarding of grants, loans, funding opportunities, and cost sharing agreements; contracting, procurement announcements, and actions; rulings, decisions or other actions on any applications, enforcement action, or settlements of any contested matter; submissions to the Federal Register for publication; and the publication or announcement of reports, studies, congressional correspondence, and public statements. This includes all studies or reports that are either ongoing, set to be released, are already under review, or have not yet begun.

The reviews are necessary to facilitate a comprehensive review of the Department's ongoing activities and to align these efforts with Congressional authorizations and the Administration's priorities, to ensure that resources are allocated efficiently, and that the Department's initiatives are in line with the statutory mission of DOE and the priorities of the Administration.

As discussed below, a process will be in place for the submission of requests for action by the Secretary (acting) to ensure the important work of the Department continues to serve the American people.

Scope of Actions:

1.  **Personnel Actions:** All personnel actions, including appointments, promotions, and transfers, are to be halted. This includes both internal staff movements and external hiring processes, unless expressly and unambiguously authorized with the prior approval of the acting Secretary, after the date of issuance of this order.

---

[1] With respect to NNSA, nothing herein is intended to contradict 50 USC Ch. 41 but to be construed broadly consistent with the Secretary's authority thereunder, include §2402(d).

DOE AR 001131

2. **Procurement Announcements and Actions:** Any announcements or awards regarding procurement opportunities and contracts are to be put on hold, other than for routine building operations and supplies for contracts with a value of less than $100,000. This includes, but is not limited to, requests for proposals (RFPs), requests for quotations (RFQs), and contract negotiations. Such approvals will be made in writing by the Secretary (acting) or the Head of Departmental Element with the prior approval of the Secretary (acting).

3. **Funding Actions:** All funding and financial assistance activities including loans, loan guarantees, grants, cost sharing agreements, funding opportunity announcements, and contracts shall not be announced, approved, finalized, modified, or provided until a review of such takes place to ensure compliance with Congressional authorization and Administration policy. Such approvals will be made in writing by the Secretary (acting) or the program head with the prior approval of the Secretary (acting).

4. **Release of Reports, Studies, Congressional Correspondence, and Public Announcements:** Submission of actions to the Secretary (acting) for approval shall be completed through relevant program heads prior to continuation of development and dissemination of any reports, studies, requests for information (RFIs) or congressional correspondence, including both finalized documents and those in draft form; conducting and scheduling public meetings related to any studies or reports. Relative to studies and reports being conducted by the National Laboratories, approvals must be obtained by the Head of Departmental Element with concurrence by the Administration designee within the Departmental Element. If reports or studies are subject to statutory or other requirements, a request for waiver from the reviews may be made to the Secretary (acting), who may grant the waiver. Submission of actions to the Secretary (acting) for approval shall be completed before publishing any Department social media posts, press releases, or other public announcements including website changes, even if previously scheduled and approved.

5. **Federal Register Notices:** Nothing should be sent to the Federal Register (FR) for publication without written approval of the Secretary (acting) or designee. The Office of the General Counsel is directed to: (i) immediately withdraw all items that have been submitted to the FR but have not yet been published, and (ii) provide the Secretary (acting) by noon on January 23 a list of all items that have been published but have not yet reached the date by which any such item is considered final (including the date such item becomes final).

6. **Actions under the National Environmental Policy Act (NEPA):** NEPA work may continue. However, the Secretary (acting) shall be informed of all NEPA work by January 24, 2025; or if new action is taken, at least 10 days before initiated. The scope of the NEPA reviews shall be reviewed by the Principal Deputy General Counsel or other person as designated by the Secretary (acting). Final Environmental Assessments and Environmental Impact Statements shall be

reviewed and approved by the Principal Deputy General Counsel or other person as designated by the Secretary (acting).

The reviews shall be conducted by all DOE offices, field offices, National Laboratories, and NNSA. There are no exemptions other than for routine building operations and supplies for contracts with a value of less than $100,000 without prior approval by the Secretary (acting).

**Rescinding of Signature Authority.**

To ensure compliance with this Directive, all signature authority for any of the actions provided herein are rescinded. Any actions requiring signature authority should not proceed until explicit authorization is provided in writing by the Secretary (acting) or designee.

The heads or administrators of each of the program, administrative, and support offices, National Laboratory Directors, field offices, and NNSA shall immediately disseminate this memorandum within their respective organizations and ensure full compliance with the directives as applicable.

Further guidance regarding the full resumption of activities, results of the review process, additional changes in DOE priorities, interagency collaboration, and legal compliance guidance will be forthcoming. Your cooperation and understanding are greatly appreciated as we work to enhance the effectiveness and efficiency of the Department.

DOE AR 001133



**THE DIRECTOR**

**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

January 21, 2025

M-25-11

MEMORANDUM TO THE HEADS OF DEPARTMENTS AND AGENCIES

FROM:       Matthew J. Vaeth, Acting Director, Office of Management and Budget

Kevin Hassett, Assistant to the President for Economic Policy and Director of the National Economic Council

SUBJECT:    Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*

The directive in section 7 of the Executive Order entitled *Unleashing American Energy* requires agencies to immediately pause disbursement of funds appropriated under the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58).  This pause only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order. This interpretation is consistent with section 7's heading ("Terminating the Green New Deal") and its reference to the "law and the policy outlined in section 2 of th[e] order."

For the purposes of implementing section 7 of the Order, funds supporting the "Green New Deal" refer to any appropriations for objectives that contravene the policies established in section 2.  Agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget.

DOE AR 001134



# The Secretary of Energy
## Washington, DC 20585

February 5, 2025

MEMORANDUM FOR HEADS OF DEPARTMENTAL ELEMENTS

FROM:             CHRIS WRIGHT
                  SECRETARY OF ENERGY

SUBJECT:          Unleashing the Golden Era of American Energy Dominance

As Secretary of Energy, it is an immense privilege to serve alongside each of you at such a consequential moment in American history. Energy is the essential ingredient that enables everything we do. A highly energized society can bring health, wealth, and opportunity for all. At the Department, we have an opportunity to promote energy abundance, demonstrate leadership in scientific and technological innovation, steward and strengthen our weapons stockpiles and meet Cold War legacy waste clean-up commitments.

President Trump has outlined a bold and ambitious agenda to unleash American energy at home and abroad to restore energy dominance. To compete globally, we must expand energy production and reduce energy costs for American families and businesses. America must lead the world in innovation and technology breakthroughs, which includes accelerating the work of the Department's National Laboratories. We must also permit and build energy infrastructure and remove barriers to progress, including federal policies that make it too easy to stop projects and far too difficult to complete projects.

We must pursue a culture of transparency, performance, and common sense to succeed. Accordingly, the Department will take the following initial actions:

1. **Advance Energy Addition, Not Subtraction:** Great attention has been paid to the pursuing of a net-zero carbon future. Net-zero policies raise energy costs for American families and businesses, threaten the reliability of our energy system, and undermine our energy and national security. They have also achieved precious little in reducing global greenhouse gas emissions. The fact is that energy matters, and we need more of it, not less. Going forward, the Department's goal will be to unleash the great abundance of American energy required to power modern life and to achieve a durable state of American energy dominance.

2. **Unleash American Energy Innovation:** The Department's Research and Development (R&D) enterprise is the envy of the world. We must focus our time and resources on technologies that will advance basic science, grow America's scientific leadership, reduce costs for American families, strengthen the reliability of our energy system, and bolster America's manufacturing competitiveness and supply chain security. As such, the Department's R&D efforts will prioritize

DOE AR 001135

affordable, reliable, and secure energy technologies, including fossil fuels, advanced nuclear, geothermal, and hydropower.

The Department must also prioritize true technological breakthroughs – such as nuclear fusion, high-performance computing, quantum computing, and AI – to maintain America's global competitiveness. To that end, the Department will comprehensively review its R&D portfolio. As part of that review, the Department will rigorously enforce project milestones to ensure that taxpayer resources are allocated appropriately and cost-effectively consistent with the law.

3. **Return to Regular Order on LNG Exports:** America is blessed with abundant energy resources – we are the world's top oil and gas producer and a net energy exporter for the first time in decades. Our energy abundance is an asset, not a liability. On January 20, the Department resumed consideration of pending applications to export American liquefied natural gas (LNG) to countries without a free trade agreement (FTA) with the U.S. in accordance with the Natural Gas Act. Proper consideration of LNG export applications is required by law and shall proceed accordingly.

4. **Promote Affordability and Consumer Choice in Home Appliances:** A top priority of the Trump Administration is to ensure that American families can choose from a range of affordable home appliances and products. Therefore, the Department will initiate a comprehensive review of the DOE Appliance Standards Program. Any standards should include a cost-benefit analysis considering the upfront cost of purchasing new products and reflecting actual cost savings for American families. The Department will pursue a commonsense approach that does not regulate products that consumers value out of the market; instead, affordability and consumer choice will be our guiding light.

5. **Refill the Strategic Petroleum Reserve (SPR):** As President Trump has stated, the SPR is a national asset that protects our security in times of crisis. It must be refilled. Unfortunately, the SPR is currently at historically low levels. We will not permit this to become a new status quo. Moreover, the Department will review SPR infrastructure and develop appropriate plans to safeguard this important strategic asset.

6. **Modernize America's nuclear stockpile:** We urgently need to modernize the nation's nuclear weapons systems. The Department will continue its critical mission of protecting our national security and nuclear deterrence in the development, modernization, and stewardship of America's atomic weapons enterprise, including the peaceful use of nuclear technology and nonproliferation.

7. **Unleash Commercial Nuclear Power in the United States:** The long-awaited American nuclear renaissance must launch during President Trump's administration. As global energy demand continues to grow, America must lead the commercialization of affordable and abundant nuclear energy. As such, the

the commercialization of affordable and abundant nuclear energy. As such, the Department will work diligently and creatively to enable the rapid deployment and export of next-generation nuclear technology.

8. **Strengthen Grid Reliability and Security:** Fortifying America's electric grid is critical to the reliable and secure delivery of electricity. Under President Trump's Executive Order, "Declaring a National Energy Emergency," the Department will identify and exercise all lawful authorities to strengthen the nation's grid, including the backbone of the grid, our transmission system. This is an imperative as we consider current and anticipated load growth on our nation's electric utilities. Moreover, after two decades of very slow demand growth, electricity demand is forecast to soar in the coming years. The Department will bring a renewed focus to growing baseload and dispatchable generation to reliably meet growing demand.

9. **Streamline Permitting and Identify Undue Burdens on American Energy:** A burdensome federal permitting process undermines America's competitiveness and national security. Pursuant to President Trump's Executive Orders, the Department will prioritize more efficient permitting to enable private sector investments and build the energy infrastructure needed to make energy more affordable, reliable, and secure. To that end, the Department will identify and exercise its legal authorities to expedite the approval and construction of reliable energy infrastructure.

The Department's mission is vital to American security and prosperity. Working together, we will accelerate American science, reduce energy costs for American families and businesses, and strengthen the reliability and security of our nation's energy system — all in our quest to better human lives. I look forward to working with you on this noble mission.



**United States Government Accountability Office**

Testimony

Before the Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives

For Release on Delivery
Expected at 10:30 a.m. ET
Wednesday, February 26, 2025

# OVERSIGHT OF EPA AND DOE SPENDING

# Implementing Remaining GAO Recommendations Could Help Address Identified Challenges

Statement of J. Alfredo Gómez, Director, Natural Resources and Environment and Frank Rusco, Director, Natural Resources and Environment

GAO-25-108135

DOE AR 001138

**February 26, 2025**

# GAO Highlights

Highlights of GAO-25-108135, a testimony before the Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives

# OVERSIGHT OF EPA AND DOE SPENDING

## Implementing Remaining GAO Recommendations Could Help Address Identified Challenges

## Why GAO Did This Study

The IIJA and IRA provided billions of dollars in funding to federal entities, including EPA and DOE.

This testimony discusses the status of programs created or expanded with funds under the IIJA and IRA and related challenges. Specifically, the statement discusses (1) EPA, (2) DOE, and (3) key issues looking ahead.

This testimony is based on prior GAO work and more recent work reviewing new and expanded programs from the IIJA and IRA. It is also based on preliminary observations from ongoing work reviewing EPA's use of IRA appropriations, where GAO analyzed EPA data and documentation, and interviewed EPA officials. GAO's prior work was issued from 2007 through 2024. Details on GAO's methodology can be found in each of the 22 reports cited throughout GAO's statement for this hearing.

## What GAO Recommends

Across 22 reports from 2007 to 2024, GAO has made a total of 60 recommendations to help address identified challenges at EPA and DOE discussed in GAO's statement for this hearing. The agencies have implemented 43 of these recommendations. GAO maintains that implementing the remaining recommendations could help address programmatic challenges.

For more information, contact J. Alfredo Gómez at (202) 512-3841 or GomezJ@gao.gov, or Frank Rusco at (202) 512-3841 or RuscoF@gao.gov.

## What GAO Found

The Infrastructure Investment and Jobs Act (IIJA) and the Inflation Reduction Act of 2022 (IRA) provided billions of dollars in funding to the Environmental Protection Agency (EPA) and the Department of Energy (DOE). This funding is for grants and programs supporting clean energy research and development, water and infrastructure investments, and other purposes. GAO has identified challenges in various aspects of certain programs that received significant funding through this legislation.

**EPA.** The IIJA provided over $43 billion for State Revolving Fund (SRF) water infrastructure programs. As of January 2025, EPA had fully obligated funds to six states and had not yet obligated any funding to eight states for fiscal year 2024. The status of funds for the remaining states was mixed. The IRA also provided about $41.5 billion for grants to reduce greenhouse gas emissions and enhance climate resilience. As of January 2025, EPA had obligated about $40 billion (96 percent), and about $20 billion (49 percent) of its IRA appropriations had been expended. GAO has recommended ways EPA could improve grants monitoring, including improving financial indicators for the SRFs, and address workforce challenges affecting grants management. EPA has implemented 24 out of 29 of these recommendations.

