UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CHRISTOPHER WRIGHT, et al.,<br><br>Defendants. | Case No. 26-cv-01417-RFL<br><br>**ORDER DENYING MOTION TO DISMISS AND TO TRANSFER**<br><br>Re: Dkt. No. 68 |

## I.    INTRODUCTION

In 2021 and 2022, Congress created a series of multi-billion dollar programs to build renewable energy and infrastructure and charged the Department of Energy ("DOE") with supervising the programs. The current Administration allegedly made a public vow to shut down these "Green New Deal" programs. Rather than convincing Congress to roll back the legislation or rescind the funding, the Administration allegedly enacted a policy to terminate the programs in contravention of Congress's mandate and in a manner that allegedly violated the First Amendment, Fifth Amendment, and constitutional separation of powers principles. Thirteen states and a California state agency brought this action to challenge the alleged policy and the resulting termination or abandonment of billions of dollars in renewable energy funding. Defendants now move to transfer certain claims challenging *past* terminations of funding to the Court of Federal Claims ("CFC"), or in the alternative to dismiss those claims for lack of jurisdiction, while keeping the claims challenging the policy and *future* terminations in district court.

As explained below, the motion to transfer is denied. The claims that Defendants seek to transfer arise from substantially the same operative facts as the rest of the lawsuit. As

1

Defendants did not contest in their briefs, Plaintiffs challenge the policy and the resulting terminations (both past and future) based on the same course of conduct. Transfer to the CFC is barred under 28 U.S.C. § 1500 when claims challenging the same conduct or involving the same evidence are already pending in district court. In such circumstances, the case must proceed *seriatim*, beginning first in the district court and continuing later in the CFC, rather than proceeding simultaneously in both courts. That way, two trial courts—and potentially, two courts of appeals—are not adjudicating claims about substantially overlapping facts and evidence at the same time.

Due to Defendants' motion to transfer, the Court is statutorily barred from reaching their alternative motion to dismiss those claims. Under 28 U.S.C. § 1292, Defendants have the right to seek an immediate interlocutory appeal to the Federal Circuit as to their transfer motion (but not their motion to dismiss in the alternative), and all adjudication of the implicated claims is automatically stayed for 60 days or, if an appeal is filed, pending the appeal. The Court will address the alternative motion to dismiss when the automatic stay is lifted.

Defendants separately move to dismiss the remaining claims seeking to vacate the policy and enjoin future terminations, which were not subject to their transfer motion. As explained more fully below, that motion is denied. Those claims are properly in district court. Plaintiffs have alleged ongoing and non-speculative future injuries sufficient to satisfy Article III, and the Complaint plausibly alleges that the challenged policy was a final agency action.

## II.    BACKGROUND

### A.    Factual Allegations

Plaintiffs bring this action against DOE Secretary Christopher Wright and Director of the U.S. Office of Management and Budget ("OMB") Russell Vought—in their official capacities—as well as both agencies. (Dkt. No. 1 ("Compl.").) The thirteen Plaintiff states receive DOE funding through the Inflation Reduction Act ("IRA"), the Infrastructure Investment and Jobs Act ("IIJA"), and other congressional acts. (Compl. ¶ 84.)

The IIJA was signed into law in November 2021. Pub. L. No. 117–58, 135 Stat. 429

(Nov. 15, 2021). Through it, Congress appropriated funding for energy, technology, and infrastructure development programs, including electrical grid resilience, large-scale carbon storage and utilization, wind and solar energy research and development, and clean hydrogen electrolysis and hydrogen hubs. (Compl. ¶ 42.) Through the IIJA, Congress also created an Office of Clean Energy Demonstrations ("OCED"), which has been tasked with administering over $21 billion in "covered projects." (*Id.* ¶ 44.) Those projects include the Regional Clean Hydrogen Hubs program, for which Congress appropriated $8 billion to support development of at least four "hydrogen hubs" in different regions of the United States. (Compl. ¶ 44 (citing 42 U.S.C. § 16161a).)[1] The IRA was signed into law in 2022. Pub. L. No. 117–169, 136 Stat. 1818 (Aug. 16, 2022). Through it, Congress appropriated hundreds of billions of dollars for domestic energy and climate-change projects.[2] Furthermore, between 2020 and 2023, Congress appropriated hundreds of millions of dollars through other legislation that required DOE to establish various energy-efficiency and renewable-energy programs. (Compl. ¶ 48.)

On January 20, 2025, the President issued a pair of executive orders (the "Executive Orders") that together allegedly "set forth a policy to deprioritize funding for renewable-energy projects." (*Id*. ¶¶ 50, 52.) One Executive Order, titled "Unleashing American Energy,"[3] directed federal agencies to "[t]erminat[e] the Green New Deal," by "immediately paus[ing] the disbursement of funds appropriated through" the IIJA and IRA, conducting a review of all funded programs for alignment with the President's policies, and making any future disbursements subject to Director Vought's approval.[4] The other Executive Order, titled "Declaring a National Energy Emergency" called for immediate action to address the Nation's "inadequate energy supply and infrastructure," but excluded hydrogen, solar, and wind sources

---

[1] https://www.energy.gov/cmei/regional-clean-hydrogen-hubs-0.

[2] https://www.cbo.gov/system/files/2022-09/PL117-169_9-7-22.pdf.

[3] Exec. Ord. No. 14154, 90 Fed. Reg. 8353, §§ 1, 8 (Jan. 20, 2025).

[4] *Id.* § 7.

from the definition of "energy" and "energy sources."[5]

Plaintiffs allege that in May 2025, the President tried to convince Congress to rescind almost $20 billion in energy-efficiency and renewable-energy program funding through the IIJA and other acts. (Compl. ¶ 56.) The effort largely failed. (*Id.* ¶ 57.) However, the Complaint alleges that, even as the White House lobbied for recission, Defendants were simultaneously rolling out an alternative plan to comply with the Executive Orders by "eliminat[ing]" the programs without congressional action. (*Id.* ¶¶ 58, 86.)