**DOE.** DOE's Office of Clean Energy Demonstrations (OCED) and Loan Programs Office (LPO) are responsible for billions of DOE's IIJA and IRA funding.

- **OCED.** DOE established OCED in 2021 to manage about $27 billion in IIJA and IRA funding. As of January 2025, OCED had awarded about 140 projects and obligated about $1.6 billion. In 2024, GAO found that OCED did not have a strategic workforce plan despite needing to fill about 100 more positions to be fully staffed. GAO made recommendations including that OCED develop such a workforce plan. OCED has lost staff since the 2024 report, and GAO is monitoring OCED's efforts to implement the recommendation given current agency priorities.

- **LPO.** The IIJA and IRA provided LPO over $350 billion in new loan authority for energy-related ventures and added two new programs to the office's three active programs. After experiencing a substantial increase in applications for LPO's programs starting in 2021, the office increased the number of loans and loan guarantees it closed in the last quarter of calendar year 2024. Loans and guarantees closed in that quarter ($24.4 billion) account for about half of the total that the office has closed under its five current programs since they were established ($52.5 billion). GAO has reported on the importance of monitoring loans and guarantees after they are closed to proactively manage their risks and protect the financial interests of the federal government and the taxpayer.

GAO has previously reported that there are risks involved with major new programs, especially when funding is awarded on a compressed schedule. GAO has additional ongoing work examining various aspects of how EPA and DOE are spending the funds they received in the IIJA and IRA.

United States Government Accountability Office

DOE AR 001139

Chairman Palmer, Ranking Member Clarke, and Members of the Subcommittee:

Thank you for the opportunity to discuss our work related to how the Environmental Protection Agency (EPA) and Department of Energy (DOE) are using funds appropriated by the Infrastructure Investment and Jobs Act (IIJA)[1] and the Inflation Reduction Act of 2022 (IRA) for new and expanded programs.[2]

These two acts provided billions in multi-year funding to federal entities—including EPA and DOE. This funding is for grants and programs supporting clean energy research and development, water and infrastructure investments, and climate resilience, among other purposes.[3]

For EPA, new funding through the IIJA included over $50 billion for water infrastructure and other investments, while the IRA included about $41.5 billion in funding for greenhouse gas reduction and other programs.[4] For DOE, funding included over $60 billion for a broad range of energy and other investments under the IIJA, and hundreds of billions in loan authority under the IRA and IIJA.

The new funding represented a significant increase for both of these agencies. In recent years EPA's average annual appropriation has been about $8.8 billion per year, and DOE's non-defense appropriation has been about $15.5 billion per year.[5]

---

[1]Pub. L. No. 117-58, 135 Stat. 429 (2021).

[2]An Act To provide for reconciliation pursuant to Title II of S. Con. Res. 14," Pub. L. No. 117-169, 136 Stat. 1818 (commonly known as the Inflation Reduction Act).

[3]As of January 20, 2025, all federal agencies were directed to pause disbursements of funds under the IRA and IIJA. Exec. Order No. 14,154, 90 Fed. Reg. 8,353, 8,357 (Jan. 29, 2025).

[4]EPA received over $43 billion for the State Revolving Fund programs and about $7 billion for other investments.

[5]This average is based on EPA's annual appropriations for fiscal years 2014 through 2024. During this period, EPA's annual appropriations ranged from a low of about $8.1 billion in fiscal year 2017 to a high of about $10.1 billion in fiscal year 2023. For DOE, this average is based on the agency's non-defense annual appropriation for fiscal years 2020 through 2024. DOE's total defense and non-defense annual appropriations averaged $44 billion for these years.

DOE AR 001140

GAO testified before this subcommittee in March 2023 regarding lessons for overseeing agency spending and addressing long-standing challenges associated with some of the programs that received significant funding through the IIJA and IRA.[6] Since that testimony, we have examined aspects of how EPA and DOE have spent appropriations received in the IIJA and IRA.

This statement addresses the status of EPA and DOE programs created or expanded with funds from the IIJA and IRA, and prior recommendations we have made to address related challenges we have identified. Specifically, the statement discusses (1) EPA, (2) DOE, and (3) key issues looking ahead.

This statement is based on 22 of our prior reports and testimonies reviewing EPA and DOE programs IIJA and IRA created or expanded from 2007 through 2024, as well as on preliminary observations from our ongoing work reviewing EPA's use of IRA appropriations. The statement is also based on updates on the status of EPA and DOE spending for selected programs we reviewed using publicly available information that we discussed with the agencies.

A detailed discussion of our objectives, scope, and methodologies, including our assessment of data reliability, is available for each of the prior reports we cite throughout this statement. For our ongoing work, we are examining how EPA obligated and expended IRA appropriations, made decisions regarding its use of IRA appropriations, and how EPA is overseeing its use of IRA appropriations. To complete this work, we are analyzing EPA data on its IRA obligations and expenditures, as well as reviewing documentation and interviewing EPA officials about their decisions for using IRA appropriations and their actions to oversee to them.

We conducted the work upon which this statement is based in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that

---

[6]GAO, *Oversight of Agency Spending: Implementing GAO Recommendations Could Help Address Previously Identified Challenges at Commerce, DOE, and EPA,* GAO-23-106726 (Washington, D.C.: Mar. 29, 2023).

GAO-25-108135
DOE AR 001141

the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Status and Challenges Identified in EPA's Management of Various Programs

We have issued 10 reports identifying challenges in various aspects of certain EPA programs related to water infrastructure, air quality, and grants. Our 10 reports included a total of 29 recommendations to EPA and one matter for congressional consideration to address these challenges. EPA has implemented 24 of the recommendations. The matter for congressional consideration has not been implemented. This section discusses EPA's State Revolving Fund programs, air quality monitoring programs, and grants management. It also addresses EPA's use of IRA appropriations and oversight of IRA spending.

## Clean Water and Drinking Water State Revolving Fund Programs

Through the federal Clean Water and Drinking Water State Revolving Fund (SRF) programs, EPA provides annual grants to states to capitalize state-level SRF programs that make loans for drinking water and wastewater infrastructure projects. The IIJA provided over $43 billion to EPA across five funding streams, which the agency is providing to state SRF programs.[7] This funding is being allocated to states using formulas prescribed by law. When the capitalization grants are awarded, the funds are then obligated by EPA to states. As of January 2025, EPA reported on its website that most fiscal year 2022 and fiscal year 2023 grants had been awarded, with eleven states partially funded or not yet funded in at least one of the five funding streams. For fiscal year 2024, EPA reported that six states had been fully awarded funding across all five funding streams, and eight states had received no awards.[8] The status of funds for the remaining states was mixed, with full or partial awards from some funding streams.[9]

EPA has implemented our two recommendations to enhance its monitoring and oversight of SRF funds. In 2015, we identified the need for

---

[7]The IIJA provided appropriations to the SRF programs for 5 years, fiscal years 2022–2026, across five funding streams, including over $23 billion for the SRF general programs, $15 billion for lead service line replacement, and $5 billion to address emerging contaminants. A portion of the funds is transferred to the EPA OIG for oversight.

[8]EPA officials said that grant awards change on a monthly basis, and numbers reflected on the EPA website were based on the awards made at the time of posting.

[9]To receive a capitalization grant, a state must apply for funding and prepare a plan that describes how it intends to use the SRF program funds, as well as how those uses support the overall goals of the SRF program. EPA officials said that, by law, states have up to 2 federal fiscal years of the appropriation to request and receive their capitalization grant award.

GAO-25-108135

DOE AR 001142

better financial indicators to monitor the sustainability of SRF funds.[10] One of our recommendations was that EPA should update its financial indicators guidance to include better information on the overall growth of state SRF funds. EPA addressed this recommendation in 2018, directing its regional managers to use new indicators in their review of state SRF programs. With these new indicators, EPA has been better able to support oversight and management of SRF fund growth.

In our prior work, we identified a number of factors that can affect the spending of SRF funds. For example, some communities have limited technical and financial capacity, which makes it difficult to assess their water and wastewater project needs or use the funding available from programs such as the SRFs.[11]

In 2024, we recommended that Congress consider revising the allotment formula for the Clean Water SRF program to clearly align with the program's goals and to require EPA to periodically calculate allotment percentages using the most recent data.[12] A panel of experts we convened recommended focusing allotment criteria on states' clean water needs, as well as on population and poverty. We reported that by taking actions such as sampling the needs of small communities and providing tools to estimate needs for noncentralized projects (e.g., nonpoint source pollution or stormwater controls), EPA could improve the results of its needs estimates. Based on these findings, we recommended that EPA take actions to improve the collection of Clean Water needs through its periodic surveys. EPA agreed with the three recommendations we made and has begun taking steps to address them. We are continuing to monitor their efforts to fully address the recommendations.

---

[10]GAO, *State Revolving Funds: Improved Financial Indicators Could Strengthen EPA Oversight*, GAO-15-567 (Washington, D.C.: Aug. 5, 2015). In 2015, we examined the financial indicators that EPA regions use in their reviews of states' SRF performance and compared them with leading financial management practices. We found that the financial indicators that EPA regional offices used as part of their annual reviews of SRF programs' performance did not demonstrate the financial sustainability of states' programs or project their future lending capacity.

[11]See GAO, *Drinking Water and Wastewater Infrastructure: Information on Identified Needs, Planning for Future Conditions, and Coordination of Project Funding*, GAO-17-559 (Washington, D.C.: Sept. 20, 2017).

[12]GAO, *Clean Water: Revolving Fund Grant Formula Could Better Reflect Infrastructure Needs, and EPA Could Improve Needs Estimate*, GAO-24-106251 (Washington, D.C.: July 19, 2024). As of February 2025, Congress had not yet taken actions to address the recommendation.

GAO-25-108135

DOE AR 001143

The EPA's Office of Inspector General (OIG) has published a number of reviews of the IIJA SRF funding and continues to review how the funds are being spent.[13] For example, in February 2025, the OIG reported that EPA guidance on the Drinking Water SRF Emerging Contaminants funds could more clearly identify criteria for non-PFAS contaminants.[14] We continue to coordinate with the OIG on IIJA and other work.

## Air Quality Monitoring

The IRA appropriated over $170 million to EPA for grants and activities related to air quality monitoring and deploying air quality sensors.[15] EPA and state and local agencies jointly manage the national ambient air quality monitoring system, which provides information that is essential for supporting Clean Air Act implementation and managing public risks from air pollution. EPA provides federal funding for the system through grants to tribal, state, and local air agencies. In addition, EPA has provided grants for community air monitoring projects conducted by groups including nonprofit organizations and tribal, state, and local agencies.[16] According to EPA officials, more than half of these projects planned to use lower cost air quality sensors.

In November 2020, we reported that air quality managers, researchers, and the public need additional information not currently provided by the air quality monitoring system to better understand and address health risks from air pollution.[17] In the report, we recommended that EPA, in consultation with state and local air agencies, develop and make public an air quality monitoring modernization plan to better meet the additional

---

[13]For example, see EPA Office of Inspector General, Infrastructure Investment and Jobs Act Oversight Plan—Year Three, 24-N-0036 (Washington, D.C.: May 6, 2024).

[14]EPA Office of Inspector General, EPA Guidance Addresses Implementation Requirements for Infrastructure Investment and Jobs Act for Drinking Water State Revolving Fund Emerging Contaminants Funding, but Clarification Is Needed Before More States Spend Funds, 25-P-0015 (Washington, D.C.: Feb. 12, 2025).

[15]See Pub. L. No. 117-169, § 60105(a)-(c), 136 Stat. 1067 (2022).

[16]In November 2022, EPA announced the selection of 132 air monitoring projects in 37 states to receive $53.4 million in funding from the American Rescue Plan Act of 2021 and the IRA to enhance air quality monitoring in communities across the United States.

[17]GAO, Air Pollution: Opportunities to Better Sustain and Modernize the National Air Quality Monitoring System, GAO-21-38 (Washington, D.C.: Nov. 12, 2020).

GAO-25-108135

DOE AR 001144

information needs of air quality managers, researchers, and the public.[18] EPA officials said that as of December 2024, the agency was actively engaging with tribal, state, and local air agencies and drafting an air quality monitoring modernization plan. In addition, EPA officials told us that the agency is using appropriations it received through the IRA, as well as through the American Rescue Plan Act of 2021, to enhance monitoring of certain air pollutants and fund air monitoring projects in communities across the United States. These officials said that the investments will help address the air quality monitoring information needs identified in our 2020 report. We are continuing to monitor EPA's efforts to address our recommendation.

## EPA Grants Management

In addition to grants for SRF funds, air quality monitoring, and related activities, EPA provides grants under numerous programs for a wide variety of purposes, including improving children's health, small business innovation research, and brownfields clean-up. We have issued five reports on EPA's grants management since 2015, and EPA has implemented 21 of 22 of our recommendations.[19] For example, we previously recommended that EPA develop clear guidance for tracking grants and determine how to make more complete information on discretionary grants publicly available.[20] EPA implemented both of these recommendations.

We also previously identified opportunities for EPA to improve grants monitoring. As of 2023, EPA had implemented nine of 10 of our recommendations made in two prior reports for improving grants monitoring, including by migrating to a new, comprehensive web-based IT

---

[18]We also recommended that EPA, in consultation with state and local agencies, develop, make public, and implement an asset management framework for consistently sustaining the national ambient air quality monitoring system. EPA fully addressed the recommendation after finalizing an asset management framework in January 2024. Air quality monitoring on tribal lands was outside the scope of our 2020 report on air quality monitoring, GAO-21-38.