In March 2025, Defendants allegedly began compiling a "kill list," which eventually included more than 600 grants totaling over $20 billion in cuts to DOE-funded energy projects primarily supporting renewable energy development and decarbonization. (*Id.* ¶¶ 3, 54, 75.) On May 15, 2025, Secretary Wright announced DOE's new "Secretarial Policy on Ensuring Responsibility in Financial Assistance," which was memorialized in an accompanying one-page memorandum (the "DOE Memo"). (*Id.* ¶ 58.) Consistent with the instructions in the Unleashing American Energy Executive Order, the DOE Memo stated that DOE would conduct "focused reviews of awards and other forms of financial assistance on a case-by-case basis."[6] The review was intended to ensure that projects were:

> [A]mong other things, financially sound and economically viable, aligned with national and economic security interests, and consistent with Federal law and this Administration's policies and priorities and program goals and priorities (Standards).[7]

Only projects that "meet Standards" would proceed, and the remainder would be modified or terminated.[8] No other description of the Standards or DOE's review process was allegedly provided. (Compl. ¶ 60.) Plaintiffs allege that the DOE Memo, together with its "Standards," was the vehicle through which Defendants formalized their policy to terminate the Green New

---

[5] Exec. Ord. No. 14156, 90 FR 8433, 8433, 8436 (Jan. 20, 2025).

[6] https://www.energy.gov/sites/default/files/2025-05/EXEC-2025-005990%20-%20Secretarial%20Policy%20-PRP%20-%205-14-25%20%28FINAL%29%20%282%29.pdf.

[7] *Id.*

[8] *Id.*

Deal programs, as they had been instructed to do by the Executive Orders. (*Id.* ¶¶ 50, 58, 60, 61.) In other words, the only actual "Standards" applied were allegedly the intent to rescind Congress's Green New Deal as inconsistent with the "Administration's policies and priorities and program goals and priorities."

On May 30, 2025, DOE allegedly "terminated 24 carbon-capture projects, totaling $3.7 billion, all of which were administered by the [OCED]." (*Id.* ¶ 61.) Secretary Wright stated that the termination generated "$3.6 billion in savings for the American people," which Plaintiffs contend means that those funds would not be reallocated and instead would simply be withheld in violation of Congress's directive to fund the projects at issue. (*Id.*) Furthermore, on a forward-looking basis, the Complaint alleges that "[s]ince October 1, 2025, OMB has withheld funding intended for OCED, preventing DOE from spending *any* of the funds that Congress dedicated for OCED's use." (*Id.* ¶ 63 (emphasis added).) As a result, Plaintiffs California and Washington have allegedly lost OCED-administered funding. (*Id.* ¶¶ 44, 84.)

Similarly, the Complaint alleges that on October 2, 2025, "DOE announced the termination of 315 awards collectively worth $7.56 billion" that almost exclusively funded IIJA programs. (*Id.* ¶ 73.) All but one of the projects prioritized for termination was allegedly situated in a "Blue State." (*Id.*)[9] The timing of the October 2 cuts was allegedly intended as "retribution for the government shutdown" in October 2025. (*Id.* ¶ 76.) Plaintiffs allege that in other litigation, OMB and DOE "concede[d] that the political identity of a terminated grantee's state, including the fact that the state supported Vice President Kamala Harris in the 2024 election, played a preponderant role in the October 2025 grant termination decisions." (Compl. ¶ 77 (citing *City of Saint Paul, Minnesota v. Wright*, 816 F. Supp. 3d 65, 69 (D.D.C. 2026).)

In the wake of DOE's efforts, some awardees allegedly received termination letters, while many others allegedly lost access to federal funds without receiving any notice of

---

[9] The Complaint defines "Blue States as "California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, New York, Oregon, Vermont, and Washington State." (Compl. ¶ 6.)

termination.  Each Plaintiff alleges that it has had cooperative agreements terminated and/or abandoned.  (*Id.* ¶ 84.)  For example, DOE terminated cooperative agreements encompassing over $2 billion in funding to the Alliance for Renewable Clean Hydrogen Energy Systems ("ARCHES") and the Pacific Northwest Hydrogen Hub that supported the development of hydrogen hub projects in California and Washington.  (*Id.*)  The awardees were informed that the hub projects had not "passed" "Standards."  (*Id.*)  In Colorado, DOE terminated Carbon Storage Validation and Testing cooperative agreements totaling over $41.5 million, citing the DOE Memo.  (*Id.*)  In Massachusetts and Oregon, DOE terminated Wind Energy Technology and Storage cooperative agreements totaling over $24 million.  (*Id.*)  DOE also appears to have abandoned three Colorado Methane Emissions Reduction Program cooperative agreements totaling almost $325 million without formally terminating the agreements.  (*Id.* ¶¶ 84, 128–29.)  Oregon, Washington, Maryland, and Wisconsin have experienced similar abandonment of cooperative agreements.  (*Id.* ¶¶ 84, 160, 197.)

## B.    This Action

Plaintiffs challenge DOE's policy of terminating and abandoning cooperative agreements pursuant to the DOE Memo, as well as the terminations themselves.  The Complaint brings two sets of claims.  The first set of claims (Counts I and IV–VI) is brought under the U.S. Constitution and on the basis that Defendants' actions are *ultra vires*.  Count I alleges that Defendants' policy and the resulting terminations violate the separation of powers enshrined in the Constitution by seeking to "eliminate entire programs" created by Congress under the IRA, IIJA, and other acts, and to unlawfully "punish Blue States."  (*Id.* ¶¶ 2, 209–17.)  Count IV is pled on a similar theory, alleging that Defendants' actions are *ultra vires* in excess of statutory authority and seek to "chok[e] off congressionally appropriated funding."  (*Id.* ¶¶ 237–40.)  Counts V and VI are brought by a California state agency alleging that DOE violated the First and Fifth Amendments by prioritizing the ARCHES cooperative agreement for termination based on its location in a Blue State.  (*Id.* ¶¶ 241–50.)  For the constitutional and *ultra vires* claims, Plaintiffs seek injunctive and declaratory relief that would both enjoin Defendants from

taking similar actions in the future and undo past actions, including the terminations of Plaintiffs' cooperative agreements.  (*Id.* at Prayer for Relief ¶¶ 1, 3.)