[19]EPA's Office of Inspector General (OIG) has also examined the agency's grants management. For example, in 2022, the OIG issued considerations for EPA's implementation of grants through the Infrastructure Investment and Jobs Act. OIG officials used prior OIG and GAO findings that indicated deficiencies in EPA's administration and oversight of grants to inform these considerations. See Environmental Protection Agency, Considerations for the EPA's *Implementation of Grants Awarded Pursuant to the Infrastructure Investment and Jobs Act*, Report No. 22-N-0055 (Washington, D.C.: Aug. 11, 2022).

[20]GAO, *Grants Management: EPA Has Taken Steps to Improve Competition for Discretionary Grants but Could Make Information More Readily Available*, GAO-17-161 (Washington, D.C.: Jan. 23, 2017).

GAO-25-108135

DOE AR 001145

system in December 2020.[21] Additionally, we reported on workforce challenges affecting EPA's grants management. EPA implemented all 10 of our recommendations in this area, including developing a process for collecting and analyzing data on staffing for grant officers.[22]

## EPA's IRA Spending

The IRA provided EPA with about $41.5 billion for grants and other investments to reduce greenhouse gas emissions and enhance climate resilience across the nation. Our analysis of provisional EPA data shows the agency obligated nearly all the funds and about half was expended. As of January 20, 2025, EPA had obligated about $39.7 billion (96 percent) and about $20.3 billion (49 percent) of its IRA appropriations was expended.[23]

EPA obligated about 70 percent of the appropriations in fiscal year 2024 and another 26 percent in fiscal year 2025. The IRA appropriations directed EPA to establish several new grant programs and support other ongoing efforts.

[21]For example, in 2015 we found that EPA faced challenges monitoring compliance with grant management directives agency-wide, including limited electronic records and analytical capabilities of its IT systems. See GAO, *Grants Management: EPA Has Opportunities to Improve Planning and Compliance Monitoring*, GAO-15-618 (Washington, D.C.: Aug. 17, 2015). In addition, in 2016, we found that EPA could improve certain monitoring practices to ensure that grants achieve environmental and other program results. See GAO, *Grants Management: EPA Could Improve Certain Monitoring Practices*, GAO-16-530 (Washington, D.C.: July 14, 2016).

[22]For example, in 2017, we found that staffing levels for grants management personnel had declined over time and that EPA only partially followed leading practices for strategic workforce planning related to grants management. See GAO, *Grants Management: EPA Partially Follows Leading Practices of Strategic Workforce Planning and Could Take Additional Steps*, GAO-17-144 (Washington, D.C.: Jan. 9, 2017). In addition, in 2020 we identified staffing challenges for EPA personnel working on tribal grants, including heavy workloads and high turnover. See GAO, *EPA Grants to Tribes: Additional Actions Needed to Effectively Address Tribal Environmental Concerns*, GAO-21-150 (Washington, D.C.: Oct. 20, 2020).

[23]In federal budgeting, the term obligation refers to a legal liability to pay for goods and services the federal government ordered or received. Specifically, obligation refers to a definite commitment that creates a legal liability for the payment of goods and services ordered or received or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States. The standards for the proper reporting of obligations are found in section 1501(a) of title 31 of the United States Code. An expenditure is the actual spending of money—that is, the issuance of checks, disbursement of cash, or electronic transfer for funds—to liquidate a federal obligation.

GAO-25-108135

DOE AR 001146

| EPA's Greenhouse Gas Reduction Fund | EPA has obligated nearly 100 percent of the $27 billion provided by the IRA for the new Greenhouse Gas Reduction Fund, which is the largest amount of appropriations provided to EPA under the IRA. EPA obligated appropriations for the fund before they expired on September 30, 2024, and about $20 billion has been expended so far. To implement the fund, EPA created a new program office and established three subprograms for making competitive grants: the $14 billion National Clean Investment Fund, the $6 billion Clean Communities Investment Accelerator, and the $7 billion Solar for All program. |

Two of the subprograms—the National Clean Investment Fund and the Clean Communities Investment Accelerator—have made awards obligating about $20 billion of their combined funds. EPA officials stated that nearly all $20 billion has been expended by depositing the funds for the two subprograms with a U.S. Treasury-designated commercial bank acting as EPA's financial agent.[24] The financial agent will provide commercial banking and financial services for the grant awardees for these two subprograms.

- The National Clean Investment Fund awarded grants to three recipients to establish national-scale financial institutions to provide financing for low- and zero-emissions technology projects nationwide.

- The Clean Communities Investment Accelerator awarded grants to five recipients to provide funding and technical assistance to community lenders operating in low-income and disadvantaged communities for the purpose of providing financing for projects that reduce or avoid greenhouse gas emissions.

The third subprogram, the Solar for All program, awarded its $7 billion to a total of 60 grantees to expand existing and develop new low-income solar energy programs nationwide. EPA has obligated 100 percent of

---

[24]This funding arrangement differs from EPA's customary funding model, where funds obligated to grantees remain in the U.S. Treasury until they are disbursed. According to agency documentation, EPA chose this model to provide adequate capitalization to the recipients as required by the IRA and ensure the funds are used in a timely manner to fulfill the purposes of the grants. We are examining this arrangement in our ongoing work.

GAO-25-108135
DOE AR 001147

these funds and about $6.1 million (less than 1 percent) has been expended.[25]

Similar to other EPA grant programs, the agency's oversight of grant recipients includes several performance reporting requirements, such as requiring recipients to report progress on achieving outcomes and outputs outlined in their workplans. Recipients are responsible for ensuring that any subrecipients also comply with grants' terms and conditions, including reporting performance to EPA. Program beneficiaries—that is, the final recipients of grant funds that implement emission-reduction projects—are generally not subject to the same EPA terms and conditions as the grant recipients or subrecipients. Grant recipients or subrecipients impose terms and conditions for performance and reporting in their assistance agreements with beneficiaries. EPA recently finalized what performance information grant recipients will be required to report. The required information includes semi-annual, annual, and final progress reports; organizational disclosures; transaction- and project-level reports; and, for the Solar for All program, drawdown reports. The progress reports are to provide qualitative and quantitative information on key activities completed by recipients, show annual spending trends, and summarize outputs and outcomes achieved.

EPA officials we interviewed for our ongoing work told us they had not yet developed program-level performance goals and measures for the three subprograms. They said they first intended to collect evidence on each recipients' progress toward the program's three overarching objectives—that is, (1) reducing emissions of greenhouse gases and other air pollutants; (2) delivering benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities; and (3) mobilizing financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects. EPA officials stated that each recipient had performance goals and measures established in their workplans, and that EPA was closely monitoring their progress. However, EPA officials also told us they would need to collect evidence for 1 or 2 years before they

---

[25]To select recipients, all three subprograms developed eligibility requirements and evaluation criteria that reviewers used to assess each application. Review panels consisting of EPA staff and subject matter experts from across the federal government reviewed, scored, and ranked each application on these criteria. EPA officials told us that emissions reduction was a key evaluation criterion, and that EPA evaluated applicants on this and other key criteria on a per dollar basis to ensure comparability.

DOE AR 001148

could set program-level performance goals and measures for the three subprograms.

| | |
|---|---|
| EPA's Other Appropriations | The remaining amount of EPA's total IRA appropriation (about $14.5 billion) is spread across various sections. As of January 20, 2025, per provisional agency data, EPA had obligated about $12.7 billion and about $327.6 million had been expended. These appropriations are set to expire between fiscal years 2026 and 2031. The appropriations include, for example, $5 billion for Climate Pollution Reduction Grants (98 percent obligated) and $3 billion for Grants to Reduce Air Pollution at Ports (98 percent obligated). EPA divided programmatic and oversight responsibility for these appropriations among several of its existing program offices, and EPA plans to use its regular grants management process for overseeing these awards. To administer and oversee its IRA grants, EPA officials told us they follow the same general body of guidance based on law and regulations used to implement and manage all other EPA grant programs. As discussed earlier, we have reported on EPA's grants management for years. |

# Status and Challenges Identified in DOE's Management of Clean Energy Demonstrations and Loan Programs

We have issued 12 reports identifying challenges associated with DOE's Office of Clean Energy Demonstrations (OCED), Loan Programs Office (LPO), and other programs. Our 12 reports included a total of 31 recommendations and two matters for congressional consideration to address these challenges. DOE has implemented 19 of the recommendations. One matter for congressional consideration has been implemented and one has not been implemented.

| | |
|---|---|
| Office of Clean Energy Demonstrations | DOE established OCED in December 2021 to manage a historic amount of appropriated funding for clean energy demonstration projects. Such projects are intended to help lower the investment risks of new technologies and allow for additional private investment and commercialization of such technologies.<br><br>DOE was appropriated in the IIJA and IRA about $27 billion for fiscal years 2022 through 2026 to fund OCED-managed clean energy |

**GAO-25-108135**

DOE AR 001149

demonstration projects.[26] This funding covers eight portfolio areas including $8 billion for Regional Clean Hydrogen Hubs, about $7 billion for carbon capture and storage and direct air capture projects, and about $3 billion for advanced nuclear projects.

When establishing OCED, the office hired staff and developed or modified policies and procedures as it announced, evaluated, and awarded projects. In November 2024, we reported that OCED had awarded over 130 projects, committed about $18.8 billion to these projects, [27] and obligated about $1.6 billion to them.[28] From the time we issued our report through mid-January 2025, OCED finalized negotiations and awarded an additional 37 projects that had been previously selected. OCED obligated about $222 million to these awards.[29]

In our November 2024 report, we also found that OCED had been responsive to some of our relevant prior recommendations. Specifically:

- **Program design.** In a 2021 report, we recommended that the Office of Fossil Energy and Carbon Management (FECM), which previously managed carbon capture projects that are similar to those currently managed by OCED, improve its processes for carbon capture and storage demonstrations. Specifically, we recommended that FECM adopt a down-selection process—whereby DOE would select certain projects for initial funding and further review, and then select a subset of those projects for full funding.[30] We found that FECM had fully committed to some projects at their initial selection, which increased the risk of funding unsuccessful projects.

---

[26]This total also includes appropriations and repurposed unobligated balances in recent annual appropriations acts.

[27]Committed means here the total federal cost share amount for the full selected or awarded project (as identified in selection or award documentation). For awards with multiple phases, this represents the full federal amount if the project successfully meets all milestone requirements to advance to subsequent phases and is subject to future award negotiations at the end of each phase.

[28]GAO, *Clean Energy: New DOE Office Should Take Steps to Improve Performance Management and Workforce Planning,* GAO-25-106748 (Washington, D.C.: Nov. 14, 2024).

[29]A significant portion of these funds were concentrated in three large awards under the Hydrogen Hubs portfolio. Specifically, OCED obligated about $60.8 million to three Hydrogen Hub awards finalized from November 2024 through January 2025.

[30]GAO, *Carbon Capture and Storage: Actions Needed to Improve DOE Management of Demonstration Projects,* GAO-22-105111 (Washington, D.C.: Dec. 20, 2021).

**GAO-25-108135**

DOE AR 001150

Instead of a down-selection process, in general, OCED sought to reduce the risk of funding unsuccessful projects by building in go/no-go decision points into its awards.[31] Specifically, for demonstration programs, awardees must meet established project milestones before they are able to advance to subsequent phases, according to OCED documents.

This approach is similar to how FECM structured the carbon capture and storage awards we reviewed in our 2021 report. However, in our November 2024 report, OCED officials said that their approach to the go/no-go decisions will be more rigorous and include outside independent review. While OCED's intended actions are steps towards addressing our recommendation, we continue to monitor the extent to which OCED's use of decision points is more effective than we found it to be in our 2021 report.

- **Project selection.** In our May 2024 report, we recommended that FECM ensure that it adheres to guidance and only select projects that are deemed to be technically acceptable.[32] We had found that FECM had selected and awarded a project even though its technical score did not meet the office's established threshold. In our November 2024 report, we reviewed the awards OCED issued through July 2024 and found that OCED had only selected projects that met the technically acceptable criteria.

- **Award negotiations.** In our 2021 report, we also reported that DOE used expedited time frames to negotiate some projects—fewer than 3 months—based on DOE's desire to begin spending funds quickly. We found that these actions reduced DOE's ability to identify and mitigate technical and financial risks. We recommended that future carbon capture and storage demonstrations allow adequate time for negotiations prior to entering cooperative agreements. In our November 2024 report, we found that the time from project selection to award for some of OCED's larger awards was from about 7 months to 13 months, according to OCED's selection and award

---

[31]OCED adopted a process similar to down-selection for one of its 17 programs.

[32]DOE agreed with this recommendation. As of October 2024, DOE had directed staff to follow the guidance to ensure selected projects are technically acceptable. We are continuing to monitor to ensure staff adhere to this guidance. GAO, *Decarbonization: Opportunities Exist to Improve the Department of Energy's Management of Risks to Carbon Capture Projects*, GAO-24-106489 (Washington, D.C.: May 16, 2024).

GAO-25-108135

DOE AR 001151

announcements.[33] For the 37 OCED awards issued since our November 2024 report, negotiations took on average about 10 months, ranging from about 7 months to 15 months. While DOE has made progress towards addressing our recommendation, this recommendation has not been fully implemented.

Also in our November 2024 report, we found that while OCED's activities followed some leading practices to enhance federal agency coordination, performance management, and workforce planning, DOE should take additional steps. Specifically, OCED's goals do not cover all its activities and not all OCED's long-term goals have associated near term-measurable goals. Furthermore, at the time of our report, OCED stated that it needed to fill about 100 more positions to fully staff the office to meet its organizational needs, but OCED had not developed a strategic workforce plan. We recommended that OCED take steps to fully implement leading practices for workforce planning by developing a strategic workforce plan and processes to evaluate progress toward OCED's human capital goals. OCED agreed with this recommendation, and we are monitoring its implementation. As of February 19, 2025, OCED anticipated that 62 staff would be lost through planned resignations and the dismissal of probationary employees—representing about 20 percent of the OCED workforce.