Plaintiffs' second set of claims (Counts II and III) are brought under the Administrative Procedure Act (the "APA") and allege that Defendants' actions are contrary to the Constitution and appropriation and authorization statutes, and are arbitrary and capricious because they lack a reasonable explanation.  (*Id.* ¶¶ 218–36.)  For these claims, Plaintiffs seek to vacate, on a prospective basis, the allegedly unlawful review policy adopted through the DOE Memo.  (*Id.* at Prayer for Relief ¶ 2.)  Counts II and III do not challenge past terminations that occurred before the Complaint was filed, but to the extent actions were taken *after* the filing of the Complaint, Plaintiffs seek remand of "DOE's termination or abandonment of those awards to DOE for reconsideration . . . in light of the vacatur of the DOE Memo."  (*Id.*)

Defendants move to transfer Plaintiffs' claims to the extent they challenge past funding terminations, arguing that the Tucker Act requires these portions of the claims to be heard in the CFC and not here.  (Dkt. No. 68.)  Alternatively, they seek dismissal of these portions of the claims for the same reasons.  Defendants also separately move to dismiss the remainder of Plaintiffs' claims that were not subject to the motion to transfer for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Defendants argue that (1) the United States has not waived sovereign immunity with respect to the *ultra vires* claim, (2) Plaintiffs lack standing to seek injunctive relief, and (3) Plaintiffs' APA claims fail to challenge a final agency action.

## III.    APPLICABLE LEGAL STANDARD

Defendants seek transfer pursuant to 28 U.S.C. § 1631.  That statute provides for transfer "if three conditions are met: (1) the transferring court lacks jurisdiction; (2) the transferee court could have exercised jurisdiction at the time the action was filed; and (3) the transfer is in the interest of justice."  *Cruz-Aguilera v. I.N.S.*, 245 F.3d 1070, 1074 (9th Cir. 2001).  Because the Federal Circuit has exclusive jurisdiction over an interlocutory appeal from an order granting or denying a motion to transfer an action to the CFC, 28 U.S.C. § 1292(d)(4)(A), the Federal

Circuit advises district courts to apply the law of the Federal Circuit when deciding such motions. *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007). The Court, therefore, applies the law of the Federal Circuit to its analysis of Defendants' motion to transfer.

By contrast, Ninth Circuit law binds the Court with respect to the merits of this case, including Defendants' motion to dismiss. Defendants move to dismiss the remaining claims for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). With respect to subject matter jurisdiction, as the party invoking federal jurisdiction, Plaintiffs "bear[] the burden of establishing" the court's jurisdiction. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). As here, when a defendant raises a facial challenge to subject matter jurisdiction rather than mounting a factual challenge to the truth of the allegations, the court is required to resolve the challenge "as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). Under this standard, plaintiff's "factual allegations must . . .suggest that the claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citation omitted).

## IV.    MOTION TO TRANSFER

Defendants move to transfer to the CFC portions of "Counts I, II, III, V, and VI to the extent they challenge the grant terminations, but not to the extent they challenge the DOE Memo." (Dkt. No. 68 at 15.)[10] As such, Defendants' motion leaves the *ultra vires* claim and Plaintiffs' challenge to the alleged policy enacted by the DOE Memo pending in the district court. The motion to transfer is denied because 28 U.S.C. § 1500 bars transfer to the CFC where a claim arising from substantially the same operative facts is pending in district court.

Section 1500 provides that the CFC "shall not have jurisdiction of any claim for or in

---

[10] Citations to page numbers refer to ECF pagination.

respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States [or its agents]." 28 U.S.C. § 1500; *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 311 (2011). "Two suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on substantially the same operative facts, regardless of the relief sought in each suit." *Tohono O'Odham*, 563 U.S. at 317. When a party seeks to transfer claims to the CFC under Section 1631, the district court must consider whether Section 1500 would have barred the CFC from exerting jurisdiction over the claims "at the time of the action brought." *United States v. Cnty. of Cook, Ill.*, 170 F.3d 1084, 1090 (Fed. Cir. 1999) (citing *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993)). If the answer to this question is yes, the claims cannot be transferred, and must proceed *seriatim* with claims going forward in the district court first, followed by the CFC second. *Id.*; *see also Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) ("*NIH*") (Barrett, J., concurring) (recognizing that "[t]wo-track litigation" may occur in which "plaintiffs will have to proceed sequentially rather than simultaneously" if there is the "requisite factual overlap").[11]

The application of Section 1500 requires a case-by-case, fact-specific analysis. Not every challenge to agency policy will automatically arise from substantially the same operative facts as those challenging the acts taken pursuant to the policy. *See NIH*, 145 S. Ct. at 2662 (Barrett, J., in concurrence stating that she was "not sure" if the requisite overlap existed in *NIH*, but if it did litigation would need to proceed in the district court first). "To determine whether the overlap" in the claims is sufficient, courts "apply the res judicata test": that is, whether the claims "would have been barred under res judicata if [they] had been brought in a district court." *Res. Invs., Inc. v. United States*, 785 F.3d 660, 665–66 (Fed. Cir. 2015). Thus, courts examine whether claims arise from the same "transaction, or series of connective transactions, . . . giving weight to such considerations as whether the facts are related in time, space, origin, or motivation." *Id.* at

---

[11] Justice Barrett's opinion in *NIH* controls. *See Pacito v. Trump*, 169 F.4th 895, 929 (9th Cir. 2026) (analyzing Justice Barrett's concurrence in *NIH* as controlling).