Our November 2024 report did not examine OCED's oversight of awarded projects because few awards had been made at the time of our review. However, we have made prior recommendations related to oversight of nuclear and carbon capture projects that had previously been managed by other DOE offices. While DOE has made some progress, these recommendations have not been fully implemented. Specifically:

- In September 2022, we reported that DOE planned to use external independent reviews to oversee Advanced Reactor Demonstration Program awards but had not institutionalized these plans.[34] We recommended that DOE document and institutionalize risk management processes for large nuclear energy demonstration

---

[33]These awards include Regional Clean Hydrogen Hubs and carbon capture demonstrations that were awarded as of October 2024.

[34]GAO, *Nuclear Energy Projects: DOE Should Institutionalize Oversight Plans for Demonstrations of New Reactor Types,* GAO-22-105394 (Washington, D.C.: Sept. 8, 2022).

GAO-25-108135

DOE AR 001152

projects. DOE has since taken some action to address it through OCED's management of these projects.

- In December 2021, we found that DOE supported projects even though they were not meeting required key milestones and bypassed cost controls designed to limit its financial exposure. As a result, the agency spent nearly $472 million on four unbuilt coal facilities.[35] We recommended that DOE more consistently administer projects against established scopes, schedules, and budgets. As of January 2025, OCED has made some progress, but completion of its actions remains pending.

## Loan Programs Office

DOE's Loan Programs Office is to provide loans and loan guarantees for innovative and high-impact energy-related ventures. The IIJA and the IRA added two new loan programs to LPO's three active programs and provided over $350 billion in new loan authority for LPO, with much of the loan authority expiring by 2028.[36] The two new programs were the Carbon Dioxide Transportation Infrastructure Finance and Innovation Act Program and the Title XVII Energy Infrastructure Reinvestment Program. The two laws also expanded the eligibility or coverage for existing programs, for example to include medium- and heavy-duty vehicles under the Advanced Technology Vehicles Manufacturing Program. Industry interest in and applications to LPO's loan programs increased substantially starting in 2021.

The loans and guarantees LPO closed in the last quarter of calendar year 2024 account for about half of the total that the office has closed under its five current programs. Specifically, since the first loans and guarantees under these programs were made in 2009 through December 2024, LPO had closed loans or loan guarantees for a total of 24 projects with a

---

[35]While this report reviewed DOE's Office of Fossil Energy and Carbon Management carbon capture and storage demonstrations, according to DOE officials, OCED is now responsible for carbon capture demonstrations moving forward and DOE has indicated to us that OCED is best positioned to evaluate our recommendations and develop a corrective action plan.

[36]The total loan authority for each program, or the amount of loans and loan guarantees LPO may issue for each of the programs, is determined in one of two ways. First, Congress may authorize a maximum amount for the loans or loan guarantees that can be made. LPO may not exceed this amount unless Congress amends the legislation. Second, LPO may also be limited by congressional appropriations for credit subsidy cost. LPO estimates the amount of loan authority it can support based on the dollar amount Congress appropriates for credit subsidy cost, and if that amount is lower than any amount authorized by Congress, LPO is limited by available appropriations. LPO also continues to monitor several loans from the Title XVII Renewable Energy Loan Guarantee Program (Section 1705), for which program authority expired September 30, 2011.

GAO-25-108135
DOE AR 001153

combined obligated value of $52.5 billion (see table 1). In the last three months of 2024, LPO reported it closed 11 loans or loan guarantees with a combined value of $24.4 billion.

**Table 1: Loan Programs Office Number and Value of Projects Achieving Financial Close, as of December 2024**

| | Title XVII Clean Energy Financing Program | Tribal Energy Financing Program | Advanced Technology Vehicles Manufacturing Program | Carbon Dioxide Transportation Infrastructure Finance and Innovation Act Program | Title XVII Energy Infrastructure Reinvestment Program | Total[c] |
|---|---|---|---|---|---|---|
| **Number of projects achieving financial close (value, billions)** | | | | | | |
| **January 2009 - December 2021** | 1 ($11.6)[a] | 0 ($0) | 5 ($8.4) | N/A[b] | N/A[b] | **6 ($20.0)** |
| **January 2022 – September 2024** | 2 ($3.8) | 1 ($0.1) | 3 ($2.9) | 0 ($) | 1 ($1.4) | **7 ($8.2)** |
| **October 2024 – December 2024** | 3 ($1.9) | 0 ($0) | 6 ($20.6) | 0 ($0) | 2 (1.9) | **11 ($24.4)** |
| **Total[c]** | **6 ($17.3)** | **1 ($0.1)** | **14 ($31.2)** | **0 ($0)** | **3 ($3.3)** | **24 ($52.5)** |

Source: GAO analysis of DOE documentation and data. | GAO-25-108135

[a]The Loan Programs Office has closed on a total of 10 loans on the Vogtle nuclear power plant, we report these as one project.

[b]This program did not yet exist or had not yet begun accepting applications during this period.

[c]Totals may not sum due to rounding.

After a loan or loan guarantee reaches financial close, LPO's practice is to continue to monitor it until it is fully paid. We have previously reported on the importance of monitoring loans and guarantees to proactively manage their risks and protect the financial interests of the federal government and the taxpayer.[37] In 2014, we made four recommendations to help ensure LPO was effectively monitoring its loans, all of which were implemented, including that the office staff key positions in its loan monitoring area. However, given the substantial increase in loan activity in the last 3 months of 2024, it is uncertain whether LPO can still ensure it has the capacity and expertise to effectively monitor these loans and guarantees for years to come. We will be examining this in future work.

[37]GAO, *DOE Loan Programs: DOE Should Fully Develop Its Loan Monitoring Function and Evaluate Its Effectiveness,* GAO-14-367 (Washington, D.C.: May 1, 2014).

**GAO-25-108135**

DOE AR 001154

# Key Issues Looking Ahead

As we have previously reported, there are risks involved with major new programs, especially when funding is awarded on a compressed schedule.[38] At this point, EPA and DOE have stood up programs and issued awards, and now their emphasis turns to monitoring and overseeing those awards.

We have also previously reported on challenges to monitoring and oversight, including managing fraud risk, adhering to cost controls, and ensuring programs have the right policies and expertise in place. Monitoring existing awards may require different skills and expertise than evaluating award applications. In this regard, the staff reductions at OCED and potentially other offices have the potential to adversely affect the ability to monitor existing projects, and could increase the associated fraud and financial risks. Staff reductions may also affect the quality of loan and grant awards.

Currently, we are performing ongoing work regarding EPA spending of IRA appropriations. We are assessing EPA's process for making spending decisions in light of relevant agency polices, such as EPA's Competition Policy, and other federal requirements, such as OMB's *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (as codified at 2 C.F.R. Part 200).

We are also examining how EPA is overseeing its use of IRA appropriations to ensure they meet IRA and grant requirements. Specifically, we are assessing EPA's monitoring and oversight of grant recipients and the extent to which the oversight extends to program beneficiaries. Our audit work will also examine how agency officials are implementing EPA's processes for program management, performance measurement, and recipient performance monitoring.

GAO is performing other ongoing work examining how EPA and DOE are spending and overseeing the funds they received through the IIJA and IRA, including reviews of the following:

---

[38]For example, see GAO-23-106726 and GAO-22-105111.

- Potential fragmentation, overlap, and duplication among EPA and other federal programs that fund non-diesel school buses;[39]

- Funding for water and wastewater infrastructure improvements for disaster resilience, including from EPA;

- DOE's Loan Programs Office;

- DOE's Office of Clean Energy Demonstrations oversight of awarded projects; and

- EPA's, DOE's, and other agencies' oversight of selected programs, including EPA's Greenhouse Gas Reduction Fund and DOE's Hydrogen Hubs program, to help prevent fraud, waste and abuse.

Chairman Palmer, Ranking Member Clarke, and Members of the Subcommittee, this completes our prepared statement. We would be pleased to respond to any questions you may have at this time.

## GAO Contacts and Staff Acknowledgments

If you or your staff have questions about this statement, please contact J. Alfredo Gómez, Director, Natural Resources and Environment at (202) 512-3841 or GomezJ@gao.gov or Frank Rusco, Director, Natural Resources and Environment at (202) 512-3841 or RuscoF@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this statement.

GAO staff who made key contributions to this testimony are Quindi Franco and Chad Gorman (Assistant Directors), Colson Campbell Ricciardi (Analyst in Charge), John Delicath, and Mick Ray. Other contributors include Matthew Bond, Antoinette Capaccio, Joseph Capuano, Caitlin Cusati, Lee Carroll, Maggie Childs, Marissa Dondoe, Wil Gerard, Ivan Hernandez, Michael Hoffman, Anne Hobson, Susan Iott, Chaya Johnson, Tricia Moye, Marietta Revesz, Kate Shouse, Karla Springer, Matthew Tabbert, Linda Tsang, Jeremy Williams, and Rebecca Yurman. Additional contributors are listed in the reports on which this statement is based.

---

[39]For example, the IIJA appropriated a total of $5 billion from fiscal year 2022 through fiscal year 2026 to EPA for the Clean School Bus program. 42 U.S.C. § 16091. The IRA appropriated $1 billion from fiscal year 2022 through fiscal year 2031 for EPA to establish the Clean Heavy-Duty Vehicles program, which offers grants to subsidize the purchase of zero-emission heavy-duty vehicles, including certain school buses. 42 U.S.C. § 7432. The IIJA also appropriated $500 million from FY2022 through FY2026 for DOE to administer grants for energy improvements at public school facilities, including the purchase of alternative fueled buses and other vehicles. 42 U.S.C. § 18831.

GAO-25-108135

DOE AR 001156

# Related GAO Products

*Clean Energy: New DOE Office Should Take Steps to Improve Performance Management and Workforce Planning*, GAO-25-106748. Washington, D.C.: November 14, 2024.

*Clean Water: Revolving Fund Grant Formula Could Better Reflect Infrastructure Needs, and EPA Could Improve Needs Estimate*, GAO-24-106251. Washington, D.C.: July 19, 2024.

*Decarbonization: Opportunities Exist to Improve the Department of Energy's Management of Risks to Carbon Capture Projects*, GAO-24-106489. Washington, D.C.: May 16, 2024.

*Air Quality Sensors: Policy Options to Help Address Implementation Challenges*, GAO-24-106393. Washington, D.C.: March 19, 2024.

*Oversight of Agency Spending: Implementing GAO Recommendations Could Help Address Previously Identified Challenges at Commerce, DOE, and EPA*, GAO-23-106726. Washington, D.C.: March 29, 2023.

*Nuclear Energy Projects: DOE Should Institutionalize Oversight Plans for Demonstrations of New Reactor Types*. GAO-22-105394. Washington, D.C.: September 8, 2022.

*Carbon Capture and Storage: Actions Needed to Improve DOE Management of Demonstration Projects*. GAO-22-105111. Washington, D.C.: December 20, 2021.

*Air Pollution: Opportunities to Better Sustain and Modernize the National Air Quality Monitoring System*, GAO-21-38. Washington, D.C.: November 12, 2020.

*EPA Grants to Tribes: Additional Actions Needed to Effectively Address Tribal Environmental Concerns*, GAO-21-150. Washington, D.C.: October 20, 2020.

*Drinking Water and Wastewater Infrastructure: Information on Identified Needs, Planning for Future Conditions, and Coordination of Project Funding*, GAO-17-559. Washington, D.C.: September 20, 2017.

*Grants Management: EPA Has Taken Steps to Improve Competition for Discretionary Grants but Could Make Information More Readily Available*, GAO-17-161. Washington, D.C.: January 23, 2017.

GAO-25-108135

DOE AR 001157

**Related GAO Products**

*Grants Management: EPA Partially Follows Leading Practices of Strategic Workforce Planning and Could Take Additional Steps*, GAO-17-144. Washington, D.C.: January 9, 2017.

*Grants Management: EPA Could Improve Certain Monitoring Practices.* GAO-16-530. Washington, D.C.: July 14, 2016.

*Grants Management: EPA Has Opportunities to Improve Planning and Compliance Monitoring.* GAO-15-618. Washington, D.C.: August 17, 2015.

*State Revolving Funds: Improved Financial Indicators Could Strengthen EPA Oversight.* GAO-15-567. Washington, D.C.: August 5, 2015.

*DOE Loan Programs: Current Estimated Net Costs Include $2.2 Billion in Credit Subsidy, Plus Administrative Expenses*, GAO-15-438. Washington, D.C.: April 27, 2015.

*DOE Loan Programs: DOE Should Fully Develop Its Loan Monitoring Function and Evaluate Its Effectiveness.* GAO-14-367. Washington, D.C.: May 1, 2014.

*Department of Energy: Status of Loan Programs*, GAO-13-331R. Washington, D.C.: March 15, 2013.

*DOE Loan Guarantees: Further Actions Are Needed to Improve Tracking and Review of Applications*, GAO-12-157. Washington, D.C.: Mar. 12, 2012.

*Department of Energy: Advanced Technology Vehicle Loan Program Implementation Is Under Way, but Enhanced Technical Oversight and Performance Measures Are Needed*, GAO-11-145. Washington, D.C.: February 28, 2011.

*Department of Energy: Further Actions Are Needed to Improve DOE's Ability to Evaluate and Implement the Loan Guarantee Program*, GAO-10-627. Washington, D.C.: July 12, 2010.

*Department of Energy: New Loan Guarantee Program Should Complete Activities Necessary for Effective and Accountable Program Management*, GAO-08-750. Washington, D.C.: July 7, 2008.