667 (citation omitted). If the claims are based on the same "acts" or "evidence," that is a strong indication that they arise from substantially the same set of operative facts. *Id.* at 666. It does not matter whether there are "[d]ifferent legal theories," even if those theories "depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief." *Id.* at 667. Instead, the focus is on the facts and evidence, because the aim is to "save the Government from burdens of redundant litigation," especially "[d]eveloping a factual record" through "[d]iscovery" and "preparation and examination of witnesses at trial," which is "responsible for much of the cost of litigation." *Tohono O'Odham*, 563 U.S. at 315.

Here, the portions of the claims that Defendants seek to transfer are undeniably based on substantially the same operative facts as the claims that Defendants concede must remain with this Court. Plaintiffs challenge the policy announced through the DOE Memo as an attempt to terminate the Green New Deal in contravention of Congress's instructions and in violation of constitutional principles and statutory requirements. That is the same basis for their challenge to both past and future terminations of funding pursuant to that alleged policy. Indeed, Defendants conceded at oral argument that insofar as Plaintiffs' injunctive relief request extends to preventing DOE from re-terminating the cooperative agreements for the same allegedly unlawful reasons, such relief would need to be sought in district court. (Dkt. No. 101 at 31–32.) It is beyond dispute that a claim challenging a past termination shares substantially the same factual predicate with a claim seeking to enjoin re-termination of that *same* cooperative agreement on those *same* grounds.

Moreover, the evidence needed to prove each claim is substantially the same. To understand the scope, purpose, and intended effect of the DOE Memo, Plaintiffs are in the process of obtaining discovery concerning the review process of individual cooperative agreements undertaken to implement the policy. (Dkt. No. 84.) Among other things, Plaintiffs allege that the "Standards" referenced in the DOE Memo were actually instructions to terminate Green New Deal programs. The evidence as to that central issue relies on both the materials

considered during the DOE Memo's adoption and the actual implementation of those Standards in the individual termination decisions. The factual predicate for all of Plaintiffs' claims is intertwined. There is no basis to burden the courts and the parties with litigating these claims simultaneously in two forums.

Defendants do not contest in their briefing that all of Plaintiffs' claims arise from substantially the same set of operative facts, despite Plaintiffs making the argument in their opposition brief. (*Compare* Dkt. No. 72 at 14, *with* Dkt. No. 77.) At oral argument, when Defendants were asked to confirm that they agreed the claims arose from substantially the same facts, Defendants appeared to backpedal. Noting that Justice Barrett's concurrence in *NIH* supports conducting a fact-specific analysis under Section 1500, Defendants argued for the first time that the requisite factual overlap is lacking. According to Defendants, because they seek to transfer claims requiring the payment of money pursuant to Plaintiffs' cooperative agreements, the award of such relief would require reference to the terms of those agreements, which would not otherwise be at issue in the case. (Dkt. No. 101 at 5, 8–10.) This argument is waived. *Obrien v. Bisignano*, 142 F.4th 687, 694 n.6 (9th Cir. 2025). Moreover, even if the Court were to consider this belated argument, *Tohono O'Odham* squarely prohibits relying on differences in the requested relief to avoid the restrictions of Section 1500. In that case, a tribe brought two suits against federal officials over alleged mismanagement of their assets: one suit sought equitable relief requiring an accounting of assets in district court, and another suit sought money damages in the CFC. 563 U.S. at 309–10. The Supreme Court held that the CFC lacked jurisdiction over the claim because the suits had "sufficient factual overlap," regardless of differences in the "prayer for relief." *Id.* at 317–18. Although additional evidence would presumably have been required to prove the tribe's money damages, this could not overcome the factual overlap as to liability. The Supreme Court reasoned that a party could not avoid *res judicata* by seeking additional relief requiring further evidence, and that "[r]eading [Section] 1500 to depend on the underlying facts and not also on the relief requested gives effect to the principles of preclusion law embodied in the statute." *Id.* at 316. The same logic applies here.

The motion to transfer is therefore denied.

In the alternative, Defendants move to dismiss these claims for lack of jurisdiction pursuant to 28 U.S.C. § 1491(a)(1).  If the Court were to reach the issue, the analysis below in Section V.A would likely apply and counsel in favor of denial.  However, the Court cannot reach Defendants' arguments at this time because of the automatic stay imposed by the motion to transfer.  *See* 28 U.S.C. § 1292(d)(4)(B).  Accordingly, that motion is held in abeyance and will be decided after the lifting of the automatic stay.

## V.    MOTION TO DISMISS *ULTRA VIRES* CLAIM AND CLAIMS CHALLENGING THE DOE MEMO

Defendants separately move to dismiss the claims they did not move to transfer.  The Court may reach this motion because it does not involve the portions of the claims at issue in the motion to transfer and thus does not implicate the automatic stay.

Defendants move to dismiss the *ultra vires* claim (Count IV) in its entirety and Counts I–III to the extent they challenge the DOE Memo.[12]  First, they argue that the Court lacks jurisdiction over the *ultra vires* claim because neither the APA, the Tucker Act, nor any other source provides a waiver of sovereign immunity with respect to that claim.  Second, Defendants argue that Plaintiffs lack Article III standing to challenge the DOE Memo independently from any funding termination.  Finally, Defendants argue that jurisdiction over Plaintiffs' APA challenges to the DOE Memo is lacking because the DOE Memo is not a final agency action.  None of these arguments provides a basis for dismissal.