GAO-25-108135

DOE AR 001158

**Related GAO Products**

*The Department of Energy: Key Steps Needed to Help Ensure the Success of the New Loan Guarantee Program for Innovative Technologies by Better Managing Its Financial Risk.* GAO-07-339R. Washington, D.C.: February 28, 2007.

**GAO-25-108135**
DOE AR 001159

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

DOE AR 001160

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, X, and YouTube. <br> Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. <br> Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: <br><br> Website: https://www.gao.gov/about/what-gao-does/fraudnet <br><br> Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Sarah Kaczmarek, Managing Director, KaczmarekS@gao.gov, (202) 512-4800, U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

DOE AR 001161



April 2, 2025

DOE AR 001162

# Review of IIJA/IRA Financial Assistance Activities & Awards

- DOE IIJA/IRA financial assistance activities are undergoing a review by the Secretary to ensure all actions are consistent with Administration policies and priorities, including budgetary priorities.

- A comprehensive review is necessary

  o To determine if these actions align with Congressional authorizations and the Administration's policies and priorities;

  o To ensure that appropriate resources are allocated efficiently; and

  o To ensure that the Department's initiatives are in line with the statutory mission of DOE and the policies and priorities of the Administration and DOE.

- At this time, Program staff may not publish IIJA/IRA NOFOs, conduct Merit Reviews, negotiate new awards, or modify existing awards.

- DOE Leadership will advise when the review is complete.

*While this review is ongoing, please refer to the following slides for guidance on allowable IIJA/IRA financial assistance activities.*

This presentation is Controlled Unclassified Information (CUI) for internal use only and must not be shared with audiences external to DOE. Not for release – Do not cite.



DOE AR 001163

# IIJA/IRA Communication Guidance

| Description | OCFO Tool Required | Allowable? |
|---|---|---|
| Communication in support of **Invoice Payments** NOTE: Use caution in communicating with recipients about costs associated with DEI/CBP/J40 activities. | No | Yes |
| Communicating with recipients regarding **quarterly assessments, reporting, invoicing, general project/award oversight, and closeout**. | No | Yes |
| Communicating with applicants, selectees regarding **negotiations** or with recipients regarding **continuation applications**, **scope modifications**, or **lifting conditions**. | No | No |

- *If IIJA/IRA recipients or stakeholders contact DOE regarding status, staff may advise that IIJA/IRA financial assistance is under review and DOE will respond when the review is complete.*
- *DOE staff must refrain from discussing the scope or timing of the review or speculation on future DOE actions. Under no circumstance should DOE staff promise or imply any DOE action regarding any IIJA/IRA NOFO, application, selection, or award.*

*This presentation is Controlled Unclassified Information (CUI) for internal use only and must not be shared with audiences external to DOE. Not for release – Do not cite.*

DOE AR 001164


U.S. DEPARTMENT *of* ENERGY

# IIJA/IRA NOFOs, Merit Reviews, and Negotiations Guidance

| Description | OCFO Tool Required | Allowable? |
|---|---|---|
| Draft NOFOs | | |
| Publish NOFOs | No | No |
| Conduct Merit Reviews | | |
| Negotiate New Awards | Yes | No |

*This presentation is Controlled Unclassified Information (CUI) for internal use only and must not be shared with audiences external to DOE. Not for release – Do not cite.*

DOE AR 001165

U.S. DEPARTMENT of ENERGY

# IIJA/IRA Award Action Guidance

| Description | OCFO Tool Required | Allowable? |
|---|---|---|
| • Administrative modifications for TPO/GMS changes<br>• Mutually (recipient & DOE) agreed upon de-obligations at closeout<br>• Award Closeout<br>• Prizes where the awardee has already been announced | No | Yes |
| • Administrative modifications for critical PI/BC changes<br>• No-Cost Time Extensions<br>• Budget Modifications<br>• Terminations<br>• Novations | No | Request approval from Head of Departmental Element/Administration Designee (HDE/AD) or designee* |
| • Negotiating new awards<br>• Processing new awards in STRIPES Lifting conditions, modifying scope, or continuation into the next budget period<br>• Increasing project costs or incremental funding<br>• Prizes: new prizes selections and new selection announcements | Yes | No* |

*** If failure to execute these actions will jeopardize the award meeting its objective, provide the details of the award and a full explanation of the facts and circumstances which generate the concern and a recommendation for the specific action to your HDE/AD or designee who will coordinate with the cognizant Under Secretary for review and decision by DOE Leadership.**

*Enacted Congressionally Directed Spending Projects are base-funded and Program may proceed with new awards and modifications.*

*This presentation is Controlled Unclassified Information (CUI) for internal use only and must not be shared with audiences external to DOE. Not for release – Do not cite.*



DOE AR 001166
U.S. DEPARTMENT *of* ENERGY

# IIJA/IRA Invoices

| Description | OCFO Tool Required? | Allowable? |
|---|---|---|
| Invoice Payments (ASAP) | | |
| Invoice Payments (FAST) that meet one of the following conditions:<br><br>1) Do not include DEIA/CBP activities; or<br><br>2) Include DEIA/CBP activities that were performed prior to January 27th (GFO, OCED) or January 28th (NETL). | No | Yes |
| Invoice Payments (FAST) that include DEIA/CBP activities that were performed after January 27th (GFO, OCED) or January 28th (NETL). | No | Consult Business Office, Program Office, and GC prior to finalizing due to litigation. |

*This presentation is Controlled Unclassified Information (CUI) for internal use only and must not be shared with audiences external to DOE. Not for release – Do not cite.*

DOE-AR-001167

U.S. DEPARTMENT *of* ENERGY



DOE AR 001168



# Department of Energy
Washington, DC  20585

April 3, 2025

## PRIVILEGED ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

MEMORANDUM FOR HEADS OF DEPARTMENTAL ELEMENTS

FROM:                 DAVID R. TAGGART
                        ACTING GENERAL COUNSEL

SUBJECT:          Agency Review of IIJA and IRA Awards


Within the Department of Energy (DOE) it is imperative to ensure a deliberate approach to DOE's programmatic and administrative policies and priorities which are consistent with President Trump's policies and priorities. To that end, effective immediately and until further notice, a review under varying criteria will be undertaken by DOE on all Infrastructure Investment and Jobs Act (IIJA) and Inflation Reduction Act (IRA) awards and Notices of Funding Opportunities (NOFOs) to ensure all such actions are consistent with Administration policies and priorities, including budgetary priorities.

A comprehensive review is necessary 1) to determine if these actions align with Congressional authorizations and the Administration's policies and priorities, 2) to ensure that appropriate resources are allocated efficiently, and 3) to ensure that the Department's initiatives are in line with the statutory mission of DOE and the policies and  priorities of the Administration and DOE.

DOE staff should not enter into any negotiations or communications with award recipients or stakeholders for actions subject to this on-going review. If recipients or stakeholders contact DOE, staff may advise that the award is under review and DOE will respond when the review is completed.  DOE staff must refrain from further discussion of either the scope or timing of the review or speculation about future DOE actions.  Under no circumstances should DOE staff promise or imply any DOE action regarding any award, NOFO or application.

Administrative acts under existing awards (e.g. no-cost time extensions to pay outstanding invoices, mutual terminations, certain modifications that do not impact future funding, novations, etc.) may proceed with Heads of Departmental Elements (HDE)  (or their designee) approval.  No DOE staff shall conduct negotiations with any award recipient.   Under no circumstances may DOE Staff infer, promise, suggest or speculate that DOE has taken, or may take, an affirmative action to continue a financial assistance action.

DOE AR 001169

2

If Departmental Elements are concerned that a delay for a specific award will jeopardize the award meeting its objectives (e.g. a critical part cannot be ordered or delivered such that the project will be delayed more than a year), they should provide the details of the award and a full explanation of the facts and circumstances which generate the concern and a recommendation for specific action.  The foregoing shall be transmitted through their HDE to the cognizant Under Secretary for review and decision by DOE leadership.

The restrictions above do not apply to any actions under annually appropriated funding through FY24, including Congressionally Directed Spending projects.

Contact your applicable Under Secretary with any questions.

Cc:  All Under Secretaries

DOE AR 001170

1

DOE AR 001171



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**GENERAL COUNSEL**

April 16, 2025

MEMORANDUM FOR AGENCY GENERAL COUNSELS

FROM:          Mark R. Paoletta
               General Counsel

SUBJECT:       Preliminary Injunction Against OMB Memorandum M-25-11

This memorandum is notifying you about a preliminary injunction that was entered on April 15, 2025 in the case of *Woonasquatucket River Watershed Council et al. v. USDA et al.*, No. 25-cv-97-MSM-PAS (D. R.I.), ECF No. 45 (Apr. 15, 2025).  The case involves a challenge to a purported "funding freeze" of money appropriated un

der the Infrastructure Investment and Jobs Act (Pub. L. No. 117-58, Nov. 15, 2021) and the Inflation Reduction Act (Pub. L. No. 117-169, Aug. 16, 2022), including OMB Memorandum M-25-11, *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy* (Jan. 21, 2025). You should refer to the Court's Memorandum and Order, in particular the operative directives on pages 61-62, for a complete understanding of the preliminary injunction's requirements.

Under the terms of the Court's Order, "Defendants Energy, EPA, HUD, Interior, and USDA are ENJOINED from freezing, halting, or pausing on a non-individualized basis the processing and payment of funding that (1) was appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act and (2) has already been awarded," and those same agencies must "take immediate steps to resume the processing, disbursement, and payment of already-awarded funding appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act, and to release awarded funds previously withheld or rendered inaccessible."

The Court's Memorandum describes the Order as "not requiring the Government to do anything over than maintain their current obligations or, alternatively, pause or terminate them in an individualized way consistent with law."  (Pg. 48 n.10.)

Additionally, the Court states that its "order does not prevent the Government from making funding decisions in specific cases according to processes like those established in 2 C.F.R. § 200.340[.]"  (Pg. 56).

We strongly disagree with the Court's Order, which purports to usurp the President's Article II authorities. Regardless, on behalf of OMB and the Director of the National Economic Council, **all agencies are hereby instructed**:

- Your agency "may not take any steps to implement, give effect to, or reinstate under a different name the unilateral, non-individualized directives in Memorandum M-25-11 with respect to the disbursement of all open awards under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act."

- Your agency must "continue releasing any disbursements on open awards that were paused due to or in reliance on Memorandum M-25-11."

- Your agency may, at your agency's discretion, make individualized funding decisions, consistent with your agency's statutory and other authority.

These instructions do not eliminate or supersede any compliance obligations set forth in my memoranda of February 27, 2025 or March 10, 2025, relating to preliminary injunctions separately entered in *National Council of Nonprofits et al. v. Office of Management and Budget et al.*, No. 25-cv-239-LLA (D.D.C.), and *New York et al. v. Trump et al.*, No. 25-cv-39-JJM-PAS (D. R.I.).  To the extent you have questions about your obligations pursuant to this memorandum or any court order, please contact your agency General Counsel.  Thank you for your attention to this matter.


Attachment (copy of preliminary injunction order)

DOE AR 001173



**Department of Energy**
Washington, DC  20585

May 9, 2025

MEMORANDUM FOR DISTRIBUTION

FROM:             CHRISTOPHER S. JOHNS
                  DEPUTY CHIEF FINANCIAL OFFICER
                  OFFICE OF THE CHIEF FINANCIAL OFFICER

SUBJECT:          Financial Transaction Review Utilizing the CFO Workflow Tool

This memorandum communicates guidance on the use of the CFO Workflow Tool to facilitate the review of financial transactions by Administration Designees. Previous restrictions on signature authority apply only when use of the CFO workflow tool is required.

This memorandum expires 1 year from issuance, or when otherwise amended or cancelled. The CFO workflow tool remains an interim process step that will be continued as needed to facilitate Administration Designee (AD) review during the current transitional period as DOE pursues workforce restructuring and key DOE nominees await confirmation. For financial assistance actions, Administration Designees will coordinate their review with the cognizant Under Secretary office to ensure appropriate leadership engagement.

The Administration Designee is the Senior political appointee assigned to a Departmental Element. If no appointee is assigned to a Departmental Element, the AD is the Acting Under Secretary. For Departmental Elements reporting directly to the Deputy Secretary that do not have an assigned political appointee, the Administration Designee is the Chief of Staff or their designee.

This memorandum supersedes all previous CFO guidance regarding the workflow process to facilitate AD review, including:
- "Financial Implementing Guidance for Administration Direction," February 7, 2025
- "Detailed Financial Implementation Guidance based on the February 7, 2025, Memo from Christopher Johns"
- "Frequently Asked Questions on the Financial Implementation Guidance based on the February 7, 2025, Memo from Christopher Johns," February 11, 2025; February 12, 2025, and February 14, 2025
- "Updates to the Financial Implementation Guidance based on the February 7, 2025, memo from Christopher Johns," February 24, 2025
- "Second Update to the Financial Implementation Guidance based on the February 7, 2025, Memo from Christopher Johns," February 28, 2025.
- All related FAQs or question and answer documents provided informally by the Office of the CFO.

DOE AR 001174

This memorandum does not apply to the National Nuclear Security Administration (NNSA) or NNSA funding, the Office of Intelligence and Counterintelligence, or to the Power Marketing Administrations; these offices have separate approvals granted by the Secretary.

For questions regarding the workflow process, please contact Tom Fields, Deputy Director for Strategic Resources, at tom.fields@hq.doe.gov or by Teams.