### A.    The *Ultra Vires* Claim Belongs in This Court

Plaintiffs' *ultra vires* claim is not barred by the sovereign immunity doctrine.  Federal district courts have a long history of providing equitable relief when a plaintiff is harmed by an executive official acting unconstitutionally or in excess of their statutory authority.  *See*, *e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583–84, 589 (1952).  Although "suits

---

[12] Counts V–VI do not challenge the DOE Memo.  (Compl. ¶¶ 241–250.)

against the government are barred for lack of subject matter jurisdiction unless the government expressly and unequivocally waives its sovereign immunity," *E. V. v. Robinson*, 906 F.3d 1082, 1090 (9th Cir. 2018) (citation omitted), "(1) suits alleging that a federal official acted ultra vires of statutorily delegated authority, and (2) suits alleging that a federal official violated the Constitution"—and seeking equitable relief—are not "against the sovereign" and therefore are not barred by sovereign immunity. *Id.* at 1090–91 (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 687–90 (1949).)   The *Larson* framework continues to operate as a backstop "in cases not covered by the Section 702 waiver" of sovereign immunity under the APA. *Id.* at 1093 (collecting cases).

Plaintiffs' *ultra vires* claim is a classic *Larson* framework claim.  The Complaint alleges that Secretary Wright issued the DOE Memo, in compliance with the Executive Orders, with the intent to "eliminate entire programs" that Congress had created and funded.  (Compl. ¶ 2.) Defendants then allegedly implemented the DOE Memo by terminating and abandoning Plaintiffs' cooperative agreements, and Secretary Wright asserted that the money had been "sav[ed]," allegedly because DOE did not intend to re-allocate the funds to any other congressionally authorized program.  (Compl. ¶¶ 61, 63, 69.)  Based on these facts, the Complaint alleges that DOE and OMB, through Secretary Wright and Director Vought, took actions contrary to specific spending requirements of Congress's Appropriations Acts of 2024 and 2025 and encroached on Congress's spending power.  (Compl. ¶¶ 221–22 (citing Pub. L. No. 119-4, 139 Stat. 9 (2025); Pub. L. No. 118-42, 138 Stat. 25 (2024); Pub. L. No. 118-47, 138 Stat. 460 (2024)).)  Plaintiffs seek injunctive and declaratory relief both to reinstate the cooperative agreements to permit the ongoing work of the states in conjunction with the federal government and to enjoin the allegedly ongoing unlawful review, termination, and abandonment of these cooperative agreements.  These are remedies that would be unavailable in the CFC, which generally may award only money damages.[13]

---

[13] *Cf. Consol. Edison Co. of N.Y. v. U.S., Dep't of Energy*, 247 F.3d 1378, 1384–85 (Fed. Cir. 2001) (explaining that claims involving agreements that implicate the "relationships between

Defendants contend that Plaintiffs' claim should not be treated as a true *ultra vires* claim and should instead be collapsed into the APA contrary to law claim as a "dress[ed] up . . . statutory-authority argument."  (Dkt. No. 68 at 22 (quoting *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 682 (2025) ("*NRC*")).)  But this is not a case where Plaintiffs merely allege that Defendants erroneously "reached a conclusion which does not comport with the law" in interpreting the scope of their statutory authority.  *NRC*, 605 U.S. at 681 (citation omitted).  Rather, Defendants are alleged to have made the affirmative decision to eliminate programs despite a clear and mandatory congressional directive to fund the programs.  *See*, *e.g.*, 42 U.S.C. § 16161a(b), (c)(3)(A)(ii) (the Secretary of Energy "shall establish a program to support the development of at least 4 regional clean hydrogen hubs" including at least one that "shall demonstrate the production of clean hydrogen from renewable energy").  As such, Plaintiffs have alleged that Defendants acted "entirely in excess of [their] delegated powers" and "contrary to a specific prohibition" imposed by Congress.  *NRC*, 605 U.S. at 681 (citation omitted).  The Complaint plausibly alleges that, by requiring DOE to establish the programs at issue, Congress imposed a clear and mandatory duty prohibiting DOE from *refusing* to establish those programs, which DOE allegedly flouted.  (Compl. ¶¶ 91–98); *see also Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958) (finding a valid *ultra vires* claim because the agency violated a "clear and mandatory" directive from Congress).[14]

In addition, Plaintiffs' *ultra vires* claim plausibly alleges conduct in excess of Defendants' constitutional authority and is thus not "merely" about the scope of statutory authority.  The Complaint alleges that only Congress, not DOE, has the authority under the Appropriations and Spending Clauses to eliminate programs created and funded by Congress.

States and the Federal Government that occur over time and that involve constantly shifting balance sheets" are best heard by a district court, which can grant equitable relief).

[14] Furthermore, while "ultra vires review is [] unavailable if . . . a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review," *NRC*, 605 U.S. at 681, Plaintiffs confirmed at oral argument that their APA and *ultra vires* claims are pled in the alternative, as permitted under Federal Rule of Civil Procedure 8. Defendants did not contest the availability of alternative pleading.

(Compl. ¶¶ 92–93.)  Unlike the plaintiffs in *Dalton v. Spector*, 511 U.S. 462 (1994), on which Defendants rely, Plaintiffs identify specific provisions of the Constitution that Defendants have allegedly violated and do not base their constitutional claim solely on the notion that Defendants "necessarily" violate the Constitution by exceeding the scope of their statutory authority.  *Id.* at 473.  As such, Plaintiffs' claim is "fundamentally a constitutional one" and is cognizable on this basis as well.  *Sierra Club v. Trump*, 929 F.3d 670, 696–97 (9th Cir. 2019).[15]

Defendants also argue that the *ultra vires* claim must be dismissed because it is actually a disguised breach of contract claim that must be brought in the CFC.  As relevant here, the Tucker Act waives the government's sovereign immunity from money-damages claims "founded . . . upon any express or implied contract with the United States" exceeding ten thousand dollars and grants the CFC exclusive jurisdiction over those claims.  28 U.S.C. § 1491(a)(1); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 963 n.13 (D.C. Cir. 1982).  When claims are brought against the government under the APA's waiver of sovereign immunity, 5 U.S.C. § 702, the "damage remedy for contract claims" made available by the Tucker Act "impliedly forbids" other remedies for breach of contract claims to be provided in the district court.  H.R. REP. No. 94-1656, at 6133 (1976).