DOE AR 001175

## Required Use of the CFO Workflow Tool
## May xx, 2025 CFO Guidance

| TRANSACTION TYPE | WORKFLOW TOOL IS **NOT** REQUIRED *SIGNATURE AUTHORITY NOT RESTRICTED* | WORKFLOW TOOL REQUIRED *SIGNATURE AUTHORITY RESTRICTED* | WORKFLOW TOOL OPTIONAL |
|---|---|---|---|
| **FEDERAL EMPLOYEE TRANSACTIONS** | • Payroll from all funding sources<br>• Payment of approved travel<br>• Training using non-IRA/IIJA funding | • Training using IRA/IIJA funding | • Travel (must be approved by the Administration Designee; use of the tool is optional) |
| **CONTRACTS, FINANCIAL ASSISTANCE, AND OTHER TRANSACTION AUTHORITY (SEE LIMITED EXCEPTIONS IN "OTHER" SECTION BELOW)** | • Invoice payments (all appropriations)<br>• Payments via ASAP (all appropriations)<br>• Selections/subawards made by PIAs after the initial obligation of DOE funding<br>• Administrative modifications that do not obligate additional funding, modify scope, or extend the period of performance. | • New Announcements—including contract RFPs and financial assistance NOFOs/FOAs (all appropriations)<br>• New awards (all funding sources)<br>• Adding funding to existing awards (all appropriations)<br>• Lifting conditions, modifying scope, or extending the period of performance on existing awards (all appropriations)<br>• New obligations on PIAs (Partnership Intermediary Agreements)<br>• New funds-out interagency agreements (all appropriations)<br>• Prizes—new announcements and selections (all appropriations) | |

DOE AR 001176

| TRANSACTION TYPE | WORKFLOW TOOL IS **NOT REQUIRED** *SIGNATURE AUTHORITY NOT RESTRICTED* | WORKFLOW TOOL **REQUIRED** *SIGNATURE AUTHORITY RESTRICTED* | WORKFLOW TOOL OPTIONAL |
|---|---|---|---|
| **DOE( CONTRACTOR- OPERATED FACILITIES** | • New obligations (non-IRA/IIJA funding)<br>• Contact/Laboratory payments utilizing ASAP (all appropriations)<br>• Funds-in reimbursable work agreements with other Federal agencies (includes SPP) | New obligations of IRA/IIJA funding (excluding SC lab infrastructure funding) | Non-Federal funds-in reimbursable work (Labs must ensure consistency with administration guidance) |
| **OTHER** | • Working Capital Fund contributions and expenditures from the fund (including contract obligations)<br>• Contributions and expenditures (including contract obligations) for EITS and related CIO enterprise support for DOE programs<br>• Loan transactions (separately approved by the LPO Director)<br>• Miscellaneous transactions through HQ Vendor Pay<br>• Congressionally-Directed spending<br>• Payments in Lieu of Taxes (PILT) | | |

DOE AR 001177



# OFFICE OF INSPECTOR GENERAL
## U.S. Department of Energy

# INSPECTION REPORT

DOE-OIG-25-19    May 2025

# GRID DEPLOYMENT OFFICE'S IMPLEMENTATION OF THE GRID RESILIENCE AND INNOVATION PARTNERSHIPS PROGRAM

DOE AR 001178



**Department of Energy**
Washington, DC 20585

May 14, 2025

MEMORANDUM FOR THE DIRECTOR, GRID DEPLOYMENT OFFICE

SUBJECT: Inspection Report: *Grid Deployment Office's Implementation of the Grid Resilience and Innovation Partnerships Program*

The attached report discusses our inspection of the implementation of the Grid Resilience and Innovation Partnerships Program. This report identifies that the Department's Grid Deployment Office did not adequately develop and document its internal controls system, including oversight and risk assessment processes. This report contains two recommendations that, if fully executed, should help the Grid Deployment Office improve its internal controls and its implementation of the $10.5 billion Grid Resilience and Innovation Partnerships Program.

We conducted this inspection from March 2024 through October 2024 in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (December 2020). We appreciated the cooperation and assistance received during this inspection.

Sarah Nelson
Assistant Inspector General
   for Management
*Performing the Duties of the Inspector General*
Office of Inspector General

cc: Chief of Staff

**DOE-OIG-25-19**

DOE AR 001179



**Department of Energy**
**Office of Inspector General**

**Grid Deployment Office's Implementation of the Grid Resilience and Innovation Partnerships Program**
(DOE-OIG-25-19)

## WHY THE OIG PERFORMED THIS INSPECTION

The Department of Energy's Grid Deployment Office (GDO) is responsible for administering $10.5 billion in Infrastructure Investment and Jobs Act funds through the Grid Resilience and Innovation Partnerships (GRIP) Program. GRIP's three focus areas include: (1) grants to mitigate storm and natural disaster damage to the grid; (2) grants to increase transmission capacity and to integrate renewable energy sources and other grid-edge devices; and (3) cooperative agreements to support projects enhancing grid resiliency and reliability.

We initiated this inspection to determine whether GDO had adequate internal controls and resources to implement the GRIP Program.

### What Did the OIG Find?

We found that GDO did not have adequate internal controls and may not have adequate staff resources to implement the GRIP Program. Specifically, GDO did not develop and document an effective internal controls system, including the control environment and risk assessment, as required. Further, GDO may not have sufficient staff to oversee the Federal activities that support the GRIP Program.

The issues we identified occurred in part because GDO: (1) followed a phased implementation approach for internal controls; and (2) did not distinguish between program-level and project-specific responsibilities.

### What Is the Impact?

Without a robust internal controls system, GDO may not identify risks that could negatively impact the GRIP program's outcomes. These impacts could include improperly reimbursed costs, fraud, waste, and undisclosed conflicts of interest. Additionally, GDO may have difficulty identifying and addressing program performance issues—including the performance of organizations, such as the National Energy Technology Laboratory, which GDO depends upon for ensuring GRIP Program success.

### What Is the Path Forward?

To address the issues identified in this report, we made two recommendations that, if fully executed, should help ensure that GDO's internal controls and resources are adequate for implementing the GRIP Program.

**DOE-OIG-25-19**

## BACKGROUND

The Department of Energy's Grid Deployment Office (GDO) was established in August 2022 to drive investments in modernizing and expanding the capacity of the Nation's power grid and deploy cheaper, cleaner energy across America. GDO administers $10.5 billion in funding from the Infrastructure Investment and Jobs Act through the Grid Resilience and Innovation Partnerships (GRIP) Program. GRIP's three focus areas include: (1) Grid Resilience Utility and Industry Grants to mitigate the damage caused by extreme weather and natural disasters; (2) Smart Grid Grants to increase transmission system capacity, prevent faults, integrate renewable energy sources, and facilitate the integration of electric vehicles, buildings, and other grid-edge devices; and (3) the Grid Innovation Program, which utilizes cooperative agreements to support projects enhancing grid resiliency and reliability. GDO maintains overall responsibility for the GRIP Program and manages the financial assistance award selection process. GDO engaged other organizations to assist with GRIP-related work. For example, GDO entered into a Memorandum of Agreement with the National Energy Technology Laboratory (NETL) to assist with day-to-day management and oversight of financial award recipients and associated projects.[1] As of September 2024, GDO was in pre-award negotiations with applicants on 44 projects and had executed 13 awards spanning the 3 GRIP focus areas.

GDO is required to develop and document an effective internal controls system. *The Department of Energy FY 2024 Enterprise Risk Management Guidance* (ERM Guide) requires that Department elements develop and document an effective internal controls system that is based on the Government Accountability Office's *Standards for Internal Control in the Federal Government* (Green Book). The ERM Guide states that internal controls include more than financial controls. Significant operational controls involve processes, procedures, and guidelines put in place to optimize operations, manage risks, enhance productivity, and achieve organizational goals. These operational controls are vital for the function and success of the organization beyond financial considerations. Additionally, the Green Book defines internal control as a process effected [*sic*] by an entity's oversight that establishes reasonable assurance it will achieve its objectives. The Green Book contains the standards for establishing an effective internal controls system, which include five high-level components and their supporting principles. The first two components are the control environment[2] and risk assessment.

We initiated this inspection to determine whether GDO had adequate internal controls and resources to implement the GRIP Program.

---

[1] The Memorandum of Agreement states that NETL's work for GDO includes items such as planning, reviewing, awards administration throughout the lifecycle of the award through closeout, recipient audit and response, data, and records systems maintenance management, and any other activities required to ensure legal and programmatic sufficiency and compliance.

[2] The control environment is the foundation for an internal control system and provides the discipline and structure, which affect its overall quality of internal control. It influences how objectives are defined and how control activities are structured. One key principle that supports the control environment is the exercise of oversight responsibility.

## INADEQUATE INTERNAL CONTROLS AND RESOURCES

We determined that GDO did not have adequate internal controls and may not have adequate staff resources to implement the GRIP Program. Specifically, GDO did not develop and document an effective internal controls system, including the control environment, and risk assessment, as required. Further, GDO may not have sufficient staff to oversee the Federal activities that support the GRIP Program.

GDO did not develop and document an effective internal controls system. For example, GDO officials stated that they leverage the ERM Guide's process to implement GDO's internal controls system, but furnished no evidence GDO developed its own internal controls system that incorporated Green Book components or principles. A Department official, whose division administers the ERM Guide and its reporting requirements, stated that the ERM Guide does not prescribe how organizations create controls and that organizations are responsible for developing and documenting their own processes. The official also stated that the ERM Guide provides organizations with a template for how the Department's Office of Chief Financial Officer (OCFO) requires internal controls reporting information to be packaged and delivered.

**Inadequate Control Environment**

GDO did not adequately develop the control environment component of an effective internal controls system. For example, GDO did not develop policies or plans for its oversight of the Federal GRIP-related activities that other organizations perform on its behalf or its own GRIP-related processes and operations. Oversight is a key principle that supports the effective design, implementation, and operation of the control environment. Further, GDO had no policies, plans, or process to:

- Conduct oversight of the Federal GRIP-related activities that other organizations perform on its behalf;

- Independently verify that NETL's invoice review and approval procedures were adequately and effectively implemented to prevent improper payments;

- Independently verify NETL's processes were sufficient to ensure that award recipients adequately and effectively implemented Department-required internal controls; and

- Independently verify that the NETL personnel managing GDO financial assistance awards had Department-required grants and contract management training and certification levels.

Finally, GDO had no policies or plans for oversight of its own GRIP-related processes or operations. For example, GDO had no plans to assess whether its merit reviews met requirements. The merit review's primary purpose is to provide an independent assessment of the technical and scientific merit of an eligible and responsive application for financial assistance. Important merit review elements include reviewers' independence and expertise and their freedom from specific conflicts of interest. According to GDO officials, the written evaluation

and selection plans GDO utilizes to conduct these reviews comport with the *Department's Merit Review Guide*. However, GDO did not plan to independently assess whether its completed evaluation and selection plans met requirements. Additionally, GDO officials articulated plans to conduct periodic project performance evaluations they referred to as go/no-go decisions. Yet, GDO did not document how these evaluations would be conducted, how this process was implemented, or how it would be assessed.

Insufficient oversight has resulted in questionable costs in the past. For example, in January 2013, the Office of Inspector General (OIG) issued Audit Report, *The Department of Energy's $700 Million Smart Grid Demonstration Program Funded Through the American Recovery and Reinvestment Act of 2009* (OAS-RA-13-08), which questioned $12.3 million in approved reimbursement costs. The OIG concluded that the program had established procedures for financial oversight of projects, but the financial oversight was insufficient to ensure the accuracy and integrity of amounts paid.[3] Further, in 2012, the OIG issued Audit Report, *The Department's Management of the Smart Grid Investment Grant* (SGIG) *Program* (OAS-RA-12-04), which identified more than $2 million in funds that were inappropriately used or improperly reimbursed. The OIG determined that the Department did not ensure its personnel effectively monitored the SGIG Program nor that its personnel had adequate grants management training.[4] Moreover, certain SGIG Program goals and objectives were at significant risk without improvements to the Department's monitoring and oversight.

**Inadequate Risk Assessment**

GDO did not adequately develop the risk assessment component of an effective internal controls system. Specifically, GDO did not implement Green Book risk assessment principles, including specific, measurable objectives, risk tolerance, risk identification, risk analysis, or risk management. GDO did not have specific, measurable GRIP performance objectives—the first step in the risk assessment process. Instead, GDO furnished unspecific GRIP performance metrics, such as undetermined gigawatts of renewable energy enabled; microgrids deployed; and miles of transmission and distribution lines constructed, upgraded, or hardened. GDO also did not define GRIP Program risk tolerance, which is the amount of variance an organization is willing to accept in a process or outcome and still have confidence its objectives will be achieved. GDO might not be able to properly identify, analyze, and manage risks without implementing these principles. The Green Book identifies risk assessment and its associated principles as fundamental to an effective internal controls system. The ERM Guide requires that Department organizations conduct proper risk assessments and defines risk assessment as a systematic process of evaluating the potential risks that may impact an organization's ability to achieve its objectives.

Additionally, GDO did not develop processes to identify, analyze, or manage GRIP Program risks—including fraud risk. According to a GDO official, a GRIP programmatic risk assessment had not been conducted. Another GDO official stated that GDO evaluated GRIP Program-level

---

[3] The Department's Office of Electricity Delivery and Energy Reliability was responsible for the Smart Grid Demonstration Program but engaged NETL to manage awards for that program.

[4] The Office of Electricity Delivery and Energy Reliability was also responsible for the SGIG Program and engaged NETL to manage some of these awards.

**DOE-OIG-25-19**

risk in the Fiscal Year 2024 Risk Profile it developed to meet ERM Guide reporting requirements. However, the Risk Profile identified risks to achieving the Department's strategic objectives and did not specifically address GRIP risks. Further, GDO officials stated that NETL was responsible for identifying GRIP Program-level risks. Yet, NETL's processes centered on project-specific risk assessments of individual financial assistance recipients, and its Memorandum of Agreement with GDO did not include responsibility for GRIP Program-level risk assessment processes. Project-specific risks, such as on-time material ordering and delivery, affect the objectives of a single project. Program-level risks impact multiple projects within a program, such as regulatory changes affecting all projects in an infrastructure program. Further, GDO did not assess program-level fraud risks or determine the GRIP Program's fraud risk profile. The Government Accountability Office's *A Framework for Managing Fraud Risks in Federal Programs* cites planning regular program-tailored fraud risk assessments and determining a program fraud risk profile as part of an effective fraud risk management framework.