Plaintiffs' *ultra vires* claim is not brought pursuant to the APA's waiver of sovereign immunity, but under the *Larson* framework described above.  (Compl. ¶ 239.)  Nonetheless, in seeking to apply the Tucker Act to preclude Plaintiffs' claim, Defendants rely on two emergency docket orders in which the Supreme Court applied the Tucker Act to APA claims challenging grant terminations as arbitrary and capricious.  The Supreme Court determined that the APA claims seeking to reinstate the terminated grants were likely disguised contract claims that had to

---

[15] By contrast, in *Sustainability Institute v. Trump*, 165 F.4th 817 (4th Cir. 2026), the Fourth Circuit found that plaintiffs were not entitled to injunctive relief on their *ultra vires* claim but expressed no view as to whether such a claim would succeed if the plaintiffs showed that "the Government cancel[led] entire grant programs wholesale," as Plaintiffs allege occurred here.  *Id.* at 829, 833–34 (citation omitted); *see also Sustainability Inst. v. Trump,* No. 25-1575, 2025 WL 1587100, at *1–2 (4th Cir. June 5, 2025) (finding the same limited *ultra vires* claim likely belonged in the CFC).

be brought in the CFC, but in the second case, the Court found that the APA claims challenging the underlying policy pursuant to which the terminations had occurred could likely be brought in district court. *See Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) ("*California*") (per curiam); *NIH*, 145 S.Ct. at 2659–61. Despite the abbreviated analysis typical of emergency posture cases, the Supreme Court was clear that its rulings relied on the limited nature of the APA's waiver of sovereign immunity. *See California*, 604 U.S. at 651 ("[T]he APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." (citation omitted)); *NIH*, 145 S.Ct. at 2659 (Barrett, J., concurring) ("The [APA's] limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants.") (cleaned up and citation omitted). Neither case addressed how the "disguised contract" analysis would apply to non-APA claims, including constitutional and *ultra vires* claims.

Defendants offer no basis to extend those rulings to this context. The sovereign immunity analysis is fundamentally different for constitutional and *ultra vires* claims brought under the *Larson* framework. When Congress waives sovereign immunity by statute, as it did in the APA, such waivers must be "unequivocally expressed," and the presumption is against waiver. *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 290 (2012). But the presumption runs the opposite way as to Plaintiffs' claim for equitable relief under the *Larson* framework, which cannot be heard in the CFC because that court lacks authority to grant injunctive or declaratory relief. "[T]o foreclose a remedy for a constitutional violation, Congress must demonstrate its intent by 'clear and convincing evidence.'" *See Sierra Club*, 929 F.3d at 697 (quoting *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975)). The Supreme Court requires "this heightened showing . . . to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (citation omitted). Neither *NIH* nor *California* found such "clear and convincing evidence," and Defendants point to nothing suggesting that Congress intended to

apply the jurisdictional limits of the Tucker Act to traditional claims for injunctive and declaratory relief based on constitutional violations whenever those violations are allegedly carried out through termination of a government contract.[16]

Indeed, in the wake of *NIH* and *California*, lower courts have repeatedly declined to route such constitutional claims to the CFC, where injunctive relief would not be available, and thus no adequate remedy could be had. *See*, *e.g.*, *Am. Acad. of Pediatrics v. U.S. Dept of Health & Hum. Servs.*, 816 F. Supp. 3d 27, 51 (D.D.C. 2026) ("Nowhere in [*California*] or [*NIH*] does the Supreme Court hint, let alone express the view, that parties . . . have no forum in district court to hear First Amendment claims merely because the cases involve federal grants."); *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 107 (D. Mass. 2025) ("Under th[e] rules . . . set by existing Supreme Court precedent, this Court cannot conclude that core First Amendment claims or pure statutory violations fall within the exclusive jurisdiction of the Court of Federal Claims."); *City of Saint Paul*, 816 F. Supp. 3d at 71 ("The D.C. Circuit has long recognized that district courts have jurisdiction over constitutional claims, even if they arise from a contractual relationship with the government[.]"); *Cnty. of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1023 (N.D. Cal. 2025) ("Plaintiffs' claims are constitutional in nature and cannot be adequately remedied in the CFC.").

To adopt Defendants' contrary position would amount to a radical and deeply troubling contraction in the traditional role of federal district courts. For example, at oral argument Defendants' counsel took the position that if the federal government cancelled the grants of an individual who had publicly criticized the President, the grantee's sole recourse for this obvious First Amendment violation would be to seek money damages in the CFC or an injunction against *future* cancellations of additional grants in district court. (Dkt. No. 101 at 28–32.) However,

---

[16] Furthermore, "cooperative agreements, unlike procurement contracts, are not presumed to provide money damages" and in many cases do not "qualify as contracts for purposes of the Tucker Act." *Pacito*, 169 F.4th at 926–28; (Dkt. No. 72 at 16 n.2 (all but one award alleged in the Complaint was designated as a cooperative agreement).)

according to Defendants, the grantee would not be entitled to a preliminary injunction immediately restoring the status quo, no matter how significant their ongoing First Amendment injury might be. (*Id.*)  This is not the law.  Indeed, the Ninth Circuit implicitly rejected Defendants' view in *Thakur v. Trump*, when it found that a group of federal grant beneficiaries were likely to succeed on their claim that the termination of their funding violated the First Amendment and that they were entitled to preliminary injunctive relief restoring that funding. 163 F.4th 1198, 1207–08 (9th Cir. 2025).  Despite considering a jurisdictional challenge to an APA arbitrary and capricious claim, the Ninth Circuit did not question its jurisdiction to review the First Amendment claim and the relief ordered.  *Id.*[17]