GDO's inadequate risk assessment processes leave little foundation for managing GRIP Program risks. GDO officials stated that GDO relied on state and local utility boards, which regulate most GRIP recipients, to mitigate the risk that certain recipient internal controls, such as procurement processes, were inadequate or ineffective. According to GDO officials, state and local utility boards review and assess recipient internal controls, and GRIP projects need to comply with these boards to receive funding. However:

- GDO had no process to determine if recipients were compliant with utility board requirements nor did it assess what gaps might exist between utility board and Department requirements; and

- GDO did not assess how to address any requirement gaps and how it would determine if risks were adequately managed.

Lastly, GDO had no risk assessment process to determine that self-certification was an appropriate means to manage the risk that recipient-level internal controls were inadequate or ineffective in these areas. GDO requires recipients to self-certify compliance with certain Department requirements, such as its Interim Conflict of Interest Policy and recipient oversight of subcontractors and subaward recipients.

**GDO Staffing Resources May Not Be Sufficient**

Finally, GDO may not have sufficient staff to oversee the Federal activities that support the GRIP Program. Specifically, GDO's staffing plan has not accounted for the resources needed to perform the required oversight responsibilities previously noted.

## CONTRIBUTING FACTORS

GDO officials stated GDO had not fully developed and documented its internal controls system because the OCFO had provided a phased implementation of internal controls. However, we learned that the OCFO only provided GDO phased implementation of the reporting information

that the ERM Guide required—not the development and documentation of GDO's internal controls system. An OCFO official stated that the OCFO expected all Department organizations to develop and maintain proper internal controls to include organizations who have not previously participated in the formal ERM Guide reporting requirements. While GDO complied with its assigned reporting requirements, it did not develop and document its internal controls system, as required.

Additionally, GDO did not distinguish between program-level and project-specific responsibilities because it did not recognize that there might be a gap between them. According to GDO officials, it relied on NETL's internal controls and processes. However, NETL's controls and processes were aligned with its recipient/project-level responsibilities, and GDO did not assess whether these processes were sufficient for GRIP Program-level responsibilities.

## GAPS POSE RISKS TO GRIP OBJECTIVES AND TAXPAYER FUNDS

Without a robust internal controls system, including the control environment and risk assessment processes, GDO may not identify risks that could negatively impact the GRIP Program's outcomes. These impacts could include improperly reimbursed costs, fraud, waste, and undisclosed conflicts of interest. Additionally, GDO may have difficulty identifying and addressing program performance issues, including the performance of organizations such as NETL, which GDO depends upon for ensuring GRIP Program success.

## RECOMMENDATIONS

We recommend that the Director, GDO, develop and implement:

1.  An effective internal controls system that includes GRIP Program-level controls; and

2.  A plan to assess the gaps between GRIP Program-level and project-specific responsibilities to ensure that GRIP-related internal controls and processes are adequate and effective.

## MANAGEMENT RESPONSE

GDO Management concurred with our recommendations and plans to develop a GRIP Program Plan that will detail program-level planning and governance structures, and outline project-specific processes carried out by GDO and NETL, respectively. The target completion date is March 31, 2026.

Management disagreed with our characterization of GDO's control environment and risk assessment. Specifically, it disagreed that GDO had no policies, plans, or process to independently verify that NETL's procedures and processes were adequate and sufficient; did not develop and document an effective internal controls system; did not adequately develop the risk assessment component of an internal controls system; and its inadequate internal control environment occurred due to its phased implementation approach.

Finally, management found that implementation of the report's recommendations to further document its GRIP program-level oversight would be consistent with GDO efforts to continually mature its already-established internal controls program and processes.

Management's comments are included in Appendix 3.

## INSPECTOR COMMENTS

GDO management's proposed actions are generally responsive to our recommendations. However, we are concerned that the time allotted to develop and implement its proposed GRIP Program Plan could expose the Department to additional risk.

Management's disagreement with the characterization of our findings lacks supporting evidence. As demonstrated in the report, GDO did not furnish objective evidence of a documented internal controls system. Further, its comments do not adequately address GDO's GRIP Program-level oversight, nor do they address the potential differences between program and project risk.

**Appendix 1: Objective, Scope, and Methodology**

## OBJECTIVE

We initiated this inspection to determine whether the Grid Deployment Office (GDO) had adequate internal controls and resources to implement the Grid Resilience and Innovation Partnerships Program.

## SCOPE

The inspection was performed from March 2024 through October 2024 at GDO in Washington, DC. The scope was limited to the GDO's implementation of the Grid Resilience and Innovation Partnerships Program. The inspection was conducted under Office of Inspector General project number S24RL006.

## METHODOLOGY

To accomplish our inspection objective, we:

- Held discussions with Department of Energy personnel with knowledge and experience in the inspection area;

- Reviewed the status of the Grid Resilience and Innovation Partnerships Program;

- Reviewed applicable laws, regulations, policies, and procedures;

- Reviewed prior reports by the Office of Inspector General; and

- Reviewed other Federal Government oversight reports and court filings.

We conducted our inspection in accordance with the Quality Standards for Inspection and Evaluation (December 2020) as put forth by the Council of the Inspectors General on Integrity and Efficiency. We believe that the work performed provides a reasonable basis for our conclusions.

GDO management officials waived an exit conference.

**Appendix 2: Prior Reports**

- Inspection Report: *Special Report on Prospective Considerations for Projects Awarded Through Financial Assistance Awards* (DOE-OIG-22-40 August 2022). This special report identified six major risk areas based on prior audits, inspections, and investigations that warrant immediate attention and consideration from Department of Energy leadership to prevent similar problems from recurring. Specifically, this included: (1) recipient fraud; (2) insufficient Federal staffing; (3) inadequate oversight of projects; (4) circumvention of project controls; (5) inadequate internal controls; and (6) lack of recipient-level controls.

- Audit Report: *The Department of Energy's $700 Million Smart Grid Demonstration Program Funded Through the American Recovery and Reinvestment Act of 2009* (OAS-RA-13-08; January 2013). This audit found that the Department had not always managed this Program effectively and efficiently. Our review of 11 projects, awarded $279 million in American Recovery and Reinvestment Act of 2009 (Recovery Act) funding and $10 million in non-Recovery Act funding, identified weaknesses in reimbursement requests, cost-share contributions, and coordination efforts with another Department program. These issues resulted in about $12.3 million in questioned costs. The auditors made five recommendations to help achieve Program and Recovery Act objectives.

- Audit Report: *The Department's Management of the Smart Grid Investment Grant Program* (OAS-RA-12-04 January 2012). This audit revealed several opportunities to enhance management of the Smart Grid Investment Grant Program. The problems that were discovered could jeopardize achievement of Recovery Act goals. In particular, the audit found that: (1) Department officials approved Smart Grid projects that used federally sourced funds to meet cost-share requirements, which is specifically prohibited; and (2) grantee required cybersecurity plans were not always complete. The issues were caused, in part, to the accelerated planning, development, and deployment approach adopted by the Department for the Smart Grid Investment Grant Program. The auditors made four recommendations to help improve the Department's ability to effectively administer and monitor the Smart Grid Investment Grant Program.

## Appendix 3: Management Comments



**Department of Energy**
Washington, DC  20585

April 4, 2025

MEMORANDUM FOR  DEBORAH THOMAS
DEPUTY ASSISTANT INSPECTOR GENERAL
OFFICE OF INVESTIGATIONS

FROM:              NICK ELLIOT          **NICHOLAS**    Digitally signed by
DIRECTOR            **ELLIOT**       NICHOLAS ELLIOT
GRID DEPLOYMENT OFFICE                 Date: 2025.04.09
                                        10:48:52 -04'00'

SUBJECT:           Grid Deployment Office's Implementation of the Grid Resilience and
Innovation Partnerships Program (S24RL006)

Thank you for the opportunity to review and comment on the subject draft inspection report.
The Department of Energy's (DOE) Grid Deployment Office (GDO) appreciates the Office of the
Inspector General's (OIG) work.  While GDO believes the OIG's recommendations will mature
our documentation of Grid Resilience and Innovation Partnerships' (GRIP's) program-level
oversight, consistent with the plans we had in place to do so, GDO provides the following
comments on the OIG's characterization that GDO, as an organization, has an overarching
"inadequate" control environment and risk assessment.

First, the draft report indicated GDO had an inadequate control environment because GDO had
"no policies, plans, or process to:

- "Independently verify that National Energy Technology Laboratory's (NETL's) invoice review
and approval procedures were adequately and effectively implemented to prevent
improper payments.
- Independently verify NETL's processes were sufficient to ensure that award recipients
adequately and effectively implemented Department-required internal controls.
- Independently verify that the NETL personnel managing GDO financial assistance awards
had Department-required grants and contract management training and certification
levels."[1]

During GDO's formation in August 2022, GDO recognized the additional expertise, resources,
and controls - notably, Head of Contracting Activity granted by the DOE Senior Procurement
Executive - that NETL could provide. As such, as previously documented and provided to the
OIG, GDO and NETL executed a Memorandum of Agreement in December 2022 to allow GDO to

---

[1] Draft Inspection Report: *Grid Deployment Office's Implementation of the Grid Resilience and Innovation Partnerships Program* (DOE-OIG-25-XX), at p.2.

## Appendix 3: Management Comments

*Management Response: OIG Draft Report - Significant Internal Control Gaps Pose Risks to the Grid Deployment Office's Implementation of the Grid Resilience and Innovation Partnerships Program (S24RL006)*

leverage NETL expertise and internal controls relevant to the financial assistance work GDO needed NETL to execute on its behalf.

GDO provides program oversight to ensure GDO funding executed by NETL is in accordance with GDO direction and objectives. In addition, to assist with its monitoring efforts, GDO plans to leverage existing internal control oversight performed by the Office of the Chief Financial Officer (CF).

DOE Order 520.1B *Financial Management and Chief Financial Officer Responsibilities*, assigns the Departmental Internal Control and Assessment Review Council (DICARC), chaired by the Chief Financial Officer (CFO), as the governance body to provide oversight of DOE's internal control program.  This policy also outlines that the CFO is required to prepare, and issue detailed annual guidance for conducting the internal control reviews, and to review the results of internal control evaluations performed to identify potential significant deficiencies or material weaknesses.  Per the DOE CF's *Enterprise Risk Management Guidance*, DOE reporting organizations are required to establish and execute an internal control assessment and review process that culminates in the issuance of an annual Assurance Memorandum. The annual Assurance Memorandum documents the results of the reporting organization's internal controls assessments and provides a status of the overall adequacy, effectiveness, and efficiency of the organization's internal controls.  NETL, as a U.S. national laboratory owned and operated by DOE, a federal entity, and staffed with DOE federal employees, therefore, is governed and compliant with this process and is considered a reporting organization according to the Department's *Enterprise Risk Management Guidance*.

As part of its oversight and monitoring efforts, GDO relies on NETL's annual Assurance Memorandum to understand if there are any material weaknesses or significant deficiencies in the NETL system of internal control that may impact GDO process or achievement of GDO objectives. Additionally, GDO leverages the expertise and reporting responsibilities of CF to ensure NETL is in compliance with annual internal control responsibilities and requirements.

Further, the draft report indicated GDO had an inadequate control environment because "GDO did not develop and document an effective internal controls system.  For example, GDO officials stated that they leverage the *Enterprise Risk Management Guide*'s process to implement GDO's internal controls system but furnished no evidence GDO developed its own internal controls system that incorporated Green Book components or principles."[2]

Since its establishment in August 2022, 18 months prior to the start of this inspection, GDO has prioritized the development and documentation of its internal control system, while establishing and executing initial operations. GDO previously documented and provided the OIG with GDO analysis, documentation, and control assessment results, and suggested that the OIG request "auditor access" to DOE's internal control and risk management application,

---

[2] *Id.*

2

## Appendix 3: Management Comments

*Management Response: OIG Draft Report - Significant Internal Control Gaps Pose Risks to the Grid Deployment Office's Implementation of the Grid Resilience and Innovation Partnerships Program (S24RL006)*

AMERICA, to review its internal control assessment results and reporting. AMERICA is DOE's official application to store, document, manage, report, and analyze risks, controls, and adherence to the U.S. Government Accountability Office (GAO) Green Book Components and Principles.  In addition, GDO provided multiple process flow-charts, and available AMERICA reports that outlined our control system and evaluation, which included the evaluation of 274 enterprise-wide risk elements, and respective key control testing.

In addition, the draft report indicated "GDO did not adequately develop the risk assessment component of an effective internal controls system.  Specifically, GDO did not implement Green Book risk assessment principles, including specific, measurable objectives, risk tolerance, risk identification, risk analysis, or risk management."[3]

However, GDO has executed the four key principles of risk assessments as defined in the GAO Green Book to include, defining objectives, identifying analyzing and responding to risk, considering fraud, and identifying significant impacts to our system of controls. This included specific, measurable objectives, risk tolerance, risk identification, risk analysis, or risk management.  And although not specifically identified, GRIP is considered within two of GDO's risks for Financial Assistance & Acquisition Award Process and Project Oversight & Cost Allowability.