To be sure, the Ninth Circuit has routed constitutional claims to the CFC when they were nominally brought under the Constitution, but the true source of the rights sought to be enforced was plainly contractual.  In *Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641 (9th Cir. 1998), the plaintiff contractor alleged that the government contract required the United States to assume liability for the plaintiff's work undertaken pursuant to the contract after its termination and thus that the United States was required to defend the plaintiff against a lawsuit for soil contamination related to such work.  *Id.* at 643–44.  Although the plaintiff styled its suit as bringing "constitutional" claims under the Public Debt Clause, the Due Process Clause, and the Takings Clause, the Ninth Circuit determined that the source of the plaintiffs' alleged rights was "the notion that the United States has some contractual obligation to [plaintiff] under the . . . [c]ontract that it has failed to satisfy."  *Id.* at 647.  In other words, it was the failure to comply with specific terms of the contract, and nothing else, that allegedly violated due process or constituted an unlawful taking.

Plaintiffs' *ultra vires* claim is not based on the terms of the parties' contract.  Plaintiffs

---

[17] Federal courts are under an ongoing obligation to consider whether they have subject matter jurisdiction.  *See Special Invs., Inc. v. Aero Air, Inc.*, 360 F.3d 989, 992 (9th Cir. 2004) (the court will raise jurisdictional issues *sua sponte* when not raised by the parties); *Dep't of Treasury-I.R.S. v. Fed. Lab. Rels. Auth.*, 521 F.3d 1148, 1152–53 (9th Cir. 2008) (Federal sovereign immunity is jurisdictional and can be raised at any time).

allege that by enacting the policy reflected in the DOE Memo and by terminating their cooperative agreements pursuant to the DOE Memo, Defendants violated various clear and mandatory directives from Congress and unlawfully exercised legislative power in violation of the Appropriations and Spending Clauses.  No contractual terms provide the basis for such a claim, which could just as easily have been brought by an affected community member or some other downstream beneficiary of the terminated programs who had no contractual relationship with the government.  Tellingly, at oral argument Defendants were unable to point to any contractual language that would strengthen or weaken the merits of Plaintiffs' claim.  (Dkt. No. 101 at 37–40.)  Moreover, as noted at oral argument, reinstatement would not require Defendants to keep paying out money under the contracts, since Defendants would be free to re-terminate the agreements and redirect the funds to other grantees satisfying the statutory mandate, so long as Defendants did so on lawful grounds.  (*Id.* at 44); *see*, *e.g.*, *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 155 F.4th 1099, 1104 (9th Cir. 2025) (denying rehearing en banc) (a claim seeking to enforce Congress's directive to fund representation for unaccompanied minors in immigration proceedings was not a disguised contract claim, because, among other things, the government could continue the funding via a different contract).  The *ultra vires* claim is not a contract claim.[18]

In sum, Plaintiffs have plausibly alleged an *ultra vires* claim that is well within the traditional bounds of the district courts' jurisdiction to issue equitable relief, and the claim is not fairly recharacterized as either a disguised "APA" claim or a disguised "contract" claim.

---

[18] Even if Plaintiffs' claims were analyzed under the APA's sovereign immunity waiver framework, the result would be the same.  That test considers two factors: (1) "the source of the rights upon which" plaintiffs base their claims, and (2) "the type of relief sought."  *Megapulse*, 672 F.2d at 968–71.  The first factor is dispositive.  For the reasons explained above and in Section V.B, the source of Plaintiffs' rights is the Constitution and federal statutes, and Plaintiffs seek injunctive relief from ongoing review, termination, and abandonment of their cooperative agreements, a remedy that is unavailable in the CFC.  A breach of contract claim for money damages in the CFC would be an inadequate legal remedy for that ongoing harm.

### B.     Plaintiffs Have Standing to Assert Their Challenges to the DOE Memo

Article III standing requires that three conditions be satisfied:  (1) plaintiff has suffered an "injury in fact," (2) that injury is "fairly traceable" to defendant's conduct, and (3) the "requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  An injury-in-fact must be "concrete, particularized, and imminent," not "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (citation omitted).

Defendants first contend that if Plaintiffs' challenge to the terminations are sent to the CFC, then any stand-alone challenge to the DOE Memo is irredressable.  (Dkt. No. 68 at 18–19.) The Court has already held that none of Plaintiffs' claims will be transferred to the CFC at this time, rendering this argument moot.  But even if that were not the case, Defendants' argument is inconsistent with *NIH*, which found that grantees' challenges to a policy that resulted in the cancellation of their grants could likely proceed independently of their challenge to the cancellations themselves.  *NIH*, 145 S.Ct. at 2661 (Barrett, J., concurring).[19]  The same is true here.  Irrespective of any individual funding termination, Plaintiffs have plausibly pled that vacating the DOE Memo would redress ongoing harms stemming from Plaintiffs' alleged inability to fairly compete for funding for their planned projects as well as harm from ongoing review, abandonment, and termination of Plaintiffs' current projects pursuant to the DOE Memo. (Compl. ¶¶ 56, 63–66, 69, 83–85.)

Defendants also argue that Plaintiffs have not shown entitlement to injunctive relief because any future harm is speculative.  This argument ignores the allegations of the Complaint. Plaintiffs allege that many cooperative agreements are in limbo: not formally terminated, yet not being paid out.  (*See, e.g., id.* ¶¶ 84–85, 128–29.)  The prospective relief that Plaintiffs seek, such as enjoining DOE's ongoing review under the DOE Memo and its resulting ongoing "abandonment" of cooperative agreements, would redress non-speculative injuries that arise

---

[19] Standing is a jurisdictional prerequisite, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and must be considered even if not raised by the parties.

from these allegedly abandoned awards.  Additionally, Plaintiffs are states and allege that billions of dollars of IRA and IIJA funding is at risk, funding that frequently flows through states to arrive at the target project.  (*Id.* ¶¶ 42–47, 50.)  In light of the directive in the Executive Order to "[t]erminat[e] the Green New Deal" and to stop disbursing all funds under the IRA and IIJA, and Secretary Wright's statement indicating that withheld money would be "sav[ed]" rather than reallocated, Plaintiffs have plausibly pled a certainly impending injury with respect to ongoing project funding.

Finally, on reply, Defendants argue for the first time that because some Plaintiffs allege that they have availed themselves of the "informal adjudication processes available to DOE grant recipients," any "adjudication of the lawfulness of those proceedings is accordingly prudentially unripe for review."  (Dkt. No. 77 at 9.)  This non-jurisdictional argument is waived.  *Obrien*, 142 F.4th at 694 n.6; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) ("*SBAL*") (explaining that where plaintiff had Article III standing, any remaining ripeness challenges were "prudential," not jurisdictional).  Moreover, the Supreme Court has questioned the "continuing vitality of the prudential ripeness doctrine" in light of federal courts' "virtually unflagging" obligation "to hear and decide cases within [their] jurisdiction."  *SBAL*, 573 U.S. at 167 (citation omitted).  The Court declines to reach this argument, especially given the insufficient briefing regarding "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

### C.      Plaintiffs Have Plausibly Alleged that the DOE Memo Is a Final Agency Action

Defendants argue that the Court "lacks jurisdiction over the DOE Memo" because it is not a final agency action.  (Dkt. No. 68 at 20.)  "[Section] 704's 'final agency action' limitation applies only to APA claims." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017).  Therefore, as a threshold matter, Defendants' argument does not apply to Plaintiffs' constitutional and *ultra vires* claims, which do not rely on the APA for their cause of action.

21

As to Plaintiffs' APA claims (Counts II–III), two requirements must be met for the DOE Memo to be a final agency action within the meaning of the APA. "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (citation omitted). A court may, under the APA, "intervene in the administration of the laws only when, and to the extent that, a specific final agency action has an actual or immediately threatened effect." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990). But where a final agency action is identified, a court is authorized to grant relief sufficient to remedy the harm, even if it would affect an entire "program." *Id.* at 890 ("Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns.").

Plaintiffs have plausibly alleged that both prongs of *Bennett* are met here. First, the Complaint alleges that the issuance of the DOE Memo marked Defendants' final determination to enact a policy to terminate the Green New Deal. (Compl. ¶¶ 2–5.) The finality of the decision is reflected in the allegations regarding DOE's press statement issued contemporaneously with the Memo, which "announc[ed]" the agency's "new policy." (*Id*. ¶ 58.) The press release states that, "[t]o comply with the Secretary's memorandum, the DOE has begun requesting additional information needed to evaluate 179 awards," with further review to follow.[20] The language used in the DOE Memo itself is also not tentative or interlocutory in nature. It describes the "policy" of DOE to conduct a review and states that "[i]f it is determined that a project meets Standards, then those projects will proceed. If it is determined that projects do not meet Standards, DOE may modify the project or, DOE in its discretion, may terminate the project . . ."[21] Consistent

---

[20] https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful.

[21] *Id.*

with this policy, Plaintiffs allege that they received termination letters issued pursuant to the DOE Memo without any further communication from DOE or opportunity to advocate for their projects.  In essence, Plaintiffs plausibly allege that the Memo was DOE's "last word on the matter."  *Whitman v. Am. Trucking Ass'n,* 531 U.S. 457, 478 (2001).

It is notable that the DOE Memo has little to say about how the review process will be carried out or how and when the Green New Deal programs will be terminated.  But the fact that many of the details of a policy remain unwritten does not make the policy non-final.  *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (collecting cases finding that "[a]gency action . . . need not be in writing to be final and judicially reviewable").  Plaintiffs allege that the DOE Memo reflects DOE's decision to "eliminate congressionally established energy and infrastructure programs and rescind their funding."  (Compl. ¶ 5.)  This alleged purpose is consistent with the Executive Orders that preceded the DOE Memo and the subsequent termination decisions and public statement made by Secretary Wright.  (*Id*. ¶¶ 50, 58, 60–61.)  In short, Plaintiffs have sufficiently alleged a consummation of agency decision-making.  *See*, *e.g.*, *New York v. Trump*, 171 F.4th 1, 17–18 (1st Cir. 2026) (finding that plaintiff states could challenge "discrete, agency-wide categorical freeze[s] that each of the Agency Defendants allegedly put in place" as final agency actions).

As to the second prong, Plaintiffs plausibly plead that legal consequences flow from the DOE Memo.  Pursuant to the DOE Memo, the Complaint alleges that Plaintiffs' cooperative agreements were subject to a new (and largely undefined) set of "Standards," against which they would be measured, and would be terminated if they did not meet Standards.  Plaintiffs allege that Green New Deal programs would not be able to pass Standards because the administration has a "fundamental disagreement with the programs' policy underpinnings."  (Compl. ¶ 5.)  Where an agency establishes conditions on funding eligibility, which the Standards are plausibly alleged to be, the agency has taken action "from which legal consequences flow."  *Bennett*, 520 U.S. at 177–78.

In sum, Plaintiffs have plausibly alleged a final agency action, and they are therefore

plausibly entitled to relief from that action.

## VI.    CONCLUSION

For the reasons stated above, the motion to transfer is **DENIED** and the motion to dismiss in the alternative is held in abeyance and will be decided after the lifting of the automatic stay.  The motion to dismiss the remaining claims not subject to the motion to transfer is **DENIED**.

**IT IS SO ORDERED.**

Dated: July 2, 2026

RITA F. LIN
United States District Judge