Lastly, the draft report indicates that the contributing factor for our inadequate internal control environment "occurred in part because GDO. . . followed a phased implementation approach for internal controls."[4]

GDO used our risk profile, which requires both identification and assessment of risks, including fraud risks, to support this phased approach to implement internal controls, in accordance with CF direction.  GDO focused on the most mission critical operational areas that align directly with DOE's strategic objectives first, rather than attempting to design and implement all controls simultaneously.  This allowed for a more manageable implementation process, spreading out of resources, and ensuring the most impactful risk areas were addressed initially. A phased maturity approach is considered a best practice and is recognized by the Office of Management and Budget (OMB) Circular A-123 – *Management's Responsibility for Enterprise Risk Management and Internal Control*, and the Chief Financial Officers Council's *Enterprise Risk Management Playbook*.

As such, as previously documented and provided to the OIG, CF began working with GDO in January 2023 to implement the Department's requirements for designing and implementing effective internal controls. GDO has been fully responsive to all requests from CF since that time, and in FY 2024, GDO completed all the Department's required internal control activities as identified in the Department's *Enterprise Risk Management Guidance*.

---

[3] *Id.* at p.3.
[4] *Id.* at cover page.

3

## Appendix 3: Management Comments

*Management Response: OIG Draft Report - Significant Internal Control Gaps Pose Risks to the Grid Deployment Office's Implementation of the Grid Resilience and Innovation Partnerships Program (S24RL006)*

That said, while GDO does not agree with the OIG's characterization of GDO control environment and risk assessment, GDO does find that implementation of the recommendations to further document our GRIP program-level oversight to be consistent with GDO efforts to continually mature our already-established internal controls program and processes. The enclosure to this memorandum details actions planned by GDO related to those recommendations.

If you have any questions regarding this response, please contact Kathy Bittner, Audit Liaison, Grid Deployment Office at GDOAudits@hq.doe.gov.

Enclosure

4

## Appendix 3: Management Comments

*Enclosure*

*Management Response: OIG Draft Report - Significant Internal Control Gaps Pose Risks to the Grid Deployment Office's Implementation of the Grid Resilience and Innovation Partnerships Program (S24RL006)*

**Recommendation # 1:** We recommend that the Director, GDO, develop and implement an effective internal controls system that includes GRIP Program-level controls.

**DOE Response:**    Concur

GDO plans to develop a GRIP Program Plan in collaboration with NETL, aligning with the key guiding principles identified in DOE Policy 410.3, *Program Management*. This Program Plan will detail program-level planning and governance structures, and outline project-specific processes carried out by GDO and NETL respectively. This will facilitate more transparent communication, engagement, and oversight by GDO in leveraging NETL components to assure that program and project specific internal controls are aligned with GDO's already-established office-wide internal control program. Further, it will better enable risk identification and mitigation, quality management, and program monitoring.

**Estimated Completion Date: 3/31/2026**

**Recommendation # 2:** We recommend that the Director, GDO, develop and implement a plan to assess the gaps between GRIP Program-level and project-specific responsibilities to ensure that GRIP-related internal controls and processes are adequate and effective.

**DOE Response:**    Concur

GDO plans to develop a GRIP Program Plan in collaboration with NETL, aligning with the key guiding principles identified in DOE Policy 410.3, *Program Management*. This Program Plan will detail program-level planning and governance structures, and outline project-specific processes carried out by GDO and NETL respectively.  This will facilitate more transparent communication, engagement, and oversight by GDO in leveraging NETL components to assure that program and project specific internal controls are aligned with GDO's already-established office-wide internal control program. Further, it will better enable risk identification and mitigation, quality management, and program monitoring.

**Estimated Completion Date: 3/31/2026**

5

**FEEDBACK**

The Office of Inspector General has a continuing interest in improving the usefulness of its products. We aim to make our reports as responsive as possible and ask you to consider sharing your thoughts with us.

If you have comments, suggestions, and feedback on this report, please reach out to us at OIG.Reports@hq.doe.gov. Include your name, contact information, and the report number.

For all media-related questions, please send inquiries to OIGpublicaffairs@hq.doe.gov and include your name, contact information, and the report number.

DOE AR 001194

 An official website of the United States government   Here's how you know

**U.S. DEPARTMENT** *of* **ENERGY**

| Policy & Priorities | Leadership & Organization | Topics | News & Events | About | **Funding Opportunities** |

Office of Management    PF 2025-28 Secretarial Policy on Ensuring Responsibility for Financial Assistance

# PF 2025-28 Secretarial Policy on Ensuring Responsibility for Financial Assistance

## PF 2025-28 Secretarial Policy on Ensuring Responsibility for Financial Assistance

**Date:** May 15, 2025

**To:** HCAs/Procurement Directors/Contracting Officers

**From:** Director, Contract and Financial Assistance Policy Division, Office of Policy, Office of Acquisition Management

**SUMMARY:** The Secretary has issued a policy that DOE intends to conduct focused reviews of awards and other forms of financial assistance. It is the policy of DOE to require that its financial assistance recipients provide written responses and supporting documentation to Data Requests within communicated timeframes, and to cooperate with program personnel on any follow up requests in a timely manner, to facilitate this review. DOE is entitled to obtain current, accurate, and complete information about the project and the recipient.

The Secretarial Policy is attached.

Questions concerning this policy flash should be directed to the Contract and Financial Assistance Policy Division at DOE_oapmpolicy@hq.doe.gov.

> Secretarial Policy on Ensuring Responsibility for Financial Assistance
> (214.76 KB)

## Previous Policy Flashes

DOE AR 001195

PF 2025-26 Adjusting Department of Energy Financial Assistance Policy for Nonprofit Organizations' Financial Assistance Awards

PF 2025-27 Adjusting Department of Energy Financial Assistance Policy for For-Profit Organizations' Financial Assistance Awards

**Committed to Restoring America's Energy Dominance.**

**Follow Us**

**Quick Links**

Leadership & Offices

Newsroom

Contact Us

Careers

**Resources**

Budget & Performance

Directives, Delegations, & Requirements

Freedom of Information Act (FOIA)

Inspector General

Privacy Program

**Federal Government**

USA.gov

The White House

Open Gov    Accessibility    Privacy    Information Quality    No Fear Act    Web Policies

Vulnerability Disclosure Program    Whistleblower Protection    Equal Employment Opportunity    Notice of Court Orders

DOE AR 001196



🇺🇸 An official website of the United States government   Here's how you know

**U.S. DEPARTMENT** *of* **ENERGY**

Energy.gov    Secretary Wright Announces New Policy for Increasing Accountability, Identifying Waste...

# Secretary Wright Announces New Policy for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars

The Department of Energy today announced new actions to increase accountability and promote responsible stewardship of American taxpayer dollars.

[Energy.gov](Energy.gov)

May 15, 2025

 4 min

**WASHINGTON** – The Department of Energy (DOE) today announced new actions to increase accountability and promote responsible

DOE AR 001197

stewardship of American taxpayer dollars. In a Secretarial Memorandum entitled, "Ensuring Responsibility for Financial Assistance," U.S. Secretary of Energy Chris Wright outlined DOE's policy for evaluating financial assistance on a case-by-case basis to identity waste of taxpayer dollars, protect America's national security and advance President Trump's commitment to unleash affordable, reliable and secure energy for the American people.

"Over the past 110 days, the Energy Department has been hard at work reviewing the billions of dollars that were rushed out the door, particularly in the final days of the Biden administration, and what we have found is concerning," said **Secretary Wright**. "With this process, the Department will ensure we are doing our due diligence, utilizing taxpayer dollars to generate the largest possible benefit to the American people and safeguarding our national security. Any reputable business would have a process in place for evaluating spending and investments before money goes out the door, and the American people deserve no less from their federal government."

To comply with the Secretary's memorandum, the DOE has begun requesting additional information needed to evaluate 179 awards. These awards total over $15 billion in financial assistance. DOE is prioritizing large-scale commercial projects that require more detailed information from the awardees for the initial phase of this review, but this process may extend to other DOE program offices as the reviews progress.

Full Policy Memorandum is below:

**Secretarial Policy on Ensuring Responsibility for Financial Assistance**

It is the policy of the Department of Energy (DOE) to ensure that financial assistance award recipients and the individual projects are, among other things, financially sound and economically viable, aligned with national and economic security interests, and consistent with Federal law and this Administration's policies and priorities and program goals and priorities (Standards).  This policy is consistent with the

DOE AR 001198

general Federal Stewardship and Substantial Involvement of DOE in the financial assistance awards and essential to identifying and avoiding fraud, waste and abuse.

DOE intends to conduct focused reviews of awards and other forms of financial assistance on a case-by-case basis, especially for the large complex awards, or on groups of homogenous awards if DOE determines that such a review will adequately address the goals as set forth above.  To conduct this review, DOE may utilize information previously submitted by the award recipient, DOE's own investigation or analyses or submit  information requests to recipients for information relevant to the project to help inform DOE's decisional process including, but not limited to,  information regarding a project's financial health, a project's technological and engineering viability, market conditions, compliance with award terms and conditions and compliance with legal requirements, including those related to national security.

To accomplish DOE's objectives, it is the policy of DOE to require that its financial assistance recipients provide written responses and supporting documentation to its information requests within communicated timeframes, and to cooperate with program personnel on any follow up requests, including verbal requests, in a timely manner, to facilitate this review.  While many financial assistance awards may incorporate the audit rights under 2 C.F.R. part 200, other forms of awards have different information gathering rights available to DOE.  However, in connection with the administration and management of its awards, DOE is entitled to obtain current, accurate and complete information about the project and the recipient.

It is also the policy of DOE to treat the responses to these information requests as confidential and solely for use in managing the awards and as part of its oversight, including audit, functions.  Responses, as well as responsive information the recipient has previously provided to DOE, will be shared within DOE only to the extent required for proper management and oversight of the awards. Consistent with the National

Security Presidential Memorandum on U.S. Government-Supported Research and Development National Security Policy-33, DOE may share information regarding risk identified as part of this due diligence process with other governmental entities.

If it is determined that a project meets Standards, then those projects will proceed.  If it is determined that projects do not meet Standards, DOE may modify the project or, DOE in its discretion, may terminate the project based on the outcome of DOE's evaluation, as allowed by law. Further, if a recipient of financial assistance fails to respond to information requests within the provided timeframe, does not respond to follow-up questions in a timely manner, or offers incomplete responses that do not reasonably facilitate DOE's review, DOE may treat as the recipient's refusal to cooperate as grounds for termination of the award or the withholding of funding.

### 

**View Previous**

View Next

ICYMI: To Combat Race Discrimination, Energy Department Terminates Funding for Harvard University

Energy Department Renames Office of Technology Transitions to Office of Technology Commercialization

May 15, 2025

May 15, 2025

DOE AR 001200

# Media Inquiries:

(202) 586-4940 or
DOENews@hq.doe.gov

# Read more at the energy.gov Newsroom

**Committed to Restoring America's Energy Dominance.**

## Quick Links

Leadership & Offices

Mission

Newsroom

Contact Us

Careers

## Resources

Budget & Performance

Directives, Delegations, & Requirements

Freedom of Information Act (FOIA)

Inspector General

Privacy Program

## Federal Government

USA.gov

The White House

## Follow Us

DOE AR 001201

Open Gov      Accessibility      Privacy      Information Quality      Web Policies

Vulnerability Disclosure Program      Whistleblower Protection

Equal Employment Opportunity

DOE AR 001202



**The Secretary of Energy**
Washington, DC  20585

**Secretarial Policy on
Ensuring Responsibility for Financial Assistance**

It is the policy of the Department of Energy (DOE) to ensure that financial assistance award recipients and the individual projects are, among other things, financially sound and economically viable, aligned with national and economic security interests, and consistent with Federal law and this Administration's policies and priorities and program goals and priorities (Standards).  This policy is consistent with the general Federal Stewardship and Substantial Involvement of DOE in the financial assistance awards and essential to identifying and avoiding fraud, waste and abuse.

DOE intends to conduct focused reviews of awards and other forms of financial assistance on a case-by-case basis, especially for the large complex awards, or on groups of homogenous awards if DOE determines that such a review will adequately address the goals as set forth above.  To conduct this review, DOE may utilize information previously submitted by the award recipient, DOE's own investigation or analyses or submit  information requests to recipients for information relevant to the project to help inform DOE's decisional process including, but not limited to,  information regarding a project's financial health, a project's technological and engineering viability, market conditions, compliance with award terms and conditions and compliance with legal requirements, including those related to national security.

To accomplish DOE's objectives, it is the policy of DOE to require that its financial assistance recipients provide written responses and supporting documentation to its information requests within communicated timeframes, and to cooperate with program personnel on any follow up requests, including verbal requests, in a timely manner, to facilitate this review.  While many financial assistance awards may incorporate the audit rights under 2 C.F.R. part 200, other forms of awards have different information gathering rights available to DOE.  However, in connection with the administration and management of its awards, DOE is entitled to obtain current, accurate and complete information about the project and the recipient.

It is also the policy of DOE to treat the responses to these information requests as confidential and solely for use in managing the awards and as part of its oversight, including audit, functions. Responses, as well as responsive information the recipient has previously provided to DOE, will be shared within DOE only to the extent required for proper management and oversight of the awards. Consistent with the National Security Presidential Memorandum on U.S. Government-Supported Research and Development National Security Policy-33, DOE may share information regarding risk identified as part of this due diligence process with other governmental entities.

If it is determined that a project meets Standards, then those projects will proceed.  If it is determined that projects do not meet Standards, DOE may modify the project or, DOE in its discretion, may terminate the project based on the outcome of DOE's evaluation, as allowed by law.  Further, if a recipient of financial assistance fails to respond to information requests within the provided timeframe, does not respond to follow-up questions in a timely manner, or offers

incomplete responses that do not reasonably facilitate DOE's review, DOE may treat as the recipient's refusal to cooperate as grounds for termination of the award or the withholding of funding.

_____
Chris Wright
Secretary of Energy

<u>May 14, 2025</u>
Date

DOE AR 001